## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NEIMAN MARCUS GROUP LTD LLC, *et al.,*[1] | ) | Case No. 20-32519 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY
## MOTION FOR ENTRY OF INTERIM
## AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
## PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS,
## (B) LIEN CLAIMANTS, (C) CUSTOMS AND REGULATORY CLAIMANTS,
## AND (D) 503(B)(9) CLAIMANTS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
## PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 8, 2020, AT 1:00 P.M. (CENTRAL TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN MAY 8, 2020.**
>
> **PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**
>
> **IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832) 917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION.   THE INTERNET SITE IS WWW.JOIN.ME.   PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.

ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING".   THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGEJONES".   THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER.   PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".

HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING.   YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:

1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;

2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;

3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;

4) SELECTING "VIEW HOME PAGE" FOR JUDGE DAVID R. JONES;

5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"

6) SELECT NEIMAN MARCUS GROUP LTD LLC, ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS, AND

7) AFTER SELECTING NEIMAN MARCUS GROUP LTD LLC, ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.

SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

## **Relief Requested**

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) certain essential

---

[2]   The facts and circumstances supporting this motion are set forth in the *Declaration of Mark Weinsten, Chief Restructuring Officer of Neiman Marcus Group LTD LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on May 7, 2020 (the "Petition Date") and incorporated by reference herein.   Capitalized terms used but not immediately defined in this motion shall have the meanings assigned to them elsewhere in this motion or in the First Day Declaration, as applicable.

vendors and service providers (each, a "Critical Vendor"), in an amount not to exceed $25 million on an interim basis and $50 million on a final basis, (ii) shippers, warehousemen, and other lien claimants (each, a "Lien Claimant"), (iii) customs and regulatory claimants (the "Customs and Regulatory Claimants"), and (iv) vendors whose claims may be entitled to priority under section 503(b)(9) of the Bankruptcy Code (each, a "503(b)(9) Claimant" and, together with the Critical Vendors, the Lien Claimants, and the Customs and Regulatory Claimants, the "Trade Claimants"); (b) confirming the administrative expense priority status of Outstanding Orders; and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days following the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 363, 503(b), 507, 1107(a), 1108, and 1129 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rules 1075-1 and 9013-1 of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## Background

5.      For over 100 years, the Debtors have been the leader in retail luxury, innovation, and customer experiences.  Since opening in 1907 with just one store in Dallas, Texas, the Debtors have strategically grown to 67 stores across the United States, including their marquee luxury Neiman Marcus and Bergdorf Goodman locations, Horchow e-commerce website, and off-price Last Call stores.  Each Neiman Marcus and Bergdorf Goodman store offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.  Horchow offers luxury home furnishings and accessories, and Last Call provides a more affordable option for price-sensitive yet fashion-minded customers.  To complement its store footprint, NMG operates the largest luxury e-commerce platform in the world.  More than 30 percent of NMG's total annual revenue is from online sales.  The Debtors' non-Debtor affiliates own and operate a single store under the THERESA brand and an e-commerce platform under the Mytheresa brand.  As of the Petition Date, the Debtors have funded-debt obligations of approximately $5.5 billion.

6.      The Debtors commenced these chapter 11 cases in the face of the unprecedented global COVID-19 pandemic with the goal of stabilizing the Debtors' business and maximizing the value of the enterprise for stakeholders.  In the face of these catastrophic headwinds, the Debtors have obtained financial commitments from key stakeholders to enable the Debtors to satisfy their postpetition obligations and beyond, and support from these same key stakeholders for a pre-negotiated transaction pursuant to the Restructuring Support Agreement, filed contemporaneously herewith.  The Restructuring Support Agreement includes commitments from holders of over 77% of the Debtors' Extended Term Loans, over 99% of the Debtors' Second Lien Notes, and over 69% of the Debtors' Third Lien Notes to equitize their debt and to

backstop the full amount of a proposed $675 million new-money debtor-in-possession financing facility and a $750 million committed exit financing facility.  Through the Debtors' diligent and timely efforts to implement the transaction, the Debtors seek to deleverage their balance sheet by approximately $4 billion and emerge from chapter 11 as a stronger, better-capitalized enterprise.

7.      On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**<u>Trade Claims Overview</u>**

8.      The Debtors operate in the highly competitive business of selling high-end footwear, apparel, accessories, furniture, and home goods to customers worldwide.  In addition, the Debtors operate an expansive, full-service restaurant and beverage business.  The Debtors' ability to generate income is dependent on the Debtors' sale of a broad range of carefully curated third-party and private label merchandise (the "<u>Merchandise</u>").  Customers choose to shop with the Debtors to obtain a distinctive experience—in some instances, the Debtors are the exclusive distributor for highly sought after designers—and continued partnership with these and other non-exclusive designers and brand partners is tantamount to the success of the Debtors' business.

9.      To accomplish this, the Debtors operate a national network of stores under the Neiman Marcus, Last Call, and Bergdorf Goodman brands, which consists of approximately 67 stores located throughout the United States.  In addition, the Debtors operate four e-commerce

websites, including neimanmarcus.com, lastcall.com, bergdorfgoodman.com, and horchow.com. It is essential that the Debtors stores and their distribution and fulfillment centers replenish their inventories with the Merchandise that the Debtors' customers have grown to expect.  Likewise, the Debtors must maintain relationships with these brands and brand vendors.  Without this Merchandise and these key relationships, the Debtors' business would suffer greatly.

10.     As of the Petition Date, the Debtors owe approximately $199.8 million on account of all accounts payable to the Debtors' trade creditors.  By this motion, the Debtors are only seeking authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $42.5 million on an interim basis on account of prepetition claims held by certain Trade Claimants and accrued in the ordinary course of business (collectively, the "Trade Claims").  The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Trade Claims that are critical to maintaining the supply chain.  Notably, the Debtors are generally not proposing to pay the Trade Claims—even those of Critical Vendors—in full.  The following table summarizes the types of claimants that the Debtors request authority to pay pursuant to this motion:

| Category | Description of Claims | Estimated Total Amount Outstanding as of the Petition Date | Amount Sought to Be Paid | Estimated Amount Due Within Interim Period |
|---|---|---|---|---|
| Critical Vendors | Vendors that supply goods or services, including but not limited to Merchandise, that the Debtors rely upon to continue day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business | $88.6 million | $50 million | $25 million |
| Lien Claimants | Claimants that may assert shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid | $12.4 million | $12.4 million | $12.4 million |
| Customs and Regulatory Claimants | Holders of claims related to the importation of goods, including customs charges | $115,000 | $115,000 | $115,000 |

| 503(b)(9) Claimants | Suppliers of goods that may be entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code | $10 million | $10 million | $5 million |
|---|---|---|---|---|
| **Total Trade Claims** | | $111.1 million | $72.5 million | $42.5 million |
| **Total as Percentage of Total Accounts Payable** | | 55.6% | 36.3% | 21.3% |

## I.     The Critical Vendors.

11.     As stated, the Debtors operate in the highly competitive, luxury fashion business. Accordingly, it is essential to the success of the Debtors' restructuring efforts that they be able to maintain the level of service and the supply of brand-name goods that customers have come to expect from the Neiman Marcus experience.  If the Debtors' services and offerings fail to meet customers' expectations, these customers may move on to the Debtors' competitors to the detriment of the Debtors' estates.

12.     In light of these concerns, the Debtors have identified Critical Vendors that supply products and services that are vital to the Debtors' go-forward operations. These products and services generally fall into the following categories (collectively, the "Critical Vendor Products and Services"):  (a) Merchandise vendors and (b) expense vendors.

13.     Most of the Critical Vendor Products and Services are available from only a limited number of vendors given the emphasis on name brands in the Debtors' business.  Further, not only do the Debtors rely heavily on the Critical Vendors to deliver current orders, but they also rely on their relationships with such Critical Vendors for future supply.  In other words, more than the current orders would be at risk if these Critical Vendors are not paid—the Debtors could lose entire relationships, including exclusive rights to future seasons' design lines and non-exclusive rights to other highly sought-after designers.  Further, given that the Debtors' inventory is carefully curated to suit the Debtors' customers' needs, in some cases there may be

7

no true replacement available if a relationship with a Critical Vendor falters.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' estates given the extensive planning that goes into designing product lines in advance of each season.  Accordingly, any interruption in the provision of such Critical Vendor Products and Services could jeopardize sales.

14.     Moreover, the Debtors believe that jeopardizing their relationships with the Critical Vendors and attempting to procure the Critical Vendor Products and Services from replacement vendors, if possible, would impose a severe strain on their business operations and would likely result in significant revenue loss.  Even a temporary interruption of the provision of Critical Vendor Products and Services would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' operations and, particularly, on the ability of the Debtors to maintain business-as-usual.

15.     Prior to the Petition Date, and in the face of unprecedented business disruptions due to the global COVID-19 pandemic, the Debtors have significantly delayed payments on outstanding invoices for the Critical Vendor Products and Services.  As such, the Debtors believe that the Critical Vendors have already reached their limits, and if the Debtors further delay payments for the Critical Vendor Products and Services, the Critical Vendors may cease to supply the Critical Vendor Products and Services altogether.  Accordingly, in light of the potential for immediate irreparable consequences if the Critical Vendors do not continue to provide uninterrupted and timely deliveries of goods and services, the Debtors have determined, in the exercise of their business judgment, that payment of the prepetition claims of Critical

Vendors (the "Critical Vendor Claims") is essential to avoid costly disruptions to their operations.

## II.     The Critical Vendor Analysis.

16.     With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, *inter alia*, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.   In this process, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- the location and nationality of the vendor and the extent of its connections to the United States; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

17.     As of the Petition Date, the Debtors believe they owe the Critical Vendors approximately $88.6 million.[3]  Accordingly, by this motion, the Debtors request authorization, but not direction, to pay all outstanding prepetition obligations on account of Critical Vendor Claims, in an aggregate amount up to $50 million, but only as such amounts come due in the ordinary courses of business or as may be necessary to secure a Critical Vendor's agreement to continue business with the Debtors on Customary Trade Terms (as defined herein). The $25 million of relief requested pursuant to the Interim Order is approximately 12.5 percent of the Debtors' trade payables.

18.     The interruption of business with or absence of the Critical Vendors would reduce the efficiency of the Debtors' operations.  Any material interruption in the provision of the Critical Vendor Products and Services—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.[4]  Accordingly, to maintain stability during this critical stage of these

---

[3]   This figure does not include claims held by Lien Claimants, Customs and Regulatory Claimants, or 503(b)(9) Claimants.  Relief with respect to such claims is categorized separately as further described below.

[4]   Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

chapter 11 cases and to avoid jeopardizing the Debtors' sales and business operations going forward, the Debtors request authority to pay the Critical Vendors as described herein.

**III.    Lien Claimants.**

19.    The Debtors contract with various domestic and imported brands and manufacturers to produce or ship the Debtors' Merchandise.  These brands and manufacturers, through freight forwarders, then ship merchandise to certain warehouses that serve as the Debtors' distribution and fulfillment centers.  The Debtors operate their own warehouses and distribution centers.  The Debtors' supply chain depends on services provided by, among others, these freight forwarders, common carriers, and custom brokers (collectively, the "Shippers and Warehousemen").

20.    Certain manufacturers ship merchandise and other goods to the Debtors either "delivery duty paid" ("DDP") or "free on board" ("FOB").   Under DDP, or "domestic," arrangements, which represent most of the Debtors' shipping arrangements, the vendor pays to ship goods to a U.S.-based warehouse, and title to the merchandise and goods does not pass to the Debtors until it arrives at the warehouse.   Under a FOB, or "import," arrangement, the Debtors pay freight forwarders to transport merchandise and other goods from abroad to a U.S.-based warehouse, and title passes to the Debtors when merchandise and goods are loaded for shipment to the United States.   Under either arrangement, vendors transporting the goods may refuse (and have in the past refused) to release merchandise or other goods for shipment if they are not paid current.   As of the Petition Date, the Debtors estimate that approximately $11.7 million are due and owing to Shippers and Warehousemen.

21.    The Debtors routinely transact business with a number of third-party contractors that may be able to assert a variety of statutory, common law, or possessory liens against the

Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Third-Party Contractors"). These Third-Party Contractors perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' stores, maintenance and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating equipment, and other repair, renovation, or construction of the facilities and property therein.

22.     Non-payment of Third-Party Contractors could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors. Any of these contingencies would affect the Debtors' anticipated costs and disrupt their business. As of the Petition Date, the Debtors estimate that approximately $725,000 of prepetition obligations remain due and outstanding to Third-Party Contractors.

23.     Under certain non-bankruptcy laws, Lien Claimants (including, but not limited to, Shippers and Warehousemen and Third-Party Contractors) may be able to assert liens on the goods in their possession to secure payment of the charges or expenses incurred in connection with these prepetition obligations (collectively, "Lien Claims"). Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such possessory liens and refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed. The Lien Claimants' possession (and retention) of the Debtors' goods and supplies would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases. The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims. Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

24.     Thus, to maintain access to Merchandise that is essential to the continued viability of the Debtors' retail operations and preserve the value of the Merchandise, the Debtors seek authority to pay outstanding amounts owed to Lien Claimants.  As of the Petition Date, the Debtors estimate that they owe an aggregate amount of approximately $12.4 million on account of Lien Claims, approximately $12.4 million of which will come due within 21 days following the Petition Date.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

## IV.     Customs and Regulatory Claimants.[5]

25.     As described in greater detail above, in the ordinary course of their business, the Debtors import Merchandise from foreign countries.  Timely receipt or transmittal, as applicable, of imported Merchandise is critical to the Debtors' business.  Any disruption or delay could adversely affect the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

26.     In connection with the importation of goods, the Debtors may be required to pay various charges (the "Customs and Regulatory Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, U.S. Fish and Wildlife Service charges, and other similar obligations.  Absent such payments, the Customs and Regulatory Claimants may interfere with the transportation of the Debtors' Merchandise.

---

[5]     The Debtors maintain a customs bond with the United States Customs and Border Protection Agency.  Relief with respect to this bond is sought in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Surety Bond Program and (II) Granting Related Relief*, filed contemporaneously herewith.

27.     If the flow of the Debtors' Merchandise were to be interrupted, the Debtors may be deprived of the inventory necessary to stock the racks and shelves in their stores or fulfill online orders, thereby reducing profits.  The ultimate value of such sales is worth far more to the Debtors (both in terms of future receipts and the maintenance of valuable customer goodwill) than the aggregate amount of incurred, but unpaid, Customs and Regulatory Charges.  Accordingly, the Debtors seek authority to pay any and all necessary and appropriate Customs and Regulatory Charges incurred on account of prepetition transactions.

28.     The Debtors estimate that, as of the Petition Date, they owe approximately $115,000 on account of Customs and Regulatory Charges, approximately $115,000 of which will come due within 21 days following the Petition Date.  For the foregoing reasons, the Debtors submit that payment of the Customs and Regulatory Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

## V.     503(b)(9) Claimants.

29.     The Debtors may have received certain inventory, goods, or materials from various vendors within the twenty-day period immediately preceding the Petition Date (collectively, the "503(b)(9) Claimants"), thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' business is dependent on the steady flow of inventory to stock their stores.

30.     Further, some of the 503(b)(9) Claimants supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing operations—including merchandise necessary to stock the shelves in Debtors' stores and warehouses and custom-order goods that customers have already paid for (including wedding dresses).  Moreover, even though the manufacture of certain merchandise is completed, the 503(b)(9) Claimants may refuse to ship unless the Debtors pay some or all of the claims owing to such vendors.  Without the flow of fresh merchandise, the Debtors' businesses will effectively starve.  In the lead up to the Debtors' chapter 11 cases, the Debtors experienced strained relationships with certain of their vendors who may qualify as 503(b)(9) Claimants, which has made the Debtors acutely aware of the risk their business may face without the requested relief.

31.     In light of these consequences, the Debtors concluded that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.  The estimated amounts owing to the 503(b)(9) Claimants set forth below pale in comparison to the potential damage to the Debtors' businesses if the Debtors' operations were to experience significant disruption.  The Debtors believe that as of the Petition Date, they owe approximately $10 million on account of goods delivered within the twenty days immediately preceding the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, approximately $5 million of which will come due within 21 days following the Petition Date.

**VI.     Customary Trade Terms Condition.**

32.     Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in return for paying the Trade Claims either in full or in part, the Debtors propose that they be authorized to require the

Trade Claimants to provide favorable trade terms for the postpetition procurement of their goods and services.   Specifically, the Debtors seek authorization, but not direction, to condition payment of Trade Claims upon each Trade Claimant's agreement to continue—or recommence—providing goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the twelve months prior to the Petition Date, or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms").   The Debtors also seek authorization, but not direction, to require certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached hereto as **Exhibit A** (the "Trade Agreement").

33.      In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this motion and thereafter ceases to provide goods and services in accordance with the Customary Trade Terms:  (a) the Debtors may take any and all appropriate steps to recover from such Trade Claimant any payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such party; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; and (c) if an outstanding postpetition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to such outstanding postpetition balance, and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

16

## VII.   Outstanding Orders.

34.     Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods, including custom-order goods that customers have already paid the Debtors for, that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  In fact, interactions with certain vendors in the lead up to these chapter 11 cases have made the Debtors particularly sensitive to this risk.  To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

## Basis for Relief

## I.     The Court Should Authorize the Payment of the Trade Claims.

35.     Courts have generally acknowledged that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also In re Scotia*

17

*Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21, 2007) (outlining the factors for when a critical vendor payment is necessary); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

36.    Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *See, e.g.*, *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations. In such instances, it is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or

enhancement of the estate."); *In re CEI Roofing, Inc.*, 315 B.R. at 56 (citing *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)); *In re Mirant Corp.*, 296 B.R. 427.

37.     No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition trade claims.  Indeed, the above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

38.     Moreover, courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim."  *In re CoServ, L.L.C.*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *id*., and also when the payment was to "sole suppliers of a given product."  *Id*. at 498.  Courts in the Fifth Circuit, including the Southern District of Texas have followed *CoServ*'s three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ, L.L.C.*, 273 B.R. at 498; *see also In re Scotia Dev., LLC*, 2007 WL 2788840, at *2; *In re Mirant Corp.*, 296 B.R. at 429–30.

39.     Moreover, allowing the Debtors to pay the Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtors' business and

maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing property available to satisfy creditors"). Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this motion. *See In re CoServ*, *L.L.C.*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

40.     As described above, the Debtors require a steady stream of goods and services from their Critical Vendors to maintain operational stability while simultaneously transitioning into chapter 11. Without the goods and services provided by the Critical Vendors, the Debtors could be forced to halt production immediately while they search for substitute vendors and service providers and may have to forego existing favorable trade terms in their haste to find new vendors. Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of these businesses, which could impair stakeholder value at this critical juncture in these chapter 11 cases. Accordingly, the Debtors submit that it is appropriate for the Court to authorize the Debtors to engage in discussions with counterparties that may qualify as Critical Vendors regarding the validity and amount of their respective claims and to determine whether any such counterparties qualify as Critical Vendors and, subject to entry of the Final Order, for the Court to authorize the Debtors to satisfy the Trade Claims as set forth herein.

**II.     Failure to Make Timely Payment of the Lien Claims Would Threaten the Debtors'
Ability to Operate and May Subject the Debtors' Assets to the Perfection of Liens.**

41.     As noted above, certain Lien Claimants may be entitled under applicable
non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in
their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code)
in an attempt to secure payment of their prepetition claim.   Under section 362(b)(3) of the
Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of
the Bankruptcy Code, is expressly excluded from the automatic stay.[6]   As a result, the Debtors
anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn
over goods in their possession, or stop performing their ongoing obligations.   Even absent a valid
lien, to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment,
or products, mere possession or retention could disrupt the Debtors' operations.

42.     Furthermore, paying the Lien Claims should not impair unsecured creditor
recoveries in these chapter 11 cases.   In instances where the amount owed to a Lien Claimant is
less than the value of the goods that could be held to secure a Lien Claimant's claim, such party
may be a fully-secured creditor of the Debtors' estates.   In such instances, payment now only
provides such party with what they might be entitled to receive under a plan of reorganization,
without any interest costs that might otherwise accrue during these chapter 11 cases.
Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into
bankruptcy and the ultimate delivery and sale of inventory in the Debtors' stores.

---

6     *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally
      applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires
      rights in such property before the date of perfection").

**III.    The Court Should Authorize the Payment of Customs and Regulatory Charges.**

43.    Customs and Regulatory Charges would likely be paid in full under any plan of reorganization pursuant to Bankruptcy Code section 507(a)(8), which provides eighth priority status to the claims of a governmental unit based on a customs duty arising out of the importation of certain merchandise.  Thus, payment of the Customs and Regulatory Charges as proposed in this motion merely accelerates the distribution that the import providers would receive in any event upon confirmation of a plan.  Therefore, granting this motion with respect to the Customs and Regulatory Charges would have no substantial effect on the relative distribution of the estates' assets.

**IV.    The Court Should Authorize the Payment of 503(b)(9) Claims.**

44.    Additionally, section 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within [twenty] days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise.  Moreover, the timing of such payments also lies squarely within the Court's discretion.  *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").  The Debtors' ongoing ability to obtain inventory and other goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment

and not the ultimate treatment of such claims—the Debtors could be denied access to the inventory and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

**V.   The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized.**

45.    Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estates postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

46.    Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.  The disruption to the continuous and timely flow of critical raw materials and other goods to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

47.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and debtor in possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Emergency Consideration**

48.     Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion.  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

24

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

49.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

50.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to

the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Notice**

51.     The Debtors will provide notice of this motion to:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Term Loan Lender Group; (d) counsel to the Noteholder Group; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Trade Claimants; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested in this motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
May 7, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                kpeguero@jw.com
                vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Chad J. Husnick, P.C. (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          anup.sathy@kirkland.com
                chad.husnick@kirkland.com

-and-

Matthew C. Fagen (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on May 7, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Exhibit A**

**Form Trade Agreement**

**THIS TRADE AGREEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN. ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR ANY SUCH CHAPTER 11 PLAN. THE INFORMATION IN THIS TRADE AGREEMENT STATEMENT IS SUBJECT TO CHANGE. THIS TRADE AGREEMENT STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**TRADE AGREEMENT**

Neiman Marcus Group LTD LLC (the "Company"), on the one hand, and the supplier identified in the signature block below (the "Supplier"), on the other hand, hereby enter into the following trade agreement (this "Trade Agreement") dated as of the latest date in the signature blocks below.

**Recitals**

WHEREAS on May 7, 2020 (the "Petition Date"), Neiman Marcus Group LTD LLC and certain of its indirect and direct subsidiaries and related entities (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

WHEREAS on [●], 2020, the Court entered its [*Interim*] *Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (a) Critical Vendors, (b) Lien Claimants, (c) Customs and Regulatory Claimants, and (d) 503(B)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "[Interim] Trade Claimant Order") [Docket No. [●]] authorizing the Debtors on [an interim] basis, under certain conditions, to pay the prepetition claims of certain suppliers, including the Supplier, subject to the terms and conditions set forth therein.[1]

WHEREAS prior to the Petition Date, the Supplier delivered goods to the Company and/or performed services for the Company, and the Company paid the Supplier for such goods and/or services, according to Customary Trade Terms (as defined herein).

WHEREAS the Company and the Supplier (each a "Party," and collectively, the "Parties") agree to the following terms as a condition of payment on account of certain prepetition claims the Supplier may hold against the Company.

**Agreement**

1.    Recitals. The foregoing recitals are incorporated herein by reference as if set forth at length herein.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the [Interim] Trade Claimant Order.

2.     Supplier Payment.     The Supplier represents and agrees that, after due investigation, the sum of all amounts currently due and owing by the Company to the Supplier is $[__] (the "Agreed Supplier Claim").     Following execution of this Trade Agreement, the Company shall, in full and final satisfaction of the Agreed Supplier Claim, pay the Supplier $[__] on account of its prepetition claim (the "Supplier Payment") (without interest, penalties, or other charges), as such invoices become due and payable.

3.     Agreement to Supply.

a.     The Supplier shall supply goods to and/or perform services for the Company, and the Company shall accept and pay for goods and/or services from the Supplier (to the extent the Company seeks such services), for the duration of the Debtors' chapter 11 cases based on the following terms (the "Customary Trade Terms"):  those trade terms at least as favorable to the Company as those practices and programs (including credit limits, pricing, cash discounts, timing of payments, allowances (as may be incorporated or contemplated by any agreements between the Parties or based on historic practice, as applicable), product mix, availability, and other programs) in place in the 180 days prior to the Petition Date, or are otherwise acceptable to the Company in light of customary industry practices, except for any partial payments or other payments (or assurances) the Company made with respect to any unfinished product.  "Duration of the Debtors' chapter 11 cases" means the earlier of:  (i) the effective date of a chapter 11 plan in the Company's chapter 11 cases; (ii) the closing of a sale of all or a material portion of the Company's assets pursuant to Bankruptcy Code section 363 resulting in a cessation of the Company's business operations; (iii) the liquidation of the Company or conversion of the Debtor's chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; or (iv) a default under any of the Company's debtor-in-possession financing facilities that results in the Company losing access to funds available under any such facility.

b.     The Customary Trade Terms may not be modified, adjusted, or reduced in a manner adverse to the Company except as agreed-to in writing by the Parties.

c.     The Supplier shall continue to honor any existing allowances, credits, contractual obligations, or balances that were accrued as of the Petition Date and shall apply all such allowances, credits, or balances towards future orders in the ordinary course of business.

d.     The Supplier shall continue all shipments of goods in the ordinary course and shall fill orders for goods requested by the Company in the ordinary course of business pursuant to the Customary Trade Terms.

4.     Other Matters.

a.     The Supplier agrees that it shall not require a lump-sum payment upon the effective date of a plan in the Company's chapter 11 cases on account of any outstanding administrative claims the Supplier may assert arising from the delivery of postpetition goods or services, to the extent that payment of such claims is not yet due.  The Supplier agrees that such claims will be paid in the ordinary course of business after confirmation of a plan pursuant to the Customary Trade Terms then in effect.  The Supplier Payment will be made concurrently with payment of other outstanding administrative claims as provided in a confirmed plan.

b.      The Supplier will not separately seek payment from the Company on account of any prepetition claim (including, without limitation, any reclamation claim or any claim pursuant to section 503(b)(9) of the Bankruptcy Code) outside the terms of this Trade Agreement or a plan confirmed in the Company's chapter 11 case.

c.      The Supplier will not file or otherwise assert against the Company, its assets, or any other person or entity or any of their respective assets or property (real or personal) any lien, regardless of the statute or other legal authority upon which the lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Supplier by the Company arising from prepetition agreements or transactions.  Furthermore, if the Supplier has taken steps to file or assert such a lien prior to entering into this Trade Agreement, the Supplier will promptly take all necessary actions to remove such liens.

5.      <u>Breach</u>.

a.      In the event that the Supplier fails to satisfy its undisputed obligations arising under this Trade Agreement (a "<u>Supplier Breach</u>"), upon written notice to the Supplier, the Supplier shall promptly pay to the Company immediately available funds in an amount equal to, at the election of the Company, the Supplier Payment or any portion of the Supplier Payment which cannot be recovered by the Company from the postpetition receivables then owing to the Supplier from the Company.

b.      In the event that the Company recovers the Supplier Payment pursuant to Section 5(a) hereof or otherwise, the Agreed Supplier Claim shall be reinstated as if the Supplier Payment had not been made.

c.      The Supplier agrees and acknowledges that irreparable damage would occur in the event of a Supplier Breach and remedies at law would not be adequate to compensate the Company.  Accordingly, the Supplier agrees that the Company shall have the right, in addition to any other rights and remedies existing in its favor, to an injunction or injunctions to prevent breaches of the provisions of this Trade Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief.  The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Trade Agreement.  The Supplier hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance, or other equitable remedies.

6.      <u>Notice</u>.

If to the Supplier, then to the person and address identified in the signature block hereto.

<u>If to the Company</u>:

Neiman Marcus Group LTD LLC
One Marcus Square, 1618 Main Street
Dallas, Texas 75201
Attn:  Tracy M. Preston
E-mail:  Tracy_Preston@neimanmarcus.com

-and-

<u>If to Proposed Counsel and Co-Counsel to the Debtors</u>:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 North LaSalle, Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attn:     Anup Sathy, P.C., and Chad J. Husnick, P.C.
E-mail:  anup.sathy@kirkland.com
              chad.husnick@kirkland.com
-and-

Kirkland & Ellis LLP
601 Lexington Avenue, New York, New York 10022
Facsimile: (212) 446-4900
Attn:     Matthew C. Fagen and Gary Kavarsky
E-mail:  matthew.fagen@kirkland.com
              gary.kavarsky@kirkland.com

-and-

Jackson Walker L.L.P.
1401 McKinney Street, Suite 1900, Houston, Texas 77010
Facsimile: (713) 752-4200
Attn:     Matthew D. Cavenaugh, Jennifer F. Wertz, Kristhy M. Peguero, and
Veronica A. Polnick
E-mail:  mcavenaugh@jw.com
              jwertz@jw.com
              kpeguero@jw.com
              vpolnick@jw.com

7.     <u>Representations and Acknowledgements</u>.   The Parties agree, acknowledge and represent that:

a.      the Parties have reviewed the terms and provisions of the Trade Claimant Order and this Trade Agreement and consent to be bound by such terms and that this Trade Agreement is expressly subject to the procedures approved pursuant to the Trade Claimant Order;

b.      any payments made on account of the Agreed Supplier Claim shall be subject to the terms and conditions of the Trade Claimant Order;

c.      if the Supplier refuses to supply goods or services to the Company as provided herein or otherwise fails to perform any of its obligations hereunder, the Company may exercise all rights and remedies available under the Trade Claimant Order, the Bankruptcy Code, or applicable law; and

d.      in the event of disagreement between the Parties regarding whether a breach has occurred, either Party may apply to the Court for a determination of their relative rights, in which event, no action may be taken by either Party, including, but not limited to, the discontinuing of shipment of goods from the Supplier to the Company, until a ruling of the Court is obtained.

8.      <u>Confidentiality</u>.  In addition to any other obligations of confidentiality between the Supplier and Company, the Supplier agrees to hold in confidence and not disclose to any party:  (a) this Trade Agreement; (b) any and all payments made by the Company pursuant to this Trade Agreement;  (c) the terms of payment set forth herein;  and  (d) the Customary Trade Terms (collectively, the "<u>Confidential Information</u>"); *provided* that if any party seeks to compel the Supplier's disclosure of any or all of the Confidential Information, through judicial action or otherwise, or the Supplier intends to disclose any or all of the Confidential Information, the Supplier shall immediately provide the Company with prompt written notice so that the Company may seek an injunction, protective order or any other available remedy to prevent such disclosure; *provided*, *further, that*, if such remedy is not obtained, the Supplier shall furnish only such information as the Supplier is legally required to provide.

9.      <u>Miscellaneous</u>.

a.      The Parties hereby represent and warrant that:  (i) they have full authority to execute this Trade Agreement on behalf of the respective Parties; (ii) the respective Parties have full knowledge of, and have consented to, this Trade Agreement; and (iii) they are fully authorized to bind that Party to all of the terms and conditions of this Trade Agreement.

b.      This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter hereof and supersedes all prior oral or written agreements between them.  This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.  Moreover, Supplier agrees to vote all claims now or hereafter beneficially owned by Supplier in favor of, and not take any direct or indirect action to oppose or impede confirmation of, any chapter 11 plan on a timely basis in accordance with the applicable procedures set forth in any related disclosure statement and accompanying solicitation materials, and timely return a duly-executed ballot to the Debtors in connection therewith, if such

chapter 11 plan provides for a treatment of any Agreed Supplier Claim that is materially consistent with this Agreement.

                c.      Signatures by facsimile or electronic signatures shall count as original signatures for all purposes.

                d.      This Trade Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

                e.      The Parties hereby submit to the exclusive jurisdiction of the Court to resolve any dispute with respect to or arising from this Trade Agreement.

                f.      This Trade Agreement shall be deemed to have been drafted jointly by the Parties, and any uncertainty or omission shall not be construed as an attribution of drafting by any Party.

[Signature Page Follows]

AGREED AND ACCEPTED AS OF THE LATEST DATE SET FORTH BELOW:

**[COMPANY]**                                    **[SUPPLIER]**


_____          _____
By: [●]                                          By:
Title: [●]                                       Title:
                                                 Address:

                                                 Date: