## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| NEIMAN MARCUS GROUP LTD LLC, *et al.*,[1] | Case No. 20-32519 (DRJ) |
| Debtors. | (Jointly Administered)<br>(Emergency Hearing Requested) |

## DECLARATION OF MARK WEINSTEN, CHIEF RESTRUCTURING OFFICER, OF NEIMAN MARCUS GROUP LTD LLC, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Mark Weinsten, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Neiman Marcus Group LTD LLC ("NMG LTD LLC"), a limited liability company organized under the laws of Delaware, and each of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "NMG"). Prior to my appointment as Chief Restructuring Officer on April 1, 2020, I served as the Debtors' Interim Chief Operating Officer, in my capacity as a Managing Director at Berkeley Research Group, LLC ("BRG"), since October 2, 2019.

2.      I have over 26 years of experience providing interim management services, including as Chief Executive Officer, Chief Operating Officer, and Chief Restructuring Officer, to distressed and transitioning companies. In those roles, I have implemented revenue enhancement,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996).  The Debtors' service address is:  One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

liquidity improvement, and cost-reduction programs.  I am generally familiar with the Debtors'
day-to-day operations, business and financial affairs, and books and records.  I submit this
declaration to assist the United States Bankruptcy Court for the Southern District of Texas
(the "Court") and parties in interest in understanding the circumstances compelling the
commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and
certain motions and applications filed today.

3.      Except as otherwise indicated, all facts in this declaration are based upon my
personal knowledge, my discussions with the Debtors' management team and advisors, my review
of relevant documents and information concerning the Debtors' operations, financial affairs, and
restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the
age of 18, and if called upon to testify, I would testify competently to the facts set forth in this
declaration.

## Preliminary Statement

4.      For over 100 years, the Debtors have been the leader in retail luxury, innovation,
and customer experiences.  Since opening in 1907 with just one store in Dallas, Texas, the Debtors
have strategically grown to 67 stores across the United States, including their marquee luxury
Neiman Marcus and Bergdorf Goodman locations, Horchow e-commerce website, and off-price
Last Call stores.  Each Neiman Marcus and Bergdorf Goodman store offers a distinctive selection
of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury
and fashion designers.  Horchow offers luxury home furnishings and accessories, and Last Call
provides a more affordable option for price-sensitive yet fashion-minded customers.   To
complement its store footprint, NMG operates the largest luxury e-commerce platform in the
world.  More than 30 percent of NMG's total annual revenue is from online sales.  The Debtors'
non-Debtor affiliates own and operate a single store under the THERESA brand and an e-

commerce platform under the Mytheresa brand.  As of the Petition Date, the Debtors have funded-debt obligations of approximately $5.5 billion.

5.      In 2019, NMG de-stressed its capital structure in a highly consensual amend-and-extend transaction with holders of over 91 percent of former unsecured notes and holders of over 99 percent of existing term loans.  This transaction afforded NMG meaningful runway and flexibility to meet its earnings targets and implement new cost-savings and business initiatives to address adverse macro trends in the retail industry, such as a general transition from brick-and-mortar to online retail channels, and a shift in consumer demographics.  Prior to February 2020, NMG was on track to meet all of its budget, earnings, and savings targets for the fiscal year ending in July 2020.  NMG also posted comparable store sales growth for seven of the ten previous quarters and significantly expanded gross margins during the last holiday season in line with its goal of profitable and sustainable growth.

6.      Then, on March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[2]  In response to COVID-19, national, state, and local governments in the United States and throughout the world imposed quarantines, social distancing protocols, and shelter-in-place orders.[3]  To protect the health and safety of NMG's customers and employees, on March 18, 2020, NMG voluntarily closed all of its stores and dramatically reduced supply chain operations.  These unprecedented events have severely impacted NMG's business and liquidity.

7.      To navigate these market conditions, NMG knew it needed to proactively address its liquidity position and capital structure.  NMG engaged Kirkland & Ellis LLP ("Kirkland") as

---

[2]   Jamie Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME (Mar. 11, 2020), https://time.com/5791661/who-coronavirus-pandemic-declaration/.

[3]   *See, e.g.*, N.Y. Exec. Order No. 202.6 (Mar. 19, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO202.6.pdf

restructuring counsel and Lazard Frères & Co. LLC ("Lazard") as investment banker to work with NMG and BRG to analyze financing needs and consider NMG's capital structure alternatives. NMG encouraged its term loan lenders and noteholders to organize and retain advisors.  An ad hoc group of lenders who collectively hold approximately 78 percent of NMG's term loan debt and 78 percent of the Company's debentures (the "Term Loan Lender Group") quickly organized and retained Wachtell, Lipton, Rosen & Katz ("Wachtell") as counsel and Ducera Partners LLC ("Ducera") as investment banker to represent the Term Loan Lender Group in negotiations with NMG.  Shortly thereafter, an ad hoc group of holders of approximately 99 percent of NMG's Second Lien Notes (as defined below) and approximately 70 percent of NMG's Third Lien Notes (as defined below) (the "Noteholder Group") also organized and retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as counsel and Houlihan Lokey, Inc. ("Houlihan") to represent the Noteholder Group in negotiations with NMG.

8.      Following several weeks of extensive, arm's length negotiations, NMG and the Term Loan Lender Group were extremely close to reaching agreement on a comprehensive, pre-negotiated restructuring that would substantially deleverage the Debtors' balance sheet, a fully-backstopped $625 million[4] postpetition financing facility (the "DIP Facility"), and a fully-backstopped $750 million exit facility (the "Exit Facility").

9.      To further the Debtors' evaluation of their capital structure alternatives and negotiations with their stakeholders, on April 28, 2020, Mariposa Intermediate Holdings LLC ("Holdings"), the Debtor parent of NMG LTD LLC, appointed disinterested manager Anthony Horton to its Board of Managers, and NMG LTD LLC appointed disinterested managers Marc Beilinson and Scott Vogel to its Board of Managers.  Holdings has retained Katten Muchin

---

[4]     The DIP Facility size has since been increased to $675 million, as discussed below.

Rosenman LLP as legal counsel to advise Mr. Horton with respect to certain matters delegated to Mr. Horton.  NMG LTD LLC has retained Willkie Farr & Gallagher LLP as legal counsel and is retaining a financial advisor to advise Mr. Beilinson and Mr. Vogel with respect to certain matters delegated to Mr. Beilinson and Mr. Vogel.  Around this time, NMG received a modified restructuring proposal from the Noteholder Group.  NMG believed that further stakeholder support for its restructuring plans would provide significant additional value to its stakeholders and actively pursued a tri-party negotiation with the Term Loan Lender Group and Noteholder Group to achieve more consensus.

10.     NMG's efforts to garner additional support for its restructuring process have borne fruit.   NMG's proposed restructuring pursuant to its restructuring support agreement (the "Restructuring Support Agreement"), a copy of which is attached as **Exhibit B**, will substantially deleverage NMG's balance sheet and allow the Debtors to emerge from these cases as a stronger, better-capitalized enterprise positioned for sustained success.  The Restructuring Support Agreement has a remarkable level of support throughout the Debtors' capital structure: holders of approximately 78 percent of the Debtors' first lien term loan debt, 99 percent of the Debtors' second lien notes debt, 70 percent of the Debtors' third lien notes debt, 78 percent of the Debtors' debentures, and 100 percent of the direct equity ownership in the Debtors have committed to support the Debtors' restructuring.  Even more support is anticipated in the coming days as parties contemplate signing joinders.

11.     The Restructuring Support Agreement is tied to the now-$675 million DIP Facility and the $750 million Exit Facility, each of which is backstopped by members of the Term Loan Lender Group (excluding holders of 2028 Debentures) and members of the Noteholder Group. The Debtors believe that the Restructuring Support Agreement puts the Debtors on the best path

to maximize stakeholder recoveries and ensure that NMG can efficiently emerge from chapter 11 and continue to fulfill its promise of leading in luxury, innovation, and customer experiences.

12.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the motions and applications filed today, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing;

- **Part V** describes the Restructuring Support Agreement; and

- **Part VI** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

### Part I: Corporate History and Operations

**A.      NMG's Corporate History.**

13.     On September 10, 1907, the first Neiman Marcus store opened its doors at the corner of Elm and Murphy in Dallas with the goal of offering style, quality, and unparalleled service.  NMG has always worked hard to provide



*The original NMG store as rebuilt after the 1913 fire.*

more than "just" shopping and in the process created experiences and traditions over the decades. For example, NMG started the first weekly retail fashion show in the 1920s.  It still sponsors fashion shows as charity events today.  In the 1930s, NMG drew national attention as the first

retailer outside of New York City to run national ad campaigns in *Vogue* and *Harper's Bazaar*. NMG has continued to reinvent the publishing of fashion with the now-traditional *Christmas Book* (1939), campaigns like the Art of Fashion (1994), and its fashion magazine *the book* (1996).


The "art museum" design of the reconstructed NMG flagship debuted in 1965.

14.    Heading into the 1940s, NMG worked to bring the industry together to celebrate fashion talent with *The Neiman Marcus Award for Distinguished Service in the Field of Fashion*—the Oscar of the fashion industry—with famous winners such as Coco Chanel and Yves Saint Laurent.    Beginning in the 1950s, NMG formalized its combination of art and style by starting the Neiman Marcus Art Collection, which includes thousands of pieces and often features local artists.  One early review from *The Dallas Times Herald* summarized it best:  "This is not a store.  It is too spacious and colorful.  It is something with beautiful clothing in it.  But it is not a store."

15.    The NMG story is not just one of history and tradition.  It is also one of resilience and growth.  NMG has rebuilt itself from the ground up *twice* due to devastating fires at its flagship location (the first in 1913 and the second in 1964).  The 1964 fire resulted in a re-imagination of what the NMG experience could be.  In 1965, NMG rebuilt its Dallas store as an "art museum for shopping."   In 1971, NMG expanded outside of Texas for the first time, building a store in Bal Harbour, Florida.  Today, there are 43 Neiman Marcus brand stores nationwide, each of which offers a distinctive selection of apparel, handbags, shoes, cosmetics, and precious and designer jewelry from premier luxury and fashion designers.

16.     Continuing with its theme of revival and expansion, in 1972, the NMG family acquired the famous Fifth Avenue landmark, Bergdorf Goodman.  The acquisition gave NMG a foothold in New York City, the sole NMG location in the nation's fashion capital until the opening of Neiman Marcus's Hudson Yards location in spring 2019.  In 1988, NMG deepened and expanded its



*Bergdorf Goodman is a landmark NYC fashion destination.*

product offerings with the acquisition of the Horchow Collection, a luxury décor and furniture brand.  In 1999, NMG took its business online, launching NeimanMarcus.com.  Since then, NMG's online platform has grown into the largest luxury e-commerce platform in the world, accounting for over 30 percent of NMG's total revenue.

17.     Presently, NMG also operates Last Call, an off-price fashion brand catering to price sensitive yet fashion-minded customers.  As part of its go-forward business model, NMG will be focusing on its full-price stores and moving away from the Last Call segment.

**B.      NMG's Business Operations.**

**1.      Customer Loyalty and Customer Service.**

18.     Neiman Marcus and Bergdorf Goodman have a longstanding heritage of providing the highest level of personalized, concierge-style service to its customers.  While many retailers have suffered in recent years given the movement away from brick-and-mortar shopping, NMG is positioned to succeed in the digital era.

19.     First, NMG has a history of rewarding loyalty.  With the 1984 roll-out of InCircle, NMG's loyalty program, NMG became the first luxury retailer to offer a customer loyalty program.  In turn, Neiman Marcus and Bergdorf Goodman customers have rewarded NMG with high levels of engagement and loyalty over the years.  Approximately 35 percent of NMG's

revenues come from status-holding InCircle rewards members.  Further, Neiman Marcus and Bergdorf Goodman have multi-year relationships with true luxury customers, as illustrated by the fact that NMG makes 40 percent of its sales from Neiman Marcus and Bergdorf Goodman to customers who spend $10,000 or more annually, with an average annual spend of $50,000.

20.     Second, Neiman Marcus and Bergdorf Goodman have always been about more than shopping.  While other brick-and-mortar stores have been ill-equipped to compete with online-only retailers, Neiman Marcus and Bergdorf Goodman stores offer a variety of in-person experiences that make every visit an immersive luxury event.  Neiman Marcus and Bergdorf Goodman stores feature stunning architecture, beautiful art, and professional and well-trained sales associates to enhance the shopping experience.  Additionally, NMG's newest location, its Hudson Yards store, includes several restaurants and bars with rich views—including the Vessel and the Statue of Liberty—as well as a kitchen with cooking and mixology demonstrations and a chocolate bar that serves wine and beer.  Other locations, feature spas with makeup, hair, nail, massage, and waxing treatments.  Neiman Marcus and Bergdorf Goodman stores also host events, including private shopping events and charity events.

21.     Third, NMG is well positioned for the digital age.  When customers want a blend of convenient, quick, and high-service access to luxury brands, Neiman Marcus and Bergdorf Goodman provide an enhanced online experience that is superior to other luxury players.  NMG operates online platforms that have 17 million visits per month and provide omni-channel services and shared inventory.  In addition, Neiman Marcus launched 65 digital stylists more than a year ago that are personal shoppers for top online customers and equipped its 5,200 sales associates with clienteling tools that allow them to sell and close a transaction digitally without requiring in-store presence.  The significant investments in IT tools and new roles to better integrate its bricks

and mortar and online operations have resulted in a better customer omni-channel experience, thereby increasing sales and gross margins.

> **2.     NMG's Brands.**

22.     NMG offers brands to provide luxury in every aspect of its customers' lives.

- ***Neiman Marcus***.   The Neiman Marcus brand caters to affluent luxury customers.   Neiman Marcus operates 43 full-line stores in marquee retail locations in major U.S. markets and its global $1 billion e-commerce platform, neimanmarcus.com.   The Neiman Marcus stores are designed to provide a modern, luxurious ambiance by blending art, architecture, and technology.  Neiman Marcus offers distinctive luxury merchandise, including women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

- ***Bergdorf Goodman***.   Bergdorf Goodman is the premier retailer of ultra-high end branded goods in the world.   Bergdorf Goodman operates primarily through its two full-line stores in landmark locations on Fifth Avenue in New York City and its global e-commerce platform, bergdorfgoodman.com and the Bergdorf Goodman App.   Bergdorf Goodman is known for its high-luxury women's couture and designer apparel, contemporary sportswear, handbags, shoes, cosmetics, men's clothing and accessories, precious and designer jewelry, home, children's apparel, and gift items.

- ***Horchow***.   Horchow is a leading online resource for luxury furniture, fine linens, and unique décor.  Horchow was founded by Roger Horchow in 1973 as the first luxury mail-order catalog without a brick-and-mortar store. Today, Horchow conducts the majority of its business through its e-commerce platform, horchow.com.

- ***Last Call***.  Last Call is the off-price segment of NMG's fashion goods business.  Customers purchase merchandise through 22 Last Call stores and its online platform, lastcall.com.  Merchandise offered under the Last Call brand primarily includes end-of-season and post-season clearance goods sourced directly from the Neiman Marcus or lower price-point merchandise purchased directly from designers.  During fiscal year 2017, NMG began assessing its Last Call footprint and closed four of its Last Call stores.  In fiscal year 2020, NMG closed two more Last Call stores, and on March 11, 2020, prior to temporarily closing all of its stores, NMG announced that it would permanently close most of its 22 remaining Last Call stores to focus on NMG's core luxury business.



23.     Under each of NMG's primary brands, NMG offers its customers a curated and compelling assortment of narrowly distributed merchandise from luxury and fashion designers, including Chanel, Gucci, Brunello Cucinelli, Tom Ford, Christian Louboutin, Valentino, Saint Laurent, Prada, Akris, David Yurman, Ermenegildo Zegna, Loro Piana, Estée Lauder, Sisley, Versace, Louis Vuitton, Goyard, and Van Cleef & Arpels.  NMG is the retail partner of choice for luxury designers as it offers access to loyal and affluent customers and adheres to strict presentation, marketing, and promotional standards.  Neiman Marcus and Bergdorf Goodman also have a long history of identifying, partnering with, and nurturing emerging designers with the potential for rapid growth.  The combined offering from established and emerging designers

ensures NMG's merchandise assortment remains unique, compelling, and relevant as fashion trends evolve.

### C.   Critical Components of the Debtors' Cost Structure.

#### 1.   Supply Chain.

24.     NMG maintains an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations and the fulfillment of orders from its e-commerce platform.  A substantial majority of NMG's merchandise is delivered to NMG from various designers as finished goods and is manufactured in numerous locations, primarily in Europe, the United States, and, to a lesser extent, Asia.  NMG's women's and men's apparel and fashion accessories merchandise categories are especially dependent upon NMG's relationships with designers.  NMG monitors and evaluates the sales performance and profitability of each designer and adjusts future purchasing decisions based on this analysis.  NMG has no guaranteed supply arrangements with its principal merchandising sources.  In addition, NMG's designer base is diverse, with only two designers representing more than five percent of NMG's merchandise-sale revenues in fiscal year 2019.  The breadth of NMG's sourcing helps mitigate risks associated with any single brand or designer.

25.     NMG manages its inventory on an omni-channel basis, and its processes and facilities are designed to optimize merchandise productivity.  For the last several years, NMG has utilized an integrated merchandising and distribution system, referred to as "NMG One." NMG One was designed to enable NMG to purchase, share, manage, and sell its inventories across its omni-channel operations and brands more efficiently.

26.     The majority of NMG's merchandise is initially received at one of its centralized distribution facilities.  NMG utilizes distribution facilities in Longview, Texas, the Dallas-Fort Worth area, Whittier, California, and Pittston, Pennsylvania, as well as two regional service centers

in the United States.   NMG's distribution facilities are linked electronically to its various merchandising teams to facilitate the distribution of goods to NMG's stores.

### 2.   Employee Compensation and Benefits.

27.     NMG employs approximately 13,201 employees, including approximately 9,545 full-time employees and approximately 3,656 part-time employees.  NMG offers its employees the ability to participate in a number of insurance and benefits programs, including health benefits, vision and dental coverage, prescription drug benefits programs, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, and other employee benefit plans.

28.     NMG also maintains a qualified defined benefit pension plan (the "Qualified Pension Plan") under the Internal Revenue Code and ERISA for certain current and former employees.  The Qualified Pension Plan has been frozen since 2008, and benefit levels were frozen for all participants in 2010.  The Qualified Pension Plan provides current and future pension benefits to approximately 10,680 participants.  As of August 2019, NMG had projected Qualified Pension Plan obligations of approximately $659 million.  NMG pays annual premiums to the Pension Benefit Guaranty Corporation in connection with the Qualified Pension Plan.

29.     Additionally, certain of NMG's employees are union members and have additional benefits governed by collective bargaining agreements.   All of NMG's union-represented employees are members of one of two unions:  (a) The New York New Jersey Regional Joint Board or (b) Service, Production, Merchandising, Wholesale, Distribution, Clerical and Health Related Services Union, Local 210.  Union employees work only at the Bergdorf Goodman brand stores or facilities and represent less than one percent of NMG's employees.

30.     As explained further in Part III, in the short term, due to the unprecedented and unforeseen disruption to NMG's business caused by COVID-19, NMG made the incredibly

difficult decision to implement temporary salary reductions and both partial and full furloughs through the duration of the pandemic.

### 3.     Real Estate Portfolio.

31.     While NMG has industry-leading e-commerce platforms, the full experience is enriched by a customer experience in one of NMG's stores.  NMG's stores are located in prime locations and feature engaging, luxury shopping environments.  NMG's stores are located within driving distance of 70 percent of high-net worth individuals in the United States.  Several locations include restaurant offerings to allow for a relaxed and extended experience.  From the beginning, NMG has focused on selling an experience.  This remains true today.  In addition to knowledgeable, professional, and well-trained sales associates, NMG's stores feature in-store events, including trunk shows by leading designers that feature the latest fashions, and exclusive shopping experiences curated for the most discerning luxury clientele.



32.     In response to the COVID-19 crisis, NMG has closely monitored local government orders and, since March 18, 2020, closed all of its retail stores to in-person shopping until further notice.  Where permitted, NMG is maintaining limited staff to fulfill online orders from store merchandise, and NMG has plans to open select stores for limited private appointments in the near term.

D.      **The Designation and Distribution.**

33.     In October 2014, NMG acquired MyTheresa, a luxury retailer headquartered in Munich, Germany ("MyTheresa").  The MyTheresa brand appeals to younger, fashion-forward, luxury customers, primarily from Europe, Asia, and the Middle East.

34.     The operations of MyTheresa have always been independent of NMG and are primarily conducted through the THERESA flagship store in Munich and the mytheresa.com website and mobile app.  The entities that operate the MyTheresa business (the "MyTheresa Operating Companies") have always been non-guarantors under NMG's debt.  They were designated as "unrestricted subsidiaries" under NMG's credit facilities in 2014 and under the indentures governing the Unsecured Notes (as defined below) in 2017 (the "Designation").  In September 2018, the MyTheresa Operating Companies were distributed to Neiman Marcus Group, Inc., the non-debtor parent of NMG ("Parent") (the "Distribution").  Kirkland advised on the Designation in 2017 and Distribution in 2018.  Upon completion of the Distribution, the MyTheresa Operating Companies were subsidiaries of Parent.

35.     In December 2018, a single purported holder of Unsecured Notes, Marble Ridge, filed suit in the District Court for Dallas County against certain Debtors and Parent alleging that the Distribution was a fraudulent transfer.  That lawsuit was dismissed with prejudice at the pleadings stage in March 2019.  Certain Debtors and Parent filed counterclaims for defamation and business disparagement against Marble Ridge.  Marble Ridge's motion to dismiss the counterclaims was denied and that decision is currently on appeal.

15



36.     In August 2019, following the successful consummation of the Recapitalization Transactions, Marble Ridge and another purported holder of Unsecured Notes replaced the indenture trustee for the Unsecured Notes.  The replacement indenture trustee immediately filed fraudulent transfer claims based on the Distribution against certain Debtors, Parent, and non-debtors MYT Parent Co. and MYT Holding Co. in New York Supreme Court.  The replacement indenture trustee also filed a tortious interference claim against certain Ares entities based on the Recapitalization Transactions.  Motions to dismiss all of those claims in their entirety were fully briefed as of the Petition Date.

       **E.      The Recapitalization Transaction.**

37.     To better position the Debtors to handle these trends and allow the Debtors to execute on their business plan, the Debtors negotiated and, in June 2019, executed a multi-step amend-and-extend transaction (such steps collectively, the "<u>Recapitalization Transactions</u>").

As part of the Recapitalization Transactions, among other things, (a) approximately $1.48 billion aggregate principal amount of validly tendered Unsecured Notes were exchanged for a combination of new Third Lien Notes and shares of MYT Series A Preferred Stock, (b) all but 0.5% of the aggregate principal amount of 2013 Term Loans (or $12.7 million) were exchanged for Extended Term Loans, and (c) the Second Lien Notes were issued in exchange for $550.0 million of new money (the proceeds of which were used to pay-down $526.9 million of Extended Term Loans).

38.    The Recapitalization Transactions were overwhelmingly supported by NMG's creditor constituents and reflected a robust and comprehensive negotiation process.  Holders of approximately 99.5 percent of the aggregate principal amount of the 2013 Term Loans and approximately 91.5 percent of the aggregate principal amount of the Unsecured Notes then outstanding consented to the Recapitalization Transactions, which extended the maturities of such obligations from 2020 and 2021 to 2023 and 2024, respectively.  The participants that consented to the Recapitalization Transactions collectively represented over $4.2 billion of outstanding 2013 Term Loans and Unsecured Notes.  The majority holder of the 2028 Debentures also consented to the Recapitalization Transactions.

39.    In addition, the participants in the Recapitalization Transactions agreed to release NMG from any and all claims relating to, among other things, the Recapitalization Transactions, the Designation, and the Distribution.  The participants also agreed to turnover provisions requiring the indenture trustees and agents, NMG, and the releasing parties, in the event that they (or their successors and assignees) receive any funds, property, or value on account of the Designation or the Distribution, to turnover any such funds, property, or value to Parent.  Parent is then required

to distribute those recoveries in accordance with a contractual waterfall applicable to the instruments issued by the newly formed MyTheresa Holding Companies (the "MYT Waterfall").

40.     The MYT Waterfall was a fundamental component of the Recapitalization Transactions.  Under the waterfall, the first $200 million of value is allocated to the holders of Second Lien Notes in respect of their limited guarantee; the next $250 million (plus accrued dividends) of value is allocated to holders of MYT Series A Preferred Stock, which was issued to former holders of Unsecured Notes in connection with the Recapitalization Transactions; the next $250 million (plus accrued dividends) of value is allocated to the holder (MYT Parent Co. and, indirectly, Parent and its equity sponsors) of MYT Series B Preferred Stock; and the remaining value is to be split equally between the holders of the Third Lien Notes (via the pledge of MYT Holding Co.'s common stock) and MYT Parent Co.  The MyTheresa Operating Companies are not contractually obligated under, and do not provide any direct credit support to, the Debtors' debt arrangements.  A key consideration in the design of the MYT Waterfall was the preservation of value and separateness of the MyTheresa business.  Kirkland advised on the Recapitalization Transactions.

41.     In September 2019, certain Debtors entered into an amendment to the credit agreement governing the Asset-Based Revolving Credit Facility to provide for the FILO Facility. Subsequent to and as a result of the Debtors' borrowing under the FILO Facility, the Debtors had no further capacity to enter into incremental facilities under the Asset-Based Revolving Credit Facility.

42.     The Recapitalization Transactions successfully extended the maturities of participating debt by three years, and provided NMG with significantly more runway to implement its transformation plan.  Indeed, prior to the COVID-19 outbreak, NMG was on track to meet all

of its budget, earnings, and savings targets for the year and had posted comparable store sales growth for seven of the ten previous quarters.

### Part II:  The Debtors' Prepetition Corporate and Capital Structure

43.    As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $5.1 billion. As further described below, the Debtors' significant funded debt obligations include: (a) a $900.0 million senior secured asset-based revolving credit facility (the "Asset-Based Revolving Credit Facility"), of which $749.0 million has been drawn; (b) a $100.0 million last-out term loan facility (the "FILO Facility"); (c) a $2,253.1 million senior secured term loan facility (the "Term Loan Facility"), which is comprised of $12.6 million outstanding of stub term loans with the original maturity date of October 25, 2020, $1,193.8 million outstanding of term loans with an extended maturity date of October 25, 2023, which pay interest entirely in cash, and $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023, which pay interest partially in cash and partially in kind; (d) $561.7 million aggregate principal amount of 14.000% Second Lien Notes due 2024 (the "Second Lien Notes"); (e) $730.5 million aggregate principal amount of 8.000% Senior Secured Third Lien Notes due 2024 (the "8.000% Third Lien Notes"); (f) $497.8 million aggregate principal amount of 8.750% Senior Secured Third Lien Notes due 2024 (the "8.750% Third Lien Notes" and, together with the 8.000% Third Lien Notes, the "Third Lien Notes"); (g) $80.7 million aggregate principal amount of 8.000% Senior Cash Pay Notes due 2021 (the "Unsecured Cash Pay Notes"); (h) $56.6 million aggregate principal amount of 8.750%/9.500% Senior PIK Toggle Notes due 2021 (the "Unsecured PIK Toggle Notes" and, together with the Unsecured Cash Pay Notes, the "Unsecured Notes"); and (i) $125.0 million aggregate principal amount of 7.125% Senior Debentures due 2028.

The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity Date | Interest Rate | Principal Amount Outstanding (in thousands) |
| --- | --- | --- | --- |
| Asset-Based Revolving Credit Facility | July 25, 2021 | variable | $749,000 |
| FILO Facility | July 25, 2021 | variable | $100,000 |
| Cash Pay Extended Term Loans | October 25, 2023 | variable | $1,193,815 |
| Cash Pay/PIK Extended Term Loans | October 25, 2023 | variable | $1,046,687 |
| 2013 Term Loans | October 25, 2020 | variable | $12,597 |
| 14.0% Second Lien Notes | April 25, 2024 | 8.0% cash / 6.0% PIK | $561,733 |
| 8.000% Third Lien Notes | October 25, 2024 | 8.000% | $730,534 |
| 8.750% Third Lien Notes | October 25, 2024 | 8.750% | $497,849 |
| 8.000% Cash Pay Notes | October 15, 2021 | 8.000% | $80,680 |
| 8.750%/9.500% Senior PIK Toggle Notes | October 15, 2021 | 8.750% | $56,584 |
| 7.125% Senior Debentures | June 1, 2028 | 7.125% | $125,000 |
| **Total** | | | **$5,154,479** |

44.     A chart summarizing the relative priorities of various stakeholders to the collateral packages described below is attached as **Exhibit C**.

A.     **The Asset-Based Revolving Credit Facility.**

45.     The Debtors are party to that certain Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement"), by and among NMG, as borrower, certain of the Debtors as co-borrowers party thereto (together with NMG, the "ABL Borrowers"), Holdings, and certain of NMG's current and future, direct and indirect, wholly owned subsidiaries (the "ABL Subsidiary Guarantors"), as guarantors, the FILO Facility lenders, Deutsche Bank AG New York Branch, as administrative agent and as collateral agent, TPG Specialty Lending, Inc., as agent for the FILO Facility lenders, and the lenders from time to time party thereto.  The Asset-Based Revolving Credit Facility has a maximum committed borrowing capacity of $900.0 million

(subject to a borrowing base) and matures on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

46.     The obligations under the Asset-Based Revolving Credit Facility are secured by substantially all of the assets of Holdings, the ABL Borrowers, and the ABL Subsidiary Guarantors, including a first-priority security interest in personal property consisting of inventory and related accounts, cash, deposit accounts, all payments received by the ABL Borrowers or the ABL Subsidiary Guarantors from credit card clearing houses and processors or otherwise in respect of all credit card charges for sales of inventory by the ABL Borrowers and the ABL Subsidiary Guarantors, certain related assets and proceeds of the foregoing (together, the "ABL Priority Collateral").

47.     In addition, the obligations under the Asset-Based Revolving Credit Facility are secured by certain other interests such as:  (a) a fourth-priority pledge of 100 percent of NMG's capital stock held by Holdings, (b) a fourth-priority security interest on certain owned and leased real property and equipment, (c) a fourth-priority security interest in Extended Term Loan PropCo (as defined below), and (d) a fourth-priority security interest in the Notes Priority Collateral (as defined below).

48.     As of the Petition Date, approximately $749.0 million in borrowings and approximately $9.3 million of letters of credit are outstanding under the Asset-Based Revolving Credit Facility, and there is approximately $141.7 million of unused commitments.  As of the Petition Date, there was extremely limited availability under the Asset-Based Revolving Credit Facility.

**B.     The FILO Facility.**

49.     The FILO Facility is governed by the ABL Credit Agreement and has a maximum committed borrowing capacity of $100.0 million, subject to a borrowing base.  The FILO Facility

matures concurrently with the Asset-Based Revolving Credit Facility on July 25, 2021 (subject to the terms of the ABL Credit Agreement).

50.    As of the Petition Date, NMG had outstanding borrowings of $100.0 million under the FILO Facility.  All obligations under the FILO Facility are guaranteed by the same entities that guarantee the Asset-Based Revolving Credit Facility and are secured by the same collateral as the Asset-Based Revolving Credit Facility, but will be last-out in payment as set forth in the FILO Credit Agreement.

**C.    The Term Loan Facility.**

51.    The Debtors are party to that Credit Agreement, dated as of October 23, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among NMG, The Neiman Marcus Group LLC, and The NMG Subsidiary LLC, as borrowers (the "Term Loan Borrowers"), Holdings and certain of NMG's current and future subsidiaries, as guarantors (the "TL Subsidiary Guarantors"), Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto.

52.    All obligations under the Term Loan Facility, and the guarantees of those obligations, are secured by substantially all of the assets of Holdings, the Term Loan Borrowers, and the TL Subsidiary Guarantors, including (a) a first-priority security interest in, and mortgages on, a significant portion of NMG's owned real property and equipment and substantially all other tangible and intangible assets of the Term Loan Borrowers, Holdings, and certain subsidiary guarantors (the "Original Term Loan Priority Collateral"); (b) a second-priority security interest in the ABL Priority Collateral; and (c) solely with respect to the Extended Term Loans (as defined herein), (i) a first priority security interest in certain future foreign assets, intercompany debt, and certain additional equity interests of new subsidiary guarantors, (ii) a first-priority security interest

22

in, and mortgages on, certain of the borrowers' and any subsidiary guarantors' owned real estate interests, real estate leasehold interests, and other real property interests ("Extended Term Loan Priority Real Estate Collateral"), (iii) a first-priority security interest in the equity interests of NMG Term Loan PropCo LLC, a special purpose entity that is a subsidiary of NMG (the "Extended Term Loan PropCo") formed solely to hold certain real estate leases constituting Extended Term Loan Priority Real Estate Collateral that cannot be mortgaged directly to secure the Extended Term Loans (as defined herein) under the Term Loan Facility (the collateral described in the foregoing subclauses (i), (ii), and (iii), together with the Original Term Loan Priority Collateral, collectively, the "Term Loan Priority Collateral"), and (iv) a third-priority security interest in the Notes Priority Collateral.

53.     As of the Petition Date, the outstanding balance under the Term Loan Facility was $2,253.1 million comprised of (a) $12.6 million outstanding of stub term loans with the original maturity date of October 25, 2020 (the "2013 Term Loans"), (b) $1,193.8 million outstanding of term loans with an extended maturity date of October 25, 2023 which pay interest entirely in cash (the "Cash Pay Extended Term Loans"), and (c) $1,046.7 million outstanding of term loans with an extended maturity date of October 25, 2023 which pay interest partially in cash and partially in kind (the "Cash Pay/PIK Extended Term Loans" and, together with the Cash Pay Extended Term Loans, the "Extended Term Loans").

       **D.     The Second Lien Notes.**

54.     In connection with the Recapitalization Transactions (as defined below), NMG, The Neiman Marcus Group LLC, Mariposa Borrower, Inc., and The NMG Subsidiary LLC (collectively, the "Notes Issuers") issued $550.0 million aggregate principal amount of Second Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Ankura

Trust Company, LLC, as trustee and notes collateral agent, and certain of the Debtors as guarantors.

55.    The Second Lien Notes and related guarantees are secured by collateral that includes (a) a second-priority security interest in the Term Loan Priority Collateral, (b) a second-priority interest in certain previously unencumbered real estate related to certain full-line Neiman Marcus stores (the "Notes Priority Real Estate Collateral") mortgageable to the collateral agent, and the equity interests of a special purpose entity and subsidiary of NMG ("Notes PropCo") formed to hold certain Notes Priority Real Estate Collateral that cannot be mortgaged directly to the collateral agent (together, the "Notes Priority Collateral") (subject to a cap on recovery equal to $200.0 million less any amounts recovered against those assets by holders of the Third Lien Notes issued in connection with the Recapitalization Transactions (as defined below)), (c) a third-priority security interest in the ABL Priority Collateral, and (d) a senior secured guarantee of up to $200.0 million by three holding companies of the MyTheresa Operating Companies—non-debtors MYT Holding Co., MYT Intermediate Holding Co., and MYT Netherlands Parent B.V.—and a first priority pledge of the assets of such guarantors subject to customary exceptions (the "Limited Guarantee Collateral").

56.    As of the Petition Date, $561.7 million in aggregate principal amount of Second Lien Notes remains outstanding.  The Second Lien Notes mature on April 25, 2024 and require semiannual coupon payments of 8.0% cash interest and 6.0% PIK interest on April 15 and October 15.  The Debtors did not pay the coupon payment due on April 15, 2020.

**E.    The Third Lien Notes.**

57.    In connection with the Recapitalization Transactions (as defined below), the Notes Issuers issued (a) approximately $730.5 million aggregate principal amount of 8.000% Third Lien Notes under the Indenture, dated June 7, 2019 (as amended, restated, amended and restated,

24

supplemented, or otherwise modified from time to time), with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors, and (b) approximately $497.8 million aggregate principal amount of 8.750% Third Lien Notes under the Indenture, dated June 7, 2019, with the Notes Issuers, as issuers, Wilmington Trust, National Association, as trustee and notes collateral agent, and certain of the Debtors as guarantors.  Interest on the Third Lien Notes is payable semi-annually in arrears on April 15 and October 15.  The Third Lien Notes mature on October 25, 2024.  The Debtors did not pay the coupon payment due on April 15, 2020.

58.     The Third Lien Notes are secured by collateral that includes (a) a first-priority security interest in the Notes Priority Collateral (subject to a cap on recovery equal to $200.0 million), (b) a third-priority security interest in the Term Loan Priority Collateral, (c) a first-priority pledge of 50 percent of the common equity interests of non-debtor MYT Holding Co., a holding company of the MyTheresa business, and (d) a fourth-priority security interest in the ABL Priority Collateral.  In addition, the Third Lien Notes are guaranteed, subject to certain exceptions, by each of NMG's current and future domestic subsidiaries and future foreign subsidiaries on a senior secured basis.

**F.      The Unsecured Notes.**

59.     On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $960 million aggregate principal amount of Unsecured Cash Pay Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC), as trustee.  As of the Petition Date, the outstanding balance under the Unsecured Cash Pay Notes was $80.7 million.  Interest on the Unsecured Cash Pay Notes is payable semi-annually in arrears on each April 15 and October 15.  The Unsecured Cash Pay Notes

mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

60.     On October 21, 2013, NMG and Mariposa Borrower, Inc. issued $600 million aggregate principal amount of Unsecured PIK Toggle Notes under the Indenture, dated October 21, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with NMG as issuer, Mariposa Borrower, Inc., as co-issuer, certain Debtors, as guarantors, and UMB Bank, N.A. (as successor to U.S. Bank, N.A. and Drivetrain Trust Company LLC) as trustee. As of the Petition Date, the outstanding balance under the Unsecured PIK Toggle Notes was $56.6 million. Interest on the Unsecured PIK Toggle Notes is payable semi-annually in arrears on each April 15 and October 15. The Unsecured PIK Toggle Notes mature on October 15, 2021 and are guaranteed by the same entities that guarantee the Third Lien Notes. The Debtors did not pay the coupon payment due on April 15, 2020.

### G.     The 2028 Debentures.

61.     On May 27, 1998, the Neiman Marcus Group LLC issued $125.0 million aggregate principal amount of 2028 Debentures (the "2028 Debentures") under the Indenture, dated May 27, 1998 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), with Wilmington Savings Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company), as trustee. The 2028 Debentures mature on June 1, 2028.

62.     The 2028 Debentures are secured by "equal and ratable" liens on certain owned real estate properties, real estate ground leases, and real estate operating leases of NMG and on shares of capital stock and indebtedness of certain NMG's subsidiaries, in each case *pari passu* with the Extended Term Loans. The 2028 Debentures are guaranteed on a senior basis by NMG, Extended Term Loan PropCo, and Notes PropCo. The guarantees are full and unconditional.

The 2028 Debentures are not otherwise guaranteed by any of The Neiman Marcus Group LLC's subsidiaries.

### H. Preferred Stock of Non-Debtor MyTheresa Holding Co.

63.     In connection with the Recapitalization Transactions (as defined below), Parent formed three new Delaware subsidiaries (the "MyTheresa Holding Companies") and contributed the MyTheresa Operating Companies to the MyTheresa Holding Companies.  Further, validly tendered Unsecured Notes were exchanged for aggregate consideration consisting of new Third Lien Notes and 250,000,000 shares of Series A Preferred Stock, par value $0.001 per share (the "MYT Series A Preferred Stock"), with an initial liquidation preference of $1.00 per share, of MYT Holding Co., a MyTheresa Holding Company.  In addition, MYT Holding Co. issued 250,000,000 shares of Series B Preferred Stock, par value $0.001 per share (the "MYT Series B Preferred Stock") with an initial liquidation preference of $1.00 per share, to its direct parent and a MyTheresa Holding Company, MYT Parent Co.

### Part III: Events Leading to These Chapter 11 Cases

### A. Macroeconomic Challenges and Prepetition Cost-Saving and Cash Conservation Initiatives.

64.     While NMG has been proactive in addressing changing trends, it faces the same macro-trends that have crippled many apparel and retail companies, including a general trend from brick-and-mortar to online retail channels and a shift in consumer demographics.  Recognizing this, after the Recapitalization Transactions, but prior to the COVID-19 temporary store closures, the Debtors immediately implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations.  These initiatives included, among others, expense reduction, contract renegotiations, reduced capital expenditures, optimization of the Debtors' merchandise inventory, labor-force realignment and real estate monetization.  As a

result of these initiatives, the Debtors were on pace for $90 million in cost savings and a $100 million increase in liquidity by July 2020, on top of $100 million in additional liquidity obtained in the first half of fiscal year 2020.  The Debtors paid all of their vendors on time and in full in the ordinary course of business.

### 1.     Landlord Engagement.

65.     Strong relationships with the Debtors' landlords will be critical to the Debtors' success during these chapter 11 cases.  Prior to the Petition Date, NMG engaged in fruitful rent relief negotiations with its landlords.

66.     NMG and its advisors contacted nearly all of NMG's landlords to discuss potential postpetition rent concessions and other relief on a landlord-by-landlord basis.  NMG's landlords were generally supportive and responsive, and NMG reached several agreements in principle, representing millions of dollars in rent deferrals between April, May, and June 2020.  The Debtors will continue to discuss rent deferrals, rent concessions, and other forms of relief during these chapter 11 cases.

### 2.     Distribution Center and Store Closures.

67.     On March 11, 2020, NMG announced its decision to permanently close most of its remaining Last Call stores by October 2020.  NMG intends to file a motion requesting entry of an order approving procedures for store closures and authorizing NMG to permanently close the Last Call stores (and potentially additional underperforming or geographically undesirable stores in the NMG store portfolio).  Additionally, as a result of the Last Call store closures and a detailed analysis of its supply chain, NMG identified two of its Texas distribution centers that it plans to sell and reinvest the proceeds to optimize its supply chain.  NMG anticipates such closures could increase liquidity and accelerate profitable growth.

B.      COVID-19.

68.     NMG has experienced a significant decline in store traffic and related consumer spending as well as numerous operational challenges as a result of the COVID-19 pandemic, actions taken by governments and citizens in response, and the unprecedented upheaval in the global financial markets that has followed.  In response to state and local government mandates and recommendations, on March 18, 2020, NMG temporarily closed all Neiman Marcus, Bergdorf Goodman, Horchow, and Last Call retail stores through at least April 30, 2020.  NMG later extended its store closures through May 2020.  Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.  Online sales in April 2020, including associate-driven sales through NMG's digital platforms, have seen double digit increases compared to last year, but digital sales have not been sufficiently high to compensate for lost in-store revenues.

69.     In response to the outbreak of COVID-19, the Debtors immediately went into liquidity conservation mode.  First, the Debtors froze discretionary spending, business travel, and NMG corporate purchase cards, stopped taking spring receipts, and froze nonemergency capital expenditures.  Next, the Debtors made the incredibly difficult decision to institute the Furlough Program (as defined below).  In addition, the Debtors began to discuss contingencies with their landlords regarding the temporary store closures.  After taking extreme steps to conserve liquidity, the Debtors were forced to stretch accounts payable timelines.

1.      Furlough Program.

70.     Due to the unprecedented and unforeseen disruption to the Debtors' business caused by COVID-19, the Debtors made the incredibly difficult decision to implement temporary salary reductions and both partial and full furloughs that will affect nearly all of the Debtors' employees (the "Furlough Program").  While the Debtors initially maintained wages and salaries

29

for their employees, effective April 5, 2020, the Debtors placed approximately 11,282 full- and part-time employees on temporary furlough (the "Furloughed Employees") and reduced the salaries of all non-furloughed exempt employees.  The Debtors committed to a 30-day Furlough Program, although ongoing developments concerning COVID-19 and related governmental actions remain highly uncertain and may lead to extensions.  During the duration of the Furlough Program, Furloughed Employees will remain on unpaid leave unless otherwise scheduled to work, but will remain eligible to participate in any health benefits programs in which such Furloughed Employees are currently enrolled.  The Debtors will also maintain approximately 2,208 active employees to maintain the Debtors' limited business operations.  The Debtors anticipate that the Furloughed Employees will return to work once the public health crisis subsides.

## Part IV:  The Proposed DIP Financing and Marketing Process

71.     Pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"), the Debtors seek approval of the proposed $675 million DIP Facility.  The proposed DIP Facility consists of $675 million, backstopped by the Term Loan Lender Group (excluding holders of 2028 Debentures) and by the Noteholder Group.  The DIP Facility provides the necessary cash to meet immediate operational needs, including building new fall inventory to meet seasonal demands when stores reopen, addresses significant vendor and brand partner unease, and provides the liquidity for a smooth transition into chapter 11.

### A.     The Debtors' Need for Interim Relief

72.     Prior to preparing for these chapter 11 cases, NMG's leadership carefully managed cash flows and successfully aligned operational inflows and outflows.  The process of preparing

for and filing these chapter 11 cases disrupted these efforts.  As of the Petition Date, the Debtors lack sufficient funds to responsibly operate their businesses in light of expected cash flows during the course of these chapter 11 cases due to increased process-related costs and decreased revenues as a result of the ongoing global pandemic.  The Debtors' businesses are cash intensive and seasonal, with significant daily and monthly costs required to satisfy obligations to vendors, employees, and landlords, among others.  As such, the Debtors require immediate access to postpetition financing and use of cash collateral to operate their businesses, preserve value, and avoid irreparable harm pending the final hearing.

73.    With the unexpected temporary closure of all of the Debtors' brick-and-mortar locations on March 18, 2020, the Debtors experienced an immediate reduction in cash flow of approximately 65 percent to 75 percent.  As a result, the Debtors' access to liquidity became seriously strained.  Upon BRG's retention in March 2020, BRG, the Debtors, and their other advisors carefully considered a number of strategies to address the Debtors' capital structure and liquidity challenges, including through immediate, drastic cost saving measures to provide the Debtors sufficient runway to maintain operations.

74.    Among other cost reduction and cash conservation measures, the Debtors instituted their Furlough Program pursuant to which the Debtors furloughed between 80 percent to 90 percent of their employees on a part-time or full-time basis, eliminated or deferred most capital expense projects, dramatically reduced cash disbursements and inbound receipt of inventory, reduced employee salaries and wages company-wide, and commenced negotiations with brand partners and landlords.  These cost-saving measures, while effective, are not enough.  The Debtors need liquidity to support their online operations and to build their fall inventory to ensure that business continues without disruption.

75.     As stated above, the Debtors' liquidity has been severely constrained and subject to significant volatility because it is subject to a borrowing base formula and reserve restrictions pursuant to the Debtors' prepetition Asset-Based Revolving Credit Facility.  On April 14, 2020, the Asset-Based Revolving Credit Facility lenders submitted to the Debtors an updated inventory appraisal reflecting a reduction of net recovery value of the Debtors' inventory from $1.309 billion as of September 2019 to $1.253 billion as of March 2020, and temporarily implemented a 5 percent reserve against eligible inventory in the March borrowing base.  Through the negotiations described below, this reserve was eliminated, but overall, the Debtors' available borrowing base has been reduced by approximately $80 million to $90 million.

76.     Further, approximately two weeks ago, an event of default arose under the cross-default provision of the Asset-Based Revolving Credit Facility.  The Debtors were able to quickly negotiate and execute a forbearance agreement with the requisite lenders, affording the Debtors additional time to negotiate and document the consensual restructuring transaction and DIP Facility described herein.

77.     Without the cash and stability provided by the DIP Facility, I believe that irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations.  The Debtors operate a seasonal business.  When stores reopen, customers will expect the newest fashions.  Those orders must be planned, ordered, and paid for now, despite reduced revenues.  Failing to meet customer expectations would not only impact revenue generation but also risk losing the confidence of the Debtors' remaining employees, vendors, and landlords.  All of these parties are currently navigating the challenges of the COVID-19 pandemic, which has made them, and brand partners in particular, increasingly sensitive to risk.  The Debtors will materially benefit from the strong message the DIP Facility and authorization to use Cash

Collateral (as defined in section 363(a) of the Bankruptcy Code) will provide to the Debtors' key stakeholders that operations will continue and that the bankruptcy filing will not affect postpetition ordinary-course operations.  The DIP Facility and authorization to use Cash Collateral will ensure that the Debtors have sufficient cash to comply with their borrowing base covenants and adequately protect the Asset-Based Revolving Credit Facility lenders during these cases, including by providing the Debtors with sufficient liquidity to continue operating as a going concern and to maintain relationships with key customers.  This is especially important now as the Debtors would be unable to conduct traditional going-out-of-business sales in the unlikely event they were forced to liquidate, since stores remain closed to customers indefinitely due to COVID-19.  Authorizing the Debtors access to the DIP Facility therefore enables the Debtors to weather the storm and maximize the value of their estates by continuing to operate as a going concern.

B.     The DIP Sizing Process

78.     In light of the Debtors' liquidity position, BRG worked closely with the Debtors to evaluate the Debtors' operations and cash requirements to responsibly and successfully operate their businesses during these cases.  Specifically, the BRG team worked with key members of the Debtors' organization, including but not limited to members of the finance, merchandise planning, supply chain, treasury, and financial planning and analysis organizations, to evaluate and understand the Debtors' cash flows, borrowing base management, inventory management, and operations.

79.     As part of BRG's evaluation of the Debtors' liquidity position, BRG assisted in the development of the Debtors' 13-week and long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider the effects of the chapter 11 filing, including incremental administrative costs of a complex chapter 11 filing with a larger number of stakeholders each of whom will likely be represented by counsel,

fees and interest expenses associated with the DIP Facility, required operational payments, and cost-saving initiatives already undertaken.

80.     BRG also considered the unprecedented, adverse market conditions facing the retail industry during the COVID-19 pandemic.  With no certainty as to when the Debtors' retail stores can re-open or whether and when sales will return to the levels the Debtors saw before shelter-in-place and stay-at-home orders were implemented, the BRG team ran a series of sensitivity analyses to determine the Debtors' potential liquidity needs both during and following these chapter 11 cases.  These cash-flow scenarios assumed different store-opening timelines, utilized experience in Europe and Asia where the industry has been dealing with the effects of COVID-19 for weeks longer than the United States, and accounted for what brand partners and landlords are forecasting during and after the COVID-19 pandemic, including the permanent closure of certain lesser-performing full-line Neiman Marcus stores.

81.     The Debtors also evaluated their long-standing relationships with critical brand partners supplying inventory to the Debtors, who are generally unwilling to do business with at-risk, cash-strapped companies.  The Debtors also considered the need for sufficient cushion to weather additional unforeseeable liquidity troughs, including as a result of volatility caused by the borrowing base under the Debtors' Asset-Based Revolving Credit Facility.

82.     Based on these extensive sensitivity analyses and other considerations, the Debtors and their advisors determined that smooth postpetition operations would require incremental liquidity of $675 million to operate and satisfy all administrative costs and expenses associated with these chapter 11 cases as they come due.

C.     **The DIP Marketing Process**

83.     As more thoroughly described in the *Declaration of Tyler W. Cowan in Support of the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors*

*to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, also filed today, the Debtors retained Lazard to assist the Debtors with exploring and analyzing restructuring alternatives, including undertaking a marketing process to secure the additional liquidity the Debtors need to operate during these chapter 11 cases.  After searching for financing sources from both within and outside of the Debtors' existing capital structure, the Debtors secured a commitment from the Term Loan Lender Group and Noteholder Group to fund these chapter 11 cases, subject to the Court's approval.  I personally participated in the negotiation and analysis of various economic aspects of the DIP Facility, which lasted for weeks and was hard-fought and at arms'-length.

84.     While the Debtors received one other proposal, at this stage, it is not actionable for several reasons.  For example, weeks into the negotiations process with the Term Loan Lender Group, the Debtors received a competing proposal from a term loan lender that carried ostensibly lower transaction costs but did not offer sufficient visibility into commitments or financial wherewithal to fund the financing, required nonconsensual priming of existing secured lenders, and, due to the lack of unencumbered assets, did not propose adequate protection for those proposed to be primed.

85.     In contrast, the DIP Facility provides necessary liquidity junior to existing secured debts (other than consensual priming of the Extended Term Loan Lenders and holders of the Second Lien Notes and Third Lien Notes), which avoids the costly and protracted priming fight that would be inevitable under the competing proposal.  The Prepetition Secured Parties will inherently benefit from the DIP Facility, as it will preserve the value of their collateral, and will provide for new money to the Debtors' capital structure.  Under the completely unprecedented

conditions caused by the COVID-19 pandemic, the Debtors, in consultation with the board and their advisors, reached a consensus that it would be imprudent to forego the value-maximizing DIP Facility deal for a competing, unactionable and potentially priming financing proposal. Accordingly, I believe the DIP is necessary to avoid irreparable harm to the Debtors and their estates, and is in their best interests.

        **D.**      **The Debtors' Proposed Use of Cash Collateral**

        86.      Pursuant to the DIP Motion, the Debtors also seek the continued use of Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases. As described in the DIP Motion, the Debtors' business is cash intensive, with significant daily and monthly costs required to satisfy obligations to vendors, employees, and landlords, among others. Without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result.

        87.      Authorization to use Cash Collateral during the interim period will ensure the Debtors have sufficient cash to comply with their borrowing base covenants and adequately protect the lenders under the Asset-Based Revolving Credit Facility during these chapter 11 cases, including by providing the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key customers.

        88.      In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the prepetition secured parties under the Asset-Based Revolving Credit Facility (the "ABL Lenders") with adequate protection as set forth in the DIP Motion and the accompanying interim order.

        89.      The Debtors' use of Cash Collateral will generally be subject to the same milestones agreed upon in the DIP Facility.  In addition, the parties agreed on additional reporting covenants,

including the ABL Lenders' right to participate in calls with the Debtors' management and cooperation with the ABL Lenders' financial advisor.

## Part V:  The Restructuring Support Agreement

90.     The Restructuring Support Agreement contemplates a comprehensive reorganization achieved through the Plan (as defined below) that will result in a substantial deleveraging of the Debtors' balance sheet by as much as $4 billion and provide the Debtors with $750 million of fully-committed new capital.  The key financial components of the restructuring are as follows:

- access to the DIP Facility, in an aggregate principal amount of $675 million, which shall bear interest at a rate of LIBOR plus 12.75% (payable monthly in cash), and matures at the earlier of 5 months from the Petition Date (subject to an extension option) or consummation of a chapter 11 plan of reorganization; and

- access to a commitment for the post-effective date Exit Facility in aggregate principal amount of $750 million, backstopped by the Term Loan Lender Group (excluding holders of 2028 Debentures), the Noteholder Group, and any other Extended Term Loan lenders, holders of 2028 Debentures, holders of Second Lien Notes, and holders of Third Lien Notes who execute the Restructuring Support Agreement within seven business days of the Petition Date, which will be used to refinance the term loans under the DIP Facility.

91.     The Restructuring Support Agreement contemplates stakeholder recoveries as follows pursuant to a plan of reorganization to be filed in these chapter 11 cases to implement the Restructuring Support Agreement (the "Plan"):[5]

- each holder of Extended Term Loans, 2013 Term Loans, 2028 Debentures, Second Lien Notes, and/or Third Lien Notes will be eligible to participate in the DIP Facility pursuant to the syndication procedures;

---

[5]     In the event of any inconsistencies between the summaries set forth below and the provisions relating to such recoveries in the RSA and/or Plan documents, the descriptions in the RSA and/or Plan, as applicable, shall control.

- holders of claims on account of the Asset-Based Revolving Credit Facility and FILO Facility will receive value, as of the effective date of the Plan, equal to the allowed amount of such claims, as applicable;

- holders of 2019 Term Loan Claims shall receive their pro rata share of and interest in (a) 87.5 percent of the reorganized equity (subject to dilution) and (b) 87.5 percent of the rights to participate in the Exit Facility (the "Rights"), subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- if the class of 2013 Term Loan Claims votes in favor of the Plan, holders of 2013 Term Loans shall receive their pro rata share of and interest in (a) 0.2 percent of the reorganized equity (subject to dilution) and (b) 0.2 percent of the Rights, or, if the class of 2013 Term Loan Claims does not vote in favor of the Plan, holders of 2013 Term Loan Claims will receive value, as of the Effective Date of the Plan, equal to the allowed amount of such claims not to exceed the value of each holder's interest in the estate's interest in the property securing such claims;

- holders of 2028 Debentures Claims will receive their pro rata share of and interest in (a) 2.8 percent of the reorganized equity and (b) 2.8 percent of the Rights, subject, in each case, to upward adjustment if the holders of 2013 Term Loan Claims do not vote in favor of the Plan;

- holders of Second Lien Notes Claims shall receive their pro rata share of and interest in (a) 1.0 percent of the reorganized equity, (b) 1.0 percent of the Rights, and (c) seven-year warrants (no Black-Scholes protection) to purchase up to 25.0 percent of the reorganized equity at an agreed-upon strike price;

- holders of Third Lien Notes Claims shall receive their pro rata share of and interest in (a) 8.5 percent of reorganized equity (subject to dilution) and (b) 8.5 percent of the Rights;

- holders of general unsecured claims shall receive their pro rata share of a cash pool; and

- stakeholders' economic and governance rights with respect to MyTheresa shall be consistent with such stakeholders' prepetition rights, claims, and controls.

92.    Pursuant to the Restructuring Support Agreement, the Plan is intended to minimize any potential adverse effects to the Debtors' businesses, customers, and trade partners as a result of the restructuring, and will position the Debtors for a timely emergence from bankruptcy.

## Part VI:  Evidentiary Support for First Day Motions

93.     The Debtors also filed a number of motions today (the "First Day Motions") and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run the Debtors' business, ensure the continuation of the Debtors' cash management systems, and allow for other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors stakeholders.

94.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully implementing a chapter 11 strategy.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A** attached hereto.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  May 7, 2020               */s/ Mark Weinsten*
New York, New York            Name:  Mark Weinsten
                              Title:    Chief Restructuring Officer
                                        Neiman Marcus Group LTD LLC

**<u>Certificate of Service</u>**

I certify that on May 7, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

**Corporate Organizational Chart**



**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**

## THE DEBTORS' FIRST DAY MOTIONS

As explained in the Declaration, the Debtors have requested a variety of relief in various "first day" motions and applications (collectively, the "First Day Motions").[1]  As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.  I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these chapter 11 cases and as described below.

I believe that the relief sought in the First Day Motions is critical to a smooth transition into Chapter 11 to minimize the adverse effects of the chapter 11 cases on the Debtors' business and on their employees and creditors.  Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the chapter 11 cases on the Debtors' businesses and operations.

Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, and as described more fully in each First Day Motion, the Debtors, in consultation with their professionals, carefully tailored

---

[1] Capitalized terms used in this Exhibit but not otherwise defined shall have the meanings ascribed to such terms in the applicable First Day Motions.

the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.

I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.  For the reasons identified below and in each First Day Motion, I believe that the relief requested in each of the First Day Motions is narrowly tailored to avoid immediate and irreparable harm and is appropriate under the circumstances and should be granted by the Court.

### Administrative and Procedural Motions

**A.**     **Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion").**

1.     The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' chapter 11 cases. As in many large chapter 11 cases that are jointly administered, many of the motions, hearings, and orders in these chapter 11 cases will affect all Debtor entities.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.

Accordingly, I believe the relief requested in the Joint Administration Motion is warranted under the circumstances.

        **B.**        **Debtors' <u>Emergency</u> Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "<u>Schedules and Statements Extension Motion</u>").**

        2.        Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 30 days, for a total of 44 days from the Petition Date, through and including June 20, 2020, without prejudice to the Debtors' ability to request additional extensions.

        3.        Given the size and complexity of the Debtors' business and financial affairs, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each Debtor entity, requiring a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.  The ongoing COVID-19 pandemic has further compounded the difficulty of preparing the Schedules and Statements as many of the Debtors' employees have been, and currently are, significantly hindered in their ability to access the materials needed to compile the required information. Accordingly, I believe the relief requested in the Schedules and Statements Extension Motion is warranted under the circumstances.

C.     **Debtors' <u>Emergency</u> Motion For Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (IV) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

4.       Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) authorizing the Debtors to redact certain personal identification information, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

5.       *First*, the preparation of separate lists of creditors for each debtor would be expensive, and time consuming.  Therefore, the Debtors have requested to file a consolidated creditor matrix.  Moreover, filing a Top 50 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  *Second*, the list of creditors may include personal identification information of the Debtors' employees; and such information can be used to perpetrate identity theft.  *Third*, mailing initial notices of bankruptcy and the notice of commencement through the Debtors' proposed claims and noticing agent, Stretto, to parties in interest will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Accordingly, I believe that the relief requested in the Creditor Matrix Motion is warranted under the circumstances.

**D.** **Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Retention and Appointment of Stretto as Claims, Noticing, and Solicitation Agent (the "<u>Stretto 156(c) Retention Application</u>").**

6.        Pursuant to the Stretto 156(c) Retention Application, the Debtors seek entry of an order appointing Stretto ("<u>Stretto</u>")[2] as claims, noticing and solicitation agent (the "<u>Claims, Noticing, and Solicitation Agent</u>") for the Debtors in their chapter 11 cases, effective as of the Petition Date.  As the Claims, Noticing, and Solicitation Agent, Stretto would assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

7.        Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Stretto to act as the Claims, Noticing, and Solicitation Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and comparable to the rates charged by their competitors for similar services.

8.        The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates and their creditors because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.  Accordingly, it is my opinion that the Court should approve the Stretto 156(c) Retention Application.

---

[2]      Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

**Operational Motions**

E.      **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief (the "<u>DIP Motion</u>").**

9.      Pursuant to the DIP Motion, the Debtors seek entry of an interim order and final order: (a) authorizing the Debtors to obtain the secured, superpriority, postpetition DIP Facility; (b) authorizing the Debtors to use Cash Collateral; (c) granting DIP Liens and providing superpriority administrative expense status to the DIP Facility; (d) granting adequate protection to the Prepetition Secured Parties to the extent of any Diminution in Value of their interests in the Prepetition Collateral; (e) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders; and (f) granting related relief.

10.     In response to the outbreak of COVID-19, since March 2020, the Debtors, in consultation with their advisors, Lazard, BRG, and Kirkland, reviewed and evaluated potential financing alternatives and cash requirements necessary to operate their businesses as a going concern. The Debtors concluded that an out-of-court restructuring was not viable and that current cash was insufficient for the Debtors to operate during these chapter 11 cases. Given these conclusions, and the Debtors' work with their advisors, the Debtors determined that procuring sufficient financing at the start of these cases would be essential to fund its operating costs, its working capital needs, and these chapter 11 cases. The Debtors further determined that this financing was needed to pursue a value-maximizing restructuring for the benefit of the Debtors' stakeholders. The Debtors' DIP budget forecasting also analyzes the effect of various COVID-19 scenarios impacting, among other things, (i) the timing of reopening stores, (ii) the potential shut down of the Debtors' e-commerce operations, and (iii) various recovery

trajectories.  Based on those discussions, the Debtors, together with their advisors, determined that they require immediate access to DIP financing to fund the costs of administering these chapter 11 cases, near-term working capital needs, and ongoing business operations.

11.     Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, the Debtors' customer base may decline and vendors and suppliers may refuse to do business with the Debtors.  Without access to the funds available under the DIP Facility, including the use of Cash Collateral, the Debtors will lack sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing the success of the Debtors' reorganization. The Debtors' inability to continue ordinary course operations would not only impact revenue generation but also risk losing the confidence of the Debtors' remaining employees, vendors, landlords, and customers.  Therefore, the Debtors have an immediate need to access the DIP Facility and use the Cash Collateral on an interim basis and throughout the pendency of these chapter 11 cases.

12.     The Debtors looked for financing from sources within their existing capital structure as well as third parties.  No third-party lender provided the Debtors with a proposed out-of-court or postpetition financing facility that was executable.  As early as March 25, 2020, the Term Loan Lender Group engaged with the Debtors regarding potential postpetition financing.  In addition, after several rounds of hard-fought negotiations, the Term Loan Lender Group and Noteholder Group reached an agreement that provided for an additional $50 million in liquidity under the DIP Facility and would allow the Noteholder Group to backstop a portion of the DIP Facility.

13.     After extensive, arm's-length negotiations with the Term Loan Lender Group and the Noteholder Group, the Debtors were able to secure the proposed $675 million DIP Facility, open to all Prepetition Term Loan Lenders, and, after further negotiations, to the holders of the Second and Third Lien Notes, backstopped by the Term Loan Lender Group and the Noteholder Group.  The DIP Facility will be secured with a perfected first priming lien on substantially all of the Debtors' assets except for a second lien on the collateral of the ABL Lenders.  As such, the DIP Facility does not purport to prime the ABL Lenders' collateral.  The Prepetition Term Loan Lenders and the holders of the Third Lien Notes have consented to granting a priming lien on their collateral.

14.     Concurrently with the negotiations regarding the DIP Facility, the Debtors and their advisors engaged in good faith, arm's-length negotiations with the same group of creditors that agreed to provide the DIP Facility, namely the Term Loan Lender Group on a $750 million Exit Facility, backstopped by the Term Loan Lender Group and the Noteholder Groups.

15.     Pursuant to the DIP Motion, the Debtors also seek the continued use of Cash Collateral, to provide sufficient liquidity for their operations during these chapter 11 cases. Authorization to use Cash Collateral during the interim period will ensure the Debtors have sufficient cash to comply with their borrowing base covenants and adequately protect the ABL Lenders during these chapter 11 cases

16.     The DIP Facility ensures that the Debtors (a) have sufficient funding to consummate the Debtors' chapter 11 plan, (b) can continue to operate uninterrupted during these chapter 11 cases, and (c) have continued access to liquidity following the Debtors' emergence from bankruptcy.  Accordingly, for all the reasons described in the DIP Motion, I believe that the proposed terms of the DIP Facility and the continued use of Cash Collateral provide the best

terms presently available to the Debtors.  The proposed DIP Facility mitigates the risk of a substantial disruption to the Debtors' businesses during these chapter 11 cases.

17.     I believe that without immediate access to the DIP Facility and Cash Collateral, as provided for in the DIP Motion, the Debtors will suffer significant impairment to their business operations to the material detriment of all of their stakeholders.  The Debtors will be unable to preserve and maximize the value of their estates, responsibly administer these chapter 11 cases, and execute their business plan.  Therefore, I believe that approval of the DIP Facility, as described herein and in the DIP Motion, is in the best interests of the Debtors' estates.

18.     Accordingly, I believe that the DIP Motion should be approved.

F.     **Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Bank Accounts, and (C) Continue to Perform Intercompany Transactions, (II) Maintain Existing Business Forms, and (III) Granting Related Relief (the "<u>Cash Management Motion</u>").**

19.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached thereto, (a) authorizing the Debtors to (i) continue to operate their cash management system, as described therein and as illustrated on <u>Exhibit 1</u> annexed to the Interim Order and Final Order, (ii) maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, and (iii) continue Intercompany Transactions and funding consistent with the Debtors' historical practices, subject to the terms described in the Cash Management Motion, and (b) maintaining existing business forms in the ordinary course of business.

20.     The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating retail operations in a cost-effective, efficient

manner.  The Debtors use their Cash Management System to collect, transfer, and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with certain Intercompany Transactions, as described in more detail in the Cash Management Motion.  Additionally, the Debtors' corporate accounting and cash forecasting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.  I believe that any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' businesses and operations to the detriment of the Debtors' estates and all of the Debtors' stakeholders.

21.    Because of the disruption that would result if the Debtors were forced to close their existing bank accounts, I believe it is critical that the existing Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, it is my opinion that the Cash Management Motion should be approved.

G.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

22.    Pursuant to the Wages Motion, the Debtors seek entry of an order authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

23.     The Debtors employ approximately 13,201 Employees, including approximately 9,545 full-time employees and approximately 3,656 part-time and seasonal employees.   The Debtors also retain approximately 600 Temporary Staff who are employed through Staffing Agencies or directly by the Debtors.   Prior to the Petition Date, the Debtors placed approximately 11,282 full- and part-time employees on temporary furlough.  The Employees and Temporary Staff perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases.  In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' business, processes, and systems, who possess unique skills and experience, or who have developed relationships with vendors that are essential to the Debtors' business.  These individuals are not easily replaced.

24.     The Debtors also contract with their merchandise vendors to place specialized sales representatives in their stores.  These Independent Sales Representatives assist the Debtors with selling the vendors' branded merchandise.

25.     The Debtors are seeking authority to pay and honor certain prepetition claims relating to Employee Compensation and Benefits, including, among other things, wages, salaries, other compensation, expense reimbursement, payroll obligations and withholding of federal and state taxes (including garnishments, Employees' share of insurance premiums, taxes, and other amounts withheld), payroll processing, discretionary severance policies, health and wellness benefits (including vision and dental coverage), insurance programs, workers' compensation benefits, short and long-term disability coverage, retirement savings plans, time-off policies, and certain other benefits that the Debtors have historically provided in the ordinary course (collectively, the "Compensation and Benefits").  The Compensation and Benefits are further described in the Wages Motion.

26.     Pursuant to the Wages Motion, the Debtors also seek authority to continue their non-insider bonus programs and to honor their obligations to non-insider Employees under these pre-existing bonus programs.  The Debtors believe the bonus programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency of the Debtors' operations.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion with respect to any bonus programs.

27.     Payment of the prepetition obligations with respect to the Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.  Absent the payment of the Compensation and Benefits owed to the Employees, the Debtors will likely experience Employee turnover and instability at this critical time.  I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.

**H.     Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their (A) Existing Customer Programs and (B) Charity Donation Programs and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>")**

28.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain, administer, and honor prepetition obligations related to their (i) customer-related programs, policies, and practices (collectively, the "<u>Customer Programs</u>") and (ii) charity donation programs (collectively, the "<u>Charity Donation Programs</u>").

29.     In connection with the Customer Programs, the Debtors provide certain incentives, discounts, promotions, accommodations, and related programs to attract customers

and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

30. As of the Petition Date, the Debtors estimate that there are approximately $280,400,000 of prepetition obligations outstanding related to Customer Programs, the vast majority of which, however, ***does not*** entail the expenditure of cash. These obligations include accrued credits, adjustments, discounts, prepayments, outstanding gift cards, outstanding loyalty points, or similar programs owing to customers.

31. I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable customer relationships, goodwill, and market share, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating their customers, and might suffer corresponding losses in customer loyalty and goodwill that will harm the Debtors' prospects of maximizing the value of their estates. I also believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.

32. The Debtors also operate the Charity Donation Programs. Through the Charity Donation Programs, the Debtors support communities in need through five core initiatives, some

of which include donations from and the participation of customers and Employees.  As of the Petition Date, the Debtors estimate that they hold approximately $1,250,000 in committed but unremitted donations.  I believe that failure to honor these commitments and continue the Charity Donation Programs in the ordinary course could damage the Debtors' reputation and goodwill in the community and marketplace.

33.     I believe that the relief requested in the Customer Programs Motion will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.  Accordingly, I believe that the relief sought in the Customer Programs Motion is warranted under the circumstances.

**I.      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Continue to Pay Brokerage Fees, and (II) Granting Related Relief (the "<u>Insurance Motion</u>").**

34.     Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, and (iii) satisfy payment of prepetition obligations on account of Brokerage Fees and continue to pay such fees in the ordinary course.

35.     The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and

contracts.  Failure to make the payments required to maintain the Debtors' Insurance Policies could have a significant negative impact on the Debtors' operations.

36.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, it is my opinion that the Insurance Motion should be approved.

**J.      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Surety Bond Program and (II) Granting Related Relief (the "<u>Surety Bonds Motion</u>").**

37.     Pursuant to the Surety Bonds Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to maintain, renew, and modify their Surety Bond Program— including the procurement of new sureties—in the ordinary course of business on a postpetition basis and pay outstanding prepetition amounts, if any, as of the Petition Date.

38.     The Debtors' Surety Bond Program is necessary to the Debtors' operations during these chapter 11 cases.  The fees and expenses associated with the Surety Bond Program, including the Surety Premiums and Brokerage Fees, are necessary to ensure compliance with statutes and regulations requiring the bonds to remain in place while the Debtors operate in that jurisdiction.  Any disruption in insurance coverage or to the Surety Bond Program could threaten the Debtors' ability to continue operating their business as the Debtors are subject to numerous regulatory and contractual obligations to maintain specific amounts and types of insurance coverage and surety bonds.

39.     The relief requested in the Surety Bonds Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I believe that the relief requested in the Surety Bonds Motion should be granted.

**K.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

40.    Pursuant to the Taxes Motion, the Debtors seek entry of an order authorizing the Debtors to remit and pay (or, if applicable, use tax credits to offset) Taxes and Fees, without regard to whether such obligations accrued prior to the Petition Date, that will become payable during the pendency of these chapter 11 cases on account of sales and use taxes, property tax, income tax, franchise tax, annual reporting fees, audits, and business and regulatory fees.  In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various governmental authorities on a monthly, quarterly, or annual basis.  The Debtors must continue to pay the Taxes and Fees to avoid potentially costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because governmental authorities could file liens or seek to lift the automatic stay.

41.     The relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I believe that the Taxes Motion should be approved.

**L.    Debtors' Emergency Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock (the "Equity Trading Motion").**

42.    Pursuant to the Equity Trading Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness with respect to, Debtor Mariposa Intermediate Holdings, LLC's existing common stock or any Beneficial Ownership therein (any such record or Beneficial

17

Ownership, the "Common Stock"), as detailed in Exhibit 1 to the Interim Order and Final Order (the "Procedures"); and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*.

43.     The Debtors estimate that, as of the end of their 2019 tax year, they have approximately $59.9 million of federal NOLs and $270.4 million of disallowed business interest expense carryforwards (collectively, and together with state and certain other tax attributes, the "Tax Attributes").[3]   The Debtors further estimate that they may generate additional Tax Attributes in the year 2020 tax year.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to carry forward certain Tax Attributes to offset future taxable income or utilize the Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

44.     Implementation of the Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  The Tax Attributes described above may provide the potential for material tax savings or other tax structuring possibilities in these chapter 11 cases.  The termination or limitation of the Tax Attributes could be materially detrimental to all parties in interest.  Thus, the relief requested therein will preserve the Debtors' flexibility in operating the Debtors' businesses during the pendency of these chapter 11 cases and implementing a transaction that makes full and efficient use of the Tax Attributes and maximizes the value of the Debtors'

---

[3]     The Tax Attributes include certain alternative minimum tax credits.  These credits are not discussed further as a result of changes to the treatment of such credits in U.S. federal income tax legislation enacted in 2017.

estates.  Accordingly, I believe that the relief requested in the Equity Trading Motion should be approved.

**M.** **Debtors' <u>Emergency</u> Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code, (II) Permitting the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed with Litigation or Contested Matters Commenced Prepetition, (III) Approving the Form and Manner of Notice, and (IV) Granting Related Relief (the "<u>Automatic Stay Motion</u>").**

45.     Pursuant to the Automatic Stay Motion, the Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code, (b) modifying the automatic stay, to the extent the Debtors deem appropriate in their sole discretion, to proceed with litigation or contested matters commenced before the Petition Date, and (c) approving the form and manner of notice related thereto.  The Debtors further seek authority, but not direction, to translate the Automatic Stay Motion, the Order, and/or the Notice into other languages to better inform creditors, governmental units, and interested parties of the relief requested in the Automatic Stay Motion.

46.     The Debtors' business operations are conducted worldwide with significant assets moving through international commerce at any given time.  A substantial majority of the Debtors' merchandise is delivered from various designers and is manufactured in numerous locations, including Europe and the United States and, to a lesser extent, China, Mexico and South America.  As a result, the Debtors have many foreign creditors and counterparties to contracts in various ports and jurisdictions that may not be familiar with the restrictions of the Bankruptcy Code.  Many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11 and therefore may be unfamiliar with the scope of a debtor in possession's authority to conduct its business.  These creditors and counterparties may also be unfamiliar with the automatic stay and other provisions of the Bankruptcy Code.  Thus,

various interested parties may attempt to seize assets located outside of the United States to the detriment of the Debtors, their estates, and creditors, or take other actions in contravention of the automatic stay of section 362 of the Bankruptcy Code.  In addition, upon learning of the Debtors' bankruptcy, counterparties to leases and executory contracts may attempt to terminate those leases or contracts pursuant to *ipso facto* provisions in contravention of section 365 of the Bankruptcy Code.

47.     The Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  For the avoidance of doubt, the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Automatic Stay Motion.  Instead, the Debtors seek to affirm those rights and believe that an order from this Court will help guard the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.

48.     The relief requested in the Automatic Stay Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, I believe that the relief requested in the Automatic Stay Motion should be granted.

**N.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Customs and Regulatory Claimants, and (D) 503(B)(9)Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "All Vendor Motion").**

49.     Pursuant to the All Vendor Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) certain Critical Vendors, in an amount not to exceed $25 million on an interim

basis and $50 million on a final basis, (ii) Lien Claimants, (iii) Customs and Regulatory Claimants, and (iv) 503(b)(9) Claimants; and (b) confirming the administrative expense priority status of Outstanding Orders.

50.    ***Critical Vendor Claims***.   The Debtors' supply chain consists of certain domestic vendors that supply products and services essential to the Debtors' go-forward operations (collectively, the "Critical Vendors").   With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services.   The loss of these relationships and suppliers would immediately and irreparably harm the Debtors' businesses, by, inter alia, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' viability as a going-concern.   As of the Petition Date, the Debtors owe approximately $88.5 million to Critical Vendors.   The Debtors propose to pay the Critical Vendors only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.

51.    ***Lien Claimants.***   The Debtors contract with various domestic and imported brands to produce or ship the Debtors' Merchandise.   These brands and manufacturers, through freight forwarders, then ship merchandise to certain warehouses that serve as the Debtors' distribution and fulfillment centers.   The Debtors operate their own warehouses and distribution centers. The Debtors' supply chain depends on services provided by, among others, these freight forwarders, common carriers, and custom brokers.   Vendors transporting the goods may refuse

(and have in the past refused) to release merchandise or other goods for shipment to the United States if they are not paid current.

52.    Additionally, the Debtors routinely transact business with a number of third-party contractors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.  These third-party contractors perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' stores, maintenance and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating equipment, and other repair, renovation, or construction of the facilities and property therein.

53.    As of the Petition Date, the Debtors owe approximately $12.4 million to Lien Claimants.  The Debtors propose to pay the Lien Claimants only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.

54.    ***Customs and Regulatory Claimants***:  In the ordinary course of their businesses, the Debtors import inventory and related materials.  Timely receipt or transmittal, as applicable, of the imported goods is critical to the Debtors' business.  Any disruption or delay could adversely affect the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.

55.    In connection with the importation of goods, the Debtors may be required to pay various charges (the "Customs and Regulatory Charges"), including customs duties, detention and demurrage fees, tariffs and excise taxes, U.S. Fish and Wildlife Service charges, freight

forwarding, and other similar obligations.  Absent such payments, the Customs and Regulatory Claimants may interfere with the transportation of the imported goods.

56.     If the flow of imported goods were to be interrupted, the Debtors may be deprived of the inventory necessary to stock the racks and shelves in their stores and to fulfill online orders, which means the Debtors would not have inventory to sell to their customers. The ultimate value of such sales is worth far more to the Debtors (both in terms of future receipts and the maintenance of valuable customer goodwill) than the aggregate amount of incurred, but unpaid, Customs and Regulatory Charges.  Accordingly, the Debtors seek authority to pay any and all necessary and appropriate Customs and Regulatory Charges incurred on account of prepetition transactions.   The Debtors estimate that, as of the Petition Date, they owe approximately $115,000 on account of Customs and Regulatory Charges.  The Debtors propose to pay the Customs and Regulatory Charges only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.

57.     ***The 503(b)(9) Claims.***  The Debtors have received certain goods from various Vendors within the twenty days before the Petition Date (collectively, the "503(b)(9) Claimants").  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

58.     Further, some of the 503(b)(9) Claimants supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing operations—including merchandise necessary to stock the shelves in Debtors' stores and warehouses and custom-order goods that

23

customers have already paid for (including wedding dresses).  Moreover, even though the manufacture of certain merchandise is completed, the 503(b)(9) Claimants may refuse to ship unless the Debtors pay some or all of the claims owing to such vendors.  In the lead-up to the Debtors' chapter 11 cases, the Debtors experienced strained relationships with certain of their vendors who may qualify as 503(b)(9) Claimants, which has made the Debtors acutely aware of the risk their business may face without the requested relief.

59.     As of the Petition Date, the Debtors believe they owed approximately $10 million on account of the 503(b)(9) Claims.  Accordingly, the Debtors request the authority, but not the direction, to pay an amount necessary to preserve the value of their estates, which shall not exceed $5 million on an interim basis and $10 million on a final basis on account of 503(b)(9) Claimant's claims accrued in the ordinary course of business.

60.     ***Outstanding Orders***.  Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods, including custom-order goods that customers have already paid the Debtors for, that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  In fact, interactions with certain vendors in the lead-up to these chapter 11 cases have made the Debtors particularly sensitive to this risk.

61.     To prevent any disruption to the Debtors' business operations, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary

course of business.  The relief requested in the All Vendor Motion will allow the Debtors to maintain operational stability and prevent a disruption to the Debtors' supply chain which could result in a significant loss of operational efficiency, decreases the value of these businesses, and impair stakeholder value at this critical juncture in these chapter 11 cases.  Accordingly, I believe that the relief requested in the All Vendor Motion should be approved.

O.    **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").**

62.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Procedures provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, and (c) approving procedures for resolving any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Adequate Assurance Procedures.

63.    In connection with the operation of their businesses, the Debtors obtain electricity, natural gas, water and sewage, telephone, internet, garbage, recycling, cable, fire protection, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers and brokers (collectively, the "<u>Utility Providers</u>").  Pursuant to certain leases to which the Debtors are party, certain of the Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.  The relief requested in the Utilities Motion applies to all Utility Providers.

64.     On average, the Debtors pay approximately $3.9 million each month for Utility Services, calculated as a historical average of payments to the Utility Providers.  The Debtors estimate the amount currently held as Prepetition Deposits with respect to all Utility Providers is approximately $1.8 million.

65.     The Debtors propose depositing $1.57 million into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.  The Adequate Assurance Deposit will be held at Wells Fargo Bank, N.A. for the duration of the Debtors' chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Providers.

66.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

67.     Furthermore, the Debtors request that Utility Providers be prohibited from altering, refusing or discontinuing service to the Debtors on account of:  (a) unpaid charges for prepetition services; (b) any objections filed in response to the Adequate Assurance Deposit. Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization.  As demonstrated by the COVID-19 pandemic, any further disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  This, in turn, jeopardizes the value of the Debtors' estates and impacts creditor recoveries.  Therefore, it is critical that Utility

Services continue uninterrupted during these chapter 11 cases.  Accordingly, I believe that the relief requested in the Utilities Motion should be granted.

## **Exhibit B**

**Restructuring Support Agreement**

*EXECUTION VERSION*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, this "**Agreement**") is made and entered into as of May 7, 2020 (the "**Execution Date**"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (viii) of this preamble, collectively, the "**Parties**"):[1]

   i.    Mariposa Intermediate Holdings LLC, a limited liability company organized under the Laws of Delaware, Delaware ("**Mariposa Intermediate**"), Neiman Marcus Group LTD LLC, a limited liability company organized under the Laws of Delaware ("**NMG LTD LLC**"), and each of its affiliates or subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

   ii.   Neiman Marcus Group, Inc., a company incorporated under the Laws of Delaware ("**NMG Inc.**" or the "**Consenting Parent**");

   iii.  each of Ares Corporate Opportunities Fund III, L.P. and Ares Corporate Opportunities Fund IV, L.P., on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its Affiliates that directly or indirectly hold equity interests in the Company Parties (collectively, "**Ares**");

   iv.   CPP Investment Board USRE Inc., on behalf of itself and each of its Affiliates that directly or indirectly hold equity interests in the Company Parties (collectively, "**CPPIB**" and, together with Ares, the "**Consenting Sponsors**");

   v.    the undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, outstanding Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or a Transfer Agreement (as

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

applicable), to counsel to the Company Parties (collectively, the "**Consenting Term Loan Lenders**");

vi.    the undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, outstanding Second Lien Notes Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or a Transfer Agreement (as applicable), to counsel to the Company Parties (collectively, the "**2L Consenting Noteholders**");

vii.    the undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, outstanding Third Lien Notes Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or a Transfer Agreement (as applicable), to counsel to the Company Parties (collectively, the "**3L Consenting Noteholders**" and together with the 2L Consenting Noteholders, the "**Consenting Noteholders**"); and

viii.    the undersigned holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts, of holders of, 2028 Debenture Claims that have executed and delivered counterpart signature pages to this Agreement, or signature pages to a Joinder or Transfer Agreement (as applicable), to counsel to the Company Parties (collectively, the "**Consenting Debenture Parties**"; together with the Parties in clauses (v), (vi) and (vii) above, the "**Consenting Creditors**") (the Parties in clauses (ii) through (viii), collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the restructuring term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement, the Restructuring Term Sheet and all exhibits and schedules hereto and thereto, the "**Restructuring Transactions**");

**WHEREAS**, certain of the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

2

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>2013 Term Loans</u>**" means those certain term loans initially borrowed by NMG LTD LLC pursuant to the Term Loan Credit Agreement and maturing on October 25, 2020.

"**<u>2013 Term Loan Claim</u>**" means any Claim on account of the 2013 Term Loans.

"**<u>2013 Term Loan Lender</u>**" means any holder of 2013 Term Loan Claims.

"**<u>2019 Extended Term Loans</u>**" means those certain term loans converted into extended term loans from the 2013 Term Loans and initially incurred by the Term Loan Borrowers pursuant to the 2019 Extended Term Loan Amendment and maturing on October 25, 2023.

"**<u>2019 Extended Term Loan Amendment</u>**" means that certain Extension Amendment and Amendment No. 2 to Credit Agreement, dated as of June 7, 2019, by and among Mariposa Intermediate, the Term Loan Borrowers, the other Company Parties party thereto as guarantors, the lenders party thereto, and Credit Suisse AG, Cayman Islands, as administrative agent and collateral agent, which amended the Term Loan Credit Agreement.

"**<u>2019 Extended Term Loan Claim</u>**" means any Claim on account of the 2019 Extended Term Loans.

"**<u>2019 Extended Term Loan Lender</u>**" means any holder of 2019 Extended Term Loan Claims.

"**<u>2028 Debentures</u>**" means those 7.125% Senior Debentures due 2028 issued pursuant to an indenture dated as of May 27, 1998, as supplemented by the first supplemental indenture, dated as of July 11, 2006, the second supplemental indenture, dated as of August 14, 2006, and the third supplemental indenture, dated as of June 7, 2019, by and among The Neiman Marcus Group LLC (f/k/a The Neiman Marcus Group, Inc.), the guarantors party thereto and Wilmington Savings Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company, N.A.), as trustee.

"**<u>2028 Debenture Claim</u>**" means any Claim on account of the 2028 Debentures.

"**<u>2028 Debenture Holder</u>**" means any holder of 2028 Debenture Claims.

"**<u>8.000% Third Lien Notes</u>**" means those certain 8.000% Senior Secured Third Lien Notes due 2024 issued pursuant to an indenture, dated as of June 7, 2019, by and among the Notes Issuers, the guarantors party thereto and Wilmington Trust, National Association, as trustee and notes collateral agent.

"**<u>8.750% Third Lien Notes</u>**" means those certain 8.750% Senior Secured Third Lien Notes due 2024 issued pursuant to an indenture, dated as of June 7, 2019, by and among the Notes Issuers,

the guarantors party thereto and Wilmington Trust, National Association, as trustee and notes collateral agent.

"**2L Consenting Noteholders**" has the meaning set forth in the Preamble to this Agreement.

"**3L Consenting Noteholders**" has the meaning set forth in the Preamble to this Agreement.

"**ABL Claims**" means any Claim on account of the ABL Loans or the FILO Loans.

"**ABL Loans**" means the revolving loans borrowed under and on the terms set forth in the Revolving Credit Agreement.

"**Affiliate**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity, provided that portfolio companies owned by the Consenting Sponsors shall not constitute Affiliates under this Agreement. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan Credit Agreement and the Revolving Credit Agreement, the DIP Facility and/or the Exit Facility, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.02 (including the Restructuring Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

4

"**Backstop Fee**" has the meaning ascribed to such term in the Exit Facility Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court presiding over the Chapter 11 Cases.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Call Right Collateral**" has the meaning ascribed to it in the Junior Lien Intercreditor Agreement.

"**Cash Collateral**" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

"**Cash Pay Extended Term Loans**" has the meaning set forth in the Term Loan Credit Agreement.

"**Cash Pay/PIK Extended Term Loans**" has the meaning set forth in the Term Loan Credit Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, and Interest in, a Company Party, including, without limitation, the Term Loan Claims, Notes Claims, and the 2028 Debenture Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan and any motion or other pleadings related to the Plan (and all exhibits thereto) or confirmation of the Plan.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Debenture Parties**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Noteholder Group**" means the group or committee of Consenting Noteholders represented by the Consenting Noteholder Group Advisors.

"**Consenting Noteholder Group Advisors**" means, collectively, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, and Houlihan Lokey, Inc.

"**Consenting Parent**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Sponsors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Loan Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Loan Lender Group**" means the group of Consenting Term Loan Lenders represented by Wachtell, Lipton, Rosen & Katz, the membership of which, for the purposes of this Agreement, shall not change after the Execution Date absent the consent of each current member of the group or committee.

"**Consenting Term Loan Lender Group Advisors**" means, collectively, Wachtell, Lipton, Rosen & Katz, Vinson & Elkins LLP and Ducera Partners LLC.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**DIP Credit Agreement**" means the Superpriority Secured Debtor-In-Possession Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among NMG LTD LLC, NMG LLC and NMG Subsidiary, as borrowers, Mariposa Intermediate, each of the other Company Parties party thereto from time to time as guarantors, Cortland Products Corp., as administrative agent and collateral agent, and the lenders party thereto from time to time, consistent with the Restructuring Term Sheet and otherwise in form and substance acceptable to the Company Parties, Consenting Term Loan Lender Group, and Consenting Noteholder Group.

"**DIP Documents**" means, collectively, the DIP Credit Agreement and any and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

"**DIP Facility**" means the loans under the debtor-in-possession financing facility, as contemplated by the DIP Credit Agreement.

"**DIP Lenders**" means the lenders party to the DIP Credit Agreement from time to time.

"**DIP Order**" means collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan and the Plan becomes effective.

6

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing MYT Transaction Documents**" means the agreements and documents set forth on **Exhibit G** to this Agreement, as each may be amended from time to time, in each case, including all exhibits, annexes, and schedules thereto.

"**Exit Credit Agreement**" means the credit agreement governing the Exit Facility, which shall (i) be on the terms set forth in the Exit Facility Term Sheet and otherwise in accordance with this Agreement and (ii) become effective on the Effective Date.

"**Exit Facility**" means the loans under the Exit Facility Credit Agreement.

"**Exit Facility Term Sheet**" means the term sheet setting forth the material terms for the Exit Facility attached to the Restructuring Term Sheet as **Exhibit 2** and any modification, supplement or amendment thereto in accordance with the terms hereof.

"**FILO Loan**" has the meaning set forth in the Revolving Credit Agreement.

"**Final DIP Order**" means a final order entered by the Bankruptcy Court approving entrance into the DIP Facility and the use of Cash Collateral, and incorporating the terms and conditions set forth in the DIP Credit Agreement and otherwise in form and substance in accordance with this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Governance Documents**" means any document that may be included with the Plan Supplement with respect to the governance of any of the reorganized Company Parties following the consummation of the Restructuring Transactions, and any certificates of formation, charters, certificates or articles of incorporation, bylaws, operating agreements, limited liability company agreements or other applicable organizational documents or charter documents and any shareholder agreements or other shareholder documents, in each case, on the terms set forth in the Governance Term Sheet and otherwise in accordance with this Agreement.

"**Governance Term Sheet**" means the term sheet setting forth the material terms for the Governance documents attached hereto as **Exhibit F** and any modification, supplement or amendment thereto in accordance with the terms hereof.

"**Interim DIP Order**" means an interim order entered by the Bankruptcy Court approving entrance into the DIP Facility and the use of Cash Collateral, and incorporating the terms and conditions set forth in the DIP Credit Agreement and otherwise in form and substance in accordance with this Agreement.

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or

subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Junior Lien Intercreditor Agreement**" means that Junior Lien Intercreditor Agreement, dated as of June 7, 2019, among Credit Suisse, AG, as the Initial First Lien Representative and Initial First Lien Collateral Agent for the Initial First Lien Secured Parties, Ankura Trust Company, LLC, as the Initial Second Lien Representative, Ankura Trust Company, LLC as the Initial Second Lien Collateral Agent, Wilmington Trust, National Association, as the 8.000% Notes Representative, Wilmington Trust, National Association, as the 8.75-% Notes Representative, Wilmington Trust, National Association, as the Initial Third Lien Collateral Agent, and each additional Representative and Collateral Agent from time to time party thereto.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Majority Consenting Debenture Party Counsel**" means Quinn Emanuel Urquhart & Sullivan.

"**Mariposa Borrower**"  means Mariposa Borrower, Inc., a Delaware corporation and a direct subsidiary of NMG LTD LLC.

"**Mariposa Intermediate**"  has the meaning set forth in the preamble to this Agreement.

"**MYT Guarantee and Collateral Agreement**" means that certain Guarantee and Collateral Agreement, dated as of June 7, 2019, by and among MYT Parent Co., the grantors party thereto and Ankura Trust Company, LLC.

"**MYT Parent**" means MYT Parent Co., a Delaware corporation and direct subsidiary of NMG Inc.

"**MYT Pledge Agreement**" means that certain Pledge Agreement, dated and effective as of June 7, 2019, between MYT Parent, as the Pledgor, MYT Holding Co., Wilmington Trust, National Association, as 8.000% Third Liens Notes Trustee, Wilmington Trust, National Association, as 8.750% Third Liens Notes Trustee, and Wilmington Trust, National Association, as Collateral Agent.

"**MyTheresa**" means, collectively, MYT Parent and each of its subsidiaries.

"**New MYT Documents**" means any agreements and/or transactions necessary and appropriate to ensure that the economic and governance rights of the Second Lien Noteholders,

the Third Lien Noteholders, the Consenting Sponsors, and the Consenting Parent with respect to MyTheresa are consistent with their prepetition rights, claims and controls, the Existing MYT Transaction Documents and the Transaction Support Agreement (including documentation that gives effect to and preserves the economic and governance effect of the turnover and waterfall provisions concerning MyTheresa set forth in the Transaction Support Agreement and the equivalent provisions in any other prepetition documents and agreements), which documents, agreements and/or transactions shall be acceptable to the Consenting Parent, the Required Consenting Noteholders, the Consenting Sponsors, the Required Consenting Term Loan Lenders (solely with respect to their own rights and obligations thereunder and matters related to the Reorganized Debtors (as defined in the Restructuring Term Sheet, if any), and the Company Parties (such consent not to be unreasonably withheld, conditioned, or delayed).

"**NMG Inc.**" has the meaning set forth in the preamble to this Agreement.

"**NMG LLC**" means The Neiman Marcus Group LLC, a Delaware limited liability company and a direct subsidiary of NMG LTD LLC.

"**NMG LTD LLC**" has the meaning set forth in the preamble to this Agreement.

"**NMG Subsidiary**" means The NMG Subsidiary LLC, a Delaware limited liability company and a direct subsidiary of NMG LLC.

"**Notes**" means, collectively, the Second Lien Notes and the Third Lien Notes.

"**Notes Claims**" means any Claim on account of the Second Lien Notes or Third Lien Notes.

"**Notes Issuers**" means NMG LTD LLC, NMG LLC, NMG Subsidiary and Mariposa Borrower.

"**Notes Trustees**" means, together, the Second Lien Notes Trustee and the Third Lien Notes Trustee.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Company Parties under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions.

"**Plan Effective Date**" means the occurrence of the Effective Date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court, including without limitation, documentation with respect to the steps necessary to implement the Plan, which shall include the New MYT Documents.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting Debenture Parties**" means, as of the relevant date, Consenting Debenture Parties holding at least a majority of the aggregate outstanding principal amount of 2028 Debentures that are held by Consenting Debenture Parties.

"**Required Consenting 2L Noteholders**" means, as of the relevant date, 2L Consenting Noteholders holding at least a majority of the aggregate outstanding principal amount of Second Lien Notes that are held by the 2L Consenting Noteholders.

"**Required Consenting 3L Noteholders**" means, as of the relevant date, 3L Consenting Noteholders holding at least a majority of the aggregate outstanding principal amount of Third Lien Notes that are held by the 3L Consenting Noteholders.

"**Required Consenting Noteholders**" means, as of the relevant date, the Required Consenting 2L Noteholders and the Required Consenting 3L Noteholders.

"**Required Consenting Stakeholders**" means the Required Consenting Term Loan Lenders, the Required Consenting Debenture Parties, the Required Consenting Noteholders, the Consenting Parent, and each of the Consenting Sponsors.

"**Required Consenting Term Loan Lenders**" means, as of the relevant date, Consenting Term Loan Lenders comprising not fewer than three (3) unaffiliated Consenting Term Loan Lenders holding at least 66.67% of the aggregate outstanding principal amount of Term Loans that are held by Consenting Term Loan Lenders.

"**Restricted Period**" means the period commencing as of the date each Consenting Stakeholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Stakeholder.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Revolving Credit Agreement**" means that certain Revolving Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified, or replaced from time to time), by and among NMG LTD LLC and certain Company Parties, as co-borrowers, Mariposa Intermediate, each of the other Company Parties party thereto

as guarantors, Deutsche Bank AG New York Branch, as administrative and collateral agent, and the lenders party thereto from time to time.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Noteholder**" means any holder of Second Lien Notes Claims.

"**Second Lien Notes**" means those certain 14.0% Second Lien Notes due 2024 issued pursuant to an indenture, dated as of June 7, 2019, by and among the Notes Issuers, the guarantors party thereto and Ankura Trust Company, LLC, as trustee and notes collateral agent.

"**Second Lien Notes Indenture**" means that certain indenture, dated as of June 7, 2019, among the Second Lien Notes Trustee, the issuers party thereto and the guarantors party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"**Second Lien Notes Trustee**" means Ankura Trust Company, LLC, in its capacity as trustee and notes collateral agent for the Second Lien Notes.

"**Second Lien Notes Claims**" means any Claim on account of the Second Lien Notes.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related ballots.

"**Sponsor**" means any party that directly or indirectly holds or controls equity interests in the Consenting Parent, including the Consenting Sponsors.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Term Loans**" means, collectively, the 2019 Extended Term Loans and the 2013 Term Loans.

"**Term Loan Borrowers**" means NMG LTD LLC, NMG LLC and NMG Subsidiary.

"**Term Loan Claims**" means, collectively, the 2019 Extended Term Loan Claims and the 2013 Term Loan Claims.

"**Term Loan Credit Agreement**" means that certain Term Loan Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Mariposa Intermediate, NMG LTD LLC, the other Company Parties party thereto from time to time as guarantors, the lenders party thereto from time to time, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the other parties thereto from time to time.

"**Third Lien Noteholder**" means any holder of Third Lien Notes Claims.

"**Third Lien Notes**" means, together, the 8.000% Third Lien Notes and the 8.750% Third

Lien Notes.

"**Third Lien Notes Indentures**" means those certain indentures, dated as of June 7, 2019, among the Third Lien Notes Trustee, the issuers party thereto and the guarantors party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time.

"**Third Lien Notes Claims**" means any Claim on account of the Third Lien Notes.

"**Third Lien Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee and notes collateral agent for the Third Lien Notes.

"**Transaction Support Agreement**" means that certain Transaction Support Agreement together with all exhibits, annexes and schedules thereto, dated as of March 15, 2019 and as amended on April 10, 2019, by and among NMG Inc. and its subsidiaries, the Consenting Sponsors, an ad hoc committee of holders of 2013 Term Loans, an ad hoc committee of holders of 8.000% Senior Cash Pay Notes due 2021 and the 8.750%/9.500% Senior PIK Toggle Notes due 2021 of NMG LTD LLC and Mariposa Borrower and each of the additional parties who delivered a joinder thereto.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); provided, however, that any pledge in favor of (a) a bank or broker dealer at which a Consenting Stakeholder maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally or (b) any lender, agent or trustee to secure obligations generally under debt issued by the applicable fund or account, in each case shall not be deemed a "Transfer" for any purposes hereunder.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the indenture governing the Second Lien Notes, the indenture governing the Third Lien Notes or the indenture governing the 2028 Debentures.

1.02.   Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms

and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.10 other than counsel to the Company Parties.

**Section 2.**     ***Effectiveness of this Agreement.***  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties:

(i)     holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, at least two-thirds of the aggregate outstanding principal amount of Term Loans;

(ii)     holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, at least a majority of the aggregate outstanding principal amount of 2028 Debentures;

(iii)    holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, at least two-thirds of the aggregate outstanding principal amount of Second Lien Notes;

(iv)    holders of, or nominees, investment managers, advisors or subadvisors to funds and/or accounts, or trustees of trusts of holders of, at least two-thirds of the aggregate outstanding principal amount of Third Lien Notes;

(v)    the Consenting Parent;

(vi)    the Consenting Sponsors;

(c)    counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred; and

(d)    the Company Parties shall have paid (or caused to be paid) to the Consenting Term Loan Lenders constituting the Consenting Term Loan Lender Group and the Consenting Noteholders constituting the Consenting Noteholder Group the Backstop Fee (in accordance with and as defined in the Exit Facility Term Sheet); and

(e)    the Company Parties shall have paid in full all Consenting Lender Fees and Expenses invoiced to the Company Parties as of May 2, 2020 and the Consenting Parent Fee and Expense Obligation.

Notwithstanding anything herein to the contrary, including the definition of "Company Claims/Interests", nothing in this Agreement shall be deemed to require any Consenting Creditor to consent to any treatment, whether in the Plan, with respect to adequate protection, or otherwise, of such Party's ABL Claims or interests in ABL Loans or FILO Loans, nor to prohibit any Party from objecting to or contesting any treatment of such Party's ABL Claims or interests in ABL Loans or FILO Loans, whether pursuant to the Plan, with respect to adequate protection or otherwise or opposing the Plan on the basis of the treatment of such Party's ABL Claims or interests in ABL Loans or FILO Loans.

**Section 3.**    *Definitive Documents.*

3.01.    The Definitive Documents governing the Restructuring Transactions shall consist of the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the First Day Pleadings and all orders obtained pursuant thereto; (F) the Plan Supplement, (G) the DIP Orders, the DIP Credit Agreement, and the other DIP Documents, and related documentation, (H) the Exit Credit Agreement, (I) the Governance Documents, (J) the New MYT Documents, and (K) all other material documents necessary or customarily required to consummate the Restructuring Transactions.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or

instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including as provided for in the applicable definitions set forth in Section 1 and the term sheets attached hereto), as they may be modified, amended, or supplemented in accordance with Section 12. Further, without limiting any additional consent or approval rights of the Parties elsewhere in this Agreement, the Definitive Documents and every material other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to (i) the Company Parties, the Required Consenting Term Loan Lenders, the Required Consenting 2L Noteholders in their capacities as such, the Required Consenting 3L Noteholders in their capacities as such, and (ii) to the extent material or adverse to the interests of the Consenting Debenture Parties in their capacities as such, the Consenting Parent in its capacity as such, and/or the Consenting Sponsors in their capacities as such, the Required Consenting Debenture Parties, the Consenting Parent, and the Consenting Sponsors.

3.03.    Upon the terms and subject to the conditions of this Agreement and the Exit Facility Term Sheet, including the entry of the Confirmation Order and order approving the Disclosure Statement and the substantially simultaneous consummation of the Plan on the terms set forth in the Restructuring Term Sheet, each Backstop Lender (as defined in the Exit Facility Term Sheet) shall provide its Exit Backstop Commitment (as defined in the Exit Facility Term Sheet) and each Joinder Lender (as defined in the Exit Facility Term Sheet) shall provide its Commitment (as defined in the Exit Facility Term Sheet) on a several, not joint basis, and the Company Parties shall pay the fees to the Backstop Lenders (as defined in the Exit Facility Term Sheet) and the Joinder Lenders (as defined in the Exit Facility Term Sheet), as applicable, the Post-Joinder Fees (as defined in the Exit Facility Term Sheet). Prior to the Effective Date (as defined in the Exit Facility Term Sheet), each 2019 Extended Term Loan Lender, 2013 Term Loan Lender, 2028 Debenture Holder, Second Lien Noteholder and Third Lien Noteholder will have the opportunity to participate in the Exit Facility pursuant to their Rights (as defined in the Restructuring Term Sheet) and to the extent contemplated by the "Treatment of Claims Against and Interests in the Debtors" table in the Restructuring Term Sheet.

**Section 4.**    ***Commitments of the Consenting Stakeholders.***

4.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement to:

(i)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)    not, and shall not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims or Interests against the Company Parties or the Consenting Parent in a manner inconsistent with its obligations under this Agreement;

(iv)    give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions;

(v)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(vi)    negotiate in good faith any appropriate additional provisions or agreements to address any legal, financial or structural impediment that may arise that would prevent, hinder, impede or delay the consummation of the Restructuring Transactions; provided, that, for the avoidance of doubt, no Consenting Stakeholder shall be required to consent to any provisions or agreements that would reasonably result in any change that is material and adverse to such Consenting Stakeholder's rights or treatment in the Plan;

(vii)    solely with respect to the Consenting Noteholders, by executing this Agreement, each Consenting Noteholder expressly consents to the priming of the Call Right Collateral pursuant to section 364 of the Bankruptcy Code upon entry of the DIP Order; and

(viii)    except with respect to the Consenting Term Loan Lenders, support and take all commercially reasonable steps to defend and preserve the economic and governance rights of the Second Lien Noteholders, the Third Lien Noteholders, the Consenting Sponsors, and the Consenting Parent with respect to MyTheresa consistent with such parties' prepetition rights, claims and controls, the Existing MYT Transaction Documents, and the Transaction Support Agreement (including documentation that gives effect to the turnover and waterfall provisions concerning MyTheresa set forth in the Transaction Support Agreement and the equivalent provisions in any other prepetition documents and agreements).

(b)    During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims/Interests pursuant to this Agreement that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties, the Consenting Parent, or the other Parties other

than to enforce, or otherwise in furtherance of, this Agreement, any Definitive Document or the Restructuring Transactions, or as otherwise not prohibited under this Agreement;

(v)     without the consent of the Consenting Parent and the Consenting Sponsors, take any action to change or affect the direct or indirect ownership or control of any equity interests of any MyTheresa entity, exercise any right or remedy (including under any document applicable to the Notes) with respect to any MyTheresa entity, initiate any litigation or proceeding of any kind with respect to any MyTheresa entity, or direct or support any other party to take any of the foregoing actions;

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vii)    take or fail to take any action outside of the ordinary course of business (except to the extent expressly contemplated by the Plan) if such action or failure to act would cause a change to the tax status of any Company Party or be expected to cause, individually or in the aggregate, a material adverse tax consequence to the Company Parties without the consent of the Company Parties, the Required Consenting Term Loan Lenders, the Required Consenting 2L Noteholders in their capacities as such, or the Required Consenting 3L Noteholders in their capacities as such (such consent of the Required Consenting 2L Noteholders and Required Consenting 3L Noteholders, respectively, not to be unreasonably withheld, conditioned, or delayed); or

(viii)   limit, impair, or modify, or seek to limit, impair, or modify, the rights of the Second Lien Noteholders, the Third Lien Noteholders, the Consenting Parent, or the Consenting Sponsors under the Existing MYT Transaction Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements.

(c)     For the avoidance of doubt, nothing in this Agreement shall require any Consenting Stakeholder to consent to, acquiesce in, vote for, support or not object to any Alternative Restructuring Proposal or any portion thereof, including without limitation any alternative to the terms and provisions of the Exit Facility Term Sheet or the Restructuring Term Sheet, or any provision of either of them.

(d)     During the Chapter 11 Cases, the Consenting Noteholders hereby agree to forbear from exercising any rights or remedies under the Second Lien Notes Indenture or any document governing the Second Lien Notes (including those set forth in Sections 6.2 and 6.3 of the Second Lien Notes Indenture and corresponding provisions of any other document (including exercising rights of set off and conversion, and refusal to permit additional extensions of credit, as applicable) or applicable law with respect to any default or event default under Section 6.1(m) of the Second Lien Notes Indenture due to the failure of the MYT Entities (as defined in the Second Lien Notes Indenture) to comply with Section 4.06(2) of the MYT Guarantee and Collateral Agreement.

(e)     During the Chapter 11 Cases, the Consenting Noteholders hereby agree to forbear from exercising any rights or remedies under either of the Third Lien Notes Indentures or any

17

document governing the Third Lien Notes (including those set forth in Sections 6.2 and 6.3 of either of the Third Lien Notes Indentures and corresponding provisions of any other document (including exercising rights of set off and conversion, and refusal to permit additional extensions of credit, as applicable)) or applicable law with respect to any default or event default under Section 6.1(m) of each of the Third Lien Notes Indentures due to the failure of the MYT Entities (as defined in the Third Lien Notes Indentures) to comply with Section 3.03 of the MYT Pledge Agreement.

4.02.   Commitments with Respect to Chapter 11 Cases.

(a)   During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)   vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)   to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)   not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above; provided, however, that nothing in this Agreement shall prevent any Consenting Stakeholder from withholding, amending or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Consenting Stakeholder.

Notwithstanding any other provision of this Agreement, including this Section 4, nothing in this Agreement shall (a) require any Consenting Stakeholder to (i) incur any material expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to any Consenting Stakeholder or its Affiliates other than as expressly provided in this Agreement or (ii) provide any information that it determines, in its sole discretion, to be sensitive or confidential and (b) limit the ability of a Consenting Stakeholder to sell or enter into any transactions in connection with any Company Claims/Interests or any other claims against the Company Parties in accordance with Section 8.

**Section 5.   *Additional Provisions Regarding the Consenting Stakeholders' Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection not prohibited under this Agreement in connection

with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising its rights or remedies specifically reserved herein or in the DIP Credit Agreements or any of the Definitive Documents; (d) be construed to prohibit any Consenting Stakeholder from appearing as party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding or taking any other action to delay, interfere, impede, directly or indirectly, the Restructuring Transactions; (e) obligate a Consenting Stakeholder to deliver a vote to support the Plan or prohibit a Consenting Stakeholder from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); provided that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed void ab initio and such Consenting Stakeholder shall have the opportunity to change its vote; (f) (i) prevent any Consenting Stakeholder from taking any action which is required by applicable Law, or (ii) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or other professional or business professional privilege; or (g) prevent any Consenting Stakeholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like that are required by applicable Law.

**Section 6.**     ***Commitments of the Company Parties.***

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the Restructuring Term Sheet and the applicable milestones set forth on **<u>Exhibit E</u>** attached hereto (collectively, the "<u>Milestones</u>");

(b)     to the extent any legal, tax or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required or advisable regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and, where applicable, execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     use commercially reasonable efforts to (i) seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent and (ii) obtain (1) approval by the Bankruptcy Court of the Solicitation Materials and (2) entry of the Confirmation Order by the Bankruptcy Court in accordance with the Bankruptcy Code;

provided, that, notwithstanding anything herein to the contrary, the Company Parties shall not be permitted to offer any additional fees, expenses or other economic entitlements to other stakeholders (other than as contemplated by this Agreement) without prior written consent from the Consenting Term Loan Lender Group and the Consenting Noteholder Group;

(f)        actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(g)        upon reasonable request of any of the Consenting Stakeholders, inform the advisors to the applicable Consenting Stakeholders as to: (i) the material business and financial (including liquidity) performance of the Company Parties; (ii) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(h)        inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of: (i) any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) a breach of this Agreement (including a breach by any Company Party); and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(i)        (A) use commercially reasonable efforts to provide counsel for the Consenting Stakeholders a reasonable opportunity (which shall be no less than two (2) Business Days, absent exigency) to review draft copies of all pleadings, motions, declarations, supporting exhibits, and proposed orders (including, without limitation, all First Day Pleadings and "second day" pleadings) and any other documents that the Company Parties intend to file in the Chapter 11 Cases, and (B) be available to consult in good faith with counsel to the Consenting Stakeholders regarding the form and substance of any document referred to in the immediately preceding clause (A) before filing such document in the Chapter 11 Cases, in each case (other than with respect to First Day Pleadings and "second day" pleadings), except in the case of circumstances where doing so is not practicable;

(j)        cooperate, to the extent necessary or appropriate, with the Consenting Noteholder Group and the Consenting Parent, in the issuance of one or more securities for the purpose of preserving the rights described in Section 6.01(k), which securities shall be in form and substance acceptable to the Required Consenting Noteholders, the Consenting Parent, the Consenting Sponsors, and the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld, conditioned, or delayed), subject to the investigations of the disinterested manager(s) of the Company Parties; provided, however, that the Company Parties' failure to comply with this covenant as a result of such investigations may be a basis for termination of this Agreement pursuant to Section 11.01 hereof; and

(k)      support and take all steps necessary to defend and preserve the economic and governance rights of the Second Lien Noteholders, the Third Lien Noteholders, the Consenting Sponsors, and the Consenting Parent with respect to MyTheresa consistent with such parties' prepetition rights, claims and controls, the Existing MYT Transaction Documents and the Transaction Support Agreement (including documentation that gives effect to the turnover and waterfall provisions concerning MyTheresa set forth in the Transaction Support Agreement and the equivalent provisions in any other prepetition documents and agreements), subject to the investigations of the disinterested manager(s) of the Company Parties; provided, however, that the Company Parties' failure to comply with this covenant as a result of such investigations may be a basis for termination of this Agreement pursuant to Section 11.01 hereof.

6.02.   Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)      modify any Definitive Document, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)      except as contemplated and permitted by the DIP Credit Agreement or pursuant to the Restructuring Transactions, transfer any asset or right of the Company Parties or any material asset or right used in the business of the Company Parties to any person or entity outside the ordinary course of business without the consent of the Consenting Sponsors (not to be unreasonably withheld), the Consenting Parent (not to be unreasonably withheld), the Required Consenting Term Loan Lenders, the Required Consenting 2L Noteholders in their capacity as such, the Required Consenting 3L Noteholders in their capacity as such, and the Required Consenting Debentures Parties;

(e)      object to, delay, impede, or take any action to interfere with or that is inconsistent with or is intended or could reasonably be expected to interfere with, delay, or impede, the approval, consummation or implementation of the Restructuring Transactions;

(f)      take or fail to take any action outside the ordinary course of business (except to the extent expressly contemplated by the Plan) if such action or failure to act would cause a change to the tax status of any Company Party or be expected to cause, individually or in the aggregate, a material adverse tax consequence to the Company Parties pursuant to the Plan, without the consent of the Consenting Sponsors, the Consenting Parent, the Required Consenting Term Loan Lenders, and the Required Consenting Noteholders (such consent of the Required Consenting Noteholders not to be unreasonably withheld, conditioned, or delayed);

(g) except as contemplated and permitted by the DIP Credit Agreement, engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than the transactions

contemplated herein and on the terms contemplated hereby without the consent of the Consenting Sponsors (not to be unreasonably withheld), the Consenting Parent (not to be unreasonably withheld), the Required Consenting Term Loan Lenders, the Required Consenting Debenture Parties, and the Required Consenting Noteholders;

(h)  file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(i)  without the consent of the Required Consenting Noteholders, the Consenting Parent, and the Consenting Sponsors, take any action to change or affect the direct or indirect ownership or control of any equity interests of any MyTheresa entity, exercise any right or remedy (including under any document applicable to the Notes) with respect to any MyTheresa entity, initiate any litigation or proceeding of any kind with respect to any MyTheresa entity, or direct or support any other party to take any of the foregoing actions, subject to the investigations of the disinterested manager(s) of the Company Parties; provided, however, that the Company Parties' failure to comply with this covenant as a result of such investigations may be a basis for termination of this Agreement pursuant to Section 11.01 hereof; or

(j)  without the consent of the Required Consenting Noteholders, the Consenting Parent, and the Consenting Sponsors, limit, impair, or modify, or seek to limit, impair, or modify, the rights of the Second Lien Noteholders, the Third Lien Noteholders, the Consenting Sponsors, or the Consenting Parent under the Existing MYT Transaction Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements, subject to the investigations of the disinterested manager(s) of the Company Parties; provided, however, that the Company Parties' failure to comply with this covenant as a result of such investigations may be a basis for termination of this Agreement pursuant to Section 11.01 hereof.

**Section 7.**    *Additional Provisions Regarding Company Parties' Commitments.*

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including, for the avoidance of doubt, any disinterested director or manager of a Company Party), after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.

7.02.    Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 7.01 of this Agreement, each Company Party and its directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) solicit, consider, respond to and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) initiate, maintain or continue discussions or negotiations with respect to Alternative

Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of any Company Claim/Interest (including any Consenting Stakeholder), any other party in interest, or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals. At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide counsel to the Consenting Term Loan Lender Group, counsel to the Consenting Debenture Parties, counsel to the Consenting Noteholder Group, the Consenting Parent, and counsel to each Consenting Sponsor updates on the status of discussions regarding any Alternative Restructuring Proposal within three (3) Business Days of the Company Parties' or their advisors' receipt of any such Alternative Restructuring Proposal. The Company Parties and/or the Company Parties' advisors will make themselves reasonably available for separate weekly status update calls with (i) on the one hand, counsel to the Consenting Sponsors and the Consenting Parent and (ii) on the other hand, the Consenting Term Loan Lenders, the Consenting Debenture Parties, and the Consenting Noteholder Group, in each case, with respect to the foregoing.

7.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.   Notwithstanding anything to the contrary in this Agreement, the Company Parties' commitments to grant the releases contemplated by this Agreement are subject to the investigation(s) of the disinterested manager(s) of the applicable Company Parties.   Any determination of the Company Parties to not grant any of the releases to Consenting Stakeholders contemplated by this Agreement shall not be deemed to constitute a breach of this Agreement but shall be a basis for termination of this Agreement pursuant to Section 11.01(h) hereof.

**Section 8.**   *Transfer of Interests and Securities.*

8.01.   During the Restricted Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)   in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)   either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder or counsel of such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is otherwise permitted under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.   Notwithstanding anything to the contrary herein, any Company Claims/Interests transferred by a Consenting Stakeholder pursuant to an Open Trade shall not be subject to, or bound by, the terms and conditions of this Agreement (it being understood that such claim so transferred to and held by a Consenting Stakeholder for its own account (*i.e.*, not as part of a short transaction, or to be transferred by the Consenting Stakeholder under an Open Trade or any other transaction entered into by such Consenting Stakeholder prior to, and pending as of the date of, such Consenting Stakeholder's entry into this Agreement), shall be subject to the terms of this Agreement, as provided in Section 8.03 hereof).  For these purposes, "**Open Trade**" means a transaction, agreement, or other arrangement, whether done through an oral or written confirmation, under which a Consenting Stakeholder is entitled or obligated to transfer a claim,

with a trade date on or prior to the Consenting Stakeholder's execution of this Agreement or execution of the Transfer Agreement.

8.07.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**    ***Representations and Warranties of Consenting Stakeholders.***  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**    ***Mutual Representations, Warranties, and Covenants***.  Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and on the Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating

to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**     *Termination Events*.

11.01.  <u>Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (a) with respect to the Consenting Term Loan Lenders, by the Required Consenting Term Loan Lenders, (b) with respect to the 2L Consenting Noteholders, by the Required Consenting 2L Noteholders, (c) with respect to the 3L Consenting Noteholders, by the Required Consenting 3L Noteholders, (d) with respect to the Consenting Debenture Parties, by the Required Consenting Debenture Parties (but solely with respect to their 2028 Debentures), (e) with respect to the Consenting Parent, by the Consenting Parent, and (f) with respect to the Consenting Sponsors, by the Consenting Sponsors, in each case by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence and continuation of the following events; <u>provided</u>, <u>that</u> neither the Consenting Parent nor the Consenting Sponsors shall have any right to terminate this Agreement pursuant to clauses (i) and (j) below:

(a)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for seven (7) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof describing any such breach;

(b)     the breach in any material respect by one or more of the Consenting Stakeholders (other than the Consenting Stakeholders seeking termination under this provision) holding (i) an amount of Term Loans that would result in non-breaching Consenting Stakeholders holding less than two-thirds of the aggregate principal amount of Term Loans, (ii) an amount of Second Lien Notes that would result in the non-breaching 2L Consenting Noteholders holding less than two-thirds of the aggregate principal amount of the Second Lien Notes or (iii) an amount of Third Lien Notes that would result in the non-breaching 3L Consenting Noteholders holding less than

two-thirds of the aggregate principal amount of the Third Lien Notes, (iv) an amount of 2028 Debentures that would result in non-breaching Consenting Stakeholders holding less than a majority of the aggregate principal amount of 2028 Debentures, in each case, as applicable, of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(c)       the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)       any order approving the Plan or the Disclosure Statement is reversed, stayed, dismissed, vacated, or reconsidered without the consent of the Required Consenting Stakeholders or is modified or amended (i) in a manner that is inconsistent with this Agreement and adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Stakeholder transmits a written notice in accordance with Section 13.10 hereof describing any such breach;

(e)       the Bankruptcy Court denies confirmation of the Plan or any material provision thereof, including any provisions in the Plan granting releases to any Consenting Stakeholders;

(f)       the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, as applicable), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party that is reasonably likely to be a material impediment to the implementation of the Restructuring Transactions, (iii) rejecting this Agreement or (iv) terminating exclusivity under Bankruptcy Code section 1121;

(g)       the making public, modification, amendment or filing of any of the Definitive Documents by any Company Party that contains terms or conditions that have not received the consent of the applicable Consenting Stakeholders as provided for in Section 3 of this Agreement (i) in a manner that is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Stakeholders transmits a written notice in accordance with Section 13.10 hereof describing any such breach;

(h)       the Company Parties (i) withdraw the Plan, (ii) publicly announce their intention not to support the Restructuring Transactions or (iii) file, publicly announce, execute a definitive written agreement with respect to an Alternative Restructuring Proposal, determine not to grant releases to any Consenting Stakeholder, or take any other action pursuant to their authority in

27

Section 7.01 that would, but for the provisions of Section 7.01, give rise to a termination right under this Section 11.01;

(i)     the failure of any of the Company Parties to satisfy a Milestone that is not cured within five (5) Business Days;

(j)     an order is entered by the Bankruptcy Court granting relief from automatic stay imposed by section 362 of the Bankruptcy Code authorizing any person to (i) foreclose on a full-line store owned by the Debtors, (ii) terminate a lease of any full-line store leased by the Debtors other than in connection with a Specified Disposition (as defined in the DIP Credit Agreement), or (iii) proceed against any material asset (other than consignment inventory) of the Company Parties with a value in excess of $15,000,000 in the aggregate for all such assets;

(k)     solely with respect to the Consenting Term Loan Lenders, the 2L Consenting Noteholders and the 3L Consenting Noteholders, the occurrence of any Event of Default under the DIP Credit Agreement or DIP Order (as defined therein) that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Credit Agreement and DIP Order and the requisite DIP Lenders have validly elected to exercise remedies with respect thereto (whether or not stayed);

(l)     the Company Parties file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement (i) in a manner that is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for five (5) Business Days after such terminating Consenting Stakeholder transmits a written notice in accordance with Section 13.10 hereof describing any such breach;

(m)     solely with respect to the Consenting Noteholders or the Consenting Sponsors, the (i) Consenting Parent or any MYT Entity (as defined in the Second Lien Notes Indenture) (x) commences a voluntary case or proceeding under any Bankruptcy Law (as defined in the Second Lien Notes Indenture) or any other case or proceeding to be adjudicated bankrupt or insolvent or (y) consents to the filing of a petition, application, answer or consent seeking reorganization or relief under any Bankruptcy Law, (ii) Consenting Parent or any MYT Entity consents to the entry of a decree or order for relief in respect of Consenting Parent or such MYT Entity in an involuntary case or proceeding under any Bankruptcy Law or to the commencement of any bankruptcy or insolvency case or proceeding against it or, (iii) Consenting Parent or any MYT Entity (x) consents to the appointment of, or taking possession by, a custodian, receiver, liquidator, administrator, supervisor, assignee, trustee, sequestrator or similar official of Consenting Parent or such MYT Entity or of any substantial part of their respective properties, (y) makes an assignment for the benefit of creditors or (z) admits in writing its inability to pay its debts generally as they become due;

(n)     solely with respect to the 2L Consenting Noteholders, any event of default occurs with respect to the MYT Guarantee and Collateral Agreement that constitutes an "Event of Default" as defined in the Second Lien Notes Indenture as in effect on the date hereof, other than an "Event of Default" forborne pursuant to Section 4.01(d) of this Agreement.;

(o)      (i) a litigation or similar trust is formed, whether under the Plan or a chapter 11 plan confirmed in the Chapter 11 Cases or otherwise, for purposes of investigating, prosecuting, monetizing or otherwise pursuing any Cause of Action (as defined in the Restructuring Term Sheet) relating to the Company Parties' 2019 exchange offers and consent solicitations that resulted in the issuance of the Second Lien Notes and the Third Lien Notes, or the Existing MYT Transaction Documents; or (ii) any of the Notes Claims or Term Loan Claims are not allowed in full, or are subject to section 502(d) of the Bankruptcy Code, under the Plan or a chapter 11 plan confirmed in the Chapter 11 Cases;

(p)      solely with respect to the Consenting Noteholders, the Consenting Parent, and the Consenting Sponsors, any of the Company Parties fails to comply with any of its Affirmative Commitments in Sections 6.01(j) or (k) hereof, or Negative Commitments in Sections 6.02(i) or (j) hereof, as a result of the investigations of the disinterested manager(s) of the Company Parties; or

(q)      solely with respect to the 3L Consenting Noteholders, any event of default occurs with respect to the MYT Pledge Agreement that constitutes an "Event of Default" as defined in the Third Lien Notes Indenture as in effect on the date hereof, other than an "Event of Default" forborne pursuant to Section 4.01(e) of this Agreement.

Further, without limitation of the foregoing, this Agreement may be terminated with respect to any Consenting Stakeholder, solely with respect to such Consenting Stakeholder, by the delivery to the Company Parties of a written notice from such Consenting Stakeholder in accordance with Section 13.10 hereof if the Plan has not been consummated by December 7, 2020 (the "**Outside Date**").

11.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting Stakeholders holding (i) an amount of Term Loans that would result in non-breaching Consenting Stakeholders holding less than two-thirds of the aggregate principal amount of Term Loans, (ii) an amount of Second Lien Notes that would result in the non-breaching 2L Consenting Noteholders holding less than two-thirds of the aggregate principal amount of the Second Lien Notes or (iii) an amount of Third Lien Notes that would result in the non-breaching 3L Consenting Noteholders holding less than two-thirds of the aggregate principal amount of the Third Lien Notes, or (iv) an amount of 2028 Debentures that would result in non-breaching Consenting Stakeholders holding less than a majority of the aggregate principal amount of 2028 Debentures, in each case, as applicable, of any provision set forth in this Agreement that remains uncured for a period of seven (7) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan.

11.03.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

11.04.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.05.   Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action; provided that the foregoing shall not release any Party from liability for any breach hereof prior to the Termination Date.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or

Section 11.02(d).  Nothing in this Section 11.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

Notwithstanding anything to the contrary in this Agreement, upon the occurrence of a Termination Date as to a Party that is reasonably expected to be a material impediment to the implementation of the Restructuring Transactions, taken as a whole, the other Parties shall have the option (which option shall be determined (a) with respect to the Consenting Term Loan Lenders, by the Required Consenting Term Loan Lenders, (b) with respect to the 2L Consenting Noteholders, by the Required Consenting 2L Noteholders, (c) with respect to the 3L Consenting Noteholders, by the Required Consenting 3L Noteholders, (d) with respect to the Consenting Debenture Parties, by the Required Consenting Debenture Parties, (e) with respect to the Company Parties, by the Company Parties, (f) with respect to the Consenting Sponsors, by the Consenting Sponsors and (g) with respect to the Consenting Parent, by the Consenting Parent, and shall be delivered in writing to the other Parties, as applicable, including via email) to (i) determine that the Parties will continue remaining Parties to this Agreement in pursuit and support of the Restructuring Transactions or (ii) terminate this Agreement in accordance with Sections 11.01 or 11.02, as applicable.

**Section 12.** *Amendments and Waivers*.

(a)    This Agreement (including as to the required content of and consent rights with respect to any Definitive Document) may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties, whose consent shall be necessary solely with respect to any modification, amendment, waiver or supplement that adversely affects the rights of such Parties: (i) the Required Consenting Term Loan Lenders; (ii) the Required Consenting Debenture Parties; (iii) the Required Consenting 2L Noteholders, (iv) the Required Consenting 3L Noteholders, (v) Consenting Parent; and (vi) the Consenting Sponsors; provided, however, that if the proposed modification, amendment, waiver, or supplement has a material and disproportionate adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; provided, further, that, so long as a member of the Consenting Term Loan Lender Group holds an aggregate principal amount of Term Loans equal to or exceeding 80.0% of its holdings as of the Execution Date, written consent of such member of the Consenting Term Loan Lender Group shall be required for any modification, amendment, waiver or supplement to the material economic terms of this Agreement (including without limitation the economic treatment in the Plan of the Term Loan Claims, Notes Claims and the 2028 Debenture Claims and any fees or back-stop rights and the principal terms of the Exit Facility).  Notwithstanding the foregoing, in no event shall the Outside Date be extended as to any Consenting Stakeholder without the consent of each such Consenting Stakeholder.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**     *Miscellaneous.*

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, and not inconsistent with this Agreement or any of the Definitive Documents, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement. For the avoidance of doubt, the Transaction Support Agreement and the parties' rights and obligations thereunder are not impaired or affected by this Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in

the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, and the parties agree that the signatures appearing on this Agreement are the same as handwritten signatures for purposes of validity, enforceability and admissibility.  Each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity except as expressly permitted in Section 8 hereof and any such attempted assignment, delegation or transfer shall be void ab initio.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Neiman Marcus Group LTD LLC
One Marcus Square
1618 Main Street
Dallas, TX 75201
Attn: Tracy M. Preston
E-mail address: tracy_preston@neimanmarcus.com

with copies to:

Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attn:  David Nemecek, P.C.; Nisha Kanchanapoomi, P.C.; Philippa Bond, P.C.;
Jessica Schreiber; Peter Liskanich
E-mail address: david.nemecek@kirkland.com;
nisha.kanchanapoomi@kirkland.com; pippa.bond@kirkland.com;
jessica.schreiber@kirkland.com; peter.liskanich@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  Anup Sathy, P.C.; Chad Husnick, P.C.; Alexander Schwartz; Daniel
Latona; Carole Wurzelbacher
E-mail address: anup.sathy@kirkland.com; chad.husnick@kirkland.com;
alexander.schwartz@kirkland.com; dan.latona@kirkland.com;
carole.wurzelbacher@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn: Matthew Fagen; Gary Kavarsky
E-mail address: matthew.fagen@kirkland.com; gary.kavarsky@kirkland.com

(b)      if to the Consenting Parent, to:

Neiman Marcus Group, Inc.
One Marcus Square
1618 Main Street
Dallas, TX 75201
Attn: Tracy M. Preston
E-mail address: tracy_preston@neimanmarcus.com

34

with copies to:

Latham & Watkins LLP
811 Main Street, Suite 3700
Houston, Texas 77002
Attn:  Michael Chambers, Jeff Bjork, Ryan Maierson
E-mail address: michael.chambers@lw.com; jeff.bjork@lw.com;
ryan.maierson@lw.com


(c)      if to a Consenting Term Loan Lender, to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attn: Joshua A. Feltman, Emil A. Kleinhaus, Michael S. Benn, Stephanie A.
Marshak, Daniel J. Wertman
E-mail address: jafeltman@wlrk.com; eakleinhaus@wlrk.com;
msBenn@wlrk.com; samarshak@wlrk.com; djwertman@wlrk.com

(d)      if to the Consenting Noteholder Group, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Andrew Rosenberg, Alice Belisle Eaton; Claudia Tobler; Diane Meyers;
Neal Paul Donnelly
E-mail address: arosenberg@paulweiss.com; aeaton@paulweiss.com;
ctobler@paulweiss.com; dmeyers@paulweiss.com; ndonnelly@paulweiss.com

(e)      if to a Consenting Debenture Party, to:

Quinn Emanuel Urquhart & Sullivan
51 Madison Ave. 22 Fl.
New York, NY 10011
Attn:  Benjamin I. Finestone, Daniel Holzman
Email address: benjaminfinestone@quinnemanuel.com;
danielholzman@quinnemanuel.com

(f)      if to Ares, to:

Ares Corporate Opportunities Fund III, L.P. and Ares Corporate Opportunities
Fund IV, L.P.
2000 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Attn: Eric Waxman
E-mail address: ewaxman@aresmgmt.com

with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10011
Attn: Dennis Dunne, Michael Price
E-mail address: ddunne@milbank.com, mprice@milbank.com

and

Milbank LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Attn: Adam Moses
E-mail address: amoses@milbank.com

(g)     if to CPPIB, to:

Canada Pension Plan Investment Board
One Queen Street East
Toronto, Ontario M5C 2W4
Attn: Lori Hall-Kimm
E-mail address: lhallkimm@cppib.com

with copies to:

CPPIB America, Inc.
510 Madison Avenue, 15th Floor
New York NY 10022
Attn: Pankita Naik
E-mail address: pnaik@cppib.com

and

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attn: Jasmine Ball; Erica Weisgerber
E-mail address: jball@debevoise.com; eweisgerber@debevoise.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent

investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

13.12.   <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of any rights or remedies under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising any rights or remedies under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.   <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.   <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.15.   <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.   <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.   <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.   <u>Capacities of Consenting Stakeholders</u>.   Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.19.   <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have

occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.20. <u>Fees and Expenses</u>. Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall promptly pay in cash all reasonable and documented fees and expenses of (i) (a) the Consenting Term Loan Lender Group Advisors, (b) any local or conflicts counsel to the Consenting Term Loan Lender Group, (ii) any consultants or other professionals retained by the Consenting Term Loan Lender Group in connection with the Company Parties or the Restructuring Transactions with the consent of the Company Parties (not to be unreasonably withheld), (iii) the Consenting Noteholder Group Advisors, (iv) the Notes Trustees, including counsel for each of the Second Lien Notes Trustee and the Third Lien Notes Trustee, and (v) the Majority Consenting Debenture Party Counsel (collectively, the "**Consenting Lender Fees and Expenses**"), in each case in connection with the Restructuring Transactions and any applicable engagement letter, including, without limitation, any success fees consented to by the Company Parties, and in each case without further order of, or application to, the Bankruptcy Court by such consultant or professional.  Simultaneously with the execution of this Agreement, the Company Parties shall pay all such unpaid Consenting Lender Fees and Expenses incurred at any time prior to the Agreement Effective Date and shall pay $275,000 to the Consenting Parent on account of any accrued and future fees and expenses of advisors to the Consenting Parent in connection with the Restructuring Transactions (the "**Consenting Parent Fee and Expense Obligation**"); <u>provided</u> that the Consenting Parent shall return and remit any unused amounts upon termination of this Agreement.

13.21. <u>Relationship Among Parties</u>. Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Stakeholders under this Agreement shall be several, not joint. None of the Consenting Term Loan Lenders, Consenting Noteholders and Consenting Debenture Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Stakeholders, in each case except as expressly set forth in this Agreement. It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of any Company Parties without the consent of the Company Parties or any Consenting Stakeholder, subject to Section 8 of this Agreement and applicable securities laws. No prior history, pattern or practice of sharing confidence among or between any of the Consenting Stakeholders, and/or the Company Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any securities of any of the Company Parties and do not constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder. For the avoidance of doubt: (1) each Consenting Stakeholder is entering into this Agreement directly with the Company Parties and not with any other Consenting Stakeholder, (2) no other Consenting Stakeholder shall have any right to bring any action against any other Consenting Stakeholder with respect this Agreement (or any breach thereof), other than in accordance with this Agreement and (3) no Consenting Stakeholder shall, nor shall any action taken by a Consenting Stakeholder pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Stakeholder with respect to the obligations under this Agreement nor shall this

Agreement create a presumption that the Consenting Stakeholders are in any way acting as a group. All rights under this Agreement are separately granted to each Consenting Stakeholder by the Company Parties and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

13.22.  <u>Limitations</u>.  Each Company Party understands that each Consenting Stakeholder is engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, each Company Party acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of each Consenting Stakeholder that principally manages and/or supervises such Consenting Stakeholder's investment in the Company (the "<u>Designated Group</u>"), and shall not apply to any other affiliates, trading desks or business groups of such Consenting Stakeholder so long as they are not acting at the direction of the Designated Group.

13.23.  <u>Backstop Fee Payment</u>. The Consenting Term Loan Lenders constituting the Consenting Term Loan Lender Group and the Consenting Noteholders constituting the Consenting Noteholder Group who will be receiving the Backstop Fee shall use commercially reasonable efforts to deliver to Citibank, N.A. at the e-mail address set forth below (with a copy to NMG LTD LLC at its e-mail address set forth in Section 13.10 herein), as soon as possible prior to the Petition Date, properly completed and executed copies of the applicable Internal Revenue Service Form W-8, together with any supporting or underlying forms and certificates, or Internal Revenue Service Form W-9, or such other forms that may be agreed upon by the parties, as applicable.  For the avoidance of doubt, the failure to deliver such forms by the Petition Date does not affect any Consenting Stakeholders' entitlement to the Backstop Fee under this Agreement or the prompt payment thereof by the Company Parties.

> Citi Private Bank
> Citibank, N.A.
> One Sansome Street, 24th Floor
> San Francisco, California 94104
> Attn: Hamyd Mazrae
> Telephone No.: (415) 627-6044
> Facsimile No.: (415) 592-5584
> E-mail:  hamyd.mazrae@citi.com

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Remainder of page intentionally left blank*]

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**COMPANY**


By:_____

Name:

Authorized Signatory

**Consenting Stakeholder Signature Page to**
**the Restructuring Support Agreement**

**[CONSENTING STAKEHOLDER]**

_____

Name:

Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loans | |
| FILO Loans | |
| Cash Pay Extended Term Loans | |
| Cash Pay/PIK Extended Term Loans | |
| 2013 Term Loans | |
| 7.125% Senior Debentures | |
| Second Lien Notes | |
| 8.000% Third Lien Notes | |
| 8.750% Third Lien Notes | |
| Equity Interests in the Company Parties | |

## EXHIBIT A

### NMG LTD LLC and Mariposa Intermediate Affiliate Entities

1. Bergdorf Goodman Inc.
2. Bergdorf Graphics, Inc.
3. BG Productions, Inc.
4. Mariposa Borrower, Inc.
5. NEMA Beverage Parent Corporation
6. NEMA Beverage Holding Corporation
7. NEMA Beverage Corporation
8. NM Bermuda, LLC
9. NM Financial Services, Inc.
10. NM Nevada Trust
11. NMG California Salon LLC
12. NMG Florida Salon LLC
13. NMG Global Mobility, Inc.
14. NMG Notes PropCo LLC
15. NMG Salon Holdings LLC
16. NMG Salons LLC
17. NMG Texas Salon LLC
18. NMG Term Loan PropCo LLC
19. NMGP, LLC
20. The Neiman Marcus Group LLC
21. The NMG Subsidiary LLC
22. Worth Avenue Leasing Company

**<u>EXHIBIT B</u>**

**Restructuring Term Sheet**

[*See attached*]

**EXECUTION VERSION**

**NEIMAN MARCUS GROUP LTD. LLC.**

**RESTRUCTURING TERM SHEET[1]**

**May 7, 2020**

| Overview | |
|---|---|
| **Restructuring Transaction Overview** | This term sheet (this "**Restructuring Term Sheet**") contemplates a consensual restructuring (the "**Restructuring**") of the Company Parties' outstanding indebtedness and equity interests effectuated through filing chapter 11 cases in the Bankruptcy Court (the "**Chapter 11 Cases**"). |
| | The Company Parties will seek to confirm and effectuate a plan of reorganization (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "**Plan**"), which shall be consistent with the terms of this Restructuring Term Sheet and the Restructuring Support Agreement to which this Restructuring Term Sheet is attached, under chapter 11 of the Bankruptcy Code. |
| | As further described herein, the Restructuring is proposed to be funded through the following: (a) a post-petition DIP facility in an aggregate amount of $675 million (the "**DIP Facility**"), backstopped by the members of the Consenting Term Loan Lender Group and Consenting Noteholder Group and on terms and conditions set forth in the commitment letter attached hereto as **Exhibit 1** (the "**Backstop Commitment Letter**"), including the Initial Allocation and Syndication Procedures, each as described and defined therein, and (b) an exit term loan facility (and related exit notes)[2] in an aggregate amount of up to $750 million (the "**Exit Facility**"), backstopped by the members of the Consenting Term Loan Lender Group, and Consenting Noteholder Group and on terms and conditions set forth in the term sheet attached hereto as **Exhibit 2** (the "**Exit Facility Term Sheet**"). |
| | This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring. The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Restructuring Term Sheet. |
| | The Parties shall cooperate in good faith to structure the Restructuring Transactions in a tax efficient manner as agreed among the Company Parties, the Consenting Parent, the Consenting Sponsors, the Required Consenting Term Loan Lenders, and the Required Consenting Noteholders (such consent of the Required Consenting Noteholders not to be unreasonably withheld, conditioned, or delayed). This Restructuring Term Sheet is confidential and may not be released to any other party prior to its public filing unless permitted in accordance with an executed confidentiality agreement with the Company Parties. |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Restructuring Support Agreement.

[2]  The parties agree that a portion of the Exit Facility will be made available as notes with substantially identical terms to the Exit Facility term loans and voting together with Exit Facility term loans and will reasonably cooperate with one another to implement such arrangements.

| Treatment of Claims Against and Interests in the Debtors[3] | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment/Voting** |
| **Unclassified Non-Voting Claims Against the Debtors** | | | |
| N/A | **Administrative Claims** | Except to the extent that a holder of an Allowed[4] Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such holder, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Claim, payment in full in cash. | N/A |
| N/A | **Priority Tax Claims** | Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such holder, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Claim, payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| N/A | **DIP Facility Claims** | Except to the extent that a holder of an Allowed DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Facility Claim, on the Effective Date, each holder thereof shall be paid in full, in cash. | N/A |
| **Classified Claims Against and Interests In the Debtors** | | | |
| **Class 1** | **Other Secured Claims** | In full and final satisfaction of each Allowed Other Secured Claim, each holder of such Claim shall receive, at the option of the Debtors, in consultation with the Required Consenting Term Loan Lenders and the Required Consenting Noteholders: (a) payment in full in cash; (b) delivery of the collateral | Unimpaired; deemed to accept. |

---

[3]   As used in this Restructuring Term Sheet, "<u>Debtors</u>" shall mean each Company Party that commences a Chapter 11 Case in accordance with the Restructuring Support Agreement and this Restructuring Term Sheet.

[4]   For purposes of this Restructuring Term Sheet, "<u>Allowed</u>" shall mean, as to a claim or an interest (each as defined in the Bankruptcy Code), a claim or an interest allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

|  |  | securing its Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Allowed Other Secured Claim; or (d) other treatment rendering such Claim Unimpaired. |  |
|---|---|---|---|
| **Class 2** | **Other Priority Claims** | Each holder of an Allowed Other Priority Claim shall receive at the option of the Debtors, either: (i) payment in full in cash; (ii) reinstatement of its Allowed Other Priority Claim; or (iii) such other treatment rendering its Allowed Other Priority Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired; deemed to accept. |
| **Class 3** | **ABL Loan Claims** | In full and final satisfaction of each Allowed ABL Loan Claim, each holder of such Claim shall receive value, as of the Effective Date of the Plan, equal to the Allowed amount of such ABL Loan Claims, *provided* that such value shall not exceed the value of such holder's interest in the estate's interest in the property securing such Claims. | Impaired; entitled to vote. |
| **Class 4** | **FILO Claims** | In full and final satisfaction of each Allowed FILO Claim, each holder of such Claim shall receive value, as of the Effective Date of the Plan, equal to the Allowed amount of such FILO Claims, *provided* that such value shall not exceed the value of such holder's interest in the estate's interest in the property securing such Claims. | Impaired; entitled to vote. |
| **Class 5** | **2019 Term Loan Claims** | The 2019 Term Loan Claims shall be Allowed under the Plan in the aggregate principal amount of $2,240,501,378.16, plus accrued but unpaid allowed interest, plus any other unpaid premiums, fees, costs, or other amount due under the Term Loan Credit Agreement, in each case, up to but not including the Petition Date.<br><br>In full and final satisfaction of each Allowed 2019 Term Loan Claim, each holder of such Claim shall | Impaired; entitled to vote. |

| | | receive its Pro Rata[5] share of and interest in (i) 87.5% of the New Equity,[6] subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees,[7] the Aggregate DIP Equity Fees,[8] and the exercise of the New Warrants, and subject to upward adjustment if the Class of 2013 Term Loan Claims does not vote in favor of the Plan, and | |
|---|---|---|---|

---

[5] For purposes of this Restructuring Term Sheet, "Pro Rata" shall mean the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

[6] For purposes of this Restructuring Term Sheet, "New Equity" shall mean the equity interests in one of the reorganized Company Parties following the consummation of the Restructuring Transactions (collectively the "Reorganized Debtors"), to be authorized, issued, or reserved on the Effective Date pursuant to the Plan. The issuer of the New Equity, which issuer may be a new entity formed for purposes of issuing such equity pursuant to the Plan, and related restructuring transactions to be set forth in the Plan Supplement, will be agreed by and be reasonably acceptable to the Required Consenting Term Loan Lenders, the Consenting Parent (such consent not to be unreasonably withheld, conditioned, or delayed), the Consenting Sponsors, the Required Consenting Noteholders, and the Company Parties.

[7] For purposes of this Restructuring Term Sheet, the "Exit Term Loan Equity Fees" shall mean:  (a) a fee equal to the product of 6.50% and the aggregate principal amount of the fully committed Exit Term Loan Facility, payable in shares of New Equity in the aggregate amount equal to such fee *divided by* 65.0% of the deemed per share value of the New Equity as set forth in the Plan or other Definitive Documents (such per share value set forth in the Plan, the "Plan Equity Value"), and payable ratably to each  member of the Consenting Term Loan Lender Group, each member of the Consenting Noteholder Group, and each other holder of 2019 Term Loan Claims, 2028 Debenture Claims, and Notes Claims who elects to participate in the Exit Facility as a lender (the "Exit Opportunity"), pursuant to the terms and conditions set forth in syndication procedures and related documentation acceptable to the Consenting Term Loan Lender Group and Consenting Noteholder Group (the "Exit Syndication Procedures") based on such party's commitment percentage to fund the full amount of the Exit Facility (the "Exit Term Loan Fee"); and (b) a fee equal to 30.0% of New Equity (subject to dilution from the Management Incentive Plan and New Warrants), payable ratably to each 2019 Term Loan Lender, 2013 Term Loan Lender, 2028 Debenture Holder, Second Lien Noteholder, and/or Third Lien Noteholder who participates in the Exit Facility, based on such party's commitment percentage to fund the Exit Facility (the "Exit Term Loan Participation Fee").  Pursuant to the Exit Syndication Procedures, each holder of 2019 Term Loan Claims and each holder of 2028 Debenture Claims and Notes Claims electing to participate in Exit Opportunity shall, among other things (i) provide written notification of such election to the administrative agent listed in the Exit Facility Term Sheet by no later than seven Business Days after the Exit Syndication Procedures are distributed and (ii) execute a joinder to the Restructuring Support Agreement.  Each party entitled to receive a fee hereunder shall have the option to designate one or more of its affiliates or funds or accounts that are managed, advised, or sub-advised by such party to receive such fees.

[8] For purposes of this Restructuring Term Sheet, "Aggregate DIP Equity Fees" shall mean, to the extent not paid in cash, the sum of:  (a) a backstop fee equal to 6.0% of the amount of the full commitment of the DIP Facility (the "DIP Backstop Fee"), paid in New Equity in the aggregate amount equal to the DIP Backstop Fee *divided by* 65.0% of the Plan Equity Value, and payable ratably to each member of the Consenting Term Loan Lender Group and Consenting Noteholder Group based on its DIP Facility backstop commitment percentage to backstop the funding of the full amount of the DIP Facility; and (b) an exit fee equal to 3.0% of the amount of the full commitment of the DIP Facility (the "DIP Exit Fee"), paid in shares of New Equity in the aggregate amount equal to the DIP Exit Fee *divided by* 65.0% of the Plan Equity Value, and payable ratably to each DIP Lender based on such DIP Lender's DIP Facility commitment percentage.  Each party entitled to receive a fee hereunder shall have the option to designate one or more of its affiliates or funds or accounts that are managed, advised, or sub-advised by such party to receive such fees.

| | | (ii) 87.5% of the rights to participate in the Exit Term Loan Facility (the "Rights"), subject to upward adjustment if the Class of 2013 Term Loan Claims does not vote in favor of the Plan. | |
|---|---|---|---|
| **Class 6** | **2013 Term Loan Claims** | The 2013 Term Loan Claims shall be Allowed under the Plan in the aggregate principal amount of $12,597,197.75, plus accrued but unpaid allowed interest, plus any other unpaid premiums, fees, costs, or other amount due under the Term Loan Credit Agreement, in each case, up to but not including the Petition Date.<br><br>If the Class of 2013 Term Loan Claims votes in favor of the Plan, each holder of an Allowed 2013 Term Loan Claim shall receive, in full and final satisfaction of such Claim: its Pro Rata share of and interest in (i) 0.2% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees and the exercise of the New Warrants, and (ii) 0.2% of the Rights.<br><br>If the Class of 2013 Term Loan Claims votes to reject the Plan, in full and final satisfaction of such claim, each holder of such Claim shall receive value, as of the Effective Date of the Plan, equal to the Allowed amount of such 2013 Term Loan Claims, *provided* that such value shall not exceed the value of each holder's interest in the estate's interest in the property securing such Claims. | Impaired; entitled to vote. |
| **Class 7** | **2028 Debenture Claims** | The 2028 Debenture Claims shall be Allowed under the Plan in the aggregate principal amount of $125,000,000, plus accrued but allowed unpaid interest, plus any other unpaid premiums, fees, costs, or other amount due under the 2028 Indenture, in each case, up to but not including the Petition Date.<br><br>In full and final satisfaction of each Allowed 2028 Debenture Claim, each holder of such Claim shall receive its Pro Rata share of and | Impaired; entitled to vote. |

| | | | |
|---|---|---|---|
| | | interest in (i) 2.8% of the New Equity subject to dilution by the Management Incentive Plan, Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees and the exercise of the New Warrants and subject to upward adjustment if the Class of 2013 Term Loan Claims does not vote in favor of the Plan and (ii) 2.8% of the Rights, subject to upward adjustment if the Class of 2013 Term Loan Claims does not vote in favor of the Plan. | |
| **Class 8** | **Second Lien Notes** | The Second Lien Notes Claims shall be Allowed under the Plan in the aggregate principal amount of $561,733,333, plus accrued but allowed unpaid interest, plus any other unpaid premiums, fees, costs, or other amount due under the Second Lien Notes Indenture, in each case, up to but not including the Petition Date.<br><br>Each holder of an Allowed Second Lien Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in (i) 1.0% of the New Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, (ii) 1.0% of the Rights, and (iii) the New Warrants.[9] | Impaired; entitled to vote. |
| **Class 9** | **Third Lien Notes** | The Third Lien Notes Claims shall be Allowed under the Plan in the aggregate principal amount of $1,228,383,150, plus accrued but unpaid allowed interest, plus any other unpaid premiums, fees, costs, or other amount due under the Third Lien Notes Indenture, in each case, up to but not including the Petition Date.<br><br>Each holder of an Allowed Third Lien Notes Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of and interest in (i) 8.5% of the New | Impaired; entitled to vote |

---

[9]   For purposes of this Restructuring Term Sheet, "New Warrants" shall mean warrants for 25.0% of the New Equity (subject to dilution from the Management Incentive Plan) with a seven-year tenor (and no Black-Scholes protection) and at an aggregate equity value strike price equal to $2.025 billion.

| | | | |
|---|---|---|---|
| | | Equity, subject to dilution by the Management Incentive Plan, the Exit Term Loan Equity Fees, the Aggregate DIP Equity Fees, and the exercise of the New Warrants, and (ii) 8.5% of the Rights. | |
| Class 10 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of $[●]. | Impaired; entitled to vote |
| Class 11 | Intercompany Claims | Intercompany Claims[10] shall be, upon consultation with the Consenting Term Loan Lender Group and the Consenting Noteholder Group, at the option of the Reorganized Debtors, either: (i) reinstated; or (ii) cancelled, released, and extinguished without any distribution on account thereof. | Unimpaired and deemed to accept **or** Impaired and deemed to reject. |
| Class 12 | Intercompany Interests | Intercompany Interests shall be, upon consultation with the Consenting Term Loan Lender Group and the Consenting Noteholder Group, at the option of Reorganized Debtors, either: (i) reinstated; or (ii) cancelled, released, and extinguished without any distribution on account of such Interests. | Unimpaired and deemed to accept **or** Impaired and deemed to reject. |
| Class 13 | Existing Equity Interests | Each Existing Equity Interest[11] shall be cancelled, released, and extinguished without any distribution on account of such Existing Equity Interest. | Impaired; deemed to reject. |
| **Corporate Governance** | | | |
| Board of Directors and Corporate Governance | The Board of Directors to be determined by the Consenting Term Loan Lender Group in accordance with the Governance Term Sheet in advance of the filing of the Plan Supplement. | | |

---

[10]   For purposes of this Restructuring Term Sheet, "Intercompany Claim" means any Claim against a Debtor that is held by another Debtor or a direct or indirect subsidiary of a Debtor.

[11]   For purposes of this Restructuring Term Sheet, "Existing Equity Interests" shall mean any equity security, as such term is defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of Mariposa Intermediate Holdings LLC, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in Mariposa Intermediate Holdings LLC, whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

| | |
|---|---|
| **Charter; Bylaws; Corporate Governance** | Corporate governance for the Reorganized Debtors (other than the issuer of the New Equity), including charters, bylaws, operating agreements, shareholder agreements, or other organization or formation documents, as applicable (collectively, "<u>Organizational Documents</u>"), shall be in form and substance reasonably acceptable to the Company Parties, the Required Consenting Term Loan Lenders, and the Required Consenting Noteholders, and shall be consistent with section 1123(a)(6) of the Bankruptcy Code; corporate governance and Organizational Documents with respect to the issuer of the New Equity shall be on the terms contained in the Governance Term Sheet and otherwise in form and substance acceptable to the Required Consenting Term Loan Lenders and reasonably acceptable to the Company Parties and the Required Consenting Noteholders.<br><br>On the Effective Date, the Consenting Parent shall (at the expense of the Company Parties) change its corporate name and will no longer be known as Neiman Marcus Group, Inc. or any other corporate name that references "Neiman Marcus." |
| **Exemption from SEC Registration and Other Securities Matters** | The issuance of all securities, if any, in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law.  Any securities issued under the Plan will (i) be DTC eligible, (ii) entitle the beneficial owner of such securities on a confidential basis to certain information as set forth in the Governance Term Sheet, and (iii) entitle the beneficial owner to attend quarterly management calls with Q&A (which may be joint with lenders); *provided*, that the foregoing shall not be required with respect to such securities to the extent that, as a result thereof, the Company Parties will be (or will be required to be) an SEC registered entity. |
| **Other Terms of the Restructuring** | |
| **Pension Plans** | The Debtors shall assume all qualified pension plans. |
| **Collective Bargaining Agreements** | The Debtors shall assume all collective bargaining agreements. |
| **Other Employment Obligations and Programs** | The Required Consenting Term Loan Lenders and the Debtors, in consultation with the Consenting Noteholder Group, agree to address in good faith, in advance of filing the Plan and Disclosure Statement, the treatment of all written contracts, agreements, policies, programs, and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs, and plans for bonuses and other incentives or compensation for the Company Parties' current and former employees, directors, officers, and managers, including executive compensation programs and all existing compensation arrangements for the employees of the Company Parties, and treatment of such contracts, agreements, programs, and plans shall, to the extent then agreed, be provided for in the filing version of the Plan. |
| **Management Incentive Plan** | Prior to filing the Plan and Disclosure Statement, the Debtors and the Required Consenting Term Loan Lenders shall, in consultation with the Consenting Noteholder Group, use commercially reasonable efforts to negotiate the general terms of a mutually agreed-upon incentive program for the officers and other management of Reorganized Debtors (the "<u>Management Incentive Plan</u>"), the key terms of which shall be included in the Plan. |

| | |
|---|---|
| **Claims of the Debtors** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action[12] of the Debtors' estates, other than any Causes of Action released by the Debtors pursuant to the release and exculpation provisions set forth in the Plan and this Restructuring Term Sheet. The Company Parties and the Consenting Stakeholders will negotiate in good faith with respect to the Company Parties' and Consenting Parent's (and Consenting Parent's non-Debtor subsidiaries') rights and responsibilities with respect to the tax assets and obligations of the consolidated tax group (and any state and local tax group), and the Company Parties' and Consenting Parent's (and Consenting Parent's non-Debtor subsidiaries') rights and responsibilities with respect to the foregoing shall be reserved in the Plan absent resolution of the foregoing. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al.*** | Upon the Effective Date and consummation of the Plan on the terms set forth herein, all indemnification obligations in place as of the Effective Date under the Debtors' organizational documents (including in the by-laws, certificates of incorporation or formation, limited liability company agreements, and other organizational or formation documents,) for the current and former directors, officers, managers, and employees of the Company Parties, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose; *provided, however*, that the foregoing shall not apply to any obligations to indemnify any person or entity (other than natural-person managers or officers in their capacities as such serving as of the Effective Date) in connection with any claims or causes of action related to the designation of MyTheresa as an unrestricted subsidiary or the distribution of MyTheresa by or through certain Debtors to Neiman Marcus Group, Inc. and related transactions. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all existing prepetition unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") (it being understood that such policies have been paid in full in advance). |
| **Conditions Precedent to the Effective Date** | The following shall be conditions precedent to the Effective Date: 1. the Confirmation Order shall have been entered and shall not have been stayed; |

---

[12] As used in this Restructuring Term Sheet, "Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to Section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, or voidable transactions; and (f) any "lender liability" or equitable subordination claims or defenses.

| | |
|---|---|
| | 2.  the Company Parties shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions, including the Plan; |
| | 3.  the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated; |
| | 4.  the Final DIP Order shall remain in full force and effect; |
| | 5.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects, and shall have been filed in a manner consistent with the Restructuring Support Agreement; |
| | 6.  the fees and expenses of the Consenting Noteholder Group Advisors, as well as the Consenting Lender Fees and Expenses, shall have been paid in full in accordance with the Restructuring Support Agreement; and |
| | 7.  all Allowed Professional Fee Claims shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court. |
| **Subordination** | The classification and treatment of Claims under the Plan shall settle and compromise the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights with respect to Claims against the Debtors shall be released pursuant to the Plan. |
| **MyTheresa** | The stakeholders' economic and governance rights with respect to MyTheresa shall be consistent with stakeholders' prepetition rights, claims, and controls (including their prepetition rights with respect to the turnover and waterfall provisions concerning MyTheresa as set forth in the Existing MYT Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements). |
| | The Plan Supplement shall contain documentation sufficient to give ongoing effect to the turnover and waterfall provisions concerning MyTheresa as set forth in the Existing MYT Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements, which may be restated pursuant to the terms of a tradeable security if agreed among the Consenting Parent, the Required Consenting Noteholders, the Consenting Sponsors, the Company Parties (such consent not to be unreasonably withheld, conditioned, or delayed), and the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld, conditioned, or delayed). |
| | Each Second Lien Noteholder shall also receive its respective share of the 2L MyT Distribution[13] on account of its prepetition rights, claims, and interests with respect to MyTheresa.  For the avoidance of doubt, the Second Lien Noteholders' rights in |

---

[13]  For purposes of this Restructuring Term Sheet, "2L MyT Distribution" means a security or instrument in form and substance to be agreed upon among the Required Consenting Noteholders, the Consenting Parent, the Consenting Sponsors, the Company Parties (such consent not to be unreasonably withheld, conditioned, or delayed) and the Required Consenting Term Loan Lenders (solely with respect to their own rights and obligations thereunder and matters related to the Reorganized Debtors, if any) that memorializes the prepetition rights of Second Lien Noteholders with respect to MyTheresa, as set forth in the Existing MYT Documents.  The parties shall reasonably cooperate to determine whether such security or instrument shall take the form of a distribution by any Debtor or shall be otherwise effectuated through the New MyT Documents.

| | |
|---|---|
| | respect of the MyTheresa guarantee, and all claims related thereto against non-Debtors, shall not be affected by the Plan and shall be preserved.<br><br>Each Third Lien Noteholder shall also receive its respective share of the 3L MyT Distribution[14] on account of its prepetition rights, claims, and interests with respect to MyTheresa.  For the avoidance of doubt, the Third Lien Noteholders' rights in respect of the pledge of 50% of the common stock of MYT Holding Co., and all claims related thereto, shall not be affected by the Plan and shall be preserved. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate, consistent with the Restructuring Support Agreement, to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet, the Restructuring Support Agreement, or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation |

---

[14]   For purposes of this Restructuring Term Sheet, "3L MyT Distribution" means a security or instrument in form and substance to be agreed upon among the Required Consenting Noteholders, the Consenting Parent, the Consenting Sponsors, the Company Parties (such consent not to be unreasonably withheld, conditioned, or delayed) and the Required Consenting Term Loan Lenders (solely with respect to their own rights and obligations thereunder and matters related to the Reorganized Debtors, if any) that memorializes the prepetition rights of Third Lien Noteholders with respect to MyTheresa, as set forth in the Existing MYT Documents.  The parties shall reasonably cooperate to determine whether such security or instrument shall take the form of a distribution by any Debtor or shall be otherwise effectuated through the New MyT Documents.

| | |
|---|---|
| | Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Debtors** | **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates[15] from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder[16] of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:** |
| | (a)  **the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;** |
| | (b)  **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;** |
| | (c)  **the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or** |
| | (d)  **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.** |
| | **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and do not release any agreements under the Transaction Support Agreement or any documents or agreements executed in connection therewith related to any party's rights, claims, and controls with respect to MyTheresa (including but not limited to the waterfall and turnover provisions set forth in the Existing MYT Documents the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements).** |

---

[15]  As used in this Restructuring Term Sheet, "Estates" shall mean, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code

[16]  As used in this Restructuring Term Sheet, "Holder" shall mean an Entity holding a claim against or interest in any Debtor.

| **Releases by Holders of Claims and Interests of the Debtors** | **As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:** |
|---|---|
| | (a)  **the Debtors, the Debtors' restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement;** |
| | (b)  **any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;** |
| | (c)  **the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or** |
| | (d)  **any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.** |
| | **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and do not release any agreements under the Transaction Support Agreement or any documents or agreements executed in connection therewith related to any party's rights, claims, and controls with respect to MyTheresa (including but not limited to the waterfall and turnover provisions set forth in the Existing MYT Documents, the Transaction Support Agreement, and the equivalent turnover and waterfall provisions in any other prepetition documents and agreements).** |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and |

| | |
|---|---|
| | responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunction** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or any of the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |
| **Exculpated Party** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; and (c) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, and advisors. |
| **Released Party** | Collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Company Parties; (d) the Consenting Stakeholders; (e) the Sponsors; (f) the 2013 Term Loan Lenders; (g) the 2019 Extended Term Loan Lenders; (h) the 2028 Debenture Holders; (i) the Second Lien Noteholders; (j) the Third Lien Noteholders; (k) the Consenting Noteholder Group; (l) the Consenting Term Loan Lender Group; (m) the DIP Lenders; (n) each Agent and Trustee; (o) all Holders of Interests; (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) with respect to each of the foregoing Entities in clauses (a) through this clause (q), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases |

14

| | an objection to the releases contained in the Plan that is not resolved before Confirmation. |
|---|---|
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Company Parties; (d) the Consenting Stakeholders; (e) the Sponsors; (f) the 2013 Term Loan Lenders; (g) the 2019 Extended Term Loan Lenders (h) the 2028 Debenture Holders; (i) the Second Lien Noteholders; (j) the Third Lien Noteholders; (k) the Consenting Noteholder Group; (l) the Consenting Term Loan Lender Group; (m) the DIP Lenders; (n) each Agent and Trustee; (o) all Holders of Claims and Interests; (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) with respect to each of the foregoing Entities in clauses (a) through this clause (q), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, advisory board members, consultants, financial advisors, partners, attorneys (including any other attorneys or professionals retained by any current or former director or manger in his or her capacity as director or manager of an Entity), accountants, investment bankers, and other professional advisors; *provided* that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before Confirmation. |

[*Exhibits to follow.*]

15

**EXHIBIT 1**

**DIP Commitment Letter**

[*See attached*]

**EXECUTION COPY**

May 7, 2020

<u>PERSONAL AND CONFIDENTIAL</u>

Neiman Marcus Group LTD LLC

One Marcus Square
1618 Main Street
Dallas, Texas 75201
Attention: Tracy Preston

<u>Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility
Backstop Commitment Letter</u>

Ladies and Gentlemen:

Neiman Marcus Group LTD LLC ("<u>NMG</u>", "<u>you</u>" or "<u>your</u>") has (i) advised (A) the parties listed on the signature pages hereto as Extended Term Loan Backstop Commitment Parties (each, an "<u>Extended Term Loan Backstop Commitment Party</u>") and (B) the parties listed on the signature pages hereto as Prepetition Notes Backstop Commitment Parties (each, a "<u>Prepetition Notes Backstop Commitment Party</u>", and together with the Extended Term Loan Backstop Commitment Parties, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that NMG and certain of its subsidiaries (the "<u>Subsidiary Debtors</u>") and Mariposa Intermediate Holdings LLC, a Delaware limited liability company and the direct parent of NMG ("<u>Holdings</u>" and, collectively with NMG and the Subsidiary Debtors, the "<u>Debtors</u>"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (as amended, the "<u>Bankruptcy Code</u>"), and (ii) in connection with the foregoing, requested that the Backstop Commitment Parties agree to commit to provide a $675 million superpriority secured debtor-in-possession term loan credit facility for NMG under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement (as defined below) that are applicable to the relevant borrowing.  Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars.  Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement.

1.      <u>Backstop Commitment</u>.

To provide assurance that the DIP Facility shall be available on the terms and conditions set forth herein and in the Form DIP Credit Agreement, each Backstop Commitment Party is pleased to advise NMG of its several commitment (the "<u>Backstop Commitment</u>") to provide, itself or through one or more funds managed by such Backstop Commitment Party, the amount of the DIP Facility set forth on <u>Schedule 1</u> hereto, on the terms set forth in the form Superpriority Senior Secured Debtor-In-Possession Credit Agreement attached hereto as <u>Exhibit A</u> (the "<u>Form DIP Credit Agreement</u>", and together with this letter, the "<u>Backstop Commitment Letter</u>"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing.  Each Backstop Commitment Party may, at its option, arrange for the Form DIP Credit Agreement to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to NMG (the "<u>Fronting Lender(s)</u>"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement.

2

2.      <u>Initial Allocation</u>.

Each (a) 2019 Extending Term Lender (as defined in the Prepetition Term Loan Credit Agreement) under the Prepetition Term Loan Credit Agreement as of the Business Day immediately preceding the Petition Date (other than the Extended Term Loan Backstop Commitment Parties) shall have the right to participate (the "<u>ETL Opportunity</u>") in 85.7% of the DIP Facility based on its Extended Term Loan Pro Rata Share (as defined below), (b) holder ("<u>Debenture Holder</u>") of 2028 Debentures (as defined in the Prepetition Term Loan Credit Agreement) as of the Business Day immediately preceding the Petition Date shall have the right to participate (the "<u>Debenture Opportunity</u>") in 4.8% of the DIP Facility based on its Debenture Pro Rata Share (as defined below), (c) holder ("<u>Second Lien Noteholder</u>") of Second Lien Notes (as defined in the Prepetition Term Loan Credit Agreement) beneficially owning an aggregate principal amount of Second Lien Notes of not less than $40 million as of the Business Day immediately preceding the Petition Date (other than the Prepetition Notes Backstop Commitment Parties) shall have the right to participate (the "<u>Second Lien Notes Opportunity</u>") in 1.0% of the DIP Facility based on its Second Lien Notes Pro Rata Share (as defined below), and (d) holder ("<u>Third Lien Noteholder</u>") of Third Lien Notes (as defined in the Prepetition Term Loan Credit Agreement) beneficially owning an aggregate principal amount of Third Lien Notes of not less than $25 million (or such lesser amount held by any Third Lien Noteholder who executed the Restructuring Support Agreement prior to the Petition Date) as of the Business Day immediately preceding the Petition Date (other than the Prepetition Notes Backstop Commitment Parties) shall have the right to participate (the "<u>Third Lien Notes Opportunity</u>", and together with the ETL Opportunity, Debenture Opportunity and Second Lien Notes Opportunity, the "<u>Opportunity</u>") in 8.5% of the DIP Facility based on its Third Lien Notes Pro Rata Share (as defined below).  The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be acceptable to the Backstop Commitment Parties and NMG (the "<u>Syndication Procedures</u>"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the Business Day following the date that the Interim DIP Financing Order is entered by the Bankruptcy Court (or such later date as agreed by you and the Majority Backstop Commitment Parties).  Pursuant to the Syndication Procedures, each 2019 Extending Term Loan Lender, Debenture Holder, Second Lien Noteholder and Third Lien Noteholder electing to participate in the DIP Facility shall, among other things (i) provide written notification of such election to the Administrative Agent by no later than the date that is seven (7) Business Days (including the Business Day on which the Syndication Procedures are distributed) after the Syndication Procedures are distributed to the 2019 Extending Term Lenders, Debenture Holders, Second Lien Noteholders and Third Lien Noteholders (the "<u>Initial Allocation Request Date</u>") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties (as defined below), the Administrative Agent and you) and (ii) execute a joinder to (A) the Restructuring Support Agreement and (B) the DIP Facility, in each case prior to the Initial Allocation Request Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties, the Administrative Agent and you); provided, that, any Extended Term Loan Backstop Party that is a Debenture Holder, Second Lien Noteholder or Third Lien Noteholder and any Prepetition Notes Backstop Commitment Party that is a 2019 Extending Term Loan Lender or Debenture Holder shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility in respect of such holdings upon executing this Commitment Letter and the Restructuring Support Agreement.

"<u>Extended Term Loan Pro Rata Share</u>" means with respect to each 2019 Extending Term Lender (x) the aggregate principal amount of 2019 Extended Term Loans (as defined in the Prepetition Term Loan Credit Agreement) held by such 2019 Extending Term Lenders, as set forth in the register for the Prepetition Term Loan Credit Agreement on the business day immediately preceding the Petition Date divided by (y) the aggregate principal amount of 2019 Extended Term Loans held by all 2019 Extending Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

"Debenture Pro Rata Share" means with respect to each Debenture Holder (x) the aggregate principal amount of 2028 Debentures beneficially owned by such Debenture Holder on the business day immediately preceding the Petition Date divided by (y) the aggregate principal amount of 2028 Debentures held by all Debenture Holders outstanding at such time.

"Second Lien Notes Pro Rata Share" means with respect to each Second Lien Noteholder (x) the aggregate principal amount of Second Lien Notes beneficially owned by such Second Lien Noteholder on the business day immediately preceding the Petition Date divided by (y) the aggregate principal amount of all Second Lien Notes outstanding at such time.

"Third Lien Notes Pro Rata Share" means with respect to each Third Lien Noteholder (x) the aggregate principal amount of Third Lien Notes beneficially owned by such Third Lien Noteholder on the business day immediately preceding the Petition Date divided by (y) the aggregate principal amount of all Third Lien Notes outstanding at such time.

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 66.7% of the sum of all Backstop Commitments outstanding at such time; *provided*, that the Majority Backstop Commitment Parties must include at all times at least three unaffiliated Backstop Commitment Parties.

Any such 2019 Extending Term Lenders, Debenture Holders, Second Lien Noteholders and Third Lien Noteholders that elect to participate in the DIP Facility shall become Lenders under the DIP Facility substantially in accordance with the terms and conditions of Sections 2.01(c) and 10.04 of the Form DIP Credit Agreement (the "Initial Allocation"). Each Extended Term Loan Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility to participating 2019 Extending Term Lenders and Debenture Holders and each Prepetition Notes Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility to participating Second Lien Noteholders and Third Lien Noteholders, in each case, in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Closing Date and Initial Allocation Date, as applicable, subject to the satisfaction (or waiver) of the conditions set forth in Section 4.01 and Section 4.02 of the Form DIP Credit Agreement) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred. Any unsubscribed portion of the ETL Opportunity and Debenture Opportunity shall be allocated to the Extended Term Loan Backstop Commitment Parties based on their respective percentages set forth on Schedule 2 hereto. Any unsubscribed portion of the Second Lien Opportunity and the Third Lien Opportunity shall be allocated to the Prepetition Notes Backstop Commitment Parties based on their respective percentages set forth on Schedule 2 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation. The Backstop Commitment Parties agree that, following the Initial Allocation, NMG and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to NMG by the financial advisor for the Extended Term Loan Backstop Commitment Parties, Ducera Partners LLC, and the financial advisor for the Prepetition Notes Backstop Commitment Parties, Houlihan Lokey

4

including the Lenders listed therein and their respective Commitments.  None of NMG nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You  acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, any Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, any Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Agents are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Agents may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning NMG and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning NMG and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3.     <u>Information.</u>

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). In particular, where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain

and cannot be predicted.  You agree that if, at any time prior to the entry of the Final DIP Financing Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4.      Fees.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder, NMG agrees to pay (or cause to be paid) to the  Backstop Commitment Parties, (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop fee equal to 6.00% of the Total Commitment (the "Backstop Commitment Fee"), which shall be allocated as follows:  (i) (A) to each Extended Term Loan Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 hereto, *multiplied by* (2) 90.5%, *multiplied by* (3) the Backstop Commitment Fee and (B) to each Prepetition Note Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 hereto, *multiplied by* (2) 9.5%, *multiplied by* (3) the Backstop Commitment Fee, which (x) shall be earned on the date the Bankruptcy Court enters the Interim DIP Financing Order and (y) subject to confirmation of the Acceptable Plan, shall be due and payable in Reorganized Equity in the aggregate amount equal to (x) the Backstop Commitment Fee *divided by* (y) 65.0% of the deemed per share value of the Reorganized Equity pursuant to and in accordance with the Acceptable Plan (provided, that if the Maturity Date shall have occurred other than in connection with consummation of an Acceptable Plan, such Backstop Commitment Fee shall be immediately due and payable in cash to the Administrative Agent for the benefit of each Backstop Commitment Party (or its designated Related Lender)).  Extended Term Loan Backstop Commitment Parties with Second Lien Notes and/or Third Lien Notes cross-holdings will not receive the Backstop Commitment Fee allocable to the Prepetition Notes Backstop Commitment Parties; however, such Extended Term Loan Backstop Commitment Parties will be eligible for their ratable allocation of the Total Commitment in accordance with the Syndication Procedures along with other Second Lien Noteholders and/or Third Lien Noteholders who are not Prepetition Notes Backstop Commitment Parties.  Prepetition Notes Backstop Commitment Parties with 2019 Extended Term Loan and/or 2028 Debenture cross-holdings will not receive the Backstop Commitment Fee allocable to the Extended Term Loan Backstop Commitment Parties; however, such Prepetition Notes Backstop Commitment Parties will be eligible for their ratable allocation of the Total Commitment in accordance with the Syndication Procedures along with other 2019 Extended Term Lenders who are not Extended Term Loan Backstop Commitment Parties and/or Debenture Holders.  The parties hereby acknowledge and agree that the obligation of NMG to pay the Backstop Commitment Fee constitutes an Obligation.

5.      Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. The Backstop Commitment Parties' commitments to fund the DIP Facility on the Closing Date are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in Section 4.01 and Section 4.02 of the Form DIP Credit Agreement.  There are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or

otherwise) to the availability of the DIP Facility on the Closing Date, Initial Allocation Date, Final Order Availability Date or Last Term Loan Availability Date, as applicable, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Closing Date, Initial Allocation Date, Final Order Availability Date or Last Term Loan Availability Date, as applicable.

6.      Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Agents, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) days of receipt of their reasonable demand by presentation of a summary statement, for any reasonable and documented out-of-pocket legal (limited to $150,000 per affiliated group of Extended Term Loan Backstop Commitment Parties, other than in respect of (1) Wachtell, Lipton, Rosen & Katz, as primary counsel, and Vinson & Elkins LLP, as Texas counsel, and, if applicable, conflicts counsel, in each case for the Extended Term Loan Backstop Commitment Parties and (2) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as primary counsel, and Porter Hedges LLP, as Texas counsel, and, if applicable, conflicts counsel, in each case for the Prepetition Notes Backstop Commitment Parties) or other expenses incurred in connection with the Chapter 11 Cases, the DIP Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, and any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Ducera Partners LLC as financial advisor for the Extended Term Loan Backstop Commitment Parties and Houlihan Lokey as financial advisor for the Prepetition Notes Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent or Collateral Agent in its capacity or in fulfilling its role as such).

None of you, Sponsor, Neiman Marcus Group, Inc., a Delaware corporation (the "Parent") the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

7.      Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Agents, and is not intended to confer any benefits upon, or

create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Agents.  Notwithstanding anything set forth in this Section 7 to the contrary, each Backstop Commitment Party shall assign all or a portion of its Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to <u>Section 2</u> above (subject to the terms and conditions set forth therein).  This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter.  You acknowledge that information and documents relating to the DIP Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility.

8.      <u>Governing Law, Etc.; Jurisdiction</u>.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this

8

Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City.  Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

9.      Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.     Confidentiality.

This Backstop Commitment Letter is delivered to NMG on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, the Sponsors, the Parent and your and their officers, directors, employees, legal counsel, accountants, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you, the Sponsor or the Parent, as applicable, of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis and (d) to the Bankruptcy Court to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties

on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements.  The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

11.    Miscellaneous.

The Backstop Commitment Parties hereby notify NMG that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it and its affiliates are required to obtain, verify and record information that identifies NMG, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify NMG and each other Debtor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Fee shall be treated as a premium paid by NMG to the relevant Backstop Commitment Party in exchange for the issuance of a put right to NMG with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of each of the DIP Facility is subject to the conditions precedent expressly set forth in Section 5 hereof.

If the foregoing correctly sets forth our agreement, please indicate NMG's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on May 7, 2020.  This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.  This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) the Closing Date and (ii) unless the Backstop Commitment Parties shall, in their sole discretion, agree in writing to an extension, May 14, 2020.  Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the

Initial Allocation and confidentiality, shall automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Closing Date, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

The Backstop Commitment Parties are pleased to have been given the opportunity to assist NMG and the other Debtors in connection with the DIP Facility.

Very truly yours,

[ _____][, AS AN EXTENDED TERM LOAN BACKSTOP COMMITMENT PARTY][, AS A PREPETITION NOTES BACKSTOP COMMITMENT PARTY]

_____
Title:

_____
Title:

Accepted and agreed to as of _____, 2020:

NEIMAN MARCUS GROUP LTD LLC

By: _____
    Name:
    Title:

**Schedule 1**

[*On file with the Company*]

**Schedule 2**

[*On file with the Company*]

**Exhibit A**

<u>See Attached.</u>

STRICTLY CONFIDENTIAL

$675,000,000

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT,

dated as of [●], 2020,

among

MARIPOSA INTERMEDIATE HOLDINGS LLC,
as Holdings,

NEIMAN MARCUS GROUP LTD LLC,
as Lead Borrower,

THE NEIMAN MARCUS GROUP LLC and THE NMG SUBSIDIARY LLC,
as Borrowers,

THE LENDERS PARTY HERETO,

and

CORTLAND PRODUCTS CORP.,
as Administrative Agent and Collateral Agent,

ARTICLE I

Definitions

| | | |
|---|---|---|
| SECTION 1.01 | Defined Terms ............................................................................................................ 1 |
| SECTION 1.02 | Terms Generally ......................................................................................................... 32 |
| SECTION 1.03 | Accounting Terms; GAAP ......................................................................................... 33 |
| SECTION 1.04 | [Reserved]................................................................................................................... 33 |
| SECTION 1.05 | Currencies .................................................................................................................. 34 |
| SECTION 1.06 | [Reserved]................................................................................................................... 34 |
| SECTION 1.07 | Divisions .................................................................................................................... 34 |

ARTICLE II

The Credits

| | | |
|---|---|---|
| SECTION 2.01 | Term Loans and Borrowings ...................................................................................... 34 |
| SECTION 2.02 | [Reserved]................................................................................................................... 36 |
| SECTION 2.03 | Funding of Borrowings .............................................................................................. 36 |
| SECTION 2.04 | Interest Elections........................................................................................................ 36 |
| SECTION 2.05 | Promise to Pay; Evidence of Debt ............................................................................. 37 |
| SECTION 2.06 | Repayment of Term Loans ......................................................................................... 38 |
| SECTION 2.07 | Optional Prepayment of Term Loans.......................................................................... 38 |
| SECTION 2.08 | Mandatory Prepayment of Term Loans ...................................................................... 38 |
| SECTION 2.09 | Fees ............................................................................................................................ 40 |
| SECTION 2.10 | Interest ....................................................................................................................... 41 |
| SECTION 2.11 | Alternate Rate of Interest........................................................................................... 42 |
| SECTION 2.12 | Increased Costs .......................................................................................................... 43 |
| SECTION 2.13 | Break Funding Payments ........................................................................................... 44 |
| SECTION 2.14 | Taxes .......................................................................................................................... 45 |
| SECTION 2.15 | Payments Generally; *Pro Rata* Treatment; Sharing of Set-offs........................... 48 |
| SECTION 2.16 | Mitigation Obligations; Replacement of Lenders..................................................... 49 |
| SECTION 2.17 | Illegality .................................................................................................................... 50 |
| SECTION 2.18 | Extension of Maturity Date........................................................................................ 51 |
| SECTION 2.19 | Defaulting Lenders .................................................................................................... 51 |
| SECTION 2.20 | [Reserved]................................................................................................................... 53 |
| SECTION 2.21 | Joint and Several Liability of Borrowers ................................................................... 53 |
| SECTION 2.22 | Designation of Lead Borrower ................................................................................... 54 |
| SECTION 2.23 | No Discharge; Survival of Claims ............................................................................. 54 |
| SECTION 2.24 | Liens. .......................................................................................................................... 54 |

ARTICLE III

Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01 | Organization; Powers.................................................................................................. 55 |
| SECTION 3.02 | Authorization ............................................................................................................. 55 |
| SECTION 3.03 | Enforceability............................................................................................................. 56 |
| SECTION 3.04 | Governmental Approvals ........................................................................................... 56 |
| SECTION 3.05 | Title to Properties; Possession Under Leases ............................................................ 57 |

SECTION 3.06     Subsidiaries ........................................................................................ 57
SECTION 3.07     Litigation; Compliance with Laws ..................................................... 57
SECTION 3.08     Federal Reserve Regulations ............................................................. 58
SECTION 3.09     Investment Company Act ................................................................... 58
SECTION 3.10     Use of Proceeds ................................................................................. 58
SECTION 3.11     Tax Returns ........................................................................................ 58
SECTION 3.12     No Material Misstatements ................................................................. 59
SECTION 3.13     Environmental Matters ....................................................................... 60
SECTION 3.14     Security Documents ............................................................................ 60
SECTION 3.15     Location of Real Property and Leased Premises ................................ 61
SECTION 3.16     Approved Budget ................................................................................ 61
SECTION 3.17     No Material Adverse Effect ................................................................ 61
SECTION 3.18     Insurance ............................................................................................ 61
SECTION 3.19     USA PATRIOT Act; FCPA; OFAC ................................................. 61
SECTION 3.20     Intellectual Property; Licenses, Etc ................................................... 62
SECTION 3.21     Employee Benefit Plans ..................................................................... 62

ARTICLE IV

Conditions of Lending

SECTION 4.01     Conditions Precedent to the Closing Date ......................................... 63
SECTION 4.02     Conditions Precedent to each Borrowing ........................................... 64
SECTION 4.03     Conditions Precedent to Making the Final Order Term Loan ............. 65
SECTION 4.04     Conditions Precedent to Making the Last Term Loan ........................ 66

ARTICLE V

Affirmative Covenants

SECTION 5.01     Existence; Businesses and Properties ................................................. 66
SECTION 5.02     Insurance ............................................................................................ 67
SECTION 5.03     Taxes .................................................................................................. 67
SECTION 5.04     Financial Statements, Reports, etc ..................................................... 68
SECTION 5.05     Litigation and Other Notices .............................................................. 72
SECTION 5.06     Compliance with Laws ....................................................................... 72
SECTION 5.07     Maintaining Records; Access to Properties and Inspections .............. 73
SECTION 5.08     Use of Proceeds ................................................................................. 73
SECTION 5.09     Compliance with Environmental Laws .............................................. 73
SECTION 5.10     Further Assurances; Additional Security ........................................... 73
SECTION 5.11     [Reserved] .......................................................................................... 74
SECTION 5.12     Lender Calls ....................................................................................... 74
SECTION 5.13     Milestones .......................................................................................... 75
SECTION 5.14     Certain Bankruptcy Matters ............................................................... 75
SECTION 5.15     Credit Ratings ..................................................................................... 76

ARTICLE VI

Negative Covenants

SECTION 6.01     Indebtedness ....................................................................................... 76
SECTION 6.02     Liens .................................................................................................. 79

SECTION 6.03  Sale and Lease-Back Transactions.................................................. 82
SECTION 6.04  Investments, Loans and Advances .................................................. 82
SECTION 6.05  Mergers, Consolidations, Sales of Assets and Acquisitions ................................ 85
SECTION 6.06  Restricted Payments ......................................................... 86
SECTION 6.07  Transactions with Affiliates ................................................... 88
SECTION 6.08  Business of the Borrowers and their Subsidiaries............................... 90
SECTION 6.09  Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By Laws and Certain Other Agreements; etc................................................................. 90
SECTION 6.10  Compliance with the Approved Budget................................... 92
SECTION 6.11  Chapter 11 Modifications ..................................................... 92
SECTION 6.12  Use of Proceeds .................................................................. 92
SECTION 6.13  Additional Bankruptcy Matters.............................................. 93
SECTION 6.14  Budget Covenant................................................................ 94
SECTION 6.15  Minimum Liquidity........................................................... 94

ARTICLE VII

Holdings and PropCo Guarantors Covenants

SECTION 7.01  Holdings Covenant ............................................................ 94
SECTION 7.02  PropCo Guarantors Covenant. ............................................. 95

ARTICLE VIII

Events of Default

SECTION 8.01  Events of Default ............................................................... 96

ARTICLE IX

The Agents

SECTION 9.01  Appointment ................................................................... 100
SECTION 9.02  Delegation of Duties ......................................................... 102
SECTION 9.03  Exculpatory Provisions ..................................................... 102
SECTION 9.04  Reliance by Administrative Agent...................................... 103
SECTION 9.05  Notice of Default .............................................................. 104
SECTION 9.06  Non-Reliance on Agents and Other Lenders ...................... 104
SECTION 9.07  Indemnification................................................................ 104
SECTION 9.08  Agent in Its Individual Capacity ....................................... 105
SECTION 9.09  Successor Agent............................................................... 105

ARTICLE X

Miscellaneous

SECTION 10.01  Notices; Communications................................................ 105
SECTION 10.02  Survival of Agreement..................................................... 107
SECTION 10.03  Binding Effect.................................................................. 107
SECTION 10.04  Successors and Assigns ................................................... 107

SECTION 10.05     Expenses; Indemnity...................................................................... 112
SECTION 10.06     Right of Set-off............................................................................. 114
SECTION 10.07     Applicable Law.............................................................................. 114
SECTION 10.08     Waivers; Amendment ..................................................................... 115
SECTION 10.09     Interest Rate Limitation ................................................................. 117
SECTION 10.10     Entire Agreement........................................................................... 117
SECTION 10.11     WAIVER OF JURY TRIAL............................................................ 118
SECTION 10.12     Severability.................................................................................... 118
SECTION 10.13     Counterparts................................................................................... 118
SECTION 10.14     Headings ........................................................................................ 118
SECTION 10.15     Jurisdiction; Consent to Service of Process .................................... 118
SECTION 10.16     Confidentiality ............................................................................... 119
SECTION 10.17     Platform; Borrower Materials ......................................................... 120
SECTION 10.18     Release of Liens and Guarantees .................................................... 121
SECTION 10.19     USA PATRIOT Act Notice ............................................................ 121
SECTION 10.20     [Reserved]...................................................................................... 121
SECTION 10.21     No Advisory or Fiduciary Responsibility ........................................ 121
SECTION 10.22     [Reserved]...................................................................................... 122
SECTION 10.23     Acknowledgement and Consent to Bail-In of Affected Financial
                  Institutions ..................................................................................... 122
SECTION 10.24     Conflicts......................................................................................... 122
SECTION 10.25     [No Liens on MYTheresa ............................................................... 122

Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Interim DIP Financing Order |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Interest Election Request |
| Exhibit E | [Reserved] |
| Exhibit F | U.S. Tax Compliance Certificate |
| Exhibit G | Form of Note |
| Exhibit H | Form of Extension Request |

| | |
|---|---|
| Schedule 2.01 | Commitments |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.05(b) | Possession under Leases |
| Schedule 3.06(a) | Subsidiaries |
| Schedule 3.11 | Taxes |
| Schedule 3.13 | Environmental Matters |
| Schedule 3.15(a) | Owned Material Real Property |
| Schedule 3.15(b) | Leased Material Real Property |
| Schedule 3.18 | Insurance |
| Schedule 3.20 | Intellectual Property |
| Schedule 6.01 | Prepetition Indebtedness |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 10.01 | Notice Information |

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of [●], 2020 (this "***Agreement***"), by and among MARIPOSA INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company ("***Holdings***"), NEIMAN MARCUS GROUP LTD LLC, a Delaware limited liability company, as a Borrower (the "***Lead Borrower***"), THE NEIMAN MARCUS GROUP LLC, a Delaware limited liability company ("***TNMG LLC***"), THE NMG SUBSIDIARY LLC, a Delaware limited liability company ("***The NMG Subsidiary***" and together with TNMG LLC and the Lead Borrower, the "***Borrowers***" and each, a "***Borrower***"), the Lenders party hereto from time to time, and CORTLAND PRODUCTS CORP., as administrative agent (in such capacity, and as further defined in Section 1.01, the "***Administrative Agent***"), and as collateral agent (in such capacity, and as further defined in Section 1.01, the "***Collateral Agent***" and together with the Administrative Agent, the "***Agents***").

RECITALS

(1)     The Borrowers, Holdings and certain of their Affiliates (as hereinafter defined) have commenced voluntary cases (the "***Chapter 11 Cases***") under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), and the Loan Parties (as hereinafter defined) continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(2)     The Borrowers have asked the Lenders (as hereinafter defined) to provide them with a superpriority secured debtor-in-possession term loan credit facility, comprised of multi-draw term loans (the "***Term Facility***") in an aggregate principal amount of $675,000,000.  All of the Borrowers' obligations under the Term Facility are to be guaranteed by the Guarantors (as hereinafter defined).

(3)     To provide security for repayment of the Term Loans (as hereinafter defined), and the payment of the other Obligations (as hereinafter defined) of the Loan Parties hereunder and under the Loan Documents (as hereinafter defined), the Loan Parties will provide and grant to the Administrative Agent, for its benefit and the benefit of the other Secured Parties, certain rights and protections pursuant to the terms hereof, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, in each case having the relative priorities as set forth in the DIP Financing Orders, and other rights and protections as more fully described herein and in the DIP Financing Orders.

AGREEMENT

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01     Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"***2019 Extended Term Loan PropCo Assets***" means the assets held by Term Loan PropCo as of the Petition Date.

"***ABL Credit Agreement***" means the Revolving Credit Agreement, dated as of October 25, 2013, among Holdings, the Lead Borrower, the other co-borrowers party thereto from time to time, the lenders party thereto from time to time and Deutsche Bank AG New York Branch, as administrative agent and collateral agent, as such document may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, including by that certain Fifth Amendment to Revolving Credit Agreement, dated as of September 11, 2019, by and among the parties thereto.

"***ABL Loan Documents***" means the ABL Credit Agreement and the other "*Loan Documents*" as defined in the ABL Credit Agreement, as each such document may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"***ABL Segregated Cash Collateral***" has the meaning assigned to such term in definition of "*Liquidity*".

"***ABR***" means, for any day, a fluctuating rate per annum equal to the highest of:

(1)     the Federal Funds Rate *plus* 1/2 of 1.00%;

(2)     the Prime Rate; and

(3)     the LIBOR Quoted Rate *plus* 1.00%.

Any change in the ABR due to a change in the Federal Funds Rate, the Prime Rate or the LIBOR Quoted Rate will be effective on the effective date of such change in the Federal Funds Rate, the Prime Rate or the LIBOR Quoted Rate, as the case may be.

"***ABR Borrowing***" means a Borrowing comprised of ABR Loans.

"***ABR Loan***" means any Term Loan bearing interest at a rate determined by reference to the ABR.

"***Acceptable Confirmation Order***" means an order of the Bankruptcy Court confirming an Acceptable Plan that is in form and substance consistent with the RSA and otherwise satisfactory to the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the prior written consent of the Required Lenders in their reasonable discretion).

"***Acceptable Plan***" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"***Accounting Change***" has the meaning assigned to such term in Section 1.03.

"***Actual Cash Receipts***" means the sum of all cash receipts received by the Loan Parties and their Subsidiaries during the relevant period of determination (other than proceeds of the Term Loans and, except to the extent consistent with the Approved Budget, sales, leases or other dispositions outside of the ordinary course of business of the Loan Parties and their Subsidiaries) and which corresponds to the amounts across from the line-item in the Approved Budget with the heading "Operating Receipts" , as determined in a manner consistent with the Approved Budget.

"*Actual Disbursements*" means the sum of all cash disbursements made by the Loan Parties and their Subsidiaries (in all cases excluding payment of amounts which correspond to the figures across from the line-items in the Approved Budget with the headings "Professional Fees", "ABL / FILO / Pre-Term Interest", "DIP Interest", "Exit Term Interest", "Financing Fees", "Success Fees", "KEIP / KERP", "Stub Rent", "Cures" and "Trade Claims Cash Pool") during the relevant period of determination and which corresponds to the amounts across from the line-item in the Approved Budget with the heading "Operating Disbursements" and "Non-Operating Disbursements", as determined in a manner consistent with the Approved Budget.

"*Adjusted LIBO Rate*" means, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum equal to the greater of (1) the LIBO Rate in effect for such Interest Period *divided by* one *minus* the Statutory Reserves applicable to such Eurocurrency Borrowing, if any, and (2) 1.25%.

"*Administrative Agent*" means Cortland Products Corp., in its capacity as administrative agent for itself and the Lenders hereunder, and any duly appointed successor in such capacity.

"*Administrative Agent Fees*" has the meaning assigned to such term in Section 2.09(a).

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Affiliate*" means, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agents*" means the Administrative Agent and the Collateral Agent, in their respective capacities as such.

"*Agreement*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Applicable Margin*" means (i) with respect to an ABR Borrowing, 11.75% and (ii) with respect to a Eurocurrency Borrowing, 12.75%.

"*Approved Budget*" means the 13-week operating budget for the Loan Parties attached as Exhibit 3 to the Interim DIP Financing Order filed with the Bankruptcy Court on May 7, 2020 as the same may be updated from time to time in accordance with Section 5.04.

"*Approved Fund*" has the meaning assigned to such term in Section 10.04(b).

"*Asset Sale*" means any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any Sale and Lease-Back Transaction) to any Person of any asset or assets of the Borrowers or any Subsidiary.

"*Assignee*" has the meaning assigned to such term in Section 10.04(b).

"***Assignment and Acceptance***" means an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent and the Lead Borrower (if required by Section 10.04), substantially in the form of Exhibit A or such other form, substantially consistent with the form of Exhibit A, that is approved by the Administrative Agent and reasonably satisfactory to the Lead Borrower.

"***Backstop Commitment***" has the meaning assigned to such term in the Backstop Commitment Letter.

"***Backstop Commitment Fee***" has the meaning assigned to such term in the Backstop Commitment Letter.

"***Backstop Commitment Letter***" means the Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility Backstop Commitment Letter, dated as of May 7, 2020, among the Lead Borrower and the Backstop Commitment Parties.

"***Backstop Commitment Parties***" has the meaning assigned to such term in the Backstop Commitment Letter.

"***Bail-In Action***" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of any Affected Financial Institution.

"***Bail-In Legislation***" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"***Bankruptcy Court***" has the meaning assigned to such term in the recitals.

"***Beneficial Owner***" has the meaning given to that term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will not be deemed to have beneficial ownership of any securities that such "person" has the right to acquire or vote only upon the happening of any future event or contingency (including the passage of time) that has not yet occurred. The terms "***Beneficial Ownership***", "***Beneficially Owns***" and "***Beneficially Owned***" have a corresponding meaning.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Board***" means the Board of Governors of the Federal Reserve System of the United States of America.

4

"**Board of Directors**" means, as to any Person, the board of directors, board of managers or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors, board of managers or other governing body of such entity, and the term "**directors**" means members of the Board of Directors.

"**Borrower**" has the meaning assigned to such term in the introductory paragraph hereof. As used herein, the term "Borrower" shall mean, as the context requires, "Borrower" or "Borrowers".

"**Borrower Materials**" has the meaning assigned to such term in Section 10.17(a).

"**Borrower Supplemental Budget Election**" shall have the meaning assigned to such term in Section 5.04(n).

"**Borrowing**" means a group of Term Loans of a single Type made on a single date under the Term Facility and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" means a written request by the Borrower in accordance with the terms of this Agreement and substantially in a form of Exhibit C or such other customary form reasonably satisfactory to the Administrative Agent and the Lead Borrower.

"**Budgeted Cash Receipts**" means the sum of all cash receipts received by the Loan Parties and their Subsidiaries during the relevant period of determination (other than proceeds of the Term Loans and, except to the extent consistent with the Approved Budget, sales, leases or other dispositions outside of the ordinary course of business of the Loan Parties and their Subsidiaries) as set forth across from the line-item in the Approved Budget with the heading "Operating Receipts".

"**Budgeted Disbursements**" means the sum of all cash disbursements made by the Loan Parties and their Subsidiaries (in all cases excluding payment of amounts set forth across from the line-items in the Approved Budget with the headings "Professional Fees", "ABL / FILO / Pre-Term Interest", "DIP Interest", "Exit Term Interest", "Financing Fees", "Success Fees", "KEIP / KERP", "Stub Rent", "Cures" and "Trade Claims Cash Pool")) during the relevant period of determination as set forth across from the line-items in the Approved Budget with the headings "Operating Disbursements" and "Non-Operating Disbursements".

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; *provided* that when used in connection with a Eurocurrency Loan, the term "Business Day" also excludes any day on which banks are not open for dealings in deposits in the London interbank market.

"**Capital Lease Obligations**" means, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP (as in effect on October 25, 2013, notwithstanding any modification or interpretative change thereto thereafter and excluding the effect to any treatment of leases under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect)) and, for purposes hereof, the amount of such obligations at any time will be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Lease Obligations Cap**" has the meaning assigned to such term in Section 6.01(e).

"**Capital Stock**" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Carve Out**" has the meaning assigned to such term in the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.

"**Cash Collateral**" has the meaning assigned to such term in the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.

"**Cash Equivalents**" means:

(1)     Dollars, Canadian dollars, Japanese yen, pounds sterling, euros or the national currency of any participating member of the European Union or, in the case of any Foreign Subsidiary, any local currencies held by it from time to time in the ordinary course of business and not for speculation;

(2)     direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case, with maturities not exceeding two years;

(3)     time deposits, Eurodollar time deposits, certificates of deposit and money market deposits, in each case, with maturities not exceeding one year from the date of acquisition thereof, and overnight bank deposits, in each case, with any commercial bank having capital, surplus and undivided profits of not less than $250.0 million;

(4)     repurchase obligations for underlying securities of the types described in clauses (2) and (3) above and clause (6) below entered into with a bank meeting the qualifications described in clause (3) above;

(5)     commercial paper or variable or fixed rate notes maturing not more than one year after the date of acquisition issued by a corporation rated at least "P-1" by Moody's or "A-1" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(6)     securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(7)     Indebtedness issued by Persons (other than the Sponsors) with a rating of at least "A 2" by Moody's or "A" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency), in each case, with maturities not exceeding one year from the date of acquisition,

and marketable short-term money market and similar securities having a rating of at least "P-2" or "A-2" from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(8)      Investments in money market funds with average maturities of 12 months or less from the date of acquisition that are rated "Aaa3" by Moody's and "AAA" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(9)      instruments equivalent to those referred to in clauses (1) through (8) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above customarily utilized in the countries where any such Subsidiary is located or in which such Investment is made;

(10)     shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (1) through (9) above; and

(11)     investments of the type made pursuant to Borrowers' investment policy in effect as of the Closing Date (a copy of which has been provided to the Required Lenders), or as amended, modified, supplemented or updated from time to time with the Required Lenders' consent.

"***Cash Management Services***" means any treasury, depository, pooling, netting, overdraft, stored value card, purchase card (including so called "procurement card" or "P-card"), debit card, credit card, cash management and similar services and any automated clearing house transfer of funds.

A "***Change in Control***" will be deemed to occur if:

(1)      at any time,

    (a)     Holdings ceases to Beneficially Own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrowers; or

    (b)     a "change of control" (or comparable event) occurs under the documents governing the Prepetition Indebtedness, in each case, if any Indebtedness is outstanding under such agreement; or

(2)      the Permitted Holders, taken together, cease to Beneficially Own, directly or indirectly, Voting Stock representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings (determined on a fully diluted basis but without giving effect to contingent voting rights not yet vested).

"***Change in Law***" means:

(1)      the adoption of any law, rule or regulation after the Closing Date;

(2)      any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date; or

(3)      compliance by any Lender (or, for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority, made or issued after the Closing Date; *provided* that, notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or

directives promulgated thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, in each case will be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"*Chapter 11 Cases*" has the meaning assigned to such term in the recitals.

"*Charges*" has the meaning assigned to such term in Section 10.09.

"*Claim*" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"*Closing Date*" means the first date all the conditions set forth in Section 4.01 have been satisfied or waived by the Required Lenders in accordance with this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the DIP Financing Orders and the Security Documents as security for the Obligations, including substantially all real and personal property of the Loan Parties, but excluding any Excluded Assets.

"*Collateral Agent*" means Cortland Products Corp., in its capacity as Collateral Agent for itself and the other Secured Parties, and any duly appointed successor in that capacity.

"*Collateral Agreement*" means the Debtor-In-Possession Guarantee and Collateral Agreement, dated as of the Closing Date, among the Loan Parties and the Collateral Agent, as amended, supplemented, restated and/or otherwise modified from time to time.

"*Commitment*" means, for any Lender, the commitment of such Lender to make Term Loans pursuant to Section 2.01, as set forth on Schedule 2.01 (under the headings "Initial Term Loan Commitments" and "Post-Initial Allocation Term Loan Commitments"), which Schedule 2.01 will be modified on or prior to the Initial Allocation Date in accordance herewith, or in any applicable Assignment and Acceptance.  The aggregate amount of all Lenders' Commitments on the Closing Date immediately before the funding of the Interim Order Term Loans is $675,000,000 (the "*Total Commitment*").

"*Commitment Termination Date*" means the earlier to occur of (i) the date the Last Term Loan is made hereunder (after giving effect to the funding thereof) and (ii) the date that is ten (10) days prior to the Original Maturity Date.

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consenting Noteholder*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*continuing*" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" will have correlative meanings.

"*Control Agreement*" means any "*Control Agreement*" as defined in the Collateral Agreement.

"*Credit Date*" means the date of making of a Term Loan.

"*Credit Support*" means, with respect to any Person and any Indebtedness or other Indebtedness Obligations, (i) such Person's Guarantee of, or becoming a direct or indirect obligor with respect to, such Indebtedness or other Indebtedness Obligations, (ii) such Person's pledge or other hypothecation of its assets to directly or indirectly secure or provide recourse with respect to such Indebtedness or other Indebtedness Obligations, (iii) such Person becoming directly or indirectly liable for such Indebtedness or other Indebtedness Obligations or (iv) such Person providing any other form of direct or indirect credit support for such Indebtedness or other Indebtedness Obligations (including by means of a "keepwell" or other similar commitment).

"*Default*" means any event or condition which, but for the giving of notice, lapse of time or both, would constitute an Event of Default.

"*Defaulting Lender*" means, subject to Section 2.19(c), any Lender that (a) has failed to (i) fund all or any portion of its Term Loans on the date such Term Loans were required to be funded hereunder, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified any Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Administrative Agent or any Borrower, to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrowers), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of (A) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (B) in the case of a solvent Lender, the precautionary appointment of an administrator, guardian or custodian or similar official by a Governmental Authority under or based on the law of the country where such Lender is organized if the applicable law of such jurisdiction requires that such appointment not be publicly disclosed, in any such case, where such ownership or action, as applicable, does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent

manifest error, and such Lender shall be deemed a Defaulting Lender (subject to Section 2.19(c)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrowers and each Lender promptly following such determination.

"*DIP Financing Orders*" means the Interim DIP Financing Order and the Final DIP Financing Order.

"*DIP Proceeds Account*" shall mean a deposit account of the Borrowers with Amegy Bank, a division of Zions Bancorporation, with an account number ending with the last four digits of 4336.

"*Disqualified Institution*" means:

(1)

    (a)    any Person that is a competitor of the Borrowers and identified by the Lead Borrower in writing to the Administrative Agent on or prior to the Closing Date;

    (b)    any Person that is a competitor of the Borrowers and identified by the Lead Borrower in good faith in writing to the Administrative Agent from time to time after the Closing Date; *provided* that such Person will not be a Disqualified Institution if the Administrative Agent reasonably determines in good faith that such Person is not a competitor of the Borrowers and notifies the Lead Borrower of such determination promptly following the date on which the Lead Borrower identifies such Person to the Administrative Agent; and

    (c)    any Affiliates of such competitors described in the foregoing clauses (a) and (b) that are reasonably identifiable as such (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) below) that regularly invest in commercial loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor (i) make investment decisions or (ii) have access to non-public information relating to the Borrowers or any Person that forms part of the Borrowers' business (including their Subsidiaries)); or

(2)    certain banks, financial institutions, other institutional lenders and investors and other entities that are identified by the Lead Borrower in writing to the Administrative Agent on or prior to the Closing Date.

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent will not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent will have no liability with respect to any assignment made to a Disqualified Institution.

"*Disqualified Stock*" means, with respect to any Person, any Equity Interests of such Person that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are redeemable or exchangeable at the option of the holder thereof), or upon the happening of any event or condition:

(1)    mature or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale

are subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable);

(2)      are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part;

(3)      provide for the scheduled payments of dividends in cash; or

(4)      either mandatorily or at the option of the holders thereof, are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the earlier of:

      (a)      the Maturity Date; and

      (b)      the date on which the Term Loans and all other Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no claim has been asserted) are repaid in full;

*provided* that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock; *provided*, *further*, that if such Equity Interests are issued to any employee or to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Equity Interests will not constitute Disqualified Stock solely because they may be required to be repurchased by Holdings or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; and *provided*, *further*, that any class of Equity Interests of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Equity Interests that is not Disqualified Stock will not be deemed to be Disqualified Stock.

"***Dollars***" or "***$***" means lawful money of the United States of America.

"***Domestic Subsidiary***" means any Subsidiary of the Lead Borrower that is organized under the laws of the United States or any political subdivision thereof, and "***Domestic Subsidiaries***" means any two or more of them.  Unless otherwise indicated in this Agreement, all references to Domestic Subsidiaries will mean Domestic Subsidiaries of the Lead Borrower.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Environment*" means ambient air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, and natural resources such as flora and fauna.

"*Environmental Laws*" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, orders, legally binding agreements and final, legally binding decrees or judgments, in each case, promulgated or entered into by or with any Governmental Authority, relating to the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to occupational health and safety matters (to the extent relating to exposure to Hazardous Materials).

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and any final regulations promulgated and the rulings issued thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302, 303 and 306(g) of ERISA and Section 412 and 430 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" means:

(1)     a Reportable Event, or the requirements of Section 4043(b) of ERISA apply, with respect to a Plan;

(2)     a withdrawal by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate that is treated as a termination or withdrawal under Section 4062(e) of ERISA;

(3)     a complete or partial withdrawal by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate from a Multiemployer Plan, receipt of written notification by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate concerning the imposition of Withdrawal Liability on it or written notification that a Multiemployer Plan is, or is expected to be, insolvent within the meaning of Title IV of ERISA or endangered or in critical status within the meaning of Section 305 of ERISA or Section 432 of the Code;

(4)     (a) the provision by a Plan administrator or the PBGC to any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate of notice of intent to terminate a Plan or to appoint a trustee to administer a Plan, (b) the treatment of a Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA or (c) the commencement of proceedings by the PBGC to terminate a Plan or Multiemployer Plan;

(5)     the incurrence by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan, other than for the timely payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA;

(6)      the application for a minimum funding waiver under Section 302(c) of ERISA or Section 412(c) of the Code with respect to a Plan;

(7)      the imposition of a lien on the assets of any Loan Party under Section 303(k) of ERISA with respect to any Plan or Section 430(k) of the Code; and

(8)      a determination that any Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code).

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Eurocurrency Borrowing*" means a Borrowing comprised of Eurocurrency Loans.

"*Eurocurrency Loan*" means any Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Event of Default*" has the meaning assigned to such term in Section 8.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Assets*" means "*Excluded Assets*" as defined in the Collateral Agreement.

"*Excluded Equity Interests*" means "*Excluded Equity Interests*" as defined in the Collateral Agreement.

"*Excluded Indebtedness*" means all Indebtedness not incurred in violation of Section 6.01.

"*Excluded Subsidiary*" means:

(a)      Neiman Marcus Bermuda L.P., a company organized under the laws of Bermuda;

(b)      NMG Asia Holdings Limited, a company organized under the laws of Hong Kong; and

(c)      NMG Asia Limited, a company organized under the laws of Hong Kong;

in each case, unless the Borrower determines in its sole discretion, upon notice to the Administrative Agent, that any of the foregoing Persons should not be an Excluded Subsidiary until the date on which the Borrower has informed the Administrative Agent that it elects to have such Person again be an Excluded Subsidiary; *provided* that the Guarantee and the security interest provided by such Person is full and unconditional and fully enforceable in the jurisdiction of organization of such Person.

"*Excluded Taxes*" means, with respect to any Recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder:

(1)      income taxes imposed on or measured by its net income (however denominated) or franchise taxes imposed in lieu of net income taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes;

(2)     any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (1) above;

(3)     any withholding tax (including any backup withholding tax) that is in effect and would apply to amounts payable hereunder to or for the account of a Recipient under the law applicable at the time such Recipient becomes a party to this Agreement (or in the case of a Lender, under the law applicable at the time such Lender changes its lending office), except to the extent that the Recipient's assignor (if any), at the time of assignment (or such Lender immediately before it changed its lending office), was entitled to receive additional amounts from the Loan Party with respect to any such tax pursuant to Section 2.14(a) or Section 2.14(c);

(4)     Taxes that are attributable to such Lender's or Administrative Agent's failure to comply with Section 2.14(e) or Section 2.14(f); and

(5)     any U.S. federal withholding Taxes imposed under FATCA.

"*Executive Order*" has the meaning assigned to such term in Section 3.19(c)(i).

"*Extended Maturity Date*" means December 7, 2020.

"*Extended Term Loan Backstop Commitment Parties*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Extended Term Loan Lender Advisors*" means Ducera Partners LLC, Vinson & Elkins LLP, and Wachtell, Lipton, Rosen & Katz, and, if applicable, conflicts counsel.

"*Extension Fee*" has the meaning assigned to such term in Section 2.09(e).

"*Extension Request*" has the meaning assigned to such term in Section 2.18.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"*FCPA*" has the meaning assigned to such term in Section 3.19(b).

"*Federal Funds Rate*" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that:

(1)     if such day is not a Business Day, the Federal Funds Rate for such day will be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day; and

(2)     if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day will be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of

1.0%) charged to the Administrative Agent by three federal fund brokers on such day on such transactions as determined in good faith by the Administrative Agent.

"*Fee Letter*" means that certain Fee Letter, dated on or about the Closing Date, by and among the Administrative Agent and the Borrowers, as amended and in effect from time to time and including any joinders thereto.

"*Fees*" means the (1) Administrative Agent Fees and all other fees set forth in the Fee Letter payable to the Administrative Agent with respect to Term Loans, (2) the Backstop Commitment Fee and (3) such other fees as set forth in Section 2.09.

"*Final DIP Financing Order*" means the order of the Bankruptcy Court approving this Agreement on a final basis in form and substance satisfactory to the Administrative Agent, the Required Lenders in their sole discretion, and the Majority Noteholders, as the same may be amended, modified or supplemented from time to time with, solely in the case any such amendment, modification or supplement that adversely impacts the rights or duties of the Lenders or the Consenting Noteholders in any respect, the consent of the Required Lenders or the Majority Noteholders, respectively (and with respect to amendments, modifications or supplements that adversely affect the rights or duties of the Administrative Agent in any respect, the Administrative Agent).  The consent of the Majority Noteholders to the form of the Final DIP Financing Order and any amendment thereto shall not be unreasonably withheld, conditioned or delayed.

"*Final Order Availability Amount*" shall mean (i) $525,000,000 less the Interim Order Availability Amount or (ii) such lesser amount approved by the Bankruptcy Court in the Final DIP Financing Order.

"*Final Order Availability Date*" shall mean the date of the first Borrowing on which the conditions precedent set forth in Sections 4.02 and 4.03 have been satisfied or waived, which date shall be on or after the Final Order Entry Date.

"*Final Order Entry Date*" shall mean the date on which the Final DIP Financing Order is entered by the Bankruptcy Court.

"*Final Order Term Loan*" shall have the meaning assigned to such term in Section 2.01(a).

"*Financial Officer*" means, with respect to any Person, the chief financial officer, a chief restructuring officer appointed during the pendency of the Chapter 11 Cases, if any, principal accounting officer, director of financial services, treasurer, assistant treasurer or controller of such Person.

"*First and Second Day Orders*" means all First Day Orders and Second Day Orders.

"*First Day Orders*" means all interim orders of the Bankruptcy Court (other than the Interim DIP Financing Order) relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehousemen and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration, (xiv) extension of time to file schedules and statements of financial affairs, and (xv) any other pleading the Loan Parties deem necessary or advisable to file the Chapter 11 Cases, in each case, in form and substance substantially consistent with the Approved Budget and otherwise reasonably acceptable to the Required Lenders.

15

"***Foreign Lender***" means any Lender that is organized under the laws of a jurisdiction other than the United States of America.  For purposes of this definition, the United States of America, each state thereof and the District of Columbia will be deemed to constitute a single jurisdiction.

"***Foreign Subsidiary***" means any Subsidiary that not a Domestic Subsidiary.

"***GAAP***" means generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession (but excluding the policies, rules and regulations of the SEC applicable only to public companies).

Notwithstanding anything to the contrary above or in the definition of "Capital Lease Obligations", in the event of a change under GAAP (or the application thereof) requiring any leases to be capitalized that are not required to be capitalized as of October 25, 2013, only those leases that would result or would have resulted in Capital Lease Obligations on October 25, 2013 (assuming for purposes hereof that they were in existence on October 25, 2013) will be considered capital leases and all calculations under this Agreement will be made in accordance therewith.

"***Governmental Authority***" means any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"***Guarantee***" of or by any Person (the "***guarantor***") means:

(1)     any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect:

  (a)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take or pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligations;

  (b)     to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof;

  (c)     to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation;

  (d)     entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part); or

  (e)     as an account party in respect of any letter of credit, bank guarantee or other letter of credit guaranty issued to support such Indebtedness or other obligation; or

16

(2)     any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other Person, whether or not such Indebtedness or other obligation is assumed by the guarantor;

provided, that the term "Guarantee" will not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).

The amount of any Guarantee will be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

The term "Guaranteed" as used herein will have a corresponding meaning.

"*Guarantor*" means (1) Holdings; (2) each Subsidiary Loan Party that is not a Borrower; and (3) each Parent Entity (other than NMG or any Parent Entity of NMG) or Subsidiary that the Lead Borrower may elect in its sole discretion, from time to time, upon written notice to the Administrative Agent, to cause to Guarantee the Obligations until such date that the Lead Borrower has informed the Administrative Agent that it elects not to have such Person Guarantee the Obligations; *provided* that, in the case of this clause (3), the Guarantee and the security interest provided by such Person is full and unconditional and fully enforceable in the jurisdiction of organization of such Person.

"*Hazardous Materials*" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum byproducts or distillates, friable asbestos or friable asbestos-containing materials, polychlorinated biphenyls or radon gas, in each case, that are regulated or would give rise to liability under any Environmental Law due to their dangerous or deleterious properties.

"*Hedge Agreement*" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, not entered into for speculative purposes; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings or any of its Subsidiaries will be a Hedge Agreement.

"*Holdings*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1)     all obligations of such Person for borrowed money;

(2)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(3)     all obligations of such Person under conditional sale or title retention agreements relating to property or assets purchased by such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property or services, to the extent the same would be required to be shown as a long-term liability on a balance sheet prepared in accordance with GAAP;

(5)     all Capital Lease Obligations of such Person;

(6)     all net payments that such Person would have to make in the event of an early termination, on the date Indebtedness of such Person is being determined, in respect of outstanding Hedge Agreements;

(7)     the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and bank guarantees;

(8)     the principal component of all obligations of such Person in respect of bankers' acceptances;

(9)     all Guarantees by such Person of Indebtedness described in clauses (1) through (8) above; and

(10)    the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock);

*provided* that Indebtedness will not include:

(a)     trade payables, accrued expenses and intercompany liabilities arising in the ordinary course of business;

(b)     prepaid or deferred revenue arising in the ordinary course of business;

(c)     purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset; or

(d)     earn-out obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP.

The Indebtedness of any Person will include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof.

"***Indebtedness Documents***" means, with respect to any Indebtedness, all agreements and instruments governing such Indebtedness, all evidences of such Indebtedness or Credit Support thereof, all security documents for such Indebtedness (and documents and filings related thereto) and any intercreditor or similar agreements related thereto.

"***Indebtedness Obligations***" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

18

"**Indemnified Taxes**" means (1) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document; and (2) to the extent not otherwise described in clause (1), Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in Section 10.05(b).

"**Initial Allocation**" has the meaning assigned to such term in the Backstop Commitment Letter.

"**Initial Allocation Commitment Notice**" has the meaning assigned to such term in Section 2.01(c).

"**Initial Allocation Date**" means the effective date of the assignment of Commitments (and related rights and obligations under this Agreement) pursuant to the Initial Allocation, which is expected to be ten (10) Business Days after the Closing Date (inclusive of the Closing Date) (or such other practicable time as reasonably agreed by the Backstop Commitment Parties, the Administrative Agent and the Lead Borrower).

"**Initial Allocation Date Term Loan**" has the meaning assigned to such term in Section 2.01(a).

"**Initial Term Loan**" has the meaning assigned to such term in Section 2.01(a).

"**Intellectual Property Rights**" has the meaning assigned to such term in Section 3.20(a).

"**Interest Election Request**" means a request by the Lead Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"**Interest Payment Date**" means (1) with respect to any Eurocurrency Loan, the first Business Day of each calendar month following the then-ended Interest Period applicable to the Borrowing of which such Term Loan is a part; and (2) with respect to any ABR Loan, the first Business Day of each calendar month.

"**Interest Period**" means, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one month thereafter, or the date any Eurocurrency Borrowing is converted to an ABR Borrowing in accordance with Section 2.04 or repaid or prepaid in accordance with Section 2.06, 2.07 or 2.08; *provided* that:

(1)     if any Interest Period would end on a day other than a Business Day, such Interest Period will be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period will end on the next preceding Business Day;

(2)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) will end on the last Business Day of the calendar month at the end of such Interest Period;

(3)     no Interest Period will extend beyond the Maturity Date.  Interest will accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period; and

19

(4)     the initial Interest Period with respect to each Term Loan shall commence as of the date the Term Loan is funded and end on the last day of the calendar month in which such Term Loan is funded.

"**Interim DIP Financing Order**" means the order of the Bankruptcy Court approving this Agreement on an interim basis, in the form of Exhibit B hereto or otherwise satisfactory to the Administrative Agent, the Required Lenders in their sole discretion, and the Majority Noteholders, as the same may be amended, modified or supplemented from time to time with, solely in the case of any amendment, modification or supplement that is adverse to the rights or duties of the Lenders or the Consenting Noteholders in any respect, the consent of the Required Lenders or the Majority Noteholders, respectively (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent). The consent of the Majority Noteholders to the form of the Interim DIP Financing Order and any amendment thereto shall not be unreasonably withheld, conditioned or delayed.

"**Interim Order Availability Amount**" shall mean $275,000,000 or such lesser amount approved by the Bankruptcy Court in the Interim DIP Financing Order.

"**Interim Order Term Loan**" has the meaning assigned to such term in Section 2.01(a).

"**Investment**" has the meaning assigned to such term in Section 6.04.

"**Investment Grade Securities**" means:

(a)     securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents);

(b)     [reserved];

(c)     corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition; and

(d)     investments in any fund that invests at least 95.0% of its assets in investments of the type described in clause (a) above which fund may also hold immaterial amounts of cash pending investment and/or distribution.

"**Junior Financing**" means any Indebtedness permitted to be incurred hereunder that is contractually subordinated in right of payment to the Obligations, unsecured or secured by Liens that are contractually subordinated to the Liens securing the Obligations.

"**Last Term Loan**" shall have the meaning assigned to such term in Section 2.01(a).

"**Last Term Loan Availability Amount**" shall mean $675,000,000 (or such lesser amount approved by the Bankruptcy Court in the Final DIP Financing Order) less the Interim Order Availability Amount, less the Final Order Availability Amount.

"**Last Term Loan Availability Date**" shall mean the date of the first Borrowing on which the conditions precedent set forth in Sections 4.02 and 4.04 have been satisfied or waived, which date shall be after the Final Order Availability Date and at least 120 days after the Petition Date.

"*Lead Borrower*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Lender*" means each financial institution listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 10.04), as well as any Person that becomes a Lender hereunder pursuant to Section 10.04.

"*Lender Advisors*" means the Extended Term Loan Lender Advisors and Prepetition Notes Lender Advisors.

"*lending office*" means, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Term Loans.

"*Letter of Credit*" has the meaning assigned to such term in the ABL Credit Agreement.

"*LIBO Rate*" means, with respect to any Eurocurrency Borrowing for any Interest Period, the rate per annum equal to the arithmetic mean of the offered rates for deposits in Dollars with a term equivalent to such Interest Period by reference to the applicable Bloomberg screen page (or by reference to any successor or substitute page or other quotation service providing comparable quotations to such applicable Bloomberg screen page) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period (as set forth by any service selected by the Administrative Agent (or any successor or substitute agency) as an authorized vendor for the purpose of displaying such rates); *provided* that if such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period will be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurocurrency Loan being made, continued or converted by the Administrative Agent and with a term equivalent to such Interest Period would be offered to the Administrative Agent by major banks in the London interbank Eurocurrency market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period.

"*LIBOR Quoted Rate*" means, for any day (or if such day is not a Business Day, the immediately preceding Business Day), a fluctuating rate per annum equal to the greater of (1) the Adjusted LIBO Rate for an Interest Period of one month as determined as of 11:00 a.m. (London, England time) on such day by reference to the applicable Bloomberg screen page (or by reference to any successor or substitute page or other quotation service providing comparable quotations to such applicable Bloomberg screen page) for deposits in dollars (as set forth by any service selected by the Administrative Agent that (or any successor or substitute agency) as an authorized vendor for the purpose of displaying such rates); and (2) 1.25%.

"*Lien*" means, with respect to any asset (1) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset; or (2) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; *provided* that in no event will an operating lease or an agreement to sell be deemed to constitute a Lien.

"*Liquidity*" means, as of any time, the sum of (i) unrestricted domestic cash and Cash Equivalents of the Loan Parties (excluding, for the avoidance of doubt, cash and Cash Equivalents segregated into, or designated to be segregated into, the Segregated Collateral Account (as defined in the

Interim DIP Financing Order) (such cash collateral, the "***ABL Segregated Cash Collateral***")), (ii) Term Loan proceeds in the DIP Proceeds Account; provided that on the date the Interim Order Term Loans are made, the amount of such Term Loan proceeds for purposes of this clause (ii) shall be deemed to be $250,000,000 until but excluding the date the Initial Allocation Date Term Loan is made, irrespective of whether a lesser amount of actual Term Loan proceeds is in such account for the same period, with deductions from the DIP Proceeds Account calculated based on such deemed starting balance of $250,000,000; and (iii) the principal amount of Term Loans available for borrowing hereunder as of such time (for the avoidance of doubt, as to which all conditions precedent other than delivery of a Borrowing Notice have been satisfied or waived in accordance with the terms set forth herein).

"***Loan Documents***" means this Agreement, the Backstop Commitment Letter, the Security Documents, the DIP Financing Orders, the Fee Letter, and any other amendment or other agreement or document evidencing or governing the Obligations hereunder.

"***Loan Parties***" means Holdings, the Borrowers and the Subsidiary Loan Parties.

"***Majority Noteholders***" means, at any date of determination, Consenting Noteholders beneficially owning more than a majority of Term Loans and Commitments held by all Consenting Noteholders hereunder.

"***Management Group***" means the group consisting of the directors, executive officers and other management personnel of NM Group and its Subsidiaries on the Closing Date or who became directors, officers or management personnel of NM Group or any direct or indirect parent of NM Group, as applicable, and its Subsidiaries following the Closing Date (other than in connection with a transaction that would otherwise be a Change in Control if such persons were not included in the definition of "Permitted Holders"), or (in each case) family members thereof, or trusts, partnerships or limited liability companies for the benefit of any of the foregoing, or any of their heirs, executors, successors and legal representatives, who at any date Beneficially Own or have the right to acquire, directly or indirectly, Equity Interests of the Lead Borrower or any Permitted Parent.

"***Margin Stock***" has the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" means a material adverse effect on:

(1)     the business, financial condition or results of operations, in each case, of the Lead Borrower and the Subsidiaries (taken as a whole), excluding in any event (i) the effect of filing the Chapter 11 Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Loan Documents or the DIP Financing Orders, and the Chapter 11 Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Chapter 11 Cases, (iii) any matters disclosed on the schedules hereto and (iv) any matters or transactions disclosed, contemplated or required to be taken in any First Day Order or Second Day Order, motions related thereto or in any supporting declarations thereof;

(2)     the ability of the Borrowers and the Guarantors (taken as a whole) to perform their payment obligations under the Loan Documents; or

(3)     the rights and remedies of the Administrative Agent and the Lenders (taken as a whole) under the Loan Documents; provided that

in determining whether a "material adverse effect" has occurred or exists under clause (1) hereof, the impacts of COVID-19 on the business, financial condition or results of operations of the Loan Parties or any of their respective Subsidiaries will be disregarded.

"*Material Indebtedness*" means Indebtedness (other than the Term Loans) of any Borrower or any Subsidiary Loan Party in an aggregate outstanding principal amount exceeding $20.0 million.

"*Maturity Date*" means, the date that is the earliest of (i) October 7, 2020 (the "*Original Maturity Date*"), or, if such date has been extended pursuant to Section 2.18, the Extended Maturity Date (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (iv) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise and (vi) such earlier date on which the Term Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"*Maximum Rate*" has the meaning assigned to such term in Section 10.09.

"*Minimum Hold Percentage*" means (x) with respect to each Extended Term Loan Backstop Commitment Party, the applicable percentage under the heading "Minimum Hold Percentage—Extended Term Loan Backstop Commitment Parties" on Schedule 2.01, and (y) with respect to each Prepetition Notes Backstop Commitment Party, the applicable percentage under the heading "Minimum Hold Percentage—Prepetition Notes Backstop Commitment Parties" on Schedule 2.01.

"*MNPI*" means any material nonpublic information regarding Holdings and the Subsidiaries that has not been disclosed to the Lenders generally (other than Lenders who elect not to receive such information).  For purposes of this definition "material nonpublic information" means nonpublic information that would reasonably be expected to be material to a decision by any Lender to assign or acquire any Term Loans or to enter into any of the transactions contemplated thereby.

"*Moody's*" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"*MYT Entities*" means, collectively, (i) Mariposa Luxembourg I S.à r.l. (Luxembourg), (ii) Mariposa Luxembourg II S.à r.l. (Luxembourg), (iii) NMG Germany GmbH (Germany), (iv) mytheresa.com GmbH (Germany), (v) mytheresa.com Service GmbH (Germany), (vi) Theresa Warenvertrieb GmbH (Germany), (vii) MYT Netherlands Parent B.V. (Netherlands), and (viii) the Subsidiaries of any of the foregoing described in subclauses (i) through (vii).

"*MYT Subsidiaries*" means, collectively, (i) the MYT Entities, (ii) MYT Intermediate Holding Co., a Delaware corporation, (iii) MYT Holding Co., a Delaware corporation and (iv) MYT Parent Co., a Delaware corporation.

"***MyTheresa Assets***" means the assets described in clauses (1), (2), and (3) of the definition of MyTheresa Distribution.

"***MyTheresa Designation***" means, collectively, all designations by any Loan Party or any of their Related Parties  (including but not limited to NMG International) prior to March 25, 2019 of any of the MYT Entities as "unrestricted" Subsidiaries under the Senior Notes Indentures (as defined in the Prepetition Term Loan Credit Agreement), the Existing Credit Agreement (as defined in the Prepetition Term Loan Credit Agreement), or the ABL Credit Agreement, and all acts or omissions taken by any Loan Party or any of its Related Parties in structuring, implementing, or effectuating the foregoing designations.

"***MyTheresa Distribution***" means, collectively, all distributions or dividends by any Loan Party or any of their Related Parties (including but not limited to NMG International) prior to March 25, 2019, to or for the benefit of any other Related Parties of (1) any Equity Interests in the MYT Entities, (2) any Indebtedness owed by any MYT Entities to any Related Party (including but not limited to NMG International), and (3) any and all other Claims or Equity Interests of any Related Party (including but not limited to NMG International) in the MYT Entities, and all acts or omissions taken by any Loan Party or any of its Related Parties in structuring, implementing, or effectuating the distributions or dividends described in clauses (1) through (3) of this definition.

"***Net Cash Proceeds***" means (i) with respect to any Asset Sale, the aggregate cash proceeds (using the fair market value of any Cash Equivalents) received by the Lead Borrower or any Subsidiary in respect of any Asset Sale (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, and including any proceeds received as a result of unwinding any related Hedge Agreements in connection with such transaction but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct cash costs relating to such Asset Sale (including legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses incurred as a result thereof, taxes paid or payable within one year of such Asset Sale as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction that is secured by a Permitted Lien that is prior or senior to the Lien securing the Obligations, and any costs associated with unwinding any related Hedge Agreements in connection with such transaction and (ii) with respect to any incurrence, issuance or sale of Indebtedness, the excess, if any, of (A) cash received by the Lead Borrower or any of its Subsidiaries in connection with such incurrence over (B) the sum of (1) payments made to retire any Indebtedness that is required to be repaid in connection with such incurrence (other than Term Loans), and (2) taxes paid or payable, fees, underwriting discounts and commissions and other reasonable expenses paid or incurred by the Lead Borrower or any of its Subsidiaries in connection with such incurrence, issuance or sale.

"***New York Courts***" has the meaning assigned to such term in Section 10.15.

"***NM Group***" means, collectively, NMG and its Subsidiaries.

"***NMG***" means Neiman Marcus Group, Inc., a Delaware corporation and the direct Parent Entity of Holdings.

"***NMG International***" means NMG International LLC, a Delaware limited liability company.

"***Non-Consenting Lender***" has the meaning assigned to such term in Section 2.16(c).

"*Non-Defaulting Lender*" means, at any time, each Lender that is not a Defaulting Lender at such time.

"*Note*" has the meaning assigned to such term in Section 2.05(e).

"*Notes PropCo*" means NMG Notes PropCo LLC, a Delaware limited liability company that is a Subsidiary of the Lead Borrower formed solely to hold the Real Property interests consisting of Notes PropCo Assets.

"*Notes PropCo Assets*" means the assets held by Notes PropCo as of the Petition Date.

"*Obligations*" means all amounts owing to any Agent or any Lender pursuant to the terms of this Agreement or any other Loan Document (including principal, interest, any contingent indemnification and reimbursement obligations, or other payments required under Section 10.05, and all fees required to be paid pursuant to the Loan Documents).

"*OFAC*" has the meaning assigned to such term in Section 3.19(c)(v).

"*Original Maturity Date*" has the meaning assigned to such term in the definition of Maturity Date.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document).

"*Other Taxes*" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16).

"*Parent Entity*" means any direct or indirect parent of the Lead Borrower.

"*Participant*" has the meaning assigned to such term in Section 10.04(d)(i).

"*Participant Register*" has the meaning assigned to such term in Section 10.04(d)(i).

"*Payment Office*" means the office or account of the Administrative Agent designated to the Lead Borrower and the Lenders from time to time.

"*PBGC*" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA, or any successor thereto.

"*Permitted Debt*" has the meaning assigned thereto in Section 6.01.

"*Permitted Holders*" means each of:

(1)     the Sponsors;

(2)      any member of the Management Group (or any controlled Affiliate thereof of which members of the Management Group hold at least 50% of the Voting Stock and 50% of the economic value);

(3)      any other holder of a direct or indirect Equity Interest in Holdings that holds such Equity Interest as of the Closing Date;

(4)      any group (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of which the Persons described in the foregoing clauses (1), (2) or (3) are members; provided that, (a) without giving effect to the existence of such group or any other group, the Persons described in the foregoing clauses (1), (2) and (3), collectively, Beneficially Own Voting Stock representing 50% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings or any Permitted Parent (determined on a fully diluted basis but without giving effect to contingent voting rights not yet vested) then held by such group and (b) if the Beneficial Ownership described in subclause (a) is shared with any Person other than the Persons described in clauses (1), (2) and (3) above, the Persons described in clauses (1), (2) and (3) above hold at least 50% of the economic value of the equity securities of Holdings  (or Permitted Parent, as the case may be) then held by such group; and

(5)      any Permitted Parent.

"*Permitted Investments*" has the meaning assigned to such term in Section 6.04.

"*Permitted Liens*" has the meaning assigned to such term in Section 6.02.

"*Permitted Parent*" means any Parent Entity for so long as it is controlled only by one or more Persons that are Permitted Holders pursuant to clause (1), (2), (3) or (4) of the definition thereof; *provided* that such Parent Entity was not formed in connection with, or in contemplation of, a transaction that would otherwise constitute a Change in Control.

"*Permitted Variance*" means any variance permitted under Section 6.14.

"*Person*" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, government, individual or family trust, Governmental Authority or other entity of whatever nature.

"*Petition Date*" means May 7, 2020.

"*Plan*" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is (1) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA; and (2) either (a) sponsored or maintained (at the time of determination or at any time within the five years prior thereto) by any Loan Party or any ERISA Affiliate or (b) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Plan of Reorganization*" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"*Platform*" has the meaning assigned to such term in Section 10.17(a).

"*Prepetition Indebtedness*" means the Indebtedness of the Loan Parties existing prior to the Closing Date and set forth on Schedule 6.01.

26

"*Prepetition Noteholders*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Prepetition Notes Backstop Commitment Parties*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Prepetition Notes Documents*" means, collectively, the "Second Lien Notes Documents" and the "Third Lien Notes Documents" as defined in the Prepetition Term Loan Credit Agreement.

"*Prepetition Notes Lender Advisors*" means Houlihan Lokey, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Porter Hedges LLP, and, if applicable, conflicts counsel.

"*Prepetition Notes Obligations*" means, collectively, the "Second Lien Notes Obligations" and the "Third Lien Notes Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of October 25, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, including by that certain Refinancing Amendment, dated as of March 13, 2014 and that certain Extension Amendment and Amendment No. 2 to the Credit Agreement, dated as of June 7, 2019), by and among Holdings, the Lead Borrower, certain Subsidiary Loan Parties, Credit Suisse, Cayman Islands Branch, as the administrative agent and the collateral agent, and certain Lenders party thereto from time to time.

"*Prepetition Term Loan Documents*" means the "Loan Documents" as defined in the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Lenders*" means the "Lenders" party to the Prepetition Term Loan Credit Agreement.

"*Prepetition Term Loan Obligations*" means the "Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"*Projections*" means all projections (including financial estimates, financial models, forecasts and other forward-looking information and including the Approved Budget) furnished to the Lenders or the Administrative Agent by or on behalf of Holdings or any of the Subsidiaries on or prior to the Closing Date.

"*PropCo Guarantors*" means Notes PropCo and Term Loan PropCo.

"*Public Lender*" has the meaning assigned to such term in Section 10.17(b).

"*Qualified Equity Interests*" means any Equity Interests other than Disqualified Stock.

"*Quarterly Financial Statements*" has the meaning assigned to such term in Section 5.04(b).

"*Real Property*" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, together with, in each case, all easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"*Recipient*" means the Administrative Agent and any Lender, as applicable.

"*Register*" has the meaning assigned to such term in Section 10.04(b)(iv).

"*Regulation U*" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Reinvestment Notice*" means a written notice executed by a Responsible Officer stating that the Borrowers or any Subsidiary intends and expects to use an amount of funds not to exceed the amount of Net Cash Proceeds of any Asset Sale consisting of Specified Dispositions to, with respect to dispositions of inventory (other than any such inventory described in the parenthetical in Section 2.08(a), in consultation with the Required Lenders, and otherwise with respect to Specified Dispositions, subject to the reasonable consent of the Required Lenders, apply such funds to any investments in, or purchases of, or payments in respect of (a) third-party logistics services, (b) supply chain assets useful in the business of the Loan Parties or their Subsidiaries or (c) any warehouse or distribution center, in each case which will be made after the date of consummation of such Asset Sale.

"*Related Lender*" has the meaning assigned to such term in Section 2.09(c).

"*Related Parties*" means, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"*Release*" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the Environment.

"*Reorganized Equity*" has the meaning assigned to such term in Section 2.09(c).

"*Reportable Event*" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"*Required Financial Statements*" has the meaning assigned to such term in Section 5.04(c).

"*Required Lenders*" means, at any time, Lenders having Term Loans and Commitments outstanding that, taken together, represent at least 66.7% of the sum of all Term Loans and Commitments outstanding at such time; *provided*, that Required Lenders must include (i) at all times at least two

unaffiliated Lenders and (ii) at any time when the Lenders consist of ten or more unaffiliated funds or investment advisors or managers of funds or accounts, at least three unaffiliated Lenders.  The amount of Term Loans and Commitments of any Defaulting Lender shall be disregarded in the calculation for determining Required Lenders at any time.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means, with respect to any Loan Party, the chief executive officer, president, vice president, secretary, assistant secretary or any Financial Officer of such Loan Party or any other individual designated in writing to the Administrative Agent by an existing Responsible Officer of such Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party will be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer will be conclusively presumed to have acted on behalf of such Loan Party.

"*Restricted Payments*" has the meaning assigned to such term in Section 6.06.

"*Restructuring Support Agreement*" or "*RSA*" means that certain Restructuring Support Agreement, dated as of May 7, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"*S&P*" means Standard & Poor's Ratings Services or any successor entity thereto.

"*Sale and Lease-Back Transaction*" has the meaning assigned to such term in Section 6.03.

"*SEC*" means the Securities and Exchange Commission or any successor thereto.

"*Second Day Orders*" means all final orders of the Bankruptcy Court (other than the Final DIP Financing Order) relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehousemen and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration, (xiv) extension of time to file schedules and statements of financial affairs, and (xv) any other pleading the Loan Parties deem necessary or advisable to file the Chapter 11 Cases, in each case, in form and substance substantially consistent with the Approved Budget and otherwise reasonably acceptable to the Required Lenders.

"*Second Lien Notes*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*Secured Parties*" means the collective reference to the "*Secured Parties*" as defined in the Collateral Agreement.

"*Security Documents*" means the Collateral Agreement, the DIP Financing Orders and each of the security agreements and other instruments and documents executed and delivered by any Loan Party pursuant thereto or pursuant to Section 5.10.

"***Similar Business***" means, as of any date, any business engaged in by the Lead Borrower and its Subsidiaries on such date and any business or other activities that are similar, ancillary, complementary, incidental or related to, or an extension, development or expansion of, the businesses in which the Lead Borrower and its Subsidiaries are engaged in on such date.

"***Specified Dispositions***" means the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith) and (i) bulk sales or other dispositions of inventory or equipment of a Loan Party and (ii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith, identified in writing by the Lead Borrower to the Required Lenders and agreed to by the Required Lenders on or prior to the Petition Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders.

"***Specified Event of Default***" has the meaning assigned to such term in Section 10.04(b).

"***Sponsors***" means, any of Ares Corporate Opportunities Fund III, L.P., Ares Corporate Opportunities Fund IV, L.P., the Canada Pension Plan Investment Board and any of their respective Affiliates and funds or partnerships managed or advised by any of them or any of their respective Affiliates, but not including any operating portfolio company of any of the foregoing.

"***Statutory Reserves***" means, with respect to any currency, any reserve, liquid asset or similar requirements established by any Governmental Authority of the United States of America or of the jurisdiction of such currency or any jurisdiction in which Term Loans in such currency are made to which banks in such jurisdiction are subject for any category of deposits or liabilities customarily used to fund loans in such currency or by reference to which interest rates applicable to Term Loans in such currency are determined.

"***Subagent***" has the meaning assigned to such term in Section 9.02.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company or other entity of which (1) Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership, limited liability company or other entity are at the time owned by such Person; or (2) more than 50.0% of the Equity Interests are at the time owned by such Person. Unless otherwise indicated in this Agreement, all references to Subsidiaries will mean Subsidiaries of the Borrowers. For the avoidance of doubt, as of the Closing Date, TNMG LLC and The NMG Subsidiary are Subsidiaries of the Lead Borrower for all purposes hereunder. For the avoidance of doubt, no MYT Subsidiary shall constitute a Subsidiary of the Borrowers at any time, including in the event that such MYT Subsidiary is required to be contributed to any of the Borrowers or their Subsidiaries in accordance with any settlement, judgment, court order or other resolution of a claim, cause of action or litigation with respect to the MyTheresa Distribution which binds the Bankruptcy Court.

"***Subsidiary Loan Parties***" means each Subsidiary of the Lead Borrower on the Closing Date or hereafter formed or acquired (other than any Excluded Subsidiary).

"***Supermajority Lenders***" means each member of the Consenting Term Loan Lender Group (as defined in the Restructuring Support Agreement), the membership of which, for the purposes of this Agreement, shall not change after the Closing Date absent the consent of each current member of such group. The amount of Term Loans and Commitments of any Defaulting Lender shall be disregarded in the calculations for determining Supermajority Lenders at all times.

"*Taxes*" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority and any and all interest and penalties related thereto.

"*Term Facility*" has the meaning assigned to such term in the recitals.

"*Term Loan PropCo*" means NMG Term Loan PropCo LLC, a Delaware limited liability company that is a Subsidiary of the Lead Borrower formed solely to hold Real Property interests consisting of 2019 Extended Term Loan PropCo Assets.

"*Term Loans*" means, individually and collectively, the Interim Order Term Loan, the Initial Allocation Date Term Loan, the Final Order Term Loan and the Last Term Loan.

"*The NMG Subsidiary*" has the meaning assigned to such term in the introductory paragraph hereto.

"*Third Lien Notes*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*TNMG LLC*" has the meaning assigned to such term in the introductory paragraph hereto.

"*Total Commitment*" has the meaning assigned to such term in the definition of "Commitment".

"*Total Exit Fee*" has the meaning assigned to such term in Section 2.09(c).

"*Total Upfront Fee*" has the meaning assigned to such term in Section 2.09(b).

"*Trade Announcements*" has the meaning assigned to such term in Section 10.16.

"*Type*" means, when used in respect of any Term Loan or Borrowing, the Rate by reference to which interest on such Term Loan or on the Term Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" means Adjusted LIBO Rate or ABR, as applicable.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain Affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*U.S. Trustee*" shall have the meaning assigned to such term in Section 5.04(o).

"***USA PATRIOT Act***" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"***Variance Report***" shall have the meaning assigned to such term in Section 5.04(r).

"***Variance Report Date***" shall have the meaning assigned to such term in Section 5.04(r).

"***Variance Testing Period***" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period (i.e, from the Petition Date through May 30, 2020)).

"***Voting Stock***" means, as of any date, the Capital Stock of any Person that is at the time entitled to vote (without regard to the occurrence of any contingency) in the election of the Board of Directors of such Person.

"***Wholly Owned Subsidiary***" means, with respect to any Person, a Subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person. Unless otherwise indicated in this Agreement, all references to Wholly Owned Subsidiaries will mean Wholly Owned Subsidiaries of the Borrowers.

"***Withdrawal Liability***" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"***Write-Down and Conversion Powers***" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, transfer or dilute shares issued by a UK Financial Institution, to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02      Terms Generally.  The definitions set forth or referred to in Section 1.01 will apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun will include the corresponding masculine, feminine and neuter forms.  Unless the context requires otherwise,

(a)      the words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation;"

(b)      in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including;"

(c)      the word "will" will be construed to have the same meaning and effect as the word "shall;"

(d)      the word "incur" will be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" will have correlative meanings);

(e)      the word "or" will be construed to mean "and/or;"

(f)      any reference to any Person will be construed to include such Person's legal successors and permitted assigns; and

(g)      the words "asset" and "property" will be construed to have the same meaning and effect.

All references herein to Articles, Sections, Exhibits and Schedules will be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context otherwise requires.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or organizational document of the Loan Parties means such document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document).  Any reference to any law will include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation means, unless otherwise specified, such law or regulation as amended, modified or supplemented from time to time.  Whenever this Agreement refers to the "knowledge" of any Loan Party, such reference will be construed to mean the knowledge of the chief executive officer, president, chief financial officer, treasurer or controller of such Person.

SECTION 1.03      Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature will be construed in accordance with GAAP, as in effect from time to time; *provided* that, notwithstanding anything to the contrary herein, all accounting or financial terms used herein will be construed, and all financial computations pursuant hereto will be made, without giving effect to any election under Statement of Financial Accounting Standards Board Accounting Standards Codification 825-10 (or any other Statement of Financial Accounting Standards Board Accounting Standards Codification having a similar effect) to value any Indebtedness or other liabilities of the Borrowers or any Subsidiary at "fair value," as defined therein.  In the event that any Accounting Change (as defined below) occurs and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then upon the written request of the Lead Borrower or the Administrative Agent (acting upon the request of the Required Lenders), the Borrowers, the Administrative Agent and the Lenders will enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrowers' financial condition will be the same after such Accounting Change as if such Accounting Change had not occurred; *provided* that provisions of this Agreement in effect on the date of such Accounting Change will remain in effect until the effective date of such amendment.  "***Accounting Change***" means (1) any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or (2) any change in the application of GAAP by Holdings or the Borrowers.

SECTION 1.04      [Reserved].

SECTION 1.05      Currencies.  Unless otherwise specifically set forth in this Agreement, monetary amounts are in Dollars.  Notwithstanding anything to the contrary herein, no Default or Event of Default will arise as a result of any limitation or threshold set forth in Dollars being exceeded solely as a result of changes in currency exchange rates.

SECTION 1.06      [Reserved].

SECTION 1.07      Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II

### *The Credits*

SECTION 2.01      Term Loans and Borrowings.

(a)      Subject to the terms and conditions set forth in this Agreement and in the DIP Financing Orders, each Lender severally agrees to make Term Loans to the Borrowers in up to four (4) advances (i) on or about the Closing Date (the "***Interim Order Term Loan***"), (ii) on or about the Initial Allocation Date (the Term Loan made on such date, the "***Initial Allocation Date Term Loan***", together with the "***Interim Order Term Loan***", the "***Initial Term Loan***"), (iii) on or after the Final Order Availability Date (the Term Loan made on such date, the "***Final Order Term Loan***") and (iv) on or after the Last Term Loan Availability Date (the Term Loan made on such date, the "***Last Term Loan***"), in each case, in an aggregate principal amount not to exceed its Commitment; provided, that:

(i)      the Interim Order Term Loan shall be funded by each Backstop Commitment Party (x) in the amount set forth under the heading "Initial Term Loan Commitments—Interim Order Term Loans" on Schedule 2.01, *multiplied by* (y) a fraction the numerator of which is the amount approved by the Bankruptcy Court in the Interim DIP Financing Order and the denominator of which is $275,000,000;

(ii)      the Initial Allocation Date Term Loan shall be (1) in an aggregate amount equal to the Interim Order Availability Amount *minus* the amount funded pursuant to clause (i) above and (2) funded by each Lender in a respective amount such that, after giving effect to the Initial Allocation Date Term Loan, each Lender holds Term Loans equal to the product of (1) (a) the Initial Term Loan divided by (b) the Total Commitment and (2) such Lender's Commitments as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 (for the avoidance of doubt, the Initial Allocation Date Term Loan will not be funded ratably across all Lenders);

(iii)      the Final Order Term Loan shall be funded ratably by each Lender in accordance with its Commitment as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 and in an aggregate amount equal to the Final Order Availability Amount; and

(iv)     the Last Term Loan shall be funded ratably by each Lender in accordance with its Commitment as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 and in an aggregate amount equal to the Last Term Loan Availability Amount.

(b)     The Commitments of the applicable Lenders shall be reduced dollar for dollar immediately after the funding of any Term Loans thereunder and any unused Commitments shall terminate, (i) with respect to the Interim Order Availability Amount, upon funding of the Initial Allocation Date Term Loan, (ii) with respect to the Final Order Availability Amount, upon funding of the Final Order Term Loan and (iii) with respect to the Last Term Loan Availability Amount, upon the earlier of the (1) funding of the Last Term Loan and (2) the Commitment Termination Date. Each Borrowing shall be of the same Type made on the same day by the applicable Lenders ratably according to their respective Commitments. Amounts borrowed under Section 2.01(a) and paid or prepaid may not be reborrowed.

(c)     No later than the eighth (8th) Business Day after the Closing Date (inclusive of the Closing Date) (or such other time as reasonably acceptable to the Administrative Agent and the Lead Borrower), so long as the Lead Borrower shall have received the schedule described in this clause (c) from the Backstop Commitment Parties or their respective financial advisors, the Administrative Agent shall have received (i) from the Lead Borrower a written notice, in form and substance reasonably satisfactory to the Administrative Agent (the "*Initial Allocation Commitment Notice*"), which shall attach a schedule identifying each Lender and the amount of its Commitment and (ii) from each Lender that is not a Backstop Commitment Party, a joinder to this Agreement executed by such Lender and the Lead Borrower, pursuant to which, inter alia, such Lender shall have and shall represent and warrant that it has delivered to the Administrative Agent a completed Administrative Questionnaire, such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations requested by the Administrative Agent and such documentation and other information required under Section 2.14. The schedule delivered pursuant to clause (i) of this Section 2.01(c) shall be conclusive and binding absent manifest error. The parties hereto agree that the Administrative Agent may conclusively rely on the Initial Allocation Commitment Notice and this provision in adjusting the Register to reflect the Commitment of each Lender.

(d)     Subject to Sections 2.04(g) and 2.11, each Borrowing is or will be comprised entirely of ABR Loans or Eurocurrency Loans as the Lead Borrower has requested in accordance herewith. Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Term Loan; *provided* that any exercise of such option will not affect the obligation of the Borrowers to repay such Term Loan in accordance with the terms of this Agreement, and such Lender will not be entitled to any amounts payable under Section 2.12 or 2.14 solely in respect of increased costs resulting from, and existing at the time of, such exercise.

(e)     To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by submitting a completed Borrowing Request, executed by a Financial Officer of the Borrower, (i) in the case of a Eurocurrency Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before the date of the proposed Borrowing, provided that the request for the Interim Order Term Loan may be made by 11:00 a.m., New York City time, on the date of such Borrowing or (ii) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City Time, one (1) Business Day before the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable and shall specify the following information: (A) the aggregate amount of the requested Borrowing; (B) the date of such Borrowing, which shall be a Business Day; (C) whether

such Borrowing is to be a Eurocurrency Borrowing or an ABR Borrowing; and (D) the wire instructions for the DIP Proceeds Account.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall notify each Lender of the details thereof and the amount of such Lender's Term Loan to be made as part of the requested Borrowing in accordance with clause (a) above; *provided* that the Borrowers may condition each Borrowing in such notice on the entry of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.  If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  For the avoidance of doubt, with respect to any Eurocurrency Borrowing the Interest Period shall be one month's duration.

(f)     Notwithstanding any other provision of this Agreement, the Borrowers will not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.02     [Reserved].

SECTION 2.03     Funding of Borrowings.

(a)     Each Lender will make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 10:00 a.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Term Loans available to the Borrowers by promptly wiring the amounts so received, in like funds, to the DIP Proceeds Account.

(b)     Unless the Administrative Agent has received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.03 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent, forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent at (i) in the case of such Lender, the greater of (A) the Federal Funds Rate and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrowers, the interest rate applicable to ABR Loans at such time.  If such Lender pays such amount to the Administrative Agent then such amount will constitute such Lender's Term Loan included in such Borrowing.

SECTION 2.04     Interest Elections.

(a)     The Lead Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing, all as provided in this Section 2.04.

(b)     To make an election pursuant to this Section 2.04, the Lead Borrower will notify the Administrative Agent of such election in writing (which may include electronic communication) (i) in the case of an election to convert to or continue a Eurocurrency Borrowing, not later than 2:00 p.m., New York City time, three (3) Business Days before the effective date of such election or (ii) in the case of an election to convert to or continue an ABR Borrowing, not later

than 10:00 a.m., New York City time, on the date of such election. Each such Interest Election Request will be substantially in the form of Exhibit D and signed by the Lead Borrower.

(c)     Each written Interest Election Request will be irrevocable and will specify the following information:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) below will be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which will be a Business Day; and

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing (and for the avoidance of doubt, irrespective of whether an Interest Period is not specified or is specified for any period longer than one (1) month, all requests for a Eurocurrency Borrowing shall be deemed to have selected a Eurocurrency Borrowing having an Interest Period of one (1) month's duration).

(d)     [Reserved].

(e)     Promptly following receipt of an Interest Election Request, the Administrative Agent will advise each applicable Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(f)     If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing will be automatically converted into an ABR Borrowing.

(g)     Any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurocurrency Borrowing.

SECTION 2.05     Promise to Pay; Evidence of Debt.

(a)     The Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.06.

(b)     Each Lender will maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent will maintain accounts in which it will record (i) the amount of each Term Loan made hereunder, the Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.05 will be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein will not in any manner affect the obligation of the Borrowers to repay the Term Loans in accordance with the terms of this Agreement.  In the event of any conflict between the accounts maintained pursuant to clauses (b) or (c) above, the accounts maintained by the Administrative Agent pursuant to clause (c) shall control, subject, in each case, to the entries maintained in the Register.

(e)     Any Lender may request that Term Loans made by it be evidenced by a promissory note (a "***Note***").  In such event, the Borrowers will prepare, execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in the form of Exhibit G and reasonably acceptable to the Borrowers.  Thereafter, the Term Loans evidenced by such Note and interest thereon will at all times (including after assignment pursuant to Section 10.04) be represented by one or more Notes in such form payable to the payee named therein (or, if requested by such payee, to such payee and its registered assigns).

SECTION 2.06     Repayment of Term Loans.

(a)     To the extent not previously paid, all outstanding Term Loans will be due and payable on the Maturity Date.

(b)     On the Maturity Date, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations in accordance with the DIP Financing Orders without further application to or order of the Bankruptcy Court.

Each repayment pursuant to this Section 2.06 will be accompanied by payment of accrued and unpaid interest on the principal amount paid to but excluding the date of such payment.

SECTION 2.07     Optional Prepayment of Term Loans.

(a)     The Borrowers may at any time and from time to time prepay the Term Loans in whole or in part, without premium or penalty (subject to Section 2.13), in an aggregate principal amount, (i) in the case of Eurocurrency Loans, that is an integral multiple of $500,000 and not less than $2.5 million, and (ii) in the case of ABR Loans, that is an integral multiple of $100,000 and not less than $1.0 million, or, in each case, if less, the amount outstanding.  The Lead Borrower will notify the Administrative Agent in writing (by hand delivery, facsimile transmission or e-mail) of such election not later than 2:00 p.m., New York City time, (x) in the case of a Eurocurrency Borrowing, three (3) Business Days before the anticipated date of such prepayment and (y) in the case of an ABR Borrowing, one (1) Business Day before the anticipated date of such prepayment. Each such notice of prepayment will specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid.  All prepayments under this Section 2.07 will be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.  Any such notice may be revocable or conditioned on a refinancing of all or any portion of the Term Facility.

SECTION 2.08     Mandatory Prepayment of Term Loans.

(a)     Subject to the priority of Liens and application of funds set forth in the DIP Financing Orders with respect to the Collateral that is sold pursuant to any Asset Sale, the Borrowers will apply all Net Cash Proceeds (other than any proceeds received from the disposition

of inventory which are, or are contemplated to be, applied to working capital in accordance with the Approved Budget or posted to the ABL Borrowing Base (as defined in the DIP Financing Orders, as applicable) to support a deficit in such ABL Borrowing Base in accordance with the Approved Budget) received in an Asset Sale made pursuant to Section 6.05(g) or (l) to the prepayment of Term Loans within three (3) Business Days following receipt of such Net Cash Proceeds, unless, with respect to an Asset Sale made pursuant to Section 6.05(g), the Lead Borrower has delivered a Reinvestment Notice on or prior to such third Business Day.

(b)    [Reserved].

(c)    Subject to the priority of Liens and application of funds set forth in the DIP Financing Orders, the Borrowers will apply 100% of the Net Cash Proceeds from the incurrence, issuance or sale by the Borrowers or any Subsidiary of any Indebtedness that is not Excluded Indebtedness to the prepayment of Term Loans, on or prior to the date that is three (3) Business Days after the receipt of such net cash proceeds.

(d)    [Reserved].

(e)    The following general provisions shall apply to all prepayments pursuant to this Section 2.08:

(i)    The Lead Borrower will deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.08, (A) a certificate signed by a Financial Officer of the Lead Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (B) at least three (3) Business Days prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date, the Type of each Term Loan being prepaid and the principal amount of each Term Loan (or portion thereof) to be prepaid.

(ii)    Prepayment of the Term Loans pursuant to this Section 2.08 will be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(f)    Notwithstanding any provisions of this Section 2.08 to the contrary

(i)    to the extent that any or all of the Net Cash Proceeds giving rise to a prepayment event pursuant to Section 2.08(a) or (c) are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to prepay Term Loans at the times provided in this Section 2.08, but may be retained by the Borrowers or the applicable Subsidiary for so long, but only so long, as the applicable local law will not permit repatriation to the United States.  Once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be effected promptly and such repatriated Net Cash Proceeds will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the prepayment of the Term Loans pursuant to this Section 2.08 to the extent provided herein; provided that the Borrowers hereby agree, and will cause any applicable Subsidiary, to promptly take all commercially reasonable actions required by applicable local law to permit any such repatriation; or

(ii)    to the extent that a Responsible Officer of the Lead Borrower has reasonably determined in good faith that repatriation of any of or all the Net Cash Proceeds

giving rise to a prepayment event pursuant to Section 2.08(a) or (c) would have an adverse tax cost consequence, such Net Cash Proceeds so affected will not be required to be applied to prepay Term Loans at the times provided in this Section 2.08, but may be retained by the Borrowers or the applicable Subsidiary without being repatriated; provided that, in the case of this subclause (ii), on or before the date on which any such Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.08 the Borrowers apply an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been repatriated, less the amount of additional taxes that would have been payable or reserved against if such net cash proceeds had been repatriated.

SECTION 2.09       Fees.

(a)       The Borrowers agree to pay (i) to the Administrative Agent, for its own account, the fees set forth in the Fee Letter at the times and on the terms specified therein (the "***Administrative Agent Fees***") and (ii) to the Backstop Commitment Parties the Backstop Commitment Fees at the time and on the terms specified in the Backstop Commitment Letter.

(b)       The Borrowers agree to pay to the Administrative Agent for the benefit of the Lenders upfront fees equal to 4.00% of the Total Commitment (the "***Total Upfront Fee***"), which shall be allocated as follows:  (i) (A) to each Extended Term Loan Backstop Commitment Party, in an amount equal to (1) its Minimum Hold Percentage, *multiplied by* (2) 90.5%, *multiplied by* (3) the Total Upfront Fee and (B) to each Prepetition Note Backstop Commitment Party, in an amount equal to (1) its Minimum Hold Percentage, *multiplied by* (2) 9.5%, *multiplied by* (3) the Total Upfront Fee, and shall be earned, due, and payable in cash on the Closing Date upon the funding of its portion of the Interim Order Term Loan, and shall be netted from such funding on the Closing Date and (ii) to each Lender, in an amount equal to (A) such Lender's Commitment as set forth on Schedule 2.01 under the heading "Post-Initial Allocation Term Loan Commitments", *divided by* (B) the Total Commitment and *multiplied by* (C) the Total Upfront Fee, *minus* the amount (if any) paid to such Lender pursuant to clause (i) above and shall be earned, due, and payable on the Initial Allocation Date upon the funding of its portion of the Initial Allocation Date Term Loan, and shall be netted from such funding on the Initial Allocation Date.

(c)       The Borrowers agree to pay to the Lenders (or, at each Lender's option and upon such Lender's written designation (which may be provided by electronic communication), one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such Lender (each, a "***Related Lender***")) an exit fee equal to the product of 3.00% of the Total Commitment (the "***Total Exit Fee***"), which shall be payable ratably to each Lender on the Maturity Date in accordance with their Commitments as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01.  The Total Exit Fee due to the Lenders on the Maturity Date shall be payable in the form of shares of the same class of reorganized common equity (the "***Reorganized Equity***") distributable to the Prepetition Term Loan Lenders pursuant to an Acceptable Plan, with the amount of such shares payable to Lenders in the aggregate amount equal to (x) the Total Exit Fee *divided by* (y) 65.0% of the deemed per share value of the Reorganized Equity pursuant to and in accordance with the Acceptable Plan (provided, that if the Maturity Date shall have occurred other than in connection with consummation of an Acceptable Plan, such exit fee shall be immediately due and payable in cash to the Administrative Agent for the benefit of each Lender (or its designated Related Lender)).

(d)       The Borrowers agree to pay to the Administrative Agent for the ratable account of each Lender a ticking fee calculated on a daily basis at a rate per annum equal to 6.375% on the

daily unused Commitment of such Lender (including, in the case of any Backstop Commitment Party, prior to the Initial Allocation, the portion of its Commitment (if any) to be allocated in the Initial Allocation) accruing commencing on the date hereof and due and payable in arrears on the first Business Day of each calendar month (commencing with June 1, 2020) thereafter and on the Commitment Termination Date, in each case, with respect all amounts accrued to such date.

(e)     The Borrowers agree to pay to the Administrative Agent for the ratable account of each Lender an extension fee in an amount equal to 2.00% (the "*Extension Fee*") of the aggregate amount of outstanding Term Loans and outstanding Commitments of such Lender on the Original Maturity Date, which fee shall be earned, due, and payable in cash on the Original Maturity Date and subject to the extension under Section 2.18 having occurred.

(f)     All Fees will be paid on the dates due and payable, in immediately available funds (unless netted or otherwise expressly set forth in this Section 2.09), to the Administrative Agent at the Payment Office for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees will be refundable under any circumstances.

(g)     Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Code), the Borrowers, Lenders and Administrative Agent agree (i) that the Total Upfront Fee shall be treated consistent with the principles of Treasury Regulations Section 1.1273-2(g)(2)(i), (ii) the Total Exit Fee shall be treated as part of the debt instrument's stated redemption price at maturity within the meaning of Treasury Regulations Section 1.1273-1(b) and (iii) to not take any tax position inconsistent with the tax treatment described in clause (i) or (ii).

SECTION 2.10          Interest.

(a)     [Reserved].

(b)     [Reserved].

(c)     The Term Loans comprising each ABR Borrowing will bear interest at the ABR *plus* the Applicable Margin.

(d)     The Term Loans comprising each Eurocurrency Borrowing will bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin.

(e)     Following the occurrence and during the continuation of an Event of Default, the Borrowers will pay interest on all Obligations hereunder at a rate per annum equal to 2.0% per annum *plus* the rate applicable to ABR Loans as provided in clause (c) of this Section 2.10. Following the occurrence and during the continuation of an Event of Default, all Eurocurrency Borrowings shall automatically convert to ABR Borrowings upon the expiry of any then-current Interest Period, with no notice or action by any party, and for so long as such Event of Default continues, the Borrowers shall have no right to make and shall not make, any Interest Election Requests requesting to convert or continue any such Borrowing as a Eurocurrency Borrowing.

(f)     Accrued interest on each Term Loan will be payable in arrears (i) on each Interest Payment Date for such Term Loan and (ii) on the Maturity Date; *provided* that (A) interest accrued pursuant to paragraph (e) of this Section 2.10 will be payable on demand, (B) in the event of any repayment or prepayment of any Term Loan, accrued interest on the principal amount repaid or prepaid will be payable on the date of such repayment or prepayment and (C) in the event of any

conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Term Loan will be payable on the effective date of such conversion. All interest shall be payable in cash.

(g)     [Reserved].

(h)     All interest hereunder will be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the prime rate, will be computed on the basis of a year of 365 days (or 366 days in a leap year), and, in each case, will be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR, Adjusted LIBO Rate or LIBO Rate will be determined by the Administrative Agent, and such determination will be conclusive absent manifest error.

SECTION 2.11     Alternate Rate of Interest.  (a) If prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(i)     the Administrative Agent determines (which determination will be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Term Loans included in such Borrowing for such Interest Period;

then the Administrative Agent will give notice thereof to the Lead Borrower and the applicable Lenders by telephone, facsimile transmission or e-mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Lead Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any applicable Borrowing to, or continuation of any such Borrowing as, a Eurocurrency Borrowing will be ineffective and such Borrowing will be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) of this Section 2.11 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) of this Section 2.11 have not arisen but either (w) the supervisor for the administrator of the LIBO Rate has made a public statement that the administrator of the LIBO Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Rate), (x) the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Rate), (y) the supervisor for the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Rate may no longer be used for determining interest rates for loans, then the Administrative Agent and the Lead Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States of America at such time and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement

as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin); provided that if such alternate rate of interest as so determined would be less than zero, then such rate shall be deemed to be zero for the purposes of this Agreement; provided, further, that, any such amendment to provide for an alternate rate of interest pursuant to this Section 2.11 shall meet the standards set forth in Proposed Treasury Regulation Section 1.1001-6 so as not to be treated as a "modification" (and therefore an exchange) of any Term Loans for purposes of Treasury Regulation Section 1.1001-3.  Notwithstanding anything to the contrary in Section 10.08, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required Lenders stating that such Lenders object to such amendment.  Until an alternate rate of interest shall be determined in accordance with this Section 2.11(b) (but, in the case of the circumstances described in clause (ii)(w), clause (ii)(x) or clause (ii)(y) of the first sentence of this Section 2.11(b), only to the extent the LIBO Rate for such Interest Period is not available or published at such time on a current basis), (A) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing shall be ineffective and (B) if any Borrowing Request requests a Eurocurrency Borrowing, such Borrowing shall be made as an ABR Borrowing.

        SECTION 2.12        <u>Increased Costs</u>.

        (a)        If any Change in Law:

        (i)        imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

        (ii)        imposes on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement or Eurocurrency Loans made by such Lender; or

        (iii)        subjects any Recipient to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (3) through (5) of the definition of Excluded Taxes, and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Term Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

        (b)        If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section 2.12 will be delivered to the Lead Borrower and will be conclusive absent manifest error.  The Borrowers will pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)      Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.12, such Lender will notify the Lead Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 will not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrowers will not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided*, *further*, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above will be extended to include the period of retroactive effect thereof.

SECTION 2.13      Break Funding Payments.  Except as otherwise set forth herein, the Borrowers will compensate each Lender for the actual out-of-pocket loss, cost and expense (excluding loss of anticipated profits) attributable to the following events:

(a)      the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default);

(b)      the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto;

(c)      the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto; or

(d)      the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Lead Borrower pursuant to Section 2.16.

Such loss, cost or expense to any Lender will be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Term Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Term Loan (but not including the Applicable Margin applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Term Loan) over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in Dollars of a comparable amount and period from other banks in the London interbank market.

A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.13 will be delivered to the Lead Borrower and will be conclusive absent manifest error.  The Borrowers will pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

SECTION 2.14        Taxes.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document will be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law requires the deduction or withholding of any Tax from any such payment by a Loan Party, then the applicable Loan Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if a Loan Party is required to deduct any Indemnified Taxes or Other Taxes from such payments, then the sum payable hereunder will be increased as necessary so that after making all required deductions or withholdings (including such deductions and withholdings applicable to additional sums payable under this Section 2.14) the Administrative Agent or any Lender, as applicable, receives an amount equal to the amount it would have received had no such deductions or withholdings been made.

(b)        In addition, the Loan Parties will timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)        Each Loan Party will, jointly and severally, indemnify the Administrative Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, will be conclusive absent manifest error.

(d)        As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.14, such Loan Party will deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document will deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Lead Borrower or the Administrative Agent, will deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and

45

submission of such documentation (other than such documentation set forth in Sections 2.14(e)(ii), 2.14(e)(iii) and 2.14(f) below) will not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the effect of Section 2.14(e)(i) above, each Foreign Lender will, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), two copies of whichever of the following is applicable:

A.     executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

B.     executed copies of Internal Revenue Service Form W-8ECI;

C.     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (1) a certificate substantially in the form of the applicable Exhibit F to the effect that such Foreign Lender is not:

(x)     a "bank" described in Section 881(c)(3)(A) of the Code;

(y)     a "10 percent shareholder" of the Lead Borrower within the meaning of Section 871(h)(3) or 881(c)(3)(B) of the Code; or

(z)     a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; and

(2) executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E;

D.     to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, together with forms and certificates described in clauses (A) through (C) above (and additional Form W-8IMYs) or Internal Revenue Service Form W-9 as may be required; or

E.     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)     In addition, each Lender that is not a Foreign Lender will deliver to the Lead Borrower and the Administrative Agent two copies of Internal Revenue Service Form W-9 on or before the date such Lender becomes a party and upon the expiration of any form previously delivered by such Lender.

46

In addition, in each of the foregoing circumstances, each Foreign Lender will deliver such forms, if legally entitled to deliver such forms, promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender will promptly notify the Lead Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Lead Borrower (or any other form of certification adopted by the United States of America or other taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Lender will not be required to deliver any form pursuant to this Section 2.14 that such Lender is not legally able to deliver.

    (f)  If a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient will deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 2.14(f), "FATCA" will include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered pursuant to the foregoing Sections 2.14(e) or (f) expires or becomes obsolete or inaccurate in any respect, it will update such form or certification or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal inability to do so.

    (g)  If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund (including a credit in lieu of a refund) of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.14, it will pay over an amount equal to such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.14 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or such Lender in good faith, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.14(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.14(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.14(g) will not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other

information relating to its Taxes which it deems, in good faith, to be confidential) to the Loan Parties or any other Person.

(h)     Each party's obligations under this Section 2.14 will survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)     For purposes of this Section 2.14, the term "applicable law" includes FATCA.

SECTION 2.15     Payments Generally; *Pro Rata* Treatment; Sharing of Set-offs.

(a)     Unless otherwise specified, the Borrowers will make each payment required to be made by it hereunder (whether of principal, interest, fees or otherwise, including pursuant to Section 2.07 and Section 2.08) on a *pro rata* basis prior to 2:00 p.m., New York City time, at the Payment Office, except that payments pursuant to Sections 2.12, 2.13, 2.14 and 10.05 will be made directly to the Persons entitled thereto, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. The Administrative Agent will distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof and will make settlements with the Lenders with respect to other payments at the times and in the manner provided in this Agreement. Except as otherwise provided herein, if any payment hereunder is due on a day that is not a Business Day, the date for payment will be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon will be payable for the period of such extension. Any payment required to be made by the Administrative Agent hereunder will be deemed to have been made by the time required if the Administrative Agent, at or before such time, has taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     Except as otherwise provided in this Agreement, if (i) at any time insufficient funds are received by and available to the Administrative Agent from the Borrowers to pay fully all amounts of principal, interest and fees then due from the Borrowers hereunder or (ii) at any time an Event of Default shall have occurred and be continuing and the Administrative Agent will receive any proceeds or payments of any kind, such funds will be applied in accordance with Section 5.03 of the Collateral Agreement.

(c)     Except as otherwise expressly provided in this Agreement, if any Lender, by exercising any right of set-off or counterclaim or otherwise, obtains payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans than the proportion received by any other Lender, then the Lender receiving such greater proportion will purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments will be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations will be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) will not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of

48

a participation in any of its Term Loans to any assignee or participant.  The Borrowers consent to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers' rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

(d)     Unless the Administrative Agent has received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender fails to make any payment required to be made by it pursuant to Section 2.03(a) or 2.15(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under Section 2.03(a) or 2.15(c), as applicable, until all such unsatisfied obligations are fully paid.

SECTION 2.16          Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.12, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender will (at the request of the Borrowers) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or assign its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.14, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.12, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then the Borrowers may, at their sole expense, upon notice to such Lender and the Administrative Agent, either (a) prepay such Lender's outstanding Term Loans hereunder in full on a non-*pro rata* basis without premium or penalty (including with respect to the processing and recordation fee referred to in Section 10.04(b)(ii)(B)) or (b) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.12 or 2.14) and obligations under this Agreement to an assignee that will assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) in the case of clause (b) above, the Lead Borrower has received the prior written consent of the Administrative Agent, which consent will not unreasonably be withheld, if a consent by the Administrative Agent would be required under Section 10.04 for an

49

assignment of Term Loans to such assignee, (ii) such Lender has received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments.

(c)     If any Lender (such Lender, a "***Non-Consenting Lender***") has failed to consent to a proposed amendment, waiver, discharge or termination that, pursuant to the terms of Section 10.08, requires the consent of such Lender and with respect to which the Required Lenders, or Supermajority Lenders, as applicable, have granted their consent, then the Borrowers will have the right (unless such Non-Consenting Lender grants such consent) at their sole expense, to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Term Loans to one or more assignees reasonably acceptable to the Administrative Agent if a consent by the Administrative Agent would be required under Section 10.04 for an assignment of Term Loans to such Assignee; provided that (i) all Obligations of the Borrowers owing to such Non-Consenting Lender (including accrued Fees and any amounts due under Section 2.12, 2.13 or 2.14) being removed or replaced will be paid in full to such Non-Consenting Lender concurrently with such removal or assignment and (ii) the replacement Lender will purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Non-Consenting Lender will be necessary in connection with such removal or assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrowers, the Administrative Agent, such Non-Consenting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Non-Consenting Lender does not comply with Section 10.04 within three Business Days after the Lead Borrower's request, compliance with Section 10.04 will not be required to effect such assignment.

(d)     Subject to the rights of the Backstop Commitment Parties under Section 2.19(b), the Borrowers will have the right at their sole expense, to replace any Defaulting Lender by deeming such Defaulting Lender to have assigned its Term Loans to one or more assignees reasonably acceptable to the Administrative Agent if a consent by the Administrative Agent would be required under Section 10.04 for an assignment of Term Loans to such Assignee; provided that (i) all Obligations of the Borrowers owing to such Defaulting Lender (including accrued Fees and any amounts due under Section 2.12, 2.13 or 2.14) being removed or replaced will be paid in full to such Defaulting Lender concurrently with such removal or assignment and (ii) the replacement Lender will purchase the foregoing by paying to such Defaulting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Defaulting Lender will be necessary in connection with such removal or assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrowers, the Administrative Agent, such Defaulting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Defaulting Lender does not comply with Section 10.04 within three (3) Business Days after the Lead Borrower's request, compliance with Section 10.04 will not be required to effect such assignment.

SECTION 2.17     Illegality.  If any Lender reasonably determines that any change in law has made it unlawful, or if any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurocurrency Loans, then, upon notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligations of such Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency

Borrowings will be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Lead Borrower will upon demand from such Lender (with a copy to the Administrative Agent), either convert all Eurocurrency Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Term Loans. Upon any such prepayment or conversion, the Borrowers will also pay accrued interest on the amount so prepaid or converted.

SECTION 2.18     Extension of Maturity Date. The Original Maturity Date may be extended to the Extended Maturity Date at the option of the Lead Borrower, in each case subject to satisfaction (or waiver) of the following conditions precedent, upon which such extension shall automatically take effect and each Lender shall be deemed to have agreed to such Extension Request:

(a)     On and as of the Original Maturity Date, the representations and warranties of the Loan Parties contained in Article III shall be true and correct in all material respects (except those representations and warranties qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any representation or warranty specifically relates only to an earlier date, in which case it shall have been true and correct in all material respects (except those representations and warranties qualified by materiality or Material Adverse Effect, which shall have been true and correct in all respects) as of such earlier date;

(b)     On or prior to the Original Maturity Date, the Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents, including the Extension Fee described in Section 2.09(e) (and including, without limitation, the fees and expenses of the Lender Advisors);

(c)     On and as of the Original Maturity Date, no Event of Default shall have occurred and be continuing; and

(d)     the Lead Borrower shall have made such request to the Administrative Agent not less than fifteen (15) days (or such later date agreed to by the Required Lenders) and not earlier than sixty (60) days, prior to the Original Maturity Date, by delivering to the Administrative Agent a copy of an irrevocable extension request signed by the Lead Borrower (an "***Extension Request***") in substantially the form of Exhibit H hereto.

The Administrative Agent shall promptly notify each Lender of its receipt of such Extension Request. Thereafter, the term "Maturity Date" with respect to the Term Loans and Commitments as used herein and in any Note executed and delivered by the applicable Borrower pursuant to Section 2.05(e) hereof, shall at all times refer to the Extended Maturity Date.

SECTION 2.19     Defaulting Lenders.

(a)     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and "Supermajority Lenders" and Section 10.08.

(ii)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) shall be applied at such time or times as may be reasonably determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Lead Borrower may request, to the funding of any Term Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Term Loans to the Borrowers under this Agreement; fourth, to the payment of any amounts owing to the other Lenders as of a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Term Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Term Loans were made at a time when the applicable conditions set forth in Article IV were satisfied or waived, such payment shall be applied solely to pay the Term Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Term Loans of such Defaulting Lender until such time as all Term Loans are held by the Lenders *pro rata* in accordance with the Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.19(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Fees pursuant to Section 2.09 (x) shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender and (y) shall not be payable to such Defaulting Lender that remains a Defaulting Lender at the time such Fees are due and payable.

(b)    Upon any Lender becoming a Defaulting Lender, the Administrative Agent will notify the Lenders in writing. Each Backstop Commitment Party shall have the right, exercisable in its sole discretion within five (5) Business Days of receipt of such notice, to purchase its *pro rata* share (based on each Backstop Commitment Party's Backstop Commitment set forth on Schedule 2 to the Backstop Commitment Letter) of the outstanding Term Loans and Commitments of such Defaulting Lender at a purchase price equal to 96.0% of the outstanding amount thereof (plus accrued and unpaid interest thereon), and such Defaulting Lender is hereby required to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.12 or 2.14) and obligations under this Agreement related to the purchased Term Loans to the purchasing Backstop Commitment Parties. Thereafter, each purchasing Backstop Commitment Party shall be entitled to all interests and Fees associated with the purchased Term Loans and Commitments in accordance with the terms of this Agreement. In connection with any such purchase, the Borrowers, the Administrative Agent, such Defaulting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Defaulting Lender does not comply with Section 10.04 within three (3) Business Days after the Backstop Commitment Parties' election under this

Section 2.19(b), compliance with Section 10.04 will not be required to effect such assignment. Notwithstanding anything contained in this Agreement, to the extent any Backstop Commitment Party declines to make such purchase, the Administrative Agent may, and, at the direction of the Required Lenders, shall, reduce the outstanding principal amount of such Defaulting Lender's Term Loans by such Defaulting Lender's *pro rata* share of the Total Upfront Fee (to the extent already paid).

(c)     If the Lead Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase at par that portion of outstanding Term Loans of the other Lenders and take such other actions as the Administrative Agent may determine to be necessary to cause the Term Loans to be held on a *pro rata* basis by the Lenders based on the outstanding Commitments and Term Loans hereunder, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to Fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender having been a Defaulting Lender.

SECTION 2.20          [Reserved].

SECTION 2.21          Joint and Several Liability of Borrowers; Additional Waivers.

(a)     Each of the Borrowers hereby accepts joint and several, primary liability for all Obligations hereunder in consideration of the financial accommodations provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the Obligations of each of them under the Loan Documents.

(b)     Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all of the Obligations are the joint and several obligations of each of the Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of the Borrowers fails to make any payment with respect to any of the Obligations hereunder as and when due or to perform any of such Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The obligations of each Borrower under the provisions of this Section 2.21 constitute full recourse obligations of such Borrower, enforceable against it to the full extent of its properties and assets.

(e)     To the fullest extent permitted by applicable law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Secured Party to assert any claim or demand or to enforce or exercise any right or remedies against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise or (ii) the failure to perfect any security interest in, or the release of, any of the Collateral held by or on behalf of the Collateral Agent or any other Secured Party for the applicable Obligations.

(f)    To the fullest extent permitted by applicable law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than payment in full of the Obligations.  The Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that payment in full has occurred.  Pursuant to applicable law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

SECTION 2.22    Designation of Lead Borrower.  Each Borrower hereby appoints the Lead Borrower to act as its exclusive agent for all purposes under this Agreement and the other Loan Documents (including with respect to all matters related to the borrowing and repayment of Term Loans as described in Article II hereof).  Each Borrower (in such capacity) acknowledges and agrees that (a) the Lead Borrower may execute such documents on behalf of all the Borrowers as the Lead Borrower deems appropriate in its sole discretion and each Borrower (in such capacity) will be bound by and obligated by all of the terms of any such document executed by the Lead Borrower on its behalf, (b) any notice or other communication delivered by the Administrative Agent or any Lender hereunder to the Lead Borrower will be deemed to have been delivered to each Borrower, and (c) the Administrative Agent and each of the Lenders will accept (and will be permitted to rely on) any document or agreement executed by the Lead Borrower on behalf of the Borrowers (or any of them).

SECTION 2.23    No Discharge; Survival of Claims.  Unless in accordance with an Acceptable Plan, each of the Loan Parties agrees that prior to payment in full of the Obligations and termination of the Commitments in accordance herewith, (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Plan of Reorganization (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superiority claims granted to the Agents and the Lenders pursuant to the DIP Financing Orders and the Liens granted to the Agents and the Lenders pursuant to the DIP Financing Orders shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

SECTION 2.24    Liens.

(a)    Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Interim DIP Financing Order (and, when entered, the Final DIP Financing Order) and subject to the Carve Out in all respects, the Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected Lien on the Collateral, the priority of which shall be set forth in the DIP Financing Orders.

(b)    In accordance with the DIP Financing Orders, all of the Liens described in the DIP Financing Orders shall be effective and automatically perfected upon entry of the Interim DIP Financing Order, without the necessity of the execution, recordation of filings by the Loan Parties of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent or Collateral Agent, as applicable, of, or over, any Collateral.

54

(c)      Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim DIP Financing Order (and, when entered, the Final DIP Financing Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral (other than Excluded Assets), now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

## ARTICLE III

### *Representations and Warranties*

Each of Holdings and each Borrower represents and warrants to each Agent and to each of the Lenders that:

SECTION 3.01      <u>Organization; Powers</u>.      Each of Holdings, each Borrower and each Subsidiary:

(a)      is a partnership, limited liability company, corporation, or trust duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent such status or an analogous concept applies to such an organization);

(b)      subject to applicable orders entered into by the Bankruptcy Court, has all requisite power and authority to own its property and assets and to carry on its business as now conducted;

(c)      is qualified to do business in each jurisdiction where such qualification is required, except where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect; and

(d)      subject to the entry and the terms of the DIP Financing Orders, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is a party and, in the case of the Borrowers, to borrow and otherwise obtain credit hereunder.

SECTION 3.02      <u>Authorization</u>. Subject to the entry and terms of the DIP Financing Order, the execution, delivery and performance by the Loan Parties of each of the Loan Documents to which it is a party, and the Borrowings hereunder:

(a)      have been duly authorized by all corporate, stockholder, partnership, limited liability company or other applicable action required to be taken by the Loan Parties; and

(b)      will not:

(i)      violate:

(A)      any provision of (1) law, statute, rule or regulation, or of (2) the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreement or by-laws) of any Loan Party;

(B)      any applicable order of any court or any rule, regulation or order of any Governmental Authority; or

(C)     any provision of any post-petition indenture, certificate of designation for preferred stock, agreement or other instrument to which any Loan Party is a party or by which any of them or any of their property is or may be bound;

(ii)     be in conflict with, result in a breach of, constitute (alone or with notice or lapse of time or both) a default under, or give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under, any such indenture, certificate of designation for preferred stock, agreement or other instrument, other than conflicts, breaches, defaults or rights arising solely as a result of the commencement of the Chapter 11 Cases; or

(iii)     result in the creation or imposition of any Lien upon any property or assets of any Loan Party, other than the Liens created by the Loan Documents and Permitted Liens;

except with respect to clauses (i) (other than subclause (A)(2) thereof) and (ii) of this Section 3.02(b) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.03     Enforceability.  Subject to the entry of the Interim DIP Financing Order, this Agreement has been duly executed and delivered by Holdings and the Borrowers and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to:

(a)     the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, including the entry into and the terms of the DIP Financing Orders;

(b)     general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(c)     implied covenants of good faith and fair dealing; and

(d)     any foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries.

SECTION 3.04     Governmental Approvals.  Other than the entry of, or pursuant to the terms of, the DIP Financing Orders, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority or third party is or will be required in connection with the perfection or maintenance of the Liens created under the Security Documents or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral, except for:

(a)     [Reserved];

(b)     [Reserved];

(c)     [Reserved];

(d)     filings which may be required under Environmental Laws;

(e)     filings as may be required under the Exchange Act and applicable stock exchange rules in connection therewith;

(f)     such as have been made or obtained and are in full force and effect;

(g)     such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect; or

(h)     filings or other actions listed on Schedule 3.04.

SECTION 3.05     Title to Properties; Possession Under Leases.

(a)     Each of the Borrowers and the Subsidiary Loan Parties has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all of its Real Properties and valid title to its personal property and assets, in each case, except for Permitted Liens or defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, in each case, except where the failure to have such title, interest, easement or right would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Permitted Liens.

(b)     Neither any Borrower nor any of the Subsidiaries has defaulted under any lease to which it is a party, except for such defaults arising from the commencement of the Chapter 11 Cases or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the Borrowers' and the Subsidiaries' leases is in full force and effect, except leases in respect of which the failure to be in full force and effect arise from the commencement of the Chapter 11 Cases or would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.05(b), on the Closing Date the Borrowers and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06     Subsidiaries.

(a)     Schedule 3.06(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of Holdings, the Borrowers and each Subsidiary and, as to each Subsidiary, the percentage of each class of Equity Interests owned by the Borrowers or by any other Subsidiary of the Borrowers.

(b)     As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any Equity Interests owned or held by Holdings, the Borrowers or any Subsidiary.

SECTION 3.07     Litigation; Compliance with Laws.

(a)     Other than the Chapter 11 Cases, there are no actions, suits or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Lead Borrower, threatened in writing against or affecting the Borrowers or any Subsidiary or any business, property or rights of any such Person (but excluding any actions, suits or proceedings arising under or relating to any Environmental Laws, which are subject to

Section 3.13), in each case, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      To the knowledge of the Lead Borrower, none of the Borrowers, the Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval, or any building permit, but excluding any Environmental Laws, which are subject to Section 3.13) or any restriction of record or agreement affecting any property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority (other than any default that arises solely as a result of the commencement of the Chapter 11 Cases), where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.08      <u>Federal Reserve Regulations</u>.

(a)      None of Holdings, any Borrower or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Term Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund Indebtedness originally incurred for such purpose or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.09      <u>Investment Company Act</u>.  None of Holdings, any Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.10      <u>Use of Proceeds</u>.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the Term Loans will be used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the DIP Financing Orders or any other order entered by the Bankruptcy Court that is consistent with the RSA, the DIP Financing Orders and this Agreement, including, without limitation: (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and Claims or amounts approved by the Bankruptcy Court in the First and Second Day Orders or as required under the Bankruptcy Code; provided, however, that, except in accordance with clause (ii) of this Section 3.10 or pursuant to an Acceptable Plan, in no event shall the proceeds of the Terms Loans be used to pay any amount due or otherwise payable under the ABL Credit Agreement.

SECTION 3.11      <u>Tax Returns</u>.  Except as set forth on Schedule 3.11:

(a)      Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of Holdings, the Borrowers and the Subsidiaries has filed

or caused to be filed all federal, state, local and non-U.S. Tax returns required to have been filed by it; and

(b)      Each of Holdings, the Borrowers and the Subsidiaries has timely paid or caused to be timely paid (i) all Taxes shown to be due and payable by it on the returns referred to in clause (a) of this Section 3.11 and (ii) all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date, which Taxes, if not paid or adequately provided for, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, in each case except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrowers or any Subsidiary (as the case may be) has set aside on its books adequate reserves in accordance with GAAP and except Taxes the payment of which are stayed by the Chapter 11 Cases.

SECTION 3.12      No Material Misstatements.

(a)      All written factual information and written factual data (other than the Projections, any other projections, estimates and information of a general economic or industry specific nature) concerning Holdings, the Borrowers or any Subsidiary that has been made available to the Administrative Agent or the Lenders, directly or indirectly, by or on behalf of Holdings, the Borrowers or any Subsidiary in connection with the transactions contemplated hereby, when taken as a whole and after giving effect to all supplements and updates provided thereto, is correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made.  As of the Closing Date, to the best knowledge of the Borrowers, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all material respects.

(b)      The Projections that have been made available to the Administrative Agent or the Lenders by or on behalf of the Borrowers in connection with the transactions contemplated hereby, when taken as a whole, have been prepared in good faith based upon assumptions that are believed by the Borrowers to be reasonable at the time made and at the time delivered to the Administrative Agent or the Lenders, it being understood by the Administrative Agent and the Lenders that:

(i)      the Projections are merely a prediction as to future events and are not to be viewed as facts;

(ii)      the Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrowers, and/or the Sponsors;

(iii)      no assurance can be given that any particular Projections will be realized;

(iv)      actual results may differ and such differences may be material;

(v)      no guarantee or assurance can be given that the projected results will be realized;

(vi)      where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Loan Parties' and their Subsidiaries' operational and

financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Loan Parties' and their Subsidiaries' products and services, all of which are outside of the control of the Loan Parties and their Subsidiaries, highly uncertain and cannot be predicted.

SECTION 3.13    Environmental Matters.  Except as set forth on Schedule 3.13, as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or as to matters arising from the Chapter 11 Cases:

(a)    each Borrower and each of the Subsidiaries are in compliance with all Environmental Laws (including having obtained and complied with all permits, licenses and other approvals required under any Environmental Law for the operation of its business);

(b)    neither any Borrower nor any of the Subsidiaries has received notice of or is subject to any pending, or to the Lead Borrower's knowledge, threatened action, suit or proceeding alleging a violation of, or liability under, any Environmental Law that remains outstanding or unresolved;

(c)    to the Lead Borrower's knowledge, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by the Borrowers or any Subsidiary, and no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Borrowers or any Subsidiary and transported to or released at any location, which, in each case, described in this clause (c), would reasonably be expected to result in liability to the Borrowers or any Subsidiary; and

(d)    there are no agreements in which the Borrowers or any Subsidiary has expressly assumed or undertaken responsibility for any known or reasonably anticipated liability or obligation of any other Person arising under or relating to Environmental Laws or Hazardous Materials.

SECTION 3.14    Security Documents.

(a)    Subject to the entry of the DIP Financing Orders, the Collateral Agreement and the DIP Financing Orders are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)    Except for the entry of the DIP Financing Orders, no filing or other action will be necessary to perfect such Liens.

(c)    Notwithstanding anything herein (including this Section 3.14) or in any other Loan Document to the contrary, neither any Borrower nor any other Loan Party (i) makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, in each case, under foreign law, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign law or (ii) shall be required to take any action to perfect any Lien in any Intellectual Property Rights registered (or where an application for registration has been filed) in any jurisdiction other than the United States of America.

(d)    The Interim DIP Financing Order is (and the Final DIP Financing Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured

Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

(e)     Subject to entry of the Interim DIP Financing Order (and the Final DIP Financing Order, as applicable), the Obligations shall have the status and priority set forth in Section 2.24 and, for the avoidance of doubt, are subject to the Carve Out in all respects.

SECTION 3.15     Location of Real Property and Leased Premises.

(a)     Schedule 3.15(a) correctly identifies, in all material respects, as of the Closing Date, all Real Property owned in fee by the Loan Parties.  As of the Closing Date, the Loan Parties own in fee all the Real Property set forth as being owned by them on Schedule 3.15(a).

(b)     Schedule 3.15(b) lists correctly in all material respects, as of the Closing Date, all material Real Property (including all leased full-line Neiman Marcus and Bergdorf Goodman stores and all leased warehouses or distribution centers) leased by any Loan Party and the best known addresses thereof.  As of the Closing Date, the Loan Parties have in all material respects valid leases in all material Real Property set forth as being leased by them on Schedule 3.15(b).

SECTION 3.16     Approved Budget.  The Approved Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the Loan Parties to the best of their knowledge to be reasonable on the date such Approved Budget was delivered, which may or may not be prove to be correct.

SECTION 3.17     No Material Adverse Effect.  Since the Petition Date, there has been no event that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.18     Insurance.  Schedule 3.18 sets forth a true, complete and correct description of all material insurance maintained by or on behalf of the Borrowers or any Subsidiary as of the Closing Date.  As of such date, such insurance is in full force and effect.

SECTION 3.19     USA PATRIOT Act; FCPA; OFAC.

(a)     To the extent applicable, each of Holdings, the Borrowers and the Subsidiaries is in compliance, in all material respects, with the USA PATRIOT Act.

(b)     No part of the proceeds of the Term Loans will be used by Holdings, the Borrowers or any of their respective Subsidiaries, directly or, to the knowledge of Holdings and/or the Borrowers, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended ("*FCPA*").

(c)     None of Holdings, the Borrowers or any Subsidiary is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "*Executive Order*");

61

(ii)      a Person owned or Controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any applicable laws with respect to terrorism or money laundering;

(iv)      a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)      a Person that is named on the most current List of Specially Designated Nationals and Blocked Persons as published by the U.S. Department of the Treasury's Office of Foreign Assets Control ("*OFAC*") at its official website or any replacement website or other replacement official publication of such list and none of the proceeds of the Term Loans will be, directly or knowingly, indirectly, offered, lent, contributed or otherwise made available to any Subsidiary, joint venture partner or other Person for the purpose of financing the activities of any Person currently the subject of sanctions administered by OFAC.

SECTION 3.20      Intellectual Property; Licenses, Etc.  Except as set forth on Schedule 3.20:

(a)      except as would not reasonably be expected to have a Material Adverse Effect, the Borrowers and each Subsidiary owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights or mask works, domain names, trade secrets and other intellectual property rights (collectively, "***Intellectual Property Rights***") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person;

(b)      except as would not reasonably be expected to have a Material Adverse Effect, neither any Borrower nor any of the Subsidiaries nor any Intellectual Property Rights, product, process, method, substance, part or other material now employed, sold or offered by the Borrowers or the Subsidiaries is infringing upon, misappropriating or otherwise violating Intellectual Property Rights of any Person; and

(c)      no material claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Lead Borrower, threatened, unless arising from the Chapter 11 Cases.

SECTION 3.21      Employee Benefit Plans.  Except as would not reasonably be expected to have a Material Adverse Effect, with respect to Plans the Loan Parties and the ERISA Affiliates are in compliance with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, the present value of all accumulated benefit obligations under all Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87, as updated, amended or superseded) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plans, in the aggregate.

**ARTICLE IV**
*Conditions of Lending*

SECTION 4.01     <u>Conditions Precedent to the Closing Date</u>.  The Agreement shall become effective upon the satisfaction or waiver of each of the following conditions precedent:

(a)     The Administrative Agent shall have received this Agreement, the Backstop Commitment Letter, the Collateral Agreement and the Fee Letter, each executed by each party hereto and thereto (including via electronic means), each of which shall be in form and substance reasonably satisfactory to the Required Lenders.

(b)     [Reserved].

(c)     The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders shall have been entered by the Bankruptcy Court and such orders and all related pleadings shall be in form and substance consistent with the Approved Budget and otherwise reasonably satisfactory to the Required Lenders.

(d)     The Interim DIP Financing Order shall have been entered by the Bankruptcy Court within three (3) Business Days of the Petition Date with the consent of the Required Lenders (as defined under the ABL Credit Agreement) and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in the form of Exhibit B hereto, be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent, the Required Lenders and the Majority Noteholders.  The consent of the Majority Noteholders shall not be unreasonably withheld, conditioned or delayed.

(e)     No order shall have been entered appointing a trustee, examiner or receiver with respect to the Loan Parties' business, properties or assets.

(f)     The Administrative Agent shall have received UCC, tax and judgement lien searches in form and substance reasonably satisfactory to the Administrative Agent.

(g)     The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Interim DIP Financing Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received the Approved Budget in form and substance reasonably acceptable to the Required Lenders[, it being understood that the budget attached to the Form of Interim DIP Financing Order attached hereto as Exhibit B is an Approved Budget.][1]

(i)     The Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents (including, without limitation, the fees and expenses of the Lender Advisors).

(j)     The RSA shall not have terminated and shall be in full force and effect.

---

[1] Remove brackets once budget has been agreed and approved.

(k)     The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower on behalf of the Loan Parties certifying that the conditions in this Section 4.01 have been satisfied.

(l)     The Administrative Agent shall have received a customary legal opinion of each of Kirkland & Ellis LLP, special counsel to the Loan Parties, covering such matters customarily covered in opinions of this type as the Required Lenders shall reasonably request.

(m)     The Administrative Agent shall have received customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party and certificates (including organizational documents and good standing certificates) relating to the organization, existence and good standing of each Loan Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Loan Party.

(n)     The Closing Date shall not be later than one (1) Business Day after the Interim DIP Financing Order is entered on the docket of the Bankruptcy Court unless the Required Lenders shall have consented to such later date.

(o)     At least two (2) days prior to the Closing Date, the Administrative Agent shall have received all documentation and other information (which shall include a duly completed IRS Form W-9 for the Lead Borrower or other applicable tax forms) required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested by the Administrative Agent at least three (3) days prior to the Closing Date.

SECTION 4.02     Conditions Precedent to each Borrowing.  The obligation of each Lender to make Term Loans on each Credit Date (including the Closing Date) is subject to the satisfaction (or waiver) of the following further conditions precedent:

(a)     With respect to any Term Loan (other than the Interim Order Term Loan and Initial Allocation Date Term Loan) that is made after the Closing Date, the Final DIP Financing Order shall have been entered by the Bankruptcy Court, such order shall be in form and substance satisfactory to the Required Lenders and reasonably satisfactory to the Majority Noteholders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of (i) the Administrative Agent, the Administrative Agent and (ii) the Consenting Noteholders, the Majority Noteholders).  The consent of the Majority Noteholders shall not to be unreasonably withheld, conditioned or delayed.

(b)     The Borrower shall have delivered to the Administrative Agent a duly executed and completed Borrowing Request in accordance with Section 2.01(e) hereof.

(c)     The Collateral Agent, for the benefit of the Secured Parties, shall have valid and perfected Liens on all Collateral, to the extent contemplated hereby, and pursuant to the other Loan Documents, including the applicable DIP Financing Order.

(d)     The Loan Parties shall be in compliance in all material respects with the Interim DIP Financing Order and the Final DIP Financing Order, as the case may be.

(e)     The Loan Parties shall be in compliance in all material respects with each First Day Order and Second Day Order then in effect.

(f)     The representations and warranties of the Loan Parties contained in Article III or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of the Credit Date as though made on such date; provided that to the extent that such representations and warranties specifically refer to an earlier date, then such representations and warranties shall be true and correct in all material respects as of such earlier date.

(g)     As of the applicable Credit Date, no Default or Event of Default shall exist or would result from the making of such Term Loan and the application of proceeds therefrom; provided, however, that with respect to the Interim Order Term Loan and the Initial Allocation Date Term Loan only, such condition shall not apply to any Default or Event of Default arising out of the failure to satisfy Section 6.15, if any.

(h)     The Administrative Agent shall have received a certificate, dated as of applicable Credit Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (f) and (g) above.

(i)     The Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents (including, without limitation, the fees and expenses of the Lender Advisors) subject to and in accordance with orders of the Bankruptcy Court.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the applicable matters specified in clauses (d), (e) (f) and (g) above.

In determining the satisfaction of the conditions specified in this Section 4.02, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Credit Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which would reasonably be expected to have a Material Adverse Effect, each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Credit Date of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the Credit Date.

SECTION 4.03     Conditions Precedent to Making the Final Order Term Loan.  After the Closing Date and the funding of the Interim Order Term Loan and the Initial Allocation Date Term Loan, the obligation of each Lender to make the Final Order Term Loan is subject to the satisfaction (or waiver) of the following additional conditions precedent:

(a)     All Second Day Orders approving on a final basis the relief granted under any First Day Orders shall have been entered by the Bankruptcy Court, shall be reasonably satisfactory to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall

not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders.

(b)    The RSA shall not have terminated and shall be in full force and effect.

(c)    The Loan Parties shall have filed an Acceptable Plan with the Bankruptcy Court and such Acceptable Plan sets forth a treatment of claims against the Loan Parties in a manner that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

SECTION 4.04    Conditions Precedent to Making the Last Term Loan.  The obligation of the Lenders to make the Last Term Loan is also subject to the satisfaction (or waiver) of the following additional conditions precedent:

(a)    The Loan Parties shall have filed an Acceptable Plan with the Bankruptcy Court and such Acceptable Plan sets forth a treatment of claims against the Loan Parties in a manner that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

(b)    The RSA shall not have terminated and shall be in full force and effect.

(c)    The Bankruptcy Court shall have entered an order approving a disclosure statement with respect to an Acceptable Plan that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

## ARTICLE V

### *Affirmative Covenants*

Each Borrower covenants and agrees with each Lender that so long as this Agreement is in effect and until the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, the Borrowers will, and will cause their Subsidiaries, to:

SECTION 5.01    Existence; Businesses and Properties.

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except:

(i)    in the case of a Subsidiary, where the failure to do so would not reasonably be expected to have a Material Adverse Effect; or

(ii)    in connection with a transaction permitted under Section 6.05.

(b)    (i) Do or cause to be done all things necessary to lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, Intellectual Property Rights, licenses and rights with respect thereto necessary to the normal conduct of its business and (ii) at all times maintain and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all needful and proper repairs, renewals,

additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times, in each case, except:

        (A)     as expressly permitted by this Agreement;

        (B)     such as may expire, be abandoned or lapse in the ordinary course of business; or

        (C)     where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.02    Insurance.

(a)    Maintain, with insurance companies reasonably believed to be financially sound and reputable, insurance in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations, and cause the Collateral Agent to be listed as a co-loss payee on property and casualty policies and as an additional insured on liability policies. The Lead Borrower will furnish to the Administrative Agent or Collateral Agent, upon request, information in reasonable detail as to the insurance so maintained. Notwithstanding the foregoing, it is understood and agreed that no Loan Party will be required to maintain flood insurance unless any material Real Property owned by it is required to be so insured pursuant to the Flood Disaster Protection Act of 1973 or the National Flood Insurance Act of 1968, and the regulations promulgated thereunder, because such material Real Property is located in an area which has been identified by the Secretary of Housing and Urban Development as a "special flood hazard area."

(b)    Use commercially reasonable efforts to: (i) if insurance is procured from insurance companies, obtain certificates and endorsements reasonably acceptable to the Administrative Agent with respect to property and casualty insurance; (ii) cause each insurance policy referred to in this Section 5.02 and procured from an insurance company to provide that it shall not be canceled, modified or not renewed (x) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (y) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent; and (iii) deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent, including an insurance binder) together with evidence reasonably satisfactory to the Administrative Agent of payment of the premium therefor.

SECTION 5.03    Taxes.

(a)    Pay and discharge promptly when due all federal and material state and local Taxes imposed upon it or its income or profits or in respect of its property and arising after the Petition Date, before the same becomes delinquent or in default; *provided* that such payment and discharge will not be required with respect to any Tax if (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) Holdings, the Borrowers or any affected Subsidiary, as applicable, has set aside on its books reserves in accordance with GAAP with respect thereto

67

and (iii) non-payment thereof is permitted under the Bankruptcy Code or order of the Bankruptcy Court.

(b)     The Loan Parties agree, for U.S. federal (and applicable state and local) income tax purposes, to treat TNMG LLC and The NMG Subsidiary, in each case, as an entity disregarded as separate from the Lead Borrower.  None of the Loan Parties shall (and each shall cause its Affiliates not to) take any position inconsistent with the foregoing.

SECTION 5.04     <u>Financial Statements, Reports, etc</u>.  Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders) or, as applicable, to the Lender Advisors (other than any local counsel):

(a)     [Reserved];

(b)     within forty-five (45) days following the end of each of the first three fiscal quarters of each fiscal year, (but excluding the fiscal quarter ending May 2, 2020) a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrowers and the Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and, in each case, the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, which consolidated balance sheet and related statements of operations and cash flows will be certified by a Responsible Officer of the Lead Borrower on behalf of the Borrowers as fairly presenting, in all material respects, the financial position and results of operations of the Borrowers and the Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (the applicable financial statements delivered pursuant to this clause (b) being the "***Quarterly Financial Statements***");

(c)     within twenty-one (21) days after the end of each fiscal month (commencing with the fiscal month ending on May 2, 2020), the consolidated balance sheet and related statements of operations and consolidated statements of cash flows for the Borrowers and their Subsidiaries, as of the end of and for such fiscal month and the elapsed portion of the fiscal year and a report setting forth, for the most recently ended calendar month and the elapsed portion of the fiscal year, a computation of adjusted EBITDA of the Loan Parties and their Subsidiaries determined in a manner consistent with past practice (it being agreed that adjusted EBITDA computed in accordance with the definition of EBITDA in the Prepetition Term Loan Credit Agreement shall satisfy this provision) (the applicable financial statements delivered pursuant to this clause (c) being the "***Monthly Financial Statements***" and, together with the Quarterly Financial Statements, the "***Required Financial Statements***");

(d)     (i) together with any such Required Financial Statements, the revenue of the Borrowers and the Subsidiaries derived from (A) "brick and mortar" or retail stores at owned and leased locations, on the one hand, and (B) online operations or e-commerce sales, on the other hand, in each case on a current and prior-year period comparable basis and (ii) together with any Quarterly Financial Statements, condensed consolidating financial information regarding Holdings, the Borrowers and their Subsidiaries in form and substance substantially the same as that disclosed in the Lead Borrower's latest Form 10-K and Form 10-Q prior to the Closing Date (or at the Lead Borrower's election, as to the businesses conducted as of the Closing Date by Bergdorf Goodman Inc., a New York corporation, Bergdorf Graphics, Inc., a New York corporation, and BG Productions, Inc., a Delaware corporation, on a consolidated basis); and

68

(e)      whether or not NMG or any of its Subsidiaries is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the following reports: together with any such Quarterly Financial Statements delivered pursuant to Section 5.04(b), a "Management's Discussions and Analysis of Financial Condition and Results of Operations" containing the information required under such caption of Form 10-Q of the Exchange Act, and in the case of the second and third fiscal quarters, the period from the beginning of such fiscal year to the end of such fiscal quarter, which shall include, a reasonably detailed description during the most recently completed fiscal quarter of any Permitted Investment in excess of $15.0 million;

(f)      whether or not NMG is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, within the time period specified for filing current reports on Form 8-K by the SEC, all current reports that would be required to be filed with the SEC on Form 8-K if the Lead Borrower were required to file such reports for any of the following events (i) "Entry into a Material Definitive Agreement" pursuant to Item 1.01 on Form 8-K (ii) "Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant" pursuant to Item 2.03 on Form 8-K, (iii) any significant acquisitions or dispositions by the Lead Borrower or any of its Subsidiaries, (iv) the bankruptcy of the Lead Borrower or any of its Subsidiaries, (v) the acceleration of any Indebtedness of the Lead Borrower or any of its Subsidiaries having a principal amount in excess of $15.0 million, (vi) a change in any of the Borrowers' certifying independent auditor, (vii) the appointment or departure of the chief executive officer or chief financial officer (or persons fulfilling similar duties) of the Lead Borrower or any of its Subsidiaries, (viii) non-reliance on previously issued financial statements of the Lead Borrower or any of its Subsidiaries, (ix) entering into, materially modifying, or terminating material contracts (to the extent not otherwise required under clause (i) above) of the Lead Borrower or any of its Subsidiaries (for the avoidance of doubt, excluding officer employment arrangements) and (x) the incurrence of costs associated with exit or disposal activities by the Lead Borrower or any of its Subsidiaries;

(g)      concurrently with any delivery of Required Financial Statements, a certificate of a Financial Officer of the Lead Borrower certifying that no Default or Event of Default has occurred and is continuing or, if a Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(h)      promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials publicly filed by Holdings, the Borrowers or any Subsidiary with the SEC or, after an initial public offering, distributed to its stockholders generally, as applicable;

(i)      [Reserved];

(j)      [Reserved];

(k)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrowers or any Subsidiary, in each case, as the Administrative Agent may reasonably request (for itself or on behalf of any Lender) or as may be reasonably requested by the Required Lenders;

(l)      promptly upon request by the Administrative Agent (so long as the following are obtainable using commercially reasonable measures), copies of any documents described in Section 101(k)(1) of ERISA that the Lead Borrower may request with respect to any Multiemployer Plan; *provided* that if the Lead Borrower has not requested such documents from the administrator or

sponsor of the applicable Multiemployer Plan, the Lead Borrower shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(m)    promptly, from time to time, copies of all operative Indebtedness Documents (including full and complete schedules and exhibits thereto) with respect to any outstanding Indebtedness of the Lead Borrower and any of its Subsidiaries whose principal amount (or committed amount) exceeds $25.0 million;

(n)    to the Lender Advisors (other than any local counsel), (i) no later than 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of the third (3rd) full calendar week ending after the Petition Date, which for the avoidance of doubt, shall be May 28, 2020  and each fourth (4th) calendar week thereafter and (ii) at the option of the Lead Borrower in good faith in connection with a material change in circumstances (but no more than one (1) time pursuant to this clause (ii) during the term of this Agreement) (the exercise of such option, the "***Borrower Supplemental Budget Election***"), by 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) prior to the week in which such supplement is proposed to be effective, a supplement to the Approved Budget covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered (or in the case of clause (ii) above, is delivered), consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Required Lenders in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Required Lenders in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Required Lenders approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(o)    as soon as reasonably practicable in advance of, but no later than two (2) Business Days prior to the earlier of (x) filing with the Bankruptcy Court or (y) delivering to any statutory committee appointed in the Chapter 11 Cases or the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***"), as the case may be, all proposed orders and pleadings related to the Term Loans and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto (except that, with respect to any emergency pleading or document for which, despite the Loan Parties' best efforts, such advance notice is impracticable, the Loan Parties shall be required to furnish such documents as soon as reasonably practicable and in no event later than substantially concurrently with such filings or deliveries thereof, as applicable);

(p)    by the earlier of (x) two (2) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed) on behalf of any of the Loan Parties with the Bankruptcy Court or (y) at the same time as such documents are provided by any of the Loan Parties to any statutory committee appointed in the Chapter 11 Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or any request to approve any compromise and settlement of claims or for relief under Section 365, 1113 or 1114 of the

Bankruptcy Code or Bankruptcy Rule 9019 or any other request for relief (to the extent not covered by Section 5.04(o) above);

(q)       by no later than 12:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) following the first full calendar week ending after the Petition Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended (or, in the case of the first such report, during the period from and including the Petition Date and through the end of the first full calendar week ending after the Petition Date);

(r)       by no later than 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing with the fourth (4th) full calendar week ending after the Petition Date, which for the avoidance of doubt, shall be June 4, 2020 (each such Thursday or later time, a "*Variance Report Date*"), a line-item by line-item variance report (each, a "*Variance Report*") setting forth, in reasonable detail:  (x) any differences between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time) and (y) the computations necessary to determine compliance with Sections 6.10, 6.14 and 6.15 together with a statement from the Borrower's chief financial officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any variance in such Variance Report in excess of 10.0% in actual receipts or actual operating disbursements during the Variance Testing Period (unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget.

Anything to the contrary notwithstanding, the obligations in clauses (b), (d), (e) and (f) of this Section 5.04 may be satisfied with respect to financial information of the Borrowers and the Subsidiaries by furnishing (1) the applicable financial statements of Holdings (or any other Parent Entity) or (2) the Borrowers' or Holdings' (or any such other Parent Entity's), as applicable, Form 10-Q or 8-K, as applicable, filed with the SEC; *provided* that with respect to each of clause (1) and (2) of this paragraph to the extent such information relates to Holdings (or a Parent Entity), such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such Parent Entity), on the one hand, and the information relating to the Borrowers and the Subsidiaries on a standalone basis, on the other hand.

Documents required to be delivered pursuant to this Section 5.04 may be delivered electronically in accordance with Section 10.01(e).

Without limiting the foregoing obligations of each Borrower to the Lenders pursuant to this Section 5.04, at any time that the Lead Borrower (and any applicable Parent Entity) is not subject to the reporting requirements of Section 13 and 15(d) of the Exchange Act, in lieu of filing the reports contemplated by clauses (b), (d), (e) and (f) of this Section 5.04 with the SEC, the Lead Borrower may make available such information electronically (including by posting to a non-public, password-protected website maintained by the Lead Borrower or a third party) to any bona fide prospective holder of the Term Loans, any bona fide market maker (or person who intends to be a market maker) in the Term Loans or any

bona fide securities analyst, in each case, who provides to the Lead Borrower its email address, employer name and other information reasonably requested by the Lead Borrower.  Any Person who requests such financial information from the Lead Borrower or seeks to participate in any conference call required by this covenant (excluding for the avoidance of doubt, each Lender) may be excluded to the extent it constitutes a Disqualified Institution and may be required by the Lead Borrower to represent to and agree with the Lead Borrower that:

(1)      it is a holder of the Term Loans, a bona fide prospective holder of the Term Loans, a bona fide market maker (or intended market maker) with respect to the Term Loans or a bona fide securities analyst, as applicable;

(2)      if it is a prospective holder of the Term Loans, it would meet all the requirements to be a Lender under Section 10.04(b);

(3)      it will not use the information in violation of applicable securities laws or regulations;

(4)      it will not communicate the information to any Person and will keep the information confidential;

(5)      it will use such information only in connection with evaluating an investment in the Term Loans (or, if it is a bona fide market maker or intended market maker, only in connection with making a market in the Term Loans or, if it is a bona fide securities analyst, for preparing analysis for holders of and prospective holders of the Term Loans that otherwise have access to the financial information in compliance with this covenant); and

(6)      it (a) will not use such information in any manner intended to compete with the business of the Lead Borrower and (b) is not a Person (which includes such Person's Affiliates, other than the Affiliates of a bona fide securities research analyst with whom such research analyst does not share such information) that (i) is principally engaged in a Similar Business or (ii) derives a significant portion of its revenues from operating or owning a business substantially Similar Business.

SECTION 5.05      Litigation and Other Notices.  Furnish to the Administrative Agent (which will promptly thereafter furnish to the Lenders) written notice of the following promptly after any Responsible Officer of the Lead Borrower obtains actual knowledge thereof:

(a)      any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration (other than in connection with the Chapter 11 Cases), against Holdings or any of its Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect; and

(c)      the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to result in a material liability to a Loan Party.

SECTION 5.06      Compliance with Laws.  Subject to the DIP Financing Orders and other orders entered by the Bankruptcy Court, comply with all laws, rules, regulations and orders of any

Governmental Authority applicable to it or its property (including ERISA, FCPA, OFAC and the PATRIOT Act), except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that this Section 5.06 will not apply to Environmental Laws, which are the subject of Section 5.09, or laws related to Taxes, which are the subject of Section 5.03; provided, the Loan Parties must comply with the DIP Financing Orders in all respects.

SECTION 5.07     <u>Maintaining Records; Access to Properties and Inspections</u>.   Permit any Persons designated by the Administrative Agent (or any group of Lenders holding not less than 25% of the aggregate Term Loans) to visit and inspect the financial records and the properties of the Borrowers or any Subsidiary at reasonable times, upon reasonable prior notice to the Lead Borrower, and as often as reasonably requested, to make extracts from and copies of such financial records, and permit any Persons designated by the Administrative Agent, upon reasonable prior notice to the Lead Borrower to discuss the affairs, finances and condition of Holdings, the Borrowers or any Subsidiary with the officers thereof and independent accountants therefor (subject to such accountant's policies and procedures); *provided* that the Administrative Agent and/or any group of Lenders may not exercise such rights more often than two times during any calendar year in the aggregate unless an Event of Default is continuing and only one such time will be at the Borrowers' expense; and *provided*, *further*, that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and upon reasonable advance notice.

Notwithstanding anything to the contrary in this Agreement (including Sections 5.04(h), 5.05 and 5.07) or any other Loan Document, none of the Loan Parties or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter with any competitor to the Borrowers or any of their Subsidiaries or that (1) constitutes non-financial trade secrets or non-financial proprietary information, (2) in respect of which disclosure is prohibited by law or any binding agreement, (3) is subject to attorney-client or similar privilege or constitutes attorney work product or (4) creates an unreasonably excessive expense or burden on the Borrowers or any of their Subsidiaries.

SECTION 5.08     <u>Use of Proceeds</u>.   Use the proceeds of the Term Loans in accordance with Section 3.10.

SECTION 5.09     <u>Compliance with Environmental Laws</u>.   Comply, and make commercially reasonable efforts to cause all lessees and other Persons occupying its fee-owned Real Properties to comply, with all Environmental Laws applicable to its operations and properties, and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.10     <u>Further Assurances; Additional Security</u>.

(a)     If a Subsidiary (other than an Excluded Subsidiary) of any Borrower is formed or acquired or ceases to be an Excluded Subsidiary after the Closing Date, then, the Lead Borrower shall promptly notify the Collateral Agent thereof and, within fifteen (15) Business Days after the date such Subsidiary is formed, acquired or ceases to be an Excluded Subsidiary (or such longer period as the Collateral Agent agrees in its discretion but not to exceed twenty (20) Business Days unless otherwise agreed by the Required Lenders including through electronic means or e-mail), the Lead Borrower will or will cause such Subsidiary to deliver a joinder to the Collateral Agreement, substantially in the form specified therein, duly executed on behalf of such Subsidiary.

(b)　　[Reserved].

(c)　　Furnish to the Collateral Agent five (5) Business Days prior written notice of any change in any Loan Party's:

(i)　　corporate or organization name;

(ii)　　organizational structure;

(iii)　　location (determined as provided in UCC Section 9-307); or

(iv)　　organizational identification number (or equivalent) or, solely if required for perfecting a security interest in the applicable jurisdiction, Federal Taxpayer Identification Number.

The Borrowers will not effectuate or permit any such change unless all filings have been made, or will be made within any statutory period, that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest, for the benefit of the applicable Secured Parties, in all Collateral held by such Loan Party.

(d)　　Execute any and all other documents, financing statements, agreements and instruments as reasonably requested by the Required Lenders, and take all such other actions that are required under any applicable law, to satisfy the requirements set forth in Section 2.24 with respect to the creation and perfection of the Liens on the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, contemplated herein and in the Security Documents and to cause such requirement to be and remain satisfied, all at the expense of the Borrowers.

(e)　　Notwithstanding anything herein to the contrary,

(i)　　the other provisions of this Section 5.10 need not be satisfied with respect to any Excluded Assets or Excluded Equity Interests or any exclusions and carve-outs from the perfection requirements set forth in the Collateral Agreement;

(ii)　　no actions will be required with respect to the grant and perfection of security interests that are granted and perfected pursuant to the DIP Financing Orders and in accordance with Section 2.24; and

(iii)　　without limitation of clause (ii) above, no actions will be required outside of the United States in order to create or perfect any security interest in any assets located outside of the United States and no foreign law security or pledge agreements, foreign law mortgages or deeds or foreign intellectual property filings or searches will be required.

SECTION 5.11　　[Reserved].

SECTION 5.12　　Lender Calls.　The Loan Parties and/or their advisors, as applicable (including appropriately senior members of management with respect to clause (c) below), shall, at reasonable times to be mutually agreed from time to time by the Lead Borrower and Administrative Agent or Lender Advisors (other than any local counsel), as applicable, host the following telephonic conference calls with the Administrative Agent, the Lenders and/or their advisors, as applicable:

74

(a)     Promptly following the delivery of each Variance Report pursuant to Section 5.04(r), a call with the Lender Advisors (other than any local counsel) to discuss the contents of such Variance Report.

(b)     A weekly call with the Lender Advisors (other than any local counsel) to discuss contemplated material filings, the Approved Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions and material performance changes.

(c)     No less frequently than monthly, a call with the Lenders to discuss the Approved Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions and material performance changes.

SECTION 5.13     Milestones.  The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Bankruptcy Court, achieve the following milestones:

(a)     on or before three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Financing Order;

(b)     [Reserved];

(c)     on or before thirty (30) days after the Petition Date, the Loan Parties shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect thereto that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion;

(d)     [Reserved];

(e)     on or before forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Financing Order;

(f)     on or before seventy-five (75) days after the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement with respect to an Acceptable Plan that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion;

(g)     on or before one-hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Acceptable Confirmation Order; and

(h)     on or before two hundred ten (210) days after the Petition Date, the Acceptable Plan shall become effective.

SECTION 5.14     Certain Bankruptcy Matters.  The Loan Parties shall use their reasonable best efforts to:

(a)     cause all proposed (i) First and Second Day Orders, (ii) orders (other than the DIP Financing Orders) related to or affecting the Term Loans and other Obligations and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of

75

the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of any Agent, the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)     comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(c)     comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim DIP Financing Order and the Final DIP Financing Order, as applicable, and any other order of the Bankruptcy Court; and

(d)     except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

SECTION 5.15     Credit Ratings.  Use commercially reasonable efforts to maintain at all times (a) a credit rating by either S&P or Moody's in respect of the Term Facility and (b) a public corporate rating by S&P or a public corporate family rating by Moody's for the Lead Borrower, in each case with no requirement to maintain any specific minimum rating.

## ARTICLE VI

### *Negative Covenants*

Each Borrower covenants and agrees with each Lender that, so long as this Agreement is in effect and until the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, it will not and will not permit any of its Subsidiaries to:

SECTION 6.01     Indebtedness.  Issue, incur or assume any Indebtedness.

The foregoing limitation will not apply to (collectively, "***Permitted Debt***"):

(a)     Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out);

(b)     Indebtedness outstanding on the Petition Date and listed on Schedule 6.01;

(c)     [Reserved];

(d)     [Reserved];

76

(e)      Capital Lease Obligations, Indebtedness with respect to mortgage financings and purchase money Indebtedness to finance all or any part of the purchase, lease, construction, installation, repair or improvement of property (real or personal), plant or equipment or other fixed or capital assets in an aggregate outstanding principal amount, not to exceed $10.0 million (the "***Capital Lease Obligations Cap***"); *provided* that such Indebtedness is incurred within 270 days after the purchase, lease, construction, installation, repair or improvement of the property that is the subject of such Indebtedness;

(f)      Indebtedness owed to (including obligations in respect of letters of credit or bank Guarantees or similar instruments for the benefit of) any Person providing workers' compensation, health, disability or other employee benefits (whether to current or former employees) or property, casualty or liability insurance or self-insurance in respect of such items, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, health, disability or other employee benefits (whether current or former) or property, casualty or liability insurance; *provided* that upon the incurrence of any Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than forty-five (45) days following such incurrence;

(g)      [Reserved];

(h)      intercompany Indebtedness between or among the Borrowers and the Subsidiaries; provided that the aggregate outstanding principal amount of such Indebtedness that is owing by any Subsidiary that is not a Guarantor to a Loan Party may not exceed the amount, as of the date such Indebtedness is incurred, permitted pursuant to Section 6.04(e); *provided* further that (i) such Indebtedness owing to a Subsidiary that is not a Guarantor shall be subordinated in right of payment to the Obligations or Guarantee of such Loan Party, as applicable, and (ii) any subsequent issuance or transfer of any Equity Interests or any other event that results in such Subsidiary lending such Indebtedness ceasing to be a Subsidiary or any other subsequent transfer of any such Indebtedness (except to a Loan Party) will be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (h);

(i)      Indebtedness pursuant to Hedge Agreements;

(j)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion Guarantees and similar obligations, in each case, provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(k)      Guarantees of Indebtedness of the Borrowers or the Subsidiary Loan Parties or any other Subsidiary permitted to be incurred under this Agreement to the extent such Guarantees are not prohibited by the provisions of Section 6.04 (other than Guarantees permitted only pursuant to Section 6.04(t));

(l)      [Reserved];

(m)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness (other than credit or purchase cards) is extinguished within ten (10) Business Days after notification received by the Borrowers of its incurrence;

(n)      [Reserved];

77

(o)     Indebtedness in respect of letters of credit (1) issued under the ABL Credit Agreement or supported by the ABL Segregated Cash Collateral or (2) otherwise in an aggregate face amount not to exceed $50.0 million to the extent consistent with the Approved Budget (including Permitted Variances thereto); provided that the delivery or posting of any such letter of credit shall be deemed to be, without duplication of any cash provided as collateral for the benefit of the issuer of such letter of credit, a cash disbursement for purposes of the Approved Budget (other than with respect to any letters of credit issued pursuant to clause (1) of this clause (o)), with the amount of such cash disbursement measured as the greater of (x) the face amount of such letter of credit and (y) the dollar amount of any cash provided as collateral for the benefit of the issuer of such letter of credit;

(p)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)     [Reserved];

(r)     Indebtedness in respect of Cash Management Services (including in respect of the DIP Proceeds Account) entered into in the ordinary course of business;

(s)     [Reserved];

(t)     other Indebtedness not otherwise permitted under any other clause of this Section 6.01, in an aggregate outstanding principal amount thereof not to exceed $2.0 million;

(u)     [Reserved];

(v)     unsecured Indebtedness in respect of short-term obligations to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services so long as such obligations are incurred in the ordinary course of business and not in connection with the borrowing of money;

(w)     Indebtedness representing deferred compensation, severance, retirement benefits or other similar arrangements incurred by the Borrowers or any Subsidiary (i) in the ordinary course of business or (ii) in connection with any Permitted Investment;

(x)     [Reserved];

(y)     customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(z)     Indebtedness incurred by the Borrowers or any Subsidiary in connection with bankers' acceptances, discounted bills of exchange, warehouse receipts or similar facilities or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business.

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the categories of Permitted Debt, the Borrowers may, in their sole discretion, at the time of incurrence, combine, divide, classify or reclassify, or at any later time combine, divide, classify or reclassify, such item of Indebtedness (or any portion thereof) in any manner that complies with this covenant. Accrual of interest, the accretion of accreted value, amortization of original issue discount, the payment of interest or dividends in the form of

additional Indebtedness with the same terms (including pay-in-kind interest), and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, will not be deemed to be an incurrence of Indebtedness for purposes of this Section 6.01.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such Guarantee or letter of credit, as the case may be, was in compliance with this Section 6.01.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced (*plus* unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses in connection therewith).

SECTION 6.02    Liens.   Create, incur, assume or permit to exist any Lien that secures obligations under any Indebtedness on any property or assets at the time owned by it, except the following (collectively, "***Permitted Liens***"):

(a)    Liens securing the Obligations pursuant to the Loan Documents and Liens granted as adequate protection on account of secured Prepetition Indebtedness pursuant to the DIP Financing Orders;

(b)    Liens securing Indebtedness existing on the Closing Date; *provided* that such Liens only secure the obligations that they secure on the Closing Date and do not apply to any other property or assets of the Borrowers or any Subsidiary other than replacements, additions, accessions and improvements thereto;

(c)    Liens securing Indebtedness incurred in accordance with Sections 6.01(e); *provided* that such Liens only extend to the assets financed with such Indebtedness (and any replacements, additions, accessions and improvements thereto);

(d)    Cash Collateral and other deposits securing obligations arising after the Petition Date required under or imposed by the Bankruptcy Code;

(e)    Liens not otherwise permitted under any other clause of this Section 6.02 securing an amount not to exceed $2.0 million;

(f)    to the extent constituting a Lien, rights of setoff, reserves and holdbacks against credit balances of a Loan Party or any of its Subsidiaries with credit card issuers or credit card processors to such Loan Party or any such Subsidiaries arising in the ordinary course of business;

(g)    [Reserved];

79

(h)     Liens for Taxes, assessments or other governmental charges or levies not yet due or that are being contested in compliance with Section 5.03;

(i)     Liens disclosed by the title insurance commitments or policies delivered on or subsequent to the Closing Date and any replacement, extension or renewal of any such Liens (so long as the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(j)     Liens securing judgments that do not constitute an Event of Default under Section 8.01(g) and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and in respect of which Holdings, the Borrowers or any affected Subsidiary has set aside on its books reserves in accordance with GAAP with respect thereto;

(k)     Liens imposed by law, including landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business securing obligations that are not overdue by more than thirty (30) days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrowers or a Subsidiary has set aside on its books reserves in accordance with GAAP;

(l)     (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other similar laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrowers or any Subsidiary;

(m)     deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), the delivery of merchandise or services with factors (to company suppliers), vendors, shippers, brand partners, credit insurers and other service providers (but not to secure Indebtedness or receivables or Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof), in each case, by the Borrowers or any Subsidiary in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(n)     survey exceptions and such matters as an accurate survey would disclose, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights of way covenants, conditions, restrictions and declarations on or with respect to the use, ownership or operation of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrowers or any Subsidiary;

(o)      any interest or title of a lessor or sublessor under any leases or subleases entered into by the Borrowers or any Subsidiary in the ordinary course of business;

(p)      Liens that are contractual rights of set-off (i) relating to pooled deposit or sweep accounts of the Borrowers or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any Subsidiary or (ii) relating to purchase orders and other agreements entered into with customers of the Borrowers or any Subsidiary in the ordinary course of business;

(q)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(r)      leases or subleases, licenses or sublicenses (including with respect to Intellectual Property Rights and software) granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Borrowers and the Subsidiaries, taken as a whole;

(s)      cash collateral to support letters of credit permitted pursuant to Section 6.01(o) or to support Letters of Credit;

(t)      the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(u)      Liens arising from precautionary Uniform Commercial Code financing statements;

(v)      Liens on Equity Interests of any joint venture, to the extent such Equity Interests are Excluded Equity Interests, (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement or arrangement;

(w)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(x)      Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (4) of the definition thereof;

(y)      Liens securing insurance premium financing arrangements;

(z)      [Reserved];

(aa)      Liens on property or assets used to defease or to satisfy and discharge Indebtedness; *provided* that such defeasance or satisfaction and discharge is not prohibited by this Agreement;

(bb)      Liens:

(i)      of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection;

(ii)      attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business; or

81

(iii)      in favor of banking or other financial institutions or entities, or electronic payment service providers, arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking or finance industry;

(cc)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit entered into in the ordinary course of business issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(dd)     [Reserved];

(ee)     [Reserved];

(ff)      [Reserved]; and

(gg)     (i) Liens securing amounts owing to any Qualified Counterparty (as defined in the ABL Credit Agreement) under any Specified Hedge Agreement (as defined in the ABL Credit Agreement) and Cash Management Obligations (as defined in the ABL Credit Agreement) in each case entered into or incurred prior to the Petition Date, which amounts are secured under the ABL Loan Documents and (ii) Liens securing amounts incurred pursuant to Section 6.01(r) in respect of Cash Management Services (including in respect of the DIP Proceeds Account or the Corporate Card Programs Collateral Account (as defined in the cash management First Day Order) entered into in the ordinary course of business or as contemplated by the DIP Financing Orders or the First and Second Day Orders, as applicable.

For purposes of this Section 6.02, (x) a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition but may be incurred under any combination of such categories (including in part under one such category and in part under any other such category), (y) in the event that a Lien (or any portion thereof) meets the criteria of one or more of such categories of Permitted Liens, the Lead Borrower will, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with this definition, and (z) in the event that a portion of Indebtedness secured by a Lien could be classified as secured in part pursuant to clause (a) or (gg) above (giving effect to the incurrence of such portion of such Indebtedness), the Lead Borrower, in its sole discretion, may classify such portion of such Indebtedness (and any Obligations in respect thereof) as having been secured pursuant to clause (a) or (gg) above and thereafter the remainder of the Indebtedness as having been secured pursuant to one or more of the other clauses of this definition.

SECTION 6.03     Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any Person whereby it sells or transfers any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "*Sale and Lease-Back Transaction*") except to the extent such Sale-Leaseback Transaction is entered into in connection with a Specified Disposition so long as the term of such Sale-Leaseback Transaction is for a term of eighteen (18) months or less.

SECTION 6.04     Investments, Loans and Advances.  Purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a Person that is not a Wholly Owned Subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, a

"*Investment*"), any other Person, except the following to the extent consistent with the Approved Budget (including Permitted Variances thereto) (collectively, "*Permitted Investments*"):

(a)  Investments consisting of Equity Interests of any MYT Subsidiary owned by a Loan Party or a Subsidiary in the event that such MYT Subsidiary becomes a "subsidiary" of any Loan Party or any of their respective Subsidiaries (provided, that, for the avoidance of doubt, in no event shall any MYT Subsidiary be deemed to be a "Subsidiary");

(b)  loans and advances to officers, directors, employees or consultants of any Parent Entity, the Borrowers or any Subsidiary not to exceed $5.0 million in an aggregate principal amount at any time outstanding (calculated without regard to write-downs or write-offs thereof after the date made); provided that (i) loans and advances to consultants who are not Affiliates of the Loan Parties in the form of upfront payments made in connection with employment or consulting arrangements which (x) exist as of the Closing Date or (y) are made on or after the Closing Date in the ordinary course of business consistent with past practice and the Approved Budget, or (ii) offered on a non-discriminatory basis in the form of delayed payment of premiums under broad-based health insurance programs by officers or employees after March 1, 2020, in connection with terminations, temporary layoffs or furlough initiatives taken in response to the COVID-19 outbreak and related governmental advisories and restrictions, in each case, shall not be subject to such foregoing cap;

(c)  [Reserved];

(d)  [Reserved];

(e)  intercompany Investments (including intercompany Indebtedness) (i) among the Borrowers and the Subsidiary Loan Parties (other than Notes PropCo or 2019 Extended Term Loan PropCo; provided, that any Loan Party (other than Notes PropCo and 2019 Extended Term Loan PropCo) shall be permitted to fund, solely in the form of cash equity Investments, lease and other operating payments that are due in the ordinary course of business, to maintain the legal existence of Notes PropCo or the 2019 Extended Term Loan PropCo, as applicable), and (ii) among the Loan Parties (other than Notes PropCo and 2019 Extended Term Loan PropCo) and Subsidiaries that are not Guarantors; *provided* that (a) the sum of (1) the aggregate fair market value of all such Investments under subclause (ii) (other than intercompany Indebtedness and Guarantees of Indebtedness) made since the Petition Date (with all such Investments being valued at their original fair market value and without taking into account subsequent increases or decreases in value) by the Loan Parties in Subsidiaries that are not Guarantors; (2) the aggregate principal amount of Indebtedness owing to the Loan Parties by Subsidiaries that are not Guarantors at any time outstanding; and (3) the aggregate principal amount of Indebtedness of Subsidiaries that are not Guarantors that is Guaranteed by the Borrowers and the Guarantors may not exceed $5.0 million at any time outstanding; and (b) any such Investment consisting of an intercompany loan by the Borrowers or the Guarantors in Subsidiaries that are not Guarantors shall be pledged as Collateral to secure the Obligations, subject to carve outs for Excluded Assets; *provided further* that Investments by Borrowers or their respective Subsidiaries in Subsidiaries that are not Wholly Owned Subsidiaries shall be on arm's-length terms;

(f)  Investments not otherwise permitted under any other clause of this Section 6.04 in an aggregate amount not to exceed $2.0 million at any time outstanding;

(g)  Investments in Cash Equivalents and, to the extent not made for speculative purposes, Investment Grade Securities;

(h)     Investments arising out of the receipt by the Borrowers or any of the Subsidiaries of non-cash consideration in connection with any sale of assets permitted under Section 6.05;

(i)     accounts receivable, security deposits and prepayments and other credits granted or made in the ordinary course of business and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and others, including in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, such account debtors and others, in each case in the ordinary course of business;

(j)     Investments acquired as a result of a foreclosure by the Borrowers or any Subsidiary with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(k)     Hedge Agreements;

(l)     Investments existing on, or contractually committed as of, the Closing Date and set forth on Schedule 6.04;

(m)     Investments resulting from pledges and deposits that are Permitted Liens;

(n)     intercompany loans among Foreign Subsidiaries;

(o)     acquisitions of obligations of one or more officers or other employees of any Parent Entity, Borrowers or any Subsidiary of the Borrowers in connection with such officer's or employee's acquisition of Equity Interests of any Parent Entity, so long as no cash is actually advanced by the Borrowers or any Subsidiary to such officers or employees in connection with the acquisition of any such obligations;

(p)     Guarantees of operating leases (for the avoidance of doubt, excluding Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by the Borrowers or any Subsidiary in the ordinary course of business;

(q)     Investments to the extent that payment for such Investments is made with Equity Interests of any Parent Entity;

(r)     Investments consisting of the redemption, purchase, repurchase or retirement of any Equity Interests permitted under Section 6.06;

(s)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices;

(t)     Guarantees permitted under Section 6.01;

(u)     advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrowers or any Subsidiary;

(v)     [Reserved];

(w)      Investments consisting of the leasing or licensing of Intellectual Property Rights in the ordinary course of business or the contribution of Intellectual Property Rights pursuant to joint marketing arrangements with other Persons; and

(x)      purchases or acquisitions of inventory, supplies, materials and equipment or purchases or acquisitions of contract rights or Intellectual Property Rights in each case in the ordinary course of business.

*provided* that a Loan Party shall not, directly or indirectly, use any Investments made pursuant to the definition of "Permitted Investments" to (i) provide assets to a Person that incurs Indebtedness or issues Equity Interests, which Indebtedness, Equity Interests or proceeds thereof (as the case may be) are used to purchase, refinance or otherwise invest in any Indebtedness of Holdings and its Subsidiaries or (ii) make a Restricted Payment.

SECTION 6.05      <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>.  Merge into, or consolidate or amalgamate with, any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or sell, transfer or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person or any division, unit or business of any other Person, except that this Section 6.05 will not prohibit:

(a)      if at the time thereof and immediately after giving effect thereto no Event of Default has occurred and is continuing or would result therefrom:

(i)      the merger, consolidation or amalgamation of any Subsidiary Loan Party into (or with) the Borrowers in a transaction in which a Borrower is the survivor;

(ii)      the merger, consolidation or amalgamation of any Subsidiary Loan Party (other than Notes PropCo and Term Loan PropCo) into or with any Subsidiary Loan Party (other than Notes PropCo and Term Loan PropCo);

and, in the case of each of the foregoing clauses (i) and (ii), no Person other than a Borrower or a Subsidiary Loan Party receives any consideration;

(iii)      the merger, consolidation or amalgamation of any Subsidiary that is not a Loan Party into or with any other Subsidiary that is not a Loan Party;

(iv)      (i) (A) any transfer of inventory among (x) the Borrowers and the Subsidiary Loan Parties or between Subsidiary Loan Parties and (y) Subsidiaries that are not Subsidiary Loan Parties, and (B) any other transfer of property or assets among (x) the Borrowers and the Subsidiary Loan Parties and (y) Subsidiaries that are not Subsidiary Loan Parties, in each case, in the ordinary course of business or (ii) any other transfer of property or assets among the Borrower and any Subsidiary Loan Party (other than a PropCo Guarantor), provided any Collateral so transferred pursuant to this clause (ii) shall remain Collateral subject to valid and perfected Liens in favor of the Collateral Agent; or

(v)      the liquidation or dissolution or change in form of entity of any Subsidiary of a Borrower if a Responsible Officer of such Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of such Borrower and is not materially disadvantageous to the Lenders;

(b)        [Reserved];

(c)        (i) the purchase and sale of inventory in the ordinary course of business, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business, (iii) the sale of surplus, obsolete, damaged or worn out equipment or other property in the ordinary course of business or (iv) the disposition of Cash Equivalents (or Investments that were Cash Equivalents when made);

(d)        [Reserved];

(e)        Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)        the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)        Specified Dispositions;

(h)        leases, licenses, or subleases or sublicenses of any real or personal property in the ordinary course of business;

(i)        sales, licenses, transfers, abandonments, allowances to lapse or other dispositions of Intellectual Property Rights that are immaterial or no longer useful or necessary in the operation of the business of the Borrowers or such Subsidiary, as determined by a Responsible Officer of the Lead Borrower reasonably and in good faith;

(j)        sales, leases or other dispositions of inventory of the Borrowers or any Subsidiary determined by the management of the Borrowers to be no longer useful or necessary in the operation of the business of the Borrowers or such Subsidiary, as determined by a Responsible Officer of the Lead Borrower reasonably and in good faith; or

(k)        [Reserved];

(l)        other sales, transfers or dispositions pursuant to an order of the Bankruptcy Court which sale, transfer or disposition are consistent with the RSA and the Approved Budget;

(m)        sales of art; and

(n)        sales, transfers or dispositions of assets in an aggregate amount equal to a fair market value, as determined by a Responsible Officer of the Lead Borrower reasonably and acting in good faith, not to exceed $2.0 million in the aggregate to the extent not otherwise permitted under any other clause of this Section 6.05.

To the extent any Collateral is disposed of in a transaction expressly permitted by this Section 6.05 to any Person other than Holdings, the Borrowers or any Guarantor, such Collateral will be free and clear of the Liens created by the Loan Documents, and the Administrative Agent will take, and each Lender hereby authorizes the Administrative Agent to take, any actions reasonably requested by the Lead Borrower in order to evidence the foregoing, in each case, in accordance with Section 10.18.

SECTION 6.06        Restricted Payments.  Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), directly or indirectly, whether in cash, property,

securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the Person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the Person redeeming, purchasing, retiring or acquiring such shares) (the foregoing, "***Restricted Payments***") other than, in each case, consistent with the Approved Budget (including Permitted Variances thereto) and any applicable order of the Bankruptcy Court:

(a)     Restricted Payments to any Parent Entity on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance with Section 13.20 of the RSA; *provided* that, any such Restricted Payments that are not made and remain in excess following application of the same in accordance with Section 13.20 of the RSA shall promptly be returned to the Loan Parties upon termination of the RSA;

(b)     Restricted Payments to permit payment of franchise and similar taxes, administrative and maintenance expenses, and foreign independent director (or foreign independent member or manager) fees and expenses and related expenses, in each case, of certain non-Debtor affiliate entities to the extent provided in the First and Second Day Orders entered by the Bankruptcy Court in respect of ongoing cash management in the ordinary course of business consistent with past practice and to the extent consistent with the Approved Budget (including Permitted Variances thereto);

(c)     [Reserved];

(d)     Restricted Payments to any Parent Entity that files, or to any Parent Entity for the purpose of paying to any other Parent Entity that files, a consolidated U.S. federal or combined or unitary state tax return that includes the Borrowers and the Subsidiaries (or the taxable income thereof), or to any Parent Entity that is a partner or a sole owner of the Lead Borrower in the event any Borrower is treated as a partnership or a "disregarded entity" for U.S. federal income tax purposes, in each case, in an amount not to exceed the amount that such Borrower and its Subsidiaries would have been required to pay in respect of such U.S. federal, state or local taxes (as the case may be) in respect of such fiscal year if such Borrower and its Subsidiaries paid such taxes directly as a stand-alone taxpayer (or stand-alone group) (such amounts, the "***Tax Amount***"); *provided* that, any amounts paid pursuant to this clause (d) for any applicable fiscal year shall actually be used by a Parent Entity to pay such taxes to the applicable taxing authority; *provided further* that, amounts paid under this clause (d) shall not exceed the Tax Amount for such fiscal year;

(e)     Restricted Payments to permit any Parent Entity to:

(i)     pay operating, overhead, legal, accounting and other professional fees and expenses (including directors' fees and expenses and administrative, legal, accounting, filings and similar expenses), in each case to the extent related to its separate existence as a holding company or to its ownership of the Borrowers and the Subsidiaries, but not, for the avoidance of doubt, any costs, fees and expenses for, or directly allocable to, the MYT Entities, or in respect of any litigation related thereto, subject to reasonable pro-ration of joint services, costs, fees and expenses;

(ii)     [Reserved];

87

(iii)     pay franchise taxes or other similar taxes and other fees and expenses in connection with any Parent Entity's ownership of any Subsidiary or the maintenance of its legal existence;

(iv)     make payments under transactions permitted under Section 6.07 (other than permitted under Section 6.07(h)), in each case to the extent such payments are due at the time of such Restricted Payment; or

(v)     pay customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, employees, directors, managers, consultants or independent contractors of any Parent Entity to the extent related to its ownership of the Borrowers and the Subsidiaries, but not, for the avoidance of doubt, any indemnities, costs, fees and expenses for, or directly allocable to, the MYT Entities, or in respect of any litigation related thereto, incurred after the Closing Date, subject to reasonable pro-ration of joint services, indemnities, costs, fees and expenses; or

(f)     [Reserved];

(g)     [Reserved];

(h)     [Reserved];

(i)     Restricted Payments to the Borrowers or any Subsidiary (or, in the case of non-Wholly Owned Subsidiaries, to the Borrowers and to each other owner of Equity Interests of such Subsidiary on a *pro rata* basis (or more favorable basis from the perspective of the Borrowers or such Subsidiary) based on their relative ownership interests so long as any repurchase of its Equity Interests from a Person that is not the Borrowers or a Subsidiary is permitted under Section 6.04);

(j)     [Reserved]; or

(k)     Restricted Payments of the MyTheresa Assets (or the net cash proceeds received from a sale of the MyTheresa Assets or any of the MYT Subsidiaries) in the event the MyTheresa Assets (or proceeds from such sale) are contributed to Holdings or any of its Subsidiaries on or after the Closing Date to the extent that the MyTheresa Assets (or such proceeds) are required to be distributed in accordance with any settlement, judgment, court order or other resolution of a Claim, cause of action or litigation with respect to the MyTheresa Distribution or the MyTheresa Designation, subject to (i) restoration of all terms set forth in the MYT Holdco Preferred Series A Certificate (as defined in the Prepetition Term Loan Credit Agreement), (ii) compliance by the MYT Entities with all of the MYT Covenants (as defined in the Offering Circular (as defined in the Prepetition Term Loan Credit Agreement)), and (iii) the automatic release of any pledges or Liens on the Contributed MYT Equity Interests (as defined in the Prepetition Term Loan Credit Agreement) contemplated by the definition of "Subsidiary".

SECTION 6.07     Transactions with Affiliates.  Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates, unless such transaction is upon terms no less favorable to the Borrowers and the Subsidiaries, as applicable, than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate and to the extent consistent with the Approved Budget (including Permitted Variances thereto), except that this Section 6.07 will not prohibit:

(a) transactions between or among (i) the Borrowers and the Subsidiary Loan Parties and (ii) the Borrowers and any Subsidiary that is not a Subsidiary Loan Party as of the date of the consummation, so long as (A) such transaction is on an arms' length basis or (B) involves the sharing of operating, overhead, legal, accounting and other professional fees and expenses (including directors' fees and expenses and administrative, legal, accounting, filings and similar expenses) in the ordinary course of business;

(b) [Reserved];

(c) [Reserved];

(d) loans or advances to employees or consultants of any Parent Entity, the Borrowers or any Subsidiary in accordance with Section 6.04(b);

(e) the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees of any Parent Entity, the Borrowers or any of the Subsidiaries in the ordinary course of business (limited, in the case of any Parent Entity, to the portion of such fees and expenses that are reasonably allocable to the Borrowers and the Subsidiaries and subject to reasonable pro-ration of joint services, indemnities, costs, fees and expenses);

(f) [Reserved];

(g) (i) any reasonable employment agreements entered into by the Borrowers or any of the Subsidiaries in the ordinary course of business, (ii) any reasonable subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors and (iii) any reasonable employee compensation, benefit plan or arrangement, any reasonable health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto;

(h) Restricted Payments permitted under Section 6.06, including applicable payments to any Parent Entity;

(i) [Reserved];

(j) [Reserved];

(k) transactions with Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business and on arm's length terms;

(l) any transaction in respect of which the Lead Borrower delivers to the Administrative Agent (for delivery to the Lenders) a letter addressed to the Board of Directors of Holdings or the Borrowers from an accounting, appraisal or investment banking firm, in each case, of nationally recognized standing that is (i) in the good faith determination of the Borrowers qualified to render such letter and (ii) reasonably satisfactory to the Administrative Agent, which letter states that such transaction is on terms that are no less favorable to the Borrowers or the Subsidiaries, as applicable, than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate;

(m) transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business;

(n)     the issuance, sale or transfer of Equity Interests of the Lead Borrower to any Parent Entity and capital contributions by any Parent Entity to the Borrowers;

(o)     payments or loans (or cancellation of loans) to employees or consultants that are approved by a majority of the disinterested directors of Holdings or Borrowers in good faith, made in compliance with Holdings' or the Borrowers' organizational documents, applicable law and otherwise permitted under this Agreement;

(p)     transactions necessary to make adequate protection payments on account of secured Prepetition Indebtedness pursuant to the DIP Financing Orders; and

(q)     transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement, that are fair to the Borrowers and the Subsidiaries.

SECTION 6.08     <u>Business of the Borrowers and their Subsidiaries</u>. Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than any business or business activity conducted by the Borrowers and the Subsidiaries on the Closing Date and any similar, corollary, related, ancillary, incidental or complementary business or business activities or a reasonable extension, development or expansion thereof or ancillary thereto.

SECTION 6.09     <u>Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By Laws and Certain Other Agreements; etc.</u>

(a)     amend or modify in any manner adverse to the Lenders the articles or certificate of incorporation (or similar document), by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of the Borrowers or any Subsidiary; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent;

(b)     make any cash payment or other distribution in cash in respect of, or amend or modify, or permit the amendment or modification of, any provision of, any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposits, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any Junior Financing, except to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the DIP Financing Orders; or

(c)     permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) with respect to any such Subsidiary that is not a Guarantor, Restricted Payments from such Subsidiary to the Borrowers or any other Loan Party that is a direct or indirect parent of such Subsidiary or (ii) with respect to any such Subsidiary that is a Guarantor, the granting of Liens by such Subsidiary pursuant to the Security Documents; except in the case of this clause (c):

(i)     restrictions imposed by applicable law or any order of the Bankruptcy Court in the Chapter 11 Cases;

(ii)     contractual encumbrances or restrictions under Indebtedness incurred pursuant to Section 6.01(a), (b), (e), (i), (r), (t), (v), (w) or (x);

(iii)     [Reserved];

(iv)     customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(v)     [Reserved];

(vi)     customary provisions contained in leases or licenses of Intellectual Property Rights and other similar agreements entered into in the ordinary course of business;

(vii)     customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(viii)     customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(ix)     customary restrictions and conditions contained in any agreement relating to the sale, transfer or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer or other disposition;

(x)     customary restrictions and conditions contained in the document relating to any Lien, so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(xi)     customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as a Responsible Officer of the Lead Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrowers and the other Subsidiaries to meet their ongoing obligations;

(xii)     any agreement in effect at the time any Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary;

(xiii)     restrictions in agreements representing Indebtedness permitted under Section 6.01 of a Subsidiary that is not a Subsidiary Loan Party;

(xiv)     customary restrictions on leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(xv)     restrictions on cash or other deposits imposed by customers or brand partners under contracts entered into in the ordinary course of business or otherwise in connection with cash or other deposits permitted under Section 6.01; or

(xvi)     any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (o) above, so long as such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrowers, not materially more restrictive with respect to such Lien, dividend and other payment restrictions, taken as a whole, than those contained in the Lien, dividend or other

91

payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

SECTION 6.10     Compliance with the Approved Budget.  Except as otherwise provided herein or approved by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), directly or indirectly (i) use any cash or the proceeds of any Term Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Orders and the Approved Budget (other than a Permitted Variance), (ii) permit a disbursement causing any variance from the Approved Budget other than a Permitted Variance without the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders), or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any Claim or Indebtedness arising prior to the Petition Date other than payments consistent with the Approved Budget (or any Permitted Variance) and approved by the Bankruptcy Court.

SECTION 6.11     Chapter 11 Modifications.  Without the consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) and, with respect to clause (a), the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders:  (a) make or permit to be made any change, amendment or modification, to the DIP Financing Orders in a manner adverse to the Lenders or (b) incur, create, assume or suffer to exist or permit any Claim or Lien against any Loan Party ranking *pari passu* with or senior to the Claims and Liens of the Administrative Agent and the other Secured Parties hereunder, except as permitted under the Interim DIP Financing Order approved by the Bankruptcy Court (including the Carve Out) as of the Closing Date or under the Final DIP Financing Order, as applicable, or as otherwise agreed by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

SECTION 6.12     Use of Proceeds.  Apply the proceeds of the Term Loans not in accordance with the Approved Budget (including Permitted Variances thereto) or the DIP Financing Orders.  No part of the proceeds of the Term Loans or any Collateral (including any Cash Collateral) will be used, whether directly or indirectly, in violation of Section 5.08 or:

(a)      in any manner that causes such Term Loan or the applications of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act;

(b)      for any purpose that is prohibited under the Bankruptcy Code or the DIP Financing Orders;

(c)      to pay interest, principal or other amounts in respect of Prepetition Indebtedness, prepetition trade payables or other prepetition Claims of any kind or nature, except payments in accordance with the DIP Financing Orders, the First and Second Day Orders, the Approved Budget (subject to Permitted Variances) or the Acceptable Plan;

(d)      other than as permitted by the DIP Financing Order, to investigate, commence, prosecute or finance any adjudication, proceeding or objection with respect to or related to the Claims, Liens or security interest of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders, the Prepetition Noteholders or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders seeking (x) to avoid, subordinate or recharacterize the Obligations, the Prepetition Term Loan Obligations, the Prepetition Notes

92

Obligations or any of the Liens securing the Obligations, the Prepetition Term Loan Obligations or the Prepetition Notes Obligations, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders or the Liens and collateral under the Prepetition Term Loan Documents or the Prepetition Notes Documents, or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders of any of their respective rights or remedies under the Loan Documents, the Prepetition Term Loan Documents or the Prepetition Notes Documents; provided, however, that nothing in this Agreement or Section 6.12 shall prohibit any Borrower or any other Loan Party from prosecuting or defending any adversary action, suit, proceeding, application, motion, contested matter or other litigation for breach of or to otherwise enforce the terms of the Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents; or

(e)        other than as permitted by the DIP Financing Orders and subject to clause (d) above (including the proviso therein) and Section 6.13(c) and 6.13(d) below, to finance any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type adverse to the interests of any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders or their respective rights and remedies under the Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any application of interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

SECTION 6.13        Additional Bankruptcy Matters.  Do any of the following other than as permitted by the DIP Financing Order:

(a)        enter into any agreement to return any of its inventory to any of its creditors for application against any Prepetition Indebtedness, prepetition trade payables or other prepetition Claims under Section 546(c) of the Bankruptcy Code or agree that any creditor may take any set-off or recoupment against any of its Prepetition Indebtedness, prepetition trade payables or other prepetition Claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, set-off or recoupment, the aggregate amount applied to Prepetition Indebtedness, prepetition trade payables and other prepetition Claims subject to all such agreements, set-offs and recoupments since the Petition Date would exceed $500,000;

(b)        seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Financing Orders or the other Loan Documents or refrain from taking any action that is expressly required to be taken by the terms of this Agreement, the DIP Financing Orders or any of the other Loan Documents;

(c)        assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties;

*provided that* nothing contained in this clause 6.13(c) shall prohibit the Loan Parties from responding to or complying with discovery requests of any statutory committee appointed or appearing in the Chapter 11 Cases, in whatever form, made in connection with an investigation against any of the Secured Parties or the payment from proceeds of the Term Loans of professional fees related thereto;

(d)     subject to the terms of the DIP Financing Orders and subject to Article VIII, object to, contest, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including, without limitation, a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (provided that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Financing Orders);

(e)     hold any proceeds of the Term Loans in any account other than the DIP Proceeds Account, pending application thereof in accordance with this agreement;

(f)     without the consent of the Required Lenders, move to assume or reject any material lease, license or other material contract of any Loan Party pursuant to Section 365 of the Bankruptcy Code; provided that, this clause (f) shall not apply to the assumption or rejection of any material lease, license or other material contract in connection with a Specified Disposition so long as the Loan Parties are in compliance with Section 5.04(p);

(g)     except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First and Second Day Orders) or as otherwise contemplated in the then Approved Budget (including Permitted Variances thereto), make any payment or distribution to any non-Subsidiary Affiliate or insider of any debtor outside of the ordinary course of business; or

(h)     assert any right of subrogation or contribution against any other Loan Party.

SECTION 6.14     Budget Covenant.  Permit, as of any Variance Report Date commencing with the Variance Report Date that occurs in the fourth (4th) full calendar week following the Petition Date, which, for the avoidance of doubt, shall be June 4, 2020 (x) the Actual Disbursements of the Loan Parties for any Variance Testing Period to exceed 117.5% of the Budgeted Disbursements for such period set forth in the Approved Budget or (y) the Actual Cash Receipts for any Variance Testing Period to be less than 82.5% of the Budgeted Cash Receipts for such period set forth in the Approved Budget.

SECTION 6.15     Minimum Liquidity.  Beginning on the Business Day following the Closing Date, allow Liquidity to be less than $50.0 million at any time.

## ARTICLE VII

### *Holdings and PropCo Guarantors Covenants*

SECTION 7.01     Holdings Covenant.  Holdings will not, so long as this Agreement is in effect and until all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, conduct, transact or otherwise engage in any active trade or business or operations other than through the Borrowers and their Subsidiaries.

The foregoing will not prohibit Holdings from taking actions related to the following (and activities incidental thereto):

(a)      its ownership of the Equity Interests of the Lead Borrower;

(b)      the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance);

(c)      the performance of its obligations with respect to the Indebtedness permitted by this Agreement and under the DIP Financing Orders;

(d)      any offering of its common stock or any other issuance of its Equity Interests;

(e)      the making of Restricted Payments; *provided* that Holdings will not be permitted to make Restricted Payments using the cash from the Borrowers or any Subsidiary unless such cash has been dividended or otherwise distributed to Holdings as a permitted Restricted Payment;

(f)      [Reserved];

(g)      making contributions to the capital or acquiring Equity Interests of its Subsidiaries;

(h)      guaranteeing the obligations of the Borrowers and their Subsidiaries;

(i)      participating in tax, accounting and other administrative matters as a member or parent of the consolidated group;

(j)      holding any cash or property (including cash and property received in connection with Restricted Payments made by the Borrowers, but excluding the Equity Interests of any Person other than the Borrowers);

(k)      providing indemnification to officers and directors;

(l)      the making of Investments consisting of Cash Equivalents or, to the extent not made for speculative purposes, Investment Grade Securities; and

(m)      activities incidental to the businesses, activities or operations described above.

SECTION 7.02      PropCo Guarantors Covenant.

No PropCo Guarantor will, so long as this Agreement is in effect and until all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders and the Majority Noteholders otherwise consent in writing, (i) conduct, transact or otherwise engage in any active trade or business or operations other than own interests in, and perform its obligations pursuant to, its assets as of the Petition Date, (ii) issue, incur or assume any Indebtedness or Guarantee any Indebtedness of another Person, (iii) create, incur, assume or permit to exist any Lien securing Indebtedness or on any property or assets at the time owned by it, (iv) sell, lease, transfer or otherwise dispose of any of its properties or assets, (v) own any property or assets other than such as are owned as of the Petition Date or (vi) after the Petition Date, acquire any property or assets.  The foregoing will not prohibit either PropCo Guarantor from taking actions related to the following (and activities incidental thereto):

(a)     the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance);

(b)     the making of Restricted Payments permitted under Section 6.06;

(c)     sales, leases, transfer or other dispositions permitted under Section 6.05;

(d)     the performance of its obligations with respect to the Indebtedness permitted by this Agreement and under the DIP Financing Orders;

(e)     holding the assets owed by it as of the Petition Date and the performance of its obligations with respect to any PropCo Operating License (as defined in the Prepetition Term Loan Credit Agreement).

(f)     participating in tax, accounting and other administrative matters as a member of the consolidated group;

(g)     providing indemnification to officers and directors; and

(h)     activities incidental to the businesses, activities or operations described above.

## ARTICLE VIII

### *Events of Default*

SECTION 8.01      <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "***Event of Default***"):

(a)     any representation or warranty made by Holdings, the Borrowers or any other Loan Party herein or in any other Loan Document or any certificate or document required to be delivered pursuant hereto or thereto proves to have been false or misleading in any material respect when so made;

(b)     default is made in the payment of any principal of any Term Loan when and as the same becomes due and payable, whether at the due date thereof, at a date fixed for prepayment thereof, by acceleration thereof or otherwise;

(c)     default is made in the payment of any interest on any Term Loan or in the payment of any Fee or any other amount due under any Loan Document (other than an amount referred to in clause (b) of this Section 8.01), when and as the same becomes due and payable, and such default continues unremedied for a period of three (3) Business Days;

(d)     default is made in the due observance or performance by Holdings, the Borrowers or any Subsidiary of any covenant, condition or agreement contained in Section 2.24, 5.01(a), 5.04(d), (n), (o), (p), (q) and (r), 5.05(a), 5.08, and 5.13 or in Article VI or Article VII of this Agreement, or in any provision of the DIP Financing Orders (in each case solely to the extent applicable to such Person);

(e)     default is made in the due observance or performance by Holdings, the Borrowers or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) and (d) of this Section 8.01), in each case solely to the extent

applicable to such Person, and such default continues unremedied for a period of fifteen (15) days after notice thereof from the Administrative Agent to the Lead Borrower;

(f)        except as a result of commencement of the Chapter 11 Cases or entry into this Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) the Borrowers or any Subsidiary fails to pay the principal of any Material Indebtedness at the stated final maturity thereof; *provided* that this clause (f) will not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that such event or condition is unremedied and is not waived or cured by the holders of such Indebtedness prior to any acceleration of the Term Loans pursuant to this Section 8.01;

(g)        a Change in Control occurs;

(h)        except for any order fixing the amount of any Claim in the Chapter 11 Cases, the Borrowers or any Subsidiary fails to pay one or more final judgments aggregating in excess of $20.0 million (to the extent not covered by insurance), which judgments are not discharged or effectively waived or stayed for a period of forty-five (45) consecutive days, or any action is legally taken by a judgment creditor to levy upon assets or properties of the Borrowers or any other Subsidiary Loan Party to enforce any such judgment;

(i)        (i) a trustee is appointed by a United States district court to administer any Plan or (ii) an ERISA Event or ERISA Events occurs with respect to any Plan or Multiemployer Plan, and, in each case, with respect to clauses (i) and (ii) above, such event or condition, together with all other such events or conditions, if any, is reasonably expected to have a Material Adverse Effect;

(j)        (A) any material provision of any Loan Document ceases to be, or is asserted in writing by Holdings, the Borrowers or any Subsidiary not to be, for any reason, a legal, valid and binding obligation of any party thereto, (B) any security interest purported to be created by any Security Document and to extend to assets that are not immaterial to Holdings, the Borrowers and the Subsidiaries on a consolidated basis ceases to be, or is asserted in writing by the Borrowers or any other Loan Party not to be, a valid and perfected security interest in the securities, assets or properties covered thereby, except to the extent that any such loss of validity, perfection or priority results from the limitations of foreign laws, rules and regulations as they apply to pledges of Equity Interests in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under a Security Document or to file Uniform Commercial Code continuation statements or take any other action and except to the extent that such loss is covered by a lender's title insurance policy and the Collateral Agent is reasonably satisfied with the credit of such insurer or (C) the Guarantees pursuant to the Security Documents by any Loan Party of any of the Obligations cease to be in full force and effect (other than in accordance with the terms thereof) or are asserted in writing by Holdings, the Borrowers or any other Subsidiary Loan Party not to be in effect or not to be legal,

97

valid and binding obligations, except in the cases of clauses (A) and (B), in connection with an Asset Sale permitted by this Agreement;

(k)     the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(l)     the breach in any material respect by a Company Party (as defined in the RSA) of any of the representations, warranties, or covenants of the Company Parties set forth in the RSA in a manner materially adverse to the Lenders and/or the Administrative Agent;

(m)     any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), to obtain additional financing from a party other than the Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) or provide for the payment of the Obligations in full and in cash upon the incurrence of such additional financing;

(n)     the Bankruptcy Court shall enter an order (i) approving payment of any prepetition Claim other than (x) as provided for in the First and Second Day Orders, (y) as otherwise contemplated hereunder and by the Approved Budget (including Permitted Variances thereto) or (z) as otherwise consented to by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) in writing in their reasonable discretion, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1.0 million in the aggregate, or (iii) except as provided in the DIP Financing Orders, approving any settlement or other stipulation not approved by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) with any prepetition secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor;

(o)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(p)     an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all Commitments, and payment in full of all Obligations upon entry thereof;

(q)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of (i) the Administrative Agent, the Administrative Agent or (ii) the Consenting Noteholders, the Majority Noteholders, not to be unreasonably withheld, conditioned or delayed), (i) to revoke, reverse, stay, modify, supplement or amend any of the DIP Financing Orders in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the DIP Financing Orders, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Obligations (other than the Carve Out);

(r)      (i) an application for any of the orders described in clause (o) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(s)      the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(t)      any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Lenders' Claims in respect of the Obligations or contest any provision of any Loan Document or any provision of any Loan Document shall cease to be effective (other than in accordance with its terms or as a result of the action or inaction of the Administrative Agent);

(u)      any Loan Party shall fail to comply with the Interim DIP Financing Order or the Final DIP Financing Order;

(v)      any order by the Bankruptcy Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Obligations, other than in accordance with the DIP Financing Orders;

(w)      except with respect to any Specified Dispositions, without the Required Lenders' consent, the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court seeking authority to (1) close any full-line Neiman Marcus or Bergdorf Goodman store, or (2) consummate a sale of material assets constituting Collateral outside the ordinary course of business;

(x)      the Bankruptcy Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent, the Collateral Agent, and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Chapter 11 Cases;

(y)      the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent, the Collateral Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the DIP Financing Orders; or

(z)      the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the applicable DIP Financing Order, (i) upon the occurrence of any such Event of Default, and at any time thereafter during the continuance of such Event of Default, the Administrative Agent, at the request of the Required Lenders, will, by notice to the Lead Borrower, take any or all of the following actions, at the same or different times: (A) declare the Term Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Term Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any

other Loan Document, will become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (B) exercise all rights and remedies granted to it under any Loan Document and all of its rights under any other applicable law or in equity.

## ARTICLE IX

### *The Agents*

SECTION 9.01        Appointment.

(a)        Each Lender hereby irrevocably designates and appoints the Administrative Agent as agent of such Lender under this Agreement and the other Loan Documents, as applicable, including as the Collateral Agent for such Lender and the other applicable Secured Parties under the applicable Security Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacities, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than the United States, each of the Lenders hereby grants to the Administrative Agent any required powers of attorney to execute any Security Document governed by the laws of such jurisdiction on such Lender's behalf. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a Claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. For the avoidance of doubt, no Borrower shall have liability for the actions of the Administrative Agent pursuant to the immediately preceding sentence.

(b)        In furtherance of the foregoing, each Lender hereby appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on the Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In connection therewith, the Administrative Agent (and any Subagents appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights or remedies thereunder at the direction of the Administrative Agent) shall be entitled to the benefits of this Article IX (including Section 9.07) as though the Administrative Agent (and any

100

such Subagents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)        Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion:

(i)        to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document

(A)        upon payment in full of all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted);

(B)        that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document; or

(C)        if approved, authorized or ratified in writing in accordance with Section 10.08 hereof;

(ii)        to release any Loan Party from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(iii)        to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(c).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Documents.

(d)        In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, including during the pendency of the Chapter 11 Cases, (i) the Administrative Agent (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a Claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the Claims of the Lenders and the Agents and any Subagents allowed in such judicial proceeding and (B) to collect and receive any monies or other property payable or deliverable on any such Claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any Plan of Reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to

101

authorize the Administrative Agent to vote in respect of the Claim of any Lender in any such proceeding.

(e)     The Lenders and each other holder of an Obligation under a Loan Document shall act collectively through the Administrative Agent with respect to the Obligations and the Loan Documents.  Without limiting the delegation of authority to the Administrative Agent set forth herein, the Required Lenders shall direct the Administrative Agent with respect to the exercise of rights and remedies hereunder and under other Loan Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default), and the exercise of rights and remedies with respect to (i) the Term Loans and any securities, notes, or other interests issued pursuant to this Agreement and (ii) any Collateral with respect to the Obligations.  Any such rights and remedies shall not be exercised other than through the Administrative Agent.  None of the foregoing shall preclude any Lender from exercising any right of set-off in accordance with the provisions of Section 10.06 or from exercising rights and remedies (other than the enforcement of Collateral) with respect to any payment default after the occurrence of the Maturity Date with respect to any Term Loans made by it.

SECTION 9.02     Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof)) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of the agents or attorneys-in-fact selected by it with reasonable care.  The Administrative Agent may also from time to time, when the Administrative Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "*Subagent*") with respect to all or any part of the Collateral; *provided* that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  Should any instrument in writing from the Borrowers or any other Loan Party be required by any Subagent so appointed by the Administrative Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges and duties, the Borrowers shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, attorney-in-fact or Subagent that it selects in accordance with the foregoing provisions of this Section 9.02 in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 9.03     Exculpatory Provisions.  None of the Administrative Agent, its Affiliates or any of their respective officers, directors, employees, agents or attorneys-in-fact shall be (1) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (2) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or *provided* for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or

conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, (1) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (2) the Administrative Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity. The Agents shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary or as such Agents shall in good faith believe to be necessary under the circumstances as provided in Section 10.08, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment; provided, that no action taken or not taken by the Agents in accordance with the direction of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary shall be deemed to constitute gross negligence or willful misconduct by the Agents. The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into:

(a)     any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document;

(b)     the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith;

(c)     the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default;

(d)     the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(e)     the value or the sufficiency of any Collateral; or

(f)     the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 9.04     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) or conversation believed in good faith by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed in good faith by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to any Borrowing that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to such Borrowing. The Administrative Agent may consult with legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any

103

action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders  (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Term Loans.

SECTION 9.05     Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender, Holdings or the Lead Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all or other Lenders); *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 9.06     Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Term Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 9.07     Indemnification.  The Lenders agree to indemnify each Agent (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), in the amount of its *pro rata* share (based on its aggregate outstanding Term Loans) (determined at the time such indemnity is sought), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions

contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct.  The failure of any Lender to reimburse the Administrative Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to the Administrative Agent as *provided* herein shall not relieve any other Lender of its obligation hereunder to reimburse the Administrative Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's ratable share of such amount.  The agreements in this Section 9.07 shall survive the payment of the Term Loans and all other amounts payable hereunder.

SECTION 9.08      <u>Agent in Its Individual Capacity</u>.  Each Agent and its affiliates may make loans to, accept deposits from, and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.  With respect to its Term Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 9.09      <u>Successor Agent</u>.  The Administrative Agent (i) may resign as Administrative Agent upon ten (10) days' notice to the Lenders and the Lead Borrower or (ii) if so directed by the Required Lenders, shall resign, upon ten (10) days' prior written notice (or such shorter period as agreed to by the Required Lenders and Lead Borrower) by the Required Lenders to the Administrative Agent and the Lead Borrower.  If the Administrative Agent resigns as the Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent for the Lenders which successor agent shall (unless an Event of Default under Section 8.01(b) or 8.01(c) shall have occurred and be continuing) be subject to the approval by the Lead Borrower (which approval shall not be unreasonably withheld, conditioned or delayed) and following such approval the Borrowers shall use commercially reasonable efforts to cause such successor agent to accept such appointment (including by paying customary agency fees to such successor agent), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the reference to the resigning Administrative Agent means such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Term Loans.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent.  If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation will nevertheless thereupon become effective, and the Required Lenders will thereafter perform all the duties of such Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article IX and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

# ARTICLE X

## *Miscellaneous*

SECTION 10.01      <u>Notices; Communications</u>.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or e-mail, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, in each case, as follows:

(i)      if to any Loan Party or the Administrative Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 10.01; and

(ii)      if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire.

(b)      Notices and other communications to the Lenders may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)      Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by facsimile shall be deemed to have been given when sent and confirmation of transmission received  (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in Section 10.01(b) shall be effective as provided in such Section 10.01(b).

(d)      Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(e)      Documents required to be delivered pursuant to Section 5.04 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in Section 10.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents or provides a link thereto on the Borrowers' website on the Internet at the website address listed on Schedule 10.01 or (ii) on which such documents are posted on the Borrowers' behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that the Lead Borrower shall notify the Administrative Agent (by facsimile or e-mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; *provided*, *further*, that, upon reasonable request by the Administrative Agent, the Lead Borrower shall also provide a hard copy to the Administrative Agent of any such document; *provided*, *further*, that any documents posted for which a link is provided after normal business hours for the recipient shall be deemed to have been given at the opening of business on the next Business Day for such recipient.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above,

106

and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

SECTION 10.02    Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document will be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Term Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such Persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.12, 2.14 and 10.05) shall survive the payment in full of the principal and interest hereunder and the termination of this Agreement.

SECTION 10.03    Binding Effect.  This Agreement shall become effective when it has been executed by Holdings, the Borrowers and the Administrative Agent and when the Administrative Agent has received copies thereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Borrowers, the other Loan Parties, each Agent, each Lender and their respective permitted successors and assigns.

SECTION 10.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or Claim under or by reason of this Agreement or the other Loan Documents.

(b)    Subject to the conditions set forth in paragraph (b)(ii) of this Section 10.04, any Lender may assign to one or more assignees (other than a natural person) (each, an "*Assignee*") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, delayed or conditioned) of the (i) Lead Borrower; *provided* that no consent of the Lead Borrower shall be required for an assignment (A) in connection with the Initial Allocation, (B) to a Lender, an Affiliate of a Lender, an Approved Fund or (C) if an Event of Default under Section 8.01(b), 8.01(c) or 8.01(d) (solely with respect to the failure to comply with Section 5.04(n), 5.04(r), 6.14 or 6.15) (any such Event of Default, a "***Specified Event of Default***") shall have occurred and be continuing, any other Person; *provided*, *further*, that such consent shall be deemed to have been given if the Lead Borrower has not responded within five (5) Business Days after delivery of a written request therefor by the Administrative Agent, (ii) the Administrative Agent (*provided* that no consent of the Administrative Agent shall be required (x) for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund, (y) for an assignment pursuant to Section 2.19(b) or (z) in connection with the

Initial Allocation) and (iii) Lead Borrower, if an assignment is made to a Disqualified Institution in accordance with Section 10.04(h).

(i)        Assignments (other than any assignment pursuant to Section 2.19(b)), shall be subject to the following additional conditions:

(A)       except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Loans, the amount of the Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million, unless each Borrower and the Administrative Agent otherwise consent; *provided* that (1) no such consent of the Borrowers shall be required if a Specified Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds (with simultaneous assignments to or by two or more Approved Funds being treated as one assignment for purposes of meeting the minimum assignment amount requirement), if any;

(B)       except in connection with the Initial Allocation, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent and which fee has been waived in connection with the Initial Allocation);

(C)       the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, any tax forms required to be delivered pursuant to Section 2.14 and all documents requested by the Administrative Agent pursuant to anti-money laundering rules and regulations;

(D)       the assignor shall deliver to the Administrative Agent any Note issued to it with respect to the assigned Term Loan; and

(E)       the Assignee shall be or become a party to the RSA.

For the purposes of this Section 10.04, "*Approved Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(ii)       Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall

cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such Assignment and Acceptance).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 10.04 to the extent such participation would be permitted by such Section 10.04(d).

(iii)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount (and stated interest with respect thereto) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender (solely with respect to such Lender's Term Loans) at any reasonable time and from time to time upon reasonable prior written notice.  The parties hereto acknowledge and agree that this Section 10.04 (including the Register and the Participant Register) shall be interpreted such that the Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code.

(iv)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), all applicable tax forms, any Note outstanding with respect to the assigned Term Loan, the processing and recordation fee referred to in paragraph (b)(ii)(B) of this Section 10.04 and any written consent to such assignment required by paragraph (b) of this Section 10.04, the Administrative Agent promptly shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:

(i)    such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim;

(ii)    except as set forth in clause (a) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Holdings, the Borrowers or any Subsidiary or the performance or observance by Holdings, the Borrowers or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto;

109

(iii)     the Assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance;

(iv)     the Assignee confirms that it has received a copy of this Agreement, together with copies of the most recent Required Financial Statements delivered pursuant to Section 5.04, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance;

(v)     the Assignee will independently and without reliance upon the Administrative Agent or the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement;

(vi)     the Assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms of this Agreement, together with such powers as are reasonably incidental thereto; and

(vii)     the Assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     (i) Any Lender may, without the consent of the Administrative Agent or, subject to Section 10.04(h), the Borrowers, sell participations to one or more banks or other entities (a "**_Participant_**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Term Loans owing to it); *provided* that

(A)     such Lender's obligations under this Agreement shall remain unchanged;

(B)     such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and

(C)     the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents, to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents, and to exercise any right or remedy with respect to the Term Loans and any securities, notes, or other interests issued pursuant to this Agreement, and any Collateral; *provided* that (A) such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to Section 10.04(a)(i) or clauses (A), (B), (C), (D), (E) or (F) of the first proviso to Section 10.08(b) and (2) directly affects such Participant and (B) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant. Subject to clause (d)(ii) of this Section 10.04, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 to the same extent as if it

110

were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.04.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.06 as though it were a Lender; *provided* that such Participant shall be subject to Section 2.15(c) as though it were a Lender.  Any Participant that seeks to receive the foregoing benefits under Sections 2.12, 2.13, 2.14 or 10.06 must act through the Lender that sold the participation to the Participant, and such Lender must comply with all other requirements for seeking such benefits, including complying with Section 9.01(e) of this Agreement.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.12, 2.13 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.14 to the extent such Participant fails to comply with Section 2.14(e) as though it were a Lender.

(e)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank and in the case of any Lender that is an Approved Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender, including to any trustee for, or any other representative of, such holders, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(f)     The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (e) of this Section 10.04.

(g)     [Reserved].

(h)     Notwithstanding the foregoing, no assignment may be made or participation sold to (x) a Disqualified Institution without the prior written consent of the Lead Borrower; *provided* that, in connection with a participation, the Lenders shall have received a list of the Disqualified Institutions prior to the execution of such participation right or (y) any Defaulting Lender or any of

111

its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (h)(y).

(i)      In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable *pro rata* share of Term Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Term Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

SECTION 10.05      Expenses; Indemnity.

(a)      Subject to and in accordance with the terms of the DIP Financing Orders, the Borrowers agree to pay all reasonable, documented and invoiced out-of-pocket expenses incurred by the Administrative Agent and the Backstop Commitment Parties (including, without limitation, the fees and expenses of the Lender Advisors) and, with respect to enforcement of the Loan Documents, incurred by any Lender, in connection with (i) the preparation of this Agreement and the other Loan Documents (including as to post-closing matters), (ii) the preparation, execution and delivery, administration, amendment, modification, waiver or enforcement of this Agreement (including expenses incurred in connection with due diligence and initial and ongoing Collateral examination to the extent incurred with the reasonable prior approval of the Borrowers or provided for in this Agreement) or (iii) otherwise in connection with the Chapter 11 Cases, the monitoring and administration thereof, the negotiation and implementation of an Acceptable Plan and any other matter, motion or order bearing on the validity, priority and/or repayment of the Obligations in accordance with the terms hereof, including the reasonable, documented and invoiced fees, charges and disbursements of the Lender Advisors and a single counsel for the Administrative Agent, one firm of local counsel for the Administrative Agent in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and, in the case of any actual or perceived conflict of interest, one additional firm of counsel for the Administrative Agent, the Backstop Commitment Parties and, in the case of enforcement of this Agreement, the Lenders.

(b)      Each Borrower agrees to indemnify the Administrative Agent, each Lender, each of their respective Affiliates and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling Persons, equityholders, partners, members and other representatives and each of their respective successors and permitted assigns (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable, documented and invoiced out-of-pocket fees and expenses (limited to reasonable and documented legal fees of a single firm of counsel for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and a single firm of counsel for all other all Indemnitees, taken as a whole, and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Indemnitees related to the Administrative Agent (including the Administrative

112

Agent) and one firm of counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all other Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Lead Borrower of such conflict and thereafter retains its own counsel, of an additional counsel for each group of affected Indemnitees similarly situated, taken as a whole)), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of:

> (i)      the execution or delivery of this Agreement or any other Loan Document, the performance by the parties hereto and thereto of their respective obligations thereunder and the other transactions contemplated hereby;

> (ii)      the use of the proceeds of the Term Loans;

> (iii)      the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents; or

> (iv)      any Claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrowers or any of their Subsidiaries or Affiliates or creditors;

*provided* that no Indemnitee will be indemnified for any loss, Claim, damage, liability, cost or expense to the extent it (i) has been determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties or (B) a material breach of the obligations of such Indemnitee under the Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than (A) Claims against Administrative Agent or their Affiliates, in each case, in their capacity or in fulfilling their role as the agent or any other similar role under the Term Facility (excluding their role as a Lender) to the extent such Persons are otherwise entitled to receive indemnification under this paragraph (b) or (B) Claims arising out of any act or omission on the part of Holdings, the Borrowers or their Subsidiaries.

(c)      Subject to and without limiting the generality of the foregoing sentence, the Borrowers agree to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, Claims, damages, liabilities and related expenses, including reasonable, documented and invoiced fees, charges and disbursements of one firm of counsel for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and one firm of counsel for all other Indemnitees, taken as a whole, and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel in multiple jurisdictions) for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel in multiple jurisdictions) for all other Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, an additional counsel for each group of so conflicted Indemnitees similarly situated) and reasonable, documented and invoiced consultant fees, in each case, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of any Claim arising under Environmental Laws against the Borrowers or any of the Subsidiaries, or any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any property for which the Borrowers or any Subsidiaries would reasonably be expected to be held liable under Environmental Laws; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, Claims, damages, liabilities or related expenses are determined by a final, non-appealable judgment of a court of

competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties.

(d)     Any indemnification or payments required by the Loan Parties under this Section 10.05 shall not apply with respect to (i) Taxes other than (A) any Taxes that represent losses, Claims, damages, etc.  arising from any non-Tax claim and (B) expenses related to the enforcement of Section 2.14 or (ii) Taxes that are duplicative of any indemnification or payments required by the Loan Parties under Section 2.14.

(e)     To the fullest extent permitted by applicable law, Holdings and the Borrowers shall not assert, and hereby waive, any Claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Chapter 11 Cases, any Term Loan and the use of the proceeds thereof, and the other transactions contemplated hereby and thereby.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(f)     The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.  All amounts due under this Section 10.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

SECTION 10.06     Right of Set-off.  Notwithstanding anything to the contrary in Section 362 of the Bankruptcy Code but subject to the DIP Financing Orders (including the Carve Out), if an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any payroll, trust, tax and petty cash accounts) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of Holdings or any Subsidiary Loan Party against any of and all the Obligations of Holdings or any Subsidiary Loan Party now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the Obligations may be unmatured.  Notwithstanding the foregoing, in the event that any Defaulting Lender shall exercise any such right of set-off, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.19 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  The rights of each Lender under this Section 10.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may be exercised only at the direction of the Administrative Agent or the Required Lenders.

SECTION 10.07     Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS) AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS

CONTEMPLATED HEREBY AND THEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (EXCEPT FOR CONFLICTS OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION OR TO THE EXTENT GOVERNED OR SUPERSEDED BY THE BANKRUPTCY CODE).

SECTION 10.08      Waivers; Amendment.

(a)      No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.08, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on Holdings, the Borrower or any other Loan Party in any case shall entitle such Person to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except:

(i)      [Reserved];

(ii)      in the case of this Agreement, pursuant to an agreement or agreements in writing (including via e-mail) entered into by Holdings, the Borrower and the Required Lenders; and

(iii)      in the case of any other Loan Document, pursuant to an agreement or agreements in writing (including via e-mail) entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders;

*provided*, *however*, that no such agreement shall:

(A)      except as provided in Section 2.19(b), decrease, forgive, waive or excuse the principal amount of, or any interest on, or extend the final maturity of, or decrease the rate of interest on, any Term Loan beyond the Maturity Date, without the prior written consent of each Lender directly affected thereby;

(B)      increase or extend the Commitment of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of covenants, Defaults or Events of Default shall not constitute an increase of the Commitments of any Lender);

(C)      except as provided in Section 2.19(b), increase, decrease, forgive, waive or excuse any Fees without the prior written consent of each Lender, and with respect to the Administrative Agent Fees, the Agents;

(D)    except with respect to the extension of the Maturity Date pursuant to Section 2.18 of this Agreement, extend any date on which payment of principal or interest on any Term Loan or any Fee is due, without the prior written consent of each Lender adversely affected thereby;

(E)    amend the provisions of Section 2.15(b) or (c) of this Agreement or any analogous provision of any other Loan Document, in a manner that would by its terms alter the *pro rata* sharing of payments required thereby, without the prior written consent of each Lender adversely affected thereby;

(F)    amend or modify the provisions of this Section 10.08 or the definition of the term "Required Lenders" or "Supermajority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders or Supermajority Lenders, as applicable, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders or the Supermajority Lenders, as applicable, on substantially the same basis as the Term Loans are included on the Closing Date);

(G)    release a material portion of the Collateral, unless pursuant to a transaction permitted by this Agreement, or release any of Holdings, the Borrower or any of the other Subsidiary Loan Parties from their respective Guarantees under the Collateral Agreement, unless, in the case of a Subsidiary Loan Party (other than the Borrower), all or substantially all the Equity Interests of such Subsidiary Loan Party is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender;

(H)    contractually subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document (other than (i) to the holder of any Lien on such property that is permitted by Section 6.02(c) in accordance with Section 9.01(c)(iii) or (ii) pursuant to the terms of the DIP Financing Orders);

(I)    amend, modify or waive any provision of Article IV without the prior written consent of the Supermajority Lenders (it being understood that amendments, waivers or modifications of covenants, Defaults or Events of Default shall not constitute an amendment, modification or waiver for purposes of determining whether any condition of Article IV has been satisfied unless separately approved by the Supermajority Lenders); or

(J)    alter the Consenting Noteholders' adequate protection status or the priority of the Liens on the Collateral securing the Obligations hereunder, in each case, as set forth in the Interim DIP Financing Order on the Closing Date, without the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders.

*provided* that no such agreement shall amend, modify or otherwise affect (a) the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement, as applicable or (b) the Consenting Noteholders in a

disproportionality adverse manner relative to the other Lenders hereunder without the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 10.08 and any consent by any Lender pursuant to this Section 10.08 shall bind any assignee of such Lender.

(c)     Without the consent of the Administrative Agent or any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected lender may be effected with the consent of the applicable Lenders other than the Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionality adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(e)     Notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document, and such amendment, modification or supplement shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

SECTION 10.09     Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "***Charges***"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate; *provided* that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.  In no event will the total interest received by any Lender exceed the amount which it could lawfully have received and any such excess amount received by any Lender will be applied to reduce the principal balance of the Term Loans or to other amounts (other than interest) payable hereunder to such Lender, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining will be paid to the Borrowers.

SECTION 10.10     Entire Agreement.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this

Agreement and remain in full force and effect. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 10.11   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

SECTION 10.12   Severability.   In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.13   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 10.03. Delivery of an executed counterpart to this Agreement by facsimile or other electronic transmission (e.g., "*PDF*" or "*TIFF*") shall be as effective as delivery of a manually signed counterpart.

SECTION 10.14   Headings.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.15   Jurisdiction; Consent to Service of Process.

(a)   Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, non-exclusive jurisdiction of any New York State court or federal court of the United State of America sitting in the borough of Manhattan in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (collectively, "*New York Courts*") in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court (or, as applicable, a New York Court). Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction, except that each of the Loan Parties agrees that (i) it will not bring any such

118

action or proceeding in any court other than the Bankruptcy Court, and (ii) in any such action or proceeding brought against any Loan Party in any other court, it will not assert any cross-claim, counterclaim or set-off, or seek any other affirmative relief, except to the extent that the failure to assert the same will preclude such Loan Party from asserting or seeking the same in the Bankruptcy Court.

(b)        Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 10.16        Confidentiality.  Each of the Lenders and each of the Agents agrees (and agrees to cause each of its Affiliates) to use all information provided to it by or on behalf of Holdings, the Borrowers or its Subsidiaries under the Loan Documents or otherwise in connection with the Chapter 11 Cases solely for the purposes of the transactions contemplated by this Agreement and the other Loan Documents and shall not publish, disclose or otherwise divulge such information, (other than information that:

(a)        has become generally available to the public other than as a result of a disclosure by such party;

(b)        has been independently developed by such Lender or the Administrative Agent without violating this Section 10.16; or

(c)        was available to such Lender or the Administrative Agent from a third party having, to such Person's knowledge, no obligations of confidentiality to Holdings, the Borrowers or any other Loan Party);

and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any Person that approves or administers the Term Loans on behalf of such Lender or any numbering, administration or settlement service providers (so long as each such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16), except:

(i)        to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, in which case such Person agrees, to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure;

(ii)        as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or any bank accountants or bank regulatory authority exercising examination or regulatory authority, in which case (except with respect to any audit or examination conducted by any such bank accountant or bank regulatory authority) such Person agrees, to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure;

(iii)    to its parent companies, Affiliates, limited partner, investors, prospective investors or auditors (so long as each such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16);

(iv)    in order to enforce its rights under any Loan Document in a legal proceeding; and

(v)    to any pledgee or assignee under Section 10.04(e) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16).

Notwithstanding the foregoing, (i) no such information shall be disclosed to a Disqualified Institution that constitutes a Disqualified Institution at the time of such disclosure without the Lead Borrower's prior written consent and (ii) any Agent or Lender may, at its own expense and in the ordinary course of its respective business, issue customary news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals, and other appropriate media (which may include use of logos of one or more of the Loan Parties) (collectively, "***Trade Announcements***"), until such time as the Loan Parties revoke such authorization granted in this clause (ii) in writing to such Agent or such Lender, as applicable.  Until such time such authorization has been revoked, such Agent or such Lender shall provide a draft reasonably in advance of any Trade Announcement to the Lead Borrower for review and comment prior to the publication thereof.  No Loan Party shall issue any Trade Announcement or disclose the name of any Lender except (A) disclosures required by applicable law, regulation, legal, judicial or administrative process, or the rules of the SEC or other governmental authority, including the Bankruptcy Court, (B) with the prior approval of such Agent (in respect of Trade Announcements) and such Lender, (C) to the Sponsors, and the Loan Parties' and the Sponsors' respective officers, directors, employees, legal counsel, accountants, financial advisors and representatives, (D) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis and (E) if such Trade Announcement or disclosure contains information that is publicly available (other than as a result of a breach of this section by the Loan Parties).

SECTION 10.17    Platform; Borrower Materials.  Each Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials or information provided by or on behalf of the Borrowers hereunder (collectively, "***Borrower Materials***") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "***Platform***"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrowers or their securities) (each, a "***Public Lender***").  The Borrowers hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that:

(i)    all the Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "***PUBLIC***" shall appear prominently on the first page thereof;

(ii)    by marking Borrower Materials "***PUBLIC***," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrowers or their securities for purposes of United States Federal and state securities laws;

        (iii)     all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated "*Public Investor*;" and

        (iv)     the Administrative Agent shall be entitled to treat the Borrower Materials that are not marked "*PUBLIC*" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

        Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrowers notify the Administrative Agent that any such document contains MNPI: (1) the Loan Documents, (2) any notification of changes in the terms of the Term Loans, (3) any notification of the identity of Disqualified Institutions and (4) all information delivered pursuant to clauses (b) and (d) of Section 5.04.

        SECTION 10.18     <u>Release of Liens and Guarantees</u>.  In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Loan Party (other than Equity Interests of the Lead Borrower) to a Person that is not (and is not required to become) a Loan Party in a transaction not prohibited by Section 6.05, any Liens created by any Loan Document in respect of such Equity Interests or assets shall be automatically released and the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrowers and at the Borrowers' expense in connection with the release of any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests of any Subsidiary Loan Party (other than the Lead Borrower) in a transaction permitted by Section 6.05 (including through merger, consolidation, amalgamation or otherwise) and as a result of which such Subsidiary Loan Party would cease to be a Subsidiary, such Subsidiary Loan Party's obligations under the Collateral Agreement shall be automatically terminated and the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrowers to terminate such Subsidiary Loan Party's obligations under the Collateral Agreement.  In addition, the Administrative Agent agrees to take such actions as are reasonably requested by Holdings or the Borrowers and at the Borrowers' expense to terminate the Liens and security interests created by the Loan Documents when all the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) are paid in full.

        SECTION 10.19     <u>USA PATRIOT Act Notice</u>.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

        SECTION 10.20     [Reserved].

        SECTION 10.21     <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of Holdings and each Borrower acknowledges and agrees that:  (1) (a) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between Holdings and the Borrowers, on the one hand, and the Agents, on the other hand; (b) the Borrowers and Holdings have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate; and (c) the Borrowers and Holdings are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions

contemplated hereby and by the other Loan Documents; (2) (a) each Agent each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, Holdings or any other Person and (b) none of the Agents has any obligation to the Borrowers, Holdings or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (3) the Agents and their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, Holdings and their respective Affiliates, and none of the Agents has any obligation to disclose any of such interests to the Borrowers, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each Borrower and Holdings hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.22    [Reserved].

SECTION 10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 10.24    Conflicts.  In the event of a conflict between, or inconsistency among, the Interim DIP Financing Order and the Final DIP Financing Order, on the one hand, and any Loan Document, on the other hand, the Interim DIP Financing Order or the Final DIP Financing Order, as the case may be, shall control.

SECTION 10.25    [No Liens on MYTheresa.  Notwithstanding anything to the contrary in this Agreement or the Loan Documents, the Collateral shall not include, and neither the Agents nor any Lender nor any Secured Party shall be granted nor have a Lien on or security interest in (pursuant to or based on this Agreement, the Loan Documents, the DIP Financing Orders, or the Term Loans, as applicable) with respect to: (1) any Claims, Causes of Action (as defined in the Interim DIP Financing Order), or litigation against NMG or the MYT Subsidiaries (or any direct or indirect parent company of such entities) arising from the MyTheresa Designation or the MyTheresa Distribution; (2) any funds, property, or value received on account of any such Claims, Causes of Action, or litigation; or (3) the Other Second Lien Collateral and

the Other Third Lien Collateral (in each case, as referred to in the Prepetition Term Loan Credit Agreement).][2]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[2]    To conform to DIP Financing Orders.  Changes to order still under consideration.

## EXHIBIT 2

### Exit Facility Term Sheet

[*See attached*]

**EXECUTION VERSION**

**Exit Facility Term Sheet[1]**

| | |
|---|---|
| **Borrower:** | Reorganized Neiman Marcus Group LTD LLC, a Delaware limited liability company (together with any co-borrower to be agreed prior to the Effective Date, the "**Borrower**") |
| **Administrative Agent and Collateral Agent:** | Cortland Products Corp. (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**") |
| **Backstop Lenders:** | (I) certain funds or accounts affiliated with Pacific Investment Management Company LLC, Sixth Street Partners, LLC and Davidson Kempner Capital Management LP and (II) certain existing noteholders constituting the Consenting Noteholder Group on the date hereof ((I) and (II) collectively, the "**Backstop Lenders**"), in accordance with the Commitments set forth on Schedule 1 hereto under the heading "Backstop Commitments" (the "**Exit Backstop Commitments**").  Each Backstop Lender may, at its option, arrange for the Definitive Documentation (as defined below) to be executed as an initial lender by, and the Commitment of some or all of the Backstop Lender funded by, one or more financial institutions selected by the applicable Backstop Lender and reasonably acceptable to the Borrower and the Administrative Agent (the "**Fronting Lender(s)**"), in which case the applicable Backstop Lender will acquire its Term Loans by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Definitive Documentation. |
| **Joinder Lenders** | Each Consenting Term Loan Lender, Consenting Noteholder and Consenting Debenture Party that elects to participate in the Exit Opportunity (as defined in the Restructuring Term Sheet) no later than seven (7) Business Days after the Exit Syndication Procedures (as defined in the Restructuring Term Sheet) are distributed (including the day distributed) (the "**Joinder Lenders**"), in accordance with the Commitments set forth on Schedule 1 hereto under the heading "Post-Joinder Commitments"; provided that, the Backstop Lenders shall use commercially reasonable efforts to cause the Exit Syndication Procedures to be distributed by no later than 10:00 am New York Time on the Business Day following the date that the Interim DIP Financing Order is entered by the Bankruptcy Court (or such later date as agreed by the Borrower and the Majority Exit Backstop Lenders (as defined below)). "Majority Exit Backstop Lenders" means, at any time, Backstop Lenders having |

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of May 7, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached.

Exit Backstop Commitments outstanding that, taken together, represent at least 66.7% of the sum of all Exit Backstop Commitments outstanding at such time; *provided*, that Majority Exit Backstop Lenders must include at all times at least three unaffiliated Backstop Lenders.

**Lenders:**

To the extent set forth in the Restructuring Term Sheet, holders of 2019 Extended Term Loan Claims, 2013 Term Loan Claims, 2028 Debenture Claims, Second Lien Notes Claims and Third Lien Notes Claims against the Company Parties will have the ability to participate in the Term Loan Facility (as defined below) in proportion to the equity distribution on account of their claims under the Plan (together with the Backstop Lenders and the Joinder Lenders, the "**Lenders**")

**Term Loan Facility:**

First lien senior secured term loan facility in an aggregate original principal amount of $750 million, denominated in US Dollars (the "**Term Loan Facility**", the commitments thereunder, the "**Commitments**" and the loans thereunder the "**Term Loans**").[2]

**Use of Proceeds:**

The proceeds of the Term Loans shall be used to refinance the Superpriority Secured Debtor-in-Possession Credit Agreement, to be dated on or about May 8, 2020, among the Borrower, the lenders party thereto, Cortland Products Corp., as administrative agent and collateral agent, and the other parties thereto (the "**DIP Credit Agreement**"), and for general corporate purposes.

**Definitive Documentation:**

The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on and substantially consistent with the Term Loan Credit Agreement, dated as of October 25, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, including by that certain Refinancing Amendment, dated as of March 13, 2014 and that certain Extension Amendment and Amendment No. 2 to the Credit Agreement, dated as of June 7, 2019), by and among Mariposa Intermediate Holdings LLC, Neiman Marcus Group LTD LLC, certain Company Parties party thereto, Credit Suisse, Cayman Islands Branch, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational

---

[2] The parties agree that a portion of the Term Loan Facility will be made available as notes with substantially identical terms to the Term Loans and voting together with Term Loans and will reasonably cooperate with one another to implement such arrangements.

requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Company Parties, the Required Consenting Term Loan Lenders, and to the extent that the Consenting Note-holders would reasonably be expected to be affected in a dispro-portionately adverse manner relative to the other Lenders, the Re-quired Consenting Noteholders.  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order.  This paragraph, collectively, is referred the here as the "**Documentation Principles**".

**Incremental Facility:** None.

**Availability:** Amounts available under the Term Loan Facility shall be available in a single draw on the Effective Date (as defined below).

**Maturity Date:** 5 years after the Effective Date.

**Amortization:** Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Term Loan, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

**Voluntary Prepayments:** The Borrower may make voluntary prepayments of the Term Loans, in each case, in whole or in part, at any time, at par *plus* the prepayment premium set forth below (expressed as a percentage of the principal amount being prepaid as set forth opposite the relevant period indicated below, the "**Prepayment Premium**"), *plus* accrued and unpaid interest to the prepayment date and in aggregate minimum amounts, and integral multiples in excess thereof, to be agreed.

| Prepayment Date | Prepayment Premium |
| --- | --- |
| After the Effective Date and prior to the first anniversary of the Effective Date | a customary make-whole premium (using a discount rate of T+50 basis points) |
| On or after the first anniver-sary of the Effective Date and prior to the second anni-versary thereof | 4.00% |

3

| On or after the second anniversary of the Effective Date | 0.00% |
|---|---|

The Prepayment Premium shall be expressly payable in respect of any repayment prior to the Maturity Date that is prior to the second anniversary of the Effective Date, including upon any acceleration of maturity for any reason.

Voluntary prepayments of the Term Loans shall be applied to reduce amortization payments in respect thereof in direct order of maturity.

**Mandatory Prepayments:**

100% of the Net Cash Proceeds (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) of non-ordinary course asset sales or other dispositions of property by the Borrower and its subsidiaries (including insurance and condemnation proceeds and sale leaseback proceeds) (each, an "**Asset Sale**") in excess of an aggregate amount to be agreed for any fiscal year and subject to the right to reinvest 100% of such proceeds, if such proceeds are reinvested (or committed to be reinvested) in the business, including in permitted acquisitions or capital expenditures, within 12 months and, if so committed to be reinvested, so long as such reinvestment is actually completed within 18 months.

100% of the Net Cash Proceeds of the incurrence of debt obligations of the Borrower and its subsidiaries after the Effective Date (excluding any debt permitted to be incurred under the Exit Credit Agreement (as defined below)).

Beginning with the end of the fiscal year of the Borrower ending on July 30, 2022, 50% (subject to step-downs to 25% and 0% based on total leverage ratio (to be defined in a manner to be mutually agreed) levels to be agreed) of Excess Cash Flow (to be defined in a manner to be agreed) of the Borrower and its subsidiaries shall be used to prepay the Term Loans or, no more than ratably, other indebtedness secured by a lien on the Collateral that ranks pari passu with the liens that secure the Term Loans, on an annual basis; *provided* that any voluntary prepayment of Term Loans (excluding in all cases prepayments funded with the incurrence of indebtedness for borrowed money (other than revolving indebtedness)) shall be credited against Excess Cash Flow prepayment obligations for such fiscal year on a dollar-for-dollar basis.

**Backstop Fee:**   The Borrower agrees to pay to the Backstop Lenders (or their designated Related Lenders (as defined below)) a backstop fee (the "**Backstop Fee**") equal to the product of 1.50% and $750 million, (i) 90.5% of which fee shall be earned, due and payable in cash prior to the Agreement Effective Date to the members of the Consenting Term Loan Lender Group and (ii) 9.5% of which fee shall be earned, due and payable in cash prior to the Agreement Effective Date to the members of the Consenting Noteholder Group.

**Post-Joinder Fee:**   The Borrower agrees to pay to the Backstop Lenders and the Joinder Lenders (or their respective designated Related Lenders) a fee equal to the product of 6.50% and the aggregate principal amount of Commitments on the Effective Date (the "**Post-Joinder Fee**"), which fee (i) shall be shared on a pro rata basis by the Backstop Lenders and the Joinder Lenders based on each Backstop Lender's and Joinder Lender's Commitment set forth on Schedule 1 hereto under the heading "Post-Joinder Commitments", (ii) shall be earned on the Agreement Effective Date and (iii) shall be due and payable on the Effective Date in Reorganized Equity (as defined in the DIP Credit Agreement), in the aggregate amount equal to (x) the Post-Joinder Fee *divided by* (y) 65.0% of the Plan Equity Value (as defined in the Restructuring Term Sheet).

"**Related Lender**" shall mean one or more of a Lender's affiliates or funds or accounts that are managed, advised or sub-advised by such Lender.

**Participation Fees:**   The Borrower agrees to pay to the Lenders (or their designated Related Lenders) a participation fee equal to 30.00% of the Reorganized Equity (as defined in the DIP Credit Agreement) (subject to dilution from shares allocated pursuant to the post-emergence management incentive plan and shares issuable upon exercise of the New Warrants (as defined in the Restructuring Term Sheet)), which fee (i) shall be shared on a pro rata basis by the Lenders based on each Lender's Commitment immediately prior to the Effective Date and (ii) shall be earned, due and payable on the Effective Date.

Notwithstanding the foregoing, at each Lender's option and upon such Lender's written designation (which may be provided by electronic communication), the Participation Fees may be payable to Related Lenders.

**Interest:**   ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.00% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to

5

the Prepetition Term Loan Credit Agreement) *plus* 12.00% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% per annum floor on the Adjusted LIBO Rate), at the Borrower's election.

**Guarantees:**

All obligations of the Borrower under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrower Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by each existing and subsequently acquired or organized direct or indirect subsidiary of the Borrower (other than customary excluded subsidiaries to be mutually agreed) (the "**Subsidiary Guarantors**") and reorganized Mariposa Intermediate Holdings LLC ("**Holdings**" and together with the Subsidiary Guarantors, the "**Guarantors**", and the Guarantors, together with the Borrower, the "**Loan Parties**").

**Security:**

Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrower Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"). The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:**

The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by appropriate counsel to the Borrower;

- simultaneously with the funding of the Term Loan Facility, repayment in full of the obligations under the DIP Credit Agreement (other than inchoate indemnity and reimbursement obligations), termination of the commitments thereunder and release of all liens granted thereunder;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement but including the proviso regarding COVID-19 included in such definition in the DIP Credit Agreement);

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least two (2) Business Days prior to the Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective

Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the funding of the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived;

- either (x) the Revolving Credit Agreement, dated as of October 25, 2013 (as amended, amended and restated or otherwise modified prior to the date hereof, the "**Existing ABL Credit Agreement**"), among the Borrower, the lenders party thereto, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (the "**ABL Agent**"), and the other parties thereto shall have been renegotiated or reinstated on terms and conditions reasonably acceptable to the Required Consenting Term Loan Lenders, or (y) the Existing ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based lending facilities for working capital and other general corporate purposes of the Borrower and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Term Loan Lenders (any such credit agreement, the "**ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Existing ABL Credit Agreement or the ABL Credit Agreement, the "**ABL Facility**");

- Liquidity (as defined below) shall not be less than $175 million;

8

- delivery of a customary borrowing notice;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

  "**Liquidity**" means, as of any time, the sum of (i) unrestricted domestic cash and cash equivalents of the Loan Parties and (ii) net availability under the ABL Facility.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Negative Covenants:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and "baskets" to be mutually agreed and set forth in the Exit Credit Agreement. |
| **Holdings Covenant:** | To the extent applicable, substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Financial Covenant:** | Customary for transactions of this type, including a total leverage ratio and a fixed charge coverage ratio, and otherwise on terms (including holiday into fiscal year 2021) to be mutually agreed. |
| **Unrestricted Subsidiaries:** | None. |
| **Events of Default:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Voting:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Required Lenders** | Lenders having Term Loans and Commitments outstanding that, taken together, represent more than a percentage to be agreed of the |

sum of all Term Loans and Commitments outstanding at such time; provided, that Required Lenders must include (i) at all times at least two unaffiliated Lenders and (ii) at any time when the Lenders consist of ten or more unaffiliated funds or investment advisors or managers of funds or accounts, at least three unaffiliated Lenders.

**Intercreditor Agreement:**   Usual and customary for transactions of this type, subject to Documentation Principles and based on that certain ABL/Term Loan/Notes Intercreditor Agreement, dated as of June 7, 2019, among Holdings, the ABL Agent, Credit Suisse AG, Cayman Islands Branch, as term loan agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders.

**Cost and Yield Protection:**   Usual and customary for transactions of this type, subject to the Documentation Principles.

**Defaulting Lenders:**   Usual and customary for transactions of this type, subject to the Documentation Principles.

**Assignments and Participations:**   Usual and customary for transactions of this type, subject to the Documentation Principles.

**Expenses and Indemnification:**   Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Wachtell, Lipton, Rosen & Katz, and one counsel to the Administrative Agent.

**Tax Treatment:**   For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the parties agree to (i) treat the Backstop Fees and the Post-Joinder Fees as premium paid by the Borrower to the Backstop Lenders and/or Joinder Lenders, as applicable, in exchange for the issuance of a put right to the Borrower with respect to the Term Loans, (ii) treat the Reorganized Equity issued to the Lenders pursuant to the Participation Fee as acquired by the Lenders at the Effective Date in exchange for cash (as part of an investment unit with the Term Loans) and (iii) not take any tax position inconsistent with the tax treatment described in clause (i) or (ii).

**Governing Law and Forum:**   New York.

**Schedule 1**

[*On file with the Company*]

Post-Joinder Commitments

| Lender | Commitment |
|---|---|
| [____] | $[____] |
| [____] | $[____] |
| [____] | $[____] |
| [____] | $[____] |
| [____] | $[____] |
| [____] | $[____] |
| **Total** | **$[____]** |

[Schedule 1 to be supplemented on or prior to the date that is ten (10) Business Days after the Petition Date to give effect to each holder of 2019 Extended Term Loan Claims, 2028 Debenture Claims and Notes Claims who elects to participate in the Term Loan Facility as a Joinder Lender in accordance with the Exit Syndication Procedures (as defined in the Restructuring Term Sheet).]

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 7, 2020 (the "**Agreement**")[1] by and among Neiman Marcus Group, Inc. ("**NMG**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Stakeholder" and [an "Agent"] [a "Trustee"] [a Company Party] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:


E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loans | |
| FILO Loans | |
| Cash Pay Extended Term Loans | |
| Cash Pay/PIK Extended Term Loans | |
| 2013 Term Loans | |
| 7.125% Senior Debentures | |
| Second Lien Notes | |
| 8.000% Third Lien Notes | |
| 8.750% Third Lien Notes | |
| Equity Interests in the Company Parties | |

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT D

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 7, 2020 (the "**Agreement**"),[1] by and among Neiman Marcus Group, Inc. ("**NMG**") and its Affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loans | |
| FILO Loans | |
| Cash Pay Extended Term Loans | |
| Cash Pay/PIK Extended Term Loans | |
| 2013 Term Loans | |
| 7.125% Senior Debentures | |
| Second Lien Notes | |
| 8.000% Third Lien Notes | |
| 8.750% Third Lien Notes | |
| Equity Interests in the Company Parties | |

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT E</u>

### Milestones

The Company Parties shall achieve the following milestones:

1. the Closing Date (as defined in the DIP Credit Agreement) shall not be later than one (1) Business Day after the Interim DIP Order is entered on the docket of the Bankruptcy Court unless the Required Consenting Term Loan Lenders and the Required Consenting Noteholders shall have consented to such later date;

2. on or before three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

3. on or before thirty (30) days after the Petition Date, the Company Parties shall file with the Bankruptcy Court the Plan and a Disclosure Statement with respect thereto that is consistent with this Agreement;

4. on or before forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

5. on or before seventy five (75) days after the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement with respect to the Plan that is consistent with this Agreement; and

6. on or before one-hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.

## EXHIBIT F

## Proposed Governance Terms for Reorganized Neiman Marcus

In connection with the proposed restructuring of the Company Parties pursuant to the Restructuring Support Agreement, dated as of May 7, 2020 (the "RSA"), by and among the Company Parties and the Consenting Stakeholders party thereto, this Exhibit sets forth certain rights and obligations of certain funds, accounts and investment vehicles for which Pacific Investment Management Company LLC serves as investment manager or advisor (collectively, "PIMCO"), Davidson Kempner Capital Management LP (together with its affiliates and related funds, "DK") and Sixth Street Partners, LLC (together with its affiliates and related funds, "Sixth Street", and collectively with PIMCO and DK, the "Principal Investors"), JPMorgan Asset Management (the "Additional Investor Designee") and each of the other holders of the New Equity (together with the Principal Investors, the "Holders"; and, for purposes of this term sheet, the issuer of the New Equity, the "Company"). The agreements set forth herein will be further and definitively documented in a stockholders, operating or similar agreement for the restructured Company (the "Agreement") and other organizational documents of the restructured Company (together with the Agreement, the "Equity Documents") to be entered into on the effective date of the Company's emergence from bankruptcy (the "Emergence Date").[1]

| | |
|---|---|
| **Board of Directors:** | <u>Composition/Designation</u>: The board of directors of the Company (the "Board") will consist of the following seven (7) directors (each, a "Director"), or such other number as approved as an Additional Consent Matter from time to time; provided, that the number of Directors shall not be reduced below the number of Directors that the Principal Investors are entitled to designate as provided below: |

      (i)      the then-serving Chief Executive Officer of the Company;

      (ii)      three (3) Directors (the "PIMCO Directors") designated by PIMCO; provided, that the number of PIMCO Directors shall decrease to (a) two (2), if PIMCO's (and its permitted affiliate transferees') beneficial ownership of the common equity falls below 25% of the then-outstanding common equity, (b) one (1), if PIMCO's (and its permitted affiliate transferees') beneficial ownership of the common equity falls below 10% of the then-outstanding common equity, and (c) zero (0), if PIMCO's (and its permitted affiliate transferees') beneficial ownership of the common equity falls below 7.5% of the then-outstanding common equity; provided, further, that for so long as (x) there are more than two (2) PIMCO Directors and (y) at least one of DK and Sixth Street continues to hold at least 50% of the common equity held by it as of the Emergence Date, at least one of the PIMCO Directors shall be independent of the Company, the Principal Investors and each of the other Holders and shall be designated by PIMCO (such director, the "Independent PIMCO Director");

      (iii)      one (1) Director designated by DK (the "DK Director"), so long as DK continues to beneficially own at least 50% of the common equity held by it as of the Emergence Date;

      (iv)      one (1) Director designated by Sixth Street (the "Sixth Street Director," and (a) together with the DK Director, the "Minority Directors," and (b) together with the PIMCO Directors and the DK Director, the "Investor Group Directors"), so long as Sixth Street continues to beneficially own at least 50% of the common equity

---

[1]    Company corporate form at emergence subject to RSA.

held by it as of the Emergence Date.

(v)    one (1) Director that (a) is independent of the Company, the Principal Investors and each of the other Holders and (b) has significant experience of and standing in the retail industry (the "Independent Director"), appointed by Holders representing at least 50% of the then-outstanding common equity; provided, that for so long as PIMCO continues to hold 25% or more of the then-outstanding common equity, any Independent Director shall be appointed by Holders representing at least 50% of the then-outstanding common equity other than PIMCO, and excluding any common equity held by PIMCO (it being further understood and agreed that any Director whose seat is no longer entitled to be designated or appointed as set forth above will also be appointed pursuant to this clause (v)).

Prior to the Emergence Date, (x) the Holders entitled to designate or appoint the Independent Director shall mutually agree upon the identity of the individual who will initially serve as such Independent Director, and (y) each of the Holders entitled to designate or appoint the remaining Directors shall identify to the other Holders the identities of the individuals who will initially serve as such Directors.[2]

Director Removal/Replacement:  A Director may be removed and/or replaced at any time, with or without cause, as determined by the Holder(s) entitled to designate or appoint such Director.

Chairperson:  The Chairperson will be selected by the PIMCO Directors, other than the Independent PIMCO Director, in their sole and absolute discretion, but such PIMCO Directors will consult with the other Investor Group Directors; provided, that if the number of PIMCO Directors is less than three, the Chairperson will be selected by the Board.

Quorum:  Majority, and including at least one PIMCO Director, other than the Independent PIMCO Director, and each of the Minority Directors; provided, that in the event at least one PIMCO Director (other than the Independent PIMCO Director) or a Minority Director fails to attend two consecutive meetings of the Board or any committee thereof for which the attendance of such PIMCO Director or such Minority Director is required to constitute a quorum, with respect to the third consecutive meeting of the Board or any committee thereof, the requirement that a quorum include such PIMCO Director or such Minority Director shall be eliminated.

Voting:  Each Director will have one vote with respect to each matter to be decided upon by the Board.  All matters will be decided by the affirmative vote or consent of a majority of the Directors present or represented and voting at a Board meeting, including with respect to each of the Major Consent Matters and Additional Consent Matters below.

Meetings:  The Board shall meet at least once per fiscal quarter, which meeting may be held by telephonic conference call, but if held in person, telephonic conference call will be made available for any participants (and Observers) who do not attend in person.  Any Investor Group Director may call a special meeting of the Board at any time upon at least three business days' prior written notice.

Committees:  The Board may establish one or more committees from time to time.  The composition of any committee of the Board will be determined by the Board and the

---

[2]    Parties agree that the Board shall have a minimum of 4 Directors with significant experience of and standing in the retail industry and, to the extent necessary, the size of the Board will be increased to add one or more additional Independent Directors with such experience.

Chairperson; provided, that a PIMCO Director, other than the Independent PIMCO Director, and one of the DK Director and the Sixth Street Director shall be entitled to join each committee of the Board.

Observer Rights:  Each of the Principal Investors (and its permitted affiliate transferees) shall have the right to designate one observer (each, an "Observer") so long as such Principal Investor (or permitted affiliate transferee) continues to own at least 5% of the then-outstanding common equity.  In addition, the Additional Investor Designee (as designated by the Consenting Noteholder Group (as defined in the RSA)) shall have the right to appoint an Observer for a period ending on the first anniversary of the Effective Date. Each Observer will be permitted to attend all meetings of the Board in a nonvoting capacity (but subject to the policies applicable to directors) and to receive all materials provided, or made available, to the Directors, subject to customary limitations to protect privilege.

Board Fees & Expenses / D&O Insurance and Indemnification:  The Company shall (i) reimburse each Director for any reasonable fees and expenses incurred by such Director in carrying out his or her duties as a director, and (ii) pay to any Director who is not an employee of a Holder such market fee as may be approved by the Board (the "Market Fee"); provided, that no Director who is designated by any Principal Investor and is also an affiliate thereof, shall be entitled to any Market Fees. The Company shall also maintain from and after the Emergence Date an appropriate level of D&O insurance on customary terms.   The Company's organizational documents will provide for Director indemnification and exculpation to the maximum extent provided by law.

Transferability:  Each Principal Investor shall be permitted to transfer all of its rights with respect to the appointment and/or approval of Directors and Board observation rights in connection with any permitted transfer of its common equity, so long as the number of shares of new Common Equity so transferred is equal to or in excess of any applicable threshold number of shares required to exercise such rights; provided, that the rights to designate an Observer by PIMCO, DK and Sixth Street shall not be transferable separate from the right to appoint or approve a Director.  It being understood that PIMCO may also transfer the right to designate up to three Directors (in aggregate) in connection with permitted transfers that results in a Holder (or a New Holder) holding the requisite percentage of the then-outstanding common equity to appoint such PIMCO Director(s). The Additional Investor shall not be permitted to transfer its right to designate an Observer.

| **Major Consent Matters:** | "Major Consent Matters" shall mean each of the following: |
|---|---|

(i)     any dissolution, liquidation, winding up or bankruptcy of the Company;

(ii)    (a) any sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets or otherwise (other than in connection with a Drag-Along Sale), or (b) any disposition of any assets (tangible or intangible) or securities, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets or otherwise, by the Company or any of its subsidiaries in any transaction or series of related transactions that involves consideration in excess of $50,000,000;

(iii)   the licensing or other disposition, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets or otherwise, by the Company or any of its subsidiaries in any transaction or series of related transactions of any material intellectual property (other than pursuant to customary licenses entered into in the ordinary course);

3

(iv)    the acquisition of assets (tangible or intangible) or securities, whether through merger, consolidation, share exchange, business combination or otherwise, or any joint venture or similar transaction, by the Company or any of its subsidiaries in any transaction or series of related transactions that involves consideration or investments in excess of $25,000,000;

(v)    the issuance of any equity senior to the equity held by the Principal Investors;

(vi)    adopting, approving or revising any equity incentive plan; and

(vii)    any amendment, modification or supplement to the Equity Documents with respect to any of the foregoing matters, or to any provision related to preemptive rights, transfer restrictions, tag-along rights, drag-along rights, information rights or registration rights, or any waiver of any material provision related to any of the foregoing.

**Additional Consent Matters**

"<u>Additional Consent Matters</u>" shall mean each of the following:

(viii)    an IPO of the Company or any of its subsidiaries, or any successor entity to any of the foregoing;

(ix)    the entry into any new line of business or termination of any existing line of business, or any other material change in the nature or scope of the business of the Company and its subsidiaries;

(x)    any issuance of equity securities of the Company or any of its subsidiaries (including an IPO), other than the grant of awards pursuant to any employee incentive plans or arrangements existing as of the Emergence Date;

(xi)    the incurrence, issuance, assumption, guarantee or permission to exist by the Company or any of its subsidiaries of indebtedness with a principal amount in excess of $50,000,000 in the aggregate, other than pursuant to any indenture or facility existing as of the Emergence Date;

(xii)    the making of any dividend, distribution or repurchase with respect to the Company's equity securities, other than repurchases of equity or equity awards from departing or former employees;

(xiii)    any change in the size, voting or composition of the Board;

(xiv)    the appointment or termination of the Chief Executive Officer and/or Chief Financial Officer;

(xv)    initiate, settle, agree to settle, waive or otherwise compromise any pending or threatened litigation with a value in excess of $10,000,000 or that is with a governmental agency or involves any non-monetary relief;

(xvi)    approving any annual budget of the Company and its subsidiaries;

(xvii)    any capital expenditures by the Company or any of its subsidiaries in excess of $150,000,000 in the aggregate during any 12-month period; and

(xviii)    any amendment, modification or supplement to the Equity Documents with respect to any of the foregoing matters, or any waiver of any material provision related to any of the foregoing.

**Principal Investor Consent Rights**

Notwithstanding anything to the contrary in any of the Equity Documents, for so long as (a) with respect to each of Sixth Street and DK, such Principal Investor continues to beneficially own no less than 50% of the common equity held by it as of the Emergence

Date and (b) with respect to PIMCO, such Principal Investor holds no less than 7.5% of the then-outstanding common equity, then (i) none of the actions set forth in the definition of Major Consent Matters may be taken by the Company or any of its subsidiaries without the approval of all of the Principal Investors; provided, that to the extent that one (1) Principal Investor does not approve of such action, then another Principal Investor may put such proposed action to a vote or consent of the Holders and such action may be taken by the Company or any of its subsidiaries with the affirmative vote or consent of at least 70% of the Holders of the then-outstanding common equity and (ii) none of the actions set forth in the definition of Additional Consent Matters, may be taken by the Company or any of its subsidiaries without the approval or at least two (2) of the Principal Investors; provided, that to the extent that two (2) Principal Investors do not approve of such action, then the approving Principal Investor may put such proposed action to a vote or consent of the Holders and such action may be taken by the Company or any of its subsidiaries with the affirmative vote or consent of at least 70% of the Holders of the then-outstanding common equity (such rights to affirmatively vote or consent with respect to such matters in (i) and (ii) above, the "Principal Investor Consent Rights").

The Principal Investor Consent Rights shall be transferable by each Principal Investor in connection with any permitted transfer that results in a Holder (or new Holder) holding at least 10% of the then-outstanding common equity.

| | |
|---|---|
| **Transfer/Resale Restrictions:** | General:  The new common equity issued under the Company's plan of reorganization and the new common equity issued to the backstop parties will be exempt from registration under the U.S. Securities Act of 1933, as amended (the "Securities Act"), pursuant to, and to the fullest extent permitted under, section 1145 of the U.S. Bankruptcy Code. |

Transfer Restrictions:  There will be no restrictions on the transfer of the common equity, except that (i) no transfer of common equity shall be made in violation of the Securities Act or any applicable U.S. federal or state securities laws or shall result in any requirement that the Company register the common equity or any of its other capital stock under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and (ii) no transfer of common equity shall be made to any "Competitors" of the Company, with the definition of Competitors to be reasonably agreed by the Required Consenting Noteholders and Required Consenting Term Loan Lenders.

Conditions:  Any permitted transferee will be required to execute a customary joinder to the Agreement (which joinder shall not require any countersignature from the Company) in connection with a permitted transfer.  The Company will use commercially reasonably efforts to notate its books and records reflecting the trade within 5 business days from receipt of any joinder (or notice of trade, as applicable).

| | |
|---|---|
| **ROFO:** | Until such time as (i) PIMCO holds less than 24.9% of the then-outstanding common equity and (ii) any fund affiliated with PIMCO individually holds less than 4.9% of the then-outstanding common equity, first the Company[, and if not taken up by the Company the Principal Investors,][3] will have a right of first offer on any transfer of common equity or other equity securities of the Company, to the extent that such transfer is to a registered broker-dealer and the transfer would result in such broker-dealer owning more than 4.9% of the then-outstanding common equity. |
| **Tag-Along Rights:** | In the event that any Holder or group of Holders (a "Tag-Along Holder")  intends to transfer at least 20% of the then-outstanding common equity in any single transaction or |

---

[3]   Subject to review in accordance with the RSA.

series of related transactions (other than to an affiliate or another Holder, in a Drag-Along Sale, or in connection with an IPO), each other Holder may participate in such sale (a "Tag-Along Sale") by transferring a *pro rata* portion of its common equity upon the same terms and conditions; provided, that a Tag-Along Holder (or group of affiliated Tag-Along Holders, but *not* a group of Tag-Along Holders comprised of at least two unaffiliated Holders) may transfer up to 50% of the common equity held by it as of the Emergence Date without being subject to the foregoing tag-along rights.  These tag-along rights will apply to *mutatis mutandis* to any other equity securities of the Company held by the Holders.

**Drag-Along Rights; Other Liquidity Events:** If any Drag-Along Holder (as defined below) proposes to transfer shares representing at least 50% of the then-outstanding common equity (other than to an affiliate or another Holder or in connection with an IPO), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, such Drag-Along Holder may require each other Holder (a "Dragged Seller") to participate in such transaction (a "Drag-Along Sale").   In connection with such Drag-Along Sale, each Holder will (i) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-Along Sale is not being effected in accordance with the terms set forth in the Agreement) and (ii) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag Along Sale at the Company's expense and subject to other customary terms and conditions (including, but not limited to, limitation of liability in excess of consideration received, pro rata indemnification and no non-compete restrictions) to be mutually agreed.

"Drag-Along Holder" shall mean any Holder or group of Holders collectively beneficially owning at least 66 2/3% of the then-outstanding common equity (the "Drag Threshold"); provided, that on and after the fifth anniversary of the Emergence Date, the Drag Threshold shall be deemed to be 50% of the then-outstanding common equity.

**Preemptive Rights:** Prior to a qualified IPO, each Holder will have customary preemptive rights with respect to all issuances by the Company or any of its subsidiaries of (i) equity or equity-linked securities, (ii) convertible debt securities and (iii) other securities issued in any private placement or which carry with them any right to receive Company equity securities (subject in each case to customary exceptions to be mutually agreed).

**Amendments:** Subject to the approval rights with respect to the Major Consent Matters and the Additional Consent Matters set forth above, any amendments to the Equity Documents will require approval of Holders representing more than 50% of the then-issued and outstanding common equity including each of the Principal Investors; provided, that the approval of any such Principal Investor shall only be required for so long as it continues to hold at least 5% of the then-outstanding common equity; and provided, further, that any amendments of any provisions of the Equity Documents that by their terms are disproportionally and materially adverse to a particular group of Holders as compared to any other group of Holders will require the prior written consent of more than 50% of such affected Holders, other than amendments that correct clerical errors or that reflect the grant of rights associated with new equity interests otherwise issued in compliance with the Equity Documents that do not discriminate among the existing Holders.

In addition, any of the following amendments to the Equity Documents will require approval of Holders representing more than 50% of the then-issued and outstanding common equity held by Holders *other than* the Principal Investors:

6

- implementation of ROFR or other restriction on the transfer of New Equity, other than customary lock up agreements in furtherance of a public offering or other circumstances to be reasonably agreed by the Required Consenting Noteholders and Required Consenting Term Loan Lenders;
- adverse changes to the Preemptive Rights, Information Rights, Tag-Along Rights, Drag-Along Rights or Amendment consent rights provided for herein.

| | |
|---|---|
| **Information Rights:** | General:  Each Holder will be entitled to receive: |

       (xix)    within 90 days after the end of each fiscal year, audited annual consolidated financial statements of the Group, certified by a national accounting firm and prepared in accordance with GAAP, along with a reasonably detailed management's discussion and analysis in narrative form commenting on such financial statements ("MD&A"), which shall include a breakout of brick & mortar and ecommerce sales and, in the discretion of the Board, other information; and

       (xx)    within 45 days after the end of each of the first three (3) fiscal quarters of each fiscal year, unaudited quarterly condensed consolidated financial statements, which shall include an MD&A with respect thereto, which shall include a breakout of brick & mortar and ecommerce sales and, in the discretion of the Board, other information; and

       (xxi)    within 10 days after the occurrence of any event that would have been required to be filed on a Current Report on Form 8-K under the Exchange Act if the Company had then been a reporting company under the Exchange Act, information substantially similar to the information that would have been required to be included in such Form 8-K (subject to exceptions to be mutually agreed).

All such informational materials shall, to the extent permitted, be made available to the Holders and each of their actual and prospective permitted transferees through an online data room (such as Intralinks or another secure website) maintained by the Company (a "Data Room").

Rule 144A(d)(4) Information:  So long as the common equity remains outstanding and during any period during which the Company is not subject to Section 13 or 15(d) of the Exchange Act, nor exempt therefrom pursuant to Rule 12g3-2(b) promulgated thereunder, the Company shall furnish to the holders of common equity and, upon their request, prospective purchasers of the common equity, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Transferability:  Each Holder shall be permitted to transfer information rights under the Agreement to any permitted transferee of such Holder.

| | |
|---|---|
| **Confidentiality; Waiver of Corporate Opportunities:** | The Agreement shall include a customary confidentiality provision requiring that each Holder maintain the confidentiality of all information provided (pursuant to the Information Rights described above or otherwise) by the Company and its subsidiaries and their respective representatives and professional advisors, subject to customary exceptions and carve-outs, including a carve-out for disclosure to potential permitted transferees.  The definitive documents will include a waiver of corporate opportunities. |
| **Affiliate Transactions:** | Any transaction or series of related transactions with any affiliate of the Company, including portfolio companies of the Holders (each, an "Affiliate Transaction"), shall, subject to customary exceptions to be agreed, require approval from a majority of the disinterested Directors of the Board and must be on an arm's length basis; provided, that in any transaction or series of related transactions involving greater than $500,000 in the |

aggregate, prior to consummating such transaction(s), either (i) the Board shall have received a fairness opinion from a reputable, independent third party firm or (ii) holders of at least 66 2/3% of the then-outstanding common equity, including each of the Principal Investors; provided, further, that the consent of any such Principal Investor for purposes of the forgoing clause (ii) shall only be required for so long as it continues to hold at least 5% of the then-outstanding common equity.

**Termination:**

The Agreement will terminate upon the first to occur of: (i) the written agreement of the parties thereto, (ii) the unanimous consent of the Holders, (iii) the occurrence of a qualified IPO, (iv) the dissolution, liquidation or winding up of the Company and (v) the consummation of a Drag-Along Sale in which all of the Holders participate (either as Drag-Along Holders or Dragged Sellers).

**Registration Rights:**

The Holders will be entitled to the following registration rights:

- Demand Registration:  The Company shall register all Registrable Securities requested to be registered by Stockholders if the Company receives a written request (x) at any time following the occurrence of an IPO, from Holders representing at least 10% of the then-outstanding common equity, or (y) on and after the fifth anniversary of the Emergence Date, from Holders representing at least 40% of the then-outstanding common equity (subject to usual and customary exceptions and limitations).  The holders of Registrable Securities will be entitled to an aggregate of five demand registrations following the occurrence of an IPO.

- Piggyback Registration:  Each Holder who beneficially owns at least 5% of the then-outstanding common equity will have the right to include its Registrable Securities each time the Company proposes to register any of its Registrable Securities under the Securities Act.  The rights to piggyback registration may be exercised an unlimited number of occasions (subject to usual and customary exceptions and limitations).

- S-3 Registration:  Once the Company is eligible to file a shelf registration statement on Form S-3, any Holder who beneficially owns at least 5% of the then-outstanding common equity may request that the Company file a shelf registration statement Form S-3 (or similar or successor form), covering the Registrable Securities held by such Holder (subject to usual and customary exceptions and limitations).  Demands to register the Registrable Securities on Form S-3 will not be deemed to be demand registration requests (as described above).

"Registrable Securities" shall mean all shares of common equity held by the Holders, whether acquired on or after the Emergence Date, but excluding any such shares that may be sold pursuant to Rule 144 under the Securities Act (or any similar provisions then in force) by such Holder without being subject to the volume and manner of sale restrictions thereunder.

**Periodic Tender Offers:**

The Company will be permitted to make periodic tender offers for the New Equity subject to restrictions in debt documents.

**No Side Agreements:**

All Holders shall represent in the Agreement as of the Emergence Date that all agreements with respect to the governance of the Company are as set forth in the Agreement, and no other agreements or understandings (whether oral or written) with respect to any such matters or the relationship between or among the Company, its directors and any Holder in its capacity as equityholder have been entered into or made.

**Governing Law:**

Delaware.

| | |
|---|---|
| **Calculations:** | For purposes of determining satisfaction of any holder thresholds in the Agreement or the other Equity Documents, the common equity held by any Holder will be (a) calculated without giving effect to any management incentive dilution (whether as a result of actually issued and outstanding shares or contingent instruments (e.g., options)) or dilution from other future-issued securities and (b) aggregated with common stock held by its and its affiliates' related funds, investment vehicles and managed accounts. |
| **Term Sheet Amendments** | Any amendments to this Exhibit will require approval of each of the Principal Investors in addition to the consents otherwise required by the RSA. |

**EXHIBIT G**

The Existing MYT Transaction Documents include the:

1.      Letter Agreement made and entered into as of June 7, 2019, by and between MYT Parent Co. and MYT Holding Co. pertaining to, among other things, the MYT Waterfall (as defined therein);

2.      Amended and Restated Certificate of Incorporation of MYT Holding Co., as filed with the Secretary of State of Delaware on June 5, 2019;

3.      Certificate of Designation of Series A Preferred Shares of MYT Holding Co., as filed with the Secretary of State of Delaware on June 6, 2019;

4.      Certificate of Designation of Series B Preferred Shares of MYT Holding Co., as filed with the Secretary of State of Delaware on June 6, 2019;

5.      Guarantee and Collateral Agreement, dated as of June 7, 2019, among MYT Parent Co., each Grantor party thereto, and Ankura Trust Company, LLC, as Trustee and as Collateral Agent; and

6.      Pledge Agreement, dated and effective as of June 7, 2019, between MYT Parent, as the Pledgor, MYT Holding Co., Wilmington Trust, National Association, as 8.000% Third Lien Notes Trustee, Wilmington Trust, National Association, as 8.750% Third Lien Notes Trustee, and Wilmington Trust, National Association, as Collateral Agent.

## Exhibit C

**Required Collateral Lien Priority Chart**

| | Extended Term Loan Priority Real Estate Collateral | Original Term Loan Priority Collateral | ABL Priority Collateral | Notes Priority Real Estate Collateral and Notes PropCo Equity Interests | Extended Term Loan PropCo Equity Interests | Limited Guarantee Collateral |
|---|---|---|---|---|---|---|
| **Extended Term Loans and non-Extended Term Loans** .................. | 1 | 1 | 2 | 3 | 1 | None |
| **Non-Extended Term Loans** ............................ | None | 1 | 2 | None | None | None |
| **Asset-Based Revolving Credit Facility** ............. | 4 | 4 | 1 | 4 | 4 | None |
| **Second Lien Notes** ............ | 2 | 2 | 3 | 2[i] | 2 | 1 |
| **Third Lien Notes** ............. | 3 | 3 | 4 | 1[ii] | 3 | None |
| **2028 Debentures** .............. | 1[iii] | 1[iii] | None | 3[iii] | 1[iii] | None |

(i)     Recovery not to exceed $200.0 million, together with recovery for Second Lien Notes obligations.

(ii)    Recovery not to exceed $200.0 million, together with recovery for the Third Lien Notes obligations.

(iii)   Priority will be *pari passu* with the Extended Term Loan liens (or if there are no Extended Term Loan liens or non-Extended Term Loan liens, the highest priority lien on the relevant asset) solely on assets if and to the extent required by the "equal and ratable clause" set forth in the indenture governing the 2028 Debentures and related documentation in effect as of the issue date thereof.