**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
06/16/2020

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NEIMAN MARCUS GROUP LTD LLC, *et al.*,[1] | ) | Case No. 20-32519 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket Nos. 104, 254** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES, (III) MODIFYING
THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion"),[2] of Neiman Marcus Group LTD LLC ("Company"),

The Neiman Marcus Group LLC, and The NMG Subsidiary LLC (each, together with the

Company, a "DIP Borrower" and collectively, the "DIP Borrowers") and each of their affiliates

that are debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") and pursuant to sections 105, 361, 362, 363, 364, 365,

503, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the applicable DIP Loan Documents (as defined herein).

4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 1075-1, 4002-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas seeking entry of an interim and a final order (together with all annexes, schedules, and exhibits hereto, this "Final Order"):

(1)     authorizing the DIP Borrowers to obtain postpetition financing on a secured superpriority basis, consisting of a new money term loan facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $675,000,000, of which (x) $275,000,000 was made available to the DIP Borrowers upon entry of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 254] (the "Interim Order") with a percentage of such amount available at the closing of the DIP Facility and the remainder available at the closing of the initial allocation syndication period, (y) $250,000,000 shall be available to the DIP Borrowers upon entry of this Final Order, and (z) $150,000,000 shall be available to the DIP Borrowers on or around the Last Term Loan Availability Date (as defined in the DIP Credit Agreement (as defined below)), in each case, pursuant to the terms and conditions set forth in, as applicable, the Interim Order and this Final Order (collectively, the "DIP Orders") and that certain credit agreement, dated as of May 11, 2020, annexed hereto as **Exhibit 2** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement"), executed by the DIP Borrowers, Alter Domus Products Corp. (f/k/a Cortland Products Corp.), as the administrative agent and collateral agent for the DIP Facility (the "DIP Agent"), and each of the Lenders (as defined in the DIP Credit Agreement, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), along with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (including any Loan Documents (as defined in the DIP Credit Agreement)) (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Credit Agreement, the "DIP Loan Documents");

(2)     authorizing the DIP Borrowers to incur, and for the Guarantors (as defined in the DIP Credit Agreement in such capacities, the "DIP Guarantors," and, together with the DIP Borrowers, in such capacities, the "DIP Loan Parties") to guarantee on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts (including, without limitation, all Obligations (as defined in the DIP Credit Agreement)), as and when due and payable under and in accordance with each of the DIP Loan Documents (collectively, the "DIP Obligations");

(3)     authorizing the DIP Loan Parties to execute, deliver, and perform under the DIP Credit Agreement and all other DIP Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Final Order, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(4)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below), in each case, subject to the Carve Out (as defined below) and the terms hereof;

(5)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Obligations, in each case, in accordance with and subject to the Carve Out and the terms hereof;

(6)     authorizing the DIP Loan Parties' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility, subject to the terms and conditions set forth in this Final Order and the DIP Loan Documents;

(7)     providing adequate protection, subject to the Carve Out and as and to the extent set forth herein, to the Prepetition Secured Parties (as defined below) to the extent of any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral (as defined below) (including Cash Collateral) arising out of the Prepetition Loan Documents (as defined below);

(8)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise solely to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the DIP Loan Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order, and providing for the immediate effectiveness of this Final Order;

(9)     as set forth in paragraphs 28, 29, and 31 herein, authorizing the Debtors to waive (a) certain of their rights to surcharge the DIP Collateral or any Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; and

(10)    waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Collateral, for the benefit of any party other than the Prepetition Secured Parties, subject to the Carve Out.

The interim hearing on the DIP Motion (the "Interim Hearing") pursuant to Bankruptcy Rule 4001 having been held by this Court on May 8, 2020, and a final hearing (the "Final Hearing" and together with the Interim Hearing, the "Hearings") having been held by this Court on [June 15, 2020], and the Court having considered the DIP Motion, the DIP Loan Documents, the

*Declaration of Tyler W. Cowan In Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Exhibit A to Docket No. 104] (the "<u>Cowan Declaration</u>") and the *Declaration of Mark Weinsten in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 86] (the "<u>Weinsten Declaration</u>" and together with the Cowan Declaration, the "<u>First Day Declarations</u>"), the pleadings filed with the Court, the evidence submitted and arguments proffered or adduced at the Hearings and upon the record of these Chapter 11 Cases; and adequate notice of this Final Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, if any, to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date.** On May 7, 2020 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (this "<u>Court</u>") commencing these Chapter 11

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Cases. On May 7, 2020, this Court entered an order approving the joint administration of the Chapter 11 Cases for procedural purposes only [Docket No. 23].

B.  **Debtors-in-Possession.**  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C.  **Committee Formation**.  On May 19, 2020, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Chapter 11 Cases (together with any statutory committee that may appointed or formed in the Chapter 11 Cases or any Successor Cases, the "Official Committee").

D.  **Jurisdiction and Venue.** The Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rules 1075-1, 4002-1, and 9013-1.

E.  **Debtors' Stipulations.** Without prejudice to the rights of the DIP Loan Parties' estates or any other party in interest (but subject to the limitations thereon contained in paragraph 27 hereof), the DIP Loan Parties, on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(a)  **Prepetition CF Credit Facility:**

(i)  **Prepetition CF Credit Agreement:** Pursuant to that certain Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented, extended, renewed, or otherwise modified prior to the Petition Date, the "Prepetition CF Credit Agreement," and, together with any other agreements and

documents executed or delivered in connection therewith, including the Loan Documents (as defined in the Prepetition CF Credit Agreement), the "Prepetition CF Credit Documents"), among the DIP Borrowers, the DIP Guarantors party thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (solely in such capacities, the "Prepetition CF Credit Facility Agent"), and the lenders party thereto (the "Prepetition CF Credit Facility Lenders," and together with the Prepetition CF Credit Facility Agent, the "Prepetition CF Credit Facility Secured Parties"), the Prepetition CF Credit Facility Lenders provided term loans to the DIP Borrowers (the "Prepetition CF Credit Facility"), and the DIP Guarantors unconditionally guaranteed, on a joint and several basis, all of the Prepetition CF Credit Facility Obligations (as defined below);

(ii)     **Prepetition CF Credit Facility Obligations:** As of the Petition Date, the Loan Parties (as defined in the Prepetition CF Credit Facility) were jointly and severally liable and indebted to the Prepetition CF Credit Facility Agent and the Prepetition CF Credit Facility Lenders, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $2,244.6 million, plus any other amounts due and payable under the Prepetition CF Credit Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith (including all Obligations as defined in the Prepetition CF Credit Agreement), in each case, as and to the extent provided in the Prepetition CF Credit Documents (collectively, the "Prepetition CF Credit Facility Obligations"); and

(iii)     **Prepetition CF Credit Facility Liens:** To secure the Prepetition CF Credit Facility Obligations, each of the DIP Borrowers and DIP Guarantors party thereto granted to the Prepetition CF Credit Facility Agent, for the benefit of the Prepetition CF Credit Facility Secured Parties, properly perfected continuing liens, mortgages on, and security interests (collectively, the "Prepetition CF Credit Facility Liens") in all Collateral (as defined in the Prepetition CF Credit Agreement, the "Prepetition CF Credit Facility Collateral").

(b)     **Prepetition Second Lien Notes:**

(i)     **Prepetition Second Lien Notes Indenture:** Pursuant to that certain Indenture, dated as of June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Second Lien Notes Indenture," and, together with any other agreements and documents executed or delivered in connection therewith, the "Prepetition Second Lien Notes Documents"), among the DIP Borrowers and Mariposa Borrower, Inc., a Delaware corporation (in such capacities, collectively, the "Prepetition Second Lien Notes Issuers"), Ankura Trust Company, LLC, as trustee (solely in such capacity, the "Prepetition Second Lien Notes Trustee") and as notes collateral agent (solely in such capacity, the "Prepetition Second Lien Notes Collateral Agent") and the guarantors (including the DIP Guarantors) party

thereto (in such capacities, the "Prepetition Second Lien Notes Guarantors"), the Prepetition Second Lien Notes Issuers issued 14.0% Second Lien Notes due 2024 (the "Prepetition Second Lien Notes"; and the holders thereof, the "Prepetition Second Lien Noteholders," and together with the Prepetition Second Lien Notes Trustee, the Prepetition Second Lien Notes Collateral Agent, and Ankura Trust Company, LLC as paying agent for the Prepetition Second Lien Notes (solely in such capacity, the "Prepetition Second Lien Paying Agent") and as registrar for the Prepetition Second Lien Notes (solely in such capacity, the "Prepetition Second Lien Registrar"), the "Prepetition Second Lien Notes Secured Parties");

(ii)     **Prepetition Second Lien Notes Obligations:** Pursuant to the Prepetition Second Lien Notes Indenture, the Prepetition Second Lien Notes Issuers issued, and the Prepetition Second Lien Notes Guarantors guaranteed, $550.0 million in aggregate principal amount of Prepetition Second Lien Notes.  As of the Petition Date, the Prepetition Second Lien Notes Issuers were liable and indebted to the Prepetition Second Lien Notes Collateral Agent and the Prepetition Second Lien Noteholders, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $561.7 million in Prepetition Second Lien Notes, plus any other amounts due and payable under the Prepetition Second Lien Notes Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Second Lien Notes Documents (collectively, the "Prepetition Second Lien Notes Obligations"); and

(iii)     **Prepetition Second Lien Notes Liens:** To secure the Prepetition Second Lien Notes Obligations, each of the Prepetition Second Lien Notes Issuers and Prepetition Second Lien Notes Guarantors granted to the Prepetition Second Lien Notes Collateral Agent, for the benefit of the Prepetition Second Lien Notes Secured Parties, properly perfected (as to the Debtors) continuing liens, mortgages on, and security interests (collectively, the "Prepetition Second Lien Notes Liens") in all Collateral (as defined in the Second Lien Notes Documents but, for purposes of the DIP Orders, excluding the Other Second Lien Collateral (as defined in the Junior Lien Intercreditor Agreement), the "Prepetition Second Lien Notes Collateral").

(c)     **Prepetition Third Lien Notes:**

(i)     **Prepetition 8.00% Third Lien Indentures:** Pursuant to that certain Indenture, dated as of June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition 8.00% Third Lien Notes Indenture," and, together with any other agreements and documents executed or delivered in connection therewith, the "Prepetition 8.00% Third Lien Notes Documents"), among the DIP Borrowers and Mariposa Borrower, Inc., a Delaware corporation (in such capacities, collectively, the "Prepetition Third Lien Notes Issuers"),

Wilmington Trust, National Association, as trustee (solely in such capacity, the "Prepetition 8.00% Third Lien Notes Trustee") and as notes collateral agent (solely in such capacity, the "Prepetition 8.00% Third Lien Notes Collateral Agent"), and the guarantors (including the DIP Guarantors) party thereto (in such capacities, the "Prepetition 8.00% Third Lien Notes Guarantors"), the Prepetition Third Lien Notes Issuers issued 8.00% Third Lien Secured Notes due 2024 (the "Prepetition 8.00% Third Lien Notes"; and the holders of the Prepetition 8.00% Third Lien Notes, the "Prepetition 8.00% Third Lien Noteholders," and together with the Prepetition Third Lien Notes Trustee, the Prepetition 8.00% Third Lien Notes Collateral Agent and Wilmington Trust, National Association as paying agent for the Prepetition 8.00% Third Lien Notes (solely in such capacity, the "Prepetition 8.00% Third Lien Paying Agent") and as registrar for the Prepetition 8.00% Third Lien Notes (solely in such capacity, the "Prepetition 8.00% Third Lien Registrar"), the "Prepetition 8.00% Third Lien Notes Secured Parties");

(ii)     **Prepetition 8.750% Third Lien Indentures:** Pursuant to that certain Indenture, dated as of June 7, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition 8.750% Third Lien Notes Indenture" and, together with the Prepetition 8.00% Third Lien Notes Indenture, the "Prepetition Third Lien Notes Indentures") (the 8.750% Third Lien Notes Indenture and any other agreements and documents executed or delivered in connection therewith, the "Prepetition 8.750% Third Lien Notes Documents" and, together with the Prepetition 8.00% Third Lien Notes Documents, the "Prepetition Third Lien Notes Documents"), among the Prepetition Third Lien Notes Issuers, Wilmington Trust, National Association, as trustee (solely in such capacity, the "Prepetition 8.750% Third Lien Notes Trustee" and together with the Prepetition 8.00% Third Lien Notes Trustee, the "Prepetition Third Lien Notes Trustee") and as notes collateral agent (solely in such capacity, the "Prepetition 8.750% Third Lien Notes Collateral Agent" and together with the Prepetition 8.00% Third Lien Notes Collateral Agent, the "Prepetition Third Lien Notes Collateral Agent"), and the guarantors (including the DIP Guarantors) party thereto (in such capacities, the "Prepetition 8.750% Third Lien Notes Guarantors" and together with the Prepetition 8.00% Third Lien Notes Guarantors, the "Prepetition Third Lien Notes Guarantors"), the Prepetition Third Lien Notes Issuers issued 8.750% Third Lien Secured Notes due 2024 (the "Prepetition 8.750% Third Lien Notes" and together with the Prepetition 8.00% Third Lien Notes, the "Prepetition Third Lien Notes"; and the holders of the Prepetition 8.750% Third Lien Notes, the "Prepetition 8.750% Third Lien Noteholders" and together with the Prepetition 8.00% Third Lien Noteholders, the "Prepetition Third Lien Noteholders," and together with the Prepetition 8.750% Third Lien Notes Trustee, the Prepetition 8.750% Third Lien Notes Collateral Agent and Wilmington Trust, National Association as paying agent for the Prepetition 8.750% Third Lien Notes (solely in such capacity, the "Prepetition 8.750% Third Lien Paying Agent" and together with the Prepetition 8.00% Third Lien Paying Agent, the "Prepetition Third Lien Paying Agent") and as registrar for the Prepetition 8.750% Third Lien Notes (solely in such capacity, the "Prepetition 8.750% Third Lien Registrar" and together with the Prepetition 8.00% Third Lien Registrar, the "Prepetition Third Lien Registrar"), the "Prepetition

8.750% Third Lien Notes Secured Parties," and together with the 8.00% Third Lien Notes Secured Parties, the "Third Lien Notes Secured Parties");

(iii)    **Prepetition Third Lien Notes Obligations:** Pursuant to the Prepetition 8.00% Third Lien Notes Indenture, the Prepetition Third Lien Notes Issuers issued, and the Prepetition Third Lien Notes Guarantors guaranteed, $730,534,000 in aggregate principal amount of Prepetition 8.00% Third Lien Notes and pursuant to the Prepetition 8.750% Third Lien Notes Indenture, the Prepetition Third Lien Notes Issuers issued, and the Prepetition Third Lien Notes Guarantors guaranteed, $497,849,150 in aggregate principal amount of Prepetition 8.750% Third Lien Notes.  As of the Petition Date, the Prepetition Third Lien Notes Issuers were liable and indebted to the Prepetition Third Lien Notes Trustee and the Prepetition Third Lien Noteholders, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $1,228.4 million in Prepetition Third Lien Notes, plus any other amounts due and payable under the Prepetition Third Lien Notes Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Third Lien Notes Documents (collectively, the "Prepetition Third Lien Notes Obligations"); and

(iv)    **Prepetition Third Lien Notes Liens:** To secure the Prepetition Third Lien Notes Obligations, the Prepetition Third Lien Notes Issuers, and Prepetition Third Lien Notes Guarantors granted to the Prepetition Third Lien Notes Collateral Agent, for the benefit of the Prepetition Third Lien Notes Secured Parties, properly perfected continuing liens, mortgages on, and security interests (collectively, the "Prepetition Third Lien Notes Liens") in all Collateral (as defined in the Third Lien Notes Documents but, for purposes of the DIP Orders, excluding the Other Third Lien Collateral (as defined in the Junior Lien Intercreditor Agreement), the "Prepetition Third Lien Notes Collateral").

(d)    **Prepetition Secured Debentures:**

(i)    **Prepetition Debenture Indenture:** Pursuant to that certain Indenture, dated as of May 27, 1998 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "Prepetition Debenture Indenture," and, together any other agreements and documents executed or delivered in connection therewith, the "Prepetition Debenture Documents"), among The Neiman Marcus Group LLC, a Delaware limited liability company (in such capacity, the "Issuer"), Wilmington Savings Fund Society, FSB, as successor trustee (solely in such capacity, the "Prepetition Debenture Trustee") and the guarantors (including the DIP Guarantors) party thereto (in such capacities, the "Prepetition Debenture Guarantors"), the Issuer issued 7.125% Senior Debentures due 2028 (the "Prepetition Debentures," and the holders

thereof, the "<u>Prepetition Debenture Holders</u>," and together with the Prepetition Debenture Trustee, the "<u>Prepetition Debenture Secured Parties</u>");

       (ii)     **Prepetition Debenture Obligations:** Pursuant to the Prepetition Debenture Indenture, the Issuer issued $125.0 million in aggregate principal amount of Prepetition Debentures. As of the Petition Date, the Issuer was liable and indebted to the Prepetition Debenture Trustee and the Prepetition Debenture Holders, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $125.0 million in Prepetition Debentures, plus any other amounts due and payable under the Prepetition Debenture Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in the Prepetition Debenture Documents (collectively, the "<u>Prepetition Debenture Obligations</u>"); and

       (iii)     **Prepetition Debenture Liens:** To secure the Prepetition Debenture Obligations, the Issuer and the Prepetition Debenture Guarantors granted to the Prepetition CF Credit Agreement Agent, for the benefit of the Prepetition Debenture Secured Parties, properly perfected continuing liens, mortgages on, and security interests (collectively, the "<u>Prepetition Debenture Liens</u>") in all 2028 Notes Collateral (as defined in the Junior Lien Intercreditor Agreement (as defined below) but not, for the avoidance of doubt, in any other Prepetition CF Credit Facility Collateral, the "<u>Prepetition Debenture Collateral</u>").

     (e)     **Prepetition ABL Credit Facility:**

       (i)     **Prepetition ABL Credit Agreement:** Pursuant to that certain Credit Agreement, dated as of October 25, 2013 (as amended, restated, amended and restated, supplemented, extended, renewed or otherwise modified prior to the Petition Date, the "<u>Prepetition ABL Credit Agreement</u>," and, together with any other agreements and documents executed or delivered in connection therewith, including the Loan Documents (as defined in the Prepetition ABL Credit Agreement), the "<u>Prepetition ABL Credit Documents</u>" and, together with the Prepetition CF Credit Documents, the Prepetition Second Lien Notes Documents, the Prepetition Third Lien Notes Documents, and the Prepetition Debenture Documents, the "<u>Prepetition Loan Documents</u>"), among the DIP Borrowers, the DIP Guarantors party thereto as co-borrowers (in such capacities, together with the DIP Borrowers, the "<u>Prepetition ABL Credit Facility Borrowers</u>"), the DIP Guarantors party thereto as guarantors (in such capacities, the "<u>Prepetition ABL Credit Facility Guarantors</u>"), Deutsche Bank AG New York Branch ("<u>DBNY</u>"), as administrative agent and collateral agent under the Prepetition ABL Credit Agreement (solely in such capacity, the "<u>Prepetition ABL Credit Facility Agent</u>"), DBNY, as issuing bank (in such capacity, the "<u>ABL Issuing Bank</u>"), DBNY, as swingline lender, TPG Specialty Lending, Inc., as agent for the FILO Lenders (as defined in the Prepetition ABL Credit Agreement and, in such capacity, the "<u>FILO Agent</u>," and together with the Prepetition ABL Credit Facility Agent, the Prepetition CF Credit Facility Agent, the Prepetition Second Lien

Notes Trustee, the Prepetition Third Lien Notes Trustee and the Prepetition Debenture Trustee, the "Prepetition Agents"), and the lenders party thereto (the "Prepetition ABL Credit Facility Lenders," and together with the Prepetition ABL Credit Facility Agent, the FILO Agent, the Cash Management Banks (as defined in the Prepetition ABL Credit Agreement), the Qualified Counterparties to any Specified Hedge Agreements (each as defined in the Prepetition ABL Credit Agreement), and all other parties to whom Obligations (as defined in the Prepetition ABL Credit Agreement) may be owed, the "Prepetition ABL Credit Facility Secured Parties," and together with the Prepetition CF Credit Facility Secured Parties, the Prepetition Second Lien Notes Secured Parties, the Prepetition Third Lien Notes Secured Parties, and the Prepetition Debenture Secured Parties, the "Prepetition Secured Parties"), the Prepetition ABL Credit Facility Lenders provided an asset-based revolving facility to the Prepetition ABL Credit Facility Borrowers (the "Prepetition ABL Credit Facility," and together with the Prepetition CF Credit Facility, the "Prepetition Facilities"), consisting of (x) a revolving credit facility with aggregate commitments of up to $900,000,000, including a letter of credit sublimit of up to $150,000,000 and swingline commitments of up to $45,000,000 and (y) FILO Loans (as defined in the Prepetition ABL Credit Agreement) in the aggregate principal amount of $100,000,000, and the Prepetition ABL Credit Facility Guarantors unconditionally guaranteed, on a joint and several basis, all of the Prepetition ABL Credit Facility Obligations (as defined below);

(ii)     **Prepetition ABL Credit Facility Obligations:** As of the Petition Date, the Loan Parties (as defined in the Prepetition ABL Credit Facility) were jointly and severally liable and indebted to the Prepetition ABL Credit Facility Agent and the Prepetition ABL Credit Facility Lenders, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $749,000,000 in Revolving Loans (as defined in the Prepetition ABL Credit Agreement), $100,000,000 in FILO Loans (as defined in the Prepetition ABL Credit Agreement), and $9,250,000 in aggregate face amount of undrawn letters of credit under the Prepetition ABL Credit Facility, plus any other amounts due and payable under the Prepetition ABL Credit Documents, including, without limitation, accrued and unpaid interest thereon, premiums (including prepayment premiums), reimbursement obligations (contingent or otherwise), fees, costs, expenses (including any attorneys', accountants', appraisers', collateral examiners', consultants' and financial advisors' fees and expenses), breakage costs, charges, indemnities, Cash Management Obligations (as defined in the Prepetition ABL Credit Agreement), Specified Hedge Obligations (as defined in the Prepetition ABL Credit Agreement, including, without limitation, the Specified Hedge Obligations owing to Qualified Counterparties DBNY, JPMorgan Chase Bank, N.A., and Bank of America, N.A.), and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith (including all Obligations as defined in the Prepetition ABL Credit Agreement), in each case, as and to the extent provided in the Prepetition ABL Credit Documents (collectively, the "Prepetition ABL Credit Facility Obligations," and together with the Prepetition CF Credit Facility Obligations, Prepetition Second Lien Notes Obligations, Prepetition Third Lien Notes Obligations, and Prepetition Debenture Obligations, the "Prepetition Secured Obligations"), which shall constitute

allowed claims under sections 502 and 506 of the Bankruptcy Code against the applicable Debtor's estate; and

(iii)      **Prepetition ABL Credit Facility Liens:** To secure the Prepetition ABL Credit Facility Obligations, each of the DIP Borrowers and DIP Guarantors granted to the Prepetition ABL Credit Facility Agent, for the benefit of the Prepetition ABL Credit Facility Secured Parties, properly perfected continuing liens, mortgages on, and security interests (collectively, the "Prepetition ABL Credit Facility Liens," and together with the Prepetition CF Credit Facility Liens, Prepetition Second Lien Notes Liens, Prepetition Third Lien Notes Liens and Prepetition Debenture Liens, the "Prepetition Liens") in all Collateral (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Credit Facility Collateral," and together with the Prepetition CF Credit Facility Collateral, Prepetition Second Lien Notes Collateral, Prepetition Third Lien Notes Collateral, and Prepetition Debenture Collateral, the "Prepetition Collateral").

(f)      **Validity and Enforceability of Prepetition CF Credit Facility Liens.** All of the Prepetition CF Credit Facility Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable, and perfected liens on the Prepetition CF Credit Facility Collateral securing the Prepetition CF Credit Facility Obligations, subject only to (i) pre-existing liens, solely to the extent such liens are permitted to be senior to the respective Prepetition CF Credit Facility Liens as of the Petition Date under the Prepetition CF Credit Documents and such senior liens were existing, valid, enforceable, properly perfected, and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code against the DIP Loan Parties (the "Prepetition CF Credit Facility Permitted Prior Liens"), including, without limitation, the liens on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the Prepetition ABL Credit Facility Obligations and the liens on the Call Right Collateral (as defined in the Junior Lien Intercreditor Agreement) securing the Prepetition Second Lien Note Obligations and Prepetition Third Lien Notes Obligations (the "Prepetition CF Credit Facility Call Right Collateral Prior Liens"), and (ii) the terms and conditions of the Prepetition Intercreditor Agreements (as defined below). The Prepetition CF Credit Facility Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise. The Prepetition CF Credit Facility Liens were granted to or for the benefit of the Prepetition CF Credit Facility Secured Parties, for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(g)      **Validity and Enforceability of Prepetition Second Lien Notes Liens.** All of the Prepetition Second Lien Notes Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable, and perfected liens (as to the Debtors) in the Prepetition Second Lien Notes Collateral securing the Prepetition Second Lien Notes Obligations, subject only to (i) pre-existing liens, solely to the extent such liens are permitted to be senior to the respective Prepetition

Second Lien Notes Liens as of the Petition Date under the Prepetition Second Lien Notes Documents and such senior liens were existing, valid, enforceable, properly perfected, and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code against the DIP Loan Parties (the "Prepetition Second Lien Notes Permitted Prior Liens"), and (ii) the terms and conditions of the Prepetition Intercreditor Agreements (as defined below). The Prepetition Second Lien Notes Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise. The Prepetition Second Lien Notes Liens were granted to or for the benefit of the Prepetition Second Lien Notes Secured Parties, for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(h)     **Validity and Enforceability of Prepetition Third Lien Notes Liens.** All of the Prepetition Third Lien Notes Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable, and perfected liens in the Prepetition Third Lien Notes Collateral securing the Prepetition Third Lien Notes Obligations, subject only to (i) pre-existing liens, solely to the extent such liens are permitted to be senior to the respective Prepetition Third Lien Notes Liens as of the Petition Date under the Prepetition Third Lien Notes Documents and such senior liens were existing, valid, enforceable, properly perfected, and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code against the DIP Loan Parties (the "Prepetition Third Lien Notes Permitted Prior Liens"), and (ii) the terms and conditions of the Prepetition Intercreditor Agreements (as defined below). The Prepetition Third Lien Notes Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise. The Prepetition Third Lien Notes Liens were granted to or for the benefit of the Prepetition Third Lien Notes Secured Parties, for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(i)     **Validity and Enforceability of Prepetition Debenture Liens.** All of the Prepetition Debenture Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable, and perfected liens in the Prepetition Debenture Collateral securing the Prepetition Debenture Obligations, subject only to (i) pre-existing liens, solely to the extent such liens are permitted to be senior to the respective Prepetition Debenture Liens as of the Petition Date under the Prepetition Debenture Documents and such senior liens were existing, valid, enforceable, properly perfected, and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code against the DIP Loan Parties (the "Prepetition Debenture Permitted Prior Liens"), and (ii) the terms and conditions of the Prepetition Intercreditor Agreements (as defined

below). The Prepetition Debenture Liens are not subject to any offset, contest, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise. The Prepetition Debenture Liens were granted to or for the benefit of the Prepetition Debenture Secured Parties, for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(j)     **Validity and Enforceability of Prepetition ABL Credit Facility Liens.** All of the Prepetition ABL Credit Facility Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are valid, binding, enforceable, non-avoidable, and perfected liens in the Prepetition ABL Credit Facility Collateral securing the Prepetition ABL Credit Facility Obligations, subject only to (i) pre-existing liens, solely to the extent such liens are permitted to be senior to the respective Prepetition ABL Credit Facility Liens as of the Petition Date under the Prepetition ABL Credit Documents and such permitted senior liens were existing, valid, enforceable, properly perfected, and non-avoidable liens as of the Petition Date or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code against the DIP Loan Parties (the "Prepetition ABL Credit Facility Permitted Prior Liens"), and (ii) the terms and conditions of the ABL Intercreditor Agreement (as defined below). The Prepetition ABL Credit Facility Liens are not subject to any offset, contest, disallowance, attack, challenge, objection, defense, claim or counterclaim, subordination, recharacterization, avoidance or other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise. The Prepetition ABL Credit Facility Liens were granted to or for the benefit of the Prepetition ABL Credit Facility Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans and/or the commitments and other financial accommodations secured thereby.

(k)     **Relative Priority of the Prepetition Liens Under, and Enforceability of, the Prepetition Intercreditor Agreements.** The Prepetition ABL Credit Facility Agent, the Prepetition Second Lien Notes Collateral Agent, the Prepetition Third Lien Notes Collateral Agent, the Prepetition CF Credit Facility Agent, the DIP Borrowers, and the DIP Guarantors are party to that certain ABL/Term Loan/Notes Intercreditor Agreement (the "ABL Intercreditor Agreement"), dated as of June 7, 2019, which sets forth the relative lien priorities and other rights and remedies of the Prepetition ABL Credit Facility Secured Parties, the Prepetition Debenture Secured Parties, the Prepetition Second Lien Notes Secured Parties, the Prepetition Third Lien Notes Secured Parties, and the Prepetition CF Credit Facility Secured Parties with respect to, among other things, the Prepetition ABL Credit Facility Collateral, 2028 Notes Collateral, the Prepetition Second Lien Notes Collateral, the Prepetition Third Lien Notes Collateral, and the Prepetition CF Credit Facility Collateral. The respective rights to, and remedies, payment priorities and relative priorities between the Revolving Lenders (as defined in the Prepetition ABL Credit Agreement) and the FILO Lenders (as defined in the Prepetition ABL Credit Agreement) with respect to the ABL Priority Collateral and any proceeds thereof are set forth (i) in

Section 2.18(3) of the Prepetition ABL Credit Agreement and (ii) the New 2019 FILO Intercreditor Provisions (as defined in the Prepetition ABL Credit Agreement) set forth on Exhibit I-2 to the Prepetition ABL Credit Agreement (clauses (i) and (ii), together, the "ABL-FILO Intercreditor Provisions"). The Prepetition CF Credit Facility Agent, the Prepetition Second Lien Notes Collateral Agent, the Prepetition Third Lien Notes Collateral Agent, the DIP Borrowers, the DIP Guarantors, and certain other parties are party to that certain Junior Lien Intercreditor Agreement (the "Junior Lien Intercreditor Agreement," and together with the ABL Intercreditor Agreement, and the ABL-FILO Intercreditor Provisions, the "Prepetition Intercreditor Agreements"), dated as of June 7, 2019, which sets forth the relative lien priorities and other rights and remedies of the Prepetition Second Lien Notes Secured Parties, the Prepetition Third Lien Notes Secured Parties, the Prepetition Debenture Secured Parties and the Prepetition CF Credit Facility Secured Parties with respect to, among other things, the Prepetition Second Lien Notes Collateral, the Prepetition Third Lien Notes Collateral, the 2028 Notes Collateral, and the Prepetition CF Credit Facility Collateral. The Prepetition Intercreditor Agreements are binding and enforceable against the DIP Borrowers, the DIP Guarantors, and other parties thereto in accordance with their terms, and the DIP Borrowers, the DIP Guarantors, and other parties thereto are not entitled to take any action that would be contrary to the provisions thereof.

(l) **Relative Priority of the Prepetition Guarantees Under, and Enforceability of, the Prepetition Subordination Agreements.** The Prepetition ABL Credit Facility Agent, the Prepetition CF Credit Facility Agent, the Prepetition Second Lien Notes Collateral Agent, the Prepetition Third Lien Notes Collateral Agent, the Prepetition Debenture Trustee, NMG Term Loan PropCo LLC, a Delaware limited liability company ("Term Loan PropCo"), and certain other parties are party to that certain Subordination Agreement, dated as of June 7, 2019 (the "Term Loan PropCo Subordination Agreement"), which sets forth the relative guarantee priorities and other rights and remedies of the Prepetition ABL Credit Facility Secured Parties, the Prepetition Second Lien Notes Secured Parties, the Prepetition Third Lien Notes Secured Parties, the Prepetition Debenture Secured Parties, and the Prepetition CF Credit Facility Secured Parties with respect to, among other things, the guarantee from Term Loan PropCo of the Prepetition Secured Obligations. The Prepetition CF Credit Facility Agent, the Prepetition Second Lien Notes Trustee, the Prepetition Third Lien Notes Trustee, the Prepetition Debenture Trustee, the Prepetition ABL Credit Facility Agent, NMG Notes PropCo LLC, a Delaware limited liability company ("Notes PropCo"), and certain other parties are party to that certain Subordination Agreement, dated as of June 7, 2019 (the "Notes PropCo Subordination Agreement," and together with the Term Loan PropCo Subordination Agreement, the "Prepetition Subordination Agreements"), which sets forth the relative guarantee priorities and other rights and remedies of the Prepetition ABL Credit Facility Secured Parties, the Prepetition Second Lien Notes Secured Parties, the Prepetition Third Lien Notes Secured Parties, the Prepetition Debenture Secured Parties, and the Prepetition CF Credit Facility Secured Parties with respect to, among other things, the guarantee from Notes PropCo of the Prepetition Secured Obligations. The Prepetition Subordination Agreements are binding and enforceable against Term Loan PropCo, Notes PropCo, and the other parties thereto in accordance with their terms, and Term Loan PropCo, Notes

PropCo, and the other parties thereto are not entitled to take any action that would be contrary to the provisions thereof.

(m)    **Validity and Enforceability of Prepetition Secured Obligations.** Each of the Prepetition CF Credit Facility Obligations, the Prepetition Second Lien Notes Obligations, the Prepetition Third Lien Notes Obligations, the Prepetition Debenture Obligations, and the Prepetition ABL Credit Facility Obligations, respectively, constitute legal, valid, binding, enforceable, and non-avoidable obligations of the DIP Loan Parties that are party to the applicable debt arrangements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of any of the Prepetition Secured Obligations or any payment made to any of the Prepetition Secured Parties (or applied to or paid on account of any of the Prepetition Secured Obligations), as applicable, at any time is subject to any offset, contest, attack, challenge, objection, defense, claim or counterclaim, disallowance, subordination, recharacterization, recoupment, disgorgement, avoidance or any other claim, cause of action, or challenge of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise, except as otherwise contemplated herein, including pursuant to paragraph 27.

(n)    **No Control.**   None of the DIP Secured Parties nor the Prepetition Secured Parties control the DIP Loan Parties or their properties or operations, has authority to determine the manner in which any of the DIP Loan Parties' operations are conducted, or is a control person or insider of the DIP Loan Parties or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Final Order, the DIP Facility, the DIP Loan Documents, or the Prepetition Loan Documents.

(o)    **No Claims, Defenses or Causes of Action**.  As of the date hereof, there exist no claims, defenses or causes of action, including avoidance actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties with respect to, in connection with, related to, or arising from any of the Prepetition Loan Documents, any action or conduct of any Prepetition Secured Party in respect thereof, or any of the transactions contemplated thereunder, that may be asserted by the Debtors, their respective estates, or any other person or entity.

(p)    **Release.** Effective as of the date of the entry of the Interim Order, the DIP Loan Parties, on behalf of themselves and their respective estates, forever and irrevocably released and forever discharged the Prepetition Secured Parties and the DIP Secured Parties (in each case, solely in their capacity as such) and each of their respective former, current, and future officers, directors, employees, shareholders, owners, members, managers, partners, subsidiaries, affiliates, funds or managed accounts, agents, advisors, attorneys, accountants, investment bankers, consultants, and other representatives, together with each of their predecessors and successors in interest (collectively, the "Releasees") from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including,

attorneys' fees), costs, expenses, or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any theory of so-called "lender liability" or equitable subordination or any claim or defense asserting recharacterization, subordination, or avoidance, any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or any other provision of the Bankruptcy Code or of applicable state or federal law, or any other claim, cause of action, or defense arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the DIP Loan Parties or their estates, the extent, amount, validity, enforceability, priority, security, and perfection of the Prepetition Facilities, the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Loan Documents, the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, and/or the transactions contemplated thereunder and/or hereunder, except as otherwise contemplated herein.

(q)     **Cash Collateral.** All of the DIP Loan Parties' cash, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the DIP Loan Parties in any account or accounts), constitutes or will constitute "cash collateral" of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"); *provided* that, notwithstanding anything in this Final Order to the contrary, (i) in no event shall the Debtors be authorized hereunder to use Cash Collateral constituting Other Second Lien Collateral or Other Third Lien Collateral and (ii) the DIP Proceeds Account (as defined in the DIP Credit Agreement) shall in no event be Cash Collateral (as defined herein) so long as funds deposited in the DIP Proceeds Account comprise only proceeds of DIP Term Loans and interest thereon.

F.     **Findings Regarding Corporate Authority.** Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

G.     **Findings Regarding Postpetition Financing and Use of Cash Collateral.**

(i)     *Good Cause.* Good and sufficient cause has been shown for the entry of this Final Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facility and the DIP Loan Documents and to use Cash Collateral as set forth herein.

(ii)     *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors' need to use the Prepetition Collateral (including Cash Collateral) and to obtain credit pursuant to the DIP Facility as provided for herein is immediate and critical to avoid serious and irreparable

harm to the Debtors, their estates, their creditors, and other parties in interest. The Debtors have an immediate need to obtain the DIP Loans and other financial accommodations and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things:  (i) permit the orderly continuation of the operation of their businesses, including maintaining, amending, renewing, or modifying insurance policies and surety bonds in the ordinary course of business; (ii) maintain business relationships with customers, vendors, and suppliers, including purchasing necessary materials and services to maintain compliance with all applicable regulatory and safety requirements; (iii) make payroll; (iv) satisfy other working capital, capital improvement, and operational needs; (v) pay professional fees, expenses, and obligations benefitting from the Carve Out; (vi) pay costs, fees, and expenses associated with or payable under the DIP Facility, subject to the terms of this Final Order and the DIP Loan Documents; and (vii) make adequate protection payments as set forth herein. The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the pendency of these Chapter 11 Cases. The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Loan Documents, and other financial accommodations provided under the DIP Loan Documents are necessary and vital to preserve and maintain the going concern values of the Debtors. The terms of the DIP Facility, pursuant to the DIP Loan Documents and this Final Order are fair and reasonable, reflect each Debtor's exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

(iii)    *No Credit Available on More Favorable Terms.* The Debtors have been unable to obtain financing and other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan

Documents. The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien. Postpetition financing is not otherwise available without granting the DIP Agent, for the benefit of the respective DIP Secured Parties and subject to the Carve Out: (1) the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claims (as defined below), and (3) the other protections set forth in the DIP Orders. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

(iv)     *Use of Proceeds of the DIP Facility and Cash Collateral.* As a condition to entry into the DIP Loan Documents, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), each of the DIP Secured Parties require, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Final Order and the DIP Loan Documents, and only for the expenditures set forth in and consistent with the Approved DIP Budget (as defined below) (subject to Permitted Variances), and for no other purpose.

(v)     *Adequate Protection.* The Debtors have agreed, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to provide the Prepetition Secured Parties adequate

protection, as and to the extent set forth in this Final Order, against the risk of any diminution in the value of their respective interests in the Prepetition Collateral including, with respect to any Cash Collateral, on a dollar-for-dollar basis, from and after the Petition Date, resulting from, among other things, the use, sale, or lease by the Debtors of the Prepetition Collateral (including the use of any Cash Collateral) and the imposition or enforcement of the automatic stay under section 362(a) of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "Diminution in Value").  Based on the DIP Motion, the declarations, or other evidence filed in support of the DIP Motion, and the record presented to the Court in connection with the Hearings, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(vi)     *Consent.* To the extent such consent is required, the Prepetition Secured Parties have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral) and the DIP Loan Parties' entry into the DIP Facility and the DIP Loan Documents, in each case, in accordance with and subject to the terms and conditions of this Final Order and the DIP Loan Documents.

(vii)     *Limitation on Charging Expenses Against Collateral.* As set forth in and subject to paragraphs 28 and 29 herein, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or any Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law,

without the prior written consent of the DIP Secured Parties with respect to DIP Collateral other than ABL Priority Collateral or the Prepetition Secured Parties with respect to Prepetition Collateral, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, respectively, and nothing contained in this Final Order or the DIP Loan Documents shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral (other than the ABL Priority Collateral) or the Prepetition Collateral, respectively, under section 506(c) of the Bankruptcy Code or otherwise.

(viii)   *No Marshaling*. Subject to paragraph 30 with respect to Avoidance Actions Proceeds (as defined below), in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations (in each case, as applicable).  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

(ix)   *Business Judgment and Good Faith Pursuant to Section 364(e)*. Based on the DIP Motion, the First Day Declarations, and the record presented to the Court at the Hearings, (i) the extension of credit and other financial accommodations made under the DIP Facility and the DIP Loan Documents, (ii) the terms of the DIP Facility, (iii) the fees and other amounts paid and to be paid thereunder, (iv) the terms of adequate protection granted to the Prepetition Secured Parties, (v) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (vi) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Final Order and the DIP Loan Documents, (a) are fair, reasonable, and the

best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available. The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties. The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties and the Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

(x)     *Good Faith of DIP Secured Parties*. The DIP Facility, the adequate protection granted to the Prepetition Secured Parties, and the use of Prepetition Collateral (including Cash Collateral) hereunder have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan Documents and any DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits, and protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant

to this Final Order and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(xi)     *Good Faith of Prepetition Secured Parties.* The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the adequate protection claims, security interests and liens, and other rights, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns thereof) pursuant to this Final Order and the DIP Loan Documents shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(xii)    *Initial Budget.* The Debtors prepared and delivered to the DIP Secured Parties and the Prepetition ABL Credit Facility Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 3** to the Interim Order (the "Initial Budget"), which is acceptable to the Required Lenders (as defined in the DIP Credit Agreement and as used here, the "Required DIP Lenders"), the Prepetition ABL Credit Facility Agent, and the FILO Agent, setting forth all line-item and cumulative cash receipts and operating disbursements (including all necessary and required expenses which the Debtors expect to incur) on a weekly basis for the period beginning as of the week including the Closing Date (as defined in the DIP Credit Agreement) through and including the end of the thirteenth calendar week following such week. The DIP Secured Parties and Prepetition ABL Credit Facility Secured Parties are relying, in part, upon the Debtors'

agreement to comply with the Initial Budget (as may be updated by the Debtors and approved by the DIP Secured Parties from time to time pursuant to and in accordance with the terms hereof and of the DIP Credit Agreement, the "Approved DIP Budget"), in accordance with the terms hereof and the DIP Loan Documents, in determining to enter into the postpetition financing arrangements provided for in the DIP Orders and to allow the Debtors to use Prepetition Collateral (including Cash Collateral) subject to the terms of this Final Order, respectively.

(xiii)   *Notice*. Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Extended Term Loan Backstop Commitment Parties (as defined in the Backstop Commitment Letter); (d) counsel to the Ad Hoc Committee; (e) counsel to the Prepetition ABL Credit Facility Agent; (f) counsel to the FILO Agent; (g) counsel to the Prepetition Second Lien Notes Trustee; (h) counsel to the Prepetition Third Lien Notes Trustee; (i) the United States Attorney's Office for the Southern District of Texas; (j) the Internal Revenue Service; (k) the United States Securities and Exchange Commission; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Under the circumstances, such notice of the Final Hearing and the relief requested in the DIP Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and Local Rules 2002-1 and 4001-1(b).

(xiv)   *Relief Essential; Best Interests of the Debtors' Estates*. The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  The

Court concludes that entry of this Final Order is in the best interests of the Debtors' estates, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP Motion, the First Day Declarations, and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. **DIP Motion Approved.** The DIP Motion is granted on a final basis, and the financing described herein is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Final Order and the DIP Loan Documents. Any objections or other statements to any of the relief set forth in this Final Order that have not been withdrawn, waived, or settled, and all reservation of rights inconsistent with this Final Order, are hereby overruled.

2. **Authorization of DIP Facility.**

(a)     Subject to the terms and conditions of this Final Order, each of the DIP Loan Parties were, by the Interim Order, and hereby are authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facility and the DIP Loan Documents to which they are party. The DIP Loan Documents and this Final Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by the DIP Lenders in connection with the DIP Facility.

(b)     The DIP Credit Agreement and each of the other DIP Loan Documents are hereby approved upon execution thereof.

(c)      The DIP Borrowers are authorized to incur, and the DIP Guarantors are authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Loan Parties' DIP Obligations on account of such incurrence under the DIP Facility, up to an aggregate principal amount of $675,000,000 in new money DIP Loans, inclusive of amounts authorized by the Interim Order, and in each case together with applicable interest, protective advances, expenses, fees, and other charges payable in connection with the DIP Facility, as applicable, in each case, subject to the terms and conditions set forth in this Final Order and the DIP Loan Documents.

(d)      Without limiting the foregoing, and without the need for further approval of this Court, each DIP Loan Party was by the Interim Order and hereby is authorized to perform all acts to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, deeds of trust, and financing statements), and to pay all fees or expenses that may be required, necessary, or desirable for the DIP Loan Parties to implement the terms of, performance of their obligations under or effectuate the purposes of and transactions contemplated by this Final Order, the DIP Facility, and the DIP Loan Documents (as applicable) in accordance herewith and therewith, including, without limitation:

(1)      the execution and delivery of, and performance under, the DIP Loan Documents;

(2)      the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case, as the DIP Loan Parties and the requisite DIP Secured Parties (in accordance with and subject to the terms of the applicable DIP Loan Documents) may agree, it being understood that no further approval of the Court shall be required for non-material authorizations, amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including any attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in accordance and connection therewith);

(3)     the non-refundable and irrevocable payment of any and all fees, costs, and expenses, whether paid pursuant to the Interim Order or this Final Order, payable pursuant to the DIP Loan Documents, including, without limitation, (a) any closing fees, upfront fee, exit fee, prepayment fee, unused line fees, ticking fees, arrangement fees, structuring fees, duration fees, commitment fees, backstop fees, servicing fees, audit fees, appraisal fees, servicing fees, liquidator fees, agency fees, prepayment premiums, or similar amounts (which fees, in each case, were approved upon entry of the Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Documents (including the Backstop Commitment Letter referred to in the DIP Credit Agreement) and in accordance with Section 10.05 of the DIP Credit Agreement, and (b) the reasonable and documented invoiced out-of-pocket fees, costs, and expenses as may be due from time to time of the DIP Agent, the DIP Lenders, or the Backstop Commitment Parties and in accordance with Section 10.05 of the DIP Credit Agreement, including, without limitation, the reasonable and documented fees and expenses of (A) the following professionals (whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated): (i) Wachtell, Lipton, Rosen & Katz, (ii) Ducera Partners LLC, (iii) Vinson & Elkins LLP as Texas-based counsel, (iv) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), (v) Porter Hedges LLP, as Texas-based counsel ("Porter Hedges"), (vi) Houlihan Lokey ("Houlihan," and together with Paul Weiss and Porter Hedges, the "Ad Hoc Committee Advisors"), (vii) counsel for each of the Extended Term Loan Backstop Commitment Parties (as defined in the Backstop Commitment Letter), and (viii) if necessary, conflicts counsel for particular matters, and (B) the DIP Agent and its professionals (collectively, each of the fees and expenses described in the foregoing clauses, the "DIP Fees and Expenses"), in each case, without the need to file retention or fee applications, and without the need to provide notice to any party or obtain further Court approval; *provided* that the DIP Fees and Expenses incurred after the Closing Date by professionals for the DIP Agent or DIP Lenders shall be subject to the review process set forth in paragraph 22;

(4)     subject to the Carve Out, the granting and perfection of the DIP Liens (as defined below) and the Adequate Protection Liens (as defined below), the granting of the DIP Superpriority Claims (as defined below) and the Adequate Protection Claims (as defined below), and the granting of the DIP Protections and the ABL Adequate Protections (as defined below), in each case, as set forth herein and in the DIP Loan Documents; and

(5)     the performance of all other acts necessary, required, or desirable to implement the DIP Facility and to facilitate the transactions contemplated by the DIP Loan Documents and this Final Order in accordance therewith and herewith.

(e)     No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and each DIP Secured Party may rely upon each DIP Loan

Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Final Order, the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

3.     **DIP Obligations.** Upon entry of the Interim Order and execution and delivery of the DIP Loan Documents, the DIP Loan Documents constituted valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and are fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), and their creditors and other parties in interest, in each case, in accordance with the terms thereof and the DIP Orders, as applicable. Upon execution and delivery of the DIP Loan Documents, the DIP Obligations included all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the DIP Loan Parties to any of the DIP Agent or DIP Lenders, in each case, under, or secured by, and in accordance with, the DIP Loan Documents or this Final  Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Final Order). As of the entry of the Interim Order, the DIP Loan Parties are jointly and severally liable for the DIP Obligations. Subject to paragraph 21 of this Final Order and after the expiration of the Remedies Notice Period (as defined below), the DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease during the continuation of a DIP Termination Event (as defined herein) or the occurrence and continuance of

any event or condition set forth in paragraph 21 of this Final Order. No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Final Order to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraph 21 of this Final Order.

4.      **No Obligation to Extend Credit.** The DIP Secured Parties shall have no obligation to make any loan or advance under the applicable DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties under the applicable DIP Loan Documents and this Final Order have been satisfied in full or waived in accordance with the terms of the DIP Loan Documents.

5.      **DIP Liens.**

(a)      As security for the DIP Obligations, effective immediately upon the date of the Interim Order and closing of the DIP Facility, and subject and subordinate only to the Carve Out, as set forth more fully in this Final Order, the DIP Agent, for the benefit of the DIP Secured Parties, were by the Interim Order, and are hereby granted (without the necessity of the execution by the DIP Loan Parties or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the DIP Agent or the DIP Lenders) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (as applicable, the "Priming DIP Liens," the "Senior DIP

Liens," or the "Junior DIP Liens," as applicable, and collectively, the "DIP Liens")[4] in the DIP

Collateral (as defined below), as collateral security for the prompt and complete performance and

payment when due (whether at the stated maturity, by acceleration or otherwise) of all

DIP Obligations, which DIP Liens shall have the following relative rank and priority, as further

set forth on **Exhibit 1** attached hereto:

(1) *Priming DIP Liens*.   Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected, first priority senior priming security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, to the extent such property is subject to the Prepetition Liens securing the Prepetition Secured Obligations (collectively, the "DIP Priming Collateral"), subject and subordinate only to (a) the Carve Out, (b) the Prepetition CF Credit Facility Permitted Prior Liens other than the Prepetition CF Credit Facility Call Right Collateral Prior Liens, (c) Permitted Liens (as defined in the DIP Credit Agreement, solely to the extent such liens are expressly permitted to be senior to the respective Priming DIP Liens under the DIP Loan Documents), and (d) the Prepetition ABL Credit Facility Permitted Prior Liens, the Prepetition ABL Credit Facility Liens, and the ABL Adequate Protection Liens (as defined below), in each case, with respect to the ABL Priority Collateral;

(2) *Senior DIP Liens*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under (x) the DIP Proceeds Account or any other account that only holds the proceeds of any Term Loans (as defined in the DIP Credit Agreement and hereinafter referred to as "DIP Term Loans"), interest thereon pursuant to the DIP Credit Agreement and treasury securities or other cash equivalents purchased with such proceeds pending application thereof in accordance with the DIP Credit Agreement (collectively, the "DIP Proceeds"), (y) Avoidance Actions Proceeds and solely to the extent set forth below, and (z) any other unencumbered tangible and

---

[4]   For the avoidance of doubt, the DIP Liens shall not attach to the Adequate Assurance Account and the Prepetition Deposits (in each case, as defined in the *Debtors' Emergency Motion for Entry of An Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 19]); *provided* that, the DIP Liens will attach to the Debtors' right, title and interest in the Adequate Assurance Account and the Prepetition Deposits, if any.

intangible, real (including leaseholds) and personal prepetition and postpetition property of each DIP Loan Party (excluding assets that qualify as ABL Priority Collateral), whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (all of the foregoing, collectively, the "DIP Priority Collateral"), in each case, subject and subordinate only to the Carve Out; *provided,* that, the DIP Priority Collateral shall include the proceeds of Claims and Causes of Action[5] under chapter 5 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates and avoidance actions proceeds (collectively, the "Avoidance Actions Proceeds"), but DIP Priority Collateral shall not include:  (A) any Claims, Causes of Action, or litigation (including under chapter 5 of the Bankruptcy Code and commercial tort claims) against NMG or the MYT Subsidiaries (or any direct or indirect parent company of such entities) arising from or related to the MyTheresa Designation or the MyTheresa Distribution, including any Ancillary MyT Challenge (as defined below) (the "MyT Causes of Action"); or (B) any funds, property, or proceeds received on account of any MyT Causes of Action (collectively, the "MyT Avoidance Actions Proceeds"); and

(3)     *Junior DIP Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected junior security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, to the extent such property is subject to a Prepetition CF Credit Facility Permitted Prior Lien other than the Prepetition CF Credit Facility Call Right Collateral Prior Liens, including without limitation all assets that qualify as ABL

---

[5]   As used in this Final Order, "Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

Priority Collateral, subject and subordinate only to (a) the Prepetition CF Credit Facility Permitted Prior Liens other than the Prepetition CF Credit Facility Call Right Collateral Prior Liens, (b) Permitted Liens (as defined in the DIP Credit Agreement, solely to the extent such liens are expressly permitted to be senior to the respective Priming DIP Liens under the DIP Loan Documents), (c) the Prepetition ABL Credit Facility Permitted Prior Liens, the Prepetition ABL Credit Facility Liens, and the ABL Adequate Protection Liens, in each case, with respect to the ABL Priority Collateral, and (d) the Carve Out (the "Junior DIP Collateral" and, together with the DIP Priority Collateral and the DIP Priming Collateral, the "DIP Collateral").

(b)     For the avoidance of doubt, the term "DIP Collateral" shall include all assets and properties of each of the DIP Loan Parties of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties, whether prior to or after the Petition Date, whether (subject to paragraph 39 herein) owned or consigned by or to, or leased from or to, the DIP Loan Parties, and wherever located, including, without limitation, each of the DIP Loan Parties' rights, title and interests in (i) all Prepetition Collateral, (ii) all "Collateral" as defined in the DIP Loan Documents, and (iii) all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions, and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing; *provided*, *however*, that DIP Collateral shall not include (x) the MyT Causes of Action, the MyT Avoidance Actions Proceeds, the Other Second Lien Collateral, the Other Third Lien Collateral or the Debtors' real property leases to the extent any DIP Liens thereon would be prohibited by the applicable lease after giving effect to any applicable law regarding the enforceability of such prohibition (but DIP Collateral shall in all cases include all proceeds of such real property leases) or (y) any other Excluded Assets (as defined in the DIP Credit Agreement).

(c)       Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary, (x) in the case of the Senior DIP Liens, subject only to the Carve Out, (y) in the case of the Priming DIP Liens, subject only to (1) the Carve Out, (2) the Prepetition CF Credit Facility Permitted Prior Liens other than the Prepetition CF Credit Facility Call Right Collateral Prior Liens, (3) the Permitted Liens (as defined in the DIP Credit Agreement, solely to the extent such liens are expressly permitted to be senior to the respective Priming DIP Liens under the DIP Loan Documents), and (4) the Prepetition ABL Credit Facility Permitted Prior Liens, the Prepetition ABL Credit Facility Liens, and the ABL Adequate Protection Liens, in each case, with respect to the ABL Priority Collateral, and (z) in the case of the Junior DIP Liens, subject only to (1) the Prepetition CF Credit Facility Permitted Prior Liens other than the Prepetition CF Credit Facility Call Right Collateral Prior Liens, (2) the Permitted Liens (as defined in the DIP Credit Agreement, solely to the extent such liens are expressly permitted to be senior to the respective Priming DIP Liens under the DIP Loan Documents), and (3) the Prepetition ABL Credit Facility Permitted Prior Liens, the Prepetition ABL Credit Facility Liens, and the ABL Adequate Protection Liens, in each case, with respect to the ABL Priority Collateral, the DIP Liens (i) shall not be made subject to or *pari passu* with (A) any lien or security interest heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the DIP Loan Parties, their estates, any trustee, or any other estate representative appointed or elected in the Chapter 11 Cases, or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate lien, and (ii) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

Subject to Paragraph 5(b),

(d)        Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Loan Parties, in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with the terms of the DIP Loan Documents and this Final Order.

(e)        Notwithstanding anything to the contrary herein, DIP Collateral shall not include, and neither the DIP Agent nor any DIP Lender nor any DIP Secured Party shall be granted nor have any DIP Liens or other Liens on or security interest in pursuant to the Interim Order, this Final Order, the DIP Credit Agreement, the DIP Loan Documents or the DIP Loans, as applicable, the MyT Causes of Action or MyT Avoidance Actions Proceeds.

(f)        Notwithstanding anything to the contrary in this Final Order, under no circumstance shall any DIP Lien or any Adequate Protection Lien attach to goods owned by the Debtors' customers, regardless of whether such goods are stored or otherwise held by the Debtors or by a third party.

6.        **DIP Superpriority Claims.**  Effective as of entry of the Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) was granted, pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Chapter 11 Cases and any Successor Cases thereof on account of the

DIP Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis.  Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary, the DIP Superpriority Claims shall, at all times be (a) in respect of any assets or property that constitute, or, but for the commencement of the Chapter 11 Cases would have constituted, ABL Priority Collateral or proceeds or products thereof (other than DIP Proceeds), junior in right of payment to the ABL Adequate Protection Claims (as defined below) and the Prepetition ABL Credit Facility Obligations, (b) other than set forth in subclauses (c) and (d) below, in respect of any assets or property that constitute, or, but for the commencement of the Chapter 11 Cases would have constituted, Prepetition Collateral (other than the ABL Priority Collateral) (including Avoidance Actions Proceeds) or, in each case, proceeds or products thereof and DIP Proceeds, junior in right of payment to (i) the Carve Out, and (ii) any Liens on the DIP Collateral, (c) except as expressly provided herein, senior to the CFD Adequate Protection Claims (as defined herein), (d) with respect only to the MyT Causes of Action and the MyT Avoidance Actions Proceeds, but subject to the succeeding sentence, junior to the Second Lien Notes Adequate Protection Claims, Third Lien Notes Adequate Protection Claims, and CFD Adequate Protection Claim, and (e) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

Notwithstanding the foregoing, the DIP Superpriority Claims shall not attach to (or be payable from) the MyT Causes of Action or the MyT Avoidance Action Proceeds unless a Challenge against a holder of Series A Preferred Stock (as defined in the Transaction Support Agreement referred to below) or a Prepetition Secured Party (in each case solely in its capacity as a Series A Preferred Stock holder, noteholder or lender, as the case may be and not, for the avoidance of doubt, (i) Neiman Marcus Group Inc. or (ii) any person in its capacity as a shareholder of Neiman Marcus Group, Inc.) or Ancillary MyT Challenge (other than any action or proceeding under sections 506(a), 544(a) or 547 of the Bankruptcy Code, solely to the extent such action or proceeding challenges any defects in the grant or perfection of any asserted lien (a "Permitted Action")) has been commenced (or is publicly supported) by the Official Committee, any member of the Official Committee (or its affiliates) or any other party in interest on behalf of or for the benefit of the Debtors' estates or creditors (and is not publicly opposed by the Official Committee), whereupon, the DIP Superpriority Claims shall automatically and without further action attach to (and be payable from) the MyT Causes of Action and MyT Avoidance Actions Proceeds in accordance with the priorities set forth herein.  For purposes hereof, "Ancillary MyT Challenge" means any Claims, Causes of Action, or litigation against, or purporting to effect the claims and interests of, any Prepetition Secured Party or any holder of the Series A Preferred Stock (but not, for the avoidance of doubt, Neiman Marcus Group, Inc. or any person in its capacity as a shareholder of Neiman Marcus Group, Inc.) challenging the MyTheresa Distribution, the MyTheresa Designation, the Transaction Support Agreement (as defined in the Restructuring Support Agreement), or any arrangement, document or transaction pursuant thereto, including the issuance of any debt or equity securities by any MyT Subsidiary or any affiliate thereof (other than any equity interests Neiman Marcus Group Inc. holds in MyT Parent Co.).

7.        **Use of Proceeds of the DIP Facility and Cash Collateral.** The use of Prepetition Collateral (including Cash Collateral) was, by the Interim Order, and hereby is authorized and approved on a final basis, in each case, in accordance with and subject to the terms and conditions of this Final Order and the DIP Loan Documents. As of the date of entry of the Interim Order, (x) so long as no DIP Termination Event has occurred and is continuing, the DIP Loan Parties are authorized to use Prepetition Collateral (excluding Cash Collateral), (y) so long as no Cash Collateral Termination Event (as defined below) has occurred and is continuing, and subject to paragraphs 21 and 35 below, the DIP Loan Parties are authorized to use Cash Collateral and, (z) so long as no DIP Termination Event has occurred and is continuing, and subject to paragraph 21 below, the DIP Loan Parties are permitted to draw upon the DIP Facility and the proceeds thereof, subject, in each case, to the terms and conditions of this Final Order and the DIP Loan Documents, and in accordance with the Approved DIP Budget (subject to Permitted Variances (as defined in the DIP Credit Agreement)), including, without limitation:  (i) to pay amounts due to DIP Secured Parties under the DIP Loan Documents and professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Secured Parties, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the transactions contemplated by the DIP Loan Documents; (ii) the payment of any adequate protection payments approved by the Court; (iii) to fund the Carve Out (other than from Cash Collateral of the Prepetition ABL Credit Facility Secured Parties) as set forth herein; (iv) to provide working capital and for other general corporate purposes of the DIP Loan Parties; and (v) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Court, including in the First and Second Day Orders (as defined in the DIP Credit Agreement) or as required under the Bankruptcy Code. For the avoidance of doubt, none of the DIP Loan

Parties will use any DIP Loans, the proceeds of the DIP Facility or DIP Collateral (including Cash Collateral) in a manner or for a purpose other than those consistent with the Approved DIP Budget, the DIP Loan Documents, and this Final Order. Except as expressly permitted in this Final Order, the DIP Loan Documents, or the Approved DIP Budget, nothing in this Final Order shall otherwise authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any DIP Collateral (including Cash Collateral) or other proceeds resulting therefrom. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Final Order and the DIP Loan Documents.

8.      **Disposition of DIP Collateral**. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or ABL Priority Collateral (including Cash Collateral) (and, in each case, or enter into any binding agreement to do so) other than ABL Priority Collateral with respect to Last-Call Stores or other than in the ordinary course of business without the prior written consent of the Required DIP Lenders (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders) or, with respect to the ABL Priority Collateral (including Cash Collateral), without the prior written consent of the Prepetition ABL Credit Facility Agent and the FILO Agent, except as otherwise expressly provided for in the DIP Loan Documents or the Prepetition ABL Credit Documents, as applicable.

9.      **Adequate Protection.**

(a)     **Adequate Protection for Prepetition CF Credit Facility Secured Parties and Prepetition Debenture Secured Parties.** Pursuant to sections 361, 363(e), and 364(d) of the

Bankruptcy Code, the Debtors granted upon the entry of the Interim Order to the Prepetition CF Credit Facility Secured Parties and the Prepetition Debenture Secured Parties as adequate protection of their interests in all Prepetition CF Credit Facility Collateral or Prepetition Debenture Collateral, as applicable, including the Cash Collateral, against any Diminution in Value of the Prepetition CF Credit Facility Secured Parties' or Prepetition Debenture Secured Parties' interests in the Prepetition CF Credit Facility Collateral (including Cash Collateral), or Prepetition Debenture Collateral, as applicable, from and after the Petition Date:

(i)     **Adequate Protection Lien.** The Prepetition CF Credit Facility Agent, on behalf of the Prepetition CF Credit Facility Secured Parties and the Prepetition Debenture Secured Parties, was granted upon the entry of the Interim Order, a valid, binding, enforceable, and automatically perfected postpetition lien on all DIP Collateral to the extent of any Diminution in Value of the Prepetition CF Credit Facility Secured Parties' or Prepetition Debenture Secured Parties', as applicable, interests in their respective Prepetition Collateral (including Cash Collateral) (each, a "CFD Adequate Protection Liens"), which CFD Adequate Protection Liens shall be (x) subject to the Prepetition Intercreditor Agreements as if such DIP Collateral had been Prepetition Collateral as of the Petition Date, (y) subject and subordinate only to the (1) Carve Out, (2) the Prepetition CF Credit Facility Permitted Prior Liens or the Prepetition Debenture Permitted Prior Liens, as applicable, (3) the Third Lien Notes Adequate Protection Liens, Prepetition Third Lien Notes Liens, Adequate Protection Second Lien Notes Liens, Prepetition Second Lien Notes, in each case, with respect to Call Right Collateral, (4) the DIP Liens, and (5) the Prepetition ABL Credit Facility Permitted Prior Liens, the Prepetition ABL Credit Facility Liens, and the ABL Adequate Protection Liens, in each case, with respect to the ABL Priority Collateral, and (z) with respect to the DIP Priority Collateral, *pari passu* with the ABL Adequate Protection Liens (other than Avoidance Actions Proceeds).

(ii)     **Adequate Protection Claim.**  Subject to clause (h) below, each of (I) the Prepetition CF Credit Facility Agent, on behalf of the Prepetition CF Credit Facility Secured Parties, and (II) the Prepetition Debenture Trustee, on behalf of the Prepetition Debenture Holders, was granted upon the entry of the Interim Order an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition CF Credit Facility Secured Parties' or Prepetition Debenture Secured Parties', as applicable, interests in the Prepetition Collateral (including Cash Collateral), as provided for in section 507(b) of the Bankruptcy Code (each, a "CFD Adequate Protection Claim"), against each of the DIP Loan Parties on a joint and several basis, which shall be (A) subject and subordinate to the Carve Out, (B) with respect only to MyT Avoidance Actions Proceeds, senior to (i) the DIP Superpriority Claims, (ii) the Second Lien Notes Adequate Protection Claims, (iii) the Third Lien Notes Adequate Protection Claims, and (iv) any and all other administrative expenses of the kind specified or ordered pursuant to

any provision of the Bankruptcy Code, (C) subject to any Liens on such DIP Collateral, (D) junior to the DIP Superpriority Claims (other than with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds), (E) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted ABL Priority Collateral or proceeds or products thereof other than with respect to claims against the DIP Proceeds, junior in right of payment to (i) the Prepetition ABL Credit Facility Obligations, (ii) the ABL Adequate Protection Claims, and (iii) the DIP Superpriority Claims, and senior in right of payment to (i) the Third Lien Notes Adequate Protection Claims, (ii) the Second Lien Notes Adequate Protection Claims, and (iii) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, (F) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted Prepetition Collateral (other than the ABL Priority Collateral) or Avoidance Actions Proceeds (other than the MyT Causes of Action and MyT Avoidance Actions Proceeds) or, in each case, proceeds or products thereof, and with respect to claims against the DIP Proceeds, junior in right of payment to the (i) Carve Out, (ii) DIP Superpriority Claims, (iii) the Third Lien Notes Adequate Protection Claim (as to the proceeds from the Call Right Collateral) and (iv) the Second Lien Notes Adequate Protection Claim and Prepetition Second Lien Notes Obligations (as to the proceeds from the Call Right Collateral), and senior in right of payment to (w) the Second Lien Notes Adequate Protection Claims (as to proceeds from non-Call Right Collateral and the MyT Causes of Action and MyT Avoidance Actions Proceeds), (x) the Third Lien Notes Adequate Protection Claims (as to proceeds from non-Call Right Collateral and the MyT Causes of Action and MyT Avoidance Actions Proceeds), (y) the Prepetition ABL Credit Facility Obligations and the ABL Adequate Protection Claims, and (z) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, and (G) in respect of any DIP Priority Collateral (other than (i) Avoidance Actions Proceeds and (ii) DIP Proceeds, *pari passu* in right of payment with the ABL Adequate Protection Claims. Except to the extent expressly set forth in the Interim Order, this Final Order, or the DIP Loan Documents, the Prepetition CF Credit Facility Secured Parties and Prepetition Debenture Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the CFD Adequate Protection Claims from the DIP Collateral unless and until the Carve Out and the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash (or other form of payment pursuant to an Acceptable Plan (as defined in the DIP Credit Agreement)) in full and all Commitments (as defined in the DIP Credit Agreement) have been terminated; *provided*, *however*, that subject to clause (h) below, any recovery in respect of the DIP Obligations on account of any MyT Causes of Action or MyT Avoidance Actions Proceeds shall be subject and subordinate to the CFD Adequate Protection Claims.

(b)     **Additional Adequate Protection for Prepetition CF Credit Facility Secured Parties.** As additional adequate protection of the Prepetition CF Credit Facility Secured Parties' security interests in the Prepetition CF Credit Facility Collateral, including the Cash Collateral,

the Debtors were, by the Interim Order, and hereby are authorized to provide adequate protection

in the form of the following:

(i)     **Financial Reporting.**  The DIP Loan Parties shall (A) provide each of (i) the Prepetition CF Credit Facility Agent, on behalf of the Prepetition CF Credit Facility Secured Parties, and (ii) the Prepetition Debenture Trustee, on behalf of the Prepetition Debenture Holders, with (I) copies of the DIP Reporting (as defined below) promptly after providing the same to the DIP Secured Parties, if provided, and (II) a copy of Approved DIP Budget, promptly after the same is approved by the DIP Secured Parties, in each case, in accordance with paragraph 13 hereof, and (B) otherwise continue with financial and other reporting substantially in compliance with the Prepetition CF Credit Agreement or Prepetition Debentures Indenture, as applicable, to the extent required under the DIP Credit Agreement, excluding (1) annual financial statements and other documents required to be delivered in conjunction or concurrently therewith, (2) quarterly financial statements for the third fiscal quarter ending May 2, 2020 and other documents required to be delivered in conjunction or concurrently therewith, and (3) any annual budgets.

(ii)    **Fees and Expenses.** The DIP Loan Parties shall pay all reasonable and documented invoiced out-of-pocket fees, costs, and expenses of (i) Wachtell, Lipton, Rosen & Katz as counsel for Prepetition CF Credit Facility Lenders, (ii) Ducera Partners LLC, (iii) Vinson & Elkins LLP as Texas-based counsel for Prepetition CF Credit Facility Lenders, (iv) conflicts counsel for particular matters, if necessary, (v) Quinn Emanuel Urquhart & Sullivan, LLP, as counsel for the majority Prepetition Debenture Holder; (vi) the Prepetition Debenture Trustee (including, without limitation, the fees and expenses of its counsel, Stroock & Stroock & Lavan LLP, and one local counsel); and (vii) counsel for the Prepetition CF Credit Facility Agent, in each case incurred on behalf of the Prepetition CF Credit Facility Agent and/or Prepetition CF Credit Facility Lenders  in connection with the Chapter 11 Cases, subject to the review procedures set forth in paragraph 11 of this Final Order.

(c)     **Adequate Protection for Prepetition Second Lien Notes Secured Parties.**

Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Debtors granted upon

entry of the Interim Order (and hereto, confirm) the Prepetition Second Lien Notes Secured Parties

adequate protection of their interests in all Prepetition Second Lien Notes Collateral against any

Diminution in Value of the Prepetition Second Lien Secured Parties' interests in the Prepetition

Second Lien Notes Collateral, from and after the Petition Date:

(i)     **Adequate Protection Lien.** The Prepetition Second Lien Notes Collateral Agent, on behalf of the Prepetition Second Lien Notes Secured Parties, was granted upon entry of the Interim Order a valid, binding, enforceable, and automatically perfected

postpetition lien on all DIP Collateral to the extent of any Diminution in Value of the Prepetition Second Lien Notes Secured Parties' interests in its Prepetition Second Lien Notes Collateral (the "Second Lien Notes Adequate Protection Liens"), which Second Lien Notes Adequate Protection Liens shall be (x) subject to the Prepetition Intercreditor Agreements as if such DIP Collateral had been Prepetition Collateral as of the Petition Date and (y) subject and subordinate to (1) the Carve Out, (2) Prepetition Second Lien Notes Permitted Prior Liens, (3) CFD Adequate Protection Liens (other than with respect to Call Right Collateral), (4) Third Lien Notes Adequate Protection Liens (solely as to Call Right Collateral), (5) DIP Liens, (6) the ABL Adequate Protection Liens with respect to ABL Priority Collateral and any DIP Priority Collateral (other than Avoidance Actions Proceeds), and (7) the Prepetition ABL Credit Facility Permitted Prior Liens, and the Prepetition ABL Credit Facility Liens with respect to ABL Priority Collateral.

(ii)     **Adequate Protection Claim.**  Subject to clause (h) below, the Prepetition Second Lien Notes Collateral Agent, on behalf of the Prepetition Second Lien Notes Secured Parties, was granted upon entry of the Interim Order an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition Second Lien Notes Secured Parties' interests in the Second Lien Notes Collateral, as provided for in section 507(b) of the Bankruptcy Code (the "Second Lien Notes Adequate Protection Claims"), against each of the DIP Loan Parties on a joint and several basis, which shall be (A) subject and subordinate to the Carve Out, (B) junior to the DIP Superpriority Claims (other than with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds), (C) subject to any permitted senior Liens on such DIP Collateral, (D) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted ABL Priority Collateral or proceeds or products thereof (other than the DIP Proceeds), junior in right of payment to (i) the ABL Adequate Protection Claims, (ii) the Prepetition ABL Credit Facility Obligations, (iii) the DIP Superpriority Claims, and (iv) the CFD Adequate Protection Claims, and senior in right of payment to (y) the Third Lien Notes Adequate Protection Claims, and (z) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, (E) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted Prepetition Collateral (other than the ABL Priority Collateral) or Avoidance Actions Proceeds or MyT Avoidance Actions Proceeds or, in each case, proceeds or products thereof, and with respect to claims against the DIP Proceeds, junior in right of payment to (i) the Carve Out, (ii) the DIP Superpriority Claims (other than with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds), (iii) the CFD Adequate Protection Claims (other than with respect to Call Right Collateral), and (iv) the Third Lien Notes Adequate Protection Claims (solely as to the proceeds of Call Right Collateral) and senior in right of payment to (w) the Prepetition ABL Credit Facility Obligations and the ABL Adequate Protection Claims, (x) the Third Lien Notes Adequate Protection Claims (solely as to the proceeds of non-Call Right Collateral), (y) the CFD Adequate Protection Claims (solely as to the proceeds of non-Call Right Collateral), and (z) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, and (F) in respect of any assets or property which constitute DIP Priority Collateral (other than (i) Avoidance Actions Proceeds, (ii) DIP Proceeds) or proceeds or products thereof, junior in right of payment to (i) the Carve Out, (ii) the DIP Superpriority

Claims, (iii) the CFD Adequate Protection Claim (other than with respect to Call Right Collateral), and (iv) the ABL Adequate Protection Claims (solely as to ABL Priority Collateral) and senior in right of payment to any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code.  Except to the extent expressly set forth in the Interim Order, this Final Order, or the DIP Loan Documents, the Prepetition Second Lien Notes Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Notes Adequate Protection Claims from the DIP Collateral unless and until the Carve Out and any claims having a priority superior to the Second Lien Notes Adequate Protection Claims have indefeasibly been paid in cash (or other form of payment pursuant to an Acceptable Plan) in full and all Commitments have been terminated.

(d)     **Adequate Protection for Prepetition Third Lien Notes Secured Parties.**

Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Debtors granted upon entry of the Interim Order (and hereby confirm) the Prepetition Third Lien Notes Secured Parties adequate protection of their interests in all Prepetition Third Lien Notes Collateral, against any Diminution in Value of the Prepetition Third Lien Secured Parties' interests in the Prepetition Third Lien Notes Collateral, from and after the Petition Date:

(i)     **Adequate Protection Lien.** The Prepetition Third Lien Notes Collateral Agent, on behalf of the Prepetition Third Lien Notes Secured Parties, was granted upon entry of the Interim Order a valid, binding, enforceable, and automatically perfected postpetition lien on all DIP Collateral to the extent of any Diminution in Value of the Prepetition Third Lien Notes Secured Parties' interests in its Prepetition Third Lien Notes Collateral (the "Third Lien Notes Adequate Protection Liens"), which Third Lien Notes Adequate Protection Liens shall be (x) subject to the Prepetition Intercreditor Agreements as if such DIP Collateral had been Prepetition Collateral as of the Petition Date and (y) subject and subordinate to (1) the Carve Out, (2) the Prepetition Second Lien Notes Permitted Prior Liens, (3) the CFD Adequate Protection Liens, and Second Lien Notes Adequate Protection Liens, in each case other than as to Call Right Collateral, (4) DIP Liens, (5) the ABL Adequate Protection Liens with respect to the ABL Priority Collateral, and (6) any DIP Priority Collateral (other than Avoidance Actions Proceeds), and the Prepetition ABL Credit Facility Permitted Prior Liens and the Prepetition ABL Credit Facility Liens with respect to the ABL Priority Collateral.

(ii)     **Adequate Protection Claim.**  Subject to clause (h) below, the Prepetition Third Lien Notes Trustee, on behalf of the Prepetition Third Lien Notes Secured Parties, was granted upon entry of the Interim Order an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition Third Lien Notes Secured Parties' interests in the Third Lien Notes Collateral, as provided for in section 507(b) of the Bankruptcy Code (the "Third Lien Notes Adequate Protection Claims"),

43

against each of the DIP Loan Parties on a joint and several basis, which shall be (A) subject and subordinate to the Carve Out, (B) junior to the DIP Superpriority Claims (other than with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds), (C) subject to any Lien on DIP Collateral, (D) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted ABL Priority Collateral or proceeds or products thereof (other than the DIP Proceeds), junior in right of payment to the (i) ABL Adequate Protection Claims, (ii) the Prepetition ABL Credit Facility Obligations, (iii) the DIP Superpriority Claims, (iv) the Second Lien Notes Adequate Protection Claims, and (v) the CFD Adequate Protection Claims, and senior in right of payment to any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, (E) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted Prepetition Collateral (other than ABL Priority Collateral) or Avoidance Actions Proceeds (including the MyT Causes of Action and MyT Avoidance Actions Proceeds) or, in each case, proceeds or products thereof, and with respect to claims against the DIP Proceeds, junior in right of payment to (i) the Carve Out, (ii) the DIP Superpriority Claims, (iii) the CFD Adequate Protection Claims (except as to the proceeds of Call Right Collateral), and (iv) the Second Lien Notes Adequate Protection Claims (except as to the proceeds of Call Right Collateral) and senior in right of payment to (w) the CFD Adequate Protection Claims (solely as to the proceeds of Call Right Collateral), (x) the Second Lien Notes Adequate Protection Claims (solely as to the proceeds of Call Right Collateral), (y) the Prepetition ABL Credit Facility Obligations and the ABL Adequate Protection Claims (other than with respect to ABL Priority Collateral), and (z) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, and (F) in respect of any assets or property which constitute DIP Priority Collateral (other than (i) Avoidance Actions Proceeds or the MyT Causes of Action and MyT Avoidance Actions Proceeds and (ii) DIP Proceeds) or proceeds or products thereof (other than Avoidance Actions Proceeds or MyT Avoidance Actions Proceeds), junior in right of payment to (i) the Carve Out, (ii) the DIP Superpriority Claims, (iii) the ABL Adequate Protection Claims, (iv) the CFD Adequate Protection Claims, and (v) the Second Lien Notes Adequate Protection Claims and senior in right of payment to any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code.  Except to the extent expressly set forth in the Interim Order, this Final Order, or the DIP Loan Documents, the Prepetition Third Lien Notes Secured Parties, shall not receive or retain any payments, property or other amounts in respect of the Third Lien Notes Adequate Protection Claims from the DIP Collateral unless and until the Carve Out and any claims having a priority superior to the Third Lien Notes Adequate Protection Claims have indefeasibly been paid in cash (or other form of payment pursuant to an Acceptable Plan) in full and all Commitments have been terminated.

(e)     **Additional Adequate Protection for Prepetition Second Lien Notes Secured Parties and Third Lien Notes Secured Parties.** As additional adequate protection of the Prepetition Second Lien Notes Secured Parties' and Prepetition Third Lien Notes Secured Parties' security interests in the Prepetition Second Lien Notes Collateral and the Prepetition Third Lien

Notes Collateral, respectively, the Debtors were, by the Interim Order, and hereby are authorized to provide adequate protection in the form of the following:

(i)     **Fees and Expenses.** The DIP Loan Parties shall pay all reasonable and documented invoiced out-of-pocket fees, costs, and expenses of (A) the Ad Hoc Committee Advisors and (B) one Texas-based local counsel, in each case as advisors to an ad hoc committee of Prepetition Second Lien Notes Secured Parties and Prepetition Third Lien Notes Secured Parties (the "Ad Hoc Committee"), in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date, the "Secured Notes Adequate Protection Fees and Expenses"), as well as the out of pocket fees, costs and expenses (including fees, costs, and expenses of counsel and advisors) of the Prepetition Second Lien Notes Trustee, the Prepetition Second Lien Notes Collateral Agent, the Prepetition Second Lien Notes Paying Agent, the Prepetition Second Lien Notes Registrar, the Prepetition Third Lien Notes Trustee, Prepetition Notes Collateral Agent, the Prepetition Third Lien Paying Agent, and the Prepetition Third Lien Notes Registrar subject to the review procedures set forth in paragraph 11 of this Final Order.

(ii)     **Financial Reporting.** The DIP Loan Parties shall (A) provide the Ad Hoc Committee Advisors, on behalf of the Ad Hoc Committee, and (B) the Prepetition Second Lien Notes Trustee and the Third Lien Notes Trustee with (I) copies of the DIP Reporting (as defined below) promptly after providing the same to the DIP Secured Parties, if provided, (II) a copy of Approved DIP Budget, promptly after the same is approved by the DIP Secured Parties, in each case, in accordance with paragraph 13 hereof, (III) copies of the Monthly Financial Statements (as defined below) promptly upon delivery of same to the DIP Secured Parties and (IV) the other financial and other reporting being delivered pursuant to paragraph 9(b)(i)(B).

(f)     **Adequate Protection for Prepetition ABL Credit Facility Secured Parties.** Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Debtors granted upon entry of the Interim Order (and hereby confirm) the Prepetition ABL Credit Facility Secured Parties adequate protection of their interests in all Prepetition ABL Credit Facility Collateral, including Cash Collateral, against any Diminution in Value of the Prepetition ABL Credit Facility Secured Parties' interests in the Prepetition ABL Credit Facility Collateral (including Cash Collateral) from and after the Petition Date:

(i)     **Adequate Protection Lien.** The Prepetition ABL Credit Facility Agent, on behalf of the Prepetition ABL Credit Facility Secured Parties, was granted upon entry of the Interim Order a valid, binding, enforceable, and automatically perfected postpetition lien on all DIP Collateral (other than Avoidance Actions Proceeds, the MyT Causes of

Action or MyT Avoidance Actions Proceeds), to the extent of any Diminution in Value of the Prepetition ABL Credit Facility Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (the "ABL Adequate Protection Liens" and, together with the CFD Adequate Protection Liens, Second Lien Notes Adequate Protection Liens, and Third Lien Notes Adequate Protection Liens, the "Adequate Protection Liens"), which ABL Adequate Protection Liens shall be (w) subject to the Prepetition Intercreditor Agreements as if such DIP Collateral had been Prepetition Collateral as of the Petition Date, (x) subject and subordinate to the Carve Out (except with respect to ABL Priority Collateral), Prepetition ABL Credit Facility Permitted Prior Liens, and DIP Liens (other than Junior DIP Liens on Junior DIP Collateral as to which the Prepetition ABL Credit Facility Secured Parties hold a senior lien), (y) with respect to the Call Right Collateral, subject and subordinate to the Prepetition Third Lien Notes Liens, Third Lien Notes Adequate Protection Liens, Prepetition Second Lien Notes Liens, Second Lien Notes Adequate Protection Liens, Prepetition CF Credit Facility Liens, and CFD Adequate Protection Liens, and (z) otherwise, with respect to DIP Priority Collateral, *pari passu* with the CFD Adequate Protection Liens. Except as provided herein, the ABL Adequate Protection Liens shall not be subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The ABL Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition ABL Credit Facility Liens or the ABL Adequate Protection Liens.

(ii)     **Adequate Protection Claim.**  Subject to clause (h) below, the Prepetition ABL Credit Facility Agent, on behalf of the Prepetition ABL Credit Facility Secured Parties, was granted upon entry of the Interim Order an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition ABL Credit Facility Secured Parties' interests in the Prepetition Collateral (including Cash Collateral), as provided for in section 507(b) of the Bankruptcy Code (the "ABL Adequate Protection Claim" and, together with the CFD Adequate Protection Claims, Second Lien Notes Adequate Protection Claims, and Third Lien Notes Adequate Protection Claims the "Adequate Protection Claims"), against each of the DIP Loan Parties on a joint and several basis, which shall be (A) subject to Liens on DIP Collateral, (B) in respect of any assets or property that constitute or, but for the commencement of the Chapter 11 Cases, would have constituted ABL Priority Collateral or proceeds or products thereof (other than the DIP Proceeds), senior in right of payments to (i) the Carve Out, (ii) the DIP Superpriority Claims, (iii) the CFD Adequate Protection Claims, (iv) the Second Lien Notes Adequate Protection Claims, (v) the Third Lien Notes Adequate Protection Claims, and (vi) any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, (C) in respect of any assets or property which constitute or, but for the commencement of the Chapter 11 Cases, would have constituted Prepetition Collateral (other than the ABL Priority Collateral) or Avoidance Actions Proceeds, the MyT Causes of Action or MyT Avoidance Actions Proceeds and with respect to claims against the DIP Proceeds, junior in right of payment to (i) the Carve Out, (ii) the DIP Superpriority Claims, (iii) the CFD Adequate Protection Claims, (iv) the Second Lien

Notes Adequate Protection Claims, and (v) the Third Lien Notes Adequate Protection Claims and senior in right of payment to any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, and (D) in respect of any assets or property which constitute DIP Priority Collateral (other than (i) Avoidance Actions Proceeds, the MyT Causes of Action and MyT Avoidance Actions Proceeds, and the DIP Proceeds), *pari passu* in right of payment with the CFD Adequate Protection Claims and junior in right of payment to the DIP Superpriority Claims and senior in right of payment to (x) the Second Lien Notes Adequate Protection Claims, (y) the Third Lien Notes Adequate Protection Claims, and (z) any and all other administrative expense claims of the kind specified or ordered pursuant to any provision of the Bankruptcy Code.  Except to the extent expressly set forth in the Interim Order, this Final Order, or the DIP Loan Documents, the Prepetition ABL Credit Facility Secured Parties, shall not receive or retain any payments, property, or other amounts in respect of the ABL Adequate Protection Claim from the DIP Collateral (other than ABL Priority Collateral) unless and until the Carve Out and any claims having a priority superior to the ABL Adequate Protection Claims have indefeasibly been paid in cash (or other form of payment pursuant to an Acceptable Plan) in full and all Commitments have been terminated; *provided* that, in respect of Avoidance Actions Proceeds, the MyT Causes of Action or MyT Avoidance Actions Proceeds, any ABL Adequate Protection Claims shall be junior in right of payment of the CFD Adequate Protection Claims, the Second Lien Notes Adequate Protections Claims, the Third Lien Notes Adequate Protection Claims, and the DIP Superpriority Claims.  Any assets or property or other distribution received by the Prepetition ABL Credit Facility Agent, the FILO Agent or any other Prepetition ABL Credit Facility Secured Party on account of any ABL Adequate Protection Claims or any Prepetition ABL Credit Facility Obligations shall be subject to the ABL-FILO Intercreditor Provisions.

(g)     **Additional Adequate Protection for Prepetition ABL Credit Facility Secured Parties.** As additional adequate protection of the Prepetition ABL Credit Facility Secured Parties' security interests in the Prepetition ABL Credit Facility Collateral, including the Cash Collateral, the Debtors were, by the Interim Order, and hereby are authorized to provide adequate protection in the form of the following (collectively, the "ABL Adequate Protections" and the payments set forth in clauses 9(g)(i) and 9(g)(ii), the "ABL Adequate Protection Payments"):

(i)     **Interest and Other Amounts Due Under Prepetition ABL Credit Agreement.** From and after entry of the Interim Order, the Prepetition ABL Credit Facility Agent, on behalf of the Prepetition ABL Credit Facility Secured Parties, shall receive cash payment in immediately available funds, (x) promptly upon the entry of this Final Order, all accrued and unpaid amounts (whether accrued prior to or after the Petition Date) in respect of the following, and (y) thereafter, as and when due under the Prepetition ABL Credit Documents or as provided herein (whichever is earlier): all interest, fees and other amounts (other than principal), including without limitation, any L/C Participation Fees (giving effect to the default interest rate applicable to Revolving Loans) and Issuing Bank

Fees (each, as defined in the Prepetition ABL Credit Agreement), each of which shall, in each case, accrue and be payable at the rates and times provided for under the respective Prepetition ABL Credit Documents, including at the default rate specified in Section 2.13(3) of the Prepetition ABL Credit Agreement.  In the event the value of the Prepetition ABL Credit Facility Collateral is determined, pursuant to a final, non-appealable order of a court of competent jurisdiction, to be less than the value of the Prepetition ABL Credit Facility Obligations, the DIP Loan Parties and all other parties in interest reserve all rights to seek to recharacterize such interest payments as principal payments.

(ii)     **Fees and Expenses.** The DIP Loan Parties shall pay in full, in cash and in immediately available funds, all accrued and unpaid reasonable and documented invoiced out-of-pocket fees, costs and expenses (whether accrued prior to or after the Petition Date) of (A) White & Case LLP, (B) Schulte Roth & Zabel LLP, (C) FTI Consulting, Inc. ("FTI"), (D) Gray Reed & McGraw LLP, (E) one Texas-based legal counsel retained by the FILO Agent, or on behalf of, the FILO Lenders (as defined under the Prepetition ABL Credit Agreement), (F) one Acceptable Appraiser (as defined in the Prepetition ABL Credit Agreement, which may be Great American Group) to the extent an appraisal is undertaken in accordance with clause (vi) below, and (G) one collateral examiner to the extent a collateral examination is undertaken in accordance with clause (vi) below, in each case incurred on behalf of the Prepetition ABL Credit Facility Agent, the FILO Agent and the Prepetition ABL Credit Facility Lenders in connection with the Chapter 11 Cases, subject to the review procedures set forth in paragraph 11 of this Final Order.

(iii)     **Financial Reporting and Other Affirmative Covenants**. The DIP Loan Parties shall (A) provide the Prepetition ABL Credit Facility Agent, on behalf of the Prepetition ABL Credit Facility Secured Parties, and FTI with (I) copies of the DIP Reporting (as defined below) promptly after providing the same to the DIP Secured Parties, (II) copies of the Monthly Financial Statements (as defined in, and set forth in Section 5.04(c) of, the DIP Credit Agreement) promptly after providing the same to the DIP Secured Parties, and (III) a copy of the Initial Budget, promptly after the same is approved by the DIP Secured Parties, the Prepetition ABL Credit Facility Agent, and the FILO Agent, and any Updated DIP Budget (as defined below), promptly after the same is approved by the DIP Secured Parties, in each case, in accordance with paragraph 13 hereof, (B) otherwise continue with financial and other reporting substantially in compliance with the Prepetition ABL Credit Agreement to the extent required to be delivered under the DIP Credit Agreement; *provided* that the DIP Loan Parties shall not be required to deliver (1) annual financial statements and other documents required to be delivered in conjunction or concurrently therewith, (2) quarterly financial statements for the third fiscal quarter ending May 2, 2020 and other documents required to be delivered in conjunction or concurrently therewith, and (3) any annual budgets, (C) provide the Prepetition ABL Credit Facility Secured Parties with the opportunity to participate in telephonic conference calls with senior members of the Debtors' management at reasonable times during normal business hours (subject to availability) with reasonable advance notice, (D) reasonably cooperate with any financial advisor retained by the Prepetition ABL Credit Facility Agent and (E) comply with the affirmative covenants set forth in Sections 5.01, 5.02, 5.03 (as modified in accordance with Section 5.03 of the DIP Credit Agreement), 5.04(10), 5.05(4), 5.06 (as modified in accordance with Section 5.06 of the DIP Credit

Agreement), 5.07(1), and 5.07(4) of the Prepetition ABL Credit Agreement; *provided*, *however*, that no new appraisals or field examinations shall be conducted for the purpose of determining the ABL Borrowing Base (as defined below) or compliance therewith during the first five (5) months following the Petition Date; *provided*, *further* that if the DIP Agent and/or DIP Lenders waive the Debtors' compliance to provide the DIP Reporting under the DIP Loan Documents, then the Debtors shall not be required to comply with clause (B) hereof during the time such waiver is effective.

(iv) **ABL Borrowing Base.** The Debtors shall not permit the Revolving Facility Credit Exposure (as defined in the Prepetition ABL Credit Agreement) at any time to exceed the Borrowing Base (as defined in, and determined in accordance with, the Prepetition ABL Credit Agreement, but modified as provided in this paragraph 9(g)(iv) below, the "ABL Borrowing Base") then in effect, which, for the avoidance of doubt, shall give effect to the Net Orderly Liquidation Values (as defined in the Prepetition ABL Credit Agreement, the "NOLVs") set forth in the appraisal prepared by Great American Group for the Prepetition ABL Credit Facility Agent effective February 1, 2020 pursuant to Section 5.07(3) of the Prepetition ABL Credit Agreement but shall apply an NOLV of 100.8% for the duration of the Chapter 11 Cases (unless and until modified after the five (5) month anniversary of the Petition Date by way of a new appraisal required by the Prepetition ABL Credit Facility Agent as permitted pursuant to paragraph 9(g)(vi) below); *provided* that, (x) at all times during the Chapter 11 Cases, there shall be a reserve to the ABL Borrowing Base in an amount equal to the Applicable Block Percentage (as defined below) of the sum of (a) the lesser of (I) the ABL Borrowing Base (determined without giving effect to the reserve contemplated by this clause (x) and without giving effect to the FILO Reserve (as defined in the Prepetition ABL Credit Agreement), if any) and (II) $900 million plus (b) the lesser of (I) the FILO Borrowing Base (as defined in the Prepetition ABL Credit Agreement) and (II) $100 million, which shall be in addition to the reserves set forth in **Annex 1** attached hereto; *provided*, *further*, that the ABL Borrowing Base shall not otherwise reflect any new discretionary reserves during the Chapter 11 Cases and (y) the ABL Borrowing Base may be increased by the amount of cash held in the Segregated Collateral Account (as defined below) designated as a "builder" as provided below.

(v) **Segregated Collateral Account.** The Debtors shall maintain a minimum of $50 million in a controlled segregated cash reserve account with the Prepetition ABL Credit Facility Agent or another financial institution reasonably acceptable to it (it being agreed that JPMorgan Chase is reasonably acceptable) or designated as cash collateral in a controlled account in favor of the Prepetition ABL Credit Facility Agent until such segregated cash reserve account is set up after the Petition Date (with the Debtors agreeing to use commercially reasonable efforts to do so as soon as reasonably practicable after the Petition Date) (the "Segregated Collateral Account"), which shall constitute ABL Priority Collateral and shall be subject to the ABL Adequate Protection Liens and to the ABL-FILO Intercreditor Provisions, which amount may be withdrawn and/or designated as a "builder" to the ABL Borrowing Base as provided below.  If, at any point during the Chapter 11 Cases, the Debtors are no longer in compliance with the ABL Borrowing Base, the Debtors will be required to either (A) make a cash paydown of the Revolving Loans (as defined in the Prepetition ABL Credit Agreement) with cash on hand or cash in the Segregated

Collateral Account or (B) designate (by way of written notice to the Prepetition ABL Credit Facility Agent, which may be in the form of e-mail) a portion of the cash in the Segregated Collateral Account as a permitted builder to the ABL Borrowing Base, in each case as needed to restore compliance with the ABL Borrowing Base within one (1) business day; *provided* that cash in the Segregated Collateral Account designated as a permitted builder to the ABL Borrowing Base may be un-designated at the option of the Debtors if such cash is no longer necessary for compliance with the ABL Borrowing Base.  Cash in the Segregated Collateral Account may be withdrawn (I) to repay outstandings under the Prepetition ABL Credit Agreement as provided above in order to restore compliance with the ABL Borrowing Base, (II) on or within two (2) business days after October 1, 2020 (if the Debtors have so elected, in their sole discretion, by irrevocable written notice to the Prepetition ABL Credit Facility Agent and the FILO Agent), in an aggregate amount of up to $15 million, for use in accordance with the Approved DIP Budget; *provided* that, if the Debtors, in their discretion in accordance with this clause (II) elect to withdraw $15 million from the Segregated Collateral Account, the Debtors shall thereafter only be required to maintain a minimum balance of $35 million (rather than $50 million) from the date following such withdrawal; *provided*, *further*, that after giving effect to any such withdrawal pursuant to this clause (II), the Debtors (x) shall be in compliance with the ABL Borrowing Base calculated using the Applicable Block Percentage set forth in clause (ii) of the definition thereof and (y) shall have delivered an officer's certificate from a Responsible Officer (as defined in the ABL Prepetition CF Credit Agreement) demonstrating such compliance, or (III) at any time to the extent (x) such cash is not designated as a "builder" to the ABL Borrowing Base at such time and (y) after withdrawing such cash, the $50 million minimum balance (or $35 million minimum balance if reduced in accordance with the preceding clause (II)) is maintained.  As used herein, the "Applicable Block Percentage" means (i) initially, 7.0% and (ii) upon and at all times after any withdrawal of cash from the Segregated Collateral Account as contemplated by clause (II) of the immediately preceding sentence, 10.0%).  The amount of cash in the Segregated Collateral Account designated as a "builder" in any Cash Collateral Borrowing Base Certificate (as defined below) shall be deemed to remain designated as such until the delivery of the subsequent Cash Collateral Borrowing Base Certificate at which point the amount of the "builder" shall be reset to the new amount designated therein.

(vi)     **Appraisals and Field Examinations.**  Notwithstanding anything to the contrary herein or in the Prepetition ABL Credit Agreement, the Prepetition ABL Credit Facility Agent will not be entitled to request access for and/or request any new appraisals and field examinations of ABL Priority Collateral for the purpose of determining the ABL Borrowing Base or compliance therewith during the first five (5) months following the Petition Date (but shall be permitted to do so (x) from time to time for valuation purposes that do not impact the calculation of the ABL Borrowing Base at the Prepetition ABL Credit Facility Agent's own expense, and (y) after such five-month anniversary consistent with the terms of the Prepetition ABL Credit Agreement), it being understood, for the avoidance of doubt, that the Prepetition ABL Credit Facility Agent may request access for and commission one new appraisal and one new field examination of ABL Priority Collateral on terms consistent with the ABL Prepetition Credit Agreement after the three (3) month anniversary of the Petition Date, so long as the same are not used for the purpose

of determining the ABL Borrowing Base or compliance therewith during the first five (5) months following the Petition Date.

(vii) **Borrowing Base Certificate.** The Debtors shall provide the Prepetition ABL Credit Facility Agent with a Borrowing Base Certificate (as defined in, and as contemplated by Section 5.04(12) of, the Prepetition ABL Credit Agreement, but subject to the modifications described in this paragraph 9 (the "Cash Collateral Borrowing Base Certificate")), on the Thursday of the first full calendar week following the Petition Date and every Thursday thereafter (or, if Thursday is not a business day, on the next succeeding business day), calculated as of the close of business on Saturday of the immediately preceding calendar week, together with such supporting materials as the Prepetition ABL Credit Facility Agent or the FILO Agent may reasonably request (which requests may be more frequent with respect to information regarding Eligible Cash (as defined in the Prepetition ABL Credit Agreement)). In addition, on or before the 15th business day of each month from and after entry of this Final Order (or such later date as agreed to by the Prepetition ABL Credit Facility Agent), the Debtors shall provide the Prepetition ABL Credit Facility Agent with the supporting materials for the most recently ended month of the type (and in the form) historically provided to the Prepetition ABL Credit Facility Agent in connection with the delivery of the monthly Borrowing Base Certificate under, and as defined in, the Prepetition ABL Credit Agreement, to the extent such supporting materials are applicable to the Cash Collateral Borrowing Base Certificate delivered pursuant to this paragraph 9(g)(vii).

(viii) **Milestones**. As a condition to the use of the Prepetition ABL Credit Facility Collateral (including Cash Collateral) of the Prepetition ABL Credit Facility Secured Parties, the Debtors shall comply with the milestones set forth in **Annex 2** hereto (each, an "ABL Milestone"), which ABL Milestones shall not be extended or waived without the prior written consent of the Prepetition ABL Credit Facility Agent.

(ix) **Assumed/Rejected Leases.** The Debtors shall notify the Prepetition ABL Credit Facility Agent as soon as reasonably practicable if they intend on modifying the treatment of leases to be assumed or rejected by the Debtors as set forth in the Disclosure Statement (as defined below).

(h) **MyT Causes of Action and MyT Avoidance Actions Proceeds**. Notwithstanding the foregoing, the Adequate Protection Claims shall not attach to (or be payable from) the MyT Causes of Action or the MyT Avoidance Actions Proceeds unless a Challenge against a holder of Series A Preferred Stock or a Prepetition Secured Party (in each case solely in its capacity as a Series A Preferred Stock holder, noteholder or lender, as the case may be and not, for the avoidance of doubt, (i) Neiman Marcus Group Inc. or (ii) any person in its capacity as a shareholder of Neiman Marcus Group, Inc.) or Ancillary MyT Challenge (other than a Permitted Action) has been

commenced (or is publicly supported) by the Official Committee, any member of the Official Committee (or its affiliates) or any other party in interest on behalf of or for the benefit of the Debtors' estates or creditors (and is not publicly opposed by the Official Committee), whereupon the Adequate Protection Claims shall automatically and without further action attach to (and be payable from) the MyT Causes of Action and MyT Avoidance Actions Proceeds in accordance with the priorities set forth herein.

10.    **Relative Priority of Liens**. Notwithstanding anything to the contrary in this Final Order or in the DIP Loan Documents, the relative priority of each DIP Lien, the Prepetition Liens, and the Adequate Protection Liens shall be as set forth in **Exhibit 1** attached hereto; *provided* that, for the avoidance of doubt, each such Lien (other than the Prepetition ABL Credit Facility Liens and the ABL Adequate Protection Liens, in each case, with respect to the ABL Priority Collateral) shall be subject and subordinate to the Carve Out in all respects.

11.    **Adequate Protection Fees and Expenses**. Subject to the review procedures set forth in this paragraph 11, payment of all reasonable and documented invoiced out-of-pocket fees and expenses provided for herein as adequate protection shall not be required to comply with the U.S. Trustee guidelines or file fee applications with the Court with respect to any fees or expenses payable herein, may be in summary form only (and shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, counsel to the DIP Agent, counsel to any Official Committee, and the U.S. Trustee (the "Fee Notice Parties"); *provided*, *however*, that any time such

professionals seek payment of fees and expenses from the Debtors, the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to any attorney-client privilege limitations. If no objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within ten business days after delivery of such invoices (the "Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any case, within ten business days. If an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. Notwithstanding the foregoing, the DIP Loan Parties were, by the Interim Order, and hereby are authorized and directed, without further notice or hearing, to pay, on the date on which the DIP Facility was initially funded, all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition CF Credit Facility Secured Parties, Prepetition Second Lien Notes Secured Parties, Prepetition Third Lien Notes Secured Parties, Ad Hoc Committee, and Prepetition ABL Credit Facility Secured Parties incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the Prepetition CF Credit Documents, Prepetition Second Lien Notes Documents, Prepetition Third Lien Notes Documents, and/or Prepetition ABL Credit Documents, and the DIP Orders, as applicable. Payments of any amounts set forth in this paragraph 11 shall not be subject to recharacterization, subordination, or disgorgement, unless expressly provided herein, including pursuant to paragraph 27.

12.      **Reservation of Rights of Prepetition Secured Parties.**

(a)      Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition CF Credit Facility Secured Parties and Prepetition Debenture Secured Parties; *provided* that any of the Prepetition CF Credit Facility Agent, acting on its own behalf or at the direction of the Prepetition CF Credit Facility Secured Parties or the Prepetition Debenture Trustee, acting on its own behalf or at the direction of the Prepetition Debenture Secured Parties, may request further or different adequate protection, including Adequate Protection Liens and Adequate Protection Claims with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds, and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request.

(b)      Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition ABL Credit Facility Secured Parties; *provided* that the Prepetition ABL Credit Facility Agent, acting on its own behalf or at the direction of the Prepetition ABL Credit Facility Secured Parties, may request further or different adequate protection, including Adequate Protection Liens and Adequate Protection Claims with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds, and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request.

(c)      Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the

adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Second Lien Notes Secured Parties; *provided* that the Prepetition Second Lien Notes Collateral Agent, acting on its own behalf or at the direction of the Prepetition Second Lien Notes Secured Parties, may request further or different adequate protection, including Adequate Protection Liens and Adequate Protection Claims with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request.

(d)     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Third Lien Notes Secured Parties; *provided* that the Prepetition Third Lien Notes Trustee, acting on its own behalf or at the direction of the Prepetition Third Lien Notes Secured Parties, may request further or different adequate protection, including Adequate Protection Liens and Adequate Protection Claims with respect to the MyT Causes of Action and MyT Avoidance Actions Proceeds, and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request.

13.     **Approved DIP Budget.**  All borrowings under the DIP Facility, and the use of Cash Collateral, shall at all times comply with the Approved DIP Budget (subject to Permitted Variances) and the DIP Loan Documents. The Debtors shall (a) provide copies of the reporting required under Sections 5.04(q) and (r) of the DIP Credit Agreement (collectively, the "DIP Reporting") as and when required under the DIP Credit Agreement and to counsel to the Official Committee and (b) comply with all financial or other reporting, lender or advisor call, budget, variance reporting, and testing requirements as set forth in the DIP Loan Documents. As

set forth in Section 5.04(n) of the DIP Credit Agreement, on or before 12:00 p.m., New York City time, on the Thursday of the third (3rd) full calendar week ending after the Petition Date, which, for the avoidance of doubt, shall be May 28, 2020 (or such later time as agreed to in writing (including via e-mail) by the Required DIP Lenders in their sole discretion) and each fourth (4th) calendar week thereafter, the Debtors shall deliver, as described in the DIP Loan Documents, updates to the Initial Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered, consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required DIP Lenders in their reasonable discretion (each such supplemental budget, an "Updated DIP Budget"), and once so approved by the Required DIP Lenders in their reasonable discretion, such Updated DIP Budget shall constitute the then-approved "Approved DIP Budget"; *provided* that unless and until the Required DIP Lenders approve such Updated DIP Budget, the then-current Approved DIP Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered; *provided*, *further*, that the Debtors shall provide any Approved DIP Budget to counsel to the Official Committee promptly after the same is approved by the DIP Secured Parties.

14.     **Modification of Automatic Stay.** Subject to paragraph 21 hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code was, by the Interim Order, and hereby is modified as necessary to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the DIP Loan Parties to incur all liabilities and obligations, including all the DIP Obligations, to the

DIP Secured Parties as contemplated under this Final Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements, and documents that may be reasonably required, necessary, or prudent for the performance by the applicable DIP Loan Parties under the DIP Loan Documents and any transactions contemplated therein or in this Final Order in each case in accordance therewith or herewith; (c) the DIP Loan Parties to take all appropriate actions to grant the Adequate Protection Liens and the Adequate Protection Claims set forth herein, and to take all appropriate actions (including such actions as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted hereunder were perfected upon the date of the Interim Order and maintain the priority set forth herein and therein; (d) the DIP Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Final Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Final Order; (f) subject to paragraphs 20 and 21 hereof, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event, subject to the Remedies Notice Period, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein in accordance therewith; (g) subject to paragraph 35 hereof, the Prepetition ABL Credit Facility Secured Parties to exercise, upon the occurrence and during the continuance of any Cash Collateral Termination Event, subject to the ABL Remedies Notice Period, all rights and remedies provided for in this Final Order and take any or all actions provided for therein or herein; and (h) subject to paragraphs 20 and 21 hereof, the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the DIP Loan Documents, in each

case, in accordance herewith and therewith, without further notice, motion or application to, or order of this Court.

15.     **Perfection of DIP Liens and Adequate Protection Liens.** The DIP Orders are sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted therein and herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Agents, without any further consent of any party, were, by the Interim Order, and hereby are authorized to execute, file, or record, as the case may be (and the DIP Agent and Prepetition Agents may reasonably request the execution, filing, or recording), as each, in its reasonable discretion deems necessary, such financing statements, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve, and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable Adequate Protection Liens, as applicable, and all such financing statements, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided* that no such filing or recordation shall be necessary or required in order to create, perfect, preserve, or enforce the DIP Liens and/or the Adequate Protection Liens. The Debtors were, by the Interim Order, and hereby are authorized to execute and deliver promptly upon reasonable request and in accordance with

the DIP Loan Documents to the DIP Agent and each of the Prepetition Agents all such financing statements, notices, and other security documents as the DIP Agent and the Prepetition Agents may reasonably request. The DIP Agent and the Prepetition Agents, each in its discretion, may file a photocopy of the Interim Order or this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. To the extent that any Prepetition Agent is a secured party under any account control agreement, listed as an additional insured, loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "Security Document"), the DIP Agent shall also be deemed to be the secured party under each such Security Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received subject to the Carve Out and in accordance with the terms of the DIP Orders, as applicable, and the other DIP Loan Documents.  Each Prepetition Agent shall serve as agent for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of the DIP Orders) may be accomplished only by possession or control by a secured party to the extent such Prepetition Agent possesses or controls any such DIP Collateral.  Notwithstanding anything in this paragraph 15 or elsewhere in this Final Order to the contrary, in no event shall the DIP Collateral include the "Other Second Lien Collateral" or the "Other Third Lien Collateral," each as defined in the Junior Lien Intercreditor Agreement and in no event shall the DIP Agent or any other DIP Secured Party, or

any Prepetition Secured Party (other than the Prepetition Second Lien Notes Secured Parties and the Prepetition Third Lien Notes Secured Parties, as applicable) have any rights with respect to the Other Second Lien Collateral or the Other Third Lien Collateral or be deemed to be a secured party with respect to the Other Second Lien Collateral or the Other Third Lien Collateral.

16.      **Proceeds of Subsequent Financing.** Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the indefeasible payment in full in cash (or other form of payment pursuant to an Acceptable Plan) of all of the DIP Obligations and the Prepetition Secured Obligations, the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Final Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, either the DIP Loan Parties, the DIP Loan Parties' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the DIP Loan Parties' Chapter 11 Cases or any Successor Cases thereof, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final Order or the DIP Loan Documents then, unless otherwise agreed by the requisite DIP Lenders in their discretion:  (i) after satisfaction of the Carve Out, all of the cash proceeds derived from such credit or debt and all DIP Collateral (other than the Junior DIP Collateral) shall immediately be turned over to the DIP Agent for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Obligations pursuant to the applicable DIP Loan Documents, (ii) after satisfaction of the Carve Out and the payment in full of all permitted prior liens in cash, all of the cash proceeds derived from all Junior DIP Collateral shall immediately be turned over to the DIP Agent for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Obligations pursuant to the

applicable DIP Loan Documents, and (iii) after satisfaction of the Carve Out and payment in full of all DIP Obligations in cash (and, in the case of the Junior DIP Collateral, after payment in full of all permitted prior liens in cash), all the cash proceeds derived from DIP Collateral shall immediately be turned over to the Prepetition Agents, for further distribution to the applicable Prepetition Secured Parties pursuant to the terms of this Final Order and/or the applicable Prepetition Loan Documents.

17.      **Financial Reporting; Monitoring of Collateral.**   Without limitation of the requirements of the DIP Loan Documents, the DIP Loan Parties shall (a) provide to the DIP Agent and the DIP Lenders (and, in each case, their respective consultants, advisors and professionals) or, if contemplated by the DIP Loan Documents, the financial advisor to the DIP Lenders and counsel to the Official Committee, (i) all financial information required under the DIP Loan Documents, and (ii) reasonable access upon reasonable notice and during regular business hours to the DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the Debtors' businesses and the value of the DIP Collateral. The DIP Loan Parties shall also provide such reports and information required to be provided in the DIP Loan Documents, and such other reports and information as may be reasonably requested by the Prepetition Secured Parties (and their respective professionals), and reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors hereby authorize their accountants, attorneys, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and the DIP Lenders (and, in each case, their respective consultants, advisors and professionals) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors. Notwithstanding anything in this paragraph 17 to the contrary, in no event shall the DIP Loan

Parties be required to provide (1) annual financial statements and other documents required to be delivered in conjunction or concurrently therewith, (2) quarterly financial statements for the third fiscal quarter ending May 2, 2020 and other documents required to be delivered in conjunction or concurrently therewith or (3) any annual budgets.

18.     **Milestones**. It is a condition to the DIP Facility and the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in the DIP Credit Agreement (the "Milestones"). The failure to comply with any Milestone shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement.

19.     **Maintenance of DIP Collateral.**

(a)     Until all DIP Obligations are indefeasibly paid in full and the DIP Secured Parties' obligation to extend credit under the DIP Facility has terminated, the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents. The DIP Loan Parties have provided the DIP Agent and its counsel with photocopy evidence of such insurance. Upon entry of the Interim Order and to the fullest extent provided by applicable law, the DIP Agent was, and was deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the Prepetition Secured Obligations (subject to the terms and conditions of the Prepetition Intercreditor Agreements).

(b)      The Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Final Order, the Cash Management Order,[6] and any order that may be entered by the Court in accordance with this Final Order (which has first been agreed to by the DIP Lenders in accordance with the DIP Credit Agreement or the Restructuring Support Agreement, as applicable).

20.      **DIP Termination Events.** The occurrence and continuance of any "Event of Default" under and as defined in the DIP Credit Agreement shall constitute a "DIP Termination Event" under this Final Order (each a "<u>DIP Termination Event</u>," and the date upon which such DIP Termination Event occurs, the "<u>DIP Termination Date</u>") , unless waived in writing by the Required DIP Lenders; provided that the entry of an order described under Section 8.01(s) of the DIP Credit Agreement shall not constitute an Event of Default thereunder or a DIP Termination Event hereunder and the DIP Loan Parties shall not be entitled to exercise any rights and remedies with respect to the entry of such an order.

21.      **Exercise of Remedies.**

(a)      Immediately upon the occurrence and during the continuation of a DIP Termination Event, subject to the Remedies Notice Period described below, the DIP Agent, at the direction of the Required DIP Lenders, shall (in the case of a DIP Termination Event), and any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Final Order, including clause (b) of this paragraph 21, was, by the Interim Order, and hereby is modified, without further notice to, hearing of, or order from this

---

[6]      As used herein, "<u>Cash Management Order</u>" means the *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Maintain Existing Bank Accounts, and (C) Continue to Perform Intercompany Transactions, (II) Maintain Existing Business Forms, and (III) Granting Related Relief*, filed contemporaneously herewith.

Court, to the extent necessary to permit the DIP Agent to, upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties (as defined below): (i) declare all DIP Obligations owing under the applicable DIP Facility to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan Parties under the DIP Facility (to the extent any such commitment remains); (iii) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation thereunder, but without affecting the DIP Liens or the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Final Order and the DIP Loan Documents to use any Cash Collateral of the DIP Secured Parties; (v) charge interest at the default rate under the DIP Facility; (vi) freeze monies or balances in the DIP Proceeds Account; (vii) otherwise enforce any and all rights against the DIP Collateral (other than ABL Priority Collateral) in the possession of the DIP Agent, including, without limitation, disposition of the DIP Collateral (other than ABL Priority Collateral) solely for application towards the Carve Out and the DIP Obligations in accordance with their respective priorities; and (viii) take any other actions or exercise any other rights or remedies (other than with respect to ABL Priority Collateral) permitted under this Final Order, the DIP Loan Documents, or applicable law; *provided* that prior to the exercise of any right in clauses (i) through (viii) of this paragraph, the DIP Agent shall be required to file a motion with the Court seeking emergency relief from the automatic stay (the "Stay Relief Motion") on at least five (5) business days' written notice to counsel to the Debtors, counsel to the Prepetition Agents, counsel to the Ad Hoc Committee, counsel to any Official Committee, and the U.S. Trustee (the "Remedies Notice Parties") of the DIP Agent's intent to exercise its rights and remedies (the "Remedies Notice Period") and to obtain such relief; *provided*, *however*, that during the Remedies Notice Period, and in the cases of the succeeding clauses (ii) and (iii), until the Court orders otherwise, (i) the Debtors

and the Official Committee may seek an emergency hearing before the Court (to be held within the Remedies Notice Period) solely to contest whether an Event of Default has occurred, (ii) the DIP Lenders shall not be obligated to make any loans or advances under the DIP Facility and (iii) the Debtors may use Cash Collateral of the DIP Secured Parties only to pay the following amounts and expenses: (A) the Carve Out (provided that no Cash Collateral constituting ABL Priority Collateral shall be used for such purpose) and (B) amounts that the Debtors have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates, and have been approved in advance in writing by the Required DIP Lenders.

(b)     Unless during such Remedies Notice Period the Court determines that a DIP Termination Event has not occurred or has occurred and is not continuing, the DIP Agent shall be deemed to have received relief from the automatic stay to exercise all rights and remedies available against the DIP Collateral (other than the ABL Priority Collateral) permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code or otherwise (in each case, subject to paragraph 21(c) hereof); *provided* that the DIP Agent must file the Stay Relief Motion with the Court to terminate the stay or file written notice using a CM/ECF emergency event code, to, in accordance therewith and with the DIP Loan Documents, foreclose on or otherwise exercise remedies against all or any portion of the DIP Collateral (other than ABL Priority Collateral), occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral (other than the ABL Priority Collateral); *provided*, *further* that in the event that a party challenges the DIP Agent's assertion that a DIP Termination Event has occurred or has occurred and is continuing and the Court is unavailable for a hearing during the Remedies Notice Period, the automatic stay shall remain in effect until the Court has an opportunity to rule on such challenge.

Upon the occurrence and during the continuation of a DIP Termination Event and the later of (i) expiration of the Remedies Notice Period or (ii) the Court's ruling on a challenge, if any, the DIP Agent and any liquidator or other professional acting at the DIP Agent's direction will have the right to access and utilize, on a royalty-free basis, any trade names, trademarks, copyrights, or other intellectual property and any warehouse, distribution centers, store, or other locations that the Debtors have a right to occupy to the extent necessary or appropriate in order to sell, lease, or otherwise dispose of any of the DIP Collateral (other than ABL Priority Collateral), including pursuant to any Court approved sale process (subject, in each case, to the rights of third parties in each of the foregoing).   Notwithstanding anything to the contrary herein, the DIP Secured Parties can only enter upon a leased premises during the continuation of a DIP Termination Event in accordance with (w) a separate written agreement by and between the DIP Secured Parties and any applicable landlord, (x) pre-existing rights of the DIP Secured Parties and any applicable landlord under applicable non-bankruptcy law, (y) consent of the applicable landlord, or (z) entry of an order of this Court obtained by motion of the applicable DIP Secured Party on such notice to the landlord as shall be required by this Court.

(c)       The Debtors (i) shall reasonably cooperate with the DIP Agent in its exercise of rights and remedies, whether against DIP Collateral (other than ABL Priority Collateral) or otherwise, (ii) waive any right to seek relief under section 105 of the Bankruptcy Code, and (iii) unless the Court orders otherwise, may not contest or challenge the exercise of any such rights or remedies other than to dispute whether a DIP Termination Event has in fact occurred; *provided* that the DIP Agent shall not object to a request by the Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has in fact occurred.   During the

Remedies Notice Period, the DIP Loan Parties and DIP Agent consent to such a hearing on an expedited basis.

(d)      So long as there are any DIP Obligations outstanding or any DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreement), in each case with respect to DIP Collateral that is secured by DIP Liens that in accordance with the DIP Orders are senior to any liens held by Prepetition Secured Parties, then with respect to such DIP Collateral, such Prepetition Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or the DIP Orders, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such DIP Collateral or proceeds thereof (until payment in full in cash (or other form of payment pursuant to an Acceptable Plan) of all DIP Obligations and termination of the Commitments), to the extent such transfer, disposition, sale, or release is authorized under the applicable DIP Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), any of the applicable DIP Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to the DIP Orders or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date.  For the avoidance of doubt, all provisions in this paragraph 21 that explicitly do not apply to the ABL Priority Collateral shall apply to the ABL Priority Collateral following the payment in full in cash of the Prepetition ABL Credit Facility Obligations.

22.     **DIP Fees and Expenses.**  The DIP Loan Parties were by the Interim Order and hereby are authorized to pay, in cash and on a current basis, all DIP Fees and Expenses, as and when due under the DIP Loan Documents and this Final Order, whether or not the transactions contemplated hereby are consummated, whether incurred prior to, on, or after the Petition Date, and whether or not contained in the Approved DIP Budget and without limitation with respect to the dollar estimates contained in the Approved DIP Budget; *provided*, *however*, that such overages shall not weigh against the DIP Loan Parties in any testing related to compliance with the Approved DIP Budget. Payment of all DIP Fees and Expenses shall not be subject to further review or allowance by the Court. The invoices for such DIP Fees and Expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, with a copy to the Fee Notice Parties; *provided*, *however*, that the Debtors reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals, subject to any attorney-client privilege limitations. If no objection to payment of the requested fees and expenses is made in writing by any of the Fee Notice Parties within the Fee Objection Period, then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any case, within ten (10) business days. Any objection to payment of the requested fees and expenses shall be limited to reasonableness and no objection shall be made on any other basis.  If any objection (solely as to reasonableness) is made

by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.  Notwithstanding the foregoing, the DIP Loan Parties were by the Interim Order and hereby are authorized and directed, without further notice or hearing, to pay on the date on which the DIP Facility is initially funded all reasonable and documented fees, costs, and out-of-pocket expenses of the DIP Agent, each DIP Lender, and each of their counsel and advisors, including legal fees and reasonable and documented expenses, incurred on or prior to such date to the extent otherwise payable in accordance with the terms of the DIP Loan Documents. Payments of any amounts set forth in this paragraph 22 shall not be subject to recharacterization, subordination, or disgorgement except as expressly provided in the preceding sentence.

23.    **Indemnification.**  The DIP Loan Parties shall jointly and severally indemnify and hold harmless the DIP Agent and each DIP Secured Party and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equityholders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of-pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Credit Agreement) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of:  (i) the execution or delivery of the DIP Credit Agreement, any other DIP Loan Document, the performance by the parties thereto of their

respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Loans; (iii) the enforcement or protection of its rights in connection with the DIP Credit Agreement, and any other DIP Loan Document; (iv) the negotiation of and consent to the DIP Orders; or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; *provided* that no Indemnitee will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnitee or (B) a material breach of the obligations of such Indemnitee under the DIP Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than (A) claims against the DIP Agent or its affiliates, in their capacity or in fulfilling their role as the agent or any other similar role under the DIP Facility (excluding their role as a DIP Lender) to the extent such persons are otherwise entitled to receive indemnification under this paragraph 23 or (B) claims arising out of any act or omission on the part of the DIP Loan Parties in accordance with this paragraph 23.

24.     **Proofs of Claim.** The DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successors Cases for any claim allowed herein or therein in respect of the Prepetition Secured Obligations. Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided* that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the

DIP Agent, on behalf of the DIP Secured Parties, and any of the Prepetition Agents, on behalf of the Prepetition Secured Parties, may (but are not required) in their discretion file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor. Any proof of claim filed by the DIP Secured Parties or any of the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

25.   **Carve Out.**

(a)    Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties (other than the Prepetition ABL Credit Facility Secured Parties solely as to the ABL Priority Collateral) and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Loan Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims (other than the ABL Adequate Protection Claims with respect to recovery from ABL Priority Collateral), and the Prepetition Liens (other than the Prepetition ABL Credit Facility Liens solely as to the ABL Priority Collateral), shall be subject in all respects and subordinate to the Carve Out.

(b)    As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set

forth in clause (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a

trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in

clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural

order, or otherwise, (x) all unpaid fees and expenses (including any restructuring, sale, success, or

other transaction fee of any investment bankers or financial advisors of the Debtors and the Official

Committee) (the "Allowed Professional Fees") incurred by persons or firms retained by the

Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals")

and the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the

"Committee Professionals" and, together with the Debtor Professionals, the "Professional

Persons") and (y) reasonable, documented unpaid out-of-pocket expenses of members of the

Official Committee (other than in respect of professional advisors) not to exceed $150,000 in the

aggregate, solely to the extent incurred in connection with such Official Committee member's

service on the Official Committee, in the case of (x) and (y), incurred at any time before or on the

first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined

below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and

(iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed

$15,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve

Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order,

or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice

Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice

delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead

restructuring counsel, the U.S. Trustee, and counsel to the Official Committee, which notice may

be delivered following the occurrence and during the continuation of an Event of Default and

acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)  <u>Carve Out Reserves</u>.  The Debtors shall establish and fund a segregated account (the "<u>Funded Reserve Account</u>") for purposes of funding the Carve Out.  The Funded Reserve Account will be funded first from the DIP Proceeds Account and then from the DIP Priority Collateral (but excluding, for the avoidance of doubt, any Cash Collateral constituting ABL Priority Collateral).   Notwithstanding anything to the contrary in this Final Order, the DIP Documents, or the Prepetition Loan Documents, (i) in no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the DIP Proceeds Account for the purpose of funding the Funded Reserve Account, and (ii) the DIP Proceeds shall not be ABL Priority Collateral or Prepetition ABL Credit Facility Collateral and no Cash Collateral constituting ABL Priority Collateral shall be deposited in the DIP Proceeds Account.  Upon entry of the Interim Order, the Debtors deposited into the Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected as of the Petition Date to accrue from the Petition Date through the date that the Final Order is entered by the Court (the "<u>Initial Funded Reserve Amount</u>"), which, for the avoidance of doubt, does not include the Post-Carve Out Trigger Notice Cap.  Commencing June 1, 2020 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following month in the Approved DIP Budget *plus* twenty percent of such aggregate amount of Allowed Professional Fees Projected to accrue in the following month

in the Approved DIP Budget (the "Monthly Funded Reserve Amount").  Each Professional Person may deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount for the applicable period or month, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person and is then due and payable, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.  Upon entry of this Final Order, the Debtors shall deposit into the Funded Reserve Account an amount equal to (i) the Post-Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under (b)(i) and (ii) above.  The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust, for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents or DIP Loan Documents and neither the Prepetition Secured Parties nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition Loan Documents or DIP Loan Documents.  Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Funded Reserve Account.

(d)      On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors in accordance with paragraph 25(b) above, with a copy to counsel to the Official Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor (other than Cash Collateral that constitutes ABL Priority Collateral), including cash in the DIP Proceeds Account, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; *provided* that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors, and the Debtors shall fund into the Funded Reserve Amount any Top Off Amounts.  The Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor (other than Cash Collateral that constitutes ABL Priority Collateral), including cash in the DIP Proceeds Account, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of this Final Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the

definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth herein. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as set forth herein. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 25, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 25, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves

have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents. Further, notwithstanding anything to the contrary in the DIP Orders, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Approved DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in the DIP Orders, the DIP Loan Documents, or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens (other than the ABL Adequate Protection Liens), the Prepetition Liens (other than the Prepetition ABL Credit Facility Liens as to the ABL Priority Collateral), and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations (other than the Prepetition ABL Credit Facility Liens and the Prepetition ABL Credit Facility Obligations solely as to the ABL Priority Collateral).

(e)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Funded Reserve Account.

(f)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or

reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in the DIP Orders or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

26.     **<u>Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve Out, and Other Funds.</u>** Notwithstanding anything contained in the DIP Loan Documents, this Final Order, or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, the Official Committee, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, so long as a DIP Termination Event or Cash Collateral Termination Event has occurred and is continuing; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare,

assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Releasees with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to this Final Order, the DIP Facility, the DIP Loan Documents, the DIP Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any Avoidance Actions Proceeds, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims, or the Prepetition Secured Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition Collateral, the Prepetition Secured Obligations, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Secured Parties, or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents

or Prepetition Loan Documents and the Interim Order and/or this Final Order (as applicable));
*provided* that no more than $250,000 may be used for allowed fees and expenses incurred solely
by the Official Committee in investigating, but not objecting to, challenging, litigating, opposing,
prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and
priority of the Prepetition Liens, the Prepetition Secured Obligations or the Prepetition Loan
Documents prior to the Challenge Deadline (as defined below); *provided further* that nothing
contained in this paragraph 26 shall prohibit the Debtors from responding or objecting to or
complying with discovery requests of any Official Committee, in whatever form, made in
connection with such investigation or the payment from the DIP Collateral of professional fees
related thereto or from contesting or challenging whether a DIP Termination Event has in fact
occurred.   Except to the extent expressly permitted by the terms of the DIP Loan Documents and
this Final Order, none of the Debtors, the Official Committee, or any trustee or other estate
representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or
entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or
Prepetition Collateral, in each case, without the consent of the Required DIP Lenders or the
Prepetition ABL Credit Facility Agent with respect to ABL Priority Collateral.

27. **Reservation of Certain Third-Party Rights and Bar of Challenges and
Claims**.

(a)      Subject to the Challenge Deadline (as defined herein), the stipulations, admissions,
agreements, and releases contained in this Final Order, including, without limitation, in
paragraph E of this Final Order (collectively, the "Stipulations"), shall be binding upon the
DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter
11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any

Successor Cases) in all circumstances and for all purposes. The Stipulations shall be binding upon all other parties in interest (including without limitation, any Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the DIP Loan Parties' estates, in all circumstances and for all purposes, unless (1) an Official Committee, if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline (as defined below)), has timely and duly filed an adversary proceeding or contested matter under the Bankruptcy Rules (subject to the limitations contained herein) (each, a "Challenge Proceeding") by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan Documents, or otherwise asserting or prosecuting any avoidance action or any other claim, counterclaim, cause of action, objection, contest, defense or other challenge (a "Challenge") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Debtors, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan Documents, and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; *provided* that (i) as to the Debtors, any and all such challenges are hereby irrevocably waived and relinquished as of the Petition Date and (ii) any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released and barred).  In the event there is entered a final non-appealable order in favor of the plaintiff in any such timely filed

Challenge Proceeding, then to the extent applicable, any amounts received by the Prepetition Secured Parties after the Petition Date may be subject to disgorgement.

(b)     If no such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (a) the Stipulations shall be binding on all parties in interest (including, without limitation, any Official Committee, if appointed); (b) the Prepetition Secured Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases; (c) the Prepetition Loan Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the DIP Loan Parties in the Chapter 11 Cases and any Successor Cases, the Prepetition Second Lien Notes Guarantors, and the Prepetition Third Lien Notes Guarantors; (d) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense; and (e) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Loan Documents shall not be subject to any other or further claim or Challenge by the Official Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases or any Successor Cases or any other party in interest, whether acting or seeking to act on behalf of the Debtors' estates or otherwise.

(c)     If any such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 27(b) hereof) on the Official Committee and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)     The "Challenge Deadline" shall mean the date that is (A) the later of (i) 75 calendar days after entry of the Interim Order, or (ii) solely with respect to the Official Committee, the earlier of (x) ninety (90) days after formation and (y) the entry of the confirmation order of any plan of reorganization in the Chapter 11 Cases (the "Committee Challenge Deadline"); *provided* that if prior to the Committee Challenge Deadline, the Official Committee files a motion seeking standing to pursue a Challenge Proceeding, then the Committee Challenge Deadline shall be extended until the date that is two (2) business days after the Court rules on such request, (B) such later date that has been agreed to in writing, prior to the expiration of the deadline to commence a Challenge, or (C) any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge, by (i) with respect to the Prepetition CF Credit Facility, the Prepetition CF Credit Facility Agent (at the direction of the Required Lenders (as defined in the Prepetition CF Credit Agreement)), (ii) with respect to the Prepetition Debenture Indenture, the Prepetition Debenture Trustee,  (iii) with respect to the Prepetition Second Lien Notes Indenture, the Prepetition Second Lien Notes Trustee,  (iv) with respect to the Prepetition Third Lien Notes Indenture, the Prepetition Third Lien Notes Trustee, and  (v) with respect to the Prepetition ABL Credit Facility, the Prepetition ABL Credit Facility Agent (at the direction of the Required Lenders (as defined in the Prepetition ABL Credit Agreement)) and the FILO Agent. Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Official Committee or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

28.   **Limitations on Charging Expenses.** Except to the extent of the Carve Out and paragraph 26, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the DIP Secured Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Obligations, or (b) the Prepetition Secured Parties, Prepetition Collateral, the Other Second Lien Collateral, the Other Third Lien Collateral, or any of the Prepetition Secured Obligations, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without the prior express written consent of the Required DIP Lenders or the requisite lenders or holders under the relevant Prepetition Loan Document(s) or the affected Prepetition Secured Party, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

29.   Notwithstanding anything to the contrary in paragraph 28 hereof, if the consensual use of Cash Collateral of the Prepetition ABL Credit Facility Secured Parties is terminated pursuant to paragraphs 34 and 35 hereof, the Debtors reserve any rights they may have under section 506(c) of the Bankruptcy Code solely with respect to (a) costs and expenses incurred on or after the Cash Collateral Termination Date and (b) costs or expenses that are incurred prior to a Cash Collateral Termination Date, other than costs or expenses on account of goods delivered prior to a Cash Collateral Termination Date, but are attributable to, in whole or in part, periods after any

such Cash Collateral Termination Date and with respect to the Prepetition ABL Credit Facility Collateral and the Prepetition ABL Credit Facility Secured Parties, and the Prepetition ABL Credit Facility Secured Parties reserve their rights to contest any such assertion on any basis.

30.    **No Marshaling.** Other than with respect to Avoidance Actions Proceeds, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations, as applicable, and all proceeds shall be received and applied in accordance with this Final Order, the DIP Loan Documents, and the Prepetition ABL Credit Facility Documents, as applicable, subject to the Prepetition Intercreditor Agreements, including, for the avoidance of doubt, to the funding of the Carve Out, if applicable.  The DIP Superpriority Claims and Adequate Protection Claims may be collected out of Avoidance Actions Proceeds only after holders of such DIP Superpriority Claims or Adequate Protection Claims have made commercially reasonable efforts to otherwise exhaust recovery for such claims.

31.    Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any of the Prepetition Secured Parties or Prepetition Collateral.

32.    **Joint and Several Liability.** Nothing in the DIP Orders shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Final Order.

33.    **Right to Credit Bid.** (a) The DIP Agent or its designee (at the written direction of the Required DIP Lenders), on behalf of the DIP Secured Parties, shall have the unqualified right to credit bid on the DIP Collateral, in accordance with the DIP Loan Documents, up to the full

amount of the DIP Obligations and (b) subject to expiration of the Challenge Deadline and the challenge rights set forth in paragraph 27 of this Final Order, each Prepetition Agent or its designee (at the written direction of the applicable Prepetition Secured Parties), on behalf of the applicable Prepetition Secured Parties shall have the right to credit bid, in accordance with the applicable Prepetition Loan Documents, up to the full amount of the Prepetition Secured Obligations under the applicable prepetition facility, in each case, in connection with any sale or other disposition of all or any portion of the DIP Collateral or Prepetition Collateral (as applicable), as provided for in section 363(k) of the Bankruptcy Code and in accordance with the Prepetition Intercreditor Agreements, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall each automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral or Prepetition Collateral (as applicable) under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. The DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agents (at the direction of the requisite lenders or holders under the applicable Prepetition Loan Documents), shall each have the absolute right to assign, transfer, sell, or otherwise dispose of its rights to credit bid, except as may be set forth in the DIP Loan Documents.

34.    **Cash Collateral Termination Events**.  The occurrence of and continuance of any of the termination events set forth in **Annex 3** attached hereto shall each constitute a "Cash Collateral Termination Event," and the date on which such Cash Collateral Termination

Event occurs, the "Cash Collateral Termination Date," unless waived in writing by the Prepetition ABL Credit Facility Agent and FILO Agent.

35.    **Remedies Upon a Cash Collateral Termination Event.**

(a)    Upon the occurrence or continuation of a Cash Collateral Termination Event, subject to the ABL Remedies Notice Period described below, unless such Cash Collateral Termination Event has been waived in writing by the Prepetition ABL Credit Facility Agent and FILO Agent, the Prepetition ABL Credit Facility Agent, shall, and any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the Prepetition ABL Credit Facility Agent to, upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties (as defined below): (i) terminate and/or revoke the Debtors' right under this Final Order and the Prepetition ABL Credit Documents to use any Cash Collateral of the Prepetition ABL Credit Facility Secured Parties; and (ii) freeze monies or balances in the Segregated Collateral Account and any other accounts subject to a Control Agreement (as defined in the Prepetition ABL Credit Agreement) or otherwise subject to a senior lien in favor of the Prepetition ABL Credit Facility Agent pursuant to the terms of the DIP Orders; *provided* that prior to the exercise of any right in clauses (i) and (ii) of this paragraph, the Prepetition ABL Credit Facility Agent shall be required to file a Stay Relief Motion on five (5) days' prior written notice to the Remedies Notice Parties of the Prepetition ABL Credit Facility Agent's intent to exercise its rights and remedies (the "ABL Remedies Notice Period")and to obtain such relief; *provided*, *however*, that during the ABL Remedies Notice Period, the Debtors and the Official Committee may seek an emergency hearing before the Court (to be held within ABL Remedies Notice Period) to object to the termination of the consensual use of Cash Collateral on any basis and can seek the

non-consensual use of Cash Collateral subject to the Prepetition ABL Credit Facility Secured Parties' rights to object to, or otherwise oppose, any such non-consensual use and seek adequate protection in connection therewith; *provided*, that, notwithstanding anything herein to the contrary, the Prepetition ABL Credit Facility Agent shall be required to file the Stay Relief Motion with the Court to terminate the stay or to file the written notice using a CM/ECF emergency event code. Subject to the terms and conditions of the DIP Orders and in accordance with the Approved DIP Budget, the Debtors are authorized to use Cash Collateral until the Cash Collateral Termination Date; *provided*, *however*, that during the ABL Remedies Notice Period, the Debtors may use Cash Collateral solely in accordance with the terms and provisions of the Approved DIP Budget and solely to meet payroll obligations and pay expenses critical to the administration of the Debtors' estates in accordance with the Approved DIP Budget, as agreed by the Prepetition ABL Credit Facility Agent and the FILO Agent in their reasonable discretion; *provided*, *further*, *however*, that the Debtors may use Cash Collateral that is not ABL Priority Collateral to fund the Carve Out consistent with the terms of this Final Order; *provided*, *further*, *however*, that nothing in the DIP Orders shall prejudice the rights of the Debtors to seek non-consensual use of Cash Collateral, subject to the Prepetition ABL Credit Facility Secured Parties' rights to object to, or otherwise oppose, any such non-consensual use and seek adequate protection in connection therewith.

(b)     So long as there are any Prepetition ABL Credit Facility Obligations (including any ABL Adequate Protection Claim) outstanding and prior to the payment in full, in cash, of the Prepetition ABL Credit Facility Obligations (including any ABL Adequate Protection Claim and cash collateralization of all Letters of Credit required under the Prepetition ABL Credit Agreement), in each case with respect to ABL Priority Collateral that is secured by Prepetition ABL Credit Facility Liens that in accordance with this Final Order are senior to any liens held by

DIP Secured Parties or Prepetition Secured Parties (other than the Prepetition ABL Credit Facility Secured Parties), then with respect to such ABL Priority Collateral, such DIP Secured Parties or Prepetition Secured Parties (other than the Prepetition ABL Credit Facility Secured Parties) shall: (i) have no right to and shall not take any action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents, the DIP Loan Documents or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against such ABL Priority Collateral, including in connection with the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, such ABL Priority Collateral or proceeds thereof (until payment in full in cash of all Prepetition ABL Credit Facility Obligations), to the extent such transfer, disposition, sale, or release is authorized under the applicable Prepetition ABL Credit Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such ABL Priority Collateral unless, solely as to this clause (iii), any of the applicable Prepetition ABL Credit Facility Secured Parties have filed financing statements or other documents to perfect the liens granted pursuant to this Final Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date.

36.     **Letters of Credit.**  The Debtors shall be authorized to maintain and, solely to the extent subject to "auto-renewal" pursuant to the terms thereof, to renew existing Letters of Credit issued under the Prepetition ABL Credit Facility prior to the Petition Date on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date (excluding the requirement to certify that no Default or Event of Default is

continuing and the requirement to bring down representations and warranties, in each case solely to the extent such certification or bring down cannot be made as a result of the Chapter 11 Cases), in each case subject to the terms of the Prepetition ABL Credit Agreement (except as set forth in the prior parenthetical), and to take all actions reasonably appropriate with respect thereto; *provided* that no ABL Issuing Bank shall have any obligation to issue, extend, renew, or otherwise modify any Letters of Credit, but the obligations of the parties with respect to existing Letters of Credit shall be continued without modification in accordance with their existing terms.

37.  **Concession Merchandise**.  Notwithstanding anything to the contrary set forth herein, in no event shall the DIP Collateral include (x) any property of a concession vendor ("Concession Merchandise") or (y) any proceeds from the sale of any such Concession Merchandise that are not property of the Debtors' estates in accordance with applicable law without the need for segregation of such proceeds by the Debtors.  The rights of any party in interest to seek a determination as to the validity of an asserted concession right and/or the return of any Concession Merchandise or the proceeds from the sale thereof are expressly preserved.

38.  **Insurance Policies**.  Nothing, including the DIP Loan Documents and/or this Final Order, alters or modifies the terms and conditions of any insurance policies or related agreements issued by ACE American Insurance Company, Federal Insurance Company and/or any of their respective affiliates or successors.

39.  **Consignment Inventory**.  The Debtors are hereby authorized to enter into consignment agreements or arrangements and to issue orders for consignment merchandise, in each case consistent with past practice, with all such contracts and orders being deemed to be in the ordinary course of business, without further order of this Court.

(a)     For purposes of this Final Order, a "Valid Consignor" is any vendor that (i) consigned and delivered merchandise to the Debtors prior to the Petition Date on a consignment basis pursuant to an invoice, memo, or similar document that the merchandise identified thereon was provided "on consignment," "on memo," or words of similar import, or pursuant to an express contractual consignment agreement between the vendor and one or more of the Debtors ("Pre-Petition Consigned Merchandise") and (x) complied with the filing requirements of Article 9 of the Uniform Commercial Code (the "UCC") (such vendors, "UCC Consignors"), (y) otherwise obtains entry of a final order determining that the merchandise so consigned and delivered constitutes a valid consignment, or (z) is deemed to have a valid consignment interest pursuant to paragraph (g) below, or (ii) consigned and delivered merchandise to the Debtors on or after the Petition Date on a consignment basis in accordance with the terms of this Final Order (a "Post-Petition Consignor").

(b)     With respect to any merchandise consigned and delivered to the Debtors on or after the Petition Date (all such merchandise referred to herein as "Post-Petition Consigned Merchandise"), the vendor shall either (i) state on its invoice, memo, or similar document that the merchandise identified therein is being provided to the Debtors "on consignment," "on memo," or use words of similar import generally understood in the industry to indicate a consignment, or (ii) ship such merchandise pursuant to an existing or hereafter entered consignment agreement or arrangement between the vendor and the Debtors. All merchandise consigned and delivered to the Debtors by a Valid Consignor including, without limitation, Post-Petition Consigned Merchandise, shall be referred to collectively as, "Valid Consigned Merchandise."

(c)     Valid Consigned Merchandise shall not constitute or be deemed to constitute property of any Debtor's estate under section 541 of the Bankruptcy Code, nor shall it

constitute or be deemed to constitute postpetition assets of any Debtor, and it shall not be subject to any liens, claims, or encumbrances granted by or asserted against any Debtor or its estate, including without limitation any administrative expense claims or any pre or postpetition secured, priority, or unsecured claim.

(d)     During the pendency of these Chapter 11 Cases, Post-Petition Consignors are authorized but not required to file UCC Financing Statements to perfect their rights and all Post-Petition Consigned Merchandise shall be deemed fully and properly perfected consignments with priority over any liens, claims, encumbrances, or administrative expense claims of any pre or postpetition secured, priority, or unsecured creditor within the meaning of the applicable sections of the UCC, without the need to file UCC financing statements or serve any notices of consignment. Upon entry of this Order, the automatic stay under section 362 of the Bankruptcy Code is modified to permit vendors delivering Post-Petition Consigned Merchandise to file financing statements under Article 9 of the UCC to evidence their rights as Post-Petition Consignors.  Notwithstanding the foregoing, nothing contained herein shall relieve any vendor of consigned merchandise from complying with applicable law from and after the effective date of any plan of reorganization.

(e)     Each Valid Consignor's interest in Valid Consigned Merchandise shall extend to and attach to the proceeds thereof up to the consignment price of the Consigned Merchandise (the "Consigned Cost") without the need for segregation of such proceeds by the Debtors. The proceeds of Valid Consigned Merchandise in excess of the Consigned Cost shall be property of the Debtors' estates.

(f)     Except as set forth below, the Debtors are authorized and directed to remit payment to each Valid Consignor for the Consigned Cost of all Valid Consigned Merchandise sold

by the Debtors for which payment to the Valid Consignor has not yet been made, whether prepetition or post-petition, commencing on the later of:  (i) the date that is the earlier of (i) thirty (30) days following the entry of this Final Order and (ii) July 15, 2020; and (ii) the date on which payment would otherwise be due in accordance with the applicable consignment agreement or arrangement, invoice, memo, or any other document. The Debtors are authorized and directed to remit payment to each consignor whose consignment proceeds were held in escrow pursuant to paragraph (g) below within five (5) days after a consignor is deemed to be a Valid Consignor pursuant to paragraph (g).

(g)     All proceeds from the sale of Pre-Petition Consigned Merchandise, other than Prepetition Consigned Merchandise consigned and delivered to the Debtors by a UCC Consignor, shall be held in escrow by the Debtors, subject to a determination of whether the vendor of the Pre-Petition Consigned Merchandise is a Valid Consignor. All consignors of Pre-Petition Consigned Merchandise shall be deemed to be Valid Consignors unless, within the earlier of (i) forty-five (45) days following the entry of this Final Order and (ii) July 30, 2020, the Debtors, the DIP Agent, the Prepetition ABL Credit Facility Agent, or the Creditors' Committee, in good faith, provide written notice to a consignor and such consignor's counsel of record, if any, challenging the validity of such consignor's consignment interest in Prepetition Consigned Merchandise (a "Challenge Notice").  The Court will conduct a status conference on August 26, 2020 at 9:00 a.m. (prevailing Central time) to establish procedures (i) to determine whether consignors receiving a Challenge Notice are Valid Consignors, and (ii) to determine underlying factual and legal issues common to all such consignors. A consignor that is determined not to be a Valid Consignor, shall have thirty (30) days after such determination becomes final and nonappealable, to file a proof of claim notwithstanding any bar date order entered in these Chapter 11 Cases.

(h)     Upon notice to the Debtors, the DIP Agent, and the Prepetition ABL Credit Facility Agent, any Valid Consignor shall have the right to withdraw its consent to the sale of its Valid Consigned Merchandise, and to the return of its Valid Consigned Merchandise. The cost and expense of the return of any Valid Consigned Merchandise shall be borne by the Valid Consignor requesting return of its Valid Consigned Merchandise, provided however, that such Valid Consignor may file a claim against the Debtors for such costs and expenses (and the Debtors and other parties in interest shall reserve all rights to object thereto).

(i)     The Debtors shall provide to the DIP Agent and the Prepetition ABL Credit Facility Agent, with a copy of the relevant portion to each applicable consignor, a weekly report (in form and substance reasonably acceptable to the DIP Agent and the Prepetition ABL Credit Facility Agent) setting forth (i) all Consigned Merchandise then held by the Debtors, (ii) the total of a sales of Consigned Merchandise during the preceding week, and (iii) the amounts then due to all consignors. Consigned merchandise and funds held in escrow pursuant to paragraph (g) shall be excluded from any borrowing base under the Prepetition ABL Credit Agreement (including the ABL Borrowing Base set forth herein).

(j)     The provisions of this paragraph 39 of this Final Order are entered on a final basis and shall be binding on the Debtors and their estates, any assignee or successor, any trustee, examiner, or examiner with expanded powers, the Prepetition ABL Credit Facility Agent, and the DIP Agent.

(k)     For the avoidance of doubt nothing contained herein shall constitute or be deemed to constitute an assumption of any agreement between any Debtor and any consignor pursuant to section 365 of the Bankruptcy Code.

40.   **Setoff and Recoupment**. Nothing in this Final Order is intended to, and shall not: (a) waive, modify, prejudice, limit or otherwise impair the right of any party to exercise rights of setoff or recoupment, if any, under the Bankruptcy Code (including, without limitation, pursuant to section 553 of the Bankruptcy Code) or any other applicable non-bankruptcy law, contract or agreement, subject, however, to section 546(c) of the Bankruptcy Code, (b) provide any party with any greater or lesser setoff or recoupment rights, if any, than they would have under the Bankruptcy Code or any other applicable non-bankruptcy law, contract or agreement, or eliminate the need to seek relief from the automatic stay where required before exercising any such rights, or (c) waive, modify, prejudice, limit or otherwise impair any defenses or objections of any party-in-interest to such setoff and recoupment rights or the exercise thereof.

41.   **Rights Preserved.** Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Intercreditor Agreements, the Prepetition Subordination Agreements, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties. Notwithstanding anything herein to the

contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the DIP Loan Parties', or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Final Order.

42.      **Intercreditor Agreements and Subordination Agreements.** Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreements, the Prepetition Subordination Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties.

43.      **No Waiver by Failure to Seek Relief.** The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the DIP Loan Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise. No delay on the part of any party in the exercise of any right or remedy under the DIP Orders shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under the DIP Orders shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

44. **Binding Effect of this Final Order.** Immediately upon entry of this Final Order by the Court, this Final Order shall inure to the benefit of the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, and the provisions of this Final Order (including all findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, any and all other creditors of the Debtors, the Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest, and the respective successors and assigns of each of the foregoing, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases.  The DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

45. **Survival.** The terms and provisions of this Final Order, including, without limitation, (a) the Carve Out and (b) all of the rights, privileges, benefits, and protections afforded herein and in the DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any other claims, liens, security interests, and other protections (as applicable)) granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Final Order and the DIP Loan Documents (collectively, the "DIP Protections"), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall remain binding on all parties in interest, and shall maintain their priorities, and shall not be modified, impaired, or discharged by, entry of any order that may be entered (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting

any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, or (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, in each case, until (x) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Final Order, have been indefeasibly paid in full in cash (or other form of payment pursuant to an Acceptable Plan) (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (y) in respect of the Prepetition Secured Obligations, all of the Prepetition Secured Obligations have been indefeasibly paid in full in cash (or other form of payment pursuant to an Acceptable Plan) (or, in respect of outstanding letters of credit (if any), cash collateralized). This Court shall retain jurisdiction, notwithstanding any such confirmation, conversion, or dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.

46. **Discharge Waiver/Release.** The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, (i) unless the DIP Obligations have been indefeasibly paid in full in cash (or other form of payment pursuant to an Acceptable Plan), on or before the effective date of such confirmed plan of reorganization, or (ii) the DIP Lenders have otherwise agreed in writing in respect of the applicable obligations owed to each of them (including the agreement reflected in the Restructuring Support Agreement). None of the Debtors shall propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash (or other form of payment pursuant

to an Acceptable Plan) on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale, without the written consent of the DIP Lenders (including the agreement reflected in the Restructuring Support Agreement).

47.     **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.** The DIP Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, and with this Final Order, and their reliance on this Final Order is in good faith. Based on the findings set forth in the DIP Orders and the record made during the Hearings, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Final Order and the DIP Loan Documents, to the extent applicable. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect the validity, priority, or enforceability of the DIP Obligations, the DIP Liens or, to the extent section 364(e) of the Bankruptcy Code is applicable, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens, or the Prepetition Secured Obligations. Notwithstanding any such reversal, modification, vacatur, or stay of this Final Order, any DIP Obligations, DIP Liens, or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agents of the effective date of such reversal, modification, vacatur stay shall be governed in all respects by the original provisions of this Final Order.

48.     **No Modification of Final Order**. Until and unless the DIP Obligations have been indefeasibly paid in full in cash (or other form of payment pursuant to an Acceptable Plan), the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:

(a) without the prior written consent of the Required DIP Lenders and the Majority Noteholders (the consent of the Majority Noteholders shall not be unreasonably delayed, conditioned, or withheld), (i) any modification, stay, vacatur, or amendment to this Final Order or (ii) allowance of a priority claim for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, other than the Carve Out and except to the extent expressly provided in this Final Order or the DIP Credit Agreement; (b) without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) or the Prepetition Agents (at the direction of the requisite lenders or holders under the applicable Prepetition Loan Documents), any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with this Final Order; (c) without the prior written consent of the Required DIP Lenders, grant of any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as expressly provided in the DIP Loan Documents or this Final Order; or (d) without the prior written consent of the Prepetition Agents (at the direction of the requisite lenders or holders under the applicable Prepetition Loan Documents), grant of any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens, except to the extent expressly provided in this Final Order or the DIP Credit Agreement.

49.    **Limitation of Liability.** Nothing in this Final Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of (a) any liability for any claims arising from the prepetition or postpetition activities of the

Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates. So long as the DIP Secured Parties comply with their obligations under the DIP Loan Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

50.    **Final Order Controls.** In the event of any conflict or inconsistency between or among the terms or provisions of the Interim Order, this Final Order, or any of the DIP Loan Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents or the Interim Order, the terms and provisions of this Final Order shall govern and control. Notwithstanding anything contained in any other order entered by this Court to the contrary, any payment made pursuant to, or authorization contained in, any other order entered by this Court shall be consistent with and subject to the requirements set forth in the Interim Order, this Final Order and the DIP Loan Documents, including, without limitation, the Approved DIP Budget (subject to Permitted Variances).

51.    **Payments Held in Trust**.  Except as expressly permitted in this Final Order or the DIP Loan Documents and other than with respect to the ABL Priority Collateral, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments

(as defined in the DIP Credit Agreement) in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the applicable DIP Agent or DIP Lender, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents and this Final Order.

52.     **Final Order Effective as of the Petition Date**. This Final Order shall take effect and shall be enforceable as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), and 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

53.     **Bankruptcy Rules.** The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

54.     **Necessary Action.** The Debtors are authorized to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Final Order.

55.     **Headings.** Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

56.     **Notice of Entry of this Final Order.** The Debtors' counsel shall serve a copy of this Final Order or a suitable notice thereof on the Notice Parties.

57.     **[Reserved].**

58.     **[Reserved].**

59.     **Retention of Jurisdiction.** The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Final Order.

     **Signed:  June 16, 2020.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit 1

### Lien Priority Ranking[7]

| Priority | DIP Priority Collateral (*i.e.*, unencumbered assets) (other than Avoidance Actions Proceeds) | Avoidance Actions Proceeds that constitute DIP Priority Collateral (i.e., excluding MyT Avoidance Actions Proceeds)[8] | DIP Priming Collateral (other than Call Right Collateral) (*i.e.*, Extended CF Credit Facility Collateral) | ABL Priority Collateral | Call Right Collateral (Pre-Call Right Cap Recovery, as defined in the Junior Lien Intercreditor Agreement) |
|---|---|---|---|---|---|
| 1 | • Senior DIP Liens | • Senior DIP Liens | • Priming DIP Liens | • ABL Adequate Protection Liens<br>• Prepetition ABL Liens | • Priming DIP Liens |
| 2 | • CFD Adequate Protection Liens and ABL Adequate Protection Liens | • CFD Adequate Protection Liens | • CFD Adequate Protection Liens<br>• Prepetition CF Credit Facility Liens (and Prepetition Debenture Liens[9] | • Junior DIP Liens | • Third Lien Notes Adequate Protection Liens<br>• Prepetition Third Lien Notes Liens[10] |
| 3 | • Second Lien Notes Adequate Protection Liens | • Second Lien Notes Adequate Protection Liens | • Second Lien Notes Adequate Protection Liens<br>• Prepetition Second Lien Notes Liens | • CFD Adequate Protection Liens<br>• Prepetition CF Credit Facility Liens | • Second Lien Notes Adequate Protection Liens<br>• Prepetition Second Lien Notes Liens[10] |
| 4 | • Third Lien Notes Adequate Protection Liens | • Third Lien Notes Adequate Protection Liens | • Third Lien Notes Adequate Protection Liens<br>• Prepetition Third Lien Notes Liens | • Second Lien Notes Adequate Protection Liens<br>• Prepetition Second Lien Notes Liens | • CFD Adequate Protection Liens<br>• Prepetition CF Credit Facility Liens and Prepetition Debenture Liens[9] |
| 5 | | | • ABL Adequate Protection Liens<br>• Prepetition ABL Credit Facility Liens | • Third Lien Notes Adequate Protection Liens<br>• Prepetition Third Lien Notes Liens | • ABL Adequate Protection Liens<br>• Prepetition ABL Credit Facility Liens |

---

[7]   DIP Collateral does not, and shall not, include any Other Second Lien Collateral or Other Third Lien Collateral.

[8]   For the avoidance of doubt, there shall be no DIP Liens on the MyT Causes of Action and the MyT Avoidance Actions Proceeds.

[9]   A further breakdown of the priority ranking of the Prepetition Debenture Liens and Prepetition CF Credit Facilities Liens securing the Prepetition Debenture Obligations and Non-Extending Term Loan Obligations (as defined in the Junior Lien Intercreditor Agreement), as applicable, is set forth in the Junior Lien Intercreditor Agreement.

[10]   Recovery for the Prepetition Second Lien Notes Secured Parties and Prepetition Third Lien Notes Secured Parties on the Call Right Collateral is capped at $200M.

## **Exhibit 2**

**DIP Credit Agreement**

**Annex 1**

**Agreed Contractual Reserves**

*Reserves set forth on this Annex 1 are without duplication of other items that are excluded from the ABL Borrowing Base through eligibility criteria.  For the avoidance of doubt, Agreed Contractual Reserves shall not include the 2013 Term Loan Reserve.*

1.  **Customer Credit Liabilities Reserves**:[1]

    - Merchandise Credits: 50% of the Debtors' total merchandise credit liability balance, representing the liability owed to customers for returned merchandise

    - Gift Cards: 50% gift card balances, including gift cards issued to customers for product returns

    - Customer Rewards Program:  50% of the Debtors' total InCircle customer rewards program liability balance, which is accrued for on a program year basis.

2.  **Customer Deposits Reserves**:[2]  100% of the Debtors' total balance of customer deposits for custom purchases or pre-ordered goods.

3.  **Undelivered Sales**:[3] 100% of the Debtors' reserve for special order products, including precious jewelry, which have been sold through the Debtors' retail or online sales systems but for which the Debtors have not yet received the related product from the vendor.  The amount reserved by the Debtors is reduced by the value of related inventory and employee sales commissions.

4.  **Landlord Lien Reserve**:[4]  2 months' rent for distribution centers and retail stores located in states with landlord lien laws, unless the location is subject to a Collateral Access Agreement (as defined in the Prepetition ABL Credit Agreement).  States and districts with these laws are subject to change, and presently include Pennsylvania, Virginia, Washington, Delaware and Washington D.C.

5.  **Specified Obligations Reserve**:[5] Equal to the amount by which the sum of (a) the Hedge Termination Value (as defined in the Prepetition ABL Credit Agreement) of the Specified Hedge Obligations and (b) the Cash Management Obligations (as defined in the Prepetition ABL Credit

---

[1]   This type of reserve is referenced in the definition of "Reserves" in the Prepetition ABL Credit Agreement.  The percentage to be applied to each sub-category of liability shall remain 50% during the duration of the Chapter 11 Cases.  The underlying liability referenced will not be held constant through the duration of the Chapter 11 Cases but shall be adjusted in the Cash Collateral Borrowing Base Certificate to reflect any change therein.

[2]   This type of reserve is referenced in the definition of "Reserves" in the Prepetition ABL Credit Agreement.  The applicable percentage shall remain 100% during the duration of the Chapter 11 Cases.  The balance of customer deposits will not be held constant through the duration of the Chapter 11 Cases but shall be adjusted in the Cash Collateral Borrowing Base Certificate to reflect any change therein.

[3]   The applicable percentage shall remain 100% during the duration of the Chapter 11 Cases.  The amount of the reserve will not be held constant through the duration of the Chapter 11 Cases but shall be adjusted in the Cash Collateral Borrowing Base Certificate to reflect changes in value.

[4]   This type of reserve is referenced in the definition of "Reserves" in the Prepetition ABL Credit Agreement.  The number of months' rent reserved will remain fixed for the duration of the Chapter 11 Cases.  This reserve is subject to change based on changes to state landlord lien law.

[5]    Set forth in Section 9.11(2) of the Prepetition ABL Credit Agreement.

Agreement) solely to the extent related to stored value cards, purchase cards (including so called "procurement cards" or "P-cards"), debit cards and credit cards, exceed $7.5 million in the aggregate.  The Specified Obligations Reserve is calculated as of the last day of each month based on the Hedge Termination Value of the Specified Hedge Obligations as set forth by the Debtors in the applicable Cash Collateral Borrowing Base Certificate and the amount of Cash Management Obligations set forth by the Debtors in the applicable Cash Collateral Borrowing Base Certificate.

6. **FILO Reserve**. Equals the amount of the FILO Reserve (as defined in the Prepetition ABL Credit Agreement).

7. **Tax Reserve**.  Reserve equal to the sum of (i) $2,200,000, which reserve shall be increased on each Thursday  of each calendar week by an additional amount of $81,481 per week beginning on June 18, 2020 for estimated real and personal property ad valorem taxes for tax year 2020 of certain Texas Taxing Authorities[6] imposed by section § 32.01, et seq. of the Texas Property Tax Code and purported to be senior (in Lien priority) to the Prepetition ABL Credit Facility Obligations; provided that the amount provided for in this clause (i) shall be increased or decreased, as the case may be, if the Debtors′ estimate for such taxes changes, with such adjustment to be made using the methodology set forth in succeeding clause (ii), plus (ii) the aggregate amount of all other real and personal property ad valorem taxes for tax year 2020 estimated to be imposed by States with similar statutes and purported to be senior (in Lien priority) to the Prepetition ABL Credit Facility Obligations, which amount, in the case of any portion thereof attributable to any given State, (x) has been reasonably determined by the Debtors and Prepetition ABL Credit Facility Agent (based on a tax estimate provided by such State and/or reasonably estimated taxes on anticipated sales in such State in 2020), (y) be pro rated for the portion of the year elapsed at the time notification and (z) be subject to weekly adjustments based on the same methodology for weekly adjustments set forth in preceding clause (i).

---

[6]   "Texas Taxing Authorities" means Bexar County, Dallas County, Fort Bend County, Gregg County, Harris County, San Marcos CISD and Tarrant County.

## Annex 2

### ABL Milestones

Any of the following shall constitute an ABL Milestone under the Final Order:

(a)     On or before the date that is forty (40) calendar days following the date of entry of the Interim Order, the Court shall have entered the Final Order, in form and substance acceptable to the Prepetition ABL Credit Facility Agent;

(b)     On or before the date that is seventy-five (75) calendar days following the Petition Date, the Debtors shall have filed (i) a disclosure statement that shall include a list of all of the Debtors' leases indicating which leases are to be assumed or rejected (the "Disclosure Statement") and (ii) a chapter 11 plan in connection with such Disclosure Statement;

(c)     On or before the date that is ninety (90) calendar days following the Petition Date, the Court shall have entered an order approving the Disclosure Statement; and

(d)     On or before the date that is one hundred twenty (120) calendar days following the Petition Date, the Court shall have entered an order confirming a chapter 11 plan.

**Annex 3**

**Cash Collateral Termination Events**

Any of the following shall constitute a Cash Collateral Termination Event under the Final Order:

(a)      The failure to comply with the ABL Milestones;

(b)      The failure to timely file a motion to extend the time period to assume or reject leases pursuant to Section 365(d)(4) of the Bankruptcy Code to not less than 210 calendar days following the Petition Date;

(c)      The Debtors shall (i) close more than five (5) full-line Neiman Marcus and Bergdorf Goodman stores (i.e., non-Last Call Stores) in the aggregate or (ii) submit or obtain an Approved DIP Budget which reflects the closure of more than five (5) such stores in the aggregate, in each case, without the prior consent of the Prepetition ABL Credit Facility Agent;

(d)      If the Debtors use the Cash Collateral of the Prepetition ABL Credit Facility Secured Parties in a manner that is not permitted by any Approved DIP Budget;

(e)      (a) Any event or condition occurs that (i) results in indebtedness under the DIP Credit Agreement becoming due (or the Commitments (as defined in the DIP Credit Agreement) thereunder being terminated) prior to scheduled maturity (or termination, as applicable), or (ii) enables or permits (with all applicable grace periods having expired) the holder or holders of indebtedness under the DIP Credit Agreement or any trustee or agent on its or their behalf to cause such indebtedness to become due (or the Commitments (as defined in the DIP Credit Agreement) to be terminated), or to require the prepayment, repurchase, redemption or defeasance thereof, prior to scheduled maturity (or termination, as applicable), or (b) any Debtor fails to pay the principal of any indebtedness under the DIP Credit Agreement at the stated final maturity thereof; *provided* that such event or condition is unremedied and is not waived or cured

by the holders of such indebtedness prior to the delivery of any notice pursuant to paragraph 35 of this Final Order seeking to exercise rights and remedies hereunder as a result of a Cash Collateral Termination Event; *provided*, that if such default is caused by a breach of Section 6.14 of the DIP Credit Agreement, it shall not be a Cash Collateral Termination Event unless unremedied or unwaived by the DIP Agent within five (5) business days;

(f)     The failure to make (i) ABL Adequate Protection Payments as required under the Final Order or (ii) to comply with the covenants and agreements set forth in paragraphs 9(g)(iv) and (v) of this Final Order;

(g)     This Final Order ceases to be in full force and effect for any reason;

(h)     The dismissal of any of the Cases, the conversion of any Case to a case under chapter 7 of the Bankruptcy Code, the appointment in any Case of a trustee or examiner with expanded powers under chapter 11 of the Bankruptcy Code, the Court shall abstain from hearing any of the Cases in accordance with section 305 of the Bankruptcy Code, or any of the Debtors shall file a motion or other pleading, or support any motion or other pleading filed by any other party, seeking any of the foregoing relief;

(i)     An order of the Court is entered (or any of the Debtors shall seek an order) (i) reversing, staying, vacating, or (ii) otherwise amending, supplementing, or modifying the DIP Orders in a manner described in paragraph (n) below without the prior written consent of the Prepetition ABL Credit Facility Agent;

(j)     The Debtors shall create, incur, or suffer to exist any claim or lien on ABL Priority Collateral that is *pari passu* with or senior to the ABL Adequate Protection Liens or the ABL Adequate Protection Claims while any portion of the Prepetition ABL Credit Facility Obligations or the ABL Adequate Protection Payments remain outstanding, or the Court shall grant

any application by any party seeking payment of any claim on a superpriority administrative claim basis with respect to ABL Priority Collateral *pari passu* with or senior to the ABL Adequate Protection Claim, without the consent of the Prepetition ABL Credit Facility Agent;

(k)     The ABL Adequate Protection Liens or the ABL Adequate Protection Claims shall cease to be valid, perfected, and enforceable in all respects or the filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition ABL Credit Facility Liens securing the Prepetition ABL Credit Facility Obligations or asserting any other cause of action against and/or with respect to the Prepetition ABL Credit Facility Obligations, any Prepetition ABL Credit Facility Secured Party's claim in respect of such Prepetition ABL Credit Facility Obligations, or the Prepetition Collateral securing such Prepetition ABL Credit Facility Obligations (or if the Debtors support any such motion, pleading, application, or adversary proceeding commenced by any third party);

(l)     The Debtors shall file or the Court shall grant any application, motion or borrowing request (other than pursuant to the Interim Order or the Final Order) seeking to:  (i) incur, without the consent of the Prepetition ABL Credit Facility Agent, any indebtedness from any party secured by a lien on, or, otherwise having a claim against or recourse to, as the case may be, the Debtors, the Prepetition Collateral or the DIP Collateral, unless such liens or claims are junior and subordinated in all respects to the Prepetition ABL Credit Facility Liens, the Prepetition ABL Credit Facility Obligations, the ABL Adequate Protection Liens, and the ABL Adequate Protection Claim; or (ii) use Cash Collateral on a nonconsensual basis;

(m)     [Reserved];

(n)     Any modification shall be made to the Interim Order, this Final Order, or

otherwise that that could reasonably be expected to result in nonpayment of the Prepetition ABL Adequate Protection Payments granted hereunder or otherwise affect the Debtors' use of the Prepetition ABL Secured Parties Cash Collateral or any of the Prepetition ABL Secured Parties' stipulations, remedies, or other rights under this Final Order, in each case, without the prior written consent of the Prepetition ABL Credit Facility Agent;

(o)     The filing by any Debtor or any DIP Secured Party seeking an order, or the entry of an order by the Court or any other court having jurisdiction to do so approving claims for recovery of amounts under section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or the disposition of Prepetition Collateral, other than as provided in paragraph 29 of this Final Order;

(p)     The filing by any Debtor of a motion seeking an order, or the entry of an order by the Court or any other court having jurisdiction to do so, avoiding or requiring repayment or disgorgement of any portion of the ABL Adequate Protection Payments made by or on behalf of the Debtors hereunder;

(q)     The DIP Lenders fail to fund (i) the amount of DIP Loans required to be funded after entry of the Interim Order and on the applicable funding date therefor in the DIP Credit Agreement (as in effect on the date of entry of the Interim Order without giving effect to any amendments, waiver, or other modifications), (ii) the amount of DIP Loans required to be funded after entry of the Final Order and on the applicable funding date therefor in the DIP Credit Agreement (as in effect on the date of entry of this Final Order without giving effect to any amendments, waiver, or other modifications), or (iii) the amount of DIP Loans required to be funded on or around the Last Term Loan Availability Date (as defined in the DIP Credit Agreement as in effect on the date of entry of this Final Order without giving effect to any amendments,

waiver, or other modifications) and, in each case, such failure has not been cured within seven (7) days thereof;

(r)     The failure to deliver any Cash Collateral Borrowing Base Certificate in accordance with, or otherwise comply with the requirements of, paragraph 9(g)(vii) of this Final Order and, in each case, such failure has not been cured within two (2) business days thereof;

(s)     Any default under the covenants or agreements in paragraphs 9(g)(iii)(C), (D) or (E) of this Final Order or paragraphs 9(g)(vi) and (ix) of this Final Order and, in each case, such default has not been cured within five (5) business days thereof; and

(t)     The delivery by the DIP Agent of a Carve Out Trigger Notice.

**<u>Exhibit 1</u>**

**Budget**

**Neiman Marcus**
**DIP Budget**
**$ in 000s**

PRIVILEGED AND CONFIDENTIAL

| Week Number: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13Wk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | 11-Jul | 18-Jul | 25-Jul | 1-Aug | 8-Aug | 15-Aug | 22-Aug | 29-Aug | Total |
| **I. Cash Flow** | | | | | | | | | | | | | | |
| 1 Operating Receipts | 18,019 | 16,587 | 22,404 | 18,878 | 11,568 | 6,508 | 17,417 | 33,238 | 44,165 | 49,241 | 43,917 | 47,096 | 46,234 | 375,272 |
| 2 Rent | (8,846) | - | - | - | (8,696) | - | - | - | (8,958) | - | - | (22) | - | (26,522) |
| 3 Operating Disbursements | (56,874) | (38,852) | (56,704) | (42,424) | (40,724) | (33,536) | (44,257) | (50,369) | (58,136) | (52,186) | (83,260) | (67,994) | (94,539) | (719,855) |
| **4 Net Operating Cash Flow** | **(47,701)** | **(22,265)** | **(34,301)** | **(23,546)** | **(37,852)** | **(27,028)** | **(26,840)** | **(17,131)** | **(22,930)** | **(2,945)** | **(39,343)** | **(20,920)** | **(48,304)** | **(371,106)** |
| 5 Financing Proceeds | - | 250,000 | - | - | - | - | - | - | - | - | - | - | 150,000 | 400,000 |
| 6 Financing Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7 Professional Fees | (13,165) | (16,015) | (625) | (625) | (625) | (12,005) | (1,015) | (625) | (625) | (11,605) | (1,015) | (625) | (625) | (59,195) |
| 8 Interest | (4,363) | (2,059) | (729) | (810) | (6,902) | (134) | (446) | (284) | (7,559) | (1,505) | - | (729) | (482) | (26,002) |
| 9 Utility Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 Other Non-Operating Cash Flows | (693) | (500) | (500) | (500) | (3,192) | (3,385) | (3,192) | (3,192) | (692) | (279) | (86) | (86) | (86) | (16,384) |
| **11 Non-Operating Cash Flows** | **(18,220)** | **231,426** | **(1,854)** | **(1,935)** | **(10,719)** | **(15,524)** | **(4,653)** | **(4,101)** | **(8,876)** | **(13,389)** | **(1,101)** | **(1,440)** | **148,807** | **298,419** |
| **12 Total Cash Flow** | **(65,922)** | **209,161** | **(36,155)** | **(25,482)** | **(48,571)** | **(42,551)** | **(31,493)** | **(21,232)** | **(31,806)** | **(16,333)** | **(40,444)** | **(22,361)** | **100,503** | **(72,686)** |
| **II. Cash / DIP Balance** | | | | | | | | | | | | | | |
| 13 Beginning Book | 382,200 | 316,278 | 525,439 | 489,284 | 463,802 | 415,231 | 372,680 | 341,187 | 319,955 | 288,149 | 271,816 | 231,371 | 209,010 | 382,200 |
| 14 + Net Cash Flow | (65,922) | 209,161 | (36,155) | (25,482) | (48,571) | (42,551) | (31,493) | (21,232) | (31,806) | (16,333) | (40,444) | (22,361) | 100,503 | (72,686) |
| **15 Ending Book** | **316,278** | **525,439** | **489,284** | **463,802** | **415,231** | **372,680** | **341,187** | **319,955** | **288,149** | **271,816** | **231,371** | **209,010** | **309,513** | **309,513** |
| 16 - ABL Segregated Cash | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| 17 - Additional Deficit Cure Cash | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **18 Adjusted Ending Book** | **266,278** | **475,439** | **439,284** | **413,802** | **365,231** | **303,470** | **291,187** | **269,955** | **233,491** | **221,816** | **181,371** | **159,010** | **259,513** | **259,513** |
| 19 + Checks O/S | 14,927 | 6,188 | 5,559 | 9,411 | 16,788 | 8,803 | 9,462 | 12,400 | 20,965 | 14,332 | 15,843 | 17,187 | 21,274 | 21,274 |
| **20 Ending Bank** | **281,205** | **481,626** | **444,842** | **423,213** | **382,019** | **312,273** | **300,649** | **282,355** | **254,456** | **236,148** | **197,214** | **176,197** | **280,787** | **280,787** |
| 21 Ending DIP Drawn Amount | 275,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 525,000 | 675,000 | 675,000 |
| 22 Ending Prepetition Revolver Balance | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 | 749,000 |

## **Exhibit 2**

**DIP Credit Agreement**

STRICTLY CONFIDENTIAL

$675,000,000

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT,

dated as of [●], 2020,

among

MARIPOSA INTERMEDIATE HOLDINGS LLC,
as Holdings,

NEIMAN MARCUS GROUP LTD LLC,
as Lead Borrower,

THE NEIMAN MARCUS GROUP LLC and THE NMG SUBSIDIARY LLC,
as Borrowers,

THE LENDERS PARTY HERETO,

and

CORTLAND PRODUCTS CORP.,
as Administrative Agent and Collateral Agent,

# ARTICLE I

## Definitions

| | | |
|---|---|---|
| SECTION 1.01 | Defined Terms | 1 |
| SECTION 1.02 | Terms Generally | 32 |
| SECTION 1.03 | Accounting Terms; GAAP | 33 |
| SECTION 1.04 | [Reserved] | 33 |
| SECTION 1.05 | Currencies | 34 |
| SECTION 1.06 | [Reserved] | 34 |
| SECTION 1.07 | Divisions | 34 |

# ARTICLE II

## The Credits

| | | |
|---|---|---|
| SECTION 2.01 | Term Loans and Borrowings | 34 |
| SECTION 2.02 | [Reserved] | 36 |
| SECTION 2.03 | Funding of Borrowings | 36 |
| SECTION 2.04 | Interest Elections | 36 |
| SECTION 2.05 | Promise to Pay; Evidence of Debt | 37 |
| SECTION 2.06 | Repayment of Term Loans | 38 |
| SECTION 2.07 | Optional Prepayment of Term Loans | 38 |
| SECTION 2.08 | Mandatory Prepayment of Term Loans | 38 |
| SECTION 2.09 | Fees | 40 |
| SECTION 2.10 | Interest | 41 |
| SECTION 2.11 | Alternate Rate of Interest | 42 |
| SECTION 2.12 | Increased Costs | 43 |
| SECTION 2.13 | Break Funding Payments | 44 |
| SECTION 2.14 | Taxes | 45 |
| SECTION 2.15 | Payments Generally; *Pro Rata* Treatment; Sharing of Set-offs | 48 |
| SECTION 2.16 | Mitigation Obligations; Replacement of Lenders | 49 |
| SECTION 2.17 | Illegality | 50 |
| SECTION 2.18 | Extension of Maturity Date | 51 |
| SECTION 2.19 | Defaulting Lenders | 51 |
| SECTION 2.20 | [Reserved] | 53 |
| SECTION 2.21 | Joint and Several Liability of Borrowers | 53 |
| SECTION 2.22 | Designation of Lead Borrower | 54 |
| SECTION 2.23 | No Discharge; Survival of Claims | 54 |
| SECTION 2.24 | Liens. | 54 |

# ARTICLE III

## Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01 | Organization; Powers | 55 |
| SECTION 3.02 | Authorization | 55 |
| SECTION 3.03 | Enforceability | 56 |
| SECTION 3.04 | Governmental Approvals | 56 |
| SECTION 3.05 | Title to Properties; Possession Under Leases | 57 |

SECTION 3.06     Subsidiaries ................................................................................ 57
SECTION 3.07     Litigation; Compliance with Laws .......................................... 57
SECTION 3.08     Federal Reserve Regulations ................................................... 58
SECTION 3.09     Investment Company Act ......................................................... 58
SECTION 3.10     Use of Proceeds ....................................................................... 58
SECTION 3.11     Tax Returns .............................................................................. 58
SECTION 3.12     No Material Misstatements ...................................................... 59
SECTION 3.13     Environmental Matters ............................................................ 60
SECTION 3.14     Security Documents ................................................................. 60
SECTION 3.15     Location of Real Property and Leased Premises ..................... 61
SECTION 3.16     Approved Budget ..................................................................... 61
SECTION 3.17     No Material Adverse Effect ..................................................... 61
SECTION 3.18     Insurance .................................................................................. 61
SECTION 3.19     USA PATRIOT Act; FCPA; OFAC ........................................ 61
SECTION 3.20     Intellectual Property; Licenses, Etc ........................................ 62
SECTION 3.21     Employee Benefit Plans ........................................................... 62

## ARTICLE IV
### Conditions of Lending

SECTION 4.01     Conditions Precedent to the Closing Date ............................... 63
SECTION 4.02     Conditions Precedent to each Borrowing ................................ 64
SECTION 4.03     Conditions Precedent to Making the Final Order Term Loan ............... 65
SECTION 4.04     Conditions Precedent to Making the Last Term Loan ......................... 66

## ARTICLE V

### Affirmative Covenants

SECTION 5.01     Existence; Businesses and Properties ...................................... 66
SECTION 5.02     Insurance .................................................................................. 67
SECTION 5.03     Taxes ........................................................................................ 67
SECTION 5.04     Financial Statements, Reports, etc .......................................... 68
SECTION 5.05     Litigation and Other Notices ................................................... 72
SECTION 5.06     Compliance with Laws ............................................................ 72
SECTION 5.07     Maintaining Records; Access to Properties and Inspections ............... 73
SECTION 5.08     Use of Proceeds ....................................................................... 73
SECTION 5.09     Compliance with Environmental Laws .................................... 73
SECTION 5.10     Further Assurances; Additional Security ................................. 73
SECTION 5.11     [Reserved] ................................................................................ 74
SECTION 5.12     Lender Calls ............................................................................. 74
SECTION 5.13     Milestones ................................................................................ 75
SECTION 5.14     Certain Bankruptcy Matters ..................................................... 75
SECTION 5.15     Credit Ratings .......................................................................... 76

## ARTICLE VI

### Negative Covenants

SECTION 6.01     Indebtedness ............................................................................ 76
SECTION 6.02     Liens ......................................................................................... 79

ii

SECTION 6.03        Sale and Lease-Back Transactions............................................................ 82
SECTION 6.04        Investments, Loans and Advances .............................................................. 82
SECTION 6.05        Mergers, Consolidations, Sales of Assets and Acquisitions ................................. 85
SECTION 6.06        Restricted Payments............................................................................... 86
SECTION 6.07        Transactions with Affiliates...................................................................... 88
SECTION 6.08        Business of the Borrowers and their Subsidiaries............................................. 90
SECTION 6.09        Limitation on Payments and Modifications of Indebtedness; Modifications
                    of Certificate of Incorporation, By Laws and Certain Other Agreements;
                    etc............................................................................................... 90
SECTION 6.10        Compliance with the Approved Budget.......................................................... 92
SECTION 6.11        Chapter 11 Modifications ........................................................................ 92
SECTION 6.12        Use of Proceeds................................................................................... 92
SECTION 6.13        Additional Bankruptcy Matters.................................................................. 93
SECTION 6.14        Budget Covenant................................................................................... 94
SECTION 6.15        Minimum Liquidity................................................................................ 94

ARTICLE VII

Holdings and PropCo Guarantors Covenants

SECTION 7.01        Holdings Covenant ............................................................................... 94
SECTION 7.02        PropCo Guarantors Covenant. ................................................................... 95

ARTICLE VIII

Events of Default

SECTION 8.01        Events of Default ................................................................................. 96

ARTICLE IX

The Agents

SECTION 9.01        Appointment ...................................................................................... 100
SECTION 9.02        Delegation of Duties .............................................................................. 102
SECTION 9.03        Exculpatory Provisions ........................................................................... 102
SECTION 9.04        Reliance by Administrative Agent................................................................ 103
SECTION 9.05        Notice of Default ................................................................................. 104
SECTION 9.06        Non-Reliance on Agents and Other Lenders .................................................... 104
SECTION 9.07        Indemnification ................................................................................... 104
SECTION 9.08        Agent in Its Individual Capacity ................................................................ 105
SECTION 9.09        Successor Agent................................................................................... 105

ARTICLE X

Miscellaneous

SECTION 10.01       Notices; Communications......................................................................... 105
SECTION 10.02       Survival of Agreement............................................................................ 107
SECTION 10.03       Binding Effect..................................................................................... 107
SECTION 10.04       Successors and Assigns ........................................................................... 107

| SECTION 10.05 | Expenses; Indemnity | 112 |
| SECTION 10.06 | Right of Set-off | 114 |
| SECTION 10.07 | Applicable Law | 114 |
| SECTION 10.08 | Waivers; Amendment | 115 |
| SECTION 10.09 | Interest Rate Limitation | 117 |
| SECTION 10.10 | Entire Agreement | 117 |
| SECTION 10.11 | WAIVER OF JURY TRIAL | 118 |
| SECTION 10.12 | Severability | 118 |
| SECTION 10.13 | Counterparts | 118 |
| SECTION 10.14 | Headings | 118 |
| SECTION 10.15 | Jurisdiction; Consent to Service of Process | 118 |
| SECTION 10.16 | Confidentiality | 119 |
| SECTION 10.17 | Platform; Borrower Materials | 120 |
| SECTION 10.18 | Release of Liens and Guarantees | 121 |
| SECTION 10.19 | USA PATRIOT Act Notice | 121 |
| SECTION 10.20 | [Reserved] | 121 |
| SECTION 10.21 | No Advisory or Fiduciary Responsibility | 121 |
| SECTION 10.22 | [Reserved] | 122 |
| SECTION 10.23 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 122 |
| SECTION 10.24 | Conflicts | 122 |
| SECTION 10.25 | [No Liens on MYTheresa | 122 |

Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Interim DIP Financing Order |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Interest Election Request |
| Exhibit E | [Reserved] |
| Exhibit F | U.S. Tax Compliance Certificate |
| Exhibit G | Form of Note |
| Exhibit H | Form of Extension Request |

| | |
|---|---|
| Schedule 2.01 | Commitments |
| Schedule 3.04 | Governmental Approvals |
| Schedule 3.05(b) | Possession under Leases |
| Schedule 3.06(a) | Subsidiaries |
| Schedule 3.11 | Taxes |
| Schedule 3.13 | Environmental Matters |
| Schedule 3.15(a) | Owned Material Real Property |
| Schedule 3.15(b) | Leased Material Real Property |
| Schedule 3.18 | Insurance |
| Schedule 3.20 | Intellectual Property |
| Schedule 6.01 | Prepetition Indebtedness |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |
| Schedule 10.01 | Notice Information |

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of [●], 2020 (this "***Agreement***"), by and among MARIPOSA INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company ("***Holdings***"), NEIMAN MARCUS GROUP LTD LLC, a Delaware limited liability company, as a Borrower (the "***Lead Borrower***"), THE NEIMAN MARCUS GROUP LLC, a Delaware limited liability company ("***TNMG LLC***"), THE NMG SUBSIDIARY LLC, a Delaware limited liability company ("***The NMG Subsidiary***" and together with TNMG LLC and the Lead Borrower, the "***Borrowers***" and each, a "***Borrower***"), the Lenders party hereto from time to time, and CORTLAND PRODUCTS CORP., as administrative agent (in such capacity, and as further defined in Section 1.01, the "***Administrative Agent***"), and as collateral agent (in such capacity, and as further defined in Section 1.01, the "***Collateral Agent***" and together with the Administrative Agent, the "***Agents***").

RECITALS

(1)     The Borrowers, Holdings and certain of their Affiliates (as hereinafter defined) have commenced voluntary cases (the "***Chapter 11 Cases***") under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"), and the Loan Parties (as hereinafter defined) continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

(2)     The Borrowers have asked the Lenders (as hereinafter defined) to provide them with a superpriority secured debtor-in-possession term loan credit facility, comprised of multi-draw term loans (the "***Term Facility***") in an aggregate principal amount of $675,000,000. All of the Borrowers' obligations under the Term Facility are to be guaranteed by the Guarantors (as hereinafter defined).

(3)     To provide security for repayment of the Term Loans (as hereinafter defined), and the payment of the other Obligations (as hereinafter defined) of the Loan Parties hereunder and under the Loan Documents (as hereinafter defined), the Loan Parties will provide and grant to the Administrative Agent, for its benefit and the benefit of the other Secured Parties, certain rights and protections pursuant to the terms hereof, security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, in each case having the relative priorities as set forth in the DIP Financing Orders, and other rights and protections as more fully described herein and in the DIP Financing Orders.

AGREEMENT

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01     Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"***2019 Extended Term Loan PropCo Assets***" means the assets held by Term Loan PropCo as of the Petition Date.

"*ABL Credit Agreement*" means the Revolving Credit Agreement, dated as of October 25, 2013, among Holdings, the Lead Borrower, the other co-borrowers party thereto from time to time, the lenders party thereto from time to time and Deutsche Bank AG New York Branch, as administrative agent and collateral agent, as such document may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, including by that certain Fifth Amendment to Revolving Credit Agreement, dated as of September 11, 2019, by and among the parties thereto.

"*ABL Loan Documents*" means the ABL Credit Agreement and the other "*Loan Documents*" as defined in the ABL Credit Agreement, as each such document may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*ABL Segregated Cash Collateral*" has the meaning assigned to such term in definition of "*Liquidity*".

"*ABR*" means, for any day, a fluctuating rate per annum equal to the highest of:

(1)     the Federal Funds Rate *plus* 1/2 of 1.00%;

(2)     the Prime Rate; and

(3)     the LIBOR Quoted Rate *plus* 1.00%.

Any change in the ABR due to a change in the Federal Funds Rate, the Prime Rate or the LIBOR Quoted Rate will be effective on the effective date of such change in the Federal Funds Rate, the Prime Rate or the LIBOR Quoted Rate, as the case may be.

"*ABR Borrowing*" means a Borrowing comprised of ABR Loans.

"*ABR Loan*" means any Term Loan bearing interest at a rate determined by reference to the ABR.

"*Acceptable Confirmation Order*" means an order of the Bankruptcy Court confirming an Acceptable Plan that is in form and substance consistent with the RSA and otherwise satisfactory to the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the prior written consent of the Required Lenders in their reasonable discretion).

"*Acceptable Plan*" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"*Accounting Change*" has the meaning assigned to such term in Section 1.03.

"*Actual Cash Receipts*" means the sum of all cash receipts received by the Loan Parties and their Subsidiaries during the relevant period of determination (other than proceeds of the Term Loans and, except to the extent consistent with the Approved Budget, sales, leases or other dispositions outside of the ordinary course of business of the Loan Parties and their Subsidiaries) and which corresponds to the amounts across from the line-item in the Approved Budget with the heading "Operating Receipts" , as determined in a manner consistent with the Approved Budget.

2

"*Actual Disbursements*" means the sum of all cash disbursements made by the Loan Parties and their Subsidiaries (in all cases excluding payment of amounts which correspond to the figures across from the line-items in the Approved Budget with the headings "Professional Fees", "ABL / FILO / Pre-Term Interest", "DIP Interest", "Exit Term Interest", "Financing Fees", "Success Fees", "KEIP / KERP", "Stub Rent", "Cures" and "Trade Claims Cash Pool") during the relevant period of determination and which corresponds to the amounts across from the line-item in the Approved Budget with the heading "Operating Disbursements" and "Non-Operating Disbursements", as determined in a manner consistent with the Approved Budget.

"*Adjusted LIBO Rate*" means, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum equal to the greater of (1) the LIBO Rate in effect for such Interest Period *divided by* one *minus* the Statutory Reserves applicable to such Eurocurrency Borrowing, if any, and (2) 1.25%.

"*Administrative Agent*" means Cortland Products Corp., in its capacity as administrative agent for itself and the Lenders hereunder, and any duly appointed successor in such capacity.

"*Administrative Agent Fees*" has the meaning assigned to such term in Section 2.09(a).

"*Administrative Questionnaire*" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Affiliate*" means, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"*Agents*" means the Administrative Agent and the Collateral Agent, in their respective capacities as such.

"*Agreement*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Applicable Margin*" means (i) with respect to an ABR Borrowing, 11.75% and (ii) with respect to a Eurocurrency Borrowing, 12.75%.

"*Approved Budget*" means the 13-week operating budget for the Loan Parties attached as Exhibit 3 to the Interim DIP Financing Order filed with the Bankruptcy Court on May 7, 2020 as the same may be updated from time to time in accordance with Section 5.04.

"*Approved Fund*" has the meaning assigned to such term in Section 10.04(b).

"*Asset Sale*" means any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any Sale and Lease-Back Transaction) to any Person of any asset or assets of the Borrowers or any Subsidiary.

"*Assignee*" has the meaning assigned to such term in Section 10.04(b).

3

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Assignee, and accepted by the Administrative Agent and the Lead Borrower (if required by Section 10.04), substantially in the form of Exhibit A or such other form, substantially consistent with the form of Exhibit A, that is approved by the Administrative Agent and reasonably satisfactory to the Lead Borrower.

"*Backstop Commitment*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Backstop Commitment Fee*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Backstop Commitment Letter*" means the Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility Backstop Commitment Letter, dated as of May 7, 2020, among the Lead Borrower and the Backstop Commitment Parties.

"*Backstop Commitment Parties*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of any Affected Financial Institution.

"*Bail-In Legislation*" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"*Bankruptcy Court*" has the meaning assigned to such term in the recitals.

"*Beneficial Owner*" has the meaning given to that term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will not be deemed to have beneficial ownership of any securities that such "person" has the right to acquire or vote only upon the happening of any future event or contingency (including the passage of time) that has not yet occurred.  The terms "*Beneficial Ownership*", "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States of America.

"**Board of Directors**" means, as to any Person, the board of directors, board of managers or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors, board of managers or other governing body of such entity, and the term "**directors**" means members of the Board of Directors.

"**Borrower**" has the meaning assigned to such term in the introductory paragraph hereof. As used herein, the term "Borrower" shall mean, as the context requires, "Borrower" or "Borrowers".

"**Borrower Materials**" has the meaning assigned to such term in Section 10.17(a).

"**Borrower Supplemental Budget Election**" shall have the meaning assigned to such term in Section 5.04(n).

"**Borrowing**" means a group of Term Loans of a single Type made on a single date under the Term Facility and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" means a written request by the Borrower in accordance with the terms of this Agreement and substantially in a form of Exhibit C or such other customary form reasonably satisfactory to the Administrative Agent and the Lead Borrower.

"**Budgeted Cash Receipts**" means the sum of all cash receipts received by the Loan Parties and their Subsidiaries during the relevant period of determination (other than proceeds of the Term Loans and, except to the extent consistent with the Approved Budget, sales, leases or other dispositions outside of the ordinary course of business of the Loan Parties and their Subsidiaries) as set forth across from the line-item in the Approved Budget with the heading "Operating Receipts".

"**Budgeted Disbursements**" means the sum of all cash disbursements made by the Loan Parties and their Subsidiaries (in all cases excluding payment of amounts set forth across from the line-items in the Approved Budget with the headings "Professional Fees", "ABL / FILO / Pre-Term Interest", "DIP Interest", "Exit Term Interest", "Financing Fees", "Success Fees", "KEIP / KERP", "Stub Rent", "Cures" and "Trade Claims Cash Pool")) during the relevant period of determination as set forth across from the line-items in the Approved Budget with the headings "Operating Disbursements" and "Non-Operating Disbursements".

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; *provided* that when used in connection with a Eurocurrency Loan, the term "Business Day" also excludes any day on which banks are not open for dealings in deposits in the London interbank market.

"**Capital Lease Obligations**" means, with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP (as in effect on October 25, 2013, notwithstanding any modification or interpretative change thereto thereafter and excluding the effect to any treatment of leases under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect)) and, for purposes hereof, the amount of such obligations at any time will be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Lease Obligations Cap**" has the meaning assigned to such term in Section 6.01(e).

"*Capital Stock*" means:

(1)     in the case of a corporation, corporate stock;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Carve Out*" has the meaning assigned to such term in the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.

"*Cash Collateral*" has the meaning assigned to such term in the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.

"*Cash Equivalents*" means:

(1)     Dollars, Canadian dollars, Japanese yen, pounds sterling, euros or the national currency of any participating member of the European Union or, in the case of any Foreign Subsidiary, any local currencies held by it from time to time in the ordinary course of business and not for speculation;

(2)     direct obligations of the United States of America or any member of the European Union or any agency thereof or obligations guaranteed by the United States of America or any member of the European Union or any agency thereof, in each case, with maturities not exceeding two years;

(3)     time deposits, Eurodollar time deposits, certificates of deposit and money market deposits, in each case, with maturities not exceeding one year from the date of acquisition thereof, and overnight bank deposits, in each case, with any commercial bank having capital, surplus and undivided profits of not less than $250.0 million;

(4)     repurchase obligations for underlying securities of the types described in clauses (2) and (3) above and clause (6) below entered into with a bank meeting the qualifications described in clause (3) above;

(5)     commercial paper or variable or fixed rate notes maturing not more than one year after the date of acquisition issued by a corporation rated at least "P-1" by Moody's or "A-1" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(6)     securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(7)     Indebtedness issued by Persons (other than the Sponsors) with a rating of at least "A 2" by Moody's or "A" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency), in each case, with maturities not exceeding one year from the date of acquisition,

and marketable short-term money market and similar securities having a rating of at least "P-2" or "A-2" from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(8)     Investments in money market funds with average maturities of 12 months or less from the date of acquisition that are rated "Aaa3" by Moody's and "AAA" by S&P (or reasonably equivalent ratings of another internationally recognized rating agency);

(9)     instruments equivalent to those referred to in clauses (1) through (8) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above customarily utilized in the countries where any such Subsidiary is located or in which such Investment is made;

(10)    shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (1) through (9) above; and

(11)    investments of the type made pursuant to Borrowers' investment policy in effect as of the Closing Date (a copy of which has been provided to the Required Lenders), or as amended, modified, supplemented or updated from time to time with the Required Lenders' consent.

"*Cash Management Services*" means any treasury, depository, pooling, netting, overdraft, stored value card, purchase card (including so called "procurement card" or "P-card"), debit card, credit card, cash management and similar services and any automated clearing house transfer of funds.

A "*Change in Control*" will be deemed to occur if:

(1)     at any time,

    (a)     Holdings ceases to Beneficially Own, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrowers; or

    (b)     a "change of control" (or comparable event) occurs under the documents governing the Prepetition Indebtedness, in each case, if any Indebtedness is outstanding under such agreement; or

(2)     the Permitted Holders, taken together, cease to Beneficially Own, directly or indirectly, Voting Stock representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings (determined on a fully diluted basis but without giving effect to contingent voting rights not yet vested).

"*Change in Law*" means:

(1)     the adoption of any law, rule or regulation after the Closing Date;

(2)     any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date; or

(3)     compliance by any Lender (or, for purposes of Section 2.12(b), by any lending office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority, made or issued after the Closing Date; *provided* that, notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or

directives promulgated thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States of America or foreign regulatory authorities, in each case pursuant to Basel III, in each case will be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"*Chapter 11 Cases*" has the meaning assigned to such term in the recitals.

"*Charges*" has the meaning assigned to such term in Section 10.09.

"*Claim*" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"*Closing Date*" means the first date all the conditions set forth in Section 4.01 have been satisfied or waived by the Required Lenders in accordance with this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the DIP Financing Orders and the Security Documents as security for the Obligations, including substantially all real and personal property of the Loan Parties, but excluding any Excluded Assets.

"*Collateral Agent*" means Cortland Products Corp., in its capacity as Collateral Agent for itself and the other Secured Parties, and any duly appointed successor in that capacity.

"*Collateral Agreement*" means the Debtor-In-Possession Guarantee and Collateral Agreement, dated as of the Closing Date, among the Loan Parties and the Collateral Agent, as amended, supplemented, restated and/or otherwise modified from time to time.

"*Commitment*" means, for any Lender, the commitment of such Lender to make Term Loans pursuant to Section 2.01, as set forth on Schedule 2.01 (under the headings "Initial Term Loan Commitments" and "Post-Initial Allocation Term Loan Commitments"), which Schedule 2.01 will be modified on or prior to the Initial Allocation Date in accordance herewith, or in any applicable Assignment and Acceptance.  The aggregate amount of all Lenders' Commitments on the Closing Date immediately before the funding of the Interim Order Term Loans is $675,000,000 (the "*Total Commitment*").

"*Commitment Termination Date*" means the earlier to occur of (i) the date the Last Term Loan is made hereunder (after giving effect to the funding thereof) and (ii) the date that is ten (10) days prior to the Original Maturity Date.

"*Connection Income Taxes*" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Consenting Noteholder*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*continuing*" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" will have correlative meanings.

"*Control Agreement*" means any "*Control Agreement*" as defined in the Collateral Agreement.

"*Credit Date*" means the date of making of a Term Loan.

"*Credit Support*" means, with respect to any Person and any Indebtedness or other Indebtedness Obligations, (i) such Person's Guarantee of, or becoming a direct or indirect obligor with respect to, such Indebtedness or other Indebtedness Obligations, (ii) such Person's pledge or other hypothecation of its assets to directly or indirectly secure or provide recourse with respect to such Indebtedness or other Indebtedness Obligations, (iii) such Person becoming directly or indirectly liable for such Indebtedness or other Indebtedness Obligations or (iv) such Person providing any other form of direct or indirect credit support for such Indebtedness or other Indebtedness Obligations (including by means of a "keepwell" or other similar commitment).

"*Default*" means any event or condition which, but for the giving of notice, lapse of time or both, would constitute an Event of Default.

"*Defaulting Lender*" means, subject to Section 2.19(c), any Lender that (a) has failed to (i) fund all or any portion of its Term Loans on the date such Term Loans were required to be funded hereunder, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified any Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect, (c) has failed, within three (3) Business Days after written request by the Administrative Agent or any Borrower, to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrowers), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of (A) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (B) in the case of a solvent Lender, the precautionary appointment of an administrator, guardian or custodian or similar official by a Governmental Authority under or based on the law of the country where such Lender is organized if the applicable law of such jurisdiction requires that such appointment not be publicly disclosed, in any such case, where such ownership or action, as applicable, does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent

manifest error, and such Lender shall be deemed a Defaulting Lender (subject to Section 2.19(c)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrowers and each Lender promptly following such determination.

"***DIP Financing Orders***" means the Interim DIP Financing Order and the Final DIP Financing Order.

"***DIP Proceeds Account***" shall mean a deposit account of the Borrowers with Amegy Bank, a division of Zions Bancorporation, with an account number ending with the last four digits of 4336.

"***Disqualified Institution***" means:

(1)

     (a)    any Person that is a competitor of the Borrowers and identified by the Lead Borrower in writing to the Administrative Agent on or prior to the Closing Date;

     (b)    any Person that is a competitor of the Borrowers and identified by the Lead Borrower in good faith in writing to the Administrative Agent from time to time after the Closing Date; *provided* that such Person will not be a Disqualified Institution if the Administrative Agent reasonably determines in good faith that such Person is not a competitor of the Borrowers and notifies the Lead Borrower of such determination promptly following the date on which the Lead Borrower identifies such Person to the Administrative Agent; and

     (c)    any Affiliates of such competitors described in the foregoing clauses (a) and (b) that are reasonably identifiable as such (other than any such Affiliate that is a bank, financial institution or fund (other than a Person described in clause (2) below) that regularly invest in commercial loans or similar extensions of credit in the ordinary course of business and for which no personnel involved with the relevant competitor (i) make investment decisions or (ii) have access to non-public information relating to the Borrowers or any Person that forms part of the Borrowers' business (including their Subsidiaries)); or

(2)    certain banks, financial institutions, other institutional lenders and investors and other entities that are identified by the Lead Borrower in writing to the Administrative Agent on or prior to the Closing Date.

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent will not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Institution and the Administrative Agent will have no liability with respect to any assignment made to a Disqualified Institution.

"***Disqualified Stock***" means, with respect to any Person, any Equity Interests of such Person that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are redeemable or exchangeable at the option of the holder thereof), or upon the happening of any event or condition:

(1)    mature or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale

are subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable);

(2)     are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part;

(3)     provide for the scheduled payments of dividends in cash; or

(4)     either mandatorily or at the option of the holders thereof, are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in each case, prior to the date that is ninety-one (91) days after the earlier of:

(a)     the Maturity Date; and

(b)     the date on which the Term Loans and all other Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no claim has been asserted) are repaid in full;

*provided* that only the portion of the Equity Interests that so mature or are mandatorily redeemable, are so convertible or exchangeable or are so redeemable at the option of the holder thereof prior to such date will be deemed to be Disqualified Stock; *provided*, *further*, that if such Equity Interests are issued to any employee or to any plan for the benefit of employees of Holdings or its Subsidiaries or by any such plan to such employees, such Equity Interests will not constitute Disqualified Stock solely because they may be required to be repurchased by Holdings or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; and *provided*, *further*, that any class of Equity Interests of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Equity Interests that is not Disqualified Stock will not be deemed to be Disqualified Stock.

"***Dollars***" or "***$***" means lawful money of the United States of America.

"***Domestic Subsidiary***" means any Subsidiary of the Lead Borrower that is organized under the laws of the United States or any political subdivision thereof, and "***Domestic Subsidiaries***" means any two or more of them.  Unless otherwise indicated in this Agreement, all references to Domestic Subsidiaries will mean Domestic Subsidiaries of the Lead Borrower.

"***EEA Financial Institution***" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"***EEA Member Country***" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Environment*" means ambient air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, and natural resources such as flora and fauna.

"*Environmental Laws*" means all applicable laws (including common law), statutes, rules, regulations, codes, ordinances, orders, legally binding agreements and final, legally binding decrees or judgments, in each case, promulgated or entered into by or with any Governmental Authority, relating to the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to occupational health and safety matters (to the extent relating to exposure to Hazardous Materials).

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and any final regulations promulgated and the rulings issued thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302, 303 and 306(g) of ERISA and Section 412 and 430 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" means:

(1)     a Reportable Event, or the requirements of Section 4043(b) of ERISA apply, with respect to a Plan;

(2)     a withdrawal by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate that is treated as a termination or withdrawal under Section 4062(e) of ERISA;

(3)     a complete or partial withdrawal by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate from a Multiemployer Plan, receipt of written notification by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate concerning the imposition of Withdrawal Liability on it or written notification that a Multiemployer Plan is, or is expected to be, insolvent within the meaning of Title IV of ERISA or endangered or in critical status within the meaning of Section 305 of ERISA or Section 432 of the Code;

(4)     (a) the provision by a Plan administrator or the PBGC to any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate of notice of intent to terminate a Plan or to appoint a trustee to administer a Plan, (b) the treatment of a Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA or (c) the commencement of proceedings by the PBGC to terminate a Plan or Multiemployer Plan;

(5)     the incurrence by any Loan Party or, to the knowledge of Holdings or the Lead Borrower, any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan or Multiemployer Plan, other than for the timely payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA;

12

(6)      the application for a minimum funding waiver under Section 302(c) of ERISA or Section 412(c) of the Code with respect to a Plan;

(7)      the imposition of a lien on the assets of any Loan Party under Section 303(k) of ERISA with respect to any Plan or Section 430(k) of the Code; and

(8)      a determination that any Plan is in "at risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code).

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Eurocurrency Borrowing*" means a Borrowing comprised of Eurocurrency Loans.

"*Eurocurrency Loan*" means any Term Loan bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Event of Default*" has the meaning assigned to such term in Section 8.01.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Assets*" means "*Excluded Assets*" as defined in the Collateral Agreement.

"*Excluded Equity Interests*" means "*Excluded Equity Interests*" as defined in the Collateral Agreement.

"*Excluded Indebtedness*" means all Indebtedness not incurred in violation of Section 6.01.

"*Excluded Subsidiary*" means:

(a)      Neiman Marcus Bermuda L.P., a company organized under the laws of Bermuda;

(b)      NMG Asia Holdings Limited, a company organized under the laws of Hong Kong; and

(c)      NMG Asia Limited, a company organized under the laws of Hong Kong;

in each case, unless the Borrower determines in its sole discretion, upon notice to the Administrative Agent, that any of the foregoing Persons should not be an Excluded Subsidiary until the date on which the Borrower has informed the Administrative Agent that it elects to have such Person again be an Excluded Subsidiary; *provided* that the Guarantee and the security interest provided by such Person is full and unconditional and fully enforceable in the jurisdiction of organization of such Person.

"*Excluded Taxes*" means, with respect to any Recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder:

(1)      income taxes imposed on or measured by its net income (however denominated) or franchise taxes imposed in lieu of net income taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes;

13

(2)     any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (1) above;

(3)     any withholding tax (including any backup withholding tax) that is in effect and would apply to amounts payable hereunder to or for the account of a Recipient under the law applicable at the time such Recipient becomes a party to this Agreement (or in the case of a Lender, under the law applicable at the time such Lender changes its lending office), except to the extent that the Recipient's assignor (if any), at the time of assignment (or such Lender immediately before it changed its lending office), was entitled to receive additional amounts from the Loan Party with respect to any such tax pursuant to Section 2.14(a) or Section 2.14(c);

(4)     Taxes that are attributable to such Lender's or Administrative Agent's failure to comply with Section 2.14(e) or Section 2.14(f); and

(5)     any U.S. federal withholding Taxes imposed under FATCA.

"*Executive Order*" has the meaning assigned to such term in Section 3.19(c)(i).

"*Extended Maturity Date*" means December 7, 2020.

"*Extended Term Loan Backstop Commitment Parties*" has the meaning assigned to such term in the Backstop Commitment Letter.

"*Extended Term Loan Lender Advisors*" means Ducera Partners LLC, Vinson & Elkins LLP, and Wachtell, Lipton, Rosen & Katz, and, if applicable, conflicts counsel.

"*Extension Fee*" has the meaning assigned to such term in Section 2.09(e).

"*Extension Request*" has the meaning assigned to such term in Section 2.18.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"*FCPA*" has the meaning assigned to such term in Section 3.19(b).

"*Federal Funds Rate*" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that:

(1)     if such day is not a Business Day, the Federal Funds Rate for such day will be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day; and

(2)     if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day will be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of

1.0%) charged to the Administrative Agent by three federal fund brokers on such day on such transactions as determined in good faith by the Administrative Agent.

"*Fee Letter*" means that certain Fee Letter, dated on or about the Closing Date, by and among the Administrative Agent and the Borrowers, as amended and in effect from time to time and including any joinders thereto.

"*Fees*" means the (1) Administrative Agent Fees and all other fees set forth in the Fee Letter payable to the Administrative Agent with respect to Term Loans, (2) the Backstop Commitment Fee and (3) such other fees as set forth in Section 2.09.

"*Final DIP Financing Order*" means the order of the Bankruptcy Court approving this Agreement on a final basis in form and substance satisfactory to the Administrative Agent, the Required Lenders in their sole discretion, and the Majority Noteholders, as the same may be amended, modified or supplemented from time to time with, solely in the case any such amendment, modification or supplement that adversely impacts the rights or duties of the Lenders or the Consenting Noteholders in any respect, the consent of the Required Lenders or the Majority Noteholders, respectively (and with respect to amendments, modifications or supplements that adversely affect the rights or duties of the Administrative Agent in any respect, the Administrative Agent). The consent of the Majority Noteholders to the form of the Final DIP Financing Order and any amendment thereto shall not be unreasonably withheld, conditioned or delayed.

"*Final Order Availability Amount*" shall mean (i) $525,000,000 less the Interim Order Availability Amount or (ii) such lesser amount approved by the Bankruptcy Court in the Final DIP Financing Order.

"*Final Order Availability Date*" shall mean the date of the first Borrowing on which the conditions precedent set forth in Sections 4.02 and 4.03 have been satisfied or waived, which date shall be on or after the Final Order Entry Date.

"*Final Order Entry Date*" shall mean the date on which the Final DIP Financing Order is entered by the Bankruptcy Court.

"*Final Order Term Loan*" shall have the meaning assigned to such term in Section 2.01(a).

"*Financial Officer*" means, with respect to any Person, the chief financial officer, a chief restructuring officer appointed during the pendency of the Chapter 11 Cases, if any, principal accounting officer, director of financial services, treasurer, assistant treasurer or controller of such Person.

"*First and Second Day Orders*" means all First Day Orders and Second Day Orders.

"*First Day Orders*" means all interim orders of the Bankruptcy Court (other than the Interim DIP Financing Order) relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehousemen and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration, (xiv) extension of time to file schedules and statements of financial affairs, and (xv) any other pleading the Loan Parties deem necessary or advisable to file the Chapter 11 Cases, in each case, in form and substance substantially consistent with the Approved Budget and otherwise reasonably acceptable to the Required Lenders.

"***Foreign Lender***" means any Lender that is organized under the laws of a jurisdiction other than the United States of America.  For purposes of this definition, the United States of America, each state thereof and the District of Columbia will be deemed to constitute a single jurisdiction.

"***Foreign Subsidiary***" means any Subsidiary that not a Domestic Subsidiary.

"***GAAP***" means generally accepted accounting principles in the United States of America as in effect from time to time, including those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession (but excluding the policies, rules and regulations of the SEC applicable only to public companies).

Notwithstanding anything to the contrary above or in the definition of "Capital Lease Obligations", in the event of a change under GAAP (or the application thereof) requiring any leases to be capitalized that are not required to be capitalized as of October 25, 2013, only those leases that would result or would have resulted in Capital Lease Obligations on October 25, 2013 (assuming for purposes hereof that they were in existence on October 25, 2013) will be considered capital leases and all calculations under this Agreement will be made in accordance therewith.

"***Governmental Authority***" means any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"***Guarantee***" of or by any Person (the "***guarantor***") means:

(1)      any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect:

     (a)      to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take or pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligations;

     (b)      to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof;

     (c)      to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation;

     (d)      entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part); or

     (e)      as an account party in respect of any letter of credit, bank guarantee or other letter of credit guaranty issued to support such Indebtedness or other obligation; or

(2)      any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other Person, whether or not such Indebtedness or other obligation is assumed by the guarantor;

provided, that the term "Guarantee" will not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted by this Agreement (other than such obligations with respect to Indebtedness).

The amount of any Guarantee will be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

The term "Guaranteed" as used herein will have a corresponding meaning.

"*Guarantor*" means (1) Holdings; (2) each Subsidiary Loan Party that is not a Borrower; and (3) each Parent Entity (other than NMG or any Parent Entity of NMG) or Subsidiary that the Lead Borrower may elect in its sole discretion, from time to time, upon written notice to the Administrative Agent, to cause to Guarantee the Obligations until such date that the Lead Borrower has informed the Administrative Agent that it elects not to have such Person Guarantee the Obligations; *provided* that, in the case of this clause (3), the Guarantee and the security interest provided by such Person is full and unconditional and fully enforceable in the jurisdiction of organization of such Person.

"*Hazardous Materials*" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum byproducts or distillates, friable asbestos or friable asbestos-containing materials, polychlorinated biphenyls or radon gas, in each case, that are regulated or would give rise to liability under any Environmental Law due to their dangerous or deleterious properties.

"*Hedge Agreement*" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, not entered into for speculative purposes; *provided* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings or any of its Subsidiaries will be a Hedge Agreement.

"*Holdings*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1)      all obligations of such Person for borrowed money;

(2)      all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(3)      all obligations of such Person under conditional sale or title retention agreements relating to property or assets purchased by such Person;

(4)     all obligations of such Person issued or assumed as the deferred purchase price of property or services, to the extent the same would be required to be shown as a long-term liability on a balance sheet prepared in accordance with GAAP;

(5)     all Capital Lease Obligations of such Person;

(6)     all net payments that such Person would have to make in the event of an early termination, on the date Indebtedness of such Person is being determined, in respect of outstanding Hedge Agreements;

(7)     the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and bank guarantees;

(8)     the principal component of all obligations of such Person in respect of bankers' acceptances;

(9)     all Guarantees by such Person of Indebtedness described in clauses (1) through (8) above; and

(10)    the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock);

*provided* that Indebtedness will not include:

(a)     trade payables, accrued expenses and intercompany liabilities arising in the ordinary course of business;

(b)     prepaid or deferred revenue arising in the ordinary course of business;

(c)     purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase prices of an asset to satisfy unperformed obligations of the seller of such asset; or

(d)     earn-out obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP.

The Indebtedness of any Person will include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof.

"***Indebtedness Documents***" means, with respect to any Indebtedness, all agreements and instruments governing such Indebtedness, all evidences of such Indebtedness or Credit Support thereof, all security documents for such Indebtedness (and documents and filings related thereto) and any intercreditor or similar agreements related thereto.

"***Indebtedness Obligations***" means any principal, interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness.

18

"**_Indemnified Taxes_**" means (1) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document; and (2) to the extent not otherwise described in clause (1), Other Taxes.

"**_Indemnitee_**" has the meaning assigned to such term in Section 10.05(b).

"**_Initial Allocation_**" has the meaning assigned to such term in the Backstop Commitment Letter.

"**_Initial Allocation Commitment Notice_**" has the meaning assigned to such term in Section 2.01(c).

"**_Initial Allocation Date_**" means the effective date of the assignment of Commitments (and related rights and obligations under this Agreement) pursuant to the Initial Allocation, which is expected to be ten (10) Business Days after the Closing Date (inclusive of the Closing Date) (or such other practicable time as reasonably agreed by the Backstop Commitment Parties, the Administrative Agent and the Lead Borrower).

"**_Initial Allocation Date Term Loan_**" has the meaning assigned to such term in Section 2.01(a).

"**_Initial Term Loan_**" has the meaning assigned to such term in Section 2.01(a).

"**_Intellectual Property Rights_**" has the meaning assigned to such term in Section 3.20(a).

"**_Interest Election Request_**" means a request by the Lead Borrower to convert or continue a Borrowing in accordance with Section 2.04.

"**_Interest Payment Date_**" means (1) with respect to any Eurocurrency Loan, the first Business Day of each calendar month following the then-ended Interest Period applicable to the Borrowing of which such Term Loan is a part; and (2) with respect to any ABR Loan, the first Business Day of each calendar month.

"**_Interest Period_**" means, as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one month thereafter, or the date any Eurocurrency Borrowing is converted to an ABR Borrowing in accordance with Section 2.04 or repaid or prepaid in accordance with Section 2.06, 2.07 or 2.08; _provided_ that:

(1)     if any Interest Period would end on a day other than a Business Day, such Interest Period will be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period will end on the next preceding Business Day;

(2)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) will end on the last Business Day of the calendar month at the end of such Interest Period;

(3)     no Interest Period will extend beyond the Maturity Date.  Interest will accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period; and

(4)      the initial Interest Period with respect to each Term Loan shall commence as of the date the Term Loan is funded and end on the last day of the calendar month in which such Term Loan is funded.

"*Interim DIP Financing Order*" means the order of the Bankruptcy Court approving this Agreement on an interim basis, in the form of Exhibit B hereto or otherwise satisfactory to the Administrative Agent, the Required Lenders in their sole discretion, and the Majority Noteholders, as the same may be amended, modified or supplemented from time to time with, solely in the case of any amendment, modification or supplement that is adverse to the rights or duties of the Lenders or the Consenting Noteholders in any respect, the consent of the Required Lenders or the Majority Noteholders, respectively (and with respect to amendments, modifications or supplements that affect the rights or duties of the Administrative Agent, the Administrative Agent).  The consent of the Majority Noteholders to the form of the Interim DIP Financing Order and any amendment thereto shall not be unreasonably withheld, conditioned or delayed.

"*Interim Order Availability Amount*" shall mean $275,000,000 or such lesser amount approved by the Bankruptcy Court in the Interim DIP Financing Order.

"*Interim Order Term Loan*" has the meaning assigned to such term in Section 2.01(a).

"*Investment*" has the meaning assigned to such term in Section 6.04.

"*Investment Grade Securities*" means:

(a)      securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents);

(b)      [reserved];

(c)      corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition; and

(d)      investments in any fund that invests at least 95.0% of its assets in investments of the type described in clause (a) above which fund may also hold immaterial amounts of cash pending investment and/or distribution.

"*Junior Financing*" means any Indebtedness permitted to be incurred hereunder that is contractually subordinated in right of payment to the Obligations, unsecured or secured by Liens that are contractually subordinated to the Liens securing the Obligations.

"*Last Term Loan*" shall have the meaning assigned to such term in Section 2.01(a).

"*Last Term Loan Availability Amount*" shall mean $675,000,000 (or such lesser amount approved by the Bankruptcy Court in the Final DIP Financing Order) less the Interim Order Availability Amount, less the Final Order Availability Amount.

"*Last Term Loan Availability Date*" shall mean the date of the first Borrowing on which the conditions precedent set forth in Sections 4.02 and 4.04 have been satisfied or waived, which date shall be after the Final Order Availability Date and at least 120 days after the Petition Date.

"*Lead Borrower*" has the meaning assigned to such term in the introductory paragraph hereof.

"*Lender*" means each financial institution listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with Section 10.04), as well as any Person that becomes a Lender hereunder pursuant to Section 10.04.

"*Lender Advisors*" means the Extended Term Loan Lender Advisors and Prepetition Notes Lender Advisors.

"*lending office*" means, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Term Loans.

"*Letter of Credit*" has the meaning assigned to such term in the ABL Credit Agreement.

"*LIBO Rate*" means, with respect to any Eurocurrency Borrowing for any Interest Period, the rate per annum equal to the arithmetic mean of the offered rates for deposits in Dollars with a term equivalent to such Interest Period by reference to the applicable Bloomberg screen page (or by reference to any successor or substitute page or other quotation service providing comparable quotations to such applicable Bloomberg screen page) at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period (as set forth by any service selected by the Administrative Agent (or any successor or substitute agency) as an authorized vendor for the purpose of displaying such rates); *provided* that if such rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period will be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurocurrency Loan being made, continued or converted by the Administrative Agent and with a term equivalent to such Interest Period would be offered to the Administrative Agent by major banks in the London interbank Eurocurrency market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period.

"*LIBOR Quoted Rate*" means, for any day (or if such day is not a Business Day, the immediately preceding Business Day), a fluctuating rate per annum equal to the greater of (1) the Adjusted LIBO Rate for an Interest Period of one month as determined as of 11:00 a.m. (London, England time) on such day by reference to the applicable Bloomberg screen page (or by reference to any successor or substitute page or other quotation service providing comparable quotations to such applicable Bloomberg screen page) for deposits in dollars (as set forth by any service selected by the Administrative Agent that (or any successor or substitute agency) as an authorized vendor for the purpose of displaying such rates); and (2) 1.25%.

"*Lien*" means, with respect to any asset (1) any mortgage, deed of trust, lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset; or (2) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; *provided* that in no event will an operating lease or an agreement to sell be deemed to constitute a Lien.

"*Liquidity*" means, as of any time, the sum of (i) unrestricted domestic cash and Cash Equivalents of the Loan Parties (excluding, for the avoidance of doubt, cash and Cash Equivalents segregated into, or designated to be segregated into, the Segregated Collateral Account (as defined in the

Interim DIP Financing Order) (such cash collateral, the "***ABL Segregated Cash Collateral***")), (ii) Term Loan proceeds in the DIP Proceeds Account; provided that on the date the Interim Order Term Loans are made, the amount of such Term Loan proceeds for purposes of this clause (ii) shall be deemed to be $250,000,000 until but excluding the date the Initial Allocation Date Term Loan is made, irrespective of whether a lesser amount of actual Term Loan proceeds is in such account for the same period, with deductions from the DIP Proceeds Account calculated based on such deemed starting balance of $250,000,000; and (iii) the principal amount of Term Loans available for borrowing hereunder as of such time (for the avoidance of doubt, as to which all conditions precedent other than delivery of a Borrowing Notice have been satisfied or waived in accordance with the terms set forth herein).

"***Loan Documents***" means this Agreement, the Backstop Commitment Letter, the Security Documents, the DIP Financing Orders, the Fee Letter, and any other amendment or other agreement or document evidencing or governing the Obligations hereunder.

"***Loan Parties***" means Holdings, the Borrowers and the Subsidiary Loan Parties.

"***Majority Noteholders***" means, at any date of determination, Consenting Noteholders beneficially owning more than a majority of Term Loans and Commitments held by all Consenting Noteholders hereunder.

"***Management Group***" means the group consisting of the directors, executive officers and other management personnel of NM Group and its Subsidiaries on the Closing Date or who became directors, officers or management personnel of NM Group or any direct or indirect parent of NM Group, as applicable, and its Subsidiaries following the Closing Date (other than in connection with a transaction that would otherwise be a Change in Control if such persons were not included in the definition of "Permitted Holders"), or (in each case) family members thereof, or trusts, partnerships or limited liability companies for the benefit of any of the foregoing, or any of their heirs, executors, successors and legal representatives, who at any date Beneficially Own or have the right to acquire, directly or indirectly, Equity Interests of the Lead Borrower or any Permitted Parent.

"***Margin Stock***" has the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" means a material adverse effect on:

(1)     the business, financial condition or results of operations, in each case, of the Lead Borrower and the Subsidiaries (taken as a whole), excluding in any event (i) the effect of filing the Chapter 11 Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Chapter 11 Cases, the effects thereof and any action required to be taken under the Loan Documents or the DIP Financing Orders, and the Chapter 11 Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Chapter 11 Cases, (iii) any matters disclosed on the schedules hereto and (iv) any matters or transactions disclosed, contemplated or required to be taken in any First Day Order or Second Day Order, motions related thereto or in any supporting declarations thereof;

(2)     the ability of the Borrowers and the Guarantors (taken as a whole) to perform their payment obligations under the Loan Documents; or

(3)     the rights and remedies of the Administrative Agent and the Lenders (taken as a whole) under the Loan Documents; provided that

in determining whether a "material adverse effect" has occurred or exists under clause (1) hereof, the impacts of COVID-19 on the business, financial condition or results of operations of the Loan Parties or any of their respective Subsidiaries will be disregarded.

"*Material Indebtedness*" means Indebtedness (other than the Term Loans) of any Borrower or any Subsidiary Loan Party in an aggregate outstanding principal amount exceeding $20.0 million.

"*Maturity Date*" means, the date that is the earliest of (i) October 7, 2020 (the "*Original Maturity Date*"), or, if such date has been extended pursuant to Section 2.18, the Extended Maturity Date (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a Chapter 7 case, (iv) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise and (vi) such earlier date on which the Term Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"*Maximum Rate*" has the meaning assigned to such term in Section 10.09.

"*Minimum Hold Percentage*" means (x) with respect to each Extended Term Loan Backstop Commitment Party, the applicable percentage under the heading "Minimum Hold Percentage—Extended Term Loan Backstop Commitment Parties" on Schedule 2.01, and (y) with respect to each Prepetition Notes Backstop Commitment Party, the applicable percentage under the heading "Minimum Hold Percentage—Prepetition Notes Backstop Commitment Parties" on Schedule 2.01.

"*MNPI*" means any material nonpublic information regarding Holdings and the Subsidiaries that has not been disclosed to the Lenders generally (other than Lenders who elect not to receive such information).  For purposes of this definition "material nonpublic information" means nonpublic information that would reasonably be expected to be material to a decision by any Lender to assign or acquire any Term Loans or to enter into any of the transactions contemplated thereby.

"*Moody's*" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"*MYT Entities*" means, collectively, (i) Mariposa Luxembourg I S.à r.l. (Luxembourg), (ii) Mariposa Luxembourg II S.à r.l. (Luxembourg), (iii) NMG Germany GmbH (Germany), (iv) mytheresa.com GmbH (Germany), (v) mytheresa.com Service GmbH (Germany), (vi) Theresa Warenvertrieb GmbH (Germany), (vii) MYT Netherlands Parent B.V. (Netherlands), and (viii) the Subsidiaries of any of the foregoing described in subclauses (i) through (vii).

"*MYT Subsidiaries*" means, collectively, (i) the MYT Entities, (ii) MYT Intermediate Holding Co., a Delaware corporation, (iii) MYT Holding Co., a Delaware corporation and (iv) MYT Parent Co., a Delaware corporation.

"**MyTheresa Assets**" means the assets described in clauses (1), (2), and (3) of the definition of MyTheresa Distribution.

"**MyTheresa Designation**" means, collectively, all designations by any Loan Party or any of their Related Parties  (including but not limited to NMG International) prior to March 25, 2019 of any of the MYT Entities as "unrestricted" Subsidiaries under the Senior Notes Indentures (as defined in the Prepetition Term Loan Credit Agreement), the Existing Credit Agreement (as defined in the Prepetition Term Loan Credit Agreement), or the ABL Credit Agreement, and all acts or omissions taken by any Loan Party or any of its Related Parties in structuring, implementing, or effectuating the foregoing designations.

"**MyTheresa Distribution**" means, collectively, all distributions or dividends by any Loan Party or any of their Related Parties (including but not limited to NMG International) prior to March 25, 2019, to or for the benefit of any other Related Parties of (1) any Equity Interests in the MYT Entities, (2) any Indebtedness owed by any MYT Entities to any Related Party (including but not limited to NMG International), and (3) any and all other Claims or Equity Interests of any Related Party (including but not limited to NMG International) in the MYT Entities, and all acts or omissions taken by any Loan Party or any of its Related Parties in structuring, implementing, or effectuating the distributions or dividends described in clauses (1) through (3) of this definition.

"**Net Cash Proceeds**" means (i) with respect to any Asset Sale, the aggregate cash proceeds (using the fair market value of any Cash Equivalents) received by the Lead Borrower or any Subsidiary in respect of any Asset Sale (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, and including any proceeds received as a result of unwinding any related Hedge Agreements in connection with such transaction but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct cash costs relating to such Asset Sale (including legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses incurred as a result thereof, taxes paid or payable within one year of such Asset Sale as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required to be paid as a result of such transaction that is secured by a Permitted Lien that is prior or senior to the Lien securing the Obligations, and any costs associated with unwinding any related Hedge Agreements in connection with such transaction and (ii) with respect to any incurrence, issuance or sale of Indebtedness, the excess, if any, of (A) cash received by the Lead Borrower or any of its Subsidiaries in connection with such incurrence over (B) the sum of (1) payments made to retire any Indebtedness that is required to be repaid in connection with such incurrence (other than Term Loans), and (2) taxes paid or payable, fees, underwriting discounts and commissions and other reasonable expenses paid or incurred by the Lead Borrower or any of its Subsidiaries in connection with such incurrence, issuance or sale.

"**New York Courts**" has the meaning assigned to such term in Section 10.15.

"**NM Group**" means, collectively, NMG and its Subsidiaries.

"**NMG**" means Neiman Marcus Group, Inc., a Delaware corporation and the direct Parent Entity of Holdings.

"**NMG International**" means NMG International LLC, a Delaware limited liability company.

"**Non-Consenting Lender**" has the meaning assigned to such term in Section 2.16(c).

24

"***Non-Defaulting Lender***" means, at any time, each Lender that is not a Defaulting Lender at such time.

"***Note***" has the meaning assigned to such term in Section 2.05(e).

"***Notes PropCo***" means NMG Notes PropCo LLC, a Delaware limited liability company that is a Subsidiary of the Lead Borrower formed solely to hold the Real Property interests consisting of Notes PropCo Assets.

"***Notes PropCo Assets***" means the assets held by Notes PropCo as of the Petition Date.

"***Obligations***" means all amounts owing to any Agent or any Lender pursuant to the terms of this Agreement or any other Loan Document (including principal, interest, any contingent indemnification and reimbursement obligations, or other payments required under Section 10.05, and all fees required to be paid pursuant to the Loan Documents).

"***OFAC***" has the meaning assigned to such term in Section 3.19(c)(v).

"***Original Maturity Date***" has the meaning assigned to such term in the definition of Maturity Date.

"***Other Connection Taxes***" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document).

"***Other Taxes***" means any and all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16).

"***Parent Entity***" means any direct or indirect parent of the Lead Borrower.

"***Participant***" has the meaning assigned to such term in Section 10.04(d)(i).

"***Participant Register***" has the meaning assigned to such term in Section 10.04(d)(i).

"***Payment Office***" means the office or account of the Administrative Agent designated to the Lead Borrower and the Lenders from time to time.

"***PBGC***" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA, or any successor thereto.

"***Permitted Debt***" has the meaning assigned thereto in Section 6.01.

"***Permitted Holders***" means each of:

(1)      the Sponsors;

(2)     any member of the Management Group (or any controlled Affiliate thereof of which members of the Management Group hold at least 50% of the Voting Stock and 50% of the economic value);

(3)     any other holder of a direct or indirect Equity Interest in Holdings that holds such Equity Interest as of the Closing Date;

(4)     any group (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) of which the Persons described in the foregoing clauses (1), (2) or (3) are members; provided that, (a) without giving effect to the existence of such group or any other group, the Persons described in the foregoing clauses (1), (2) and (3), collectively, Beneficially Own Voting Stock representing 50% or more of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings or any Permitted Parent (determined on a fully diluted basis but without giving effect to contingent voting rights not yet vested) then held by such group and (b) if the Beneficial Ownership described in subclause (a) is shared with any Person other than the Persons described in clauses (1), (2) and (3) above, the Persons described in clauses (1), (2) and (3) above hold at least 50% of the economic value of the equity securities of Holdings  (or Permitted Parent, as the case may be) then held by such group; and

(5)     any Permitted Parent.

"*Permitted Investments*" has the meaning assigned to such term in Section 6.04.

"*Permitted Liens*" has the meaning assigned to such term in Section 6.02.

"*Permitted Parent*" means any Parent Entity for so long as it is controlled only by one or more Persons that are Permitted Holders pursuant to clause (1), (2), (3) or (4) of the definition thereof; *provided* that such Parent Entity was not formed in connection with, or in contemplation of, a transaction that would otherwise constitute a Change in Control.

"*Permitted Variance*" means any variance permitted under Section 6.14.

"*Person*" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, government, individual or family trust, Governmental Authority or other entity of whatever nature.

"*Petition Date*" means May 7, 2020.

"*Plan*" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is (1) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA; and (2) either (a) sponsored or maintained (at the time of determination or at any time within the five years prior thereto) by any Loan Party or any ERISA Affiliate or (b) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Plan of Reorganization*" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"*Platform*" has the meaning assigned to such term in Section 10.17(a).

"*Prepetition Indebtedness*" means the Indebtedness of the Loan Parties existing prior to the Closing Date and set forth on Schedule 6.01.

"***Prepetition Noteholders***" has the meaning assigned to such term in the Backstop Commitment Letter.

"***Prepetition Notes Backstop Commitment Parties***" has the meaning assigned to such term in the Backstop Commitment Letter.

"***Prepetition Notes Documents***" means, collectively, the "Second Lien Notes Documents" and the "Third Lien Notes Documents" as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Notes Lender Advisors***" means Houlihan Lokey, Paul, Weiss, Rifkind, Wharton & Garrison LLP and Porter Hedges LLP, and, if applicable, conflicts counsel.

"***Prepetition Notes Obligations***" means, collectively, the "Second Lien Notes Obligations" and the "Third Lien Notes Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Credit Agreement***" means that certain Term Loan Credit Agreement, dated as of October 25, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, including by that certain Refinancing Amendment, dated as of March 13, 2014 and that certain Extension Amendment and Amendment No. 2 to the Credit Agreement, dated as of June 7, 2019), by and among Holdings, the Lead Borrower, certain Subsidiary Loan Parties, Credit Suisse, Cayman Islands Branch, as the administrative agent and the collateral agent, and certain Lenders party thereto from time to time.

"***Prepetition Term Loan Documents***" means the "Loan Documents" as defined in the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Lenders***" means the "Lenders" party to the Prepetition Term Loan Credit Agreement.

"***Prepetition Term Loan Obligations***" means the "Obligations" as defined in the Prepetition Term Loan Credit Agreement.

"***Prime Rate***" means the rate of interest per annum publicly announced from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent)); each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"***Projections***" means all projections (including financial estimates, financial models, forecasts and other forward-looking information and including the Approved Budget) furnished to the Lenders or the Administrative Agent by or on behalf of Holdings or any of the Subsidiaries on or prior to the Closing Date.

"***PropCo Guarantors***" means Notes PropCo and Term Loan PropCo.

"***Public Lender***" has the meaning assigned to such term in Section 10.17(b).

"***Qualified Equity Interests***" means any Equity Interests other than Disqualified Stock.

27

"***Quarterly Financial Statements***" has the meaning assigned to such term in Section 5.04(b).

"***Real Property***" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any Loan Party, together with, in each case, all easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"***Recipient***" means the Administrative Agent and any Lender, as applicable.

"***Register***" has the meaning assigned to such term in Section 10.04(b)(iv).

"***Regulation U***" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation X***" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Reinvestment Notice***" means a written notice executed by a Responsible Officer stating that the Borrowers or any Subsidiary intends and expects to use an amount of funds not to exceed the amount of Net Cash Proceeds of any Asset Sale consisting of Specified Dispositions to, with respect to dispositions of inventory (other than any such inventory described in the parenthetical in Section 2.08(a), in consultation with the Required Lenders, and otherwise with respect to Specified Dispositions, subject to the reasonable consent of the Required Lenders, apply such funds to any investments in, or purchases of, or payments in respect of (a) third-party logistics services, (b) supply chain assets useful in the business of the Loan Parties or their Subsidiaries or (c) any warehouse or distribution center, in each case which will be made after the date of consummation of such Asset Sale.

"***Related Lender***" has the meaning assigned to such term in Section 2.09(c).

"***Related Parties***" means, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"***Release***" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the Environment.

"***Reorganized Equity***" has the meaning assigned to such term in Section 2.09(c).

"***Reportable Event***" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"***Required Financial Statements***" has the meaning assigned to such term in Section 5.04(c).

"***Required Lenders***" means, at any time, Lenders having Term Loans and Commitments outstanding that, taken together, represent at least 66.7% of the sum of all Term Loans and Commitments outstanding at such time; *provided*, that Required Lenders must include (i) at all times at least two

unaffiliated Lenders and (ii) at any time when the Lenders consist of ten or more unaffiliated funds or investment advisors or managers of funds or accounts, at least three unaffiliated Lenders.  The amount of Term Loans and Commitments of any Defaulting Lender shall be disregarded in the calculation for determining Required Lenders at any time.

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means, with respect to any Loan Party, the chief executive officer, president, vice president, secretary, assistant secretary or any Financial Officer of such Loan Party or any other individual designated in writing to the Administrative Agent by an existing Responsible Officer of such Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party will be conclusively presumed to have been authorized by all necessary corporate, partnership or other action on the part of such Loan Party and such Responsible Officer will be conclusively presumed to have acted on behalf of such Loan Party.

"*Restricted Payments*" has the meaning assigned to such term in Section 6.06.

"*Restructuring Support Agreement*" or "*RSA*" means that certain Restructuring Support Agreement, dated as of May 7, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"*S&P*" means Standard & Poor's Ratings Services or any successor entity thereto.

"*Sale and Lease-Back Transaction*" has the meaning assigned to such term in Section 6.03.

"*SEC*" means the Securities and Exchange Commission or any successor thereto.

"*Second Day Orders*" means all final orders of the Bankruptcy Court (other than the Final DIP Financing Order) relating to (i) critical vendors, (ii) foreign vendors, (iii) shippers, warehousemen and lienholders, (iv) 503(b)(9) claimants, (v) customer programs, (vi) insurance, (vii) tax claims, (viii) tax attributes, (ix) utilities, (x) wages and employee benefits, (xi) cash management, (xii) case management and/or cross-border protocols, (xiii) joint administration, (xiv) extension of time to file schedules and statements of financial affairs, and (xv) any other pleading the Loan Parties deem necessary or advisable to file the Chapter 11 Cases, in each case, in form and substance substantially consistent with the Approved Budget and otherwise reasonably acceptable to the Required Lenders.

"*Second Lien Notes*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*Secured Parties*" means the collective reference to the "*Secured Parties*" as defined in the Collateral Agreement.

"*Security Documents*" means the Collateral Agreement, the DIP Financing Orders and each of the security agreements and other instruments and documents executed and delivered by any Loan Party pursuant thereto or pursuant to Section 5.10.

"*Similar Business*" means, as of any date, any business engaged in by the Lead Borrower and its Subsidiaries on such date and any business or other activities that are similar, ancillary, complementary, incidental or related to, or an extension, development or expansion of, the businesses in which the Lead Borrower and its Subsidiaries are engaged in on such date.

"*Specified Dispositions*" means the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith) and (i) bulk sales or other dispositions of inventory or equipment of a Loan Party and (ii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith, identified in writing by the Lead Borrower to the Required Lenders and agreed to by the Required Lenders on or prior to the Petition Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders.

"*Specified Event of Default*" has the meaning assigned to such term in Section 10.04(b).

"*Sponsors*" means, any of Ares Corporate Opportunities Fund III, L.P., Ares Corporate Opportunities Fund IV, L.P., the Canada Pension Plan Investment Board and any of their respective Affiliates and funds or partnerships managed or advised by any of them or any of their respective Affiliates, but not including any operating portfolio company of any of the foregoing.

"*Statutory Reserves*" means, with respect to any currency, any reserve, liquid asset or similar requirements established by any Governmental Authority of the United States of America or of the jurisdiction of such currency or any jurisdiction in which Term Loans in such currency are made to which banks in such jurisdiction are subject for any category of deposits or liabilities customarily used to fund loans in such currency or by reference to which interest rates applicable to Term Loans in such currency are determined.

"*Subagent*" has the meaning assigned to such term in Section 9.02.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company or other entity of which (1) Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership, limited liability company or other entity are at the time owned by such Person; or (2) more than 50.0% of the Equity Interests are at the time owned by such Person. Unless otherwise indicated in this Agreement, all references to Subsidiaries will mean Subsidiaries of the Borrowers. For the avoidance of doubt, as of the Closing Date, TNMG LLC and The NMG Subsidiary are Subsidiaries of the Lead Borrower for all purposes hereunder. For the avoidance of doubt, no MYT Subsidiary shall constitute a Subsidiary of the Borrowers at any time, including in the event that such MYT Subsidiary is required to be contributed to any of the Borrowers or their Subsidiaries in accordance with any settlement, judgment, court order or other resolution of a claim, cause of action or litigation with respect to the MyTheresa Distribution which binds the Bankruptcy Court.

"*Subsidiary Loan Parties*" means each Subsidiary of the Lead Borrower on the Closing Date or hereafter formed or acquired (other than any Excluded Subsidiary).

"*Supermajority Lenders*" means each member of the Consenting Term Loan Lender Group (as defined in the Restructuring Support Agreement), the membership of which, for the purposes of this Agreement, shall not change after the Closing Date absent the consent of each current member of such group. The amount of Term Loans and Commitments of any Defaulting Lender shall be disregarded in the calculations for determining Supermajority Lenders at all times.

"*Taxes*" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding) or similar charges imposed by any Governmental Authority and any and all interest and penalties related thereto.

"*Term Facility*" has the meaning assigned to such term in the recitals.

"*Term Loan PropCo*" means NMG Term Loan PropCo LLC, a Delaware limited liability company that is a Subsidiary of the Lead Borrower formed solely to hold Real Property interests consisting of 2019 Extended Term Loan PropCo Assets.

"*Term Loans*" means, individually and collectively, the Interim Order Term Loan, the Initial Allocation Date Term Loan, the Final Order Term Loan and the Last Term Loan.

"*The NMG Subsidiary*" has the meaning assigned to such term in the introductory paragraph hereto.

"*Third Lien Notes*" has the meaning assigned to such term in the Restructuring Support Agreement.

"*TNMG LLC*" has the meaning assigned to such term in the introductory paragraph hereto.

"*Total Commitment*" has the meaning assigned to such term in the definition of "Commitment".

"*Total Exit Fee*" has the meaning assigned to such term in Section 2.09(c).

"*Total Upfront Fee*" has the meaning assigned to such term in Section 2.09(b).

"*Trade Announcements*" has the meaning assigned to such term in Section 10.16.

"*Type*" means, when used in respect of any Term Loan or Borrowing, the Rate by reference to which interest on such Term Loan or on the Term Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" means Adjusted LIBO Rate or ABR, as applicable.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain Affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Uniform Commercial Code*" or "*UCC*" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"*U.S. Trustee*" shall have the meaning assigned to such term in Section 5.04(o).

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**Variance Report**" shall have the meaning assigned to such term in Section 5.04(r).

"**Variance Report Date**" shall have the meaning assigned to such term in Section 5.04(r).

"**Variance Testing Period**" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period (i.e, from the Petition Date through May 30, 2020)).

"**Voting Stock**" means, as of any date, the Capital Stock of any Person that is at the time entitled to vote (without regard to the occurrence of any contingency) in the election of the Board of Directors of such Person.

"**Wholly Owned Subsidiary**" means, with respect to any Person, a Subsidiary of such Person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such Person or another Wholly Owned Subsidiary of such Person. Unless otherwise indicated in this Agreement, all references to Wholly Owned Subsidiaries will mean Wholly Owned Subsidiaries of the Borrowers.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, transfer or dilute shares issued by a UK Financial Institution, to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02    Terms Generally.  The definitions set forth or referred to in Section 1.01 will apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun will include the corresponding masculine, feminine and neuter forms.  Unless the context requires otherwise,

(a)    the words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation;"

(b)    in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including;"

(c)     the word "will" will be construed to have the same meaning and effect as the word "shall;"

(d)     the word "incur" will be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" will have correlative meanings);

(e)     the word "or" will be construed to mean "and/or;"

(f)     any reference to any Person will be construed to include such Person's legal successors and permitted assigns; and

(g)     the words "asset" and "property" will be construed to have the same meaning and effect.

All references herein to Articles, Sections, Exhibits and Schedules will be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context otherwise requires.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or organizational document of the Loan Parties means such document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document).  Any reference to any law will include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation means, unless otherwise specified, such law or regulation as amended, modified or supplemented from time to time.  Whenever this Agreement refers to the "knowledge" of any Loan Party, such reference will be construed to mean the knowledge of the chief executive officer, president, chief financial officer, treasurer or controller of such Person.

SECTION 1.03     Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature will be construed in accordance with GAAP, as in effect from time to time; *provided* that, notwithstanding anything to the contrary herein, all accounting or financial terms used herein will be construed, and all financial computations pursuant hereto will be made, without giving effect to any election under Statement of Financial Accounting Standards Board Accounting Standards Codification 825-10 (or any other Statement of Financial Accounting Standards Board Accounting Standards Codification having a similar effect) to value any Indebtedness or other liabilities of the Borrowers or any Subsidiary at "fair value," as defined therein.  In the event that any Accounting Change (as defined below) occurs and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then upon the written request of the Lead Borrower or the Administrative Agent (acting upon the request of the Required Lenders), the Borrowers, the Administrative Agent and the Lenders will enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrowers' financial condition will be the same after such Accounting Change as if such Accounting Change had not occurred; *provided* that provisions of this Agreement in effect on the date of such Accounting Change will remain in effect until the effective date of such amendment.  "***Accounting Change***" means (1) any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or (2) any change in the application of GAAP by Holdings or the Borrowers.

SECTION 1.04     [Reserved].

SECTION 1.05      Currencies.  Unless otherwise specifically set forth in this Agreement, monetary amounts are in Dollars.  Notwithstanding anything to the contrary herein, no Default or Event of Default will arise as a result of any limitation or threshold set forth in Dollars being exceeded solely as a result of changes in currency exchange rates.

SECTION 1.06      [Reserved].

SECTION 1.07      Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II

### *The Credits*

SECTION 2.01      Term Loans and Borrowings.

(a)      Subject to the terms and conditions set forth in this Agreement and in the DIP Financing Orders, each Lender severally agrees to make Term Loans to the Borrowers in up to four (4) advances (i) on or about the Closing Date (the Term Loan made on such date, the "***Interim Order Term Loan***"), (ii) on or about the Initial Allocation Date (the Term Loan made on such date, the "***Initial Allocation Date Term Loan***", together with the "***Interim Order Term Loan***", the "***Initial Term Loan***"), (iii) on or after the Final Order Availability Date (the Term Loan made on such date, the "***Final Order Term Loan***") and (iv) on or after the Last Term Loan Availability Date (the Term Loan made on such date, the "***Last Term Loan***"), in each case, in an aggregate principal amount not to exceed its Commitment; provided, that:

(i)      the Interim Order Term Loan shall be funded by each Backstop Commitment Party (x) in the amount set forth under the heading "Initial Term Loan Commitments—Interim Order Term Loans" on Schedule 2.01, *multiplied by* (y) a fraction the numerator of which is the amount approved by the Bankruptcy Court in the Interim DIP Financing Order and the denominator of which is $275,000,000;

(ii)      the Initial Allocation Date Term Loan shall be (1) in an aggregate amount equal to the Interim Order Availability Amount *minus* the amount funded pursuant to clause (i) above and (2) funded by each Lender in a respective amount such that, after giving effect to the Initial Allocation Date Term Loan, each Lender holds Term Loans equal to the product of (1) (a) the Initial Term Loan divided by (b) the Total Commitment and (2) such Lender's Commitments as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 (for the avoidance of doubt, the Initial Allocation Date Term Loan will not be funded ratably across all Lenders);

(iii)      the Final Order Term Loan shall be funded ratably by each Lender in accordance with its Commitment as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 and in an aggregate amount equal to the Final Order Availability Amount; and

(iv)      the Last Term Loan shall be funded ratably by each Lender in accordance with its Commitment as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01 and in an aggregate amount equal to the Last Term Loan Availability Amount.

(b)      The Commitments of the applicable Lenders shall be reduced dollar for dollar immediately after the funding of any Term Loans thereunder and any unused Commitments shall terminate, (i) with respect to the Interim Order Availability Amount, upon funding of the Initial Allocation Date Term Loan, (ii) with respect to the Final Order Availability Amount, upon funding of the Final Order Term Loan and (iii) with respect to the Last Term Loan Availability Amount, upon the earlier of the (1) funding of the Last Term Loan and (2) the Commitment Termination Date.  Each Borrowing shall be of the same Type made on the same day by the applicable Lenders ratably according to their respective Commitments.  Amounts borrowed under Section 2.01(a) and paid or prepaid may not be reborrowed.

(c)      No later than the eighth (8th) Business Day after the Closing Date (inclusive of the Closing Date) (or such other time as reasonably acceptable to the Administrative Agent and the Lead Borrower), so long as the Lead Borrower shall have received the schedule described in this clause (c) from the Backstop Commitment Parties or their respective financial advisors, the Administrative Agent shall have received (i) from the Lead Borrower a written notice, in form and substance reasonably satisfactory to the Administrative Agent (the "*Initial Allocation Commitment Notice*"), which shall attach a schedule identifying each Lender and the amount of its Commitment and (ii) from each Lender that is not a Backstop Commitment Party, a joinder to this Agreement executed by such Lender and the Lead Borrower, pursuant to which, inter alia, such Lender shall have and shall represent and warrant that it has delivered to the Administrative Agent a completed Administrative Questionnaire, such documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations requested by the Administrative Agent and such documentation and other information required under Section 2.14.  The schedule delivered pursuant to clause (i) of this Section 2.01(c) shall be conclusive and binding absent manifest error.  The parties hereto agree that the Administrative Agent may conclusively rely on the Initial Allocation Commitment Notice and this provision in adjusting the Register to reflect the Commitment of each Lender.

(d)      Subject to Sections 2.04(g) and 2.11, each Borrowing is or will be comprised entirely of ABR Loans or Eurocurrency Loans as the Lead Borrower has requested in accordance herewith.  Each Lender at its option may make any ABR Loan or Eurocurrency Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Term Loan; *provided* that any exercise of such option will not affect the obligation of the Borrowers to repay such Term Loan in accordance with the terms of this Agreement, and such Lender will not be entitled to any amounts payable under Section 2.12 or 2.14 solely in respect of increased costs resulting from, and existing at the time of, such exercise.

(e)      To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by submitting a completed Borrowing Request, executed by a Financial Officer of the Borrower, (i) in the case of a Eurocurrency Borrowing, not later than 11:00 a.m., New York City time, three (3) Business Days before the date of the proposed Borrowing, provided that the request for the Interim Order Term Loan may be made by 11:00 a.m., New York City time, on the date of such Borrowing or (ii) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City Time, one (1) Business Day before the date of the proposed Borrowing.  Each Borrowing Request shall be irrevocable and shall specify the following information: (A) the aggregate amount of the requested Borrowing; (B) the date of such Borrowing, which shall be a Business Day; (C) whether

such Borrowing is to be a Eurocurrency Borrowing or an ABR Borrowing; and (D) the wire instructions for the DIP Proceeds Account.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall notify each Lender of the details thereof and the amount of such Lender's Term Loan to be made as part of the requested Borrowing in accordance with clause (a) above; *provided* that the Borrowers may condition each Borrowing in such notice on the entry of the Interim DIP Financing Order or the Final DIP Financing Order, as applicable.  If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing.  For the avoidance of doubt, with respect to any Eurocurrency Borrowing the Interest Period shall be one month's duration.

(f)        Notwithstanding any other provision of this Agreement, the Borrowers will not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.02        [Reserved].

SECTION 2.03        Funding of Borrowings.

(a)        Each Lender will make each Term Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 10:00 a.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Term Loans available to the Borrowers by promptly wiring the amounts so received, in like funds, to the DIP Proceeds Account.

(b)        Unless the Administrative Agent has received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.03 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent, forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent at (i) in the case of such Lender, the greater of (A) the Federal Funds Rate and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrowers, the interest rate applicable to ABR Loans at such time.  If such Lender pays such amount to the Administrative Agent then such amount will constitute such Lender's Term Loan included in such Borrowing.

SECTION 2.04        Interest Elections.

(a)        The Lead Borrower may elect to convert each Borrowing to a different Type or to continue such Borrowing, all as provided in this Section 2.04.

(b)        To make an election pursuant to this Section 2.04, the Lead Borrower will notify the Administrative Agent of such election in writing (which may include electronic communication) (i) in the case of an election to convert to or continue a Eurocurrency Borrowing, not later than 2:00 p.m., New York City time, three (3) Business Days before the effective date of such election or (ii) in the case of an election to convert to or continue an ABR Borrowing, not later

than 10:00 a.m., New York City time, on the date of such election.  Each such Interest Election Request will be substantially in the form of Exhibit D and signed by the Lead Borrower.

(c)       Each written Interest Election Request will be irrevocable and will specify the following information:

(i)       the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) below will be specified for each resulting Borrowing);

(ii)       the effective date of the election made pursuant to such Interest Election Request, which will be a Business Day; and

(iii)       whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing (and for the avoidance of doubt, irrespective of whether an Interest Period is not specified or is specified for any period longer than one (1) month, all requests for a Eurocurrency Borrowing shall be deemed to have selected a Eurocurrency Borrowing having an Interest Period of one (1) month's duration).

(d)       [Reserved].

(e)       Promptly following receipt of an Interest Election Request, the Administrative Agent will advise each applicable Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(f)       If the Lead Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing will be automatically converted into an ABR Borrowing.

(g)       Any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurocurrency Borrowing.

SECTION 2.05       Promise to Pay; Evidence of Debt.

(a)       The Borrowers hereby unconditionally promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender as provided in Section 2.06.

(b)       Each Lender will maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)       The Administrative Agent will maintain accounts in which it will record (i) the amount of each Term Loan made hereunder, the Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section 2.05 will be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein will not in any manner affect the obligation of the Borrowers to repay the Term Loans in accordance with the terms of this Agreement.  In the event of any conflict between the accounts maintained pursuant to clauses (b) or (c) above, the accounts maintained by the Administrative Agent pursuant to clause (c) shall control, subject, in each case, to the entries maintained in the Register.

(e)     Any Lender may request that Term Loans made by it be evidenced by a promissory note (a "***Note***").  In such event, the Borrowers will prepare, execute and deliver to such Lender a Note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in the form of Exhibit G and reasonably acceptable to the Borrowers.  Thereafter, the Term Loans evidenced by such Note and interest thereon will at all times (including after assignment pursuant to Section 10.04) be represented by one or more Notes in such form payable to the payee named therein (or, if requested by such payee, to such payee and its registered assigns).

SECTION 2.06     Repayment of Term Loans.

(a)     To the extent not previously paid, all outstanding Term Loans will be due and payable on the Maturity Date.

(b)     On the Maturity Date, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations in accordance with the DIP Financing Orders without further application to or order of the Bankruptcy Court.

Each repayment pursuant to this Section 2.06 will be accompanied by payment of accrued and unpaid interest on the principal amount paid to but excluding the date of such payment.

SECTION 2.07     Optional Prepayment of Term Loans.

(a)     The Borrowers may at any time and from time to time prepay the Term Loans in whole or in part, without premium or penalty (subject to Section 2.13), in an aggregate principal amount, (i) in the case of Eurocurrency Loans, that is an integral multiple of $500,000 and not less than $2.5 million, and (ii) in the case of ABR Loans, that is an integral multiple of $100,000 and not less than $1.0 million, or, in each case, if less, the amount outstanding.  The Lead Borrower will notify the Administrative Agent in writing (by hand delivery, facsimile transmission or e-mail) of such election not later than 2:00 p.m., New York City time, (x) in the case of a Eurocurrency Borrowing, three (3) Business Days before the anticipated date of such prepayment and (y) in the case of an ABR Borrowing, one (1) Business Day before the anticipated date of such prepayment.  Each such notice of prepayment will specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid.  All prepayments under this Section 2.07 will be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.  Any such notice may be revocable or conditioned on a refinancing of all or any portion of the Term Facility.

SECTION 2.08     Mandatory Prepayment of Term Loans.

(a)     Subject to the priority of Liens and application of funds set forth in the DIP Financing Orders with respect to the Collateral that is sold pursuant to any Asset Sale, the Borrowers will apply all Net Cash Proceeds (other than any proceeds received from the disposition

of inventory which are, or are contemplated to be, applied to working capital in accordance with the Approved Budget or posted to the ABL Borrowing Base (as defined in the DIP Financing Orders, as applicable) to support a deficit in such ABL Borrowing Base in accordance with the Approved Budget) received in an Asset Sale made pursuant to Section 6.05(g) or (l) to the prepayment of Term Loans within three (3) Business Days following receipt of such Net Cash Proceeds, unless, with respect to an Asset Sale made pursuant to Section 6.05(g), the Lead Borrower has delivered a Reinvestment Notice on or prior to such third Business Day.

(b)     [Reserved].

(c)     Subject to the priority of Liens and application of funds set forth in the DIP Financing Orders, the Borrowers will apply 100% of the Net Cash Proceeds from the incurrence, issuance or sale by the Borrowers or any Subsidiary of any Indebtedness that is not Excluded Indebtedness to the prepayment of Term Loans, on or prior to the date that is three (3) Business Days after the receipt of such net cash proceeds.

(d)     [Reserved].

(e)     The following general provisions shall apply to all prepayments pursuant to this Section 2.08:

(i)     The Lead Borrower will deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.08, (A) a certificate signed by a Financial Officer of the Lead Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (B) at least three (3) Business Days prior written notice of such prepayment.  Each notice of prepayment shall specify the prepayment date, the Type of each Term Loan being prepaid and the principal amount of each Term Loan (or portion thereof) to be prepaid.

(ii)    Prepayment of the Term Loans pursuant to this Section 2.08 will be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(f)     Notwithstanding any provisions of this Section 2.08 to the contrary

(i)     to the extent that any or all of the Net Cash Proceeds giving rise to a prepayment event pursuant to Section 2.08(a) or (c) are prohibited or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to prepay Term Loans at the times provided in this Section 2.08, but may be retained by the Borrowers or the applicable Subsidiary for so long, but only so long, as the applicable local law will not permit repatriation to the United States.  Once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be effected promptly and such repatriated Net Cash Proceeds will be promptly applied (net of additional taxes payable or reserved against as a result thereof) to the prepayment of the Term Loans pursuant to this Section 2.08 to the extent provided herein; provided that the Borrowers hereby agree, and will cause any applicable Subsidiary, to promptly take all commercially reasonable actions required by applicable local law to permit any such repatriation; or

(ii)    to the extent that a Responsible Officer of the Lead Borrower has reasonably determined in good faith that repatriation of any of or all the Net Cash Proceeds

giving rise to a prepayment event pursuant to Section 2.08(a) or (c) would have an adverse tax cost consequence, such Net Cash Proceeds so affected will not be required to be applied to prepay Term Loans at the times provided in this Section 2.08, but may be retained by the Borrowers or the applicable Subsidiary without being repatriated; provided that, in the case of this subclause (ii), on or before the date on which any such Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.08 the Borrowers apply an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been repatriated, less the amount of additional taxes that would have been payable or reserved against if such net cash proceeds had been repatriated.

SECTION 2.09       Fees.

(a)       The Borrowers agree to pay (i) to the Administrative Agent, for its own account, the fees set forth in the Fee Letter at the times and on the terms specified therein (the "***Administrative Agent Fees***") and (ii) to the Backstop Commitment Parties the Backstop Commitment Fees at the time and on the terms specified in the Backstop Commitment Letter.

(b)       The Borrowers agree to pay to the Administrative Agent for the benefit of the Lenders upfront fees equal to 4.00% of the Total Commitment (the "***Total Upfront Fee***"), which shall be allocated as follows:  (i) (A) to each Extended Term Loan Backstop Commitment Party, in an amount equal to (1) its Minimum Hold Percentage, *multiplied by* (2) 90.5%, *multiplied by* (3) the Total Upfront Fee and (B) to each Prepetition Note Backstop Commitment Party, in an amount equal to (1) its Minimum Hold Percentage, *multiplied by* (2) 9.5%, *multiplied by* (3) the Total Upfront Fee, and shall be earned, due, and payable in cash on the Closing Date upon the funding of its portion of the Interim Order Term Loan, and shall be netted from such funding on the Closing Date and (ii) to each Lender, in an amount equal to (A) such Lender's Commitment as set forth on Schedule 2.01 under the heading "Post-Initial Allocation Term Loan Commitments", *divided by* (B) the Total Commitment and *multiplied by* (C) the Total Upfront Fee, *minus* the amount (if any) paid to such Lender pursuant to clause (i) above and shall be earned, due, and payable on the Initial Allocation Date upon the funding of its portion of the Initial Allocation Date Term Loan, and shall be netted from such funding on the Initial Allocation Date.

(c)       The Borrowers agree to pay to the Lenders (or, at each Lender's option and upon such Lender's written designation (which may be provided by electronic communication), one or more of its affiliates or funds or accounts that are managed, advised or sub-advised by such Lender (each, a "***Related Lender***")) an exit fee equal to the product of 3.00% of the Total Commitment (the "***Total Exit Fee***"), which shall be payable ratably to each Lender on the Maturity Date in accordance with their Commitments as set forth under the heading "Post-Initial Allocation Term Loan Commitments" on Schedule 2.01.  The Total Exit Fee due to the Lenders on the Maturity Date shall be payable in the form of shares of the same class of reorganized common equity (the "***Reorganized Equity***") distributable to the Prepetition Term Loan Lenders pursuant to an Acceptable Plan, with the amount of such shares payable to Lenders in the aggregate amount equal to (x) the Total Exit Fee *divided by* (y) 65.0% of the deemed per share value of the Reorganized Equity pursuant to and in accordance with the Acceptable Plan (provided, that if the Maturity Date shall have occurred other than in connection with consummation of an Acceptable Plan, such exit fee shall be immediately due and payable in cash to the Administrative Agent for the benefit of each Lender (or its designated Related Lender)).

(d)       The Borrowers agree to pay to the Administrative Agent for the ratable account of each Lender a ticking fee calculated on a daily basis at a rate per annum equal to 6.375% on the

daily unused Commitment of such Lender (including, in the case of any Backstop Commitment Party, prior to the Initial Allocation, the portion of its Commitment (if any) to be allocated in the Initial Allocation) accruing commencing on the date hereof and due and payable in arrears on the first Business Day of each calendar month (commencing with June 1, 2020) thereafter and on the Commitment Termination Date, in each case, with respect all amounts accrued to such date.

(e)     The Borrowers agree to pay to the Administrative Agent for the ratable account of each Lender an extension fee in an amount equal to 2.00% (the "*Extension Fee*") of the aggregate amount of outstanding Term Loans and outstanding Commitments of such Lender on the Original Maturity Date, which fee shall be earned, due, and payable in cash on the Original Maturity Date and subject to the extension under Section 2.18 having occurred.

(f)     All Fees will be paid on the dates due and payable, in immediately available funds (unless netted or otherwise expressly set forth in this Section 2.09), to the Administrative Agent at the Payment Office for distribution, if and as appropriate, among the Lenders.  Once paid, none of the Fees will be refundable under any circumstances.

(g)     Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Code), the Borrowers, Lenders and Administrative Agent agree (i) that the Total Upfront Fee shall be treated consistent with the principles of Treasury Regulations Section 1.1273-2(g)(2)(i), (ii) the Total Exit Fee shall be treated as part of the debt instrument's stated redemption price at maturity within the meaning of Treasury Regulations Section 1.1273-1(b) and (iii) to not take any tax position inconsistent with the tax treatment described in clause (i) or (ii).

SECTION 2.10          Interest.

(a)     [Reserved].

(b)     [Reserved].

(c)     The Term Loans comprising each ABR Borrowing will bear interest at the ABR *plus* the Applicable Margin.

(d)     The Term Loans comprising each Eurocurrency Borrowing will bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing *plus* the Applicable Margin.

(e)     Following the occurrence and during the continuation of an Event of Default, the Borrowers will pay interest on all Obligations hereunder at a rate per annum equal to 2.0% per annum *plus* the rate applicable to ABR Loans as provided in clause (c) of this Section 2.10. Following the occurrence and during the continuation of an Event of Default, all Eurocurrency Borrowings shall automatically convert to ABR Borrowings upon the expiry of any then-current Interest Period, with no notice or action by any party, and for so long as such Event of Default continues, the Borrowers shall have no right to make and shall not make, any Interest Election Requests requesting to convert or continue any such Borrowing as a Eurocurrency Borrowing.

(f)     Accrued interest on each Term Loan will be payable in arrears (i) on each Interest Payment Date for such Term Loan and (ii) on the Maturity Date; *provided* that (A) interest accrued pursuant to paragraph (e) of this Section 2.10 will be payable on demand, (B) in the event of any repayment or prepayment of any Term Loan, accrued interest on the principal amount repaid or prepaid will be payable on the date of such repayment or prepayment and (C) in the event of any

conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Term Loan will be payable on the effective date of such conversion.  All interest shall be payable in cash.

(g)     [Reserved].

(h)     All interest hereunder will be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the prime rate, will be computed on the basis of a year of 365 days (or 366 days in a leap year), and, in each case, will be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable ABR, Adjusted LIBO Rate or LIBO Rate will be determined by the Administrative Agent, and such determination will be conclusive absent manifest error.

SECTION 2.11     Alternate Rate of Interest.  (a) If prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(i)     the Administrative Agent determines (which determination will be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii)     the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Term Loans included in such Borrowing for such Interest Period;

then the Administrative Agent will give notice thereof to the Lead Borrower and the applicable Lenders by telephone, facsimile transmission or e-mail as promptly as practicable thereafter and, until the Administrative Agent notifies the Lead Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any applicable Borrowing to, or continuation of any such Borrowing as, a Eurocurrency Borrowing will be ineffective and such Borrowing will be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in clause (a)(i) of this Section 2.11 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a)(i) of this Section 2.11 have not arisen but either (w) the supervisor for the administrator of the LIBO Rate has made a public statement that the administrator of the LIBO Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Rate), (x) the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Rate), (y) the supervisor for the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the LIBO Rate may no longer be used for determining interest rates for loans, then the Administrative Agent and the Lead Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States of America at such time and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement

42

as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin); underlined provided that if such alternate rate of interest as so determined would be less than zero, then such rate shall be deemed to be zero for the purposes of this Agreement; provided, further, that, any such amendment to provide for an alternate rate of interest pursuant to this Section 2.11 shall meet the standards set forth in Proposed Treasury Regulation Section 1.1001-6 so as not to be treated as a "modification" (and therefore an exchange) of any Term Loans for purposes of Treasury Regulation Section 1.1001-3.  Notwithstanding anything to the contrary in Section 10.08, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from Required Lenders stating that such Lenders object to such amendment.  Until an alternate rate of interest shall be determined in accordance with this Section 2.11(b) (but, in the case of the circumstances described in clause (ii)(w), clause (ii)(x) or clause (ii)(y) of the first sentence of this Section 2.11(b), only to the extent the LIBO Rate for such Interest Period is not available or published at such time on a current basis), (A) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing shall be ineffective and (B) if any Borrowing Request requests a Eurocurrency Borrowing, such Borrowing shall be made as an ABR Borrowing.

SECTION 2.12     Increased Costs.

(a)     If any Change in Law:

(i)     imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)     imposes on any Lender or the London interbank market any other condition (other than Taxes) affecting this Agreement or Eurocurrency Loans made by such Lender; or

(iii)     subjects any Recipient to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (3) through (5) of the definition of Excluded Taxes, and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Term Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section 2.12 will be delivered to the Lead Borrower and will be conclusive absent manifest error.  The Borrowers will pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.12, such Lender will notify the Lead Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 will not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrowers will not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided*, *further*, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180 day period referred to above will be extended to include the period of retroactive effect thereof.

SECTION 2.13      Break Funding Payments.  Except as otherwise set forth herein, the Borrowers will compensate each Lender for the actual out-of-pocket loss, cost and expense (excluding loss of anticipated profits) attributable to the following events:

(a)     the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default);

(b)     the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto;

(c)     the failure to borrow, convert, continue or prepay any Eurocurrency Loan on the date specified in any notice delivered pursuant hereto; or

(d)     the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Lead Borrower pursuant to Section 2.16.

Such loss, cost or expense to any Lender will be deemed to be the amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Term Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Term Loan (but not including the Applicable Margin applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurocurrency Loan, for the period that would have been the Interest Period for such Term Loan) over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in Dollars of a comparable amount and period from other banks in the London interbank market.

A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.13 will be delivered to the Lead Borrower and will be conclusive absent manifest error.  The Borrowers will pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

44

SECTION 2.14        Taxes.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document will be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law requires the deduction or withholding of any Tax from any such payment by a Loan Party, then the applicable Loan Party shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if a Loan Party is required to deduct any Indemnified Taxes or Other Taxes from such payments, then the sum payable hereunder will be increased as necessary so that after making all required deductions or withholdings (including such deductions and withholdings applicable to additional sums payable under this Section 2.14) the Administrative Agent or any Lender, as applicable, receives an amount equal to the amount it would have received had no such deductions or withholdings been made.

(b)        In addition, the Loan Parties will timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)        Each Loan Party will, jointly and severally, indemnify the Administrative Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, will be conclusive absent manifest error.

(d)        As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.14, such Loan Party will deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document will deliver to the Lead Borrower and the Administrative Agent, at the time or times reasonably requested by the Lead Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Lead Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Lead Borrower or the Administrative Agent, will deliver such other documentation prescribed by applicable law or reasonably requested by the Lead Borrower or the Administrative Agent as will enable the Lead Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and

45

submission of such documentation (other than such documentation set forth in Sections 2.14(e)(ii), 2.14(e)(iii) and 2.14(f) below) will not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the effect of Section 2.14(e)(i) above, each Foreign Lender will, to the extent it is legally entitled to do so, deliver to the Lead Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Administrative Agent), two copies of whichever of the following is applicable:

A.     executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party;

B.     executed copies of Internal Revenue Service Form W-8ECI;

C.     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (1) a certificate substantially in the form of the applicable Exhibit F to the effect that such Foreign Lender is not:

(x)     a "bank" described in Section 881(c)(3)(A) of the Code;

(y)     a "10 percent shareholder" of the Lead Borrower within the meaning of Section 871(h)(3) or 881(c)(3)(B) of the Code; or

(z)     a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; and

(2) executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E;

D.     to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, together with forms and certificates described in clauses (A) through (C) above (and additional Form W-8IMYs) or Internal Revenue Service Form W-9 as may be required; or

E.     any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)     In addition, each Lender that is not a Foreign Lender will deliver to the Lead Borrower and the Administrative Agent two copies of Internal Revenue Service Form W-9 on or before the date such Lender becomes a party and upon the expiration of any form previously delivered by such Lender.

46

In addition, in each of the foregoing circumstances, each Foreign Lender will deliver such forms, if legally entitled to deliver such forms, promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender will promptly notify the Lead Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Lead Borrower (or any other form of certification adopted by the United States of America or other taxing authorities for such purpose).  Notwithstanding any other provision of this paragraph, a Lender will not be required to deliver any form pursuant to this Section 2.14 that such Lender is not legally able to deliver.

(f)     If a payment made to a Recipient under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient will deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 2.14(f), "FATCA" will include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered pursuant to the foregoing Sections 2.14(e) or (f) expires or becomes obsolete or inaccurate in any respect, it will update such form or certification or promptly notify the Lead Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If the Administrative Agent or any Lender determines, in its sole discretion exercised in good faith, that it has received a refund (including a credit in lieu of a refund) of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.14, it will pay over an amount equal to such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.14 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or such Lender in good faith, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.14(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.14(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.14(g) will not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other

information relating to its Taxes which it deems, in good faith, to be confidential) to the Loan Parties or any other Person.

(h)    Each party's obligations under this Section 2.14 will survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    For purposes of this Section 2.14, the term "applicable law" includes FATCA.

SECTION 2.15    Payments Generally; *Pro Rata* Treatment; Sharing of Set-offs.

(a)    Unless otherwise specified, the Borrowers will make each payment required to be made by it hereunder (whether of principal, interest, fees or otherwise, including pursuant to Section 2.07 and Section 2.08) on a *pro rata* basis prior to 2:00 p.m., New York City time, at the Payment Office, except that payments pursuant to Sections 2.12, 2.13, 2.14 and 10.05 will be made directly to the Persons entitled thereto, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. The Administrative Agent will distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof and will make settlements with the Lenders with respect to other payments at the times and in the manner provided in this Agreement. Except as otherwise provided herein, if any payment hereunder is due on a day that is not a Business Day, the date for payment will be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon will be payable for the period of such extension. Any payment required to be made by the Administrative Agent hereunder will be deemed to have been made by the time required if the Administrative Agent, at or before such time, has taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)    Except as otherwise provided in this Agreement, if (i) at any time insufficient funds are received by and available to the Administrative Agent from the Borrowers to pay fully all amounts of principal, interest and fees then due from the Borrowers hereunder or (ii) at any time an Event of Default shall have occurred and be continuing and the Administrative Agent will receive any proceeds or payments of any kind, such funds will be applied in accordance with Section 5.03 of the Collateral Agreement.

(c)    Except as otherwise expressly provided in this Agreement, if any Lender, by exercising any right of set-off or counterclaim or otherwise, obtains payment in respect of any principal of or interest on any of its Term Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Term Loans than the proportion received by any other Lender, then the Lender receiving such greater proportion will purchase (for cash at face value) participations in the Term Loans of other Lenders to the extent necessary so that the benefit of all such payments will be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Term Loans; *provided* that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations will be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph (c) will not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of

48

a participation in any of its Term Loans to any assignee or participant. The Borrowers consent to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrowers' rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.

(d)     Unless the Administrative Agent has received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender fails to make any payment required to be made by it pursuant to Section 2.03(a) or 2.15(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under Section 2.03(a) or 2.15(c), as applicable, until all such unsatisfied obligations are fully paid.

SECTION 2.16     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.12, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then such Lender will (at the request of the Borrowers) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or assign its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.14, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requests compensation under Section 2.12, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.14, then the Borrowers may, at their sole expense, upon notice to such Lender and the Administrative Agent, either (a) prepay such Lender's outstanding Term Loans hereunder in full on a non-*pro rata* basis without premium or penalty (including with respect to the processing and recordation fee referred to in Section 10.04(b)(ii)(B)) or (b) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.12 or 2.14) and obligations under this Agreement to an assignee that will assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (i) in the case of clause (b) above, the Lead Borrower has received the prior written consent of the Administrative Agent, which consent will not unreasonably be withheld, if a consent by the Administrative Agent would be required under Section 10.04 for an

assignment of Term Loans to such assignee, (ii) such Lender has received payment of an amount equal to the outstanding principal of its Term Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.14, such assignment will result in a reduction in such compensation or payments.

(c)     If any Lender (such Lender, a "***Non-Consenting Lender***") has failed to consent to a proposed amendment, waiver, discharge or termination that, pursuant to the terms of Section 10.08, requires the consent of such Lender and with respect to which the Required Lenders, or Supermajority Lenders, as applicable, have granted their consent, then the Borrowers will have the right (unless such Non-Consenting Lender grants such consent) at their sole expense, to replace such Non-Consenting Lender by deeming such Non-Consenting Lender to have assigned its Term Loans to one or more assignees reasonably acceptable to the Administrative Agent if a consent by the Administrative Agent would be required under Section 10.04 for an assignment of Term Loans to such Assignee; provided that (i) all Obligations of the Borrowers owing to such Non-Consenting Lender (including accrued Fees and any amounts due under Section 2.12, 2.13 or 2.14) being removed or replaced will be paid in full to such Non-Consenting Lender concurrently with such removal or assignment and (ii) the replacement Lender will purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Non-Consenting Lender will be necessary in connection with such removal or assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrowers, the Administrative Agent, such Non-Consenting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Non-Consenting Lender does not comply with Section 10.04 within three Business Days after the Lead Borrower's request, compliance with Section 10.04 will not be required to effect such assignment.

(d)     Subject to the rights of the Backstop Commitment Parties under Section 2.19(b), the Borrowers will have the right at their sole expense, to replace any Defaulting Lender by deeming such Defaulting Lender to have assigned its Term Loans to one or more assignees reasonably acceptable to the Administrative Agent if a consent by the Administrative Agent would be required under Section 10.04 for an assignment of Term Loans to such Assignee; provided that (i) all Obligations of the Borrowers owing to such Defaulting Lender (including accrued Fees and any amounts due under Section 2.12, 2.13 or 2.14) being removed or replaced will be paid in full to such Defaulting Lender concurrently with such removal or assignment and (ii) the replacement Lender will purchase the foregoing by paying to such Defaulting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon.  No action by or consent of the Defaulting Lender will be necessary in connection with such removal or assignment, which shall be immediately and automatically effective upon payment of such purchase price.  In connection with any such assignment, the Borrowers, the Administrative Agent, such Defaulting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Defaulting Lender does not comply with Section 10.04 within three (3) Business Days after the Lead Borrower's request, compliance with Section 10.04 will not be required to effect such assignment.

SECTION 2.17     Illegality.  If any Lender reasonably determines that any change in law has made it unlawful, or if any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable lending office to make or maintain any Eurocurrency Loans, then, upon notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligations of such Lender to make or continue Eurocurrency Loans or to convert ABR Borrowings to Eurocurrency

Borrowings will be suspended until such Lender notifies the Administrative Agent and the Lead Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Lead Borrower will upon demand from such Lender (with a copy to the Administrative Agent), either convert all Eurocurrency Borrowings of such Lender to ABR Borrowings, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Term Loans.  Upon any such prepayment or conversion, the Borrowers will also pay accrued interest on the amount so prepaid or converted.

SECTION 2.18     <u>Extension of Maturity Date.</u>  The Original Maturity Date may be extended to the Extended Maturity Date at the option of the Lead Borrower, in each case subject to satisfaction (or waiver) of the following conditions precedent, upon which such extension shall automatically take effect and each Lender shall be deemed to have agreed to such Extension Request:

(a)     On and as of the Original Maturity Date, the representations and warranties of the Loan Parties contained in Article III shall be true and correct in all material respects (except those representations and warranties qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any representation or warranty specifically relates only to an earlier date, in which case it shall have been true and correct in all material respects (except those representations and warranties qualified by materiality or Material Adverse Effect, which shall have been true and correct in all respects) as of such earlier date;

(b)     On or prior to the Original Maturity Date, the Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents, including the Extension Fee described in Section 2.09(e) (and including, without limitation, the fees and expenses of the Lender Advisors);

(c)     On and as of the Original Maturity Date, no Event of Default shall have occurred and be continuing; and

(d)     the Lead Borrower shall have made such request to the Administrative Agent not less than fifteen (15) days (or such later date agreed to by the Required Lenders) and not earlier than sixty (60) days, prior to the Original Maturity Date, by delivering to the Administrative Agent a copy of an irrevocable extension request signed by the Lead Borrower (an "***Extension Request***") in substantially the form of Exhibit H hereto.

The Administrative Agent shall promptly notify each Lender of its receipt of such Extension Request.  Thereafter, the term "Maturity Date" with respect to the Term Loans and Commitments as used herein and in any Note executed and delivered by the applicable Borrower pursuant to Section 2.05(e) hereof, shall at all times refer to the Extended Maturity Date.

SECTION 2.19     <u>Defaulting Lenders</u>.

(a)     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and "Supermajority Lenders" and Section 10.08.

(ii)     Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) shall be applied at such time or times as may be reasonably determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Lead Borrower may request, to the funding of any Term Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Lead Borrower, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Term Loans to the Borrowers under this Agreement; fourth, to the payment of any amounts owing to the other Lenders as of a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Term Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Term Loans were made at a time when the applicable conditions set forth in Article IV were satisfied or waived, such payment shall be applied solely to pay the Term Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Term Loans of such Defaulting Lender until such time as all Term Loans are held by the Lenders *pro rata* in accordance with the Commitments hereunder. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.19(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)     Fees pursuant to Section 2.09 (x) shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender and (y) shall not be payable to such Defaulting Lender that remains a Defaulting Lender at the time such Fees are due and payable.

(b)     Upon any Lender becoming a Defaulting Lender, the Administrative Agent will notify the Lenders in writing. Each Backstop Commitment Party shall have the right, exercisable in its sole discretion within five (5) Business Days of receipt of such notice, to purchase its *pro rata* share (based on each Backstop Commitment Party's Backstop Commitment set forth on Schedule 2 to the Backstop Commitment Letter) of the outstanding Term Loans and Commitments of such Defaulting Lender at a purchase price equal to 96.0% of the outstanding amount thereof (plus accrued and unpaid interest thereon), and such Defaulting Lender is hereby required to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 10.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.12 or 2.14) and obligations under this Agreement related to the purchased Term Loans to the purchasing Backstop Commitment Parties. Thereafter, each purchasing Backstop Commitment Party shall be entitled to all interests and Fees associated with the purchased Term Loans and Commitments in accordance with the terms of this Agreement. In connection with any such purchase, the Borrowers, the Administrative Agent, such Defaulting Lender and the replacement Lender will otherwise comply with Section 10.04; provided that if such Defaulting Lender does not comply with Section 10.04 within three (3) Business Days after the Backstop Commitment Parties' election under this

Section 2.19(b), compliance with Section 10.04 will not be required to effect such assignment. Notwithstanding anything contained in this Agreement, to the extent any Backstop Commitment Party declines to make such purchase, the Administrative Agent may, and, at the direction of the Required Lenders, shall, reduce the outstanding principal amount of such Defaulting Lender's Term Loans by such Defaulting Lender's *pro rata* share of the Total Upfront Fee (to the extent already paid).

(c)    If the Lead Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase at par that portion of outstanding Term Loans of the other Lenders and take such other actions as the Administrative Agent may determine to be necessary to cause the Term Loans to be held on a *pro rata* basis by the Lenders based on the outstanding Commitments and Term Loans hereunder, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to Fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender having been a Defaulting Lender.

SECTION 2.20        [Reserved].

SECTION 2.21        Joint and Several Liability of Borrowers; Additional Waivers.

(a)    Each of the Borrowers hereby accepts joint and several, primary liability for all Obligations hereunder in consideration of the financial accommodations provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the Obligations of each of them under the Loan Documents.

(b)    Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all of the Obligations are the joint and several obligations of each of the Borrowers without preferences or distinction among them.

(c)    If and to the extent that any of the Borrowers fails to make any payment with respect to any of the Obligations hereunder as and when due or to perform any of such Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)    The obligations of each Borrower under the provisions of this Section 2.21 constitute full recourse obligations of such Borrower, enforceable against it to the full extent of its properties and assets.

(e)    To the fullest extent permitted by applicable law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Secured Party to assert any claim or demand or to enforce or exercise any right or remedies against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise or (ii) the failure to perfect any security interest in, or the release of, any of the Collateral held by or on behalf of the Collateral Agent or any other Secured Party for the applicable Obligations.

(f)      To the fullest extent permitted by applicable law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than payment in full of the Obligations.  The Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that payment in full has occurred.  Pursuant to applicable law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

SECTION 2.22      <u>Designation of Lead Borrower</u>.  Each Borrower hereby appoints the Lead Borrower to act as its exclusive agent for all purposes under this Agreement and the other Loan Documents (including with respect to all matters related to the borrowing and repayment of Term Loans as described in Article II hereof).  Each Borrower (in such capacity) acknowledges and agrees that (a) the Lead Borrower may execute such documents on behalf of all the Borrowers as the Lead Borrower deems appropriate in its sole discretion and each Borrower (in such capacity) will be bound by and obligated by all of the terms of any such document executed by the Lead Borrower on its behalf, (b) any notice or other communication delivered by the Administrative Agent or any Lender hereunder to the Lead Borrower will be deemed to have been delivered to each Borrower, and (c) the Administrative Agent and each of the Lenders will accept (and will be permitted to rely on) any document or agreement executed by the Lead Borrower on behalf of the Borrowers (or any of them).

SECTION 2.23      <u>No Discharge; Survival of Claims</u>.  Unless in accordance with an Acceptable Plan, each of the Loan Parties agrees that prior to payment in full of the Obligations and termination of the Commitments in accordance herewith, (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Plan of Reorganization (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superiority claims granted to the Agents and the Lenders pursuant to the DIP Financing Orders and the Liens granted to the Agents and the Lenders pursuant to the DIP Financing Orders shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

SECTION 2.24      <u>Liens</u>.

(a)      Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Interim DIP Financing Order (and, when entered, the Final DIP Financing Order) and subject to the Carve Out in all respects, the Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected Lien on the Collateral, the priority of which shall be set forth in the DIP Financing Orders.

(b)      In accordance with the DIP Financing Orders, all of the Liens described in the DIP Financing Orders shall be effective and automatically perfected upon entry of the Interim DIP Financing Order, without the necessity of the execution, recordation of filings by the Loan Parties of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent or Collateral Agent, as applicable, of, or over, any Collateral.

54

(c)     Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim DIP Financing Order (and, when entered, the Final DIP Financing Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral (other than Excluded Assets), now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

# ARTICLE III

## *Representations and Warranties*

Each of Holdings and each Borrower represents and warrants to each Agent and to each of the Lenders that:

SECTION 3.01      Organization; Powers.      Each of Holdings, each Borrower and each Subsidiary:

(a)     is a partnership, limited liability company, corporation, or trust duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent such status or an analogous concept applies to such an organization);

(b)     subject to applicable orders entered into by the Bankruptcy Court, has all requisite power and authority to own its property and assets and to carry on its business as now conducted;

(c)     is qualified to do business in each jurisdiction where such qualification is required, except where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect; and

(d)     subject to the entry and the terms of the DIP Financing Orders, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is a party and, in the case of the Borrowers, to borrow and otherwise obtain credit hereunder.

SECTION 3.02      Authorization.   Subject to the entry and terms of the DIP Financing Order, the execution, delivery and performance by the Loan Parties of each of the Loan Documents to which it is a party, and the Borrowings hereunder:

(a)     have been duly authorized by all corporate, stockholder, partnership, limited liability company or other applicable action required to be taken by the Loan Parties; and

(b)     will not:

(i)      violate:

(A)     any provision of (1) law, statute, rule or regulation, or of (2) the certificate or articles of incorporation or other constitutive documents (including any partnership, limited liability company or operating agreement or by-laws) of any Loan Party;

(B)     any applicable order of any court or any rule, regulation or order of any Governmental Authority; or

(C)     any provision of any post-petition indenture, certificate of designation for preferred stock, agreement or other instrument to which any Loan Party is a party or by which any of them or any of their property is or may be bound;

(ii)     be in conflict with, result in a breach of, constitute (alone or with notice or lapse of time or both) a default under, or give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under, any such indenture, certificate of designation for preferred stock, agreement or other instrument, other than conflicts, breaches, defaults or rights arising solely as a result of the commencement of the Chapter 11 Cases; or

(iii)     result in the creation or imposition of any Lien upon any property or assets of any Loan Party, other than the Liens created by the Loan Documents and Permitted Liens;

except with respect to clauses (i) (other than subclause (A)(2) thereof) and (ii) of this Section 3.02(b) as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.03     Enforceability.  Subject to the entry of the Interim DIP Financing Order, this Agreement has been duly executed and delivered by Holdings and the Borrowers and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to:

(a)     the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, including the entry into and the terms of the DIP Financing Orders;

(b)     general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(c)     implied covenants of good faith and fair dealing; and

(d)     any foreign laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries.

SECTION 3.04     Governmental Approvals.  Other than the entry of, or pursuant to the terms of, the DIP Financing Orders, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority or third party is or will be required in connection with the perfection or maintenance of the Liens created under the Security Documents or the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral, except for:

(a)     [Reserved];

(b)     [Reserved];

(c)     [Reserved];

(d)     filings which may be required under Environmental Laws;

56

(e)      filings as may be required under the Exchange Act and applicable stock exchange rules in connection therewith;

(f)      such as have been made or obtained and are in full force and effect;

(g)      such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect; or

(h)      filings or other actions listed on Schedule 3.04.

SECTION 3.05      Title to Properties; Possession Under Leases.

(a)      Each of the Borrowers and the Subsidiary Loan Parties has valid fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all of its Real Properties and valid title to its personal property and assets, in each case, except for Permitted Liens or defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, in each case, except where the failure to have such title, interest, easement or right would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Permitted Liens.

(b)      Neither any Borrower nor any of the Subsidiaries has defaulted under any lease to which it is a party, except for such defaults arising from the commencement of the Chapter 11 Cases or as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the Borrowers' and the Subsidiaries' leases is in full force and effect, except leases in respect of which the failure to be in full force and effect arise from the commencement of the Chapter 11 Cases or would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.05(b), on the Closing Date the Borrowers and each of the Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.06      Subsidiaries.

(a)      Schedule 3.06(a) sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of Holdings, the Borrowers and each Subsidiary and, as to each Subsidiary, the percentage of each class of Equity Interests owned by the Borrowers or by any other Subsidiary of the Borrowers.

(b)      As of the Closing Date, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments of any nature relating to any Equity Interests owned or held by Holdings, the Borrowers or any Subsidiary.

SECTION 3.07      Litigation; Compliance with Laws.

(a)      Other than the Chapter 11 Cases, there are no actions, suits or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of the Lead Borrower, threatened in writing against or affecting the Borrowers or any Subsidiary or any business, property or rights of any such Person (but excluding any actions, suits or proceedings arising under or relating to any Environmental Laws, which are subject to

Section 3.13), in each case, which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      To the knowledge of the Lead Borrower, none of the Borrowers, the Subsidiaries or their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval, or any building permit, but excluding any Environmental Laws, which are subject to Section 3.13) or any restriction of record or agreement affecting any property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority (other than any default that arises solely as a result of the commencement of the Chapter 11 Cases), where such violation or default would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.08      Federal Reserve Regulations.

(a)      None of Holdings, any Borrower or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Term Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund Indebtedness originally incurred for such purpose or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.09      Investment Company Act.      None of Holdings, any Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.10      Use of Proceeds.      Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the Term Loans will be used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the DIP Financing Orders or any other order entered by the Bankruptcy Court that is consistent with the RSA, the DIP Financing Orders and this Agreement, including, without limitation: (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to provide working capital, and for other general corporate purposes of the Loan Parties, and to pay administration costs of the Chapter 11 Cases and Claims or amounts approved by the Bankruptcy Court in the First and Second Day Orders or as required under the Bankruptcy Code; provided, however, that, except in accordance with clause (ii) of this Section 3.10 or pursuant to an Acceptable Plan, in no event shall the proceeds of the Terms Loans be used to pay any amount due or otherwise payable under the ABL Credit Agreement.

SECTION 3.11      Tax Returns.      Except as set forth on Schedule 3.11:

(a)      Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of Holdings, the Borrowers and the Subsidiaries has filed

or caused to be filed all federal, state, local and non-U.S. Tax returns required to have been filed by it; and

(b)    Each of Holdings, the Borrowers and the Subsidiaries has timely paid or caused to be timely paid (i) all Taxes shown to be due and payable by it on the returns referred to in clause (a) of this Section 3.11 and (ii) all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date, which Taxes, if not paid or adequately provided for, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, in each case except Taxes or assessments that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrowers or any Subsidiary (as the case may be) has set aside on its books adequate reserves in accordance with GAAP and except Taxes the payment of which are stayed by the Chapter 11 Cases.

SECTION 3.12        No Material Misstatements.

(a)    All written factual information and written factual data (other than the Projections, any other projections, estimates and information of a general economic or industry specific nature) concerning Holdings, the Borrowers or any Subsidiary that has been made available to the Administrative Agent or the Lenders, directly or indirectly, by or on behalf of Holdings, the Borrowers or any Subsidiary in connection with the transactions contemplated hereby, when taken as a whole and after giving effect to all supplements and updates provided thereto, is correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made.  As of the Closing Date, to the best knowledge of the Borrowers, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all material respects.

(b)    The Projections that have been made available to the Administrative Agent or the Lenders by or on behalf of the Borrowers in connection with the transactions contemplated hereby, when taken as a whole, have been prepared in good faith based upon assumptions that are believed by the Borrowers to be reasonable at the time made and at the time delivered to the Administrative Agent or the Lenders, it being understood by the Administrative Agent and the Lenders that:

(i)    the Projections are merely a prediction as to future events and are not to be viewed as facts;

(ii)    the Projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrowers, and/or the Sponsors;

(iii)    no assurance can be given that any particular Projections will be realized;

(iv)    actual results may differ and such differences may be material;

(v)    no guarantee or assurance can be given that the projected results will be realized;

(vi)    where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Loan Parties' and their Subsidiaries' operational and

financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Loan Parties' and their Subsidiaries' products and services, all of which are outside of the control of the Loan Parties and their Subsidiaries, highly uncertain and cannot be predicted.

SECTION 3.13      Environmental Matters.  Except as set forth on Schedule 3.13, as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or as to matters arising from the Chapter 11 Cases:

(a)      each Borrower and each of the Subsidiaries are in compliance with all Environmental Laws (including having obtained and complied with all permits, licenses and other approvals required under any Environmental Law for the operation of its business);

(b)      neither any Borrower nor any of the Subsidiaries has received notice of or is subject to any pending, or to the Lead Borrower's knowledge, threatened action, suit or proceeding alleging a violation of, or liability under, any Environmental Law that remains outstanding or unresolved;

(c)      to the Lead Borrower's knowledge, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by the Borrowers or any Subsidiary, and no Hazardous Material has been generated, owned, treated, stored, handled or controlled by the Borrowers or any Subsidiary and transported to or released at any location, which, in each case, described in this clause (c), would reasonably be expected to result in liability to the Borrowers or any Subsidiary; and

(d)      there are no agreements in which the Borrowers or any Subsidiary has expressly assumed or undertaken responsibility for any known or reasonably anticipated liability or obligation of any other Person arising under or relating to Environmental Laws or Hazardous Materials.

SECTION 3.14      Security Documents.

(a)      Subject to the entry of the DIP Financing Orders, the Collateral Agreement and the DIP Financing Orders are effective to create in favor of the Collateral Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)      Except for the entry of the DIP Financing Orders, no filing or other action will be necessary to perfect such Liens.

(c)      Notwithstanding anything herein (including this Section 3.14) or in any other Loan Document to the contrary, neither any Borrower nor any other Loan Party (i) makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, in each case, under foreign law, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign law or (ii) shall be required to take any action to perfect any Lien in any Intellectual Property Rights registered (or where an application for registration has been filed) in any jurisdiction other than the United States of America.

(d)      The Interim DIP Financing Order is (and the Final DIP Financing Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured

Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

(e)     Subject to entry of the Interim DIP Financing Order (and the Final DIP Financing Order, as applicable), the Obligations shall have the status and priority set forth in Section 2.24 and, for the avoidance of doubt, are subject to the Carve Out in all respects.

SECTION 3.15      Location of Real Property and Leased Premises.

(a)     Schedule 3.15(a) correctly identifies, in all material respects, as of the Closing Date, all Real Property owned in fee by the Loan Parties.  As of the Closing Date, the Loan Parties own in fee all the Real Property set forth as being owned by them on Schedule 3.15(a).

(b)     Schedule 3.15(b) lists correctly in all material respects, as of the Closing Date, all material Real Property (including all leased full-line Neiman Marcus and Bergdorf Goodman stores and all leased warehouses or distribution centers) leased by any Loan Party and the best known addresses thereof.  As of the Closing Date, the Loan Parties have in all material respects valid leases in all material Real Property set forth as being leased by them on Schedule 3.15(b).

SECTION 3.16      Approved Budget.  The Approved Budget has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the Loan Parties to the best of their knowledge to be reasonable on the date such Approved Budget was delivered, which may or may not be prove to be correct.

SECTION 3.17      No Material Adverse Effect.  Since the Petition Date, there has been no event that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 3.18      Insurance.  Schedule 3.18 sets forth a true, complete and correct description of all material insurance maintained by or on behalf of the Borrowers or any Subsidiary as of the Closing Date.  As of such date, such insurance is in full force and effect.

SECTION 3.19      USA PATRIOT Act; FCPA; OFAC.

(a)     To the extent applicable, each of Holdings, the Borrowers and the Subsidiaries is in compliance, in all material respects, with the USA PATRIOT Act.

(b)     No part of the proceeds of the Term Loans will be used by Holdings, the Borrowers or any of their respective Subsidiaries, directly or, to the knowledge of Holdings and/or the Borrowers, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended ("**FCPA**").

(c)     None of Holdings, the Borrowers or any Subsidiary is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "**Executive Order**");

(ii)      a Person owned or Controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)      a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any applicable laws with respect to terrorism or money laundering;

(iv)      a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)      a Person that is named on the most current List of Specially Designated Nationals and Blocked Persons as published by the U.S. Department of the Treasury's Office of Foreign Assets Control ("*OFAC*") at its official website or any replacement website or other replacement official publication of such list and none of the proceeds of the Term Loans will be, directly or knowingly, indirectly, offered, lent, contributed or otherwise made available to any Subsidiary, joint venture partner or other Person for the purpose of financing the activities of any Person currently the subject of sanctions administered by OFAC.

SECTION 3.20      Intellectual Property; Licenses, Etc.  Except as set forth on Schedule 3.20:

(a)      except as would not reasonably be expected to have a Material Adverse Effect, the Borrowers and each Subsidiary owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights or mask works, domain names, trade secrets and other intellectual property rights (collectively, "***Intellectual Property Rights***") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person;

(b)      except as would not reasonably be expected to have a Material Adverse Effect, neither any Borrower nor any of the Subsidiaries nor any Intellectual Property Rights, product, process, method, substance, part or other material now employed, sold or offered by the Borrowers or the Subsidiaries is infringing upon, misappropriating or otherwise violating Intellectual Property Rights of any Person; and

(c)      no material claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Lead Borrower, threatened, unless arising from the Chapter 11 Cases.

SECTION 3.21      Employee Benefit Plans.  Except as would not reasonably be expected to have a Material Adverse Effect, with respect to Plans the Loan Parties and the ERISA Affiliates are in compliance with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to have a Material Adverse Effect.  Except as would not reasonably be expected to have a Material Adverse Effect, the present value of all accumulated benefit obligations under all Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87, as updated, amended or superseded) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plans, in the aggregate.

**ARTICLE IV**
*Conditions of Lending*

SECTION 4.01      <u>Conditions Precedent to the Closing Date</u>.  The Agreement shall become effective upon the satisfaction or waiver of each of the following conditions precedent:

(a)      The Administrative Agent shall have received this Agreement, the Backstop Commitment Letter, the Collateral Agreement and the Fee Letter, each executed by each party hereto and thereto (including via electronic means), each of which shall be in form and substance reasonably satisfactory to the Required Lenders.

(b)      [Reserved].

(c)      The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders shall have been entered by the Bankruptcy Court and such orders and all related pleadings shall be in form and substance consistent with the Approved Budget and otherwise reasonably satisfactory to the Required Lenders.

(d)      The Interim DIP Financing Order shall have been entered by the Bankruptcy Court within three (3) Business Days of the Petition Date with the consent of the Required Lenders (as defined under the ABL Credit Agreement) and the Administrative Agent shall have received a true and complete copy of such order, and such order shall be in the form of Exhibit B hereto, be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Administrative Agent, the Required Lenders and the Majority Noteholders.  The consent of the Majority Noteholders shall not be unreasonably withheld, conditioned or delayed.

(e)      No order shall have been entered appointing a trustee, examiner or receiver with respect to the Loan Parties' business, properties or assets.

(f)      The Administrative Agent shall have received UCC, tax and judgement lien searches in form and substance reasonably satisfactory to the Administrative Agent.

(g)      The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Interim DIP Financing Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)      The Administrative Agent shall have received the Approved Budget in form and substance reasonably acceptable to the Required Lenders[, it being understood that the budget attached to the Form of Interim DIP Financing Order attached hereto as Exhibit B is an Approved Budget.][1]

(i)      The Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents (including, without limitation, the fees and expenses of the Lender Advisors).

(j)      The RSA shall not have terminated and shall be in full force and effect.

---

[1] Remove brackets once budget has been agreed and approved.

(k)     The Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower on behalf of the Loan Parties certifying that the conditions in this Section 4.01 have been satisfied.

(l)     The Administrative Agent shall have received a customary legal opinion of each of Kirkland & Ellis LLP, special counsel to the Loan Parties, covering such matters customarily covered in opinions of this type as the Required Lenders shall reasonably request.

(m)     The Administrative Agent shall have received customary certificates of resolutions or other action, incumbency certificates of Responsible Officers of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party and certificates (including organizational documents and good standing certificates) relating to the organization, existence and good standing of each Loan Party in its jurisdiction of organization, in each case, as certified by the Secretary or an Assistant Secretary of such Loan Party.

(n)     The Closing Date shall not be later than one (1) Business Day after the Interim DIP Financing Order is entered on the docket of the Bankruptcy Court unless the Required Lenders shall have consented to such later date.

(o)     At least two (2) days prior to the Closing Date, the Administrative Agent shall have received all documentation and other information (which shall include a duly completed IRS Form W-9 for the Lead Borrower or other applicable tax forms) required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested by the Administrative Agent at least three (3) days prior to the Closing Date.

SECTION 4.02     Conditions Precedent to each Borrowing.  The obligation of each Lender to make Term Loans on each Credit Date (including the Closing Date) is subject to the satisfaction (or waiver) of the following further conditions precedent:

(a)     With respect to any Term Loan (other than the Interim Order Term Loan and Initial Allocation Date Term Loan) that is made after the Closing Date, the Final DIP Financing Order shall have been entered by the Bankruptcy Court, such order shall be in form and substance satisfactory to the Required Lenders and reasonably satisfactory to the Majority Noteholders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent) in their sole discretion and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of (i) the Administrative Agent, the Administrative Agent and (ii) the Consenting Noteholders, the Majority Noteholders).  The consent of the Majority Noteholders shall not to be unreasonably withheld, conditioned or delayed.

(b)     The Borrower shall have delivered to the Administrative Agent a duly executed and completed Borrowing Request in accordance with Section 2.01(e) hereof.

(c)     The Collateral Agent, for the benefit of the Secured Parties, shall have valid and perfected Liens on all Collateral, to the extent contemplated hereby, and pursuant to the other Loan Documents, including the applicable DIP Financing Order.

(d)     The Loan Parties shall be in compliance in all material respects with the Interim DIP Financing Order and the Final DIP Financing Order, as the case may be.

(e)     The Loan Parties shall be in compliance in all material respects with each First Day Order and Second Day Order then in effect.

(f)     The representations and warranties of the Loan Parties contained in Article III or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of the Credit Date as though made on such date; provided that to the extent that such representations and warranties specifically refer to an earlier date, then such representations and warranties shall be true and correct in all material respects as of such earlier date.

(g)     As of the applicable Credit Date, no Default or Event of Default shall exist or would result from the making of such Term Loan and the application of proceeds therefrom; provided, however, that with respect to the Interim Order Term Loan and the Initial Allocation Date Term Loan only, such condition shall not apply to any Default or Event of Default arising out of the failure to satisfy Section 6.15, if any.

(h)     The Administrative Agent shall have received a certificate, dated as of applicable Credit Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (f) and (g) above.

(i)     The Borrower shall have paid (or caused to be paid) to the Administrative Agent and Lenders the fees and expenses then earned, due and payable under the Loan Documents (including, without limitation, the fees and expenses of the Lender Advisors) subject to and in accordance with orders of the Bankruptcy Court.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date of such Borrowing as to the applicable matters specified in clauses (d), (e) (f) and (g) above.

In determining the satisfaction of the conditions specified in this Section 4.02, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Credit Date that the respective item or matter does not meet its satisfaction and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which would reasonably be expected to have a Material Adverse Effect, each Lender which has not notified the Administrative Agent in writing prior to the occurrence of the Credit Date of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the Credit Date.

SECTION 4.03     Conditions Precedent to Making the Final Order Term Loan.  After the Closing Date and the funding of the Interim Order Term Loan and the Initial Allocation Date Term Loan, the obligation of each Lender to make the Final Order Term Loan is subject to the satisfaction (or waiver) of the following additional conditions precedent:

(a)     All Second Day Orders approving on a final basis the relief granted under any First Day Orders shall have been entered by the Bankruptcy Court, shall be reasonably satisfactory to the Required Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall

not be subject to a stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders.

(b)      The RSA shall not have terminated and shall be in full force and effect.

(c)      The Loan Parties shall have filed an Acceptable Plan with the Bankruptcy Court and such Acceptable Plan sets forth a treatment of claims against the Loan Parties in a manner that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

SECTION 4.04      Conditions Precedent to Making the Last Term Loan.  The obligation of the Lenders to make the Last Term Loan is also subject to the satisfaction (or waiver) of the following additional conditions precedent:

(a)      The Loan Parties shall have filed an Acceptable Plan with the Bankruptcy Court and such Acceptable Plan sets forth a treatment of claims against the Loan Parties in a manner that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

(b)      The RSA shall not have terminated and shall be in full force and effect.

(c)      The Bankruptcy Court shall have entered an order approving a disclosure statement with respect to an Acceptable Plan that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion.

## ARTICLE V

### *Affirmative Covenants*

Each Borrower covenants and agrees with each Lender that so long as this Agreement is in effect and until the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, the Borrowers will, and will cause their Subsidiaries, to:

SECTION 5.01      Existence; Businesses and Properties.

(a)      Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except:

(i)      in the case of a Subsidiary, where the failure to do so would not reasonably be expected to have a Material Adverse Effect; or

(ii)      in connection with a transaction permitted under Section 6.05.

(b)      (i) Do or cause to be done all things necessary to lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, Intellectual Property Rights, licenses and rights with respect thereto necessary to the normal conduct of its business and (ii) at all times maintain and preserve all property necessary to the normal conduct of its business and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all needful and proper repairs, renewals,

66

additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times, in each case, except:

        (A)      as expressly permitted by this Agreement;

        (B)      such as may expire, be abandoned or lapse in the ordinary course of business; or

        (C)      where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.02      <u>Insurance</u>.

      (a)      Maintain, with insurance companies reasonably believed to be financially sound and reputable, insurance in such amounts and against such risks as are customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations, and cause the Collateral Agent to be listed as a co-loss payee on property and casualty policies and as an additional insured on liability policies. The Lead Borrower will furnish to the Administrative Agent or Collateral Agent, upon request, information in reasonable detail as to the insurance so maintained. Notwithstanding the foregoing, it is understood and agreed that no Loan Party will be required to maintain flood insurance unless any material Real Property owned by it is required to be so insured pursuant to the Flood Disaster Protection Act of 1973 or the National Flood Insurance Act of 1968, and the regulations promulgated thereunder, because such material Real Property is located in an area which has been identified by the Secretary of Housing and Urban Development as a "special flood hazard area."

      (b)      Use commercially reasonable efforts to: (i) if insurance is procured from insurance companies, obtain certificates and endorsements reasonably acceptable to the Administrative Agent with respect to property and casualty insurance; (ii) cause each insurance policy referred to in this Section 5.02 and procured from an insurance company to provide that it shall not be canceled, modified or not renewed (x) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (y) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Administrative Agent; and (iii) deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent, including an insurance binder) together with evidence reasonably satisfactory to the Administrative Agent of payment of the premium therefor.

SECTION 5.03      <u>Taxes</u>.

      (a)      Pay and discharge promptly when due all federal and material state and local Taxes imposed upon it or its income or profits or in respect of its property and arising after the Petition Date, before the same becomes delinquent or in default; *provided* that such payment and discharge will not be required with respect to any Tax if (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) Holdings, the Borrowers or any affected Subsidiary, as applicable, has set aside on its books reserves in accordance with GAAP with respect thereto

67

and (iii) non-payment thereof is permitted under the Bankruptcy Code or order of the Bankruptcy Court.

(b)        The Loan Parties agree, for U.S. federal (and applicable state and local) income tax purposes, to treat TNMG LLC and The NMG Subsidiary, in each case, as an entity disregarded as separate from the Lead Borrower.  None of the Loan Parties shall (and each shall cause its Affiliates not to) take any position inconsistent with the foregoing.

SECTION 5.04        <u>Financial Statements, Reports, etc</u>.  Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders) or, as applicable, to the Lender Advisors (other than any local counsel):

(a)        [Reserved];

(b)        within forty-five (45) days following the end of each of the first three fiscal quarters of each fiscal year, (but excluding the fiscal quarter ending May 2, 2020) a consolidated balance sheet and related statements of operations and cash flows showing the financial position of the Borrowers and the Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and, in each case, the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, which consolidated balance sheet and related statements of operations and cash flows will be certified by a Responsible Officer of the Lead Borrower on behalf of the Borrowers as fairly presenting, in all material respects, the financial position and results of operations of the Borrowers and the Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (the applicable financial statements delivered pursuant to this clause (b) being the "***Quarterly Financial Statements***");

(c)        within twenty-one (21) days after the end of each fiscal month (commencing with the fiscal month ending on May 2, 2020), the consolidated balance sheet and related statements of operations and consolidated statements of cash flows for the Borrowers and their Subsidiaries, as of the end of and for such fiscal month and the elapsed portion of the fiscal year and a report setting forth, for the most recently ended calendar month and the elapsed portion of the fiscal year, a computation of adjusted EBITDA of the Loan Parties and their Subsidiaries determined in a manner consistent with past practice (it being agreed that adjusted EBITDA computed in accordance with the definition of EBITDA in the Prepetition Term Loan Credit Agreement shall satisfy this provision) (the applicable financial statements delivered pursuant to this clause (c) being the "***Monthly Financial Statements***" and, together with the Quarterly Financial Statements, the "***Required Financial Statements***");

(d)        (i) together with any such Required Financial Statements, the revenue of the Borrowers and the Subsidiaries derived from (A) "brick and mortar" or retail stores at owned and leased locations, on the one hand, and (B) online operations or e-commerce sales, on the other hand, in each case on a current and prior-year period comparable basis and (ii) together with any Quarterly Financial Statements, condensed consolidating financial information regarding Holdings, the Borrowers and their Subsidiaries in form and substance substantially the same as that disclosed in the Lead Borrower's latest Form 10-K and Form 10-Q prior to the Closing Date (or at the Lead Borrower's election, as to the businesses conducted as of the Closing Date by Bergdorf Goodman Inc., a New York corporation, Bergdorf Graphics, Inc., a New York corporation, and BG Productions, Inc., a Delaware corporation, on a consolidated basis); and

(e)      whether or not NMG or any of its Subsidiaries is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the following reports: together with any such Quarterly Financial Statements delivered pursuant to Section 5.04(b), a "Management's Discussions and Analysis of Financial Condition and Results of Operations" containing the information required under such caption of Form 10-Q of the Exchange Act, and in the case of the second and third fiscal quarters, the period from the beginning of such fiscal year to the end of such fiscal quarter, which shall include, a reasonably detailed description during the most recently completed fiscal quarter of any Permitted Investment in excess of $15.0 million;

(f)      whether or not NMG is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, within the time period specified for filing current reports on Form 8-K by the SEC, all current reports that would be required to be filed with the SEC on Form 8-K if the Lead Borrower were required to file such reports for any of the following events (i) "Entry into a Material Definitive Agreement" pursuant to Item 1.01 on Form 8-K (ii) "Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant" pursuant to Item 2.03 on Form 8-K, (iii) any significant acquisitions or dispositions by the Lead Borrower or any of its Subsidiaries, (iv) the bankruptcy of the Lead Borrower or any of its Subsidiaries, (v) the acceleration of any Indebtedness of the Lead Borrower or any of its Subsidiaries having a principal amount in excess of $15.0 million, (vi) a change in any of the Borrowers' certifying independent auditor, (vii) the appointment or departure of the chief executive officer or chief financial officer (or persons fulfilling similar duties) of the Lead Borrower or any of its Subsidiaries, (viii) non-reliance on previously issued financial statements of the Lead Borrower or any of its Subsidiaries, (ix) entering into, materially modifying, or terminating material contracts (to the extent not otherwise required under clause (i) above) of the Lead Borrower or any of its Subsidiaries (for the avoidance of doubt, excluding officer employment arrangements) and (x) the incurrence of costs associated with exit or disposal activities by the Lead Borrower or any of its Subsidiaries;

(g)      concurrently with any delivery of Required Financial Statements, a certificate of a Financial Officer of the Lead Borrower certifying that no Default or Event of Default has occurred and is continuing or, if a Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(h)      promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent, other materials publicly filed by Holdings, the Borrowers or any Subsidiary with the SEC or, after an initial public offering, distributed to its stockholders generally, as applicable;

(i)      [Reserved];

(j)      [Reserved];

(k)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrowers or any Subsidiary, in each case, as the Administrative Agent may reasonably request (for itself or on behalf of any Lender) or as may be reasonably requested by the Required Lenders;

(l)      promptly upon request by the Administrative Agent (so long as the following are obtainable using commercially reasonable measures), copies of any documents described in Section 101(k)(1) of ERISA that the Lead Borrower may request with respect to any Multiemployer Plan; *provided* that if the Lead Borrower has not requested such documents from the administrator or

sponsor of the applicable Multiemployer Plan, the Lead Borrower shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(m)     promptly, from time to time, copies of all operative Indebtedness Documents (including full and complete schedules and exhibits thereto) with respect to any outstanding Indebtedness of the Lead Borrower and any of its Subsidiaries whose principal amount (or committed amount) exceeds $25.0 million;

(n)     to the Lender Advisors (other than any local counsel), (i) no later than 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of the third (3rd) full calendar week ending after the Petition Date, which for the avoidance of doubt, shall be May 28, 2020  and each fourth (4th) calendar week thereafter and (ii) at the option of the Lead Borrower in good faith in connection with a material change in circumstances (but no more than one (1) time pursuant to this clause (ii) during the term of this Agreement) (the exercise of such option, the "***Borrower Supplemental Budget Election***"), by 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) prior to the week in which such supplement is proposed to be effective, a supplement to the Approved Budget covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered (or in the case of clause (ii) above, is delivered), consistent with the form and level of detail set forth in the initial Approved Budget, including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Required Lenders in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Required Lenders in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Required Lenders approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(o)     as soon as reasonably practicable in advance of, but no later than two (2) Business Days prior to the earlier of (x) filing with the Bankruptcy Court or (y) delivering to any statutory committee appointed in the Chapter 11 Cases or the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***"), as the case may be, all proposed orders and pleadings related to the Term Loans and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto (except that, with respect to any emergency pleading or document for which, despite the Loan Parties' best efforts, such advance notice is impracticable, the Loan Parties shall be required to furnish such documents as soon as reasonably practicable and in no event later than substantially concurrently with such filings or deliveries thereof, as applicable);

(p)     by the earlier of (x) two (2) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than as promptly practicable before being filed) on behalf of any of the Loan Parties with the Bankruptcy Court or (y) at the same time as such documents are provided by any of the Loan Parties to any statutory committee appointed in the Chapter 11 Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or any request to approve any compromise and settlement of claims or for relief under Section 365, 1113 or 1114 of the

Bankruptcy Code or Bankruptcy Rule 9019 or any other request for relief (to the extent not covered by Section 5.04(o) above);

(q)        by no later than 12:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) following the first full calendar week ending after the Petition Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended (or, in the case of the first such report, during the period from and including the Petition Date and through the end of the first full calendar week ending after the Petition Date);

(r)        by no later than 12:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing with the fourth (4th) full calendar week ending after the Petition Date, which for the avoidance of doubt, shall be June 4, 2020 (each such Thursday or later time, a "***Variance Report Date***"), a line-item by line-item variance report (each, a "***Variance Report***") setting forth, in reasonable detail:  (x) any differences between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time) and (y) the computations necessary to determine compliance with Sections 6.10, 6.14 and 6.15 together with a statement from the Borrower's chief financial officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any variance in such Variance Report in excess of 10.0% in actual receipts or actual operating disbursements during the Variance Testing Period (unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget.

Anything to the contrary notwithstanding, the obligations in clauses (b), (d), (e) and (f) of this Section 5.04 may be satisfied with respect to financial information of the Borrowers and the Subsidiaries by furnishing (1) the applicable financial statements of Holdings (or any other Parent Entity) or (2) the Borrowers' or Holdings' (or any such other Parent Entity's), as applicable, Form 10-Q or 8-K, as applicable, filed with the SEC; *provided* that with respect to each of clause (1) and (2) of this paragraph to the extent such information relates to Holdings (or a Parent Entity), such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such Parent Entity), on the one hand, and the information relating to the Borrowers and the Subsidiaries on a standalone basis, on the other hand.

Documents required to be delivered pursuant to this Section 5.04 may be delivered electronically in accordance with Section 10.01(e).

Without limiting the foregoing obligations of each Borrower to the Lenders pursuant to this Section 5.04, at any time that the Lead Borrower (and any applicable Parent Entity) is not subject to the reporting requirements of Section 13 and 15(d) of the Exchange Act, in lieu of filing the reports contemplated by clauses (b), (d), (e) and (f) of this Section 5.04 with the SEC, the Lead Borrower may make available such information electronically (including by posting to a non-public, password-protected website maintained by the Lead Borrower or a third party) to any bona fide prospective holder of the Term Loans, any bona fide market maker (or person who intends to be a market maker) in the Term Loans or any

bona fide securities analyst, in each case, who provides to the Lead Borrower its email address, employer name and other information reasonably requested by the Lead Borrower.  Any Person who requests such financial information from the Lead Borrower or seeks to participate in any conference call required by this covenant (excluding for the avoidance of doubt, each Lender) may be excluded to the extent it constitutes a Disqualified Institution and may be required by the Lead Borrower to represent to and agree with the Lead Borrower that:

    (1) it is a holder of the Term Loans, a bona fide prospective holder of the Term Loans, a bona fide market maker (or intended market maker) with respect to the Term Loans or a bona fide securities analyst, as applicable;

    (2) if it is a prospective holder of the Term Loans, it would meet all the requirements to be a Lender under Section 10.04(b);

    (3) it will not use the information in violation of applicable securities laws or regulations;

    (4) it will not communicate the information to any Person and will keep the information confidential;

    (5) it will use such information only in connection with evaluating an investment in the Term Loans (or, if it is a bona fide market maker or intended market maker, only in connection with making a market in the Term Loans or, if it is a bona fide securities analyst, for preparing analysis for holders of and prospective holders of the Term Loans that otherwise have access to the financial information in compliance with this covenant); and

    (6) it (a) will not use such information in any manner intended to compete with the business of the Lead Borrower and (b) is not a Person (which includes such Person's Affiliates, other than the Affiliates of a bona fide securities research analyst with whom such research analyst does not share such information) that (i) is principally engaged in a Similar Business or (ii) derives a significant portion of its revenues from operating or owning a business substantially Similar Business.

  SECTION 5.05  <u>Litigation and Other Notices</u>.  Furnish to the Administrative Agent (which will promptly thereafter furnish to the Lenders) written notice of the following promptly after any Responsible Officer of the Lead Borrower obtains actual knowledge thereof:

    (a) any Default or Event of Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

    (b) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration (other than in connection with the Chapter 11 Cases), against Holdings or any of its Subsidiaries as to which an adverse determination is reasonably probable and which, if adversely determined, would reasonably be expected to have a Material Adverse Effect; and

    (c) the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, would reasonably be expected to result in a material liability to a Loan Party.

  SECTION 5.06  <u>Compliance with Laws</u>.  Subject to the DIP Financing Orders and other orders entered by the Bankruptcy Court, comply with all laws, rules, regulations and orders of any

Governmental Authority applicable to it or its property (including ERISA, FCPA, OFAC and the PATRIOT Act), except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that this Section 5.06 will not apply to Environmental Laws, which are the subject of Section 5.09, or laws related to Taxes, which are the subject of Section 5.03; provided, the Loan Parties must comply with the DIP Financing Orders in all respects.

SECTION 5.07      Maintaining Records; Access to Properties and Inspections.  Permit any Persons designated by the Administrative Agent (or any group of Lenders holding not less than 25% of the aggregate Term Loans) to visit and inspect the financial records and the properties of the Borrowers or any Subsidiary at reasonable times, upon reasonable prior notice to the Lead Borrower, and as often as reasonably requested, to make extracts from and copies of such financial records, and permit any Persons designated by the Administrative Agent, upon reasonable prior notice to the Lead Borrower to discuss the affairs, finances and condition of Holdings, the Borrowers or any Subsidiary with the officers thereof and independent accountants therefor (subject to such accountant's policies and procedures); *provided* that the Administrative Agent and/or any group of Lenders may not exercise such rights more often than two times during any calendar year in the aggregate unless an Event of Default is continuing and only one such time will be at the Borrowers' expense; and *provided*, *further*, that when an Event of Default is continuing, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and upon reasonable advance notice.

Notwithstanding anything to the contrary in this Agreement (including Sections 5.04(h), 5.05 and 5.07) or any other Loan Document, none of the Loan Parties or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter with any competitor to the Borrowers or any of their Subsidiaries or that (1) constitutes non-financial trade secrets or non-financial proprietary information, (2) in respect of which disclosure is prohibited by law or any binding agreement, (3) is subject to attorney-client or similar privilege or constitutes attorney work product or (4) creates an unreasonably excessive expense or burden on the Borrowers or any of their Subsidiaries.

SECTION 5.08      Use of Proceeds.  Use the proceeds of the Term Loans in accordance with Section 3.10.

SECTION 5.09      Compliance with Environmental Laws.  Comply, and make commercially reasonable efforts to cause all lessees and other Persons occupying its fee-owned Real Properties to comply, with all Environmental Laws applicable to its operations and properties, and obtain and renew all material authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws, except, in each case, to the extent the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.10      Further Assurances; Additional Security.

(a)      If a Subsidiary (other than an Excluded Subsidiary) of any Borrower is formed or acquired or ceases to be an Excluded Subsidiary after the Closing Date, then, the Lead Borrower shall promptly notify the Collateral Agent thereof and, within fifteen (15) Business Days after the date such Subsidiary is formed, acquired or ceases to be an Excluded Subsidiary (or such longer period as the Collateral Agent agrees in its discretion but not to exceed twenty (20) Business Days unless otherwise agreed by the Required Lenders including through electronic means or e-mail), the Lead Borrower will or will cause such Subsidiary to deliver a joinder to the Collateral Agreement, substantially in the form specified therein, duly executed on behalf of such Subsidiary.

(b)     [Reserved].

(c)     Furnish to the Collateral Agent five (5) Business Days prior written notice of any change in any Loan Party's:

(i)     corporate or organization name;

(ii)    organizational structure;

(iii)   location (determined as provided in UCC Section 9-307); or

(iv)    organizational identification number (or equivalent) or, solely if required for perfecting a security interest in the applicable jurisdiction, Federal Taxpayer Identification Number.

The Borrowers will not effectuate or permit any such change unless all filings have been made, or will be made within any statutory period, that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest, for the benefit of the applicable Secured Parties, in all Collateral held by such Loan Party.

(d)     Execute any and all other documents, financing statements, agreements and instruments as reasonably requested by the Required Lenders, and take all such other actions that are required under any applicable law, to satisfy the requirements set forth in Section 2.24 with respect to the creation and perfection of the Liens on the Collateral in favor of the Collateral Agent, for the benefit of the Secured Parties, contemplated herein and in the Security Documents and to cause such requirement to be and remain satisfied, all at the expense of the Borrowers.

(e)     Notwithstanding anything herein to the contrary,

(i)     the other provisions of this Section 5.10 need not be satisfied with respect to any Excluded Assets or Excluded Equity Interests or any exclusions and carve-outs from the perfection requirements set forth in the Collateral Agreement;

(ii)    no actions will be required with respect to the grant and perfection of security interests that are granted and perfected pursuant to the DIP Financing Orders and in accordance with Section 2.24; and

(iii)   without limitation of clause (ii) above, no actions will be required outside of the United States in order to create or perfect any security interest in any assets located outside of the United States and no foreign law security or pledge agreements, foreign law mortgages or deeds or foreign intellectual property filings or searches will be required.

SECTION 5.11      [Reserved].

SECTION 5.12      Lender Calls.   The Loan Parties and/or their advisors, as applicable (including appropriately senior members of management with respect to clause (c) below), shall, at reasonable times to be mutually agreed from time to time by the Lead Borrower and Administrative Agent or Lender Advisors (other than any local counsel), as applicable, host the following telephonic conference calls with the Administrative Agent, the Lenders and/or their advisors, as applicable:

(a)     Promptly following the delivery of each Variance Report pursuant to Section 5.04(r), a call with the Lender Advisors (other than any local counsel) to discuss the contents of such Variance Report.

(b)     A weekly call with the Lender Advisors (other than any local counsel) to discuss contemplated material filings, the Approved Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions and material performance changes.

(c)     No less frequently than monthly, a call with the Lenders to discuss the Approved Budget and budget-related initiatives, recent performance, cash and liquidity management, operational activities, current business and market conditions and material performance changes.

SECTION 5.13     Milestones.  The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Bankruptcy Court, achieve the following milestones:

(a)     on or before three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Financing Order;

(b)     [Reserved];

(c)     on or before thirty (30) days after the Petition Date, the Loan Parties shall file with the Bankruptcy Court an Acceptable Plan and a disclosure statement with respect thereto that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion;

(d)     [Reserved];

(e)     on or before forty (40) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Financing Order;

(f)     on or before seventy-five (75) days after the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement with respect to an Acceptable Plan that is consistent with the RSA and otherwise satisfactory to the Required Lenders in their reasonable discretion;

(g)     on or before one-hundred twenty (120) days after the Petition Date, the Bankruptcy Court shall have entered the Acceptable Confirmation Order; and

(h)     on or before two hundred ten (210) days after the Petition Date, the Acceptable Plan shall become effective.

SECTION 5.14     Certain Bankruptcy Matters.  The Loan Parties shall use their reasonable best efforts to:

(a)     cause all proposed (i) First and Second Day Orders, (ii) orders (other than the DIP Financing Orders) related to or affecting the Term Loans and other Obligations and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of

75

the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of any Agent, the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)     comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(c)     comply in a timely manner with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim DIP Financing Order and the Final DIP Financing Order, as applicable, and any other order of the Bankruptcy Court; and

(d)     except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

SECTION 5.15     Credit Ratings.  Use commercially reasonable efforts to maintain at all times (a) a credit rating by either S&P or Moody's in respect of the Term Facility and (b) a public corporate rating by S&P or a public corporate family rating by Moody's for the Lead Borrower, in each case with no requirement to maintain any specific minimum rating.

## ARTICLE VI

### *Negative Covenants*

Each Borrower covenants and agrees with each Lender that, so long as this Agreement is in effect and until the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, it will not and will not permit any of its Subsidiaries to:

SECTION 6.01     Indebtedness.  Issue, incur or assume any Indebtedness.

The foregoing limitation will not apply to (collectively, "***Permitted Debt***"):

(a)     Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out);

(b)     Indebtedness outstanding on the Petition Date and listed on Schedule 6.01;

(c)     [Reserved];

(d)     [Reserved];

76

(e)      Capital Lease Obligations, Indebtedness with respect to mortgage financings and purchase money Indebtedness to finance all or any part of the purchase, lease, construction, installation, repair or improvement of property (real or personal), plant or equipment or other fixed or capital assets in an aggregate outstanding principal amount, not to exceed $10.0 million (the "*Capital Lease Obligations Cap*"); *provided* that such Indebtedness is incurred within 270 days after the purchase, lease, construction, installation, repair or improvement of the property that is the subject of such Indebtedness;

(f)      Indebtedness owed to (including obligations in respect of letters of credit or bank Guarantees or similar instruments for the benefit of) any Person providing workers' compensation, health, disability or other employee benefits (whether to current or former employees) or property, casualty or liability insurance or self-insurance in respect of such items, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims, health, disability or other employee benefits (whether current or former) or property, casualty or liability insurance; *provided* that upon the incurrence of any Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than forty-five (45) days following such incurrence;

(g)      [Reserved];

(h)      intercompany Indebtedness between or among the Borrowers and the Subsidiaries; provided that the aggregate outstanding principal amount of such Indebtedness that is owing by any Subsidiary that is not a Guarantor to a Loan Party may not exceed the amount, as of the date such Indebtedness is incurred, permitted pursuant to Section 6.04(e); *provided* further that (i) such Indebtedness owing to a Subsidiary that is not a Guarantor shall be subordinated in right of payment to the Obligations or Guarantee of such Loan Party, as applicable, and (ii) any subsequent issuance or transfer of any Equity Interests or any other event that results in such Subsidiary lending such Indebtedness ceasing to be a Subsidiary or any other subsequent transfer of any such Indebtedness (except to a Loan Party) will be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (h);

(i)      Indebtedness pursuant to Hedge Agreements;

(j)      Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion Guarantees and similar obligations, in each case, provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(k)      Guarantees of Indebtedness of the Borrowers or the Subsidiary Loan Parties or any other Subsidiary permitted to be incurred under this Agreement to the extent such Guarantees are not prohibited by the provisions of Section 6.04 (other than Guarantees permitted only pursuant to Section 6.04(t));

(l)      [Reserved];

(m)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness (other than credit or purchase cards) is extinguished within ten (10) Business Days after notification received by the Borrowers of its incurrence;

(n)      [Reserved];

(o)     Indebtedness in respect of letters of credit (1) issued under the ABL Credit Agreement or supported by the ABL Segregated Cash Collateral or (2) otherwise in an aggregate face amount not to exceed $50.0 million to the extent consistent with the Approved Budget (including Permitted Variances thereto); provided that the delivery or posting of any such letter of credit shall be deemed to be, without duplication of any cash provided as collateral for the benefit of the issuer of such letter of credit, a cash disbursement for purposes of the Approved Budget (other than with respect to any letters of credit issued pursuant to clause (1) of this clause (o)), with the amount of such cash disbursement measured as the greater of (x) the face amount of such letter of credit and (y) the dollar amount of any cash provided as collateral for the benefit of the issuer of such letter of credit;

(p)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take or pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)     [Reserved];

(r)     Indebtedness in respect of Cash Management Services (including in respect of the DIP Proceeds Account) entered into in the ordinary course of business;

(s)     [Reserved];

(t)     other Indebtedness not otherwise permitted under any other clause of this Section 6.01, in an aggregate outstanding principal amount thereof not to exceed $2.0 million;

(u)     [Reserved];

(v)     unsecured Indebtedness in respect of short-term obligations to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services so long as such obligations are incurred in the ordinary course of business and not in connection with the borrowing of money;

(w)     Indebtedness representing deferred compensation, severance, retirement benefits or other similar arrangements incurred by the Borrowers or any Subsidiary (i) in the ordinary course of business or (ii) in connection with any Permitted Investment;

(x)     [Reserved];

(y)     customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(z)     Indebtedness incurred by the Borrowers or any Subsidiary in connection with bankers' acceptances, discounted bills of exchange, warehouse receipts or similar facilities or the discounting or factoring of receivables for credit management purposes, in each case incurred or undertaken in the ordinary course of business.

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the categories of Permitted Debt, the Borrowers may, in their sole discretion, at the time of incurrence, combine, divide, classify or reclassify, or at any later time combine, divide, classify or reclassify, such item of Indebtedness (or any portion thereof) in any manner that complies with this covenant.  Accrual of interest, the accretion of accreted value, amortization of original issue discount, the payment of interest or dividends in the form of

additional Indebtedness with the same terms (including pay-in-kind interest), and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, will not be deemed to be an incurrence of Indebtedness for purposes of this Section 6.01.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness will not be included in the determination of such amount of Indebtedness; *provided* that the incurrence of the Indebtedness represented by such Guarantee or letter of credit, as the case may be, was in compliance with this Section 6.01.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction will be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced (*plus* unpaid accrued interest and premium (including tender premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses in connection therewith).

SECTION 6.02    Liens.   Create, incur, assume or permit to exist any Lien that secures obligations under any Indebtedness on any property or assets at the time owned by it, except the following (collectively, "**Permitted Liens**"):

(a)    Liens securing the Obligations pursuant to the Loan Documents and Liens granted as adequate protection on account of secured Prepetition Indebtedness pursuant to the DIP Financing Orders;

(b)    Liens securing Indebtedness existing on the Closing Date; *provided* that such Liens only secure the obligations that they secure on the Closing Date and do not apply to any other property or assets of the Borrowers or any Subsidiary other than replacements, additions, accessions and improvements thereto;

(c)    Liens securing Indebtedness incurred in accordance with Sections 6.01(e); *provided* that such Liens only extend to the assets financed with such Indebtedness (and any replacements, additions, accessions and improvements thereto);

(d)    Cash Collateral and other deposits securing obligations arising after the Petition Date required under or imposed by the Bankruptcy Code;

(e)    Liens not otherwise permitted under any other clause of this Section 6.02 securing an amount not to exceed $2.0 million;

(f)    to the extent constituting a Lien, rights of setoff, reserves and holdbacks against credit balances of a Loan Party or any of its Subsidiaries with credit card issuers or credit card processors to such Loan Party or any such Subsidiaries arising in the ordinary course of business;

(g)    [Reserved];

(h)     Liens for Taxes, assessments or other governmental charges or levies not yet due or that are being contested in compliance with Section 5.03;

(i)     Liens disclosed by the title insurance commitments or policies delivered on or subsequent to the Closing Date and any replacement, extension or renewal of any such Liens (so long as the Indebtedness and other obligations secured by such replacement, extension or renewal Liens are permitted by this Agreement); *provided* that such replacement, extension or renewal Liens do not cover any property other than the property that was subject to such Liens prior to such replacement, extension or renewal;

(j)     Liens securing judgments that do not constitute an Event of Default under Section 8.01(g) and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and in respect of which Holdings, the Borrowers or any affected Subsidiary has set aside on its books reserves in accordance with GAAP with respect thereto;

(k)     Liens imposed by law, including landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business securing obligations that are not overdue by more than thirty (30) days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrowers or a Subsidiary has set aside on its books reserves in accordance with GAAP;

(l)     (i) pledges and deposits and other Liens made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other similar laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits and other Liens securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrowers or any Subsidiary;

(m)     deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), the delivery of merchandise or services with factors (to company suppliers), vendors, shippers, brand partners, credit insurers and other service providers (but not to secure Indebtedness or receivables or Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, agreements with utilities, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof), in each case, by the Borrowers or any Subsidiary in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business;

(n)     survey exceptions and such matters as an accurate survey would disclose, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights of way covenants, conditions, restrictions and declarations on or with respect to the use, ownership or operation of Real Property, servicing agreements, development agreements, site plan agreements and other similar encumbrances incurred in the ordinary course of business and title defects or irregularities that are of a minor nature and that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrowers or any Subsidiary;

80

(o)     any interest or title of a lessor or sublessor under any leases or subleases entered into by the Borrowers or any Subsidiary in the ordinary course of business;

(p)     Liens that are contractual rights of set-off (i) relating to pooled deposit or sweep accounts of the Borrowers or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrowers or any Subsidiary or (ii) relating to purchase orders and other agreements entered into with customers of the Borrowers or any Subsidiary in the ordinary course of business;

(q)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(r)     leases or subleases, licenses or sublicenses (including with respect to Intellectual Property Rights and software) granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Borrowers and the Subsidiaries, taken as a whole;

(s)     cash collateral to support letters of credit permitted pursuant to Section 6.01(o) or to support Letters of Credit;

(t)     the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business;

(u)     Liens arising from precautionary Uniform Commercial Code financing statements;

(v)     Liens on Equity Interests of any joint venture, to the extent such Equity Interests are Excluded Equity Interests, (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement or arrangement;

(w)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(x)     Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (4) of the definition thereof;

(y)     Liens securing insurance premium financing arrangements;

(z)     [Reserved];

(aa)     Liens on property or assets used to defease or to satisfy and discharge Indebtedness; *provided* that such defeasance or satisfaction and discharge is not prohibited by this Agreement;

(bb)     Liens:

(i)     of a collection bank arising under Section 4-210 of the Uniform Commercial Code, or any comparable or successor provision, on items in the course of collection;

(ii)     attaching to pooling, commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business; or

81

(iii)     in favor of banking or other financial institutions or entities, or electronic payment service providers, arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking or finance industry;

(cc)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit entered into in the ordinary course of business issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(dd)     [Reserved];

(ee)     [Reserved];

(ff)     [Reserved]; and

(gg)     (i) Liens securing amounts owing to any Qualified Counterparty (as defined in the ABL Credit Agreement) under any Specified Hedge Agreement (as defined in the ABL Credit Agreement) and Cash Management Obligations (as defined in the ABL Credit Agreement) in each case entered into or incurred prior to the Petition Date, which amounts are secured under the ABL Loan Documents and (ii) Liens securing amounts incurred pursuant to Section 6.01(r) in respect of Cash Management Services (including in respect of the DIP Proceeds Account or the Corporate Card Programs Collateral Account (as defined in the cash management First Day Order) entered into in the ordinary course of business or as contemplated by the DIP Financing Orders or the First and Second Day Orders, as applicable.

For purposes of this Section 6.02, (x) a Lien need not be incurred solely by reference to one category of Permitted Liens described in this definition but may be incurred under any combination of such categories (including in part under one such category and in part under any other such category), (y) in the event that a Lien (or any portion thereof) meets the criteria of one or more of such categories of Permitted Liens, the Lead Borrower will, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with this definition, and (z) in the event that a portion of Indebtedness secured by a Lien could be classified as secured in part pursuant to clause (a) or (gg) above (giving effect to the incurrence of such portion of such Indebtedness), the Lead Borrower, in its sole discretion, may classify such portion of such Indebtedness (and any Obligations in respect thereof) as having been secured pursuant to clause (a) or (gg) above and thereafter the remainder of the Indebtedness as having been secured pursuant to one or more of the other clauses of this definition.

SECTION 6.03     Sale and Lease-Back Transactions.  Enter into any arrangement, directly or indirectly, with any Person whereby it sells or transfers any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Lease-Back Transaction**") except to the extent such Sale-Leaseback Transaction is entered into in connection with a Specified Disposition so long as the term of such Sale-Leaseback Transaction is for a term of eighteen (18) months or less.

SECTION 6.04     Investments, Loans and Advances.  Purchase, hold or acquire (including pursuant to any merger, consolidation or amalgamation with a Person that is not a Wholly Owned Subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, a

"***Investment***"), any other Person, except the following to the extent consistent with the Approved Budget (including Permitted Variances thereto) (collectively, "***Permitted Investments***"):

      (a)      Investments consisting of Equity Interests of any MYT Subsidiary owned by a Loan Party or a Subsidiary in the event that such MYT Subsidiary becomes a "subsidiary" of any Loan Party or any of their respective Subsidiaries (provided, that, for the avoidance of doubt, in no event shall any MYT Subsidiary be deemed to be a "Subsidiary");

      (b)      loans and advances to officers, directors, employees or consultants of any Parent Entity, the Borrowers or any Subsidiary not to exceed $5.0 million in an aggregate principal amount at any time outstanding (calculated without regard to write-downs or write-offs thereof after the date made); provided that (i) loans and advances to consultants who are not Affiliates of the Loan Parties in the form of upfront payments made in connection with employment or consulting arrangements which (x) exist as of the Closing Date or (y) are made on or after the Closing Date in the ordinary course of business consistent with past practice and the Approved Budget, or (ii) offered on a non-discriminatory basis in the form of delayed payment of premiums under broad-based health insurance programs by officers or employees after March 1, 2020, in connection with terminations, temporary layoffs or furlough initiatives taken in response to the COVID-19 outbreak and related governmental advisories and restrictions, in each case, shall not be subject to such foregoing cap;

      (c)      [Reserved];

      (d)      [Reserved];

      (e)      intercompany Investments (including intercompany Indebtedness) (i) among the Borrowers and the Subsidiary Loan Parties (other than Notes PropCo or 2019 Extended Term Loan PropCo; provided, that any Loan Party (other than Notes PropCo and 2019 Extended Term Loan PropCo) shall be permitted to fund, solely in the form of cash equity Investments, lease and other operating payments that are due in the ordinary course of business, to maintain the legal existence of Notes PropCo or the 2019 Extended Term Loan PropCo, as applicable), and (ii) among the Loan Parties (other than Notes PropCo and 2019 Extended Term Loan PropCo) and Subsidiaries that are not Guarantors; *provided* that (a) the sum of (1) the aggregate fair market value of all such Investments under subclause (ii) (other than intercompany Indebtedness and Guarantees of Indebtedness) made since the Petition Date (with all such Investments being valued at their original fair market value and without taking into account subsequent increases or decreases in value) by the Loan Parties in Subsidiaries that are not Guarantors; (2) the aggregate principal amount of Indebtedness owing to the Loan Parties by Subsidiaries that are not Guarantors at any time outstanding; and (3) the aggregate principal amount of Indebtedness of Subsidiaries that are not Guarantors that is Guaranteed by the Borrowers and the Guarantors may not exceed $5.0 million at any time outstanding; and (b) any such Investment consisting of an intercompany loan by the Borrowers or the Guarantors in Subsidiaries that are not Guarantors shall be pledged as Collateral to secure the Obligations, subject to carve outs for Excluded Assets; *provided further* that Investments by Borrowers or their respective Subsidiaries in Subsidiaries that are not Wholly Owned Subsidiaries shall be on arm's-length terms;

      (f)      Investments not otherwise permitted under any other clause of this Section 6.04 in an aggregate amount not to exceed $2.0 million at any time outstanding;

      (g)      Investments in Cash Equivalents and, to the extent not made for speculative purposes, Investment Grade Securities;

(h)       Investments arising out of the receipt by the Borrowers or any of the Subsidiaries of non-cash consideration in connection with any sale of assets permitted under Section 6.05;

(i)       accounts receivable, security deposits and prepayments and other credits granted or made in the ordinary course of business and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and others, including in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, such account debtors and others, in each case in the ordinary course of business;

(j)       Investments acquired as a result of a foreclosure by the Borrowers or any Subsidiary with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(k)       Hedge Agreements;

(l)       Investments existing on, or contractually committed as of, the Closing Date and set forth on Schedule 6.04;

(m)       Investments resulting from pledges and deposits that are Permitted Liens;

(n)       intercompany loans among Foreign Subsidiaries;

(o)       acquisitions of obligations of one or more officers or other employees of any Parent Entity, Borrowers or any Subsidiary of the Borrowers in connection with such officer's or employee's acquisition of Equity Interests of any Parent Entity, so long as no cash is actually advanced by the Borrowers or any Subsidiary to such officers or employees in connection with the acquisition of any such obligations;

(p)       Guarantees of operating leases (for the avoidance of doubt, excluding Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case, entered into by the Borrowers or any Subsidiary in the ordinary course of business;

(q)       Investments to the extent that payment for such Investments is made with Equity Interests of any Parent Entity;

(r)       Investments consisting of the redemption, purchase, repurchase or retirement of any Equity Interests permitted under Section 6.06;

(s)       Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices;

(t)       Guarantees permitted under Section 6.01;

(u)       advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrowers or any Subsidiary;

(v)       [Reserved];

(w)      Investments consisting of the leasing or licensing of Intellectual Property Rights in the ordinary course of business or the contribution of Intellectual Property Rights pursuant to joint marketing arrangements with other Persons; and

(x)      purchases or acquisitions of inventory, supplies, materials and equipment or purchases or acquisitions of contract rights or Intellectual Property Rights in each case in the ordinary course of business.

*provided* that a Loan Party shall not, directly or indirectly, use any Investments made pursuant to the definition of "Permitted Investments" to (i) provide assets to a Person that incurs Indebtedness or issues Equity Interests, which Indebtedness, Equity Interests or proceeds thereof (as the case may be) are used to purchase, refinance or otherwise invest in any Indebtedness of Holdings and its Subsidiaries or (ii) make a Restricted Payment.

SECTION 6.05      <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>.  Merge into, or consolidate or amalgamate with, any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or sell, transfer or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets, or issue, sell, transfer or otherwise dispose of any Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person or any division, unit or business of any other Person, except that this Section 6.05 will not prohibit:

(a)      if at the time thereof and immediately after giving effect thereto no Event of Default has occurred and is continuing or would result therefrom:

(i)      the merger, consolidation or amalgamation of any Subsidiary Loan Party into (or with) the Borrowers in a transaction in which a Borrower is the survivor;

(ii)      the merger, consolidation or amalgamation of any Subsidiary Loan Party (other than Notes PropCo and Term Loan PropCo) into or with any Subsidiary Loan Party (other than Notes PropCo and Term Loan PropCo);

and, in the case of each of the foregoing clauses (i) and (ii), no Person other than a Borrower or a Subsidiary Loan Party receives any consideration;

(iii)      the merger, consolidation or amalgamation of any Subsidiary that is not a Loan Party into or with any other Subsidiary that is not a Loan Party;

(iv)      (i) (A) any transfer of inventory among (x) the Borrowers and the Subsidiary Loan Parties or between Subsidiary Loan Parties and (y) Subsidiaries that are not Subsidiary Loan Parties, and (B) any other transfer of property or assets among (x) the Borrowers and the Subsidiary Loan Parties and (y) Subsidiaries that are not Subsidiary Loan Parties, in each case, in the ordinary course of business or (ii) any other transfer of property or assets among the Borrower and any Subsidiary Loan Party (other than a PropCo Guarantor), provided any Collateral so transferred pursuant to this clause (ii) shall remain Collateral subject to valid and perfected Liens in favor of the Collateral Agent; or

(v)      the liquidation or dissolution or change in form of entity of any Subsidiary of a Borrower if a Responsible Officer of such Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of such Borrower and is not materially disadvantageous to the Lenders;

(b)  [Reserved];

(c)  (i) the purchase and sale of inventory in the ordinary course of business, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business, (iii) the sale of surplus, obsolete, damaged or worn out equipment or other property in the ordinary course of business or (iv) the disposition of Cash Equivalents (or Investments that were Cash Equivalents when made);

(d)  [Reserved];

(e)  Investments permitted by Section 6.04, Permitted Liens, and Restricted Payments permitted by Section 6.06;

(f)  the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction;

(g)  Specified Dispositions;

(h)  leases, licenses, or subleases or sublicenses of any real or personal property in the ordinary course of business;

(i)  sales, licenses, transfers, abandonments, allowances to lapse or other dispositions of Intellectual Property Rights that are immaterial or no longer useful or necessary in the operation of the business of the Borrowers or such Subsidiary, as determined by a Responsible Officer of the Lead Borrower reasonably and in good faith;

(j)  sales, leases or other dispositions of inventory of the Borrowers or any Subsidiary determined by the management of the Borrowers to be no longer useful or necessary in the operation of the business of the Borrowers or such Subsidiary, as determined by a Responsible Officer of the Lead Borrower reasonably and in good faith; or

(k)  [Reserved];

(l)  other sales, transfers or dispositions pursuant to an order of the Bankruptcy Court which sale, transfer or disposition are consistent with the RSA and the Approved Budget;

(m)  sales of art; and

(n)  sales, transfers or dispositions of assets in an aggregate amount equal to a fair market value, as determined by a Responsible Officer of the Lead Borrower reasonably and acting in good faith, not to exceed $2.0 million in the aggregate to the extent not otherwise permitted under any other clause of this Section 6.05.

To the extent any Collateral is disposed of in a transaction expressly permitted by this Section 6.05 to any Person other than Holdings, the Borrowers or any Guarantor, such Collateral will be free and clear of the Liens created by the Loan Documents, and the Administrative Agent will take, and each Lender hereby authorizes the Administrative Agent to take, any actions reasonably requested by the Lead Borrower in order to evidence the foregoing, in each case, in accordance with Section 10.18.

SECTION 6.06    Restricted Payments.  Declare or pay any dividend or make any other distribution (by reduction of capital or otherwise), directly or indirectly, whether in cash, property,

securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Equity Interests (other than Disqualified Stock) of the Person paying such dividends or distributions) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of its Equity Interests or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests (other than Disqualified Stock) of the Person redeeming, purchasing, retiring or acquiring such shares) (the foregoing, "***Restricted Payments***") other than, in each case, consistent with the Approved Budget (including Permitted Variances thereto) and any applicable order of the Bankruptcy Court:

(a)     Restricted Payments to any Parent Entity on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance with Section 13.20 of the RSA; *provided* that, any such Restricted Payments that are not made and remain in excess following application of the same in accordance with Section 13.20 of the RSA shall promptly be returned to the Loan Parties upon termination of the RSA;

(b)     Restricted Payments to permit payment of franchise and similar taxes, administrative and maintenance expenses, and foreign independent director (or foreign independent member or manager) fees and expenses and related expenses, in each case, of certain non-Debtor affiliate entities to the extent provided in the First and Second Day Orders entered by the Bankruptcy Court in respect of ongoing cash management in the ordinary course of business consistent with past practice and to the extent consistent with the Approved Budget (including Permitted Variances thereto);

(c)     [Reserved];

(d)     Restricted Payments to any Parent Entity that files, or to any Parent Entity for the purpose of paying to any other Parent Entity that files, a consolidated U.S. federal or combined or unitary state tax return that includes the Borrowers and the Subsidiaries (or the taxable income thereof), or to any Parent Entity that is a partner or a sole owner of the Lead Borrower in the event any Borrower is treated as a partnership or a "disregarded entity" for U.S. federal income tax purposes, in each case, in an amount not to exceed the amount that such Borrower and its Subsidiaries would have been required to pay in respect of such U.S. federal, state or local taxes (as the case may be) in respect of such fiscal year if such Borrower and its Subsidiaries paid such taxes directly as a stand-alone taxpayer (or stand-alone group) (such amounts, the "***Tax Amount***"); *provided* that, any amounts paid pursuant to this clause (d) for any applicable fiscal year shall actually be used by a Parent Entity to pay such taxes to the applicable taxing authority; *provided further* that, amounts paid under this clause (d) shall not exceed the Tax Amount for such fiscal year;

(e)     Restricted Payments to permit any Parent Entity to:

(i)     pay operating, overhead, legal, accounting and other professional fees and expenses (including directors' fees and expenses and administrative, legal, accounting, filings and similar expenses), in each case to the extent related to its separate existence as a holding company or to its ownership of the Borrowers and the Subsidiaries, but not, for the avoidance of doubt, any costs, fees and expenses for, or directly allocable to, the MYT Entities, or in respect of any litigation related thereto, subject to reasonable pro-ration of joint services, costs, fees and expenses;

(ii)     [Reserved];

87

(iii)    pay franchise taxes or other similar taxes and other fees and expenses in connection with any Parent Entity's ownership of any Subsidiary or the maintenance of its legal existence;

(iv)    make payments under transactions permitted under Section 6.07 (other than permitted under Section 6.07(h)), in each case to the extent such payments are due at the time of such Restricted Payment; or

(v)    pay customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, employees, directors, managers, consultants or independent contractors of any Parent Entity to the extent related to its ownership of the Borrowers and the Subsidiaries, but not, for the avoidance of doubt, any indemnities, costs, fees and expenses for, or directly allocable to, the MYT Entities, or in respect of any litigation related thereto, incurred after the Closing Date, subject to reasonable pro-ration of joint services, indemnities, costs, fees and expenses; or

(f)    [Reserved];

(g)    [Reserved];

(h)    [Reserved];

(i)    Restricted Payments to the Borrowers or any Subsidiary (or, in the case of non-Wholly Owned Subsidiaries, to the Borrowers and to each other owner of Equity Interests of such Subsidiary on a *pro rata* basis (or more favorable basis from the perspective of the Borrowers or such Subsidiary) based on their relative ownership interests so long as any repurchase of its Equity Interests from a Person that is not the Borrowers or a Subsidiary is permitted under Section 6.04);

(j)    [Reserved]; or

(k)    Restricted Payments of the MyTheresa Assets (or the net cash proceeds received from a sale of the MyTheresa Assets or any of the MYT Subsidiaries) in the event the MyTheresa Assets (or proceeds from such sale) are contributed to Holdings or any of its Subsidiaries on or after the Closing Date to the extent that the MyTheresa Assets (or such proceeds) are required to be distributed in accordance with any settlement, judgment, court order or other resolution of a Claim, cause of action or litigation with respect to the MyTheresa Distribution or the MyTheresa Designation, subject to (i) restoration of all terms set forth in the MYT Holdco Preferred Series A Certificate (as defined in the Prepetition Term Loan Credit Agreement), (ii) compliance by the MYT Entities with all of the MYT Covenants (as defined in the Offering Circular (as defined in the Prepetition Term Loan Credit Agreement)), and (iii) the automatic release of any pledges or Liens on the Contributed MYT Equity Interests (as defined in the Prepetition Term Loan Credit Agreement) contemplated by the definition of "Subsidiary".

SECTION 6.07    Transactions with Affiliates.  Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transaction with, any of its Affiliates, unless such transaction is upon terms no less favorable to the Borrowers and the Subsidiaries, as applicable, than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate and to the extent consistent with the Approved Budget (including Permitted Variances thereto), except that this Section 6.07 will not prohibit:

(a)     transactions between or among (i) the Borrowers and the Subsidiary Loan Parties and (ii) the Borrowers and any Subsidiary that is not a Subsidiary Loan Party as of the date of the consummation, so long as (A) such transaction is on an arms' length basis or (B) involves the sharing of operating, overhead, legal, accounting and other professional fees and expenses (including directors' fees and expenses and administrative, legal, accounting, filings and similar expenses) in the ordinary course of business;

(b)     [Reserved];

(c)     [Reserved];

(d)     loans or advances to employees or consultants of any Parent Entity, the Borrowers or any Subsidiary in accordance with Section 6.04(b);

(e)     the payment of fees, reasonable out-of-pocket costs and indemnities to directors, officers, consultants and employees of any Parent Entity, the Borrowers or any of the Subsidiaries in the ordinary course of business (limited, in the case of any Parent Entity, to the portion of such fees and expenses that are reasonably allocable to the Borrowers and the Subsidiaries and subject to reasonable pro-ration of joint services, indemnities, costs, fees and expenses);

(f)     [Reserved];

(g)     (i) any reasonable employment agreements entered into by the Borrowers or any of the Subsidiaries in the ordinary course of business, (ii) any reasonable subscription agreement or similar agreement pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with employees, officers or directors and (iii) any reasonable employee compensation, benefit plan or arrangement, any reasonable health, disability or similar insurance plan which covers employees, and any reasonable employment contract and transactions pursuant thereto;

(h)     Restricted Payments permitted under Section 6.06, including applicable payments to any Parent Entity;

(i)     [Reserved];

(j)     [Reserved];

(k)     transactions with Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business and on arm's length terms;

(l)     any transaction in respect of which the Lead Borrower delivers to the Administrative Agent (for delivery to the Lenders) a letter addressed to the Board of Directors of Holdings or the Borrowers from an accounting, appraisal or investment banking firm, in each case, of nationally recognized standing that is (i) in the good faith determination of the Borrowers qualified to render such letter and (ii) reasonably satisfactory to the Administrative Agent, which letter states that such transaction is on terms that are no less favorable to the Borrowers or the Subsidiaries, as applicable, than would be obtained in a comparable arm's length transaction with a Person that is not an Affiliate;

(m)     transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business;

89

(n)     the issuance, sale or transfer of Equity Interests of the Lead Borrower to any Parent Entity and capital contributions by any Parent Entity to the Borrowers;

(o)     payments or loans (or cancellation of loans) to employees or consultants that are approved by a majority of the disinterested directors of Holdings or Borrowers in good faith, made in compliance with Holdings' or the Borrowers' organizational documents, applicable law and otherwise permitted under this Agreement;

(p)     transactions necessary to make adequate protection payments on account of secured Prepetition Indebtedness pursuant to the DIP Financing Orders; and

(q)     transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement, that are fair to the Borrowers and the Subsidiaries.

SECTION 6.08     <u>Business of the Borrowers and their Subsidiaries</u>.  Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than any business or business activity conducted by the Borrowers and the Subsidiaries on the Closing Date and any similar, corollary, related, ancillary, incidental or complementary business or business activities or a reasonable extension, development or expansion thereof or ancillary thereto.

SECTION 6.09     <u>Limitation on Payments and Modifications of Indebtedness; Modifications of Certificate of Incorporation, By Laws and Certain Other Agreements; etc.</u>

(a)     amend or modify in any manner adverse to the Lenders the articles or certificate of incorporation (or similar document), by-laws, limited liability company operating agreement, partnership agreement or other organizational documents of the Borrowers or any Subsidiary; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent;

(b)     make any cash payment or other distribution in cash in respect of, or amend or modify, or permit the amendment or modification of, any provision of, any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposits, on account of the purchase, redemption, retirement, acquisition, cancellation or termination in respect of any Junior Financing, except to the extent provided for in the Approved Budget  (including Permitted Variances thereto) and permitted by the DIP Financing Orders; or

(c)     permit any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) with respect to any such Subsidiary that is not a Guarantor, Restricted Payments from such Subsidiary to the Borrowers or any other Loan Party that is a direct or indirect parent of such Subsidiary or (ii) with respect to any such Subsidiary that is a Guarantor, the granting of Liens by such Subsidiary pursuant to the Security Documents; except in the case of this clause (c):

(i)     restrictions imposed by applicable law or any order of the Bankruptcy Court in the Chapter 11 Cases;

(ii)     contractual encumbrances or restrictions under Indebtedness incurred pursuant to Section 6.01(a), (b), (e), (i), (r), (t), (v), (w) or (x);

(iii)     [Reserved];

90

(iv)    customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(v)    [Reserved];

(vi)    customary provisions contained in leases or licenses of Intellectual Property Rights and other similar agreements entered into in the ordinary course of business;

(vii)    customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(viii)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(ix)    customary restrictions and conditions contained in any agreement relating to the sale, transfer or other disposition of any asset permitted under Section 6.05 pending the consummation of such sale, transfer or other disposition;

(x)    customary restrictions and conditions contained in the document relating to any Lien, so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 6.09;

(xi)    customary net worth provisions contained in Real Property leases entered into by Subsidiaries, so long as a Responsible Officer of the Lead Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrowers and the other Subsidiaries to meet their ongoing obligations;

(xii)    any agreement in effect at the time any Person becomes a Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary;

(xiii)    restrictions in agreements representing Indebtedness permitted under Section 6.01 of a Subsidiary that is not a Subsidiary Loan Party;

(xiv)    customary restrictions on leases, subleases, licenses or Equity Interests or asset sale agreements otherwise permitted hereby as long as such restrictions relate to the Equity Interests and assets subject thereto;

(xv)    restrictions on cash or other deposits imposed by customers or brand partners under contracts entered into in the ordinary course of business or otherwise in connection with cash or other deposits permitted under Section 6.01; or

(xvi)    any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (o) above, so long as such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrowers, not materially more restrictive with respect to such Lien, dividend and other payment restrictions, taken as a whole, than those contained in the Lien, dividend or other

91

payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing;

SECTION 6.10    Compliance with the Approved Budget.  Except as otherwise provided herein or approved by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), directly or indirectly (i) use any cash or the proceeds of any Term Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Orders and the Approved Budget (other than a Permitted Variance), (ii) permit a disbursement causing any variance from the Approved Budget other than a Permitted Variance without the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders), or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any Claim or Indebtedness arising prior to the Petition Date other than payments consistent with the Approved Budget (or any Permitted Variance) and approved by the Bankruptcy Court.

SECTION 6.11    Chapter 11 Modifications.  Without the consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) and, with respect to clause (a), the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders:  (a) make or permit to be made any change, amendment or modification, to the DIP Financing Orders in a manner adverse to the Lenders or (b) incur, create, assume or suffer to exist or permit any Claim or Lien against any Loan Party ranking *pari passu* with or senior to the Claims and Liens of the Administrative Agent and the other Secured Parties hereunder, except as permitted under the Interim DIP Financing Order approved by the Bankruptcy Court (including the Carve Out) as of the Closing Date or under the Final DIP Financing Order, as applicable, or as otherwise agreed by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

SECTION 6.12    Use of Proceeds.  Apply the proceeds of the Term Loans not in accordance with the Approved Budget (including Permitted Variances thereto) or the DIP Financing Orders.  No part of the proceeds of the Term Loans or any Collateral (including any Cash Collateral) will be used, whether directly or indirectly, in violation of Section 5.08 or:

(a)    in any manner that causes such Term Loan or the applications of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Securities Exchange Act;

(b)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Financing Orders;

(c)    to pay interest, principal or other amounts in respect of Prepetition Indebtedness, prepetition trade payables or other prepetition Claims of any kind or nature, except payments in accordance with the DIP Financing Orders, the First and Second Day Orders, the Approved Budget (subject to Permitted Variances) or the Acceptable Plan;

(d)    other than as permitted by the DIP Financing Order, to investigate, commence, prosecute or finance any adjudication, proceeding or objection with respect to or related to the Claims, Liens or security interest of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders, the Prepetition Noteholders or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders seeking (x) to avoid, subordinate or recharacterize the Obligations, the Prepetition Term Loan Obligations, the Prepetition Notes

Obligations or any of the Liens securing the Obligations, the Prepetition Term Loan Obligations or the Prepetition Notes Obligations, (y) any monetary, injunctive or other affirmative relief against any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders or the Liens and collateral under the Prepetition Term Loan Documents or the Prepetition Notes Documents, or (z) to prevent or restrict the exercise by any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders of any of their respective rights or remedies under the Loan Documents, the Prepetition Term Loan Documents or the Prepetition Notes Documents; provided, however, that nothing in this Agreement or Section 6.12 shall prohibit any Borrower or any other Loan Party from prosecuting or defending any adversary action, suit, proceeding, application, motion, contested matter or other litigation for breach of or to otherwise enforce the terms of the Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents; or

(e)     other than as permitted by the DIP Financing Orders and subject to clause (d) above (including the proviso therein) and Section 6.13(c) and 6.13(d) below, to finance any adversary action, suit, arbitration, proceeding, application, motion, contested matter or other litigation of any type adverse to the interests of any or all of the Administrative Agent, the Lenders, the Prepetition Term Loan Lenders or the Prepetition Noteholders or their respective rights and remedies under the Loan Documents, the DIP Financing Orders, the Prepetition Term Loan Documents or the Prepetition Notes Documents.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions or applications made in the Bankruptcy Court, including any application of interim or final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

SECTION 6.13     Additional Bankruptcy Matters.  Do any of the following other than as permitted by the DIP Financing Order:

(a)     enter into any agreement to return any of its inventory to any of its creditors for application against any Prepetition Indebtedness, prepetition trade payables or other prepetition Claims under Section 546(c) of the Bankruptcy Code or agree that any creditor may take any set-off or recoupment against any of its Prepetition Indebtedness, prepetition trade payables or other prepetition Claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, set-off or recoupment, the aggregate amount applied to Prepetition Indebtedness, prepetition trade payables and other prepetition Claims subject to all such agreements, set-offs and recoupments since the Petition Date would exceed $500,000;

(b)     seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, at the direction of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Financing Orders or the other Loan Documents or refrain from taking any action that is expressly required to be taken by the terms of this Agreement, the DIP Financing Orders or any of the other Loan Documents;

(c)     assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties;

*provided that* nothing contained in this clause 6.13(c) shall prohibit the Loan Parties from responding to or complying with discovery requests of any statutory committee appointed or appearing in the Chapter 11 Cases, in whatever form, made in connection with an investigation against any of the Secured Parties or the payment from proceeds of the Term Loans of professional fees related thereto;

(d)     subject to the terms of the DIP Financing Orders and subject to Article VIII, object to, contest, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents, the Lenders or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including, without limitation, a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (provided that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Financing Orders);

(e)     hold any proceeds of the Term Loans in any account other than the DIP Proceeds Account, pending application thereof in accordance with this agreement;

(f)     without the consent of the Required Lenders, move to assume or reject any material lease, license or other material contract of any Loan Party pursuant to Section 365 of the Bankruptcy Code; provided that, this clause (f) shall not apply to the assumption or rejection of any material lease, license or other material contract in connection with a Specified Disposition so long as the Loan Parties are in compliance with Section 5.04(p);

(g)     except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First and Second Day Orders) or as otherwise contemplated in the then Approved Budget (including Permitted Variances thereto), make any payment or distribution to any non-Subsidiary Affiliate or insider of any debtor outside of the ordinary course of business; or

(h)     assert any right of subrogation or contribution against any other Loan Party.

SECTION 6.14     Budget Covenant.  Permit, as of any Variance Report Date commencing with the Variance Report Date that occurs in the fourth (4th) full calendar week following the Petition Date, which, for the avoidance of doubt, shall be June 4, 2020 (x) the Actual Disbursements of the Loan Parties for any Variance Testing Period to exceed 117.5% of the Budgeted Disbursements for such period set forth in the Approved Budget or (y) the Actual Cash Receipts for any Variance Testing Period to be less than 82.5% of the Budgeted Cash Receipts for such period set forth in the Approved Budget.

SECTION 6.15     Minimum Liquidity.  Beginning on the Business Day following the Closing Date, allow Liquidity to be less than $50.0 million at any time.

## ARTICLE VII

### *Holdings and PropCo Guarantors Covenants*

SECTION 7.01     Holdings Covenant.  Holdings will not, so long as this Agreement is in effect and until all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders otherwise consent in writing, conduct, transact or otherwise engage in any active trade or business or operations other than through the Borrowers and their Subsidiaries.

The foregoing will not prohibit Holdings from taking actions related to the following (and activities incidental thereto):

        (a)      its ownership of the Equity Interests of the Lead Borrower;

        (b)      the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance);

        (c)      the performance of its obligations with respect to the Indebtedness permitted by this Agreement and under the DIP Financing Orders;

        (d)      any offering of its common stock or any other issuance of its Equity Interests;

        (e)      the making of Restricted Payments; *provided* that Holdings will not be permitted to make Restricted Payments using the cash from the Borrowers or any Subsidiary unless such cash has been dividended or otherwise distributed to Holdings as a permitted Restricted Payment;

        (f)      [Reserved];

        (g)      making contributions to the capital or acquiring Equity Interests of its Subsidiaries;

        (h)      guaranteeing the obligations of the Borrowers and their Subsidiaries;

        (i)      participating in tax, accounting and other administrative matters as a member or parent of the consolidated group;

        (j)      holding any cash or property (including cash and property received in connection with Restricted Payments made by the Borrowers, but excluding the Equity Interests of any Person other than the Borrowers);

        (k)      providing indemnification to officers and directors;

        (l)      the making of Investments consisting of Cash Equivalents or, to the extent not made for speculative purposes, Investment Grade Securities; and

        (m)      activities incidental to the businesses, activities or operations described above.

SECTION 7.02        <u>PropCo Guarantors Covenant.</u>

No PropCo Guarantor will, so long as this Agreement is in effect and until all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) have been paid in full, unless the Required Lenders and the Majority Noteholders otherwise consent in writing, (i) conduct, transact or otherwise engage in any active trade or business or operations other than own interests in, and perform its obligations pursuant to, its assets as of the Petition Date, (ii) issue, incur or assume any Indebtedness or Guarantee any Indebtedness of another Person, (iii) create, incur, assume or permit to exist any Lien securing Indebtedness or on any property or assets at the time owned by it, (iv) sell, lease, transfer or otherwise dispose of any of its properties or assets, (v) own any property or assets other than such as are owned as of the Petition Date or (vi) after the Petition Date, acquire any property or assets.  The foregoing will not prohibit either PropCo Guarantor from taking actions related to the following (and activities incidental thereto):

(a)      the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance);

(b)      the making of Restricted Payments permitted under Section 6.06;

(c)      sales, leases, transfer or other dispositions permitted under Section 6.05;

(d)      the performance of its obligations with respect to the Indebtedness permitted by this Agreement and under the DIP Financing Orders;

(e)      holding the assets owed by it as of the Petition Date and the performance of its obligations with respect to any PropCo Operating License (as defined in the Prepetition Term Loan Credit Agreement).

(f)      participating in tax, accounting and other administrative matters as a member of the consolidated group;

(g)      providing indemnification to officers and directors; and

(h)      activities incidental to the businesses, activities or operations described above.

### ARTICLE VIII

### *Events of Default*

SECTION 8.01      <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "***Event of Default***"):

(a)      any representation or warranty made by Holdings, the Borrowers or any other Loan Party herein or in any other Loan Document or any certificate or document required to be delivered pursuant hereto or thereto proves to have been false or misleading in any material respect when so made;

(b)      default is made in the payment of any principal of any Term Loan when and as the same becomes due and payable, whether at the due date thereof, at a date fixed for prepayment thereof, by acceleration thereof or otherwise;

(c)      default is made in the payment of any interest on any Term Loan or in the payment of any Fee or any other amount due under any Loan Document (other than an amount referred to in clause (b) of this Section 8.01), when and as the same becomes due and payable, and such default continues unremedied for a period of three (3) Business Days;

(d)      default is made in the due observance or performance by Holdings, the Borrowers or any Subsidiary of any covenant, condition or agreement contained in Section 2.24, 5.01(a), 5.04(d), (n), (o), (p), (q) and (r), 5.05(a), 5.08, and 5.13 or in Article VI or Article VII of this Agreement, or in any provision of the DIP Financing Orders (in each case solely to the extent applicable to such Person);

(e)      default is made in the due observance or performance by Holdings, the Borrowers or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) and (d) of this Section 8.01), in each case solely to the extent

applicable to such Person, and such default continues unremedied for a period of fifteen (15) days after notice thereof from the Administrative Agent to the Lead Borrower;

(f)        except as a result of commencement of the Chapter 11 Cases or entry into this Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or unless any of the following results from obligations with respect to which the Bankruptcy Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (ii) the Borrowers or any Subsidiary fails to pay the principal of any Material Indebtedness at the stated final maturity thereof; *provided* that this clause (f) will not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided*, *further*, that such event or condition is unremedied and is not waived or cured by the holders of such Indebtedness prior to any acceleration of the Term Loans pursuant to this Section 8.01;

(g)        a Change in Control occurs;

(h)        except for any order fixing the amount of any Claim in the Chapter 11 Cases, the Borrowers or any Subsidiary fails to pay one or more final judgments aggregating in excess of $20.0 million (to the extent not covered by insurance), which judgments are not discharged or effectively waived or stayed for a period of forty-five (45) consecutive days, or any action is legally taken by a judgment creditor to levy upon assets or properties of the Borrowers or any other Subsidiary Loan Party to enforce any such judgment;

(i)        (i) a trustee is appointed by a United States district court to administer any Plan or (ii) an ERISA Event or ERISA Events occurs with respect to any Plan or Multiemployer Plan, and, in each case, with respect to clauses (i) and (ii) above, such event or condition, together with all other such events or conditions, if any, is reasonably expected to have a Material Adverse Effect;

(j)        (A) any material provision of any Loan Document ceases to be, or is asserted in writing by Holdings, the Borrowers or any Subsidiary not to be, for any reason, a legal, valid and binding obligation of any party thereto, (B) any security interest purported to be created by any Security Document and to extend to assets that are not immaterial to Holdings, the Borrowers and the Subsidiaries on a consolidated basis ceases to be, or is asserted in writing by the Borrowers or any other Loan Party not to be, a valid and perfected security interest in the securities, assets or properties covered thereby, except to the extent that any such loss of validity, perfection or priority results from the limitations of foreign laws, rules and regulations as they apply to pledges of Equity Interests in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent to maintain possession of certificates actually delivered to it representing securities pledged under a Security Document or to file Uniform Commercial Code continuation statements or take any other action and except to the extent that such loss is covered by a lender's title insurance policy and the Collateral Agent is reasonably satisfied with the credit of such insurer or (C) the Guarantees pursuant to the Security Documents by any Loan Party of any of the Obligations cease to be in full force and effect (other than in accordance with the terms thereof) or are asserted in writing by Holdings, the Borrowers or any other Subsidiary Loan Party not to be in effect or not to be legal,

valid and binding obligations, except in the cases of clauses (A) and (B), in connection with an Asset Sale permitted by this Agreement;

(k)     the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(l)     the breach in any material respect by a Company Party (as defined in the RSA) of any of the representations, warranties, or covenants of the Company Parties set forth in the RSA in a manner materially adverse to the Lenders and/or the Administrative Agent;

(m)     any Loan Party shall file a motion in the Chapter 11 Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), to obtain additional financing from a party other than the Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) or provide for the payment of the Obligations in full and in cash upon the incurrence of such additional financing;

(n)     the Bankruptcy Court shall enter an order (i) approving payment of any prepetition Claim other than (x) as provided for in the First and Second Day Orders, (y) as otherwise contemplated hereunder and by the Approved Budget (including Permitted Variances thereto) or (z) as otherwise consented to by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) in writing in their reasonable discretion, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1.0 million in the aggregate, or (iii) except as provided in the DIP Financing Orders, approving any settlement or other stipulation not approved by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) with any prepetition secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor;

(o)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(p)     an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all Commitments, and payment in full of all Obligations upon entry thereof;

(q)     an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of (i) the Administrative Agent, the Administrative Agent or (ii) the Consenting Noteholders, the Majority Noteholders, not to be unreasonably withheld, conditioned or delayed), (i) to revoke, reverse, stay, modify, supplement or amend any of the DIP Financing Orders in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the DIP Financing Orders, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Obligations (other than the Carve Out);

(r)      (i) an application for any of the orders described in clause (o) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(s)      the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(t)      any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Lenders' Claims in respect of the Obligations or contest any provision of any Loan Document or any provision of any Loan Document shall cease to be effective (other than in accordance with its terms or as a result of the action or inaction of the Administrative Agent);

(u)      any Loan Party shall fail to comply with the Interim DIP Financing Order or the Final DIP Financing Order;

(v)      any order by the Bankruptcy Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Obligations, other than in accordance with the DIP Financing Orders;

(w)      except with respect to any Specified Dispositions, without the Required Lenders' consent, the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court seeking authority to (1) close any full-line Neiman Marcus or Bergdorf Goodman store, or (2) consummate a sale of material assets constituting Collateral outside the ordinary course of business;

(x)      the Bankruptcy Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent, the Collateral Agent, and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Chapter 11 Cases;

(y)      the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent, the Collateral Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the DIP Financing Orders; or

(z)      the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the applicable DIP Financing Order, (i) upon the occurrence of any such Event of Default, and at any time thereafter during the continuance of such Event of Default, the Administrative Agent, at the request of the Required Lenders, will, by notice to the Lead Borrower, take any or all of the following actions, at the same or different times: (A) declare the Term Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Term Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrowers accrued hereunder and under any

99

other Loan Document, will become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (B) exercise all rights and remedies granted to it under any Loan Document and all of its rights under any other applicable law or in equity.

## ARTICLE IX

### *The Agents*

SECTION 9.01          Appointment.

(a)          Each Lender hereby irrevocably designates and appoints the Administrative Agent as agent of such Lender under this Agreement and the other Loan Documents, as applicable, including as the Collateral Agent for such Lender and the other applicable Secured Parties under the applicable Security Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacities, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  In addition, to the extent required under the laws of any jurisdiction other than the United States, each of the Lenders hereby grants to the Administrative Agent any required powers of attorney to execute any Security Document governed by the laws of such jurisdiction on such Lender's behalf. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the Internal Revenue Service or any other Governmental Authority asserts a Claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  For the avoidance of doubt, no Borrower shall have liability for the actions of the Administrative Agent pursuant to the immediately preceding sentence.

(b)          In furtherance of the foregoing, each Lender hereby appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on the Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In connection therewith, the Administrative Agent (and any Subagents appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights or remedies thereunder at the direction of the Administrative Agent) shall be entitled to the benefits of this Article IX (including Section 9.07) as though the Administrative Agent (and any

such Subagents) were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c)        Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion:

(i)        to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document

(A)        upon payment in full of all Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted);

(B)        that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document; or

(C)        if approved, authorized or ratified in writing in accordance with Section 10.08 hereof;

(ii)        to release any Loan Party from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(iii)        to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(c).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Documents.

(d)        In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, including during the pendency of the Chapter 11 Cases, (i) the Administrative Agent (irrespective of whether the principal of any Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise (A) to file and prove a Claim for the whole amount of the principal and interest owing and unpaid in respect of any or all of the Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the Claims of the Lenders and the Agents and any Subagents allowed in such judicial proceeding and (B) to collect and receive any monies or other property payable or deliverable on any such Claims and to distribute the same, and (ii) any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under the Loan Documents. Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any Plan of Reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to

authorize the Administrative Agent to vote in respect of the Claim of any Lender in any such proceeding.

(e)      The Lenders and each other holder of an Obligation under a Loan Document shall act collectively through the Administrative Agent with respect to the Obligations and the Loan Documents.  Without limiting the delegation of authority to the Administrative Agent set forth herein, the Required Lenders shall direct the Administrative Agent with respect to the exercise of rights and remedies hereunder and under other Loan Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default), and the exercise of rights and remedies with respect to (i) the Term Loans and any securities, notes, or other interests issued pursuant to this Agreement and (ii) any Collateral with respect to the Obligations.  Any such rights and remedies shall not be exercised other than through the Administrative Agent.  None of the foregoing shall preclude any Lender from exercising any right of set-off in accordance with the provisions of Section 10.06 or from exercising rights and remedies (other than the enforcement of Collateral) with respect to any payment default after the occurrence of the Maturity Date with respect to any Term Loans made by it.

SECTION 9.02      Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof)) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of the agents or attorneys-in-fact selected by it with reasonable care.  The Administrative Agent may also from time to time, when the Administrative Agent deems it to be necessary or desirable, appoint one or more trustees, co-trustees, collateral co-agents, collateral subagents or attorneys-in-fact (each, a "*Subagent*") with respect to all or any part of the Collateral; *provided* that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  Should any instrument in writing from the Borrowers or any other Loan Party be required by any Subagent so appointed by the Administrative Agent to more fully or certainly vest in and confirm to such Subagent such rights, powers, privileges and duties, the Borrowers shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent, attorney-in-fact or Subagent that it selects in accordance with the foregoing provisions of this Section 9.02 in the absence of the Administrative Agent's gross negligence or willful misconduct.

SECTION 9.03      Exculpatory Provisions.  None of the Administrative Agent, its Affiliates or any of their respective officers, directors, employees, agents or attorneys-in-fact shall be (1) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (2) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or *provided* for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or

conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, (1) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, and (2) the Administrative Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity.  The Agents shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary or as such Agents shall in good faith believe to be necessary under the circumstances as provided in Section 10.08, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment; provided, that no action taken or not taken by the Agents in accordance with the direction of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary shall be deemed to constitute gross negligence or willful misconduct by the Agents.  The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into:

(a)     any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document;

(b)     the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith;

(c)     the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default;

(d)     the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents;

(e)     the value or the sufficiency of any Collateral; or

(f)     the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

SECTION 9.04     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) or conversation believed in good faith by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed in good faith by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to any Borrowing that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to such Borrowing.  The Administrative Agent may consult with legal counsel (including counsel to Holdings or the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any

action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders  (or, if so specified by this Agreement, all or other Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all or other Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Term Loans.

SECTION 9.05      Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender, Holdings or the Lead Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all or other Lenders); *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

SECTION 9.06      Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Term Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

SECTION 9.07      Indemnification.  The Lenders agree to indemnify each Agent (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), in the amount of its *pro rata* share (based on its aggregate outstanding Term Loans) (determined at the time such indemnity is sought), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Term Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions

104

contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct.  The failure of any Lender to reimburse the Administrative Agent promptly upon demand for its ratable share of any amount required to be paid by the Lenders to the Administrative Agent as *provided* herein shall not relieve any other Lender of its obligation hereunder to reimburse the Administrative Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's ratable share of such amount.  The agreements in this Section 9.07 shall survive the payment of the Term Loans and all other amounts payable hereunder.

SECTION 9.08        Agent in Its Individual Capacity.  Each Agent and its affiliates may make loans to, accept deposits from, and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.  With respect to its Term Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

SECTION 9.09        Successor Agent.  The Administrative Agent (i) may resign as Administrative Agent upon ten (10) days' notice to the Lenders and the Lead Borrower or (ii) if so directed by the Required Lenders, shall resign, upon ten (10) days' prior written notice (or such shorter period as agreed to by the Required Lenders and Lead Borrower) by the Required Lenders to the Administrative Agent and the Lead Borrower.  If the Administrative Agent resigns as the Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent for the Lenders which successor agent shall (unless an Event of Default under Section 8.01(b) or 8.01(c) shall have occurred and be continuing) be subject to the approval by the Lead Borrower (which approval shall not be unreasonably withheld, conditioned or delayed) and following such approval the Borrowers shall use commercially reasonable efforts to cause such successor agent to accept such appointment (including by paying customary agency fees to such successor agent), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the reference to the resigning Administrative Agent means such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Term Loans.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within ten (10) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent.  If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation will nevertheless thereupon become effective, and the Required Lenders will thereafter perform all the duties of such Administrative Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article IX and Section 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

## ARTICLE X

### *Miscellaneous*

SECTION 10.01        Notices; Communications.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 10.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or e-mail, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, in each case, as follows:

(i)      if to any Loan Party or the Administrative Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 10.01; and

(ii)      if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire.

(b)      Notices and other communications to the Lenders may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(c)      Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by facsimile shall be deemed to have been given when sent and confirmation of transmission received  (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in Section 10.01(b) shall be effective as provided in such Section 10.01(b).

(d)      Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(e)      Documents required to be delivered pursuant to Section 5.04 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically (including as set forth in Section 10.17) and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents or provides a link thereto on the Borrowers' website on the Internet at the website address listed on Schedule 10.01 or (ii) on which such documents are posted on the Borrowers' behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that the Lead Borrower shall notify the Administrative Agent (by facsimile or e-mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; *provided*, *further*, that, upon reasonable request by the Administrative Agent, the Lead Borrower shall also provide a hard copy to the Administrative Agent of any such document; *provided*, *further*, that any documents posted for which a link is provided after normal business hours for the recipient shall be deemed to have been given at the opening of business on the next Business Day for such recipient.  The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above,

106

and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

SECTION 10.02    Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document will be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Term Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such Persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Term Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid.  Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.12, 2.14 and 10.05) shall survive the payment in full of the principal and interest hereunder and the termination of this Agreement.

SECTION 10.03    Binding Effect.  This Agreement shall become effective when it has been executed by Holdings, the Borrowers and the Administrative Agent and when the Administrative Agent has received copies thereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Borrowers, the other Loan Parties, each Agent, each Lender and their respective permitted successors and assigns.

SECTION 10.04    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrowers without such consent shall be null and void), and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 10.04) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or Claim under or by reason of this Agreement or the other Loan Documents.

(b)    Subject to the conditions set forth in paragraph (b)(ii) of this Section 10.04, any Lender may assign to one or more assignees (other than a natural person) (each, an "*Assignee*") all or a portion of its rights and obligations under this Agreement (including all or a portion of the Term Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, delayed or conditioned) of the (i) Lead Borrower; *provided* that no consent of the Lead Borrower shall be required for an assignment (A) in connection with the Initial Allocation, (B) to a Lender, an Affiliate of a Lender, an Approved Fund or (C) if an Event of Default under Section 8.01(b), 8.01(c) or 8.01(d) (solely with respect to the failure to comply with Section 5.04(n), 5.04(r), 6.14 or 6.15) (any such Event of Default, a "*Specified Event of Default*") shall have occurred and be continuing, any other Person; *provided*, *further*, that such consent shall be deemed to have been given if the Lead Borrower has not responded within five (5) Business Days after delivery of a written request therefor by the Administrative Agent, (ii) the Administrative Agent (*provided* that no consent of the Administrative Agent shall be required (x) for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund, (y) for an assignment pursuant to Section 2.19(b) or (z) in connection with the

Initial Allocation) and (iii) Lead Borrower, if an assignment is made to a Disqualified Institution in accordance with Section 10.04(h).

(i)     Assignments (other than any assignment pursuant to Section 2.19(b)), shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Term Loans, the amount of the Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million, unless each Borrower and the Administrative Agent otherwise consent; *provided* that (1) no such consent of the Borrowers shall be required if a Specified Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds (with simultaneous assignments to or by two or more Approved Funds being treated as one assignment for purposes of meeting the minimum assignment amount requirement), if any;

(B)     except in connection with the Initial Allocation, the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent and which fee has been waived in connection with the Initial Allocation);

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire, any tax forms required to be delivered pursuant to Section 2.14 and all documents requested by the Administrative Agent pursuant to anti-money laundering rules and regulations;

(D)     the assignor shall deliver to the Administrative Agent any Note issued to it with respect to the assigned Term Loan; and

(E)     the Assignee shall be or become a party to the RSA.

For the purposes of this Section 10.04, "*Approved Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(ii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall

108

cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.14 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such Assignment and Acceptance).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 10.04 to the extent such participation would be permitted by such Section 10.04(d).

(iii)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount (and stated interest with respect thereto) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender (solely with respect to such Lender's Term Loans) at any reasonable time and from time to time upon reasonable prior written notice.  The parties hereto acknowledge and agree that this Section 10.04 (including the Register and the Participant Register) shall be interpreted such that the Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code.

(iv)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), all applicable tax forms, any Note outstanding with respect to the assigned Term Loan, the processing and recordation fee referred to in paragraph (b)(ii)(B) of this Section 10.04 and any written consent to such assignment required by paragraph (b) of this Section 10.04, the Administrative Agent promptly shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows:

(i)     such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim;

(ii)     except as set forth in clause (a) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Holdings, the Borrowers or any Subsidiary or the performance or observance by Holdings, the Borrowers or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto;

(iii)      the Assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance;

(iv)      the Assignee confirms that it has received a copy of this Agreement, together with copies of the most recent Required Financial Statements delivered pursuant to Section 5.04, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance;

(v)      the Assignee will independently and without reliance upon the Administrative Agent or the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement;

(vi)      the Assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent by the terms of this Agreement, together with such powers as are reasonably incidental thereto; and

(vii)      the Assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)      (i) Any Lender may, without the consent of the Administrative Agent or, subject to Section 10.04(h), the Borrowers, sell participations to one or more banks or other entities (a "***Participant***") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Term Loans owing to it); *provided* that

(A)      such Lender's obligations under this Agreement shall remain unchanged;

(B)      such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and

(C)      the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents, to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents, and to exercise any right or remedy with respect to the Term Loans and any securities, notes, or other interests issued pursuant to this Agreement, and any Collateral; *provided* that (A) such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to Section 10.04(a)(i) or clauses (A), (B), (C), (D), (E) or (F) of the first proviso to Section 10.08(b) and (2) directly affects such Participant and (B) no other agreement with respect to amendment, modification or waiver may exist between such Lender and such Participant. Subject to clause (d)(ii) of this Section 10.04, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.14 to the same extent as if it

110

were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.04. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.06 as though it were a Lender; *provided* that such Participant shall be subject to Section 2.15(c) as though it were a Lender. Any Participant that seeks to receive the foregoing benefits under Sections 2.12, 2.13, 2.14 or 10.06 must act through the Lender that sold the participation to the Participant, and such Lender must comply with all other requirements for seeking such benefits, including complying with Section 9.01(e) of this Agreement. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Term Loans or other obligations under the Loan Documents (the "***Participant Register***"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.12, 2.13 or 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 2.14 to the extent such Participant fails to comply with Section 2.14(e) as though it were a Lender.

(e)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank and in the case of any Lender that is an Approved Fund, any pledge or assignment to any holders of obligations owed, or securities issued, by such Lender, including to any trustee for, or any other representative of, such holders, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(f)     The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (e) of this Section 10.04.

(g)     [Reserved].

(h)     Notwithstanding the foregoing, no assignment may be made or participation sold to (x) a Disqualified Institution without the prior written consent of the Lead Borrower; *provided* that, in connection with a participation, the Lenders shall have received a list of the Disqualified Institutions prior to the execution of such participation right or (y) any Defaulting Lender or any of

its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (h)(y).

(i)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Lead Borrower and the Administrative Agent, the applicable *pro rata* share of Term Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Term Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

SECTION 10.05     Expenses; Indemnity.

(a)     Subject to and in accordance with the terms of the DIP Financing Orders, the Borrowers agree to pay all reasonable, documented and invoiced out-of-pocket expenses incurred by the Administrative Agent and the Backstop Commitment Parties (including, without limitation, the fees and expenses of the Lender Advisors) and, with respect to enforcement of the Loan Documents, incurred by any Lender, in connection with (i) the preparation of this Agreement and the other Loan Documents (including as to post-closing matters), (ii) the preparation, execution and delivery, administration, amendment, modification, waiver or enforcement of this Agreement (including expenses incurred in connection with due diligence and initial and ongoing Collateral examination to the extent incurred with the reasonable prior approval of the Borrowers or provided for in this Agreement) or (iii) otherwise in connection with the Chapter 11 Cases, the monitoring and administration thereof, the negotiation and implementation of an Acceptable Plan and any other matter, motion or order bearing on the validity, priority and/or repayment of the Obligations in accordance with the terms hereof, including the reasonable, documented and invoiced fees, charges and disbursements of the Lender Advisors and a single counsel for the Administrative Agent, one firm of local counsel for the Administrative Agent in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) and, in the case of any actual or perceived conflict of interest, one additional firm of counsel for the Administrative Agent, the Backstop Commitment Parties and, in the case of enforcement of this Agreement, the Lenders.

(b)     Each Borrower agrees to indemnify the Administrative Agent, each Lender, each of their respective Affiliates and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling Persons, equityholders, partners, members and other representatives and each of their respective successors and permitted assigns (each such Person being called an "***Indemnitee***") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable, documented and invoiced out-of-pocket fees and expenses (limited to reasonable and documented legal fees of a single firm of counsel for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and a single firm of counsel for all other all Indemnitees, taken as a whole, and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for the Indemnitees related to the Administrative Agent (including the Administrative

Agent) and one firm of counsel in each appropriate jurisdiction (which may include a single special counsel acting in multiple jurisdictions) for all other Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, where the Indemnitee affected by such conflict informs the Lead Borrower of such conflict and thereafter retains its own counsel, of an additional counsel for each group of affected Indemnitees similarly situated, taken as a whole)), incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of:

(i)     the execution or delivery of this Agreement or any other Loan Document, the performance by the parties hereto and thereto of their respective obligations thereunder and the other transactions contemplated hereby;

(ii)     the use of the proceeds of the Term Loans;

(iii)     the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents; or

(iv)     any Claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by Holdings, the Borrowers or any of their Subsidiaries or Affiliates or creditors;

*provided* that no Indemnitee will be indemnified for any loss, Claim, damage, liability, cost or expense to the extent it (i) has been determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties or (B) a material breach of the obligations of such Indemnitee under the Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than (A) Claims against Administrative Agent or their Affiliates, in each case, in their capacity or in fulfilling their role as the agent or any other similar role under the Term Facility (excluding their role as a Lender) to the extent such Persons are otherwise entitled to receive indemnification under this paragraph (b) or (B) Claims arising out of any act or omission on the part of Holdings, the Borrowers or their Subsidiaries.

(c)     Subject to and without limiting the generality of the foregoing sentence, the Borrowers agree to indemnify each Indemnitee against, and hold each Indemnitee harmless from, any and all losses, Claims, damages, liabilities and related expenses, including reasonable, documented and invoiced fees, charges and disbursements of one firm of counsel for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and one firm of counsel for all other Indemnitees, taken as a whole, and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel in multiple jurisdictions) for the Indemnitees related to the Administrative Agent (including the Administrative Agent) and, if necessary, one firm of counsel in each appropriate jurisdiction (which may include a single special counsel in multiple jurisdictions) for all other Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, an additional counsel for each group of so conflicted Indemnitees similarly situated) and reasonable, documented and invoiced consultant fees, in each case, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of any Claim arising under Environmental Laws against the Borrowers or any of the Subsidiaries, or any actual or alleged presence, Release or threatened Release of Hazardous Materials at, under, on or from any property for which the Borrowers or any Subsidiaries would reasonably be expected to be held liable under Environmental Laws; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, Claims, damages, liabilities or related expenses are determined by a final, non-appealable judgment of a court of

competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or any of its Related Parties.

(d)     Any indemnification or payments required by the Loan Parties under this Section 10.05 shall not apply with respect to (i) Taxes other than (A) any Taxes that represent losses, Claims, damages, etc.  arising from any non-Tax claim and (B) expenses related to the enforcement of Section 2.14 or (ii) Taxes that are duplicative of any indemnification or payments required by the Loan Parties under Section 2.14.

(e)     To the fullest extent permitted by applicable law, Holdings and the Borrowers shall not assert, and hereby waive, any Claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Chapter 11 Cases, any Term Loan and the use of the proceeds thereof, and the other transactions contemplated hereby and thereby.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(f)     The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the repayment, satisfaction or discharge of all the other Obligations and the termination of this Agreement.  All amounts due under this Section 10.05 shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

SECTION 10.06     Right of Set-off.  Notwithstanding anything to the contrary in Section 362 of the Bankruptcy Code but subject to the DIP Financing Orders (including the Carve Out), if an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any payroll, trust, tax and petty cash accounts) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of Holdings or any Subsidiary Loan Party against any of and all the Obligations of Holdings or any Subsidiary Loan Party now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the Obligations may be unmatured.  Notwithstanding the foregoing, in the event that any Defaulting Lender shall exercise any such right of set-off, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.19 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  The rights of each Lender under this Section 10.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may be exercised only at the direction of the Administrative Agent or the Required Lenders.

SECTION 10.07     Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS) AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS

CONTEMPLATED HEREBY AND THEREBY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (EXCEPT FOR CONFLICTS OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION OR TO THE EXTENT GOVERNED OR SUPERSEDED BY THE BANKRUPTCY CODE).

SECTION 10.08      Waivers; Amendment.

(a)      No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 10.08, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on Holdings, the Borrower or any other Loan Party in any case shall entitle such Person to any other or further notice or demand in similar or other circumstances.

(b)      Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except:

(i)      [Reserved];

(ii)      in the case of this Agreement, pursuant to an agreement or agreements in writing (including via e-mail) entered into by Holdings, the Borrower and the Required Lenders; and

(iii)      in the case of any other Loan Document, pursuant to an agreement or agreements in writing (including via e-mail) entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders;

*provided*, *however*, that no such agreement shall:

(A)      except as provided in Section 2.19(b), decrease, forgive, waive or excuse the principal amount of, or any interest on, or extend the final maturity of, or decrease the rate of interest on, any Term Loan beyond the Maturity Date, without the prior written consent of each Lender directly affected thereby;

(B)      increase or extend the Commitment of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of covenants, Defaults or Events of Default shall not constitute an increase of the Commitments of any Lender);

(C)      except as provided in Section 2.19(b), increase, decrease, forgive, waive or excuse any Fees without the prior written consent of each Lender, and with respect to the Administrative Agent Fees, the Agents;

(D)　　except with respect to the extension of the Maturity Date pursuant to Section 2.18 of this Agreement, extend any date on which payment of principal or interest on any Term Loan or any Fee is due, without the prior written consent of each Lender adversely affected thereby;

(E)　　amend the provisions of Section 2.15(b) or (c) of this Agreement or any analogous provision of any other Loan Document, in a manner that would by its terms alter the *pro rata* sharing of payments required thereby, without the prior written consent of each Lender adversely affected thereby;

(F)　　amend or modify the provisions of this Section 10.08 or the definition of the term "Required Lenders" or "Supermajority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders or Supermajority Lenders, as applicable, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders or the Supermajority Lenders, as applicable, on substantially the same basis as the Term Loans are included on the Closing Date);

(G)　　release a material portion of the Collateral, unless pursuant to a transaction permitted by this Agreement, or release any of Holdings, the Borrower or any of the other Subsidiary Loan Parties from their respective Guarantees under the Collateral Agreement, unless, in the case of a Subsidiary Loan Party (other than the Borrower), all or substantially all the Equity Interests of such Subsidiary Loan Party is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender;

(H)　　contractually subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document (other than (i) to the holder of any Lien on such property that is permitted by Section 6.02(c) in accordance with Section 9.01(c)(iii) or (ii) pursuant to the terms of the DIP Financing Orders);

(I)　　amend, modify or waive any provision of Article IV without the prior written consent of the Supermajority Lenders (it being understood that amendments, waivers or modifications of covenants, Defaults or Events of Default shall not constitute an amendment, modification or waiver for purposes of determining whether any condition of Article IV has been satisfied unless separately approved by the Supermajority Lenders); or

(J)　　alter the Consenting Noteholders' adequate protection status or the priority of the Liens on the Collateral securing the Obligations hereunder, in each case, as set forth in the Interim DIP Financing Order on the Closing Date, without the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders.

*provided* that no such agreement shall amend, modify or otherwise affect (a) the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement, as applicable or (b) the Consenting Noteholders in a

116

disproportionality adverse manner relative to the other Lenders hereunder without the consent, not to be unreasonably withheld, conditioned or delayed, of the Majority Noteholders.  Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 10.08 and any consent by any Lender pursuant to this Section 10.08 shall bind any assignee of such Lender.

(c)     Without the consent of the Administrative Agent or any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove of any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected lender may be effected with the consent of the applicable Lenders other than the Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionality adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(e)     Notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document, and such amendment, modification or supplement shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

SECTION 10.09     Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "***Charges***"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate; *provided* that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.  In no event will the total interest received by any Lender exceed the amount which it could lawfully have received and any such excess amount received by any Lender will be applied to reduce the principal balance of the Term Loans or to other amounts (other than interest) payable hereunder to such Lender, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining will be paid to the Borrowers.

SECTION 10.10     Entire Agreement.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this

Agreement and remain in full force and effect. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 10.11    WAIVER OF JURY TRIAL.    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

SECTION 10.12    Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.13    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 10.03.  Delivery of an executed counterpart to this Agreement by facsimile or other electronic transmission (e.g., "*PDF*" or "*TIFF*") shall be as effective as delivery of a manually signed original.

SECTION 10.14    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.15    Jurisdiction; Consent to Service of Process.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court, and if the Bankruptcy Court does not have (or abstains from) jurisdiction, non-exclusive jurisdiction of any New York State court or federal court of the United State of America sitting in the borough of Manhattan in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof (collectively, "*New York Courts*") in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding shall be heard and determined in the Bankruptcy Court (or, as applicable, a New York Court). Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction, except that each of the Loan Parties agrees that (i) it will not bring any such

118

action or proceeding in any court other than the Bankruptcy Court, and (ii) in any such action or proceeding brought against any Loan Party in any other court, it will not assert any cross-claim, counterclaim or set-off, or seek any other affirmative relief, except to the extent that the failure to assert the same will preclude such Loan Party from asserting or seeking the same in the Bankruptcy Court.

(b)       Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 10.16       Confidentiality.  Each of the Lenders and each of the Agents agrees (and agrees to cause each of its Affiliates) to use all information provided to it by or on behalf of Holdings, the Borrowers or its Subsidiaries under the Loan Documents or otherwise in connection with the Chapter 11 Cases solely for the purposes of the transactions contemplated by this Agreement and the other Loan Documents and shall not publish, disclose or otherwise divulge such information, (other than information that:

(a)       has become generally available to the public other than as a result of a disclosure by such party;

(b)       has been independently developed by such Lender or the Administrative Agent without violating this Section 10.16; or

(c)       was available to such Lender or the Administrative Agent from a third party having, to such Person's knowledge, no obligations of confidentiality to Holdings, the Borrowers or any other Loan Party);

and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any Person that approves or administers the Term Loans on behalf of such Lender or any numbering, administration or settlement service providers (so long as each such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16), except:

(i)       to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, in which case such Person agrees, to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure;

(ii)       as part of normal reporting or review procedures to, or examinations by, Governmental Authorities or any bank accountants or bank regulatory authority exercising examination or regulatory authority, in which case (except with respect to any audit or examination conducted by any such bank accountant or bank regulatory authority) such Person agrees, to the extent practicable and not prohibited by applicable law, to inform you promptly thereof prior to disclosure;

          (iii)      to its parent companies, Affiliates, limited partner, investors, prospective investors or auditors (so long as each such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16);

          (iv)      in order to enforce its rights under any Loan Document in a legal proceeding; and

          (v)      to any pledgee or assignee under Section 10.04(e) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such Person shall have been instructed to keep the same confidential in accordance with this Section 10.16).

Notwithstanding the foregoing, (i) no such information shall be disclosed to a Disqualified Institution that constitutes a Disqualified Institution at the time of such disclosure without the Lead Borrower's prior written consent and (ii) any Agent or Lender may, at its own expense and in the ordinary course of its respective business, issue customary news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals, and other appropriate media (which may include use of logos of one or more of the Loan Parties) (collectively, "***Trade Announcements***"), until such time as the Loan Parties revoke such authorization granted in this clause (ii) in writing to such Agent or such Lender, as applicable.  Until such time such authorization has been revoked, such Agent or such Lender shall provide a draft reasonably in advance of any Trade Announcement to the Lead Borrower for review and comment prior to the publication thereof.  No Loan Party shall issue any Trade Announcement or disclose the name of any Lender except (A) disclosures required by applicable law, regulation, legal, judicial or administrative process, or the rules of the SEC or other governmental authority, including the Bankruptcy Court, (B) with the prior approval of such Agent (in respect of Trade Announcements) and such Lender, (C) to the Sponsors, and the Loan Parties' and the Sponsors' respective officers, directors, employees, legal counsel, accountants, financial advisors and representatives, (D) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis and (E) if such Trade Announcement or disclosure contains information that is publicly available (other than as a result of a breach of this section by the Loan Parties).

      SECTION 10.17      <u>Platform; Borrower Materials</u>.  Each Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials or information provided by or on behalf of the Borrowers hereunder (collectively, "***Borrower Materials***") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "***Platform***"), and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrowers or their securities) (each, a "***Public Lender***").  The Borrowers hereby agree that they will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that:

          (i)      all the Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "***PUBLIC***" shall appear prominently on the first page thereof;

          (ii)      by marking Borrower Materials "***PUBLIC***," the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as either publicly available information or not material information (although it may be sensitive and proprietary) with respect to the Borrowers or their securities for purposes of United States Federal and state securities laws;

(iii)    all Borrower Materials marked "***PUBLIC***" are permitted to be made available through a portion of the Platform designated "***Public Investor***;" and

(iv)    the Administrative Agent shall be entitled to treat the Borrower Materials that are not marked "***PUBLIC***" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC" unless the Borrowers notify the Administrative Agent that any such document contains MNPI: (1) the Loan Documents, (2) any notification of changes in the terms of the Term Loans, (3) any notification of the identity of Disqualified Institutions and (4) all information delivered pursuant to clauses (b) and (d) of Section 5.04.

SECTION 10.18     Release of Liens and Guarantees.  In the event that any Loan Party conveys, sells, leases, assigns, transfers or otherwise disposes of all or any portion of any of the Equity Interests or assets of any Loan Party (other than Equity Interests of the Lead Borrower) to a Person that is not (and is not required to become) a Loan Party in a transaction not prohibited by Section 6.05, any Liens created by any Loan Document in respect of such Equity Interests or assets shall be automatically released and the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrowers and at the Borrowers' expense in connection with the release of any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests of any Subsidiary Loan Party (other than the Lead Borrower) in a transaction permitted by Section 6.05 (including through merger, consolidation, amalgamation or otherwise) and as a result of which such Subsidiary Loan Party would cease to be a Subsidiary, such Subsidiary Loan Party's obligations under the Collateral Agreement shall be automatically terminated and the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrowers to terminate such Subsidiary Loan Party's obligations under the Collateral Agreement.  In addition, the Administrative Agent agrees to take such actions as are reasonably requested by Holdings or the Borrowers and at the Borrowers' expense to terminate the Liens and security interests created by the Loan Documents when all the Obligations (other than Obligations in respect of contingent indemnification and reimbursement obligations that are not yet due and payable and for which no Claim has been asserted) are paid in full.

SECTION 10.19     USA PATRIOT Act Notice.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.

SECTION 10.20     [Reserved].

SECTION 10.21     No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of Holdings and each Borrower acknowledges and agrees that:  (1) (a) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between Holdings and the Borrowers, on the one hand, and the Agents, on the other hand; (b) the Borrowers and Holdings have consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate; and (c) the Borrowers and Holdings are capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions

121

contemplated hereby and by the other Loan Documents; (2) (a) each Agent each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, Holdings or any other Person and (b) none of the Agents has any obligation to the Borrowers, Holdings or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (3) the Agents and their Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, Holdings and their respective Affiliates, and none of the Agents has any obligation to disclose any of such interests to the Borrowers, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each Borrower and Holdings hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.22    [Reserved].

SECTION 10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 10.24    Conflicts.  In the event of a conflict between, or inconsistency among, the Interim DIP Financing Order and the Final DIP Financing Order, on the one hand, and any Loan Document, on the other hand, the Interim DIP Financing Order or the Final DIP Financing Order, as the case may be, shall control.

SECTION 10.25    [No Liens on MYTheresa.  Notwithstanding anything to the contrary in this Agreement or the Loan Documents, the Collateral shall not include, and neither the Agents nor any Lender nor any Secured Party shall be granted nor have a Lien on or security interest in (pursuant to or based on this Agreement, the Loan Documents, the DIP Financing Orders, or the Term Loans, as applicable) with respect to: (1) any Claims, Causes of Action (as defined in the Interim DIP Financing Order), or litigation against NMG or the MYT Subsidiaries (or any direct or indirect parent company of such entities) arising from the MyTheresa Designation or the MyTheresa Distribution; (2) any funds, property, or value received on account of any such Claims, Causes of Action, or litigation; or (3) the Other Second Lien Collateral and

the Other Third Lien Collateral (in each case, as referred to in the Prepetition Term Loan Credit Agreement).][2]

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[2]      To conform to DIP Financing Orders.  Changes to order still under consideration.