UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
HENRY G. HOBBS, JR.
ACTING UNITED STATES TRUSTEE
REGION 7, SOUTHERN and WESTERN DISTRICTS OF TEXAS
HECTOR DURAN
TRIAL ATTORNEY
515 Rusk, Suite 3516
Houston, Texas  77002
Telephone: (713) 718-4650 x 241
Fax: (713) 718-4670

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. |
| | § | |
| NEIMAN MARCUS GROUP LTD, LLC, | § | 20-32519 (DRJ) |
| *et al.,* | § | (Chapter 11) |
| | § | Jointly Administered |
| DEBTORS[1] | § | |

## STATEMENT OF THE ACTING UNITED STATES TRUSTEE
## PURSUANT TO COURT ORDER REGARDING THE CONDUCT
## OF MARBLE RIDGE CAPITAL LP AND DAN KAMENSKY

TO THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996). The Debtors' service address is: One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

COMES NOW the Acting United States Trustee for Region 7 (the "United States Trustee"), by and through the undersigned counsel, who respectfully submits this statement in response to the Court's order of August 5, 2020 [Dkt. No. 1442] (the "Order"), and represents as follows:

## PRELIMINARY STATEMENT AND SUMMARY

This statement sets out the evidence gathered by the United States Trustee and his preliminary analysis pursuant to the Court's order directing a statement of position "regarding the conduct of Marble Ridge and Mr. Kamensky in this case." Dkt. No. 1442. Marble Ridge Capital LP ("Marble Ridge") was until recently one of the three co-chairs of the Official Committee of Unsecured Creditors (the "Committee") appointed in the jointly administered chapter 11 cases of the Neiman Marcus Group (the "Debtors"), and Dan Kamensky, the managing partner and principal of Marble Ridge, served as Marble Ridge's representative on the Committee. The Court's Order expressed concern over "alarming" allegations about the conduct of Marble Ridge and Mr. Kamensky and ordered the United States Trustee to review the allegations and file this statement within fourteen days of the Order. *Id.*

Based on the United States Trustee's time-limited investigation, on July 31, Marble Ridge, through Mr. Kamensky, breached its fiduciary duty of loyalty to the creditors it represented by coercing an outside investor to refrain from bidding against Marble Ridge on a key transaction that was considered integral to a successful plan of reorganization.[2]  Furthermore, Marble Ridge's initial explanation of its own actions to the Court and to the United States Trustee was, at best,

---

[2] Nevertheless, after initially refusing to bid, the outside investor ultimately made a competing offer for the assets once information about Marble Ridge's conduct became the subject of this investigation.

incomplete and misleading.  Based on these facts, further proceedings before the Court may be appropriate to permit the Court to hear from the witnesses and receive evidence concerning Marble Ridge and Mr. Kamensky and to consider what remedial measures, if any, are appropriate.[3]

## I.      SCOPE AND LIMITATIONS OF UNITED STATES TRUSTEE'S INVESTIGATION

Immediately following the August 5 Order, the United States Trustee prepared requests for documents and interviews to individuals who appeared to have knowledge relating to the allegations against Marble Ridge and Mr. Kamensky.[4]  The United States Trustee sent document requests to: (i) Richard Pachulski, counsel to the Committee; (ii) Michael Warner, co-counsel to the Committee; (iii) Moshin Meghji, financial advisor to the Committee; (iv) Eric Geller, of Jefferies Financial Group, Inc. ("Jefferies"); (v) Mr. Kamensky; (vi) Edward Weisfelner, counsel to Marble Ridge; and (vii) Chad J. Husnick and Anup Sathy, counsel to the Debtors.  These requests sought:

> documents and media of any kind pertaining to the potential purchase or conversion to cash of MYT Series B Preferred Shares held or to be held by the unsecured creditors of the debtors Neiman Marcus Group LTD LLC, et al. and/or any potential conflict of interest arising therefrom.

The United States Trustee directed the requests both to the individuals as well as to their respective companies and requested responses by August 10.  The United States Trustee also requested a

---

[3]   Because of the preliminary and non-adversarial nature of the United States Trustee's investigation, the United States Trustee does not comment on the availability or viability of any causes of action that might be asserted by particular parties in this case.

[4] The United States Trustee, in coordination with the Executive Office for United States Trustees, assembled a team to undertake this investigation that, in addition to the undersigned, included, among others, a former Assistant United States Attorney.

litigation hold on responsive documents. Although in many cases documents were not produced until after the August 10 deadline, the United States Trustee nevertheless received and reviewed approximately 3,200 pages of documents.

Between August 14 and August 17, the United States Trustee also conducted voluntary individual interviews via videoconference with Mr. Pachulski, Mr. Meghji, and Mr. Kamensky. In place of Mr. Geller, the United States Trustee interviewed a different Jefferies employee who requested that his name be kept anonymous in this report as a condition of his voluntary interview and cooperation. The United States Trustee agreed to this condition with respect to this statement only, and this individual will accordingly be referred to as "Jefferies Employee No. 1" or "JE1" in this statement. Mr. Weisfelner also made a presentation to the United States Trustee that sought to explain the background of Marble Ridge's involvement with the Debtors and these cases. Each interview lasted between ninety minutes and four hours. Except in the case of Mr. Weisfelner's presentation, a court reporter transcribed all interviews, and all witnesses were accompanied by counsel and agreed to be sworn.

This investigation was conducted on a fully voluntary basis, and the United States Trustee commends each of the persons or firms interviewed or providing documents for their cooperation. Because the United States Trustee's investigation was not ordered under Rule 2004, the United States Trustee did not have the power to compel testimony or production of documents. Although the understandable, but short, deadline for submission of this statement somewhat constrained the United States Trustee's work, this statement nevertheless renders sufficient evidence for the Court and the parties to determine appropriate next steps. Due to these time constraints, the United States

Trustee was unable to provide any of the parties with an opportunity to review or respond to this statement prior to its submission to the Court.[5]

## II.    STATEMENT OF FACTS

### A.  Pre-Petition Background

Marble Ridge is the holder of certain of Neiman Marcus's debt and characterizes itself as the largest single unsecured creditor of the Debtors as of the petition date.  Since 2018, Marble Ridge and the Debtors have been engaged in a protracted legal dispute involving the Debtors' interests in MyTheresa, an e-commerce retailer, which were transferred to the Debtors' (non-debtor) parent in 2018 as an equity distribution (the "MyTheresa Distribution").  This transaction, which Marble Ridge has characterized as a fraudulent transfer, was the subject of two state court actions filed before the petition date, one by Marble Ridge and another by an Indenture Trustee allegedly on Marble Ridge's behalf.

In 2019, Neiman Marcus entered into a recapitalization agreement that had the effect of resolving potential claims arising out of the MyTheresa Distribution with many of its creditors—though not with Marble Ridge, which declined to participate in the exchange.  Of significance here, those negotiations also created a "waterfall" that governed how the proceeds of MyTheresa would be distributed in the event of a sale or other monetization.  Under that waterfall, the first $450 million of any sale would go to certain secured lenders and to the holders of Series A preferred stock in the holding company for the MyTheresa assets, while the next $250 million would go to the holders of Series B preferred stock, which was initially distributed to a Neiman

---

[5] For the same reasons, the United States Trustee was unable to cite specifically to documents and transcripts in this statement.

Marcus affiliate (the "Series B Shares").  The Series B Shares were apparently designed to represent an indirect source of recovery for Neiman Marcus's owners in the event of a MyTheresa sale; they were also highly illiquid, because they would be payable only in the event of a sale or monetization and even then only if the amount realized was at least $450 million.

On April 28, Neiman Marcus appointed Marc Beilinson[6] and Scott Vogel as "disinterested managers" to its Board of Managers (the "Disinterested Managers").  The Disinterested Managers were charged with determining "whether a conflict exists with respect to any issue in connection with the Debtors' chapter 11 cases," as well as with investigating the MyTheresa Distribution.

## B.  Commencement of the Bankruptcy Case and the Appointment of the Committee.

On May 7, the Debtors filed voluntary petitions seeking relief under chapter 11 of the Bankruptcy Code.  That same day, the United States Trustee sent out a standard questionnaire to the Debtors' largest creditors in order to solicit interest in serving on the Committee.  Among other things, that questionnaire informed prospective committee members that they would be required to act as "fiduciaries who represent all unsecured creditors as a group."

On May 10, Marble Ridge, through its general counsel, submitted a completed questionnaire expressing its willingness to serve on the Committee.  In its cover email, Marble Ridge stated that:

> If appointed to the Committee, Marble Ridge would be represented by Dan Kamensky.  Mr. Kamensky has more than 20 years of bankruptcy and investing experience and fully understands the fiduciary responsibilities associated with membership on the Committee.  Mr. Kamensky is committed to devote the time and energy necessary to earnestly represent all unsecured creditors.

---

[6] Mr. Beilinson resigned his position in June after a health emergency.

6

On May 19, the United States Trustee appointed a nine-member Committee that included Marble Ridge.  Dkt. No. 455.  Marble Ridge would subsequently be elected as one of three co-chairs of the Committee, which retained the law firms of Pachulski, Stang, Ziehl & Jones and Cole Schotz P.C. as its counsel, and M-III Advisory Partners L.P. as its financial advisor.  Dkt. Nos. 1105, 1106, 1225.

**C.  The Examiner Motion and Motion to Terminate Exclusivity.**

The dispute over the MyTheresa Distribution would play a prominent role in many of the contested matters that would be brought before the Court in the first months of these cases.  On May 15, Marble Ridge filed the Expedited Motion to Appoint an Examiner, which sought appointment of an examiner under section 1104 of the Bankruptcy Code to investigate the MyTheresa Distribution (the "Examiner Motion").  Dkt. No. 424.  The Committee supported the Examiner Motion, but the Debtors, the Disinterested Managers, and certain groups of ad hoc lenders opposed it.  Following a hearing before the Court on May 29, Marble Ridge withdrew the Examiner Motion without prejudice.  Dkt. No. 664.

On June 21, the Committee filed a motion to terminate exclusivity, which sought permission to file a plan substantially identical to the proposed plan filed by the Debtors, except that it would eliminate certain releases and preserve causes of action relating to the MyTheresa Distribution.  Dkt. No. 1061.

Although the litigation positions of the Committee during the first months of the case were closely aligned with those of Marble Ridge, there is no evidence that this was because of any improper influence exercised by Marble Ridge on the other Committee members.  Rather, Mr. Pachulski, Committee counsel, characterized the Committee as "great to work with" until the Marble Ridge-Jefferies issues arose on July 31.  Mr. Pachulski noted that the Committee was

populated by a diverse group of experienced and highly sophisticated creditors in addition to Marble Ridge and characterized that diversity as a "good thing."

**D.  Marble Ridge Submits an Offer to Purchase Estate Litigation Claims**

On the morning of July 4, Mr. Kamensky told Mr. Pachulski that Marble Ridge would be willing to submit an offer to purchase the MyTheresa-related litigation claims from the Debtors' estate.  Mr. Kamensky raised this suggestion again on July 9, during a call between the Committee co-chairs, the Committee professionals, and Mr. Vogel.  Mr. Pachulski advised Mr. Kamensky that he thought the offer would be premature given the state of negotiations but informed the rest of the Committee of Mr. Kamensky's expression of interest at some point between July 11 and July 14.  Mr. Pachulski stated his belief that Mr. Kamensky's offer was designed either to obtain a fair settlement or to increase the chances of obtaining a plan with a settlement trust.  He said that Mr. Kamensky had "zero interest" in actually buying the litigation claims.

On July 24, Mr. Kamensky, on behalf of Marble Ridge, submitted an offer to Mr. Vogel for the purchase of the Debtors' MyTheresa-related litigation claims.  At a Committee meeting that same day, Mr. Pachulski, who was not informed in advance of Marble Ridge's offer, informed Mr. Kamensky that he had two options: he could either withdraw his offer and agree not to submit any other offer without prior Committee approval, or if he chose not to withdraw his offer, he would be recused from Committee discussions regarding a settlement.  Mr. Kamensky chose to withdraw his offer.  Neither the United States Trustee nor the Court was informed of Mr. Kamensky's initial expression of interest, his offer to purchase the claims, or the withdrawal of his offer until after the events of July 31.

**E.  Marble Ridge Proposes to Fund a Cash Out Option for the Series B Shares**

In late July, the parties made progress towards a global settlement of the MyTheresa disputes, which ultimately would be announced to the Court at the disclosure statement hearing of July 30.   Because it was probable that any settlement would likely involve the transfer of the Series B Shares that Neiman Marcus's parent had retained, Mr. Pachulski began to explore alternatives for a "cash out" option, under which creditors could exchange the illiquid Series B Shares for cash.  Mr. Pachulski believed that this was particularly important for the Debtors' trade creditors, who strongly prefer cash to securities, and he believed a cash out option would help pave the way for a consensual plan of reorganization.

On July 28, following discussions with Mr. Pachulski, Mr. Kamensky emailed the outline of a cash out proposal to the Committee's members and professionals.  The most salient feature of this rough proposal was that Marble Ridge would guarantee, or "backstop," the purchase of 60 million Series B Shares at twenty cents per share from other unsecured creditors wishing to sell. Other noteholder creditors would have the right to participate in the purchase of the 60 million shares in proportion to their pro rata share of the overall noteholder group of claims.  Marble Ridge would purchase the shares available to any noteholder that did not wish to participate.

At a meeting held on July 29, the Committee members voted to support the global settlement.   Mr. Pachulski excused Marble Ridge from the meeting, and the members discussed the outline of the cash out proposal.  While not affirmatively accepting Mr. Kamensky's proposal, the Committee agreed to continue negotiations with Marble Ridge.  These negotiations appear to have been somewhat time-sensitive, since any last-minute changes to the Disclosure Statement would need to be presented to the Court at a hearing set for August 3, in order to be included in the Disclosure Statement mailed to creditors.

**F.      Events of July 30 and 31**

*1.      The Jefferies Proposal*

Even as the Committee worked on the Marble Ridge proposal, the financial firm Jefferies was considering its own cash out offer.  Eric Geller is the senior analyst in the Jefferies Distressed and Special Situations section.   The Distressed and Special Situations section in Jefferies trades on its own behalf and for clients, one of whom is Marble Ridge.[7]  On the evening of July 30, Mr. Geller learned of the amended Neiman Marcus plan of reorganization providing for the distribution of the Series B Shares to unsecured creditors.  That same evening, another Jefferies client contacted Mr. Geller to express interest in purchasing the Series B Shares.  Mr. Geller then sent texts around 9:00 PM ET to JE1 and another Jefferies employee to discuss the possibility of making an offer to buy the Series B Shares.

JE1 saw these texts the next morning on July 31, and talked to Mr. Geller at approximately 8:00 AM ET.  At 8:10 AM ET, JE1 and Mr. Geller had a call with the Jefferies client.  The client expressed an interest in purchasing through Jefferies 70 million of the 140 million Series B Shares set to be distributed.  After the call with the Jefferies client, JE1 spoke with an additional client who indicated interest in purchasing 10 million Series B Shares.  At that point, JE1 believed there was more than enough interest for Jefferies to move forward with a proposal to buy Series B Shares.

Between 9:00 AM ET and 10:00 AM ET on July 31, Mr. Geller called Mr. Meghji, the Committee's financial advisor.  Mr. Geller informed Mr. Meghji that Jefferies was interested in

---

[7] Mr. Kamensky later informed the United States Trustee that Jefferies was Marble Ridge's ninth largest trading partner and that Marble Ridge had paid Jefferies approximately $200,000 in trading commissions during the first six months of 2020.

making a bid to purchase the 140 million Series B Shares set to be distributed to unsecured creditors as part of the amended plan of reorganization.  He informed Mr. Meghji that the firm was considering offering to buy the shares for a price in the range in "the thirties"—in other words, between thirty and forty cents per share.  Mr. Geller sent Mr. Meghji a follow up email at 10:22 AM ET confirming Jefferies's interest in submitting a firm bid to purchase the shares and its capacity to complete the transaction if the Committee chose to accept a bid from Jefferies.  Mr. Geller's email requested that Mr. Meghji keep Jefferies's bid confidential from any member of the Committee that was interested in making its own cash out offer for the Series B Shares.

After speaking with Mr. Geller, Mr. Meghji contacted Mr. Pachulski.  Mr. Meghji and Mr. Pachulski decided the next necessary step was to schedule a further call with Jefferies to gauge the firm's interest in the shares and the potential for a Jefferies bid to produce a higher return for unsecured creditors than the pending offer from Marble Ridge.  At 12:15 PM ET, Mr. Meghji and Mr. Pachulski spoke with Mr. Geller and JE1.  Mr. Pachulski explained that while Jefferies could make a bid for the 140 million shares as a block, some unsecured creditors wanted to keep their shares, so an offer that allowed creditors to opt in or out of the sale would be more likely to be successful.  Mr. Geller and JE1 had no issue proceeding along those lines and confirmed a price in the "thirties."  They also indicated that Jefferies was prepared to submit a proposal by the end of the day.

After the 12:15 PM ET call with the Committee professionals, JE1 began putting together a formal bid to buy Series B Shares from those unsecured creditors who wished to sell them.  He informed internal Jefferies legal counsel of the proposed offer, and Jefferies outside legal counsel was tasked to prepare documents for the bid.  JE1 discussed the Series B proposal with senior Jefferies management.

Mr. Pachulski and Mr. Meghji came away from the 12:15 PM ET conversation satisfied Jefferies was serious about making a cash out offer for the Series B Shares. They determined they would need to halt work on finalizing the Marble Ridge proposal to allow consideration of a proposal from Jefferies. They decided they needed to inform Mr. Kamensky of this development.

### 2.    *Mr. Kamensky Learns of the Jefferies's Proposal and Forces its Withdrawal*

At 3:15 PM ET, Mr. Pachulski and Mr. Meghji called Mr. Kamensky. They informed him that another possible bidder had come forward to discuss making a cash out offer on the Series B Shares. They informed him the possible price for this bid was in the range of $0.30 per share. When Mr. Kamensky asked them who the new potential purchaser was, they informed him that it was Jefferies. Mr. Pachulski stated that he did not recall Jefferies's request to keep its potential bid confidential, and it may be that this request was made only to Mr. Meghji. In any event, according to both Mr. Pachulski and Mr. Meghji, Mr. Kamensky received this news calmly, without apparent anger or surprise. Mr. Kamensky stated that he believed the Jefferies's expression of interest was not serious and that nothing would come of it; he stated that Jefferies was likely just fishing for information.

Despite Mr. Kamensky's calm demeanor during his 3:15 PM ET call with Mr. Pachulski and Mr. Meghji, Mr. Kamensky engaged in a frenzy of activity once it concluded. Immediately thereafter, Mr. Kamensky via Instant Bloomberg chat told Christopher Bauer, Head Trader at Marble Ridge, to check his text messages on his iPhone. At 3:20 PM ET, Mr. Bauer received a text message from Mr. Kamensky on his iPhone, which started the text message exchange set out below:

Fri. Jul 31 3:20 PM

Kamensky: Eric Geller from Jefferies called the UCC counsel and offered to buy the units at 30 cents, that is a monumental mistake.  I'm getting [JE1] now. he needs to talk me. let me know.  They are threatening to put a bid in.

Bauer: For nmg??

Kamensky: yes i just texted [JE1]

Bauer: Yikes what did we bid.  Those guys man I hope they were just ignorant to our interests

Consistent with the text exchange between Mr. Kamensky and Mr. Bauer, Mr. Kamensky began communicating with JE1 at 3:20 PM ET using Instant Bloomberg chat messages.  Mr. Kamensky told JE1 not to put in a proposal for the Series B Shares.  The message chain between Mr. Kamensky and JE1 starting at 3:20 PM ET and ending at 3:28 PM ET is set out in relevant part below:

(2020-07-31 03:20:13 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL) has invited [JE1] (JEFFERIES LLC)

Need you NOW


(2020-07-31 03:20:40 PM EDT)

[JE1] (JEFFERIES LLC)

Call me in 10min


(2020-07-31 03:20:52 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

Tell Geller to stand DOWN

13

(2020-07-31 03:20:55 PM EDT)

[JE1] (JEFFERIES LLC)

Im on an inernal call


(2020-07-31 03:20:55 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

And let's talk


(2020-07-31 03:20:59 PM EDT)

[JE1] (JEFFERIES LLC)

I can't get off of


(2020-07-31 03:21 :03 PM EDT)

[JE1]  (JEFFERIES LLC)

Lets speak in 10 min pls


(2020-07-31 03:21 :28 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

Do I need to reach out to Geller


(2020-07-31 03:28:30 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

DO NOT SEND IN A BID

Mr. Kamensky also contacted Mr. Geller at 3:23 PM ET by Instant Bloomberg and asked to speak right away:

(2020-07-31 03:23:55 PM EDT) DKAMENSKY2 (MARBLE RIDGE CAPITAL) has invited EGELLER9 (JEFFERIES LLC)

hat is your number? Need you now?

Mr. Kamensky later stated to the United States Trustee that his instant messages to Mr. Geller and JE1 were motivated by panic. He feared Jefferies's bid might jeopardize an agreement on a cash out proposal for the Series B Shares. Mr. Kamensky claimed that, in his call with Mr. Pachulski and Mr. Meghji, Mr. Pachulski had said words to the effect of "that would be a problem" in response to Mr. Kamensky saying Jefferies was not a serious bidder. Mr. Kamensky said he interpreted this to mean that Jefferies's potential bid might disrupt the process of including a cash out proposal in the Disclosure Statement and Plan by August 3, which he understood to be a firm deadline. He admitted that he did not further discuss this concern with Mr. Pachulski. Mr. Kamensky also conceded a fear that Jefferies's higher price for the shares, mentioned in his texts with Mr. Bauer, would hurt Marble Ridge's ability to profit from any Series B purchase. He nevertheless claimed that process concerns about endangering the agreement on a cash out provision were his primary motivation for contacting JE1 and Mr. Geller. Mr. Kamensky admitted that contacting and trying to influence a potential rival bidder for property of the bankruptcy estate was wholly inappropriate and a grave mistake. He stated he should have gone to Mr. Pachulski with his concerns about the effect of Jefferies on the cash out process and let Mr. Pachulski make any necessary inquiries.

Following Mr. Kamensky's chat messages, JE1 and Mr. Geller spoke with Mr. Kamensky on the phone at approximately 3:45 PM ET.  According to JE1, Mr. Kamensky was very upset and told them to stand down and not put in a bid.  JE1 responded that Jefferies was just engaging in its normal business of purchasing assets.  Mr. Kamensky told them that they did not understand how deep his interest was in the Series B Shares.  He said he had been pursuing this matter for several years and amassed $3.5 million in legal fees.  His efforts had made the MyTheresa settlement possible.  He said he was determined to acquire the shares, so all that Jefferies's bid would accomplish was driving up his final price and costing him money. He said that as co-chair of the Committee, he would prevent Jefferies from acquiring the shares.  Finally, Mr. Kamensky stated that he had been a good partner to JE1 and Jefferies, but if JE1 moved forward with the Series B bid, they would not be partners going forward.   JE1 understood this last statement as Mr. Kamensky using a possible termination of the business relationship between Marble Ridge and JE1's section of Jefferies to pressure JE1 to drop the bid.  JE1 ended the conversation with Mr. Kamensky by stating they would consider what to do and get back to him.

In his interview with the United States Trustee, Mr. Kamensky admitted that he made each of the coercive statements recounted by JE1, including the promise to use his position as Committee Co-Chair to prevent the Jefferies's bid from winning and the statement that Marble Ridge would end its business relationship with Jefferies if the bid went forward.  As Mr. Kamensky remembered it, Mr. Geller at the start of the call said Jefferies was just pursuing its normal business of pursuing bankruptcy assets and wanted to buy half the Series B shares.  According to Mr. Kamensky, this remark turned his panic into fury.  He said he perceived Jefferies to be shaking him down for half the available assets by barging into a situation they knew nothing about at a sensitive time.  Mr. Kamensky said he began to shout, curse, and demand that Jefferies stand down

16

on any bid, while making the coercive statements recounted by JE1.  Mr. Kamensky admitted to the United States Trustee that these statements were entirely inappropriate.

According to Mr. Kamensky, JE1 then asked him why he was so angry.  Mr. Kamensky said this led him to regain his composure, and the latter half of the call purportedly involved a calmer discussion of Mr. Kamensky's long history with Neiman Marcus and the complications involved with the Series B Shares.[8]  Mr. Kamensky stated to the United States Trustee that he believed at the end of the call JE1 and Mr. Geller would consider Jefferies's next steps in light of the information he provided in the "calm" latter half of the call, not the coercive statements he made in the "angry" first half of the call.  Mr. Kamensky claimed that the intended message of the "calm" half of the call was that Jefferies should bid if it was a serious bidder but that it should back off if it was not serious to avoid disruption to the bankruptcy process.  He admitted, however, that he never actually said to JE1 and Mr. Geller that Jefferies should bid if it was serious or refrain from bidding if it was not.

JE1 and Mr. Geller had no perception that any portion of their call with Mr. Kamensky had superseded his demands that Jefferies pull its bid or face the consequences.  JE1 specifically denied Mr. Kamensky ever gave them any indication that all he wanted was for Jefferies to bid if it was serious.  JE1 and Mr. Geller perceived a clear and singular message: Jefferies should withdraw its bid or Mr. Kamensky would exact consequences by terminating their relationship.

Immediately after the call, JE1 spoke with Mr. Geller about his discomfort with what had just happened.  JE1 believed that Mr. Kamensky's actions were outside the bounds of normal

---

[8] Because Mr. Kamensky was interviewed after JE1, the United States Trustee was unable to ask JE1 about the "calmer" portion of the conversation recounted by Mr. Kamensky.

17

trading behavior.  He also believed that Mr. Kamensky was abusing his position as a fiduciary in the bankruptcy case.  Furthermore, Mr. Kamensky's demand that Jefferies not bid might involve JE1 and Jefferies in unethical and even illegal conduct.  At the same time, JE1 was concerned about his business relationship with Mr. Kamensky and Marble Ridge.  JE1 decided to speak with Jefferies general counsel, Mike Sharp, about the situation and called him at approximately 3:55 PM ET.

JE1's discussion with Jefferies general counsel resulted in a two-part decision: (1) Jefferies would withdraw from making any bid to purchase the Series B Shares;  (2) JE1 and Jefferies would be completely transparent with all interested parties about why it was withdrawing.  JE1 and Mr. Geller called Mr. Kamensky at approximately 4:07 PM ET.  JE1 explained that Mr. Kamensky was an important relationship, and Jefferies would withdraw from making any bid for the Series B Shares.   Jefferies, however, would also be transparent about why it was withdrawing. Specifically, Jefferies would be transparent about its reason for withdrawing with both its client who sought to purchase the shares and with the advisors for the Committee.  Mr. Kamensky responded by thanking JE1 and Mr. Geller and saying he would always be grateful to them.  After the call, Mr. Geller remarked to JE1 that Mr. Kamensky appeared not to hear or understand JE1's statement that they would be transparent about their reasons for withdrawing.  Mr. Kamensky later confirmed to the United States Trustee that he did not hear the statement about being transparent on what led them to withdraw.

At 4:08 PM ET, during or immediately after his call with JE1 and Mr. Geller about the withdrawal, Mr. Kamensky contacted Mr. Bauer by Instant Bloomberg chat to share the news:

(2020-07-31 04:08:10 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

They are standing down

(2020-07-31 04:08:13 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

See me

(2020-07-31 04:08:15 PM EDT)

CCBAUER13 (MARBLE RIDGE CAPITAL)

Yeah

(2020-07-31 04:08:19 PM EDT)

CCBAUER13 (MARBLE RIDGE CAPITAL)

Thank goodness

(2020-07-31 04:08:22 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

He took the high roadf

(2020-07-31 04:08:28 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

Thank gd

(2020-07-31 04:08:52 PM EDT)

CCBAUER13 (MARBLE RIDGE CAPITAL)

He got the call from H

(2020-07-31 04:08:56 PM EDT)

CCBAUER13 (MARBLE RIDGE CAPITAL)

"stand down!!"

Shortly after their 4:07 PM ET call with Mr. Kamensky, JE1 and Mr. Geller contacted their original client for the purchase of the Series B Shares and told him they were withdrawing from making a bid. They explained they were withdrawing because of pressure from another client. JE1 and Mr. Geller then tried to contact Mr. Pachulski and Mr. Meghji. After an initial attempt to reach them by phone, Mr. Geller sent an email at 4:13 PM ET to Mr. Pachulski and Mr. Meghji requesting they call him back.

### 3.   *The Committee Learns of Mr. Kamensky's Actions*

Mr. Pachulski alone eventually talked with JE1 and Mr. Geller at approximately 5:00 PM ET. After Mr. Geller explained that Jefferies was withdrawing from making a bid, Mr. Pachulski asked why. Mr. Geller explained that Jefferies was withdrawing because a significant client had asked it to do so. Mr. Pachulski asked if that client was a member of the Committee. Mr. Geller said yes. Mr. Pachulski asked if the client was Mr. Kamensky. Mr. Geller said yes. According to JE1, Mr. Pachulski responded by saying, "I've got a big problem." After the call concluded, Mr. Pachulski informed Mr. Meghji of Jefferies's withdrawal and its stated reason for doing so. Mr. Pachulski set a 6:00 PM ET conference call for Committee professionals to decide on the necessary steps in reaction to Mr. Kamensky's reported actions. In the meantime, Mr. Meghji conducted his

own follow up call with Mr. Geller, who confirmed the basic account he had provided Mr. Pachulski about Jefferies's withdrawal.

At the 6:00 PM ET conference call, the Committee professionals decided as a first step to reach out to Mr. Weisfelner, counsel for Marble Ridge, to determine if Jefferies's report about Mr. Kamensky's conduct was accurate.  At approximately 7:00 PM ET, Mr. Pachulski and several other Committee professionals spoke to Mr. Weisfelner.  Mr. Weisfelner responded that he knew nothing about the allegations and would call them back after contacting Mr. Kamensky. Mr. Kamensky confirmed to the United States Trustee that Mr. Weisfelner called him at this time and informed him that Jefferies had reported to Committee counsel that it was withdrawing from bidding after pressure from Mr. Kamensky.  Mr. Weisfelner spoke again with Mr. Pachulski and other Committee professionals at approximately 7:30 PM ET.  After speaking with Mr. Kamensky, he reported that Mr. Kamensky did contact Jefferies about its potential bid, but there was a misunderstanding about his intention in doing so.  According to Mr. Weisfelner, Mr. Kamensky had told Jefferies to bid if it was serious.   If it was not serious, it should back off to avoid disruption to the Neiman Marcus bankruptcy.  Mr. Pachulski ended the call by stating that he would need to schedule an emergency meeting of the Committee without Marble Ridge or its attorneys to consider the Committee's next steps.

Meanwhile, Mr. Kamensky was trying to contact JE1.  At 7:42 PM ET, he sent an Instant Bloomberg chat message to JE1 asking "Are you there?"  JE1 got the messages and reported being available at 8:08 PM ET.  Mr. Kamensky and JE1 soon thereafter began a phone conversation. According to JE1, Mr. Kamensky began the call by saying, "this conversation never happened." Disturbed by this opening, JE1 began to record the phone call.  Through counsel, JE1 later voluntarily provided a copy of the recorded call, an initial rough transcript, and then a final

21

transcript to the United States Trustee.  In the recorded portion of the call, Mr. Kamensky asked

why JEI had told Committee counsel that Mr. Kamensky had threatened JE1 and asked if JE1

knew this could cause Mr. Kamensky to go to jail.  JE1 responded that he had planned to bid, then

Mr. Kamensky demanded Jefferies stand down to preserve their business relationship:

> Hold on. Hold on a second, Dan. Listen to me. And then you call me and
> you say, do not bid. It's going to be a relationship issue, and so I said okay. Dan's a
> good relationship. What he's asking me to do makes me a little bit uncomfortable.

Mr. Kamensky reiterated that he could go to jail and urged JE1 to agree that Mr. Kamensky asking

Jefferies to stand down was just a large misunderstanding.

Mr. Kamensky also urged JE1 to now take part in the bidding process for the Series B

Shares.  JE1 denied any further interest in having anything to do with the matter.  Mr. Kamensky

responded:

> It's too late now. They're going to report this to the U.S. Attorney's Office, okay?
> They're reporting this to the U.S. Attorney's Office.  This is -- this is -- it's, not like,
> not like you can't bid. The U.S. Attorney is going to investigate this. My position
> to them is this. I said to them, this a huge misunderstanding, okay, humongous
> misunderstanding and I told them -- the only thing I said was if you're not real don't
> bid and if they're real then they should bid. Because otherwise the U.S. Attorney is
> investigating this then, okay? They're going to report it, okay, and my position is -
> - is -- going to be look, this is was a huge misunderstanding. I never in a million
> years would have told them not to do that. I – all I told them was if they're not real
> they shouldn't bid.[9]

JE1 later explained to the United States Trustee that Mr. Kamensky was trying to get JE1 to agree

to his account of their phone conversation earlier that day.   In fact, there had been no

misunderstanding between them.  Mr. Kamensky had made no inquiry whether Jefferies was

---

[9] Quotations of the phone call are based on the transcript provided by JE1's counsel.  The transcript
matches the audio recording also provided by JE1's counsel.

"real," i.e. a serious bidder, and had certainly not said it should bid if Jefferies was "real."  Mr. Kamensky had just demanded that Jefferies pull its bid.

In the call, JE1 again pushed back against the plausibility of Mr. Kamensky's explanation, reminding him that Mr. Geller had been on the call as well and heard what Mr. Kamensky actually said.  He urged Mr. Kamensky to just recuse himself from the whole matter.  Mr. Kamensky again responded with a plea for JE1 to adopt his version of their earlier conversations, stressing the dire consequences for Mr. Kamensky if JE1 did not.  Mr. Kamensky also admitted to abusing his position as a member of the Neiman Marcus Committee:

> . . . [I]f you're going to continue to tell them what you just told me, I'm going to jail, okay? Because they're going to say that I abused my position as a fiduciary, which I probably did, right? Maybe I should go to jail. But I'm asking you not to put me in jail.

JE1 responded that there was no possibility of lying for Mr. Kamensky.  Mr. Kamensky denied wanting JE1 to lie but kept urging JE1 to adopt his version of their earlier conversations.

JE1 again reiterated that Mr. Kamensky had pressured him to withdraw the bid to preserve their business relationship:

> I thought you were very upset about it, okay, and I thought that you -- I thought you were basically pushing me very hard to not put a bid and I thought about it and frankly it's not even worth it. It's not even important enough for me. So that's why because of my relationship with you I said okay. I don't want anything to do with this.

Mr. Kamensky then pleaded with JE1 to agree that Mr. Kamensky said something he purportedly intended to say but never actually did—that Jefferies should bid if it was serious.  He implied that adopting this position was necessary to preserve their relationship:

> I apologize. I apologize. I apologize, okay, and I'm telling you that what I intended to say, okay, is if you're not real don't bid but if you're real then you should bid, and, [JE1], for the relationship I would tell you that's exactly what I said and I apologize if I was upset or if it appeared as a threat.

He also repeated what he had set at the start of the call, "this conversation never happened," referring to his efforts to influence JE1 but not have anyone know about these efforts.

> But I'm telling you that is exactly what I intended to say and I'm just begging you to please appreciate that's what I meant to say and that this conversation never happened.

The United States Trustee questioned Mr. Kamensky concerning the above call recorded by JE1.  Mr. Kamensky freely admitted he had made the call and said it was a serious mistake, one of the worst of his life.  The United States Trustee played the audio recording of the call, and Mr. Kamensky verified it accurately captured his call with JE1.  He stated he made the call out of fear and panic of the possible consequences of Jefferies's report to the Committee that he had pressured them to withdraw from bidding.  He denied wanting JE1 to lie but said he was trying to "manage the message" by talking with him.  His hope was that he and JE1 could find "common ground" around Mr. Kamensky's notion that the "calm" second half of their earlier call was meant to communicate that Jefferies should bid if it was serious, even though he never actually said that to JE1 and Mr. Geller during their first call that day.  Mr. Kamensky admitted that his repeated statement that "this conversation never happened" was a recognition that attempting to influence JE1 might be considered improper.  When questioned by the United States Trustee, Mr. Kamensky had no explanation for his use of the phrase "for the relationship" in his statement: "I'm telling you that what I intended to say, okay, is if you're not real don't bid but if you're real then you should bid, and, [JE1], for the relationship I would tell you that's exactly what I said."

## G.      Marble Ridge Resigns from the Committee on August 1

At 8:31 AM ET on August 1, in advance of an emergency Committee meeting set for 2:00 PM ET, Mr. Weisfelner emailed Committee counsel on behalf of Mr. Kamensky and Marble Ridge.  He again advanced the "misunderstanding" explanation of Mr. Kamensky's conduct from

24

the day before, asserting that Mr. Kamensky had only contacted Jefferies to make sure it was truly committed to bidding, not to discourage a bid. Mr. Weisfelner, on Mr. Kamensky's behalf, asked the Committee professionals to assure Jefferies that it was strongly encouraged to submit a bid. Mr. Weisfelner mentioned Mr. Kamensky's continuing work on Marble Ridge's own cash out proposal. Finally, even though he believed Mr. Kamensky's conduct had been grossly misconstrued, Mr. Weisfelner stated that Marble Ridge would be resigning from the Committee as a way to resolve the issue in the best interests of all concerned.

At 1:15 PM ET, Mr. Weisfelner wrote to the United States Trustee to offer Marble Ridge's resignation from the Committee. In discussing the reasons for the resignation, Mr. Weisfelner provided the United States Trustee the substantially same "misunderstanding" explanation of Mr. Kamensky's July 31 conduct that he had provided to the Committee.

At the 2:00 PM ET emergency Committee meeting, given Marble Ridge's resignation, the Committee decided that counsel should promptly disclose Mr. Kamensky's conduct to the United States Trustee. Later that afternoon, Mr. Pachulski and Mr. Warner spoke by phone to Hector Duran, an attorney for the United States Trustee, and explained what they knew of the situation involving Mr. Kamensky and Marble Ridge. They advised Mr. Duran that they would provide him what they knew in writing and that the Committee would also disclose the situation to the Court.

## H.  Jefferies Renews Its Bid

Also on August 1, Jefferies decided to resume pursuit of its proposal to purchase Series B Shares. JE1 later explained to the United States Trustee that, given the turmoil following Jefferies's withdrawal, the business reasons behind the withdrawal no longer held. JE1 stressed that Jefferies's resumption of its proposal was not in response to Mr. Kamensky's request during

their phone call the prior evening that Jefferies bid in aid of his cover story.   Instead, the renewed bid was motivated by Jefferies's own financial interest in a profitable transaction.   During the morning of August 1, Mr. Geller and JE1 contacted Mr. Pachulski to inquire if the Committee would still be interested in a Jefferies cash out proposal for the Series B Shares.   Mr. Pachulski said the Committee would be interested in a Jefferies proposal.   He also asked Mr. Geller to reaffirm his explanation that Jefferies withdrew the day before in response to pressure from Mr. Kamensky.   Mr. Geller did so.   Mr. Pachulski asked if Mr. Kamensky had requested that Jefferies resume its bid.   Mr. Geller responded that at the advice of counsel Jefferies could not provide any additional explanation beyond what it had already provided.

Committee counsel subsequently spoke with Mr. Sharp, Jefferies general counsel, who reported that Mr. Kamensky had phoned a Jefferies employee the evening of July 31, and "seemed concerned."   This was apparently a reference to Mr. Kamensky's call with JE1 at approximately 8:08 PM ET.   Mr. Sharp did not provide any other details.   At the 2:00 PM ET Committee meeting that day, the Committee agreed to consider any renewed Jefferies cash out proposal.

## I.   The Court Orders the United States Trustee to Investigate Marble Ridge and Mr. Kamensky

On August 3, the Committee filed under seal an August 2 letter by Mr. Pachulski to United States Trustee attorney Hector Duran, laying out the facts about Mr. Kamensky and the Jefferies cash out proposal as the Committee understood them.   Dkt. No. 1427.   The Committee did not offer any conclusions as to Mr. Kamensky's conduct, but its narrative is consistent with the facts the United States Trustee has been able to establish during its subsequent investigation.

On August 4, Mr. Weisfelner, counsel to Marble Ridge Capital, filed under seal a declaration in his own name that provided an account of Mr. Kamensky's conduct ("Weisfelner

Declaration").  Dkt. No. 1432.  Once again, Mr. Weisfelner advanced the "misunderstanding" explanation of Mr. Kamensky's actions.  As discussed below, the Weisfelner Declaration in several material respects is not consistent with the facts that the United States Trustee has established during the subsequent investigation.

In response to these filings, the Court on August 5, ordered both the Committee's letter and the Weisfelner Declaration unsealed.  The Court then required the United States Trustee "to file a statement of position within 14 days regarding the conduct of Marble Ridge and Mr. Kamensky in this case."  The United States Trustee began work immediately.

**J.  The Committee is Currently Considering Cash Out Proposals from Marble Ridge and Jefferies**

In the meantime, both Jefferies and Marble Ridge submitted cash out proposals to the Committee.  Jefferies submitted a Letter of Intent to the Committee on August 2.  Marble Ridge provided a letter proposal on August 3, and then a revised proposal on August 11.  Although the proposals are complex, each offers a higher price per share than the twenty cents of Marble Ridge's original proposal.  The United States Trustee understands that the Committee has not made a decision on any cash out proposal, and the Marble Ridge and Jefferies offers remain pending.

### III.    LEGAL ANALYSIS

When a creditor accepts appointment to an official creditors' committee in a chapter 11 case, it agrees to assume certain fiduciary duties to other creditors.  *See Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3rd Cir. 2001) (noting that section 1103 of the Bankruptcy Code "impl[ies] a fiduciary duty on the part of members of a creditor's Committee").  Those duties include a duty of loyalty, a duty of care, and a duty of disclosure.  *See In re Farrell*, 610 B.R. 317, 323 (Bankr. C.D. Cal. 2019).   A committee member owes its duties to the

represented creditors collectively, rather than to particular creditors individually.  *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D. N.Y. 1992).

Committee members differ from most other bankruptcy fiduciaries, however, in one important respect: committee members are not required to be disinterested, *see* 11 U.S.C. § 1102, and it is common for committee members to have individual economic interests that may be opposed to the debtor or to other creditors.  *See In re Rickel & Assocs., Inc.,* 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (committee members are "hybrids who serve more than one master").  For this reason, a conflict of interest does not automatically prevent a creditor from serving on a committee—provided, however, that the creditor is otherwise able to exercise its fiduciary duties and provide adequate representation for the creditor body.  *See In re First RepublicBank Corp.*, 95 B.R. 58, 61 (Bankr. N.D. Tex. 1988).  In other words, committee members are not expected to abandon their personal interests, and are not prohibited from taking positions or actions that are adverse to other creditors or the estate outside the committee, so long as they do not take "unfair advantage" of their committee membership in order to do so.  *In re El Paso Refinery, L.P.,* 196 B.R. 58, 75 (Bankr. W.D. Tex. 1996).

The United States Trustee has the statutory duty to monitor creditors' committees, is responsible for soliciting and appointing members to committees, and may reconstitute or remove members from committees if necessary.  28 U.S.C. § 586(a)(3)(E), 11 U.S.C. § 1102(a).  In the United States Trustee's experience, the solicitation and appointment process itself can often forestall or mitigate many threats to the integrity of committees.  Potential committee members are advised of their fiduciary duties in advance of their appointment, and potential members will be questioned extensively about any positions, interests, or status that may affect their behavior as fiduciaries before being appointed.  Potential committee members are also advised of their

28

obligation to notify the United States Trustee of any changed circumstances that arise during the case that may affect their ability to serve.  If there is doubt about a creditor's willingness or ability to act as a fiduciary, that creditor will typically not be appointed, and a creditor who violates these duties or becomes unable to perform those duties after appointment may be removed.  *See In re America West Airlines,* 142 B.R. 901, 902 (Bankr. D. Ariz. 1992) (upholding United States Trustee's removal of creditor from committee).

## IV.    CONCLUSIONS

Although some details and interpretations remain in dispute, the substantial evidence collected to date clearly demonstrates that Mr. Kamensky breached his fiduciary duty to unsecured creditors on July 31, and his earlier conduct between July 4 and July 30 was problematic.  After being told both of the existence of a rival bid and the identity of the bidder, Mr. Kamensky sought to exploit that information for his own benefit by contacting Jefferies and pressuring them to withdraw their initial bid, to the likely detriment of all other creditors.[10]   In the course of those conversations with JE1, Mr. Kamensky improperly suggested to JE1 that he could prevent a successful Jefferies bid because of his role as Committee co-chair.  Regardless of whether Mr. Kamensky actually had the power to ensure that the Committee rejected any Jefferies bid, this type of coercion by a Committee fiduciary is highly inappropriate.  Moreover, Marble Ridge's initial representations regarding the conversations between Mr. Kamensky and Jefferies, which

---

[10] Marble Ridge's actions might have been prevented had the Court and the United States Trustee been notified that Marble Ridge intended to engage in a self-interested transaction as early as July 4. Wider awareness of Marble Ridge's intentions might have called into question its ability to continue serving on the Committee or at least led to more stringent procedures to avoid a breach of fiduciary duty.

minimized Mr. Kamensky's role in Jefferies's withdrawal of its initial offer and which suggested

that Mr. Kamensky was surprised by that result, are inconsistent with the evidence regarding those

same conversations, including Mr. Kamensky's own later testimony.  His actions were a clear

abuse of his Committee position and a breach of his duty.

As a number of courts have held—and, indeed, as Mr. Kamensky himself appears to have

admitted in his conversation with JE1—his actions of July 31 are paradigmatic examples of a

breach of a committee member's duties.  *See Rickel,* 272 B.R. at 100 (committee member breaches

its duty by using its position to monopolize negotiations, effectively freezing out other bidders, or

by exploiting confidential information known only to it through its committee service in order to

seize an advantage); *In re Refco Inc.,* 336 B.R. 187, 198 n.13 (Bankr. S.D.N.Y. 2006) ("a

Committee member's fiduciary duties do not preclude it from representing its own interests,

provided that in so doing it does not abuse its position on the Committee at the expense of the

creditor class").  *See also In re Russo*, 762 F.2d 239, 243 (2d Cir. 1985) (directing bankruptcy

court to consider whether asset sale was tainted due to former fiduciary's misuse of confidential

information).

As this Court observed in its August 5 Order, effective committees are critical to a robust

chapter 11 process, and any threats to their integrity and function must be resolved promptly and

publicly:

> A creditors' committee in a large commercial case serves an especially important
> role in the bankruptcy process. A properly functioning committee adds
> transparency and public confidence to a complicated and often confusing process.
> The Court relies on a committee's views to add depth and balance to the myriad of
> commercial issues that it considers.  Any threat that endangers this delicate balance
> must be resolved promptly and in a public manner.

Order, Dkt. No. 1442.

Although the issues discussed and conclusions drawn in this statement are supported by substantial evidence, this investigation was preliminary, and no party has had an opportunity to respond to or rebut the United States Trustee's statement. In the Court's order of August 5, the Court cited possible remedial actions, including the creditors' remedy of subordination of claims under 11 U.S.C. § 510(c).[11] To the extent the Court believes that further relief may be appropriate under these or any other provisions, such relief should be considered in a formal proceeding in open court so that the Court may hear and consider all relevant evidence.

Dated: August 19, 2020                           Respectfully Submitted,

                                                 HENRY G. HOBBS, JR.
                                                 ACTING UNITED STATES TRUSTEE
                                                 REGION 7, SOUTHERN and WESTERN
                                                 DISTRICTS OF TEXAS

                                                 By: /s/ Hector Duran
                                                 Hector Duran
                                                 Trial Attorney
                                                 Texas Bar No. 00783996
                                                 515 Rusk, Suite 3516
                                                 Houston, TX 77002
                                                 Telephone: (713) 718-4650 x 241
                                                 Fax: (713) 718-4670

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means on all PACER participants on this 19th day of August 2020.

                                                 /s/ Hector Duran
                                                 Hector Duran, Trial Attorney

---

[11] The Court also cited 18 U.S.C. § 152(6), and consistent with long-standing practice, the United States Trustee does not opine publicly about possible implications of title 18 in this statement.