**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>NEIMAN MARCUS GROUP LTD LLC, *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-32519 (DRJ)<br><br>(Jointly Administered) |
| MARIPOSA INTERMEDIATE HOLDINGS LLC, NEIMAN MARCUS GROUP LTD LLC, and THE NEIMAN MARCUS GROUP LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MARBLE RIDGE CAPITAL LP and MARBLE RIDGE MASTER FUND LP,<br><br>Defendants. | Adv. Proc. No. 20-_____ |

**COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Neiman Marcus Group LTD LLC (9435); Bergdorf Goodman, Inc. (5530); Bergdorf Graphics, Inc. (9271); BG Productions, Inc. (3650); Mariposa Borrower, Inc. (9015); Mariposa Intermediate Holdings, LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes Propco LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan Propco LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); The Neiman Marcus Group LLC (9509); The NMG Subsidiary LLC (6074); and Worth Avenue Leasing Company (5996).  The location of the Debtors' service address is One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

For their Complaint against Marble Ridge Capital LP and Marble Ridge Master Fund LP (collectively "Marble Ridge"), plaintiffs Mariposa Intermediate Holdings LLC, Neiman Marcus Group LTD LLC, and The Neiman Marcus Group LLC (collectively, "Plaintiffs") respectfully state as follows:

**Parties and Jurisdiction**

1.      Plaintiff Mariposa Intermediate Holdings LLC ("Mariposa Holdings") is a Delaware limited liability company with its principal place of business in California.

2.      Plaintiff Neiman Marcus Group LTD LLC ("NMG LTD LLC") is a Delaware limited liability company with its principal place of business in Texas.

3.      Plaintiff The Neiman Marcus Group LLC ("NMG LLC") is a Delaware limited liability company with its principal place of business in Texas.

4.      On information and belief, Defendant Marble Ridge Capital LP ("MRC") is a Delaware limited partnership with its principal place of business in New York.

5.      On information and belief, Defendant Marble Ridge Master Fund LP ("Master Fund") is a Cayman Islands limited partnership with its principal place of business in New York. Marble Ridge is the largest holder of the Debtors' unsecured notes.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Relief is sought pursuant to sections 105, 510(c), and 1107 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 7007(1), 7001(7), 7001(8), 7007, and 7065, and the Court's inherent authority.

2

## Brief Statement And Nature Of Relief Requested

7.      In late July 2020, Marble Ridge, while co-chair of the Plaintiffs' Official Committee of Unsecured Creditors (the "Committee"), violated its fiduciary duties, acted in bad faith and abused the bankruptcy process by coercing a third-party bidder not to submit a bid to fund a cash-out option for unsecured creditors that would have benefitted Plaintiffs and their stakeholders but limited Marble Ridge's profits on a competing proposal.  Marble Ridge attempted to cover-up its illegal activities by pressuring the competing bidder to change its story and misleading the Committee, the United States Trustee, the Debtors, the Court, and the public about its actions.  This is simply the latest chapter in a two-year campaign that Marble Ridge has waged to harm the Debtors and their stakeholders.  Plaintiffs seek damages and sanctions sufficient to compensate the Debtors and their estates for the harm caused by Marble Ridge's breach of fiduciary duty and its bad faith conduct and to deter future misconduct.  Plaintiffs also seek to subordinate all of Marble Ridge's claims against the Debtors below unsecured claims.

8.      Plaintiffs also seek a temporary restraining order and preliminary injunction enjoining Marble Ridge from distributing any funds or proceeds from any asset sales in connection with its wind-down and liquidation unless and until it provides proof reasonably satisfactory to the Court and the Debtors that (i) Marble Ridge has segregated $55 million into a trust or escrow account that is solely available to pay damages or sanctions in connection with this action and the account remains in place until this action concludes, and (ii) Marble Ridge agrees to provide notice, including a copy of the August 19, 2020 report from the United States Trustee (Dkt. 1485), to any potential purchaser of its claims or interests related to Neiman Marcus that such claims and interests are the subject of an equitable subordination claim in this action.  Without this injunctive relief, the Debtors may be left with claims for damages or sanctions against a judgment-proof entity or subordination of claims against innocent third-party purchasers.

3

**Background**

I.    **The MyTheresa Transactions**

9.    In 2014, Plaintiff NMG LTD LLC acquired MyTheresa, an online business that focuses on younger luxury customers primarily in Europe, Asia, and the Middle East.  Between late 2014 and March 2017, NMG LTD LLC designated the entities that operate MyTheresa as unrestricted subsidiaries under its various debt documents (the "Designation"), including the indentures pursuant to which it issued the unsecured notes (the "Indentures").  NMG LTD LLC completed the Designation on March 10, 2017 and publicly disclosed it shortly thereafter.

10.    Marble Ridge did not own any interests in Neiman Marcus debt when the Designation was publicly disclosed in March 2017.  Marble Ridge first acquired the Debtors' unsecured notes in summer 2018 as an "event-driven investment opportunity."  Marble Ridge's founder and managing partner is Daniel Kamensky.  According to Marble Ridge's website, Mr. Kamensky started his career as a bankruptcy attorney.  As of January 2019, Mr. Kamensky believed he was a member in good standing of the New York state bar according to his deposition testimony in Neiman Marcus' defamation suit against Marble Ridge.

11.    In September 2018, the Debtors (including Plaintiffs) distributed their ownership interests in the unrestricted MyTheresa subsidiaries ultimately to non-debtor Neiman Marcus Group, Inc. (the "Distribution," and together with the Designation, the "MyTheresa Transactions").  Neiman Marcus' debt documents expressly permitted the distribution of ownership interests in unrestricted subsidiaries without limit.  Neiman Marcus publicly disclosed the Distribution on September 18, 2018.

**II.   Marble Ridge Launches Defamatory Campaign Against Neiman Marcus In The Critical Lead-Up To The Holiday Season**

12.     Immediately after Neiman Marcus announced the Distribution, Marble Ridge began a public campaign accusing the company of being in default under the Indentures and claiming the Distribution was a fraudulent transfer.

13.     On September 18, 2018, Marble Ridge sent a letter to the company that was signed by Mr. Kamensky.   Marble Ridge stated that based on its purported review of "available information" and Neiman Marcus' disclosures, the MyTheresa Transactions "may [have] trigger[ed] defaults under the Indentures" and "may have caused a default under the Indentures." Marble Ridge also wrote that it "believe[s] that the Company may be in default under its Indentures" and it has "concerns that the Transactions do not comply with the Indentures."

14.     Marble Ridge conceded in its September 18 letter that "[n]ot all the facts concerning the [Designation] are known to Marble Ridge" and requested additional information from the company regarding the MyTheresa Transactions so it could determine if Neiman Marcus was actually in default.   Marble Ridge, however, did not wait for a response.   Three days after sending the September 18 letter, Marble Ridge issued a press release on September 21 asserting that Neiman Marcus was in default under the Indentures.   The headline of the press release trumpeted: "Marble Ridge Capital LP Sends Letter to Neiman Marcus Group Board Challenging the Validity of Self-Interested Asset Transfers and *Asserting Company Is in Default under Bond Indentures.*" Marble Ridge went public with its accusations of default to put "pressure" on Neiman Marcus. Any sophisticated investor would understand that accusations of default are particularly harmful to retailers like Neiman Marcus that rely on trade credit as the lifeblood of its business.

15.     Shortly after Marble Ridge issued the press release, Neiman Marcus sent a letter to Marble Ridge denying the accusations of default in the September 18 letter and September 21 press

release.  Marble Ridge responded on September 25 with another letter that it again immediately released to the press.  In the letter, Marble Ridge raised "serious questions" about "potential defaults under the Indentures governing the Notes" and asked to "hear a credible explanation, if that is possible" of how the MyTheresa Transactions "complied with the Indentures."

16.     Marble Ridge's false statements damaged Neiman Marcus.  The company's senior management team spent a significant amount of time addressing Marble Ridge's false accusations, including by reassuring business partners, vendors and employees that Marble Ridge's accusations were false and working with outside legal and public relations advisors in responding to Marble Ridge's accusations.

### III.   Texas State Court Dismisses Marble Ridge's Fraudulent Transfer Lawsuit But Allows Neiman Marcus' Defamation And Business Disparagement Counterclaims To Proceed

17.     On December 10, 2018, Marble Ridge filed a fraudulent transfer lawsuit against Neiman Marcus in state court in Dallas County.  Marble Ridge abandoned its prior accusations and did not allege that the MyTheresa Transactions caused *any* default or breached *any* covenant under the Indentures or any of Neiman Marcus' debt documents.

18.     Marble Ridge repeatedly represented to the Texas state court that it could pursue its claims because it owned Neiman Marcus' term loan.  That was false.  As Marble Ridge ultimately conceded, it only owned participation interests in Neiman Marcus' term loan that are insufficient to confer standing to assert a claim under the Texas Uniform Fraudulent Transfer Act. Accordingly, the Texas state court dismissed Marble Ridge's fraudulent transfer claims with prejudice on March 19, 2019.

19.     Neiman Marcus brought counterclaims against Marble Ridge for defamation and business disparagement based on Marble Ridge's false accusations that the company was in default

under the Indentures.  Marble Ridge moved to dismiss those claims on the grounds that they violated its right to free speech under the Texas Citizens Participation Act.

20.      The Texas state court denied Marble Ridge's motion to dismiss.  It held that Neiman Marcus had shown by clear and specific evidence—despite receiving very limited discovery—that Marble Ridge published false statements with actual malice that defamed and damaged the company.  Marble Ridge appealed.  The Texas Court of Appeals heard argument on February 18, 2020 but has not issued a decision.

## IV.      Marble Ridge Attempts to Derail Neiman Marcus' Creditors' Overwhelming Support To Extend Company's Debt Maturities

21.      Beginning in 2017, Neiman Marcus and its equity sponsors conducted on-and-off discussions with the company's creditors to proactively address upcoming debt maturities in 2020 and 2021.  Two creditor groups organized: one consisting of term loan lenders and the other of unsecured noteholders.

22.      Despite Marble Ridge's aggressive attacks against the company in the press in late 2018, Neiman Marcus repeatedly encouraged Marble Ridge to join one of the two ad hoc groups. Marble Ridge refused.  At various points, Marble Ridge indicated that it was considering forming its own group.  That never happened either.

23.      On March 1, 2019, Neiman Marcus publicly announced that it had reached an agreement in principle with its creditors to restructure the company's debt obligations and extend its debt maturities by three years.  Holders of approximately 99.5 percent of the aggregate principal amount of the term loans and 91.5 percent of the unsecured notes—which collectively represented over $4.2 billion of Neiman Marcus' debt—participated in multi-step amend-and-extend transactions that closed in June 2019.  Marble Ridge and another unsecured noteholder were the only significant holdouts.

24.     Hours after Neiman Marcus announced the agreement in principle, Marble Ridge launched a new offensive to try to stop the transactions in their tracks.  On March 1, Marble Ridge sent a letter to the company and issued a press release attacking the agreement in principle as simply a means to "insulate" NMG Inc. from liability for the MyTheresa Transactions.  Despite the substantial creditor support for the deal, Marble Ridge claimed that the agreement in principle "does not have and we believe will not obtain the approval necessary to make it effective."  The next business day, Marble Ridge sent another letter to the company concerning the deal entitled "The Devil's Bargain" and again released that letter to the press.

25.     On March 8, Marble Ridge's counsel sent a letter to the company in which it carefully stated that "***Marble Ridge advises***" it is part of a new "Ad Hoc group" and "***[w]e are advised*** that the members of the Ad Hoc group that have executed the Coordination Agreement have unanimously rejected the terms of the Proposed Transactions."  Accordingly, "the Proposed Transactions have been rejected by a significant percentage of the face amount of Neiman's Notes and Term Loans."  The letter proclaimed that the debt maturity extensions are "simply dead-on-arrival" and "as relayed by Mr. Kamensky to you, to launch an exchange offer and consent solicitation in furtherance of the Proposed Transactions is ill-advised and wasteful."

26.     When these threats did not cause Neiman Marcus to back away from a deal with the majority of its creditors, Marble Ridge upped the ante.  On March 12, 2019, Marble Ridge sent a letter to the company threatening to accelerate $2 billion in term loans—which would have been catastrophic for Neiman Marcus and its 13,000 employees—if its demands were not met:

> Last Friday, March 8th, we advised the Company that it would be ill-advised and wasteful to launch its proposed exchange offer that would be effectively dead-on-arrival given the expected opposition by the Ad Hoc Group, of which Marble Ridge is a member…. It now appears to us that the Company intends to wait out the clock on our Alternative Proposed Transaction to try to force a cram down of

its flawed exchange offer on noteholders.  Accordingly, Neiman has put us in a position in which ***we will have no choice but to accelerate the Term Loans*** in the event that the Company proceeds with its ill-advised restructuring plan.

27.     While Marble Ridge's threats were real, nothing else was true.  There was no Coordination Agreement or "Ad Hoc Group" poised to block the deal.  Nor did Marble Ridge attempt to accelerate the company's $2 billion of term loans.  Despite Marble Ridge's substantial efforts to undermine the amend-and-extend transactions, they closed on June 7, 2019 with the support of holders of 99.5 percent of the term loans and 91.5 percent of the unsecured notes.  Of the $1.6 billion in unsecured notes, only $142 million did not participate.  The majority of that amount is held by Marble Ridge and one other noteholder.

## V.     Marble Ridge Fires Indenture Trustee And Replacement Trustee Sues Neiman Marcus And Ares In New York State Court

28.     Two months after the debt maturity extension transactions closed, Marble Ridge launched its next salvo.  On August 8, 2019, Marble Ridge and another noteholder fired the indenture trustee for the unsecured notes that held out of the transactions and replaced it with one (UMB) that would file yet another lawsuit.  Hours after UMB was appointed indenture trustee, UMB filed a complaint in New York Supreme Court against three Neiman Marcus Debtors, three non-Debtor Neiman Marcus entities, and six Ares entities.  The complaint asserted fraudulent transfer claims against the Neiman Marcus defendants related to the MyTheresa Transactions that are nearly identical to those Marble Ridge filed in Texas state court.  UMB also included a tortious interference claim against Ares.  On July 16, 2020, the New York Supreme Court dismissed the action after finding that UMB's lawsuit was barred by the "Indentures' unambiguous terms" and the purported basis for UMB's lawsuit was "[n]owhere in the Indentures."  Following attempts to resuscitate the action, UMB abruptly filed a notice of voluntary discontinuance without prejudice on August 24, 2020.

**VI.     Marble Ridge Breaches Its Duties, Attempts To Cover-Up Its Illegal Activities And Inflicts Significant Damage On The Debtors And Their Stakeholders**

29.     The Debtors' chapter 11 filings on May 7, 2020 did little to slow Marble Ridge's attacks on the company.  Marble Ridge quickly indicated to the United States Trustee that it wanted to serve on the Official Committee of Unsecured Creditors (the "Committee").  In its cover email on May 10, Marble Ridge touted the credentials of Mr. Kamensky to serve on the Committee:

> If appointed to the Committee, Marble Ridge would be represented by Dan Kamensky.  Mr. Kamensky has more than 20 years of bankruptcy and investing experience and fully understands the fiduciary responsibilities associated with membership on the Committee.  Mr. Kamensky is committed to devote the time and energy necessary to earnestly represent all unsecured creditors.

30.     On May 19, the United States Trustee appointed a nine-member Committee that included Marble Ridge and UMB.  Marble Ridge was later selected as one of three co-chairs of the Committee and served in that capacity until it resigned from the Committee on August 1.

31.     At the outset of these cases, Marble Ridge attempted to continue its aggressive campaign against the Debtors.  In the second week of the case, Marble Ridge filed an Expedited Motion to Appoint an Examiner to investigate the MyTheresa Transactions.  The Court, however, was already on to Marble Ridge's games.  At the conclusion of the hearing on Marble Ridge's motion on May 29, the Court expressed significant concerns regarding Marble Ridge's conduct in the early days of these chapter 11 cases:

> After having read all of the papers, I came out today prepared to talk about whether or not Marble Ridge ought to continue on to the Committee.  It is very clear to me that this is a strategic pleading.  It is very clear to me that this motion was not in keeping with the spirit of the reason that the ability to appoint an examiner exists. . . . [I]f there were such a [good faith] requirement, I would find that the motion was not filed in good faith.

At the conclusion of the hearing, Marble Ridge withdrew the Examiner Motion without prejudice.

32.     Marble Ridge was just getting started.   On July 24, in the midst of intense negotiations among the Debtors' stakeholders, Mr. Kamensky submitted an offer without the Committee's consent to the Debtors' Disinterested Manager for Marble Ridge to purchase the Debtors' litigation claims regarding MyTheresa.   At the time, Marble Ridge was still on the Committee and in possession of confidential information about the settlement process and the Committee's investigation.   When the Committee learned about the offer, Mr. Kamensky agreed to withdraw it and not submit any other offer without prior Committee approval.

33.     The parties continued to make progress on a global settlement in late July.   The centerpiece of the deal was the Debtors' equity sponsors providing 140 million MyTheresa Series B shares for distribution to the Debtors' unsecured creditors.   The Series B Shares are illiquid and only recover if there is a sale or other monetization event of MyTheresa in an amount of at least $500 million.   Accordingly, the Committee began exploring alternatives for a "cash-out" option under which creditors could exchange the Series B shares for cash.

34.     On July 28, Mr. Kamensky provided a cash-out proposal to the Committee under which Marble Ridge would back stop the purchase of 60 million Series B Shares at $0.20 per share from other unsecured creditors wishing to sell.   Other noteholder creditors would have the right to participate in the purchase of the 60 million shares pro rata with Marble Ridge picking up any remaining shares.

35.     On July 29, the Committee voted to approve the global settlement.   Marble Ridge and UMB voted to reject the settlement.   After excusing Mr. Kamensky, the Committee then considered Marble Ridge's cash-out proposal and decided to continue negotiations with the hedge fund.

36.     At the same time, Jefferies was working on its own cash-out offer.  Jefferies trades on its own behalf and for clients.  One of Jefferies' clients is Marble Ridge.  By July 31, Jefferies had indications from two clients that they were interested in purchasing at least 80 million of the 140 million Series B Shares.

37.     On the morning of July 31, Jefferies contacted the Committee's financial advisor and indicated that Jefferies was interested in making a bid to purchase all 140 million Series B shares for a proposed purchase price in "the thirties" (*i.e.*, between 30-40 cents per share).  Jefferies sent a follow up email that morning confirming Jefferies' interest in submitting a firm bid to purchase the shares and confirming its ability to complete the transaction if the Committee chose to accept a bid from Jefferies.

38.     Around 12:15 p.m. ET, the Committee's legal and financial advisors spoke with Jefferies to determine the firm's interest in the shares and whether the Jefferies bid could produce a higher return than the Marble Ridge bid.  Jefferies confirmed its interest and a price in the "thirties."  Jefferies promised to submit a proposal by the end of the day.  Based on the call, the Committee's legal and financial advisors concluded Jefferies was serious about making a cash-out offer for the Series B Shares.

39.     At 3:15 p.m. ET, the Committee's legal and financial advisors called Mr. Kamensky and informed him that Jefferies had come forward to discuss a cash-out offer for the Series B Shares at a possible price of $0.30 per share.  Mr. Kamensky immediately set out to ensure that Jefferies' bid did not impede his efforts to personally profit from his role as Committee co-chair to the detriment of the Debtors and their stakeholders.  Shortly after hanging up the phone, Mr. Kamensky began launching texts to Christopher Bauer, the head trader at Marble Ridge:

Fri. Jul 31 3:20 PM

Kamensky:  Eric Geller from Jefferies called the UCC counsel and

12

offered to buy the units at 30 cents, that is a monumental mistake. I'm getting [confidential Jefferies Employee 1 (JE1)] now. he needs to talk me. let me know. They are threatening to put a bid in.

Bauer: For nmg??

Kamensky: yes i just texted [JE1]

Bauer: Yikes what did we bid. Those guys man I hope they were just ignorant to our interests

40.     Mr. Kamensky also began communicating with JE1 at Jefferies at 3:20 p.m. using

Instant Bloomberg chat messages and demanded that Jefferies not make a proposal for the Series

B Shares:

(2020-07-31 03:20:13 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL) has invited [JE1] (JEFFERIES LLC)

Need you NOW

(2020-07-31 03:20:40 PM EDT)

[JE1] (JEFFERIES LLC)

Call me in 10min

(2020-07-31 03:20:52 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

Tell Geller to stand DOWN

(2020-07-31 03:20:55 PM EDT)

[JE1] (JEFFERIES LLC)

Im on an internal call

(2020-07-31 03:20:55 PM EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

And let's talk

(2020-07-31 03:20:59 PM EDT)

13

[JE1] (JEFFERIES LLC)

I can't get off of

(2020-07-31 03:21:03 PM EDT)

[JE1] (JEFFERIES LLC)

Lets speak in 10 min pls

(2020-07-31 03:21:28 EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

Do I need to reach out to Geller

(2020-07-31 03:28:30 EDT)

DKAMENSKY2 (MARBLE RIDGE CAPITAL)

DO NOT SEND IN A BID

41.     Mr. Kamensky also contacted Mr. Geller at Jefferies at 3:23 PM ET by Instant Bloomberg and asked to speak right away: "hat is your number?  Need you now?"

42.     At 3:45 p.m. ET, Jefferies and Mr. Kamensky spoke.  Mr. Kamensky was very upset and told Jefferies to stand down and not put in a bid.  Highlighting the personal animus that has fueled his two-year campaign against Neiman Marcus, Mr. Kamensky said Jefferies did not understand the depth of his interest in the Series B Shares.  He indicated he has been pursuing this matter for several years, amassed $3.5 million in legal fees, and made the MyTheresa settlement possible.  He said he was determined to acquire the shares so all that Jefferies' bid would achieve was driving up the final price and costing him money.  He also told Jefferies that as co-chair of the Committee, he would prevent Jefferies from acquiring the shares.  Finally, Mr. Kamensky said that he had been a good partner to Jefferies and JE1.  (Jefferies was Marble Ridge's ninth largest trading partner and had received $200,000 in trading commissions from Marble Ridge during the

first six months of 2020.)  But if JE1 moved forward with the Series B bid, Mr. Kamensky made clear they would not be partners going forward.

43.     Following a discussion between JE1 and Jefferies' general counsel, Jefferies decided it would withdraw any bid to purchase the Series B Shares and that Jefferies would be completely transparent with all interested parties about why it was withdrawing.  JE1 and Mr. Geller called Mr. Kamensky at approximately 4:07 p.m. ET.  JE1 explained that Mr. Kamensky was an important relationship and Jefferies would withdraw from making any bid for the Series B.  Jefferies, however, also would be transparent for its reason for withdrawing with both its client who attempted to purchase the shares and with the advisors for the Committee.  Mr. Kamensky responded by thanking JE1 and Mr. Geller and saying he would always be grateful to them.  Mr. Kamensky did not hear that Jefferies had concluded it would be transparent on what led them to withdraw.

44.     During or immediately after his call with JE1 and Mr. Geller, Mr. Kamensky contacted Mr. Bauer by Instant Bloomberg chat to share the news that Jefferies was "standing down" and had taken the "high road[]." Mr. Kamensky concluded:  "Thank gd."

45.     At 5 p.m. ET, Jefferies informed counsel to the Committee that it was declining to make a bid at the request of a significant client.  Committee counsel asked if that client was Mr. Kamensky.  Mr. Geller responded yes.  The Committee professionals decided to contact Marble Ridge's counsel, Ed Weisfelner, to determine if Jefferies' report about Mr. Kamensky's conduct was accurate.  Mr. Weisfelner called Mr. Kamensky to inform him that Jefferies had reported to Committee counsel that it was withdrawing from bidding after pressure from Mr. Kamensky.

46.     In response, Mr. Kamensky called JE1 and started the call by saying, "this conversation never happened."  Disturbed by Mr. Kamensky's opening comment, JE1 began to

record the call.  Mr. Kamensky asked why JE1 had told Committee counsel that Mr. Kamensky had threatened JE1 and asked if JE1 knew this could cause Mr. Kamensky to go to jail.  JE1 responded that he had planned to bid but Mr. Kamensky demanded Jefferies stand down to preserve their relationship.  Mr. Kamensky reiterated that he could go to jail and asked JE1 to agree that Mr. Kamensky asking Jefferies to stand down was a large misunderstanding.

47.    Mr. Kamensky also urged JE1 to take part in the bidding process for the Series B. JE1 denied having any further interest in the matter.  Mr. Kamensky responded:

> It's too late now.  They're going to report this to the U.S. Attorney's Office, okay?  They're reporting this to the U.S. Attorney's Office. This is -- this is -- it's, not like, not like you can't bid.  The U.S. Attorney is going to investigate this.  My position to them is this.  I said to them, this a huge misunderstanding, okay, humongous misunderstanding and I told them -- the only thing I said was if you're not real don't bid and if they're real then they should bid. Because otherwise the U.S. Attorney is investigating this then, okay?  They're going to report it, okay, and my position is - is - going to be look, this was a huge misunderstanding.  I never in a million years would have told them not to do that.  I -- all I told them was if they're not real they shouldn't bid.

48.    Of course, there was no misunderstanding.  Mr. Kamensky never inquired into whether Jefferies was "real," or serious, about pursuing the opportunity and never said Jefferies should bid if it were "real."  Mr. Kamensky simply demanded that Jefferies refuse to bid.

49.    JE1 pushed back on Mr. Kamensky's explanation, reminding him that Mr. Geller had been on the earlier call too and had heard what Mr. Kamensky actually said.  Mr. Kamensky responded with a plea for JE1 to adopt his version of their earlier conversation stressing the dire consequences for Mr. Kamensky if JE1 did not go along with him.  Mr. Kamensky also admitted to abusing his position as a member of the Committee:

> … [I]f you're going to continue to tell them what you just told me, I'm going to jail, okay?  Because they're going to say that I abused my position as a fiduciary, which I probably did, right?  Maybe I should go to jail.  But I'm asking you not to put me in jail.

JE1 responded that he would not lie for Mr. Kamensky.

50.     JE1 again reiterated that Mr. Kamensky had pressured him to refuse to bid to preserve their business relationship:

> I thought you were very upset about it, okay, and I thought that you -- I thought that you were basically pushing me very hard not to put a bid and I thought about it and frankly it's not even worth it. It's not even important enough for me. So that's why because of my relationship with you I said okay. I don't want anything to do with this.

51.     Mr. Kamensky then pleaded with JE1 to agree that Mr. Kamensky said something he purportedly intended to say but never actually did: that Jefferies should only bid if it was serious. He implied that adopting this position was necessary to preserve their relationship:

> I apologize. I apologize. I apologize, okay, and I'm telling you that what I intended to say, okay, is if you're not real don't bid but if you're real then you should bid, and, [JE1] for the relationship I would tell you that's exactly what I said and I apologize if I was upset or if it appeared as a threat.

52.     Mr. Kamensky closed the call: "But I'm telling you that is exactly what I intended to say and I'm just begging you to please appreciate that's what I meant to stay and that this conversation never happened."

53.     On August 1, Mr. Weisfelner emailed Committee counsel on behalf of Mr. Kamensky and Marble Ridge. He advanced the "misunderstanding" explanation of Mr. Kamensky's conduct and asserted that Mr. Kamensky only contacted Jefferies to make sure it was committed to bidding and not to discourage a bid. Even though he believed Mr. Kamensky's conduct had been grossly misconstrued, Mr. Weisfelner stated Marble Ridge would be resigning from the Committee. Mr. Weisfelner then wrote to the United States Trustee to offer Marble Ridge's resignation from the Committee, providing the substantially same "misunderstanding" explanation of Mr. Kamensky's conduct that he had provided to the Committee.

54.     Later that day, the Committee decided that its counsel should promptly disclose Mr. Kamensky's conduct to the United States Trustee.  That occurred later that afternoon.  During that meeting, the Committee also agreed to consider any renewed Jefferies cash-out proposal.

55.     On August 3, the Committee filed an August 2 letter by Committee counsel to United States Trustee attorney Hector Duran setting out the facts about Mr. Kamensky and the Jefferies cash-out proposal as the Committee understood them.  On August 4, Mr. Weisfelner, counsel to Marble Ridge, filed under seal a declaration in his own name that once again provided the "misunderstanding" explanation for Mr. Kamensky's conduct.  On August 5, the Court ordered both the Committee's letter and the Weisfelner declaration unsealed.  The Court also required the United States Trustee to file a statement of position within 14 days regarding the conduct of Marble Ridge and Mr. Kamensky in this case.

56.     On August 19, the United States Trustee filed a 31-page statement on the docket detailing its time-limited investigation, which provides the basis for many of the allegations in this adversary complaint.  Based on its work to date, the United States Trustee concluded that "on July 31, Marble Ridge, through Mr. Kamensky, breached its fiduciary duty of loyalty to the creditors it represented by coercing an outside investor to refrain from bidding against Marble Ridge on a key transaction that was considered integral to a successful reorganization.  Furthermore, Marble Ridge's initial explanation of its own actions to the Court and to the United States Trustee was, at best, incomplete and misleading."  The United States Trustee uncovered dramatic wrongdoing even with limited time and document productions.  The integrity of the process now demands that a full adversarial proceeding be prosecuted given the severity of Marble Ridge's actions.

57.     Marble Ridge's illegal conduct severely damaged the Debtors and their stakeholders.  Because of Marble Ridge's self-dealing and abuse of its fiduciary position, the

Debtors' unsecured creditors lost a cash-out option for illiquid MyTheresa Series B shares that would have provided an alternative recovery of approximately $42 million to $54 million in cash. Following Marble Ridge's actions, the outcome of any cash-out option is uncertain, and the events that have transpired over the past few weeks may well deter parties from robustly participating in a process to provide any alternative cash-out option to the Debtors' unsecured creditors.

58.    The Debtors and their stakeholders also incurred significant costs in responding to the United States Trustee's investigation and otherwise addressing Marble Ridge's misconduct. These costs include responding to the United States Trustee's document requests to the Committee and the Debtors, the Committee's participation in interviews with the United States Trustee, the Committee's drafting of the detailed August 2 letter to the Court, and the preparations for this proceeding.  The costs of cleaning up Marble Ridge's mess in these cases continue to accumulate and likely exceed $1 million at this point.  That is on top of the harm that Marble Ridge has inflicted on the Debtors for the last two years.

59.    By no later than the late evening of August 20, Marble Ridge had informed its investors that it was commencing a wind-down of its business.

## Injunctive Relief

60.    Plaintiffs seek a temporary restraining order and preliminary injunction enjoining Marble Ridge from distributing any funds or proceeds from any asset sales in connection with its wind-down and liquidation unless and until it provides proof reasonably satisfactory to the Court and the Debtors that (i) Marble Ridge has segregated $55 million into a trust or escrow account that is solely available to pay damages or sanctions in connection with this action and the account remains in place until this action concludes, and (ii) Marble Ridge agrees to provide notice, including a copy of the August 19, 2020 report from the United States Trustee (Dkt. 1485), to any

potential purchaser of its claims or interests related to Neiman Marcus that such claims and interests are the subject of an equitable subordination claim in this action.

61.    Plaintiffs meet all four elements for injunctive relief.  First, Plaintiffs are highly likely to succeed on the merits of their claims as evidenced by the conclusions reached by the United States Trustee and Mr. Kamensky's own admissions as set forth in that report and the recording of his telephone call with Jefferies.  Second, there is a substantial threat of irreparable injury if injunctive relief is not granted.  Plaintiffs will not be able to obtain a sufficient remedy for the harm caused by Marble Ridge if the hedge fund dissipates its assets and distributes its funds. Third, the balance of the equities strongly favors Plaintiffs: temporarily preventing Marble Ridge from distributing funds or disposing of its claims against Neiman Marcus without proper notice poses no undue burden on Marble Ridge, whereas it preserves the only viable path for Plaintiffs to obtain a remedy for Marble Ridge's misconduct.  Fourth, the public interest favors injunctive relief, as it protects the integrity of these bankruptcy proceedings and the bankruptcy process generally.

62.    Pursuant to Fed. R. Bankr. P. 7065, Plaintiffs request that no bond or security be required in connection with the issuance of the requested temporary restraining order.

## <u>COUNT ONE: BREACH OF FIDUCIARY DUTY</u>

63.    Plaintiffs incorporate all of the preceding allegations as if set forth herein.

64.    Marble Ridge was a fiduciary by virtue of its position on the Committee.  In that role, Marble Ridge acted through Mr. Kamensky.  Marble Ridge breached its fiduciary duties by using information it received in its position of confidence and trust on the Committee to coerce Jefferies into withdrawing its indicated bid for the MyTheresa Series B shares that would have materially benefitted Plaintiffs' unsecured creditors.  Without such interference, Plaintiffs' stakeholders could have received between $42 million and $54 million in cash rather than an

illiquid security.  Marble Ridge also engaged in self-dealing as it eliminated a competitive bidding process, which would have benefitted Plaintiffs and their stakeholders, to lock in inflated profits for the hedge fund.  As a result of Marble Ridge's breach of fiduciary duties, Plaintiffs and their stakeholders were damaged, including through the lost cash-out option and additional professional fees incurred to respond to and seek compensation for Marble Ridge's illegal activities.

## COUNT TWO: SANCTIONS FOR BAD FAITH CONDUCT

65.  Plaintiffs incorporate all of the preceding allegations as if set forth herein.

66.  Marble Ridge has waged a campaign against Plaintiffs for years that, at best, has involved bad faith conduct.  Marble Ridge made a series of false public statements that were designed to "pressure" the company by causing its trade terms to seize up and tarnish its reputation heading into the critical holiday season, threated to accelerate hundreds of millions of dollars of debt when nearly every one of the company's creditors agreed to a value-maximizing transaction to extend Neiman Marcus' debt maturities, and caused serial lawsuits to be filed that two courts promptly dismissed after finding they never should have been brought in the first place.

67.  Consistent with this pattern and practice, Marble Ridge has repeatedly acted in bad faith throughout these chapter 11 proceedings.  Marble Ridge breached its fiduciary duties and engaged in self-dealing, coerced Jefferies into declining to provide a bid for a cash-out option that would have benefitted Plaintiffs' stakeholders but cost Marble Ridge some of its expected profits, engaged in witness tampering to cover up its illegal activity, and lied to the Committee, the United States Trustee, the Debtors, the Court, and the public by claiming there was a "misunderstanding" with Jefferies when that was simply not true.

68.  This conduct damaged the Plaintiffs and their estates.  In addition awarding compensatory sanctions under its inherent power and/or 11 U.S.C. § 105, the Court should exercise

its inherent power and/or 11 U.S.C. § 105 to fine Marble Ridge at least $5 million to deter future bad faith conduct.

## COUNT THREE: EQUITABLE SUBORDINATION

69.     Plaintiffs incorporate all of the preceding allegations as if set forth herein.

70.     Marble Ridge's breach of fiduciary duties and bad faith conduct constituted inequitable conduct that harmed the Plaintiffs' creditors and their estates.  In order to remedy the harm caused by Marble Ridge's inequitable conduct, any and all claims Marble Ridge holds against the Debtors should be subordinated below the claims of general unsecured creditors pursuant to 11 U.S.C. § 510(c).  Subordination of Marble Ridge's claims is consistent with the provisions of the Bankruptcy Code.

## Prayer for Relief

71.     The Plaintiffs request the following relief:

- A temporary restraining order and preliminary injunction enjoining Marble Ridge from distributing any funds or proceeds from any asset sales in connection with its wind-down and liquidation unless and until it provides proof reasonably satisfactory to the Court and the Debtors that (i) Marble Ridge has segregated $55 million into a trust or escrow account that is solely available to pay damages or sanctions in connection with this action and the account remains in place until this action concludes, and (ii) Marble Ridge agrees to provide notice, including a copy of the August 19, 2020 report from the United States Trustee (Dkt. 1485), to any potential purchaser of its claims or interests related to Neiman Marcus that such claims and interests are the subject of an equitable subordination claim in this action;

- A money judgment for the Plaintiffs' actual damages as set forth above as well as attorneys' fees and pre- and post-judgment interest on all amounts awarded;

- A fine of at least $5 million to deter future bad faith misconduct;

- An order subordinating any and all claims Marble Ridge holds against the Debtors below the claims of general unsecured creditors; and

- Such other relief to which the Plaintiffs may be entitled.

Houston, Texas
August 26, 2020

/s/ Matthew D. Cavenaugh
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Joseph August Fischer, III (TX Bar No. 00789292)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:            mcavenaugh@jw.com
                  jwertz@jw.com
                  kpeguero@jw.com
                  vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:            anup.sathy@kirkland.com
                  chad.husnick@kirkland.com

-and-

Matthew C. Fagen (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:            matthew.fagen@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on August 26, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas. A copy of this filing was also e-mailed to counsel of record for Marble Ridge, and counsel to the Plaintiffs reached out by telephone to contact counsel for Marble Ridge to alert them to the existence of this filing and the relief sought.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh