# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEIMAN MARCUS GROUP LTD LLC, *et al.,*[1] | ) | Case No. 20-32519 (MI) |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

## JACKSON WALKER LLP'S RESPONSE IN OPPOSITION TO THE UNITED STATES TRUSTEE'S AMENDED AND SUPPLEMENTAL MOTION FOR (1) RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9024 APPROVING THE RETENTION AND COMPENSATION APPLICATIONS OF JACKSON WALKER LLP, (2) SANCTIONS, AND (3) RELATED RELIEF
**[Relates to Dkt. No. 3224]**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are:  NMG Holding Company, Inc. (5916); Bergdorf Goodman LLC (5530); Bergdorf Graphics, Inc. (9271); Mariposa Intermediate Holdings LLC (5829); NEMA Beverage Corporation (3412); NEMA Beverage Holding Corporation (9264); NEMA Beverage Parent Corporation (9262); NM Bermuda, LLC (2943); NM Financial Services, Inc. (2446); NM Nevada Trust (3700); NMG California Salon LLC (9242); NMG Florida Salon LLC (9269); NMG Global Mobility, Inc. (0664); NMG Notes PropCo LLC (1102); NMG Salon Holdings LLC (5236); NMG Salons LLC (1570); NMG Term Loan PropCo LLC (0786); NMG Texas Salon LLC (0318); NMGP, LLC (1558); and The Neiman Marcus Group LLC (9509).  The Reorganized Debtors' service address is:  One Marcus Square, 1618 Main Street, Dallas, Texas 75201.

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     FACTUAL BACKGROUND.......................................................................................6

     A.     Ms. Freeman Graduates from Baylor Law School and Pursues a Career in Bankruptcy.......................................................................................................6

     B.     David R. Jones is an Acclaimed Bankruptcy Practitioner who was Appointed a Bankruptcy Judge by the Fifth Circuit. .................................................................7

     C.     As the Popularity of the Southern District of Texas Grows for Large and Complex Chapter 11 Cases, so Does JW's Bankruptcy Practice. ......................................10

     D.     Ms. Freeman Applies to JW and Joins the Firm as an Income Partner. ..............11

     E.     Ms. Freeman Achieves Recognition for Her Abilities and is Promoted to Equity Partner at JW..................................................................................................12

     F.     *Anonymous Allegations* of an Intimate Relationship Between Former Judge Jones and Ms. Freeman are Raised on March 6, 2021, in Connection with the *McDermott International* Bankruptcy Cases.......................................................13

     G.     The Bankruptcy Court Denies Mr. Van Deelen's Recusal Request, which Ruling is Affirmed on Appeal by the District Court. ......................................................17

     H.     Ms. Freeman Reveals, for the First Time, the Existence of a Current Relationship with Former Judge Jones after Confronted with New Credible Evidence...........20

     I.     JW Separates Ms. Freeman from the Firm After Ms. Freeman and Former Judge Jones Refuse to Disclose Their Relationship. ....................................................22

     J.     Ms. Freeman Exits JW and Opens her Own Law Firm.......................................26

     K.     Ms. Freeman and Former Judge Jones's Relationship Becomes Public..............27

     L.     The U.S. Trustee Seeks to Vacate Various JW Retention and Fee Orders...........28

     M.     A Miscellaneous Proceeding is Opened in the Bankruptcy Courts to Address All Pre-Trial and Discovery Matters Relating to the U.S. Trustee's Rule 60(b) Motions..........................................................................................................29

III.    RESPONSE...........................................................................................................31

     A.     The U.S. Trustee Cannot Satisfy his Burden under Rule 60(b) to Demonstrate Extraordinary Circumstances or Any Manifest Injustice to Vacate JW's Retention or Fee Orders......................................................................................................31

i.  Applicable Legal Standard. ................................................................32

ii.  The U.S. Trustee Does Not Have Standing to Assert Estate Claims and Causes of Action. ...................................................................................34

iii.  The U.S. Trustee's Asserted Estate Claims Were Released Under the Applicable Plans. ..............................................................................39

iv.  JW Did Not Violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct. ...........................................43

B.  JW Cannot be Held Liable for Former Judge Jones's Misconduct. .....................66

i.  There is No Risk of Injustice to the Parties in the Challenged Cases. ......67

ii.  There is No Risk of Injustice in Other Chapter 11 Cases. .......................69

iii.  Public Confidence Will Not be Undermined if Relief is Denied.............70

iv.  Subsection 455(b) of the Judicial Code Does Not Apply. .......................73

v.  Bankruptcy Rules 5002 and 5004 Do Not Apply to Former Judge Jones's Approval of Any JW Retention or Fee Applications..............................75

vi.  In the Mediation Cases, JW's Retention and Fee Applications were Subject to Independent Review and Approval. .......................................77

C.  The Unprecedented Facts, Mitigating Circumstances, and Overall Equities Do not Warrant Sanctions Amounting to 100% of the Fees and Expenses Paid to JW in All of the Challenged Cases. ...............................................................................81

IV. CONCLUSION .........................................................................................87

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams*,
   2020 WL 4922330 (N.D. Tex. 2020)................................................................64

*Air Line Pilots Assoc., Int'l v. Cont'l Airlines, Inc. (In re Cont'l Airlines Corp.)*,
   901 F.2d 1259 (5th Cir. 1990)......................................................... 67, 73

*In re Am. Int'l Refinery, Inc.*,
   676 F.3d 455 (5th Cir. 2012)................................................ 45, 46, 52, 84, 85

*Ameriquest Mortg. Co. v. Nosek (In re Nosek)*,
   544 F.3d 34 (1st Cir. 2008)................................................................84

*In re Apex Long Term Acute Care-Katy, L.P.*,
   599 B.R. 314 (Bankr. S.D. Tex. 2019) ......................................... 37, 41

*Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000)................................................................42

*Arenes v. Boughton (In re Prudhomme)*,
   43 F.3d 1000 (5th Cir. 1995)................................................................85

*Attorney U. v. The Mississippi Bar*,
   678 So. 2d 963 (Miss. S. Ct. 1996)......................................................60

*Baker v. Cage (In re Whitley)*,
   737 F.3d 980 (5th Cir. 2013)......................................................... 84, 86

*In re Balt. Emergency Servs. IL, Corp.*,
   432 F.3d 557 (4th Cir. 2005)................................................................38

*Bank Brussels Lambert v. Coan (In re AroChem Corp.)*,
   176 F.3d 610 (2d Cir. 1999)................................................................48

*BFP v. Resolution Trust Corp.*,
   511 U.S. 531 (1993) ................................................................44

*Blundell v. Home Quality Care Home Health Care, Inc.*,
   No. 3:17-CV-1990-L-BN, 2018 WL 276154 (N.D. Tex. Jan. 3, 2018) ..............32

*In re Bradley*,
   495 B.R. 747 (Bankr. S.D. Tex. 2013) ......................................... 57, 58

*In re Brown*,
  511 B.R. 843 (Bankr. S.D. Tex. 2014) ..............................................................51

*Buck v. Davis*,
  580 U.S. 100 (2017) .........................................................................................32

*In re Cal. Litfunding*,
  360 B.R. 310 (Bankr. C.D. Cal. 2007)..............................................................41

*Carroll v. Abide (In re Carroll)*,
  850 F.3d 811 (5th Cir. 2017)............................................................................83

*In re Case*,
  937 F.2d 1014 (5th Cir. 1991)..........................................................................83

*CEATS, Inv. v. Continental Airlines, Inc.*,
  755 F.3d 1356 (Fed. Cir. 2014) ....................................................70, 78, 80, 81

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ...........................................................................................83

*Chapman & Cole v. Itel Container Int'l B.V.*,
  865 F.2d 676 (5th Cir. 1989)............................................................................62

*Chiasson v. Bingler (In re Oxford Mgmt., Inc.)*,
  4 F.3d 1329 (5th Cir. 1993)..............................................................................84

*In re Chris Petit and Assocs., P.C.*,
  No. 22-50591, 2022 WL 17722853 (Bankr. W.D. Tex. Dec. 13, 2022) ..........52

*In re Circle Inv'rs, Inc.*,
  No. 02-39553, 2008 WL 910062 (Bankr. S.D. Tex. Apr. 3, 2008)...................48

*Concat LP v. Unilever, PLC*,
  350 F. Supp. 2d 796 (N.D. Cal. 2004) .............................................................48

*In re Condor Ins. Ltd.*,
  601 F.3d 319 (5th Cir. 2010)............................................................................47

*In re Contractor Tech., Ltd.*,
  No. CIV.A. H-05-3212, 2006 WL 1492250 (S.D. Tex. May 30, 2006)........ 48, 50

*Curtis v. The Chapman Family Trust (In re Chapman)*,
  628 B.R. 512 (Bankr. S.D. Tex. 2021) .............................................................77

*In re Cushman*,
  589 B.R. 469 (Bankr. D. Me. 2018) .................................................................84

*In re Cygnus Oil & Gas Corp.*,
   No. 07-32417, 2007 WL 1580111 (Bankr. S.D. Tex. May 29, 2007)...................... 48, 54, 77

*Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*,
   23 F.4th 529 (5th Cir. 2022)............................................................................61

*Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*,
   540 F.3d 351 (5th Cir. 2008)............................................................................43

*Edward H. Bohlin Co. v. Banning Co.*,
   6 F.3d 350 (5th Cir. 1993) ...............................................................................32

*In re Enron Corp.*,
   No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) .................................51

*In re eToys, Inc.*,
   331 B.R. 176 (Bankr. D. Del. 2005)................................................................ 52, 83

*Eubanks v. Federal Deposit Ins. Corp.*,
   977 F.2d 166 (5th Cir. 1992)........................................................................ 71, 79

*In re EWC, Inc.*,
   138 B.R. 276 (Bankr. W.D. Okla. 1992)...............................................................85

*In re First Leads & Marketing, Inc.*,
   2023 WL 4163478 (Bankr. N.D. Ga. 2023) ...........................................................37

*In re Fish & Fisher, Inc.*,
   574 B.R. 608 (Bankr. S.D. Miss. 2017)...............................................................85

*In re Fundamental Long Term Care*,
   614 B.R. 753 (Bankr. M.D. Fla. 2020) ...............................................................51

*Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*,
   655 F.2d 463 (2d Cir. 1981)........................................................................ 44, 85

*In re Genesis Health Ventures, Inc.*,
   340 B.R. 729 (Dist. Del. 2006)........................................................................41

*In re GHR Energy Corp.*,
   60 B.R. 52 (Bankr. S.D. Tex. 1985) ..................................................................86

*Gonzales v. Dankel*,
   2023 WL 1781800 (E.D. Tex. 2023) ..................................................................64

*Harris v. First City Bancorporation of Tex., Inc. (In re First City Bancorporation of Tex., Inc.)*,
   282 F.3d 864 (5th Cir. 2002)...................................................................... 84, 86

*Hartford Underwriters Ins. Co. v. Union Planters, N.A.,*
    530 U.S. 1 (2000) ........................................................................................35

*In re Hickman,*
    673 S.W.3d 188 (Tenn. 2023) .....................................................................61

*In re Hill,*
    342 B.R. 183 (Bankr. D.N.J. 2006) .............................................................76

*In re Holloway,*
    955 F.2d 1008 (5th Cir. 1992).....................................................................77

*Howe v. Vaughan (In re Howe),*
    913 F.2d 1138 (5th Cir. 1990).....................................................................41

*Hulin v. Fibreboard Corp.,*
    178 F.3d 316 (5th Cir. 1999).......................................................................41

*IP Petroleum Co. v. Wevanco Energy, L.L.C.,*
    116 S.W.3d 888 (Tex. App.—Houston [1st Dist.] 2003, no pet.).........................43

*Jamo v. Katahdin Fed. Credit Union (In re Jamo),*
    283 F.3d 392 (5th Cir. 2002).......................................................................84

*Jones v. Blume,*
    196 S.W.3d 440 (Tex. App.—Dallas 2006, pet. denied).....................................59

*Kravit, Gass & Weber, S.C. v. Michel (In re Crivello),*
    134 F.3d 831, 836 (7th Cir. 1998) ..............................................................47

*Larsen v. Utah State Bar (In re Larsen),*
    379 P.3d 1209 (Utah 2016) .........................................................................61

*Law v. Siegel,*
    571 U.S. 415 (2014) ....................................................................................84

*In re LeBlanc,*
    927 So. 2d 315 (La. 2007) ...........................................................................64

*Liljeberg v. Health Services Acquisition Corp.,*
    486 U.S. 847 (1988) ..........................................................67, 68, 69, 70, 75

*Loftis v. Minar (In re Montanino),*
    15 B.R. 307 (Bankr. D.N.J. 1981) ...............................................................76

*MacNeil Bros. Co. v. Cohen,*
    264 F.2d 186 (1st Cir. 1959) .......................................................................72

*Manges v. Seattle-First Nat'l Bank (In re Manges)*,
   29 F.3d 1034 (5th Cir. 1994)............................................................................71

*In re Marin Motor Oil, Inc.*,
   689 F.2d 445 (3d Cir. 1982)..........................................................................35

*In re Martin*,
   817 F.2d 175 (1st Cir. 1987) ...................................................................46, 50

*In re Matco Elecs. Grp., Inc.*,
   383 B.R. 848 (Bankr. N.D.N.Y. 2008) .........................................................52

*Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*,
   644 F.3d 259 (5th Cir. 2011)........................................................................42

*Miller v. Meinhard-Comm. Corp.*,
   462 F.2d 358 (5th Cir. 1972).........................................................................41

*National Med. Enters., Inc. v. Godbey*,
   924 S.W.2d 123 (Tex. 1996) ...................................................................55, 56

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022)..........................................................................41

*In re O'Connor*,
   92 S.W.3d 446 (Tex. 2002)...........................................................................56

*Obduskey v. Wells Fargo*,
   No. 22-1156, 2023 WL 1831128 (10th Cir. Feb. 9, 2023)...............................67

*Office of Disciplinary Counsel v. Price*,
   732 A.2d 599 (Pa. 1999)..........................................................................61, 62

*Okla. State Treasurer v. Linn Operating, Inc. (In re Linn Energy, L.L.C.)*,
   927 F.3d 862 (5th Cir. 2019).........................................................................41

*In re Old ANR, LLC*,
   2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019)......................................35

*Parker v. Connors Steel Co.*,
   855 F.2d 1510 (11th Cir. 1988)................................................................66, 73

*Patterson v. Mobil Corp.*,
   335 F.3d 476 (5th Cir. 2003).........................................................................67

*Perkins Coie v. Sadkin (In re Sadkin)*,
   36 F.3d 473 (5th Cir. 1994)...........................................................................84

*Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*,
    432 F.3d 347 (5th Cir. 2005)................................................................45, 46, 83, 85

*Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*,
    785 F.2d 1249 (5th Cir. 1986)...........................................................................52

*Potashnick v. Port City Const. Co.*,
    609 F.2d 1101 (5th Cir. 1980)...........................................................................75

*In re Poteet Const. Co., Inc.*,
    122 B.R. 616 (Bankr. S.D. Ga. 1990)................................................................32

*In re Powell*,
    533 N.E.2d 831 (Ill. 1988)................................................................................64

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010)..............................................................35

*Republic Supply Co. v. Shoaf*,
    815 F.2d 1046 (5th Cir. 1987)...........................................................................41

*In re Roman Cath. Church of Archdiocese of New Orleans*,
    No. 22-30539, 2024 WL 2125507 (5th Cir. May 13, 2024)..............................69

*Rome v. Braunstein*,
    19 F.3d 54 (1st Cir. 1994).................................................................................83

*In re Ronco, Inc.*,
    838 F.2d 212 (7th Cir. 1988).............................................................................61

*Ruhl v. HSBC Mortg. Servs., Inc.*,
    399 B.R. 49 (E.D. Wis. 2008)............................................................................36

*In re Schimmelpenninck*,
    183 F.3d 347 (5th Cir. 1999).............................................................................36

*Seven Elves, Inc. v. Eskenazi*,
    635 F.2d 396 (5th Cir. 2005).............................................................................32

*In re Smart World Technologies, LLC*,
    423 F.3d 166 (2d Cir. 2005).........................................................................35, 37

*Smith v. Mixon*,
    788 F.2d 229 (4th Cir. 1986).............................................................................51

*Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*,
    647 F.3d 547 (5th Cir. 2011).............................................................................43

*In re Spiech Farms, LLC*,
603 B.R. 395 (Bankr. W.D. Mich. 2019) .............................................................37

*In re SRC Liquidation, LLC*,
2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019) ............................................35

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir. 1989) ...............................................................................36

*In re Sunbeam Corp.*,
287 B.R. 861 (S.D.N.Y. 2003) .............................................................................35

*In re SunEdison, Inc.*,
2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019) ..................................... 35, 36

*In re Syntax-Brillian Corp.*,
2016 WL 7177615 (D. Del. Dec. 9, 2016) ...........................................................36

*Tesco American, Inc. v. Strong Industries, Inc.*
221 S.W.3d 550 (Tex. 2006) ......................................................................... 55, 56, 57

*Thomas v. Allstate Ins.*,
57 F.Supp.2d 361 (S.D. Miss. 1998) ...................................................................41

*In re Timber Creek, Inc.*,
187 B.R. 240 (Bankr. W.D. Tenn. 1995) ......................................................... 53, 54

*In re Tr. Am. Serv. Corp.*,
175 B.R. 413 (Bankr. M.D. Fla. 1994) ................................................................48

*In re TransAmerican Natural Gas Corp.*,
127 B.R. 800 (S.D. Tex. 1991) ............................................................................36

*Unauthorized Practice of Law Committee v. American Home Assurance Co., Inc.*,
261 S.W.3d 24 (Tex. 2008) .................................................................................57

*United States v. Gellene*,
182 F.3d 578 (7th Cir. 1998) ..............................................................................61

*United States v. Sutton*,
786 F.2d 1305 (5th Cir. 1986) ............................................................................83

*VTX Commc'ns, LLC v. AT&T Inc.*,
2023 U.S. Dist. LEXIS 28110 (S.D. Tex. Feb. 21, 2023) .....................................43

*Roberts v. Wal-Mart Louisiana, L.L.C.*,
54 F.4th 852 (5th Cir. 2022)........................................................................ 75, 78, 79

*Matter of Weishoff,*
    382 A.2d 632 (N.J. 1978) ...................................................................................64

*Whitlock v. Lowe (In re DeBerry),*
    945 F.3d 943 (5th Cir. 2019)............................................................................44

*In re Wibracht,*
    Case No. 21-50477-CAG, 2022 WL 981781 (Bankr. W.D. Tex. 2022).............................76

*Woods v. City Nat. Bank & Tr. Co. of Chicago,*
    312 U.S. 262 (1941) ......................................................................................52

*Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.),*
    714 F.3d 860 (5th Cir. 2013)..................................................................38, 43

**Rules and Statutes**

11 U.S.C. § 101(14) ........................................................................... 45, 48, 54

11 U.S.C. § 101(45) ...............................................................................76

11 U.S.C. § 102................................................................................47

11 U.S.C. § 307...........................................................................35, 39, 40,47

11 U.S.C. § 323 ...............................................................................35

11 U.S.C. § 327 ..........................................................................*passim*

11 U.S.C. § 328 ..........................................................................*passim*

11 U.S.C. § 549................................................................................36

11 U.S.C. § 1103 .........................................................................*passim*

11 U.S.C. § 1106................................................................................35

11 U.S.C. § 1107................................................................................35

11 U.S.C. § 1123................................................................................43

11 U.S.C. § 1127................................................................................41

18 U.S.C. § 152................................................................................61

18 U.S.C. § 1623................................................................................61

28 U.S.C. § 455................................................................................*passim*

28 U.S.C. § 586 .................................................................................................................40

FED. R. BANKR. P. 2014 ................................................................................................ *passim*

FED. R. BANKR. P. 5002 ................................................................................................ *passim*

FED. R. BANKR. P. 5004 ..............................................................................................67, 77

FED. R. CIV. P. 11 .............................................................................................................62

FED. R. CIV. P. 26 .............................................................................................................62

FED. R. CIV. P. 60(b) ................................................................................................. *passim*

TEX. R. PROF. CONDUCT, Preamble ................................................................................59

TEX. R. PROF. CONDUCT 1.09 .........................................................................................56

TEX. R. PROF. CONDUCT 3.03 .............................................................................59, 60, 61

TEX. R. PROF. CONDUCT 4.01 .............................................................................59, 63, 64

TEX. R. PROF. CONDUCT 5.01 .................................................................................59, 65

TEX. R. PROF. CONDUCT 5.04 .........................................................................................59

TEX. R. PROF. CONDUCT 8.03 .........................................................................................60

TEX. R. PROF. CONDUCT 8.04 .............................................................................59, 64

**Other Authorities**

ABA Model Rule 8.3(a) .....................................................................................................60

Advisory Op. 58 .................................................................................................................74

Black's Law Dictionary (11th ed. 2019) ...........................................................51, 60, 73, 76

Code of Conduct for United States Judges, Canon 3 ........................................................74, 75

COLLIER ON BANKRUPTCY ¶ 328 (16th ed.) ...............................................................85, 86

COLLIER ON BANKRUPTCY ¶ 8.03 (16th ed.) ...............................................................47, 50

COLLIER ON BANKRUPTCY ¶ 2014.05 (16th ed.) ..............................................................51

*Conn. Bar Ass'n Comm. on Prof'l Ethics*, Informal Op. 13 (2004) ...........................................60

*S.C. Bar Ethics Advisory Comm.*, Op. 04 (2005), 2005 WL 483384 ............................................60

*Phil. Bar Ass'n Prof. Guidance Comm.*, Op. 03 (1997)..............................................................60

Restatement (Third) of the Law Governing Lawyers § 5 (2000) ................................................60

Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 1 (2010) .................60

*Studies in American Tort Law 41* (4th ed. 2009)......................................................................60

*Tex. Comm. on Prof'l Ethics*, Op. 520 (1997).........................................................................58

Jackson Walker LLP ("JW") files this Response (the "Response") in opposition to the *Amended and Supplemental Motion for (1) Relief From Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief* [Dkt. No. 3224] (the "Motion") filed by Kevin M. Epstein, United States Trustee for Region 7 (the "U.S. Trustee"), and in support thereof, states as follows:

## I.     PRELIMINARY STATEMENT[2]

1.      The actions of former Judge David R. Jones and Ms. Elizabeth Freeman should not be condoned and JW does not in any way.  But neither former Judge Jones nor Ms. Freeman are parties to this contested matter, and the U.S. Trustee's requested relief not only fails to impose any consequences on former Judge Jones or Ms. Freeman, but it inequitably and improperly targets JW and each of its partners and employees who were misled by former Judge Jones and Ms. Freeman about the couple's secret relationship.  JW at all times acted reasonably and responsibly, and JW reasonably relied on Ms. Freeman's integrity, her duties as an attorney and officer of the Court, and her fiduciary duties as a partner to the firm to disclose all relevant facts throughout her employment.  It is ironic that the U.S. Trustee alleges JW should have disclosed the nature of the relationship to the same judge who knew of the relationship, allegedly had a duty to disclose or recuse himself, and who knowingly declined to do so.

2.      JW did not violate any ethical rules, disclosure obligations, or fiduciary duties because JW could not disclose information it did not know.  And when JW first confirmed the existence of a current romantic relationship between former Judge Jones and Ms. Freeman on March 30, 2022, JW acted reasonably in moving to separate Ms. Freeman from the firm.  No

---

[2] All capitalized terms not otherwise defined in this Preliminary Statement are defined below.

principles of law or equity support punishing JW for not publicly disclosing a relationship that was not only not previously known by JW until late March 2022, but a relationship that the couple had actively hidden from JW.

3.     Over and over, the U.S. Trustee has conceded that the inappropriate conduct at issue in the various challenged cases was that of former Judge Jones.   JW agrees—it is former Judge Jones's conduct that is the cause of any concern, not JW's.   JW has already incurred substantial fees defending itself in the various challenged cases related to a situation it knew nothing about until March 30, 2022. ***Indeed, in 23 of the 33 cases the U.S. Trustee challenges, JW had no knowledge of any romantic relationship, cohabitation, or joint home ownership between former Judge Jones and Ms. Freeman while JW performed legal services for the estates***.   And when JW confirmed the relationship, JW took appropriate action and ultimately severed ties with Ms. Freeman.

4.     Nonetheless, the U.S. Trustee seeks to punish JW by requesting sanctions against JW for 100% of all fees and expenses paid by the estates in 33 bankruptcy cases, which fees were for services JW indisputably performed and, in the majority of cases, with respect to which Ms. Freeman provided no or nominal work.   Such relief is misdirected and unsupportable under applicable law and the facts and circumstances of the various challenged cases.

5.     The U.S. Trustee's Motion, at its core, asserts estate-owned claims—*i.e.*, the return of 100% of the fees and expenses paid by the bankruptcy estates to JW based on the unsupported assertions of alleged breaches of duties owed to those estates.[3]   There are a myriad of problems with this theory:  not only does the U.S. Trustee lack standing to pursue estate-owned claims, but

---

[3] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at pp. 1-2, 45-46, 48-49, 52, 55-56 & ¶¶ 61, 175, 178, 180, 183, 184, 185, 187, 188, 192, 198, 206, 207, 211 (seeking the "return" of funds and/or "disgorgement").

any such claims were also released under the confirmed plans and confirmation orders that are final and to which the U.S. Trustee did not object or appeal. The applicable reorganized debtor and/or plan agent is the proper party to evaluate and pursue these estate claims (to the extent not released) based on their individual analysis of the facts taking into consideration the costs of pursuing versus the potential benefits and ultimate likelihood of success. Indeed, it is the estates— and the estates alone—that would benefit from the recoveries the U.S. Trustee seeks, and it is the estates—and the estates alone—that would bear the cost of statutorily mandated U.S. Trustee fees as well as their own legal fees associated with pursuing, liquidating, and administering any recoveries on account of these asserted claims.

6.      Additionally, the U.S. Trustee's Motion fails to assert any viable legal or factual basis for vacating JW's retention and fee orders (many of which were entered years ago and without any objections, and all of which are final orders with *res judicata* effect). To this point, at least one bankruptcy judge has noted that the entire reorganization plan may have to be vacated in order to obtain the relief requested by the U.S. Trustee.[4] No party can possibly believe that such result would be in the best interests of the various estates.

7.      At bottom, the U.S. Trustee's theories are premised on two invalid assumptions: (i) the relationship between former Judge Jones and Ms. Freeman was a disqualifying conflict of interest for JW; and (ii) JW is responsible for the misconduct of Ms. Freeman and former Judge Jones notwithstanding that JW had no actual knowledge of the alleged relationship until March 30, 2022. Neither assumption is correct.

---

[4] *See, e.g.*, *In re Exco Resources, Inc.*, Case No. 18-30155 (MI), Mar. 26, 2024, Hr'g Tr. pp. 25:15-25 & 26:15-27:23 (Bankr. S.D. Tex. 2024).

8.      A relationship that requires recusal of a judge under 28 U.S.C. § 455 is different from a conflict of interest that requires disqualification of a law firm under section 327 of the Bankruptcy Code.  The former does not *per se* constitute the latter.  There is no reasonable dispute that, had former Judge Jones recused, JW would ***not*** have been disqualified from representing its clients.  Quite the opposite—another judge would have been assigned to preside over the applicable cases; JW would have still been retained as an estate professional; JW would have still performed the same reasonable and necessary legal services for the estates; and JW would have still been compensated for performing those legal services.  In other words, the U.S. Trustee's entire premise incorrectly conflates a "disclosure issue" with a "disqualification issue."

9.      The "imputation theory" pushed by the U.S. Trustee (*i.e.*, Ms. Freeman's knowledge of her secret relationship should be imputed to JW) is equally inapposite, distinguishable, and inapplicable.  The U.S. Trustee seeks to impute Ms. Freeman's knowledge of her secret relationship with former Judge Jones to JW for purposes of section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.  ***Not a single case cited by the U.S. Trustee supports that theory***.  Nor do any cases cited support the U.S. Trustee's imputation theory of liability based on alleged violations of various disciplinary rules.  The referenced disciplinary rules are directed solely at individual attorneys—not law firms—and all require a showing of actual—not constructive or imputed—knowledge.

10.     In addition to these legal infirmities, the U.S. Trustee's Motion wholly fails to account for the multitude of mitigating factors in the challenged cases.  It seeks a judgment equal to 100% of all fees and expenses paid to JW across 33 cases spanning over six years based on an intimate relationship between former Judge Jones and Ms. Freeman that they not only failed to disclose, but ***actively concealed from JW*** and other parties-in-interest.  The U.S. Trustee's Motion

ignores these facts, along with the fact that JW itself acted reasonably in its efforts to comply with any applicable disclosure obligations based on the facts as JW understood them and took appropriate action in severing its ties with Ms. Freeman once it confirmed the relationship.

11.     The U.S. Trustee's Motion also ignores the fact that, in each case, JW performed the work for which it was paid and the work benefitted the bankruptcy estates.  The Motion further fails to account for any of the following pertinent circumstances:  (i) the time periods and facts of any particular case, (ii) whether the cases were "prepackaged" or otherwise involved consensual or non-impairing plans, (iii) whether the plans were the result of a settlement and/or whether they were supported by voting creditors, (iv) whether Ms. Freeman was even involved in the matters (and the extent of Ms. Freeman's involvement), (v) the duration of the cases, (vi) the scope (or limited scope) of JW's employment as local and/or conflicts counsel and the associated fees requested and approved, (vii) the reasonableness and necessity of JW's fees and expenses which indisputably conferred a direct, concrete benefit to the estates, (viii) any voluntary fee reductions and/or professional fee settlements already contained in various of the cases, and (ix) the release and exculpation provisions in favor of JW in the various confirmed plans and confirmation orders.

12.     The U.S. Trustee has also not sought to vacate a single substantive order entered in any of the challenged cases.  To the contrary, the U.S. Trustee has not identified any statement, ruling, decision, order, judgment, mediator recommendation, or settlement that was allegedly improperly influenced by the secret relationship between Ms. Freeman and former Judge Jones.  Nor has the U.S. Trustee pled any actual injury to any party allegedly caused by the secret relationship.  Indeed, the U.S. Trustee cannot provide, in light of the indisputable evidence in the record in each of the 33 challenged cases, that _**any**_ relevant rulings, decisions, orders, judgments,

mediator recommendations, and/or settlements were not amply supported by applicable law and each case's evidentiary record to which the U.S. Trustee participated in.

13.     The U.S. Trustee's Motion must be denied.

## II.     FACTUAL BACKGROUND

### A.     Ms. Freeman Graduates from Baylor Law School and Pursues a Career in Bankruptcy.

14.     Ms. Freeman graduated from Baylor University School of Law in 1997.  She was admitted to the Texas Bar in 1998.  Upon graduating from law school, Ms. Freeman clerked for the Honorable (Ret.) Bankruptcy Judge Wesley Steen in the Southern District of Texas.  Following her clerkship, Ms. Freeman began her career as a bankruptcy associate at the law firm of Locke Lord Bissell & Liddell LLP n/k/a Locke Lord LLP.  Ms. Freeman was ultimately promoted to partner.  In 2009, Ms. Freeman joined Houston-based Porter Hedges LLP as a partner in the bankruptcy group and remained until 2011 when she left to become former Judge Jones's permanent law clerk.  Former Judge Jones was also a partner at Porter Hedges at that time.

15.     During all relevant times, Ms. Freeman was a nationally recognized and widely respected bankruptcy attorney.  She was active in the local legal community where she frequently planned, attended, and spoke at various local conferences.[5]  According to the Texas Board of Legal

---

[5] *See, e.g.*, Bankruptcy Bench/Bar Conference Agenda and Reading Materials regarding *The First Bankruptcy Bench/Bar Conference for the Southern District of Texas*, Nov. 6-7, 2008 (available at https://www.txs.uscourts.gov/page/bankruptcy-benchbar-conference-agenda-and-reading-materials) (last visited Apr. 24, 2024); Southern District of Texas Bankruptcy Bench Bar Conference, Corpus Christi, Texas, Apr. 20-22, 2016 (available at https://www.txs.uscourts.gov/sites/txs/files/2016%20Bench%20Bar%20Flyer.pdf) (last visited Apr. 24, 2024); Southern District of Texas Bankruptcy Bench Bar Conference, Corpus Christi, Texas, May 9-11, 2018 (available at https://inns.innsofcourt.org/media/165139/2018%20Bench%20Bar%20Flyer.pdf) (last visited Apr. 24, 2024).

Specialization, only 96 board certified business bankruptcy law lawyers bear that distinction in Texas.  Ms. Freeman has held that distinction since 2005.[6]

**B.      David R. Jones is an Acclaimed Bankruptcy Practitioner who was Appointed a Bankruptcy Judge by the Fifth Circuit.**

16.      Former Judge Jones received his Master of Business Administration from Southern Methodist University in 1986 and his Bachelor of Science in Electrical Engineering from Duke University in 1983.  He later graduated from the University of Houston School of Law in 1992. Later in his career and while still on the bench, he returned to Duke University where he received an LLM (or Master of Laws) in 2018.

17.      After earning his law degree, former Judge Jones joined the bankruptcy boutique firm of Kirkendall & Isgur.  When Judge Marvin Isgur was appointed to the bench on February 1, 2004, former Judge Jones left the firm to join Porter Hedges as a partner in the bankruptcy group. Former Judge Jones developed a successful bankruptcy litigation practice, often representing clients in high stakes, high dollar, and complicated matters.  He became widely known as a no-nonsense, tough litigator who had a demanding courtroom presence and demeanor.  He prided himself on his trial skillset, knowledge of the evidentiary rules, ability to react quickly on his feet, and ability to obtain results.

18.      Former Judge Jones left Porter Hedges in 2011 to join the bench.  He was sworn in as a bankruptcy judge for the Southern District of Texas on September 30, 2011.  Ms. Freeman followed him to serve as his law clerk, a position she held for approximately six (6) years.

---

[6] *See* Texas Board of Legal Specialization, available at https://www.tbls.org/specialtyarea/BB (last visited May 13, 2024); *see also* Texas Board of Legal Specialization, available at https://www.tbls.org/findlawyer-results (last visited May 13, 2024).

19.     To qualify for appointment as a United States bankruptcy judge, nominees must, among other things, possess, and have a reputation for, integrity and good character.[7]   Judicial candidates must also possess, and have demonstrated, outstanding legal ability and competence.[8] Former Judge Jones checked all of these boxes.  Judicial candidates are also interviewed by a merit selection panel that historically consisted of 3 members—usually the Chief District Judge, a Circuit Judge, and a member of the bar.  Candidates are ultimately approved by the Fifth Circuit Court of Appeals following an extensive background check.

20.     Former Judge Jones served as Chief Bankruptcy Judge from 2015 to 2022.  In 2016, former Judge Jones was instrumental in the creation of the two judge complex case panel for the Southern District of Texas (discussed below).  While on the bench, former Judge Jones made it his mission to mentor bankruptcy practitioners.[9]  To this point, former Judge Jones created and began hosting monthly evidence and trial technique classes in his courtroom.  An array of topics were covered, ranging from mock arguments, mock examinations, expert witness matters, and evidentiary pitfalls, among many other topics.  Oftentimes, other bankruptcy judges and prominent local practitioners attended the classes.  These classes were widely popular, and continued up until former Judge Jones's announced resignation in October 2023.

21.     Notwithstanding this friendly and approachable demeanor off the bench, former Judge Jones was a force of nature on the bench.  He was intimidating at times, unapologetically

---

[7] See, e.g., Regulations of the Judicial Conference of the United States for the Selection, Appointment, and Reappointment of United States Bankruptcy Judges, available at https://www.ca5.uscourts.gov/docs/default-source/default-document-library/qualifications-texas-southern-bankruptcy-judge,   Ch. 1,   Sec. 1.01   ("Minimum Qualifications") (last visited Apr. 24, 2024).

[8] Id.

[9] Former Judge Jones was also instrumental in implementing both the "go-to meeting" video hearing platform and "court speak", which made audio recordings of hearings available almost immediately following every hearing. These technology advances, together with other changes, helped make the Southern District of Texas a more user-friendly forum, and thus, an attractive venue.

self-assured of his opinions about issues, and did not hesitate to openly voice his displeasure of lawyers and/or their clients when he disagreed with their legal positions or strategy.[10]  This did not deter lawyers from filing complex chapter 11 cases in the Southern District of Texas, however, as former Judge Jones presided over some of the largest and most complex chapter 11 cases in the country during his tenure.

22.     On March 30, 2023, former Judge Jones was honored with the Distinguished Service Award for Lifetime Achievement[11] by the Emory University School of Law and the Emory

---

[10] *See In re KP Engineering, LP*, Case No. 19-34698, Dkt. No. 396, Jan. 30, 2020 Audio Hr'g Tr. at 17:27-18:11 (Bankr. S.D. Tex.) ("Is that really necessary? . . . It was a very simple question. Was that really necessary? . . . Then let's not do it.  I don't know why you put professionalism at issue in every single hearing.  No one wants to work with you.  I find your behavior offensive.  It can't serve your constituents.  And I don't know why you persist in doing it.  Do I need to have [a senior attorney] come over here and baby sit you in every single hearing? . . . Yes or no? . . . Sit down."); *In re Neiman Marcus Group Ltd, LLC, et al.*, Case No. 20-32519, Dkt. No. 2156, Dec. 10, 2020 Hr'g Tr. at pp. 15:15-20:11 (Bankr. S.D. Tex.) ("I don't think you are a good person.  I don't think you're a nice person.  And there is very much a side of me that wants to treat you exactly the same way that you have treated other people throughout your career and in your life.  But to do that, I would be lowering myself down to your level.  I would be tarnishing the office that I took an oath to serve and I would be tarnishing a process that I took an oath to protect.  So I'm not going to do that.  But I want you to know – and for whatever it means, and it may be nothing – that the court believes you to be a thief, a person of the lowest character that attempted to steal, not based on need, not based on necessity, but out of pure greed. . . . You enticed a lawyer at [a law firm] to participate in your wrongful actions that has resulted in the total loss of his credibility, a commodity so valuable and so rare that it simply can't be restored. . . . You play one game with me, you disrespect me one more time, you will see the other side of me that I don't want to come out.  And if you doubt my conviction, you talk to any of your lawyers from Houston that know me.  They'll tell you."); *In re Bouchard Transportation Co., Inc., et al.*, Case No. 20-34682, Dkt. No. 591, Feb. 26, 2021 Hr'g Tr. at p. 10:6-8 ("[T]here will be a hammer unlike any hammer anyone has ever seen.  None of you have ever seen me like this.  I am willing to show you in this case to save the company."); *In re TaxMasters, Inc.*, Case No. 12-32065, Dkt. No. 30, Apr. 5, 2012 Hr'g Tr. at pp. 12:1-7, 13:5-7, 22:21-24 & 26:5-8 ("I'll tell you now, and you know me, I am a big believer in punitive damages for folks who intentionally try to usurp the bankruptcy process, and that's where my head is right now. . . . You may also want to rethink where you're going. . . . I think the argument you're making is really dangerous and I would never make it . . . . I told you three times it's not an argument I would make.  You chose to make it anyway.  You're a big boy, you'll live with that. . . . If you think I'm slightly irritated today, you haven't seen anything yet.  And I am not -- and again, I'm not trying to threaten you or scare you or anything else."); *In re Neiman Marcus Group Ltd LLC, et al.*, Case No. 20-32519, Dkt. No. 827, May 29, 2020 Hr'g Tr. at p. 171:9-21 ("[W]hat he gave me was a line of bull.  And I don't appreciate it.  You're asking me to put a lot of faith in people I don't know.  And I expect transparency, I expect forthrightness, and I got neither today from him.  And I want you to know that I've noted that, and whatever it is I'm about to do, I won't forget the testimony today.  And I'm going to tell you that if [it] weren't for my – I don't know you, and I assume that you're a very fine lawyer – if it weren't for my confidence in [another attorney in the firm], we'd be scheduling a hearing that would have had an entirely different implication.  That's how bothered I am about that testimony.").

[11] Previous recipients of this lifetime achievement award included figures like Kenneth Klee, Harvey Miller, Richard Levin, and Judge Mary Walrath.

Bankruptcy Developments Journal.[12]  Less than 7 months later, on October 15, 2023, former Judge Jones announced that he was resigning from the bench, with such resignation to be effective November 15, 2023.

**C.    As the Popularity of the Southern District of Texas Grows for Large and Complex Chapter 11 Cases, so Does JW's Bankruptcy Practice.**

23.    Before 2016, many Texas-based companies like Enron Corporation, American Airlines, and Energy Future Holdings, among others, filed their bankruptcy cases in locations other than Texas believing they could achieve quicker and better results.[13]  Starting in 2016, the Bankruptcy Court for the Southern District of Texas—led by former Judge Jones—implemented a series of reforms.  These changes aimed to streamline the practice in the District, making the venue more attractive to large Texas based companies (and others) that needed restructuring.  Included in those reforms was the creation of a two judge "complex case panel" whereby 50% of chapter 11 cases designated as "complex cases" would be randomly assigned to former Judge Jones, and 50% of chapter 11 cases designated as "complex cases" would be randomly assigned to Judge Isgur.[14]  In other words, overnight, bankruptcy lawyers that typically worked on large, complex cases before any one of 3 or 4 sitting bankruptcy judges (depending on the time period), now would be practicing almost exclusively (and routinely) before 1 of 2 bankruptcy judges in every case.  The Court implemented the change to, among other things, make procedures

---

[12] The Emory Bankruptcy Developments Journal is the nation's premier student-run bankruptcy journal, and the most subscribed-to publication at Emory Law.

[13] *See* "Chief Judge David Jones: The Man Who Saved the Texas Bankruptcy Practice," The Texas Lawbook, Aug. 23, 2020 (https://texaslawbook.net/chief-judge-david-jones-the-man-who-saved-the-texas-bankruptcy-practice/) (last visited Apr. 24, 2024).

[14] *See, e.g.,* S.D. Tex. Bankr. 2016-3 Work Order (effective July 1, 2016). Prior to the implementation of the two-judge complex case panel, chapter 11 cases that were filed in Houston would be randomly assigned to any of the sitting bankruptcy judges based on the then applicable Southern District of Texas case "work order".  Divisions outside of Houston had a more limited draw of potential Southern District of Texas judges given the nature of those locations.

more transparent and predictable by way of having rules and procedures that applied specifically to the larger and more complex cases.

24.     As cases began to be filed with more consistency in the Southern District of Texas, JW quickly became one of the local go-to law firms due to its reputation, knowledge of local practice, familiarity with the courts, and lower regional billing rates.  Indeed, JW cemented itself in this role years before Ms. Freeman joined the firm, oftentimes teaming with other large law firms that did not have a significant bankruptcy practice in the Southern District of Texas.

25.     Thus, JW's popularity as local counsel had nothing to do with Ms. Freeman or her unknown relationship with former Judge Jones.  Rather, it was tied to JW's efforts outside of the Southern District of Texas to form and strengthen relationships with large law firms that had no significant Houston bankruptcy presence, and to advocate for the Southern District of Texas by emphasizing the benefits of the complex case panel, the quality of the judges in the Southern District of Texas, and the excellence of the local bar.

**D.     Ms. Freeman Applies to JW and Joins the Firm as an Income Partner.**

26.     In early 2018, while Ms. Freeman clerked for former Judge Jones, Ms. Freeman sought a partnership position at JW.  As is customary, Ms. Freeman was provided with a *Lateral Partner Questionnaire* ("LPQ") which she was asked to complete and return in writing.  Among other things, the LPQ asked Ms. Freeman to disclose any possible conflicts of interest. Ms. Freeman did not disclose any possible conflicts of interest but wrote that she was "unable to work on [a] matter *currently pending* before Judge Jones" (emphasis added):

> **15)   PLEASE COMPLETE THE ATTACHED FORM REGARDING POSSIBLE CONFLICTS OF INTEREST.**
>
> I am not currently representing clients.  I am unable to work on an matter currently pending before Judge Jones.

27.     JW understood that Ms. Freeman's inability to work on matters currently pending before former Judge Jones was a requirement of former Judge Jones, and was to last for a period that equaled Ms. Freeman's clerkship tenure—here, six (6) years.

28.     At no time during the interview or onboarding process with JW did Ms. Freeman disclose that she had in the past—or was currently having—an intimate relationship with former Judge Jones.  Nor did she disclose that she lived with former Judge Jones or that they co-owned residential property.  JW had no reason to believe otherwise.  And even to this date, JW **still** does not know the true state or history of the relationship between former Judge Jones and Ms. Freeman.

29.     JW hired Ms. Freeman on May 14, 2018, as an income partner in the bankruptcy group.[15]  JW announced Ms. Freeman's hiring publicly on May 23, 2018, which announcement acknowledged Ms. Freeman's prior clerkship with former Judge Jones—a fact that was widely known by local practitioners, including the U.S. Trustee.[16]

**E.     Ms. Freeman Achieves Recognition for Her Abilities and is Promoted to Equity Partner at JW.**

30.     Ms. Freeman continued to excel in the bankruptcy field.  Her peers repeatedly recognized her intellect, skillset, and reputation—character traits that were equally apparent to her JW colleagues.  To this point, Ms. Freeman was recognized as a "Top Lawyer" in Best of Houstonia, Houstonia Magazine, in 2019; Ms. Freeman was named "H Texas Top Lawyers in Houston" in 2020; Ms. Freeman was recognized by Lawdragon as one of the 500 leading global

---

[15] JW, like many other firms, has two tiers of partnership:  an income partner where such partners' compensation consists of a salary and potential bonus, but they do not share in the profits of the firm; and an equity partner who does receive a share of the firm's profits.

[16] *See JW Expands Bankruptcy/Reorganization, Wealth Planning, and White Collar Defense Practices*, May 23, 2018 (available at https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/) (last visited Apr. 23, 2024) ("Liz brings to our Chambers USA-ranked Bankruptcy practice over 20 years' experience with out-of-court workouts and complex bankruptcy and reorganization matters. Prior to joining JW, Liz was the permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas.").

restructuring and insolvency lawyers in 2020 and 2022; Ms. Freeman was selected as a Texas Rising Star by Texas Super Lawyers (by Thompson Reuters) from 2004-2011 and named a Texas Super Lawyer by Thomson Reuters in 2022; Ms. Freeman was recognized as a Best Lawyer in America for bankruptcy and creditor/debtor rights in 2019, 2021-2023; and Ms. Freeman was Chambers-ranked by Chambers USA as one of America's Leading Lawyers for Business in 2022.

31.     JW's younger and mid-level attorneys also viewed Ms. Freeman as a mentor.  It was common for such attorneys to ask Ms. Freeman for guidance on bankruptcy matters, even on cases she was not involved.  Lawyers outside of JW would also, on occasion, do the same.

32.     Ms. Freeman was promoted to equity partner two (2) years into her employment at JW, effective January 1, 2021.

**F.     _Anonymous Allegations_ of an Intimate Relationship Between Former Judge Jones and Ms. Freeman are Raised on March 6, 2021, in Connection with the _McDermott International_ Bankruptcy Cases.**

33.     On Saturday, March 6, 2021, the very first **_allegations_** of a possible intimate relationship between former Judge Jones and Ms. Freeman surfaced.  _Pro se_ litigant Michael Van Deelen raised these allegations in an email to Mr. Cavenaugh in connection with his effort to recuse former Judge Jones from the _McDermott_ bankruptcy proceedings.[17]  Mr. Van Deelen asserted that he had received an anonymous letter claiming former Judge Jones and Ms. Freeman were in an intimate relationship.

---

[17] By way of additional background, the _McDermott_ bankruptcy cases were filed on January 21, 2020—approximately fifteen (15) months **before** JW received the email from Mr. Van Deelen.  _See In re McDermott International, Inc., et al._, Case No. 20-30336 (Bankr. S.D. Tex.).  The bankruptcy cases were filed as pre-packaged bankruptcy cases that were supported by more than two-thirds of all of McDermott's funded debt creditors for a restructuring transaction that equitized nearly all the company's funded debt, eliminating over $4.6 billion of debt.  While all general unsecured claims were unimpaired under the proposed plan (_i.e._, paid in full or otherwise reinstated), the company's existing common equity interests (of which Mr. Van Deelen held 30,000 shares) would not receive any recovery and would be canceled and extinguished.  Unsatisfied with this result, Mr. Van Deelen embarked on an unsuccessful litigation campaign in the _McDermott_ bankruptcy proceeding and elsewhere.  Former Judge Jones ultimately confirmed the McDermott plan over Mr. Van Deelen's objection which Mr. Van Deelen did not appeal.

34.     Upon receiving the March 6, 2021 email, JW discussed the allegations with Ms. Freeman that same day.  At that time, Ms. Freeman acknowledged the existence of a prior romantic relationship with former Judge Jones before the COVID-19 pandemic (*i.e.*, sometime prior to March 2020),[18] but stated that such romantic relationship was well in the past and was not ongoing.  Indeed, Ms. Freeman told a representative of the firm that she had not even seen former Judge Jones since before the onset of the pandemic, a year earlier.

35.     Ms. Freeman's acknowledgment of a past, intimate relationship contradicted the disclosures she made to JW when she joined the firm.  Moreover, the admission was contrary to JW's understanding and belief that the relationship between Ms. Freeman and former Judge Jones was on a professional-only basis.  Further, Ms. Freeman did not inform JW at this time (or any time) that she had purchased residential property with former Judge Jones in 2017, or that she lived with him.

36.     JW delivered Mr. Van Deelen's email to the Southern District of Texas Bankruptcy Court the morning of March 8, 2021—the first business day after receipt.[19]  That email was hand

---

[18] At the time Ms. Freeman acknowledged the existence of this **_prior_** relationship, there was nothing for JW to disclose or supplement.  The challenged cases implicated during this time period were filed post-COVID and had concluded prior to Ms. Freeman's later admission to JW, on March 30, 2022, that the relationship with former Judge Jones had resumed.  *See, e.g., In re Bouchard Transportation Company, Inc., et. al.*, Case No. 20-34682 (CML) (Nov. 2020 petition date); *In re Gulfport Energy Corporation, et al.*, Case No. 20-35562 (CML) (Nov. 2020 petition date); *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI) (Dec. 2020 petition date); *In re Seadrill Limited, et al.*, Case No. 21-30427 (CML) (Feb. 2021 petition date); *In re Katerra, Inc.*, Case No. 21-31861 (CML) (June 2021 petition date); *In re Seadrill New Finance Limited, et al.*, Case No. 22-90001 (MI) (Jan. 2022 petition date).

Ms. Freeman recently confirmed JW's lack of knowledge in the related litigation pending before U.S. Chief District Judge Alia Moses in the *Bouchard* matter.  *See Defendant Elizabeth Carol Freeman's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)*, Civ. Action No. 4:24:cv-00693 [Dkt. No. 18 at ¶ 4] (S.D. Tex. 2024) ("At the time of the [*Bouchard*] case, Freeman was a partner in JW.  Freeman and Judge Jones had a close personal relationship when she joined JW in May, 2018.  When JW appeared as co-debtor-in-possession counsel in the [*Bouchard*] chapter 11 case, Judge Jones elected not to disclose the relationship with Freeman in the [*Bouchard*] case.  **_Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time_** . . . .") (emphasis added).

[19] *See* Adv. Pro. No. 20-03309 at Dkt. Nos. 36, 37 & 78.  While the U.S. Trustee purports to be unaware of this proceeding and the allegations initially raised by Mr. Van Deelen, the notice of removal of Mr. Van Deelen's state court complaint against certain McDermott officers—which was the genesis of the adversary proceeding that

delivered and filed under seal given the personal nature of the allegations and related concerns regarding Mr. Van Deelen's erratic disposition and credibility (which were previously raised in the *McDermott* proceedings),[20] and the fact that Ms. Freeman had expressly denied the existence of any current romantic relationship when confronted by JW the day prior.

37.     JW immediately consulted with outside ethics counsel and engaged Peter Jarvis of the respected law firm of Holland & Knight. JW took the additional step of instructing Ms. Freeman that she could not work on any matters that were assigned to former Judge Jones, and JW informed Ms. Freeman that the firm would deduct from her compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters that were pending before former Judge Jones in light of this past relationship.

38.     To ensure that JW was accurately portraying the relevant facts, JW's general counsel presented Ms. Freeman with a draft letter that outlined the relevant facts known by JW following its discussion with Ms. Freeman; namely, JW understood:

(a)     Ms. Freeman and former Judge Jones were and remain close personal friends;

(b)     Former Judge Jones precluded Ms. Freeman from appearing personally in his court for six years (*i.e.*, the length of Ms. Freeman's clerkship);

(c)     the draft letter outlined the claims and allegations raised by Mr. Van Deelen; and

---

ultimately led to Mr. Van Deelen's recusal request—was noticed on the main bankruptcy case docket to which the U.S. Trustee had appeared.

| 01/22/2020 | | Notice of Appearance and Request for Notice Filed by Hector Duran Jr (Duran, Hector) (Entered: 01/22/2020) |
| 07/17/2020 | 983 (55 pgs; 2 docs) | Adversary case 20-03309. Nature of Suit: (01 (Determination of removed claims or cause)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Notice of Removal Michael Van Deelen. Fee Amount $350 (Attachments: # 1 Adversary Cover Sheet) (Cavanaugh, Matthew) (Entered: 07/17/2020) |

[20] For instance, on March 12, 2020, former Judge Jones conducted the McDermott confirmation hearing where Mr. Van Deelen called former Judge Jones a "son of a bitch" (which was audible on the audio recording of the hearing). Mr. Van Deelen also called McDermott's counsel a "pasty white fuck" and threatened McDermott's lawyer by saying "I will have my way with your wife." *See Van Deelen v. Dickson*, Adv. Proc. No. 20-03309 [Adv. Dkt. No. 59, p. 9]; *see also Emergency Motion for Michael Van Deelen to Appear and Show Cause Why He Should Not be Held in Contempt of Court and Prohibited from Further Contact with the Debtors, Their Officers, or Their Counsel, In re McDermott International*, Case No. 20-30336 at Dkt. No. 694.

(d)    while there existed a romantic relationship between Ms. Freeman and former Judge Jones at some time prior to March 2020, that relationship had ended and there was no ongoing romantic relationship, nor was any romantic relationship expected going forward.

***The draft letter also stated that former Judge Jones and Ms. Freeman each own their own homes, and that they do not and have not lived together.***  The draft letter informed Ms. Freeman of JW's view that an ongoing intimate relationship with former Judge Jones (as opposed to an intimate relationship that had terminated in the past) would be incompatible with JW's continued participation in cases before Judge Jones.[21]

39.    JW requested Ms. Freeman to review the letter "to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with."  In response, Ms. Freeman confirmed the contents of the letter:

| | |
|---|---|
| **From:** | Freeman, Liz |
| **Sent:** | Friday, August 27, 2021 1:15 PM |
| **To:** | Cowlishaw, Pat |
| **Subject:** | RE: Request for Opinion [IMAN-JWDOCS.FID560826] |
| **Sensitivity:** | Private |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Pat,

I reviewed the letter and have no questions or issues. I deeply appreciate the time and effort everyone has put into this very difficult situation. I lament that it was necessary. Thank you for everything.

- Liz

---

[21] A true and correct copy of the draft letter presented to Ms. Freeman and her response in acknowledgement of the same is attached hereto as **Exhibit 1**.

**G.      The Bankruptcy Court Denies Mr. Van Deelen's Recusal Request, which Ruling is Affirmed on Appeal by the District Court.**

40.      Judge Isgur was assigned Mr. Van Deelen's recusal request.  Judge Isgur ordered that the March 6, 2021 email remain sealed "pending this Court's determination of whether there is credible, admissible evidence in support of the allegations made . . . ."[22]

41.      On March 10, 2021, Judge Isgur presided over an evidentiary hearing to consider Mr. Van Deelen's recusal request.  At the recusal hearing, Judge Isgur acknowledged that "I've seen it [*i.e.*, the anonymous letter]", and ruled that "anonymous pieces of mail aren't admissible in federal court".[23]  Mr. Van Deelen had no other admissible evidence, and thus was unable to meet his clear and convincing burden of proof.   Nonetheless, while Mr. Van Deelen could not authenticate the anonymous letter or overcome hearsay objections, and while the anonymous letter remained under seal, ***the recusal hearing was public*** making the nature of the allegations raised clear:[24]

> **Mr. Van Deelen**:  Mr. Van Deelen, ***do you have any reasons to believe that Judge Jones has been engaged in an improper sexual relationship with [ ] Freeman, an attorney with JW*** who is involved in the instant action . . . .
>
> . . .
>
> Mr. Van Deelen:  I'm not going to argue with you your Honor.  I just want to put this on the record.  I'm not trying to do a deposition of Mr. Dupont to ask him about the contents of the anonymous letter. . . .  ***I'm trying to do a deposition of Ms. Freeman [inaudible] and her relationship with Judge Jones which I believe was a sexual relationship*** . . . .[25]

---

[22] *See* Adv. Case No. 20-03309, Dkt. No. 40, ¶ 2.

[23] *See* Mar. 10, 2021 Audio Hr'g at 5:19-5:30.

[24] Because Mr. Van Deelen was a *pro se* litigant, Judge Isgur instructed Mr. Van Deelen that he should ask questions to himself rather than simply provide a narrative, pause to allow for any objections, and then respond as appropriate.

[25] *See* Adv. Case No. 20-03309, Mar. 10, 2021 Audio Hr'g at 5:50-6:17 & 8:43-9:6 (emphasis added).

At the conclusion of that public recusal hearing, in the absence of any competent and admissible evidence, Judge Isgur entered an *Order Denying Motion to Recuse*.[26]   Mr. Van Deelen appealed, which appeal was assigned to United States District Judge Andrew S. Hanen,[27] who ultimately found that "Judge Isgur did not err in denying the Appellant's Motion to Recuse Judge Jones."[28] Judge Hanen also specifically addressed Mr. Van Deelen's alleged anonymous letter that was the subject of his March 6, 2021 email to JW:

> Appellant claims to have received an anonymous letter that accused Judge Jones of corruption. There is no evidence to suggest that Van Deelen's recitation as to how he came by this "letter" is false. He filed a copy of that letter along with the addendum to his motion to disqualify Judge Jones. (Adv. 20-3309, Doc. No. 39). ***This Court has reviewed the letter*** and determined that:   1) the contents and sender of the letter have not, and perhaps cannot, be verified; and 2) Appellant's general accusation of corruption to the extent it is based upon this "letter" is unsupported by any facts and therefore does not demonstrate that bias or partiality existed.
>
> ***The Court notes that the "letter" is unsigned, contains unsupported allegations of a scurrilous nature, and contains no indicia of personal knowledge of authenticity from anyone.  (Id.). Not even Appellant claims the allegations are true.  This form of unsupported character assassination has no place in any court proceeding and cannot be grounds for recusal.***[29]

42.     As a result of JW's own prompting and filing with the bankruptcy court, two courts were aware of the same allegations that JW was confronting.   And two courts, after a public hearing, ruled that recusal was not required because there was no credible evidence to support the

---

[26] *See* Adv. Case No. 20-03309, Dkt. No. 42.

[27] *See* Appeal No. 4:21-cv-3369 (S.D. Tex.).  Mr. Van Deelen also sought a writ of mandamus from the Fifth Circuit to compel recusal (*see* Fifth Circuit Court of Appeals, Case No. 20-20286), but that petition was denied on unrelated grounds.  *Id*. at Dkt. No. 24.

[28] *See* Appeal No. 4:21-cv-3369, Dkt. No. 102.

[29] *See* Appeal No. 4:21-cv-3369, Dkt. No. 102 at pp. 37-38 (emphasis added).

"scurrilous" allegations, which amounted to nothing more than an "unsupported character assassination."

43. Fifth Circuit Chief Judge Priscilla Richman further highlighted this point in her Complaint later filed against former Judge Jones:

> Judge Jones referred the motion to recuse to another bankruptcy judge but did not disclose to that judge the facts regarding his relationship with Ms. Freeman. ***On information and belief, the judge who ruled on the motion to recuse was unaware that Judge Jones was romantically involved with Ms. Freeman or that they were cohabiting.*** The motion to recuse was denied and appealed to a federal district court judge, and ***on information and belief, Judge Jones did not apprise that district court judge of the relationship with Ms. Freeman, and that judge was also unaware of the facts regarding the relationship***. The appeal was denied.[30]

44. Just as Chief Judge Richman noted as to both Judge Isgur and Judge Hanen, JW was equally "unaware that Judge Jones was romantically involved with Ms. Freeman or that they were cohabiting" because Ms. Freeman told JW there was no relationship. Yet, the day after learning of Mr. Van Deelen's March 6, 2021 allegations, JW affirmatively confronted Ms. Freeman and asked the very question that apparently was never asked of former Judge Jones. ***Ms. Freeman affirmatively denied the existence of any current intimate relationship to JW at this***

---

[30] *See Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002*, Complaint No. 05-24-9002 at pp. 2-3 (5th Cir. Oct. 13, 2023) (emphasis added).

*time*,[31] and continued to deny the existence of an ongoing intimate relationship until March 30, 2022, as discussed below.[32]

**H.     Ms. Freeman Reveals, for the First Time, the Existence of a Current Relationship with Former Judge Jones after Confronted with New Credible Information.**

45.     Following the 2021 allegations and Ms. Freeman's confirmation of JW's understanding of the facts (*i.e.*, no ongoing romantic relationship and no living together), JW did not learn of any other facts pertaining to Ms. Freeman's and former Judge Jones's alleged secret relationship until the Spring of 2022.

46.     On February 1, 2022, at a dinner between a JW non-bankruptcy partner and his friend (who happened to also be friends with Ms. Freeman's ex-husband), the friend volunteered that Ms. Freeman and former Judge Jones were living together.  The JW partner challenged that assertion and was given further information supporting the allegation.

47.     JW's management concluded that they would again confront Ms. Freeman directly. Due to Ms. Freeman's children's Spring Break schedules and related vacation and college trips,

---

[31] Indeed, in connection with litigation with Mr. Van Deelen currently pending before U.S. Chief District Judge Alia Moses, Ms. Freeman acknowledged that JW had no knowledge of any intimate relationship (or cohabitation) at any time prior to or during the McDermott proceedings.  *See Defendant's Elizabeth Carol Freemans's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b), Michael D. Van Deelen v. David R. Jones, Elizabeth Carol Freeman, JW, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP*, Civ. Action No. 4:23-cv-3729 [Dkt. No. 45 at ¶ 3] (S.D. Tex. 2023) ("Freeman and Judge Jones had a close personal relationship when she joined JW in March, 2018.  When JW appeared as co-debtor-in-possession counsel in the McDermott chapter 11 case, Judge Jones elected not to disclose the relationship with Freeman in the McDermott case.  **__Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time__** . . . .") (emphasis added).

[32] Even the U.S. Trustee has described the relationship between Ms. Freeman and former Judge Jones—whenever it existed and to whatever extent it existed—as a "secret" relationship among them.  *See, e.g.*, *United States Trustee's Objection to First and Final Fee Application of the Law Office of Liz Freeman for Allowance and Payment of Fees and Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from January 31, 2023 through June 16, 2023*, filed in *In re IEH Auto Parts Holding LLC*, Case No. 23-90054 (CML) [Dkt. No. 1049, ¶ 33] ("Ms. Freeman had a **secret relationship** with Judge Jones . . . .") (emphasis added); *see also Motion of the United States Trustee to Reopen Case* filed in *In re iQor Holdings, Inc., et al.*, Case No. 2034500 (CML) [Dkt. No. 323, ¶ 25] ("Moreover, the U.S. Trustee has acted quickly to address the many cases implicated by JW's and Ms. Freeman's misconduct by appearing in front of Judge Jones despite the **secret** relationship between Ms. Freeman and Judge Jones. The information about the **secret** relationship only became public on October 6, 2023 . . . ." and p. 9 (arguing that the "**Secret** Relationship" establishes cause to reopen) (emphasis added).

JW confronted Ms. Freeman in late March 2022.  At that meeting, Ms. Freeman once more denied the existence of any current, intimate relationship with former Judge Jones, and stated that the alleged new facts related to an earlier time period.

48.     On March 30, 2022, the day after JW confronted Ms. Freeman about the new allegations a second time, Ms. Freeman finally admitted that she and former Judge Jones had rekindled their relationship.  Ms. Freeman continued, however, to deny that she and former Judge Jones were living together and she never mentioned the co-ownership of residential property.  JW again informed Ms. Freeman that she could not work on any cases pending in former Judge Jones's court, and JW removed her share of partnership profits from cases in front of former Judge Jones which resulted in a retroactive reduction in Ms. Freeman's compensation of approximately $46,373 for 2021 and $32,595 through November 2022.

49.     Accordingly, from the time Ms. Freeman joined JW in May 2018 until March 30, 2022—JW lacked knowledge of any ongoing intimate relationship or the fact that the two were living together and jointly owned a home.  During this same period, ***JW's representation in 23 of the 33 cases (collectively, the "Pre-March 2022 Cases")***[33] ***now challenged by the U.S. Trustee had already concluded, and JW had no ongoing disclosure obligations***.[34]  These Pre-March 2022 Cases account for $10,470,463.80 of the total amount of $21,334,952.30 in fees and expenses the U.S. Trustee seeks to recover from JW.  Ms. Freeman's fees account for $1,652,061.50 of these Pre-March 2022 Cases.  Of these Pre-March 2022 Cases, 12 cases have been closed (many for years), and 3 cases involve situations where former Judge Jones served only as mediator and had

---

[33] A chart identifying the Pre-March 2022 Cases and summarizing other key facts is attached hereto as **Exhibit 2**.

[34] In each of the confirmed plans—as is typical—any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code terminated on the confirmation date.  *See, e.g., In re Exco Resources, Inc., et al.*, Case No. 18-30155 [Dkt. No. 2103, Art. II.A.2.d]; *see also* **Exhibit 2**.

no ability to issue any rulings or enter any orders.[35]   Neither the U.S. Trustee nor any party in interest objected to the reasonableness or necessity of any of JW's fees and expenses incurred in respect of any of the Pre-March 2022 Cases.

## I.    JW Separates Ms. Freeman from the Firm After Ms. Freeman and Former Judge Jones Refuse to Disclose Their Relationship.

50.    Ms. Freeman's initial lies and eventual revelation thrust JW into an unprecedented situation.  The law firm knew the status quo was not appropriate, yet, the situation involved a highly personal matter involving a sitting Federal Bankruptcy Judge who, as late as October 2023,[36] was convinced that his interpretation of the applicable rules did not require disclosure of the relationship with Ms. Freeman.  These unprecedented circumstances required a thoughtful approach.

51.    To that end, and as an initial matter, JW instructed Ms. Freeman that she must continue to not work on any matters that were assigned to former Judge Jones, and JW would

---

[35] *See In re Exco Resources, Inc.*, Case No. 18-30155 (MI); *In re Tailored Brands, Inc., et al.*, Case No: 20-33900 (MI); *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI).

Former Judge Jones served as the presiding judge in the remaining Pre-March 2022 Cases:  (1) *In re Westmoreland Coal Company*, Case No. 18-35672 (MI); (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML); (3) *In re McDermott International Inc.*, Case No. 20-30336 (MI); (4) *In re Sheridan Holding Company I, LLC, et al.*, Case No. 20-31886 (CML); (5) *In re Whiting Petroleum, Corporation et al.*, Case No. 20-32021 (CML); (6) *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (CML); (7) *In re Stage Stores, Inc., et al.*, Case No. 20-32564 (CML); (8) *In re Hornbeck Offshore Services, Inc., et al.*, Case No. 20-32679 (CML); (9) *In re Chesapeake Energy Corporation, et al.*, Case No. 20-33233 (CML); (10) *In re Covia Holdings Corporation, et al.*, Case No. 20-33295 (CML); (11) *In re Volusion, LLC*, Case No. 20-50082 (MI); (12) *In re Denbury Resources Inc., et al.*, Case No. 20-33801 (CML); (13) *In re iQor Holdings, Inc.*, Case No. 20-34500 (CML); (14) *In re J.C. Penney Company, Inc., et al.*, Case No. 20-20182 (CML); (15) *In re Bouchard Transportation Company, Inc., et. al.*, Case No. 20-34682 (CML); (16) *In re Gulfport Energy Corporation, et al.*, Case No. 20-35562 (CML); (17) *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI); (18) *In re Seadrill Limited, et al.*, Case No. 21-30427 (CML); (19) *In re Katerra, Inc.*, Case No. 21-31861 (CML); and (20) *In re Seadrill New Finance Limited, et al.*, Case No. 22-90001 (MI).

Ms. Freeman did not bill any time in connection with the *Seadrill New Finance* and *Katerra* cases, and Ms. Freeman's fees billed in *Sheridan Holding*, *Hornbeck Offshore*, *IQor*, *Seadrill Limited*, and *Jones Energy* totaled less than $11,000 in each case.

[36] *See* "Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer," The Wall Street Journal, Oct. 7, 2023 (available at https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00) (last visited May 17, 2024).

continue to deduct from her compensation any share of the firm's net income generated from bankruptcy work performed on behalf of clients in matters pending before former Judge Jones.

52.     JW also again engaged Mr. Jarvis.   JW likewise suggested that Ms. Freeman engage counsel for herself.  Ms. Freeman engaged a well-known and widely respected lawyer— Tom Kirkendall.  Mr. Kirkendall communicated with both JW and Mr. Jarvis over the next couple months to discuss whether a disclosure could be made in connection with existing and future retention applications.   Mr. Kirkendall ultimately suggested disclosure of a "close personal relationship", and provided the following alternative proposals to JW, on behalf of Ms. Freeman:

- Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court. Ms. Freeman does not have any financial interest in the Firm's cases in Judge Jones' court in that the Firm does not provide to her any compensation based on the Firm's cases in Judge Jones' court and her partner share of the Firm's profits does not include a share in any of the Firm's profits attributable to cases in Judge Jones' court.
- Elizabeth Freeman is a partner in the Firm. Ms. Freeman is a former law partner of the Honorable David R. Jones, Chief Bankruptcy Judge of the Southern District of Texas, at the Houston-based law firm of Porter & Hedges from 2009-2011. She is also a former briefing attorney for Judge Jones from 2011-2018. Ms. Freeman maintains a close personal relationship with Judge Jones. Consequently, Ms. Freeman does not appear in court or provide her professional services on the Firm's cases in Judge Jones' court, and Ms. Freeman has no financial interest in the Firm's cases in Judge Jones' court.

53.     JW believed the above-suggested language was insufficient, and in fact, would have been misleading to the extent it implied the relationship was only that of a non-intimate friend.[37] Accordingly, JW did not agree to any of Ms. Freeman's suggested "disclosures" and informed Mr. Kirkendall and Ms. Freeman on or around June 2022 that it believed Ms. Freeman's departure from the law firm was the only path forward.

---

[37] At this time, JW was still unaware that Ms. Freeman and former Judge Jones lived together and that they jointly owned residential property.

54.     The parties then discussed the terms of Ms. Freeman's separation and JW encouraged Ms. Freeman to look for other employment.   Over the following months, JW, Ms. Freeman, and her counsel negotiated the terms of Ms. Freeman's exit while she continued seeking other employment.   A draft Confidential Withdrawal Agreement (the "Withdrawal Agreement") was provided to Ms. Freeman on October 28, 2022.

55.     Around this same time, former Judge Jones invited Mr. Cavenaugh to his chambers at the conclusion of a hearing.   Former Judge Jones apologized that JW had to deal with the situation.   He then reiterated his view:  any disclosure obligation belonged to him, and him alone. He further stated that any relationship he had with Ms. Freeman was casual, and no different from encounters with many other lawyers at many other firms.   Former Judge Jones also insinuated that he was unhappy with JW's insistence on a full and complete disclosure and Ms. Freeman's exit.

56.     At the end of that in-chambers meeting, former Judge Jones handed Mr. Cavenaugh a piece of paper that contained former Judge Jones's proposed disclosure.   Former Judge Jones directed that JW "needs to make this happen."  Former Judge Jones instructed Mr. Cavenaugh that JW could file the following disclosure in all future applications pending in his Court:[38]

> **To be included in all future employment applications filed before Judge Jones**
>
> Although not specifically required by FED. R. BANKR. P. 2014(a), the Firm makes the following additional disclosures.  Veronica Polnick, an associate with the Firm, previously served as a law clerk for Judge Jones.  Ms. Polnick maintains a social friendship with Judge Jones and regularly attends a skills class taught by Judge Jones in his courtroom through the Houston Young Lawyers Association.  Elizabeth Freeman, a partner with the Firm, also served as a law clerk for Judge Jones.  In addition, Ms. Freeman was a partner at Judge Jones' former law firm.  Ms. Freeman maintains a close personal relationship with Judge Jones and at Judge Jones' request, does not appear in court before Judge Jones.  Finally, Judge Jones officiated a wedding ceremony for Genevieve Graham, an associate with the Firm.  Ms. Graham and Judge Jones maintain a social friendship. Ms. Graham also regular attends Judge Jones' skills class along with other associates and partners of the Firm.

---

[38] Neither Ms. Graham nor Ms. Polnick were aware of or assisted in the drafting of former Judge Jones's proposed disclosure.

57.     JW considered the proposed disclosure by former Judge Jones insufficient, inadequate, and misleading for the same reasons as Ms. Freeman's proposed disclosure.  Neither told the truth.

58.     As former Judge Jones and Ms. Freeman continued refusing to publicly acknowledge their relationship, JW coordinated Ms. Freeman's exit from the firm.  Ms. Freeman executed the Withdrawal Agreement on November 29, 2022.  Ms. Freeman's withdrawal from JW was effective as of December 1, 2022, at which time Ms. Freeman started her own firm:  The Law Office of Liz Freeman PLLC.

59.     From the time Ms. Freeman admitted to JW that she had an ongoing romantic relationship with former Judge Jones on March 30, 2022 until her separation from the firm, JW was engaged as an estate professional in only 10 of the 33 cases (collectively, the "Post-March 2022 Cases") subject to the U.S. Trustee's Motions.[39]  These Post-March 2022 Cases account for $10,864,486.40 of the total amount of $21,334,952.30 in fees and expenses the U.S. Trustee seeks to recover from JW.  Ms. Freeman's fees account for $353,807.81 of these Post-March 2022 Cases.

60.     Of the Post-March 2022 Cases, former Judge Jones served only as mediator in 4 of the cases and had no ability to issue any rulings or enter any orders, and in 2 of these 4 mediated cases, The Law Office of Liz Freeman was separately retained as conflicts counsel.[40]  The

---

[39] A chart identifying these Post-March 2022 Cases and summarizing other key facts is attached hereto as **Exhibit 3**.

[40] Former Judge Jones served as mediator in the following Post-March 2022 Cases:  (1) *In re HONX, Inc.*, Case No. 22-90035 (MI); (2) *In re Altera Infrastructure LP*, Case No. 22-90130 (MI); (3) *In re Auto Plus Auto Sales LLC*, Case No. 23-90055 (CML); and (4) *In re GWG Holdings, Inc.*, Case No. 22-90032 (MI).

In *HONX, Inc.*, the issues surrounding former Judge Jones's and Ms. Freeman's relationship were known by all parties prior to confirmation, and JW voluntarily reduced its fees by $250,000 with the agreement and consent of its client.

In *GWG*, Ms. Freeman exited the firm during the cases and was retained as conflicts counsel.

And in *AutoPlus*, Ms. Freeman had already exited from the firm and was separately retained by the debtors as co-counsel and conflicts counsel and had her own disclosure obligations.  JW filed its fee application in *AutoPlus* on September 29, 2023.  *See In re AutoPlus*, Case No. 23-90054, Dkt. No. 911.  The deadline to object to that final fee application was October 20, 2023.  Two weeks prior to that objection deadline, on October 6, 2023, the Business Insider reported the story of former Judge Jones's relationship with Ms. Freeman.  The Court entered an Order

---

remaining 6 cases involve situations where former Judge Jones was the presiding judge (1 of which is a chapter 7 case).[41]  And of these 6 cases, Ms. Freeman did not bill any time in connection with 5 of them.[42]

61.    As with the Pre-March 2022 Cases, neither the U.S. Trustee nor any party in interest objected to the reasonableness or necessity of any of JW's fees and expenses in any of the Post-March 2022 Cases.

**J.    Ms. Freeman Exits JW and Opens her Own Law Firm.**

62.    Beginning on December 1, 2022, Ms. Freeman was no longer a partner of JW. Nonetheless, JW and Ms. Freeman continued their representation of joint clients for ongoing matters, and worked together to ensure a smooth transition.   Indeed, as noted by the parties' Withdrawal Agreement:  "JW and you expect and intend to confer and cooperate in good faith with respect to future relationships with existing JW bankruptcy practice clients, including the potential transfer of any client matters, in whole or in part, to you and a future employer, all subject to client direction."  The Withdrawal Agreement also contemplated the possibility of Ms. Freeman working as co-counsel with JW following her separation, provided that JW and Ms. Freeman would not work together as co-counsel in matters before Judge Jones.

---

approving JW's final fee application on November 4, 2023.  *See id.*, Dkt. No. 981.  Thus, the U.S. Trustee had the ability to object to JW's final fee application, and chose not to.

[41] Former Judge Jones served as the presiding judge in the following Pre-March 2022 Cases:  (1) *In re Basic Energy Services, Inc., et al.*, Case No. 21-90002 (CML); (2) *In re Strike, LLC*, Case No. 21-90054 (MI); (3) *In re 4E Brands Northamerica, LLC*, Case No. 22-50009 (MI); (4) *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (CML); (5) *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR); and (6) *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI).

The *Brilliant Energy* case was a chapter 7 case.

[42] These cases include *Basic Energy*, *Strike*, *4E Brands*, *Sungard AS New Holdings*, *Brilliant Energy*, and *LaForta*.

K.      **Ms. Freeman and Former Judge Jones's Relationship Becomes Public.**

63.      On October 4, 2023, Mr. Van Deelen—the same *pro se* litigant who sought Judge Jones's recusal in the *McDermott* bankruptcy case—filed a Complaint (the "Van Deelen Complaint") against former Judge Jones in the United States District Court for the Southern District of Texas, Houston Division.[43]

64.      According to an interview published by the Wall Street Journal, former Judge Jones publicly acknowledged the secret intimate relationship only *after* the filing of the Van Deelen Complaint, on October 7, 2023.[44]   In that interview with the Wall Street Journal, former Judge Jones is quoted as saying:  "***I came to the conclusion that I had no duty to disclose***."  He added that he didn't want to fuel a perception that "if you were going to be appearing, you should go out and hire Jackson Walker."[45]

65.      News of the Van Deelen Complaint and Ms. Freeman's and former Judge Jones's intimate relationship broke, and ultimately resulted in Fifth Circuit Chief Judge Priscilla Richman filing a Complaint against Judge Jones based on "information constituting reasonable grounds for inquiry into whether a covered judge has engaged in misconduct . . . ."[46]

66.      That same day, former Judge Jones announced that he would resign from the complex case panel in the Southern District of Texas.  Two days later, on October 15, 2023,

---

[43] *See* S.D. Tex. Case No. 4:23-cv-3729, at Dkt. No. 1.

[44] *See* "Bankruptcy Judge Jones Named in a Lawsuit Over Romantic Relationship With Local Lawyer," The Wall Street Journal, Oct. 7, 2023 (available at https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00) (last visited May 17, 2024).

[45] *Id.* (emphasis added).

[46] *See Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002*, Complaint No. 05-24-9002 (5th Cir. Oct. 13, 2023).

Judge Jones announced that he was resigning from the bench, with such resignation to be effective November 15, 2023.

67.     To date, neither Ms. Freeman nor former Judge Jones have disclosed the full extent or nature of their relationship to JW or publicly.

**L.     The U.S. Trustee Seeks to Vacate Various JW Retention and Fee Orders.**

68.     On or around October 30, 2023, JW, through outside counsel, contacted the U.S. Trustee's office to discuss the recent news and events and offered an in-person sit down interview with JW so that JW could inform the U.S. Trustee of all relevant facts, timelines, and events as described herein.

69.     Instead of interviewing JW, on November 2-3, 2023 and without any prior notice, the U.S. Trustee filed his original Motions premised entirely on the Complaint filed by Chief Judge Richman and various unsubstantiated, uncorroborated, and largely inaccurate news reports.[47]  The U.S. Trustee also filed related *Motions for Withdrawal of the Reference and Referral of Motion for Relief under Rule 60(b)(6) and Related Matters* in each case (collectively, the "Motions to Withdraw the Reference").[48]

---

[47] *See In re Westmoreland Coal Company*, Case No. 18-35672 (CML) [Dkt. No. 3360]; *In re J.C. Penney Direct Marketing Services, LLC*, Case No. 20-20184 (CML) [Dkt. No. 1236]; *In re Whiting Petroleum Corporation*, Case No. 20-32021 (CML) [Dkt. No. 1447]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (MI) [Dkt. No. 3178]; *In re Stage Stores LLC*, Case No. 20-32564 (CML) [Dkt. No. 1217]; *In re Chesapeake Energy Corporation*, Case No. 20-33233 (CML) [Dkt. No. 4515]; *In re Covia Holdings Corporation*, Case No. 20-33295 (CML) [Dkt. No. 1477]; *In re Tug Robert J. Bouchard Corporation*, Case No. 20-34758 (CML) [Dkt. No. 354]; *In re Mule Sky LLC*, Case No. 20-35561 (CML) [Dkt. No. 1000]; *In re Seadrill Partners LLC*, Case No. 20-35740 (MI) [Dkt. No. 834]; *In re Seadrill Limited*, Case No. 21- 30427 (CML) [Dkt. No. 1588]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 254]; *In re Katerra Inc.*, Case No. 21-31861 (CML) [Dkt. No. 2049]; *In re Basic Energy Services, Inc.*, Case No. 21-90002 (CML) [Dkt. No. 1759]; *In re Strike LLC*, Case No. 21-90054 (CML) [Dkt. No. 1471]; *In re 4E Brands Northamerica LLC*, Case No. 22-50009 (MI) [Dkt. No. 517]; *In re Sungard AS New Holdings*, Case No. 22-90018 (CML) [Dkt. No. 1026].

[48] *See In re Westmoreland Coal Company*, Case No. 18-35672 (CML) [Dkt. No. 3361]; *In re J.C. Penney Direct Marketing Services, LLC*, Case No. 20-20184 (CML) [Dkt. No. 1237]; *In re Whiting Petroleum Corporation*, Case No. 20-32021 (CML) [Dkt. No. 1448]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (MI) [Dkt. No. 3179]; *In re Stage Stores LLC*, Case No. 20-32564 [Dkt. No. 1217]; *In re Chesapeake Energy Corporation*, Case No. 20-33233 [Dkt. No. 4516]; *In re Covia Holdings Corporation*, Case No. 20-33295 (CML) [Dkt. No. 1478]; *In re Tug Robert J. Bouchard Corporation*, Case No. 20-34758 (CML) [Dkt. No. 355]; *In re Mule Sky LLC*, Case No. 20-35561

**M.** **A Miscellaneous Proceeding is Opened in the Bankruptcy Courts to Address All Pre-Trial and Discovery Matters Relating to the U.S. Trustee's Rule 60(b) Motions.**

70.     On December 9, 2023, with the consent of all of the bankruptcy judges in the Southern District of Texas, Chief Judge Rodriguez entered an *Order Commencing Miscellaneous Proceeding Regarding Employment Orders and Awarded Fees and Expenses to JW, LLP in Affected Cases* (the "Miscellaneous Proceeding"), pursuant to which Chief Judge Rodriguez would consider all pre-trial and discovery matters regarding the Motions, and the underlying presiding judges in each affected case would retain all other substantive matters and issues.[49]

71.     Approximately two (2) months later, on January 29, 2024, Chief Judge Rodriguez issued a *Scheduling Order* in the Miscellaneous Proceeding setting various dates and deadlines.[50] The Scheduling Order was amended on February 26, 2024 (as amended, the "Miscellaneous Proceeding Scheduling Order").[51]

---

(CML) [Dkt. No. 1001]; *In re Seadrill Partners LLC*, Case No. 20-35740 (MI) [Dkt. No. 835]; *In re Seadrill Limited*, Case No. 21-30427 (CML) [Dkt. No. 1589]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 255]; *In re Katerra Inc.,* Case No. 21-31861 (CML) [Dkt. No. 2050]; *In re Basic Energy Services, Inc*., Case No. 21-90002 (CML) [Dkt. No. 1760]; *In re Strike LLC*, Case No. 21-90054 (MI) [Dkt. No. 1472]; *In re 4E Brands Northamerica LLC*, Case No. 22-50009 (MI) [Dk. No. 518]; *In re Sungard AS New Holdings*, Case No. 22-90018 (CML) [Dkt. No. 1027].

In connection with the Motions to Withdraw the Reference, Chief Judge Rodriguez held a hearing on the motion to withdraw filed in the *Brilliant Energy* case on December 5, 2023.  The U.S. Trustee and JW agreed that they would be bound by whatever report and recommendation Chief Judge Rodriguez issued in that case for all other affected cases.  On December 21, 2023, Chief Judge Rodriguez issued his *Report and Recommendation to the United States District Court that the United States Trustee's Motion to Withdraw the Reference be Denied* (the "Report and Recommendation").  *See* Miscellaneous Proceeding Case No. 23-00645 (EVR), Dkt. No. 44.  The District Court has not yet issued an order on the Report and Recommendation as of the date of this filing.

[49] *See* Case No. 23-00645 (EVR), Dkt. No. 1.

[50] *Id.*, Dkt. No. 57.

[51] *Id.*, Dkt. No. 76.

72.     Pursuant to the Scheduling Order, on January 31, 2024, the U.S. Trustee filed motions to reopen various closed chapter 11 cases[52] for the purpose of seeking the same relief as sought in the prior Rule 60(b) Motions filed in various open and pending cases.  JW filed responses opposing each of the U.S. Trustee's requests to reopen on March 6, 2023.[53]  The closed cases remain closed as of the date of this Response; *provided however*, that JW and the U.S. Trustee agreed that discovery could nonetheless proceed in respect of each of those cases.[54]

---

[52] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 8]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 279]; (3) *In re McDermott International Inc.*, Case No. 20-30336 (MI) [Dkt. No. 1138]; (4) *In re Sheridan Holding Company I, LLC, et al.*, Case No. 20-31886 (CML) [Dkt. No. 7]; (5) *In re Hornbeck Offshore Services, Inc., et al.*, Case No. 20-32680 [Dkt. No. 8] (6) *In re Covia Holdings Corporation, et al.*, Case No. 20-33302 (CML) [Dkt. No. 238]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 334]; (8) *In re Denbury Resources Inc., et al.*, Case No. 20-33812 (CML) [Dkt. No. 11]; (9) *In re iQor Holdings, Inc.*, Case No. 20-34500 (CML) [Dkt. No. 323]; (10) *In re Seadrill New Finance Limited, et al.*, Case No. 22-90002 (MI) [Dkt. No. 8]; (11) *In re Exco Resources, Inc.*, Case No. 18-30155 (MI) [Dkt. No. 2342]; (12) *In re Tailored Brands, Inc.*, Case No. 20-33916 (MI) [Dkt. No. 253].

[53] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 12]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 283]; (3) *In re McDermott International Inc.*, Case No. 20-30336 (MI) [Dkt. No. 1142]; (4) *In re Sheridan Holding Company I, LLC, et al.*, Case No. 20-31886 (CML) [Dkt. No. 11]; (5) *In re Hornbeck Offshore Services, Inc., et al.*, Case No. 20-32680 (CML) [Dkt. No. 14] (6) *In re Covia Holdings Corporation, et al.*, Case No. 20-33302 (CML) [Dkt. No. 247]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 338]; (8) *In re Denbury Resources Inc., et al.*, Case No. 20-33812 (CML) [Dkt. No. 15]; (9) *In re iQor Holdings, Inc.*, Case No. 20-34500 (CML) [Dkt. No. 327]; (10) *In re Seadrill New Finance Limited, et al.*, Case No. 22-90002 (MI) [Dkt. No. 12]; (11) *In re Exco Resources, Inc.*, Case No. 18-30155 (MI) [Dkt. No. 2342]; (12) *In re Tailored Brands, Inc.*, Case No. 20-33916 (MI) [Dkt. No. 254].

[54] *See In re Westmoreland Coal Company*, Case No. 18-35689 (MI) [Dkt. No. 10]; (2) *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 288]; (3) *In re McDermott International Inc.*, Case No. 20-30336 (MI) [Dkt. No. 1156]; (4) *In re Sheridan Holding Company I, LLC, et al.*, Case No. 20-31886 (CML) [Dkt. No. 22]; (5) *In re Hornbeck Offshore Services, Inc., et al.*, Case No. 20-32680 (CML) [Dkt. No. 21]; (6) *In re Covia Holdings Corporation, et al.*, Case No. 20-33302 (CML) [Dkt. No. 240]; (7) *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 349]; (8) *In re Denbury Resources Inc., et al.*, Case No. 20-33812 (CML) [Dkt. No. 20]; (9) *In re iQor Holdings, Inc.*, Case No. 20-34500 (CML) [Dkt. No. 332]; (10) *In re Seadrill New Finance Limited, et al.*, Case No. 22-90002 (MI) [Dkt. No. 21]; (11) *In re Exco Resources, Inc.*, Case No. 18-30155 (MI) [Dkt. No. 2368]; (12) *In re Tailored Brands, Inc.*, Case No. 20-33916 (MI) [Dkt. No. 264].

73.     On February 29, 2029,[55] and March 29, 2024,[56] the U.S. Trustee filed his various

amended Rule 60(b) Motions in the affected cases per the Scheduling Order.

## III.     RESPONSE

**A.     The U.S. Trustee Cannot Satisfy his Burden under Rule 60(b) to Demonstrate Extraordinary Circumstances or Any Manifest Injustice to Vacate JW's Retention or Fee Orders.[57]**

74.     Though nominally framed under Rule 60(b)(6), the U.S. Trustee does not identify

the legal standard governing the threshold relief he seeks until the end of his Motion.  And for

good reason.  Rule 60(b)(6) is available only in extraordinary circumstances upon consideration

of a multitude of factors and to prevent manifest injustice, all while balancing the requested relief

against the need for preserving the finality of judgments or orders.

---

[55] *In re Westmoreland Coal Company*, Case No. 18-35672 (MI) [Dkt. No. 3377]; *In re Jones Energy, Inc., et al.*, Case No. 19-32112 (CML) [Dkt. No. 282]; *In re McDermott International Inc.*, Case No. 20-30336 (MI) [Dkt. No. 1141]; *In re Sheridan Holding Company I, LLC, et al.*, Case No. 20-31886 (CML) [Dkt. No. 10]; *In re Whiting Petroleum, Corporation et al.*, Case No. 20-32021 (CML); [Dkt. No. 1465]; *In re Neiman Marcus Group LTD, LLC*, Case No. 20-32519 (CML) [Dkt. No. 3224]; *In re Stage Stores, Inc., et al.*, Case No. 20-32564 (CML) [Dkt. No. 1241]; *In re Energy Services Puerto Rico, LLC, et al.*, Case No. 20-32680(CML) [Dkt. No. 13]; *In re Chesapeake Energy Corporation, et al.*, Case No. 20-33239 (CML) [Dkt. No. 563]; *In re Covia Finance Company LLC, et al.*, Case No. 20-33302 (CML) [Dkt. No. 235]; *In re Volusion, LLC*, Case No. 20-50082 (MI) [Dkt. No. 337]; *In re Denbury Holdings, Inc., et al.*, Case No. 20-33801 (CML) [Dkt. No. 14]; *In re iQor Holdings, Inc.*, Case No. 20-34500 (CML) [Dkt. No. 326]; *In re J.C. Penney Direct Marketing Services, LLC, et al.*, Case No. 20-20182 (CML) [Dkt. No. 1351]; *In re Tug Robert Bouchard, Corporation, et. al.*, Case No. 20-34682 (CML) [Dkt. No. 38]; *In re Mule Sky LLC, et al.*, Case No. 20-35562 (CML) [Dkt. No. 1089]; *In re Seadrill Partners, LLC*, Case No. 20-35740 (MI) [Dkt. No. 877]; (18) *In re Seadrill Limited, et al.*, Case No. 21-30427 (CML) [Dkt. No. 1621; *In re Katerra, Inc.*, Case No. 21-31861 (CML) [Dkt. No. 2093]; *In re Seadrill Member LLC, et al.*, Case No. 22-90002 (MI) [Dkt. No. 11]; *In re Basic Energy Services, Inc., et al.*, Case No. 21-90002 (CML) [Dkt. No. 1791]; *In re Brilliant Energy, LLC*, Case No. 21-30936 (EVR) [Dkt. No. 284]; *In re Sungard AS New Holdings, LLC, et al.*, Case No. 22-90018 (CML) [Dkt. No. 1043]; *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) [Dkt. No. 316]; *In re Strike LLC, et al.*, Case No. 21-90054 (MI) 1540]; *In re 4E Brands North America LLC*, Case No. 22-50009 [Dkt. No. 645].

[56] *In re Exco Services, Inc.,* Case No. 18-30155 (MI) [Dkt. No. 2538]; *In re TMW Merchants LLC., et al.*, Case No: 20-33900 (MI) [Dkt. 255]; *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI) [Dkt. No. 2930]; *In re GWG Holdings, Inc., et al.*, Case No. 22-90032 (MI) [Dkt. No. 2415]; *In re Altera Infrastructure Project Services LLC, et al.*, Case No. 22-90129 (MI) [Dkt. No. 96]; *In re Auto Plus Auto Sales LLC*, Case No. 23-90055 (CML), Case No. 23-90055 (CML) [Dkt. No. 50]; *In re Honx, Inc.*, Case No. 22-90035 (MI) [Dkt. No. 1379]; *In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) [Dkt. No. 316].

[57] Because there have been no final fee orders entered in either the *HONX* (Case No. 22-90035) or *GWG* (Case No. 22-90032) cases, the U.S. Trustee does not rely on Rule 60 with respect to his challenge to JW's fee applications in those cases.  All other arguments raised by the U.S. Trustee are substantively the same.

i.      **Applicable Legal Standard.**

75.     Rule 60(b), made applicable by Bankruptcy Rule 9024, contains six separate clauses.   The U.S. Trustee relies solely on the sixth clause (*i.e.*, Rule 60(b)(6)), a "catchall" provision, which permits a court to "relieve a party . . . from a final judgment . . . for any other reason that justifies relief."[58]

76.     "Rule 60(b)(6) is available only in 'extraordinary circumstances'"[59] where the movant shows "the initial judgment to have been manifestly unjust."[60]  Although there is no firm definition of what constitutes "extraordinary circumstances," the Fifth Circuit recognizes that courts may consider a wide range of factors.[61]  Moreover, where the request for relief turns on a judge's failure to recuse, the Fifth Circuit focuses on certain of those factors, including "in an appropriate case, 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process,'" against the need for preserving the finality of judgments and orders.[62]  The U.S. Trustee bears the burden of proving such extraordinary circumstances and manifest injustice.

---

[58] *See* FED. R. CIV. P. 60(b)(6).

[59] *Blundell v. Home Quality Care Home Health Care, Inc.*, No. 3:17-CV-1990-L-BN, 2018 WL 276154, at *3 (N.D. Tex. Jan. 3, 2018) (quoting *Buck v. Davis*, 580 U.S. 100, 121 (2017)).

[60] *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 357 (5th Cir. 1993) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990), *abrogated by* 37 F.3d 1069 (5th Cir. 1994)) (internal quotation marks omitted).

[61] In *Seven Elves, Inc. v. Eskenazi*, the Fifth Circuit set forth the following factors to consider:  (1) that final judgments should not lightly be disturbed; (2) that a Rule 60(b) motion should not be used as a substitute for appeal; (3) that Rule 60(b) should be liberally construed in order to achieve substantial justice; (4) whether, if the case was not decided on its merits due to a default or dismissal, the interest in deciding the case on its merits outweighs the interest in the finality of the judgment and there is merit in the claim or defense; (5) whether, if the judgment was rendered on the merits, the movant had a fair opportunity to present his claims; (6) whether there are intervening equities that would make it inequitable to grant relief; and (7) any other factors relevant to the justice of the judgment under attack.  635 F.2d 396, 402 (5th Cir. 1981).

[62] *Banning*, 5 F.3d at 357; *see also In re Poteet Const. Co., Inc.*, 122 B.R. 616, 618 (Bankr. S.D. Ga. 1990).

77.     Here, the U.S. Trustee has not pleaded any facts needed to show the kind of extraordinary circumstances or manifest injustice necessary to carry his heavy burden.  Indeed, in 23 of the 33 challenged cases, only Ms. Freeman and former Judge Jones, not JW, knew about their own ongoing intimate relationship and living arrangements in whatever form they may have existed.  And when JW later learned of the existence of that intimate relationship on March 30, 2022, JW affirmatively rejected Ms. Freeman's and former Judge Jones's attempt to further hide the extent of their relationship and otherwise acted reasonably and in good faith to comply with its legal and ethical obligations that culminated with Ms. Freeman's separation from the firm.

78.     In addition to these threshold truths, the U.S. Trustee's Motion wholly neglects the following undisputed material facts:

- neither the U.S. Trustee nor any party in interest challenged (or now challenges) the reasonableness of JW's fees or the necessity or benefit of JW's services to the estates;

- in many cases, the fees awarded to JW were nominal when compared with the total fees awarded to its clients' lead counsel and other estate-retained professionals;

- in various cases, JW's fee award already reflects voluntary fee reductions, discounts, or reductions from estate-professional fee settlements;

- Ms. Freeman did not bill the estates in a number of cases, but when she did, fees for her time were nominal compared to JW's total billings;

- most of the challenged cases involve confirmed plans that did not impair creditors or that were supported by stakeholders;

- most of the challenged cases culminated in confirmed plans that resulted from extensive negotiations across various stakeholder groups each of whom were represented by sophisticated counsel (including a number of prepackaged chapter 11 cases;

- the settlements reached in the various cases were in the best interests of the estates and consistent with the evidentiary record and Bankruptcy Code;

- certain of the confirmed plans were the result of mediated settlements reached with the assistance of Judge Isgur and Judge Lopez serving as mediator, not former Judge Jones;

- not a single order, ruling or judgment has been alleged to have been entered in error and/or otherwise unsupported by the facts and evidentiary record; and

- none of the estates or their respective stakeholders suffered any actual harm due to the Freeman-Jones relationship or its alleged non-disclosure.

79.     The U.S. Trustee's Motion also fails legally for a host of reasons.  <u>First</u>, the U.S. Trustee lacks standing to prosecute the Motion because the "sanctions" relief he seeks is a thinly disguised claim for "disgorgement" of fees.  Claims against JW for those type of "sanctions" are estate-owned claims that must be brought by an appropriate estate representative, not the U.S. Trustee.  <u>Second</u>, the confirmed plans, which are no longer subject to challenge, released and exculpated JW from liability for these estate claims.  <u>Third</u>, JW did not violate the Bankruptcy Code, Bankruptcy Rules, or Texas Disciplinary Rules of Professional Conduct because, among other things, (a) Ms. Freeman's knowledge and alleged lack of disinterestedness are not imputed to JW; (b) JW could not have disclosed a relationship that was concealed from it; and (c), when JW confirmed the existence of an intimate relationship on March 30, 2022, it acted reasonably and responsibly to address it.  <u>Fourth</u>, former Judge Jones's alleged disqualification in cases where JW served as estate-retained counsel does not mandate vacatur of orders approving JW's retention or awarding fees.  And <u>fifth</u>, sanctions are not appropriate under the circumstances and equities of the cases given the undisputed facts and other mitigating factors.

### ii.     The U.S. Trustee Does Not Have Standing to Assert Estate Claims and Causes of Action.

80.     JW does not dispute that the U.S. Trustee has broad authority to participate and be heard in bankruptcy cases, including the right to file appropriate objections and motions necessary

to fulfill his statutory obligations.[63]  That right to participate in a chapter 11 proceeding, however, is wholly distinct from the right to assert and control an estate cause of action—"[t]he former does not equate to the latter."[64]

81.     Unless a trustee is appointed to displace the debtor-in-possession or another entity is granted derivative standing, the debtor-in-possession is exclusively "accountable for the estate's property, including its valuable legal claims," consistent with its fiduciary duties.[65]  Indeed, the debtor-in-possession alone has the fiduciary duty to weigh the costs and potential benefits of claims and determine whether pursuit of a claim would serve the best interests of the estate or not.[66]

82.     The relief the U.S. Trustee seeks is an estate claim dressed up as a claim for sanctions.

83.     The Fifth Circuit has repeatedly held that claims based on generalized harm to the estate—*i.e.*, conduct affecting the estate generally versus conduct uniquely affecting a particular creditor—or claims that seek to recover property improperly transferred from the estate, constitute

---

[63] 11 U.S.C. § 307.

[64] *In re Smart World Technologies, LLC*, 423 F.3d 166, 182 (2d Cir. 2005) (Bankruptcy Code § 1109(b) allows a party in interest to intervene in a pending proceeding but does not allow it to take control of the estate's legal causes of action); *see also Hartford Underwriters Ins. Co. v. Union Planters, N.A.*, 530 U.S. 1, 8 (2000) (section 1109 "does not bestow any right to usurp" the debtor-in-possession's right to initiate "litigation that belongs exclusively to the estate") (internal quotations omitted); *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 455-53 (3d Cir. 1982) (distinguishing between the right to participate in a proceeding "initiated by a . . . debtor in possession" and the right to assert such cause of actions); *In re Sunbeam Corp.*, 287 B.R. 861, 862 (S.D.N.Y. 2003) (right to intervene is distinct from "the right, in essence, to take ownership of the [estate's] causes of action"); *In re Quigley Co., Inc.*, 437 B.R. 102, 158 (Bankr. S.D.N.Y. 2010) ("While section 307 of the Bankruptcy Code grants the United States Trustee the right to appear and be heard on any issue . . ., it does not authorize the United States Trustee to assert control over causes of action belonging to the Quigley estate."); *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 (Bankr. S.D.N.Y. June 21, 2019) ("Party-in-interest standing is a separate requirement, and thus, the party seeking relief in a chapter 11 case must establish constitutional standing, prudential standing, and party-in-interest standing under section 1109(b)"); *In re SRC Liquidation, LLC*, 2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019) (same); *In re Old ANR, LLC*, 2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019) (same).

[65] *In re Smart World Technologies*, 423 F.3d at 183; 11 U.S.C. §§ 323, 1106, & 1107.

[66] *In re Smart World Technologies*, 423 F.3d at 175; *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (U.S. 1985).

estate claims.[67]  The relief requested by the U.S. Trustee seeking sanctions to recover funds **paid by** the estates **for** the estates' and their stakeholders' benefit, based on allegations of improper conduct generally **affecting** the estates is unquestionably an estate claim.[68]  In fact, the U.S. Trustee accuses JW of causing "damage [to] the administration of the estate generally."[69]

84.    Principles of equality of distribution and judicial efficiency necessarily require standing for such estate claims to vest exclusively within the debtor-in-possession.[70]  Neither the Bankruptcy Code nor any principal of federal common law contemplates multiple parties pursuing the same claims, and forcing defendants (and the Court) to litigate parallel proceedings, be liable for double damages, or settle the same claims twice.  Indeed, such a scenario would violate basic principles of due process.  "In making the debtor-in-possession accountable for the estate's legal

---

[67] *In re Schimmelpenninck*, 183 F.3d 347, 359-60 (5th Cir. 1999) (the debtor-in-possession "is the proper party to assert the claim, for the benefit of all creditors, provided the claim advances a generalized grievance"); *see also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (if a claim " is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor," the debtor-in-possession is the proper party to bring the claim and bind all parties-in-interest"); *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 ("If the claim is a general one with no particularized injury, and any creditor could bring the same claim," the debtor-in-possession (or successor to the claim under the confirmed plan) is the proper person to assert it.").

[68] *In re SunEdison, Inc.*, 2019 WL 2572250, at *6 (claim seeking to vacate retention and fee order for estate professional and disgorgement of fees paid and sanctions was an estate claim only the post-confirmation trust that acquired estate claims could pursue and settle); *In re Syntax-Brillian Corp.*, 2016 WL 7177615, at * 11 (D. Del. Dec. 9, 2016) (motion for sanctions and disgorgement against debtor's counsel was an estate cause of action released under the plan); *see also Ruhl v. HSBC Mortg. Servs., Inc.*, 399 B.R. 49, 55-56 (E.D. Wis. 2008) (claims seeking disgorgement of improper interest form mortgage servicer following confirmation and competition of a chapter 13 plan was an "estate" cause of action because the alleged harm was to the estate and any proceeds from the action would return to the estate; accordingly, the estate was the entity with Article III standing to bring the claim); 11 U.S.C. § 549 (vesting the debtor-in-possession with the exclusive right to avoid any post-petition transfer of property that is not authorized by the Bankruptcy Code).

[69] *See* Motion, at § IV.D. As to the Pre-March 2022 Cases, the alleged non-disclosure of something that happened after the various plans went effective could not possibly harm an estate that no longer exists.  *See In re TransAmerican Natural Gas Corp.*, 127 B.R. 800, 803-04 (S.D. Tex. 1991) (rejecting argument that post-confirmation claim for breach of fiduciary duty was part of the administration of the estate because the bankruptcy estate had ceased to exist at confirmation).

[70] *In re Schimmelpenninck*, 183 F.3d at 359 ("the Code's general policies of securing and preserving the debtor's property and ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern" when evaluating standing).

claims, Congress vested the debtor with the responsibility to determine how best to handle those claims."[71]

85.     Notably, the U.S. Trustee does not seek any statutory-based fines or penalties or other sanctions that would accrue to the government.[72]  Rather, whether styled as relief under Rule 60(b) or the Court's sanction authority,[73] the U.S. Trustee's requested relief in reality seeks to have JW "disgorge" or "return" 100% of the fees and expenses paid by the bankruptcy estates back to the estates[74] based on various alleged violations of rules and breaches of fiduciary duties.[75]

86.     In each of the cases where a plan was confirmed, estate claims that were not released were transferred to either the reorganized debtor or a plan/liquidating trust agent.  In the

---

[71] *In re Smart World Technologies*, 423 F.3d at 175.

[72] *See In re LaForta Gestão e Investimentos*, Case No. 22-90126 (MI) Hr'g Tr. pp 5:20–6:1-6:4 (The Court:  "Who do you want the money to go?"  The U.S. Trustee:  "Your Honor, so this is one of the things that we said early on in this case.  I think that probably right now my answer would be the most appropriate remedy would be to deposit the money with the Registry of the Court to allow parties-in-interest who had claims against the estate to file that.  Perhaps that means that someone needs to be administered.  Perhaps that means that it needs to have a trustee."  The Court:  "That would seem very strange.").

[73] The substantive allegations and relief sought, not the labels of the claims, determines whether a claim is an estate or direct claim.  *In re First Leads & Marketing, Inc.*, 2023 WL 4163478, at *2 (Bankr. N.D. Ga. 2023) ("The substance of the allegations, not the labeling of the corresponding claims for relief, controls whether a claim is direct or derivative of the Bankruptcy Estate.");  *In re Spiech Farms, LLC*, 603 B.R. 395, 404 (Bankr. W.D. Mich. 2019) (the underlying facts and harm committed determine whether a claim belongs to the bankruptcy estate); *see also In re Apex Long Term Acute Care-Katy, L.P.*, 599 B.R. 314, 322 (Bankr. S.D. Tex. 2019) (examining substance of relief sought rather than the label attached to the claim to determine if the claim was an estate claim transferred and released under a confirmed chapter 11 plan).

[74] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at pp. 1-2, 45-46, 48-49, 52, 55-56 & ¶¶ 61, 175, 178, 180, 183, 184, 185, 187, 188, 192, 198, 206, 207, 211 (seeking the "return" of funds and/or "disgorgement").  *See also Ungaretti & Harris, LLP v. Steinberg (In re Res. Tech. Corp.)*, 356 B.R. 435, 443 (Bankr. N.D. Ill. 2006) (acknowledging that "the estate has a claim for disgorgement of fees").

[75] *See, e.g., In re Sanchez Energy Corporation, et al.*, Case No. 19-34508 (MI), Dkt. No. 2930, at p. 56 & ¶¶ 7, 9, 59, 108, 135, 136, 137, 139, 140, 147, 188 & 193 (referencing JW's fiduciary duties and breaches thereof).  Breach of fiduciary duty claims are undeniably estate-owned claims.  *See Collins v. Sydow (In re NC12, Inc.)*, 478 B.R. 820, 836 (Bankr. S.D. Tex. 2012) (J. Isgur) ("The breach of fiduciary duty claim is property of the estate.  Only the [chapter 7 trustee or debtor] has standing to assert the claim, and therefore the Court dismisses the claim for lack of subject matter jurisdiction.");  *In re Margaux City Lights Partners, Ltd.*, 2014 Bankr. LEXIS 4841, *26 (Bankr. N.D. Tex. Nov. 24, 2014) (citing *NC12* for the proposition that a "breach of fiduciary duty claim to belong to the estate when allegations of damages all referred to injury to the debtor").

2 cases where there was no plan,[76] estate claims belong to the debtor or former debtors.  And in either case, any other party-in-interest must seek derivative standing to assert estate claims. However, derivative standing requires a showing that (i) the claim is colorable; and (ii) the debtor-in-possession has refused unjustifiably to pursue it.[77]  Derivative standing is granted only in narrow circumstances, recognizing that the debtor-in-possession alone has a fiduciary duty to all parties-in-interest, and to protect parties and bankruptcy estates from unnecessary and uneconomical litigation.[78]

87.     Unless and until any party in each of the challenged cases seeks and obtains derivative standing to assert an estate claim (such as the estate claims asserted here), exclusive standing to assert and control over such claims remains with the debtor-in-possession or relevant estate fiduciary under the confirmed plans—as it should.  The applicable debtors' estates paid JW's fees and expenses; the debtors' estates would be affected by any generalized harm to the estates based on any alleged lack of disclosure; and any sanctions from this proceeding would go solely and exclusively to the debtors' estates in accordance with and pursuant to the respective confirmed plans.  Moreover, the costs of this proceeding, including the accrual of any additional U.S. Trustee fees, as well as legal fees that would be incurred to participate in this proceeding, will be borne by the applicable debtors' estates.

88.     The U.S. Trustee made no effort to discuss the relief sought or request prosecution by any debtor or plan agent in any of the challenged cases, let alone attempt to satisfy the standard for derivative standing prior to filing his Motions.  Instead, the U.S. Trustee's Motion seeks to

---

[76] Of the 33 cases where Rule 60(b) Motions are pending, all but 2 (*Brilliant Energy* and *LaForta*) involve a confirmed plan.

[77] *See Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860-64 (5th Cir. 2013).

[78] *In re Balt. Emergency Servs. IL, Corp.*, 432 F.3d 557, 560-62 (4th Cir. 2005).

bypass these safeguards for the estates and parties-in-interest, without regard to the views or interests of the affected estates.[79]

89.     While there may be other avenues to address the conduct of former Judge Jones and Ms. Freeman and the allegations against JW, attempting to assert an estate claim, particularly one with nominal potential benefits to the estates and significant potential costs, is not one of them.[80]

### iii.     The U.S. Trustee's Asserted Estate Claims Were Released Under the Applicable Plans.

#### (a)     The Confirmed Plans Include Broad Release and Exculpation Provisions in Favor of JW.

90.     In nearly every challenged case,[81] the U.S. Trustee's requested relief against JW is barred under the plan's release and exculpation provisions.  The confirmed plans unconditionally released JW from all known and unknown causes of action that belonged to the estate that had any connection to the respective chapter 11 case, and where applicable, to the mediation conducted by former Judge Jones.[82]  The confirmed plans also include third-party releases with a similar scope.[83]

91.     In addition to the releases, nearly all the confirmed plans exculpate JW from any causes of action related to an act or omission relating to or arising out of the chapter 11 cases.[84]

---

[79] Notably, although the U.S. Trustee is an administrative officer with significant supervisory responsibilities, the U.S. Trustee is not a "party in interest" under section 1109(b).  COLLIER ON BANKRUPTCY ¶ 1109.03 (16th ed.).  If the U.S. Trustee were a "party in interest" under section 1109(b) of the Bankruptcy Code, then section 307 of the Code would be largely redundant, as would a number of other provisions of the Code that specify that certain actions may be taken either by a party in interest or the U.S. Trustee.  *Id.*

[80] JW does not dispute that the U.S. Trustee has the ability to object to JW's final fee applications in the *HONX* (Case No. 22-90035) or *GWG* (Case No. 22-90032) cases, although JW notes that it already provided a voluntary $250,000 fee reduction in *HONX* with its client's agreement.

[81] *Brilliant Energy* is a chapter 7 case, and the *LaForta* chapter 11 case was dismissed. The plan in *Sanchez Energy* did not include a release provision.

[82] *See, e.g.,* **Exhibits 2 & 3**.

[83] *Id.*

[84] *Id.*

These release and exculpation provisions are enforced by a plan injunction, which prohibits any entity from asserting against JW the causes of action so released or subject to exculpation.[85]

92.     In a supplemental brief the U.S. Trustee filed in the *Exco Resources* case,[86] the U.S. Trustee argued that he was not a "Releasing Party" under the plain language of the third-party release provision in the confirmed plan; thus, the U.S. Trustee asserted that the release provision did not bar his requested Rule 60(b) relief in that case.[87]  But the U.S. Trustee's argument ignores the estate's release and exculpation of JW.

93.     Neither section 586 of title 28 of the United States Code or section 307 of the Bankruptcy Code grants the U.S. Trustee the power to assert estate claims against non-debtor parties like the current claims asserted against JW in the challenged cases.  And as to these estate-owned claims, JW was released and exculpated.

> **(b)     Section 1144 of the Bankruptcy Code Bars the U.S. Trustee's Requested Relief.**

94.     Section 1144 of the Bankruptcy Code and well-settled *res judicata* principles bar the U.S. Trustee's untimely attempts to collaterally attack the release and exculpation provisions in the confirmed plans.  Because a confirmation order is a final judgment entitled to preclusive

---

[85] *Id.*

[86] *See In re Exco Resources, Inc. et al.*, Case No. 18-30155 (MI), *United States Trustee's Brief in Advance of March 26 Status Conference on the United States Trustee's and Reorganized Debtors' Motions to Reopen and the Threshold Issues Identified by the Court* [Dkt. No. 2349] (the "Exco Brief").  Because the U.S. Trustee's standing arguments raised in the Exco Brief are relevant here, JW has addressed those arguments in this Response for the sake of completeness.

[87] Exco Brief, at ¶¶ 33-34.

effect,[88] all challenges to the confirmed plans' release and exculpation provisions are now barred, and the U.S. Trustee has no ability to modify such plans or to revoke any confirmation orders.[89]

95.     Recognizing this fact, the U.S. Trustee argued in *Exco Resources* that the Fifth Circuit's decision in *Highland Capital* categorically invalidates the plan's exculpation provisions as they relate to JW.[90]  But the Fifth Circuit decided *Highland Capital* in September 2022,[91] after the exculpation provisions were approved in *Exco Resources* and the overwhelming majority of the cases at issue here.  *Highland Capital* does not retroactively invalidate previously approved exculpation provisions.[92]  Rather, challenges to the legality of the provisions of a confirmation

---

[88] *See Okla. State Treasurer v. Linn Operating, Inc. (In re Linn Energy, L.L.C.)*, 927 F.3d 862, 867 (5th Cir. 2019) (holding that confirmation order was a final order that may not be collaterally attacked by parties who were given a fair chance to challenge a provision of a plan approved by the bankruptcy court but failed to do so); *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1143 (5th Cir. 1990) (remarking that "[t]he law in this circuit is well settled that a plan is binding upon all parties once it is confirmed and all questions that could have been raised pertaining to such plan are *res judicata*"); *see also Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1053 (5th Cir. 1987) (relying on the *res judicata* effect of a confirmation order, the court barred a cause of action for enforcement of guaranty based on the release of the third-party guarantor in the confirmed plan).

[89] *See* 11 U.S.C. § 1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation. . ."); 11 U.S.C. § 1144 ("On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order based on allegations of fraud discovered after plan confirmation); *In re Apex Long Term Acute Care – Katy, L.P.*, 599 B.R. 314 (Bankr. S.D. Tex. 2019) (denying motion to reopen case that "necessarily challenges the substance of the confirmation order" by seeking to pursue claims extinguished under the chapter 11 plan and were barred by section 1144, notwithstanding that claims were based on allegations of fraud discovered after plan confirmation); *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733 (D. Del. 2006) (section 1144 bars not only direct actions to revoke a confirmation order after the 180-day period, but also claims that indirectly attack the confirmation order by seeking relief that is inconsistent with the plan's terms); *In re Cal. Litfunding*, 360 B.R. 310, 317-21 (Bankr. C.D. Cal. 2007) (section 1144 barred claims against the debtors' former directors and officers based on alleged fraudulent statements in connection with the debtors' chapter 11 plan and disclosure statement as such claims were released under the plan and any such claims would be inconsistent with findings and holdings in the plan confirmation order); *see also Miller v. Meinhard-Comm. Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment."); *In re BGI, Inc.*, 2012 WL 5392208, at *4 (Bankr. S.D.N.Y. Nov. 2, 2012) ("where the requested relief would reverse what would otherwise be the consequence of a confirmed chapter 11 plan, that action is a collateral attack on the plan and is subject to section 1144's strict limitations").

[90] *See* Exco Brief, ¶ 50 (citing *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 436 (5th Cir. 2022), petitions for cert. pending, No. 22-631 (Jan. 5, 2023) and No. 22-669 (Jan. 16, 2023)).

[91] *See In re Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (decided on September 7, 2022).

[92] *See Hulin v. Fibreboard Corp.*, 178 F.3d 316, 323 (5th Cir. 1999) (discussing well-established rule that *res judicata* overrides the retroactive effect of a subsequent judicial decision); *Thomas v. Allstate Ins.*, 57 F.Supp.2d 361, 365 (S.D.

order, like the exculpation provisions here, must be raised through an appeal.[93]  The U.S. Trustee did not appeal the confirmation orders in any of the challenged cases.

96.     To try and overcome the preclusive effect of the confirmation order in *Exco Resources*, the U.S. Trustee incorrectly relied on the Fifth Circuit's decision on third-party releases in *Applewood Chair Co.*[94]  There, the court reaffirmed the general principle that a discharge does not affect a non-debtor guarantor's liability.  It held that ambiguous language in a confirmation order that purported to discharge the debtor's directors, officers, and shareholders from creditors' pre-confirmation claims, did not bar a creditor's post-confirmation suit against the debtor's former president and his wife on their pre-petition guaranty of the debtor's indebtedness.[95]

97.     Here, however, the issue is not whether JW was discharged from a pre-petition guaranty by amorphous language in a third-party release, but whether the plan's exculpation and the estate's unequivocal release of JW for post-petition conduct (liability for all claims and causes of action related to the chapter 11 cases) bar the U.S. Trustee from seeking the current relief (*i.e.*, to return 100% of the compensation paid by the estates to JW for services rendered to the estates during the cases).  *Applewood Chair* simply does not apply.

---

Miss. 1998) (holding that notwithstanding new, contrary precedent, the prior decision by the federal district court should not be disturbed because of *res judicata*); *In re Klus*, 173 B.R. 51, 56-57 (Bankr. D. Conn. 1994) (barring challenge by a secured creditor based on newly decided Supreme Court precedent to the treatment of its claim in a confirmed plan due to the preclusive effect of the confirmation order).

[93] *See Mesdag v. Nancy Sue Davis Trust (In re Davis Offshore, L.P.)*, 644 F.3d 259, 269 (5th Cir. 2011) (holding that the appellant's challenge to the plan and confirmation order on the grounds that liability for fraud should not be excluded from the scope of the release provision was too late).

[94] Exco Brief, at ¶¶ 52-54 (discussing *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914 (5th Cir. 2000)).

[95] *See Applewood Chair Co.*, 203 F.3d at 917, 919.

98.     Further, while the exculpation (and most but not all of the release) provisions include a carve-out for actual fraud, willful misconduct, or gross negligence,[96] the U.S. Trustee's briefing does not allege any such conduct by JW (only Ms. Freeman).[97]

### iv.     JW Did Not Violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct.

99.     The U.S. Trustee contends that JW should be "sanctioned" because it was either disqualified from ever being retained in each of the challenged cases, or otherwise failed to disclose a "disqualifying interest" that arose during the course of those cases in alleged violation of various Bankruptcy Code provisions, Bankruptcy Rules, disciplinary rules, and other purportedly applicable law.

100.     In an attempt to make that case, the U.S. Trustee throws the proverbial "kitchen sink"[98] at JW.  The U.S. Trustee's narrative, however, is built on a reimagined framework for the

---

[96] *See, e.g., Exco Brief, at ¶¶ 5, 35-49.*

For the reasons set forth below, JW disputes the U.S. Trustee's assertion that Ms. Freeman's knowledge is imputed to JW.  *See IP Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 897 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (to support a finding of gross negligence or willful misconduct, a party must show "***actual subjective knowledge*** of an extreme risk of serious harm") (internal citations omitted) (emphasis added); *VTX Commc'ns, LLC v. AT&T Inc.*, 2023 U.S. Dist. LEXIS 28110, at *28 (S.D. Tex., Feb. 21, 2023) (willful misconduct involves "***intentional*** wrongdoing, not mere negligence, gross negligence or recklessness") (internal citations omitted) (emphasis added).

[97] JW also notes that under well settled Fifth Circuit law, the bankruptcy estate ceases to exist upon confirmation of a chapter 11 plan, and only claims that are specifically and unequivocally preserved in a plan survive.  *See Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) ("For a reservation [of a claim held by the estate] to be effective, it 'must be specific and unequivocal'—blanket reservations of 'any and all claims' are insufficient. Though the degree of specificity involved in a plan's reservation of claims will often vary, the reservation must, at a minimum, be specific enough to put 'creditors on notice of any claim [the debtor] wishes to pursue after confirmation.'") (internal citations omitted)); *Spicer v. Laguna Madre Oil & Gas II, LLC (In re Tex. Wyo. Drilling, Inc.)*, 647 F.3d 547, 550 (5th Cir. 2011) (unless a plan includes an effective reservation, the plaintiff "has no standing to pursue a claim that the estate owned before it was dissolved"); *Dynasty Oil and Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) (upon confirmation, the debtor loses its status as a debtor in possession and its "authority to pursue claims as though it were a trustee").

Here of course, the claims pursued by the U.S. Trustee are not among the claims retained in any confirmed plan, and even if they were, it would not be the U.S. Trustee who would be entitled to pursue such claims as a representative of the estates.  *See* 11 U.S.C. § 1123(b)(3)(B).

[98] The U.S. Trustee has at various times referred to its own Motions as "kitchen sink" motions, admitting that any and every conceivable legal theory—no matter how attenuated or far-fetched—would be thrown at JW.

retention and compensation of professionals in chapter 11 cases, where the provisions of the Bankruptcy Code and Rules are "not the limit of counsel's disclosure obligations"[99] and that disregards a professional's knowledge, intent, or other relevant circumstances.[100]  Essentially, the U.S. Trustee posits that Congress, courts, and ethics committees have enacted a strict-liability disclosure regime, with unwritten, independent obligations of uncertain scope and duration under the common law and rules of professional conduct (including non-binding advisory opinions and committee commentary) that supplement or alter unambiguous language in the Bankruptcy Code and Rules governing retention and compensation.

101.    That is not the law.

(a)    **JW Complied with the Requirements for Retention and Compensation Under Sections 327, 328, and 1103 of the Bankruptcy Code.**

102.    The requirements for retention and compensation of professionals in a chapter 11 case are governed by Bankruptcy Code sections 327, 328, and 1103 and Bankruptcy Rule 2014.

103.    The Fifth Circuit has long held that, "[i]n matters of statutory interpretation, text is always the alpha."[101]   "Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another . . . ."[102]

---

[99] The U.S. Trustee, among other things, argues that estate-retained professionals like JW are bound by independent, non-statutory "disclosure obligations [that] arise from [their] fiduciary duty." *See* Motion ¶ 97.  The authorities in the Motion, however, do not create or recognize disclosure obligations in addition to those imposed under the Bankruptcy Code and Rules.  For example, the U.S. Trustee's proposition quotes *dicta* from *In re Futuronics Corp.*, where the Second Circuit found that counsel's "*disclosure duties and the requirements necessary to fulfill them have been provided in the Bankruptcy Rules*" and merely recognized that the rules themselves were "founded upon 'the fiduciary obligation owed by counsel for the debtor to the bankruptcy court." *Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463 (2d Cir. 1981) (emphasis added).  And while many courts employ sweeping language and general principles regarding bankruptcy disclosures and conflicts in their written opinions, no court has looked beyond the Bankruptcy Code's or Rule's text to impose additional obligations on professionals under the relevant provisions.  Moreover, the U.S. Trustee has not asserted facts sufficient to state a plausible claim for breach of fiduciary duty.

[100] Motion, § IV.D.

[101] *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019).

[102] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1993).

104.     No court has found these Bankruptcy Code provisions and Bankruptcy Rule 2014 ambiguous or unclear.  Yet, the U.S. Trustee's construction ignores and contradicts the text's plain meaning.[103]

105.     Section 327 of the Bankruptcy Code sets forth the relevant requirements for retaining professionals in bankruptcy:  at the time of retention, the firm must (a) not hold or represent an "interest adverse" to the estate, and (b) be disinterested.[104]  The term "adverse interest" in section 327(a) is "generally considered to have the same meaning as the 'adverse interest' term" in the definition of "disinterested" under section 101(14) of the Bankruptcy Code.[105]  A firm is "disinterested" if it satisfies the requirements of section 101(14), including that the firm "does not have an interest **materially adverse to** the interest of **the estate or of any class of creditors or equity security holders** . . . ."[106]  "[T]he twin requirements of disinterestedness and

---

[103] Even the authorities cited in the U.S. Trustee's Motion, when read together with the applicable statutory and rule provisions, make clear that the requirements for retention as debtor's counsel in chapter 11 case means compliance with Bankruptcy Code section 327(a), full stop.  Section 327(a) in turn is coextensive with an attorney's fiduciary duties and subsumes any rules of professional conduct relevant to a professional's disqualification (*e.g.*, rules related to conflicts of interest with the estate), while section 328(c) carries those requirements forward during the case to help ensure that a professional does not become disqualified after its retention.  The Court polices the professional's qualifications through the applicable Bankruptcy Rules, namely here, Bankruptcy Rule 2014, which mandates disclosure of all connections that bear on whether the professional has a prohibited "adverse interest" under, *inter alia*, sections 327(a) and 328(c).  If the professional discloses all connections required under Bankruptcy Rule 2014, and none of those connections give rise to an adverse interest to the estate, the professional is not disqualified and may be retained and apply for compensation and reimbursement for services rendered.

[104] *See* 11 U.S.C. § 327(a).  In the *EXCO Resources* cases, JW was employed as local and oil-and-gas counsel to the official committee of unsecured creditors under section 1103 of the Bankruptcy Code.  Section 1103(b) provides, in part, that "[a]n attorney or accountant employed to represent a committee . . . may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case."  11 U.S.C. § 1103(b).  There is no "disinterestedness" requirement in order to be retained as committee counsel, although a lack of disinterest could have been considered by the Court under section 328(c) in respect of JW's fee applications during the cases.  Although this response focuses on section 327, the substantive arguments apply with equal force (if not more so) to JW's retention under section 1103 in the *EXCO Resources* cases.

[105] *See In re Am. Int'l Refinery*, 676 F.3d at n.7 (emphasis added); *In re W. Delta Oil*, 432 F.3d at 356 (stating the phrases have the same meaning).

[106] *See In re Am. Int'l Refinery*, 676 F.3d at 461 (quoting 11 U.S.C. § 101(14)) (emphasis added).

lack of adversity telescope into what amounts to a single hallmark,"[107] which aims to ensure that a firm employed by the estate does not have a conflict of interest with the estate.

106.     In the Fifth Circuit, a party has an "adverse interest" if they:

> (1) [ ] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) [ ] possess a predisposition under circumstances that render such a bias against the estate.[108]

Section 327 is written in the present tense; thus, a professional's retention is valid if, **when the professional's retention is approved**, the Bankruptcy Code's requirements were satisfied.  If a professional is not disqualified at the time of its retention under section 327(a), but later acquires or comes to represent an "adverse interest," courts then look to section 328(c) of the Bankruptcy Code.   Under section 328, a court has discretion to deny compensation and reimbursement requested by an estate-retained professional if "at any time during such professional person's employment . . ., such professional person is not a disinterested person, or represents or holds an interest adverse to the interests of the estate with respect to the matter on which such professional person is employed."[109]  "The determination of an adverse interest must be made with an eye to the specific facts of each case."[110]

---

[107] *In re Martin*, 817 F.2d 175, 180 (1st Cir. 1987).

[108] *In re Am. Int'l Refinery*, 676 F.3d at 461-62 (quoting *In re West Delta Oil*, 432 F.3d at 356) (internal quotation marks omitted).

[109] 11 U.S.C. § 328(c).

[110] *In re Am Int'l Refinery*, 676 F.3d at 462.

### (i)    JW was Disinterested and Did Not Hold or Represent an Adverse Interest.

107.    Bankruptcy Rule 2014 sets forth the procedural mechanism through which courts are able to assess whether a firm has or represents a disqualifying or other adverse interest under sections 327(a), 328(c), or 1103(b) of the Bankruptcy Code, as applicable.[111]

108.    Bankruptcy Rule 2014 defines the universe of potential adverse interests, requiring that applicants disclose—to the best of their knowledge—connections with: (a) the debtor, (b) creditors, (c) any other party in interest, (d) their respective attorneys and accountants, (e) the United States trustee, or (f) any person employed in the office of the United States trustee.[112]  The rule's language is limiting,[113] persons not enumerated in the rule's text are ***not*** within its scope.[114]

109.    The purposeful omission of judges and mediators from Bankruptcy Rule 2014's scope is unremarkable.[115]  With the exception of the U.S. Trustee and related employees,[116] Bankruptcy Rule 2014 seeks to identify an applicant's connections to parties in interest[117] that

---

[111] *See, e.g., Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*, 134 F.3d 831, 836 (7th Cir. 1998) ("The Code also provides a procedural mechanism to enforce [section 327(a)'s] requirements.  Under [Bankruptcy Rule] 2014, any applying professional must set forth 'to the best of the applicant's knowledge' all known connections of the applicant with the 'debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee' in both the application for employment and an accompanying verified statement."); COLLIER ON BANKRUPTCY ¶ 8.03[1][a] (16th ed.) ("Section 327 is implemented by [Bankruptcy Rule 2014], which states the requirements of the application to be employed.").

[112] FED. R. BANKR. P. 2014(a).

[113] *See* 11 U.S.C. § 102 (providing that, under the Bankruptcy Code, the terms "includes" and "including" are not limiting).

[114] *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010) ("Generally where there are enumerated exceptions 'additional exceptions are not to be implied, in the absence of a contrary legislative intent.'").

[115] The U.S. Trustee concedes that Bankruptcy Rule 2014 does not include connections to judges and mediators.  *See* Motion, § IV.D.

[116] Unlike the other entities identified in Bankruptcy Rule 2014, the Bankruptcy Code expressly authorizes the U.S. Trustee to appear and be heard in any bankruptcy case.  *See* 11 U.S.C. § 307.  The U.S. Trustee, like the Court and mediators, is not a party in interest and, as a result, had to be expressly included in order to fall within the Rule's scope.

[117] Although the term is not defined under the Bankruptcy Code, courts have held that a "party in interest" includes "a party with a 'pecuniary interest in the case, as well as to those parties who have a practical stake in the outcome of the

either hold or represent an interest or stake *in the estate*, because such connections might give rise to the kind of "adverse interests" or "dual loyalties" that could adversely impact the estate. Judges and mediators are excluded because they cannot hold or represent an interest in a given estate. Rather, judges and mediators are required to recuse or self-disclose under statutes, rules, and guidelines that do not bind JW and are distinct from the provisions of the Bankruptcy Code and Rules applicable to estate professionals.[118] Thus, JW had no obligation to disclose any connections with a presiding judge or mediator under Bankruptcy Rule 2014.

110. The U.S. Trustee now recognizes this and asserts that JW was not disinterested because it "had a material financial interest in having a friendly judge in a relationship with its partner who might lend a less critical eye to its employment and compensation requests,"[119] or,

---

[117] case, or to those parties who will be impacted in any significant way by a decision made in the case.'" *In re Circle Inv'rs, Inc.*, No. 02-39553, 2008 WL 910062, at *4 (Bankr. S.D. Tex. Apr. 3, 2008).

[118] *See* Motion, § I ("Bankruptcy Rule 5002 and 5004 and 28 U.S.C. § 455 impose parallel requirements on judges to ensure their orders approving employment and compensation, among others, are likewise free of conflict or partiality").

[119] Motion, § IV.E.1. In the Rule 60(b) Motions and fee objections filed in the challenged cases where Judge Jones only served as a mediator (such cases, collectively, the "Mediation Cases"), the U.S. Trustee is careful to argue throughout that "*Ms. Freeman* and [JW]" held disqualifying interests, emphasizing that *Ms. Freeman* "represented" a party, that *Ms. Freeman* would be "overly deferential," and the *Ms. Freeman* was "required . . . to disclose" her relationship. *See, e.g.,* Case No. 22-90129 (MI), Dkt. No. 96 (the "Altera Motion") at ¶¶ 82, 83, 97 (emphasis added). Again, JW, not Ms. Freeman or any other individual JW attorney, was retained under section 327. The U.S. Trustee's argument that Ms. Freeman's lack of disinterestedness (assuming, *arguendo*, that she was not disinterested at the relevant time) could be imputed to JW is meritless. *See* Motion, § IV.E.1. Disinterestedness under section 101(14)(C) "implicates only the personal interests of the professional whose disinterestedness is questioned [*i.e.*, JW]," therefore, to violate section 101(14)(C) "[JW] personally must 'have' the prohibited interest; and the representation of an adverse interest cannot be imputed to [JW]." *See, e.g., In re Contractor Tech., Ltd.*, No. CIV.A. H-05-3212, 2006 WL 1492250, at *7 (S.D. Tex. May 30, 2006) (construing the predecessor statute to section 101(14)(C)) (citing *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 629 (2d Cir. 1999)) (internal citations omitted). Indeed, as discussed in ¶ 122, this Court previously "determined *per se* imputation under § 101(14) does not exist." *In re Cygnus Oil & Gas Corp.*, No. 07-32417, 2007 WL 1580111, at *1-4 (Bankr. S.D. Tex. May 29, 2007); *see also In re McDermott Int'l, Inc.*, 614 B.R. 244, 255 (Bankr. S.D. Tex. 2020) (Jones, J.) (same). Moreover, the U.S. Trustee's argument that JW could not render itself disinterested through ethical walls or screening procedures is a red herring. *See* Motion § IV.E.2. The cases cited in the Motion are legally and factually inapposite as such measures are designed to "protect confidentiality based on knowledge from past representation." *See Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (finding that an "ethical wall" erected by law firm to separate an attorney working on estate-planning matters for one of the controlling persons of plaintiff bringing patent suit from other attorneys representing patent suit defendant, was insufficient under California law to preclude disqualification of firm from representing defendant, for breach of duty of loyalty to plaintiff); *In re Tr. Am. Serv. Corp.*, 175 B.R. 413, 421 (Bankr. M.D. Fla. 1994) (finding that an accounting firm's dual representation of a debtor's largest unsecured creditor and the unsecured creditors' committee gave rise to conflict of interest and that an ethical wall "is generally not an

-48-

where in cases where Judge Jones was appointed as a mediator, that JW's interest in continued employment "conflicted with the estate's interest in having a disinterested mediator."[120]   The Motion also suggests that by not disclosing, JW conspired with Judge Jones and Ms. Freeman to create an "unlevel playing field for parties, who might have . . . . objected to the retention of [JW]. . . ."[121]

111.   The U.S. Trustee, however, fails to cite any authority in support of the assertion that JW had an adverse interest that would have disqualified JW from representing its clients in any of the cases.  Indeed, the opposite is true.  If anything, another judge (or mediator) would have been assigned to preside over (or mediate) the applicable cases and JW would have still been retained as an estate professional; JW would have still performed the same reasonable and necessary legal services for the estates; and JW would have still been compensated for those services.  Thus, JW did not have a disqualifying interest in respect of its **clients** in any case.[122]

112.   The Third Circuit's decision in *In re Marvel Entertainment Group, Inc.* is insightful.[123]   In *Marvel*, the district court disqualified a law firm from representing a chapter 11 trustee because of the firm's unrelated representation of a significant bank creditor, reasoning that

---

acceptable means of conflict avoidance where the same professional organization actively represents two adverse interests.").

[120] *See, e.g.,* Altera Motion, at ¶ 120.

[121] Motion, at § IV.D.

[122] Many courts have found that the Bankruptcy Code permits a court to disqualify a law firm only "if it had an actual or potential conflict of interest." *In re Marvel Entertainment Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998).  A conflict is deemed actual if it places a professional in a position permitting it to favor one interest over an impermissible conflicting interest.  *In re Roper & Twardowsky*, 566 B.R. 734, 755 (Bankr. D.N.J. 2017); *see, e.g., In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y. 1994) ("[I]nterests are not considered 'adverse' merely because it is possible to conceive a set of circumstances under which they might clash.").  A "potential" conflict exists where competition between two interests "is presently dormant, but may become active if certain contingencies occur." *In re BH & P, Inc.*, 103 B.R. at 563 (internal quotations omitted).  Courts have held that section 327 imposes *per se* disqualification where a law firm has an actual conflict of interest, but permits a court to exercise discretion to disqualify a law firm that has only a potential conflict of interest.  *See Marvel*, 140 F.3d at 476.

[123] 140 F.3d 463, 477 (3d Cir. 1998).

the firm's "representation of [the bank] taints the image of objectivity that the trustee and his counsel should possess."  On appeal, the Third Circuit found that the district court abused its discretion and applied an "incorrect legal standard" under sections 101 and 327 of the Bankruptcy Code.  The *Marvel* court rejected the argument that a firm could be disqualified for the mere "appearance of impropriety," noting that a reference in its prior decision suggesting that a firm could be disqualified based on the "appearance of conflict" was only "a marginal comment [which] will not bear the heavy weight[ ] placed on it."[124]  The court found that its precedent "made clear that '[h]orrible imaginings alone cannot be allowed to carry the day," and that "[n]ot every conceivable conflict must result in sending [the trustee] away to lick his wounds.'"[125]  The court reasoned that, "[t]o allow disqualification merely on the 'appearance of impropriety' indeed would allow 'horrible imaginings alone' to carry the day."

113.    Here, as in *Marvel*, the U.S. Trustee's allegations of a "JW-Freeman-Jones" conspiracy are precisely the kind of "hypothetical, theoretical, speculative"[126] and "horrible imaginings" that cannot disqualify a firm under the Bankruptcy Code.[127]  JW itself never held or

---

[124] *Id.* at 477.  *See, e.g.,* COLLIER ON BANKRUPTCY ¶ 8.03[8] (16th ed.) (". . . the better view seems to be that disqualification based on [the appearance of impropriety] alone is improper:  there must be a concurrent violation of at least one other provision of the Model Code as well."); *Bd. of Ed. of City of New York v. Nyquist*, 590 F.2d 1241, 1247-48 (2d Cir. 1979) (". . . a federal court should not disqualify an attorney on ethical grounds from representing a party in a pending lawsuit in the absence of a reasonable basis for believing that his or her unprofessional conduct may affect the outcome.  An 'appearance of impropriety' on an attorney's part would rarely have this effect.  The attorney is the client's choice.  Disqualification is wasteful and time-consuming.  Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud.  Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.") (Mansfield, J., concurring).

[125] *Marvel*, 140 F.3d at 477 (quoting *In re Martin*, 817 F.2d 175, 183 (1st Cir. 1998)).

[126] COLLIER ON BANKRUPTCY ¶ 8.03[9][b] (16th ed.).

[127] *In re Contractor Tech.*, 2006 WL 1492250, at *9 (noting that "[t]he concern about potential issue conflicts or the 'appearance of a conflict' [however,] is legally insufficient to warrant disqualification" under the Bankruptcy Code and Rules).  *See, e.g.,* Altera Motion ¶¶ 83 (stating that "[i]n addition to the concern that Judge Jones **might** not be impartial, [JW's] client **might** reasonably be concerned that that the relationship would lead Ms. Freeman [*not JW*] to be overly deferential . . . ."), 84 ("Parties to the mediation **might** also reasonably be concerned that Judge Jones may disclose confidential information . . . .") (emphasis added).

represented an interest (let alone a materially adverse interest) with a competing economic interest in, or that otherwise had any bias against, the estates in the challenged cases.  The U.S. Trustee simply cannot articulate an "adverse interest" held or represented by JW that would have disqualified the firm under the applicable provisions of the Bankruptcy Code and Rules in any of the challenged cases.

> **(ii)** **Even if Bankruptcy Rule 2014 Applied, JW Disclosed All of its Known Connections "to the Best of [its] Knowledge."**

114.     Bankruptcy Rule 2014 requires broad disclosures concerning a professional's connections with parties in interest.  Still, "an attorney is not charged with the duty to disclose 'every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . When an attorney seeks employment in a bankruptcy case, the disclosure required by Rule 2014 should not be 'an impossible task subject to endless litigation over what would be enough.'"[128]

115.     Bankruptcy Rule 2014 requires disclosure only "***to the best of the applicant's knowledge***. . . ."[129]  While "knowledge" is not defined under the Bankruptcy Code or Rules, courts have construed the term to require "actual knowledge" of the fact.[130]  Thus, the U.S. Trustee's

---

[128] *In re Fundamental Long Term Care*, 614 B.R. 753, 761 (Bankr. M.D. Fla. 2020), *aff'd sub nom.* 2021 WL 222779 (M.D. Fla. Jan. 22, 2021), *aff'd*, 81 F.4th 1264 (11th Cir. 2023) (internal citations omitted); *In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), *aff'd*, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument that counsel should be disqualified for "a failure to disclose—not connections as required under 2014—but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough."); COLLIER ON BANKRUPTCY ¶ 2014.05 (16th ed.) ("No court has yet suggested that the requirement of disclosure includes listing every relationship and its possible consequence.").

[129] *See* FED. R. BANKR. P. 2014(a) (emphasis added).  The professional applicant in each of the challenged cases was JW, not Ms. Freeman.

[130] *See Smith v. Mixon*, 788 F.2d 229, 232 (4th Cir. 1986) ("Although 'knowledge' as used in § 550(b)(1) is not defined in the Code or in the legislative history, we conclude that it does not mean 'constructive notice.'  As several courts have noted when analyzing § 544 of the bankruptcy code, '[t]he term 'notice' may include either actual or constructive notice, while the term 'knowledge' includes only actual notice.  That Congress selected the term 'knowledge' is significant.'"); *see also* "Knowledge" definition, Black's Law Dictionary (11th ed. 2019) (defining "knowledge" to

reliance on case law supporting the general proposition that all compensation should be denied even if a lack of disclosure was "unintentional" or "negligent" is misplaced (if not misleading). Indeed, every case cited by the U.S. Trustee for this proposition concerns a situation where the facts were actually known by the firm.[131]

116.    Here, with respect to the Pre-March 2022 Cases, JW disclosed "to the best of [its] knowledge" all of JW's connections known at that time as required by Bankruptcy Rule 2014.  JW likewise supplemented its disclosures as required by Bankruptcy Rule 2014 during the various Pre-March 2022 Cases, again disclosing new connections, if any, "to the best of [JW's] knowledge."  An attorney's word is the lynchpin of self-regulation in our industry.  Under Texas law, every attorney "has an ethical responsibility to tell the truth as an officer of the court,"[132] and each partner owes a fiduciary duty to his or her own firm.  Under the circumstances, JW reasonably relied on Ms. Freeman's integrity, her duties as an attorney and officer of the court, and her fiduciary duties as a partner to the firm to disclose all relevant facts throughout her employment.

117.    With respect to the Pre-March 2022 Cases, JW cannot disclose a connection if it does not know one exists, and no rule of construction endorses a reading of Bankruptcy Rule 2014

---

mean "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact.").

[131] *See Woods v. City Nat. Bank & Tr. Co. of Chicago*, 312 U.S. 262 (1941) (finding that indenture trustee, a bondholder committee, and committee's counsel that jointly represented the trustee and committee had conflicts of interest relevant to district court's determination of claims under the Bankruptcy Act); *In re Am. Int'l Refinery*, 676 F.3d 455 (finding that law firm's inadequate disclosures regarding the source of its retainer and its prior relationship with the debtors did not give rise to a "disqualifying interest"); *In re eToys, Inc.*, 331 B.R. 176 (Bankr. D. Del. 2005) (finding, among other things, that law firm's simultaneous representation of both chapter 11 debtors and third-party against whom debtors had claims for return of prepetition payments was an "actual conflict of interest."); *In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008) (finding that law firm's disclosures regarding attorney's relationship to creditor and committee member were "purposely vague"); *In re Chris Petit and Assocs., P.C.*, No. 22-50591, 2022 WL 17722853, *10 (Bankr. W.D. Tex. Dec. 13, 2022) (finding law firm failed to adequately disclose pre-bankruptcy relationship with the debtor, or details concerning prepetition payments, under Bankruptcy Rule 2016).

[132] *Pierson & Gaylen v. Creel & Atwood (In re Consolidated Bancshares, Inc.)*, 785 F.2d 1249, 1258 n.8 (5th Cir. 1986) (finding no abuse of discretion in the bankruptcy court's reliance on the debtor's attorneys' representations at an evidentiary hearing in addition to the written application to governed by Bankruptcy Rule 9011).

that would render the word "knowledge" meaningless and read into the rule language that its drafters omitted. Thus, a finding that JW violated its Rule 2014 disclosure obligations in the Pre-March 2022 Cases under these circumstances would render unworkable the Bankruptcy Code's retention provisions, imposing on nearly all estate-retained professionals an affirmative, continuing duty to investigate their colleagues to root out any conceivable impropriety or inaccuracy. No person could discharge that kind of obligation, and no court or other party could confidently police those connections.

118. As to the Post-March 2022 Cases, and while JW was not required to make any additional disclosures under Bankruptcy Rule 2014, JW nonetheless took immediate action to address any appearance of impropriety in working with Ms. Freeman's counsel regarding a potential disclosure that could be made.[133] Former Judge Jones and Ms. Freeman, however, refused to make the full truth public. Rather than contribute to their deception, JW determined to separate Ms. Freeman from the firm.

### (iii) Ms. Freeman's Personal Knowledge and Conduct Cannot be Imputed to JW under the Bankruptcy Code or Rules.

119. The U.S. Trustee's arguments and challenges in the Pre-March 2022 Cases turn on one question: to the extent there was an intimate personal relationship between Ms. Freeman and former Judge Jones at any relevant time, can Ms. Freeman's knowledge be imputed to JW? The answer is "no."[134] And the U.S. Trustee has not, and cannot, cite a single case that has held

---

[133] *See, supra,* sections II.H through II.I.

[134] As an initial matter, the U.S. Trustee's position is at odds with foundational corporate and alternative-entity law principles in Texas and throughout the country. JW is a limited liability partnership organized under Texas law, where Ms. Freeman joined as an income partner in 2018 and was promoted to equity partner in 2021. "Stated differently, a partnership [*e.g.*, JW] is a distinct legal entity, separate from the partners [*e.g.*, Ms. Freeman] who comprise it." *In re Timber Creek, Inc.*, 187 B.R. 240, 245 n.4 (Bankr. W.D. Tenn. 1995), *aff'd sub nom.* 200 B.R. 624 (W.D. Tenn. 1996). A *per se* rule imputing one partner's knowledge of his or her personal affairs and private life to the entire firm is contrary to law and would undermine the benefits of limited liability and much of the Texas Revised Partnership Act

otherwise in the context of Bankruptcy Rule 2014 (which by its express terms, provides otherwise) or any relevant Bankruptcy Code provision.[135]

120.     The Court's decision in *In re Cygnus Oil & Gas Corp.* is instructive.  In *Cygnus*, this Court adopted a case-by-case approach to determine whether a partner's lack of disinterestedness could be imputed to her entire firm.  This Court analyzed section 101(14)'s plain language and held that the Bankruptcy Code did ***not*** impute a lack of disinterest from one "person" (*e.g.*, a non-disinterested partner) to another "person" (*e.g.*, such partner's law firm),[136] observing that, "[h]ad Congress intended to impute a single member's disqualification to her entire firm, it would have done so."  Indeed, when intended by Congress, the Bankruptcy Rules ***do*** "include vicarious disqualification [*e.g.*, under Bankruptcy Rule 5002(a)[137]]," yet "other requirements of vicarious disqualification are 'noticeabl[y] absent elsewhere in the Bankruptcy Code or Rules,"[138] including in Bankruptcy Rule 2014(a).  Thus, imputing "a single member's [knowledge of an intimate, personal relationship] to her entire firm [*i.e.*, the professional applicant under the

---

and related statutes.  Nevertheless, the U.S. Trustee—without controlling authority—asks this Court to impute ***all*** attorney knowledge for ***all*** purposes.

[135] Had Congress intended to impute one attorney's knowledge of any particular fact to the entire firm for purposes of Bankruptcy Rule 2014, it could have been easily drafted as such.  For example, instead of providing that disclosures must only be made "to the best of the applicant's knowledge", the Rule could have been drafted to (a) impose strict liability (*e.g.*, "The application shall state . . .[any and all connections] . . ."), (b) provide for vicarious liability (*e.g.*, "the applicant shall be responsible for disclosures submitted by the declarant"), or (c) lower the threshold for disclosure by imposing a notice standard.  Of course, Bankruptcy Rule 2014 says none of this.

[136] *In re Cygnus Oil & Gas Corp.*, 2007 WL 1580111, at *3-4.  In *Cygnus*, the Court noted that the term "disinterested person" referred specifically to a "person," which in turn is defined under the Bankruptcy Code to include an "individual, partnership and corporation."  The Court then ruled that the law firm itself (a partnership and, therefore, itself a "person") was disinterested even where one of its equity holders individually was not.  *See also Timber Creek.*, 187 B.R. at 245.

[137] For example, Bankruptcy Rule 5002(a) prohibits bankruptcy judges from approving, among other things, the appointment of "an individual as attorney . . . if the individual is a relative of the bankruptcy judge approving the employment[,]" and further provides that "[w]henever under this subdivision an individual may not be approved for . . . employment, the individual's firm, partnership, corporation, or any other form of business association or relationship, and all members, associates and professional employees thereof also may not be approved for . . . employment."

[138] *See Cygnus*, 2007 WL 1580111, at *2 (citing *Timber Creek*, 187 B.R. at 243).

Bankruptcy Code and Rules]"[139] would require the Court to adopt a reading of Bankruptcy Rule 2014 that deviates from its text and applicable law.

121.    Notwithstanding Bankruptcy Rule 2014's plain language and the above-referenced case law, the U.S. Trustee declares, without condition or qualification, that "Texas law imputes one attorney's knowledge to all those in the firm."[140]   The  U.S. Trustee's argument rests on a small handful of inapplicable and distinguishable Texas state-court decisions.[141]   The argument appears rooted in two Texas Supreme Court decisions:  *Tesco American, Inc. v. Strong Industries, Inc.* and *National Medical Enterprises, Inc. v. Godbey*.[142]

122.    However, in *Tesco*, the Texas Supreme Court confronted facts and issues irrelevant to the U.S. Trustee's Motion.  The *Tesco* court did ***not*** examine whether an attorney's private knowledge is imputed, for all purposes, to her entire firm; rather, the court considered whether an appellate judge was disqualified under the Texas Constitution from presiding over a matter where, "unbeknownst to her, before she took the bench another attorney at her very large firm played a very small role in the early stages of the appeal."  The Texas Constitution provides, in relevant part, that "[n]o judge shall sit in any case . . . when the judge shall have been counsel in the case."  The *Tesco* court found that the appellate judge was constitutionally disqualified.  The court's reasoning included an analysis of precedent construing Rule 18 of the Texas Rules of Civil Procedure, which governs the "vicarious disqualification" of Texas trial judges, and its prior holding in *National Medical*.  The court noted that:

> [Rule 18] recognizes that a judge is vicariously disqualified under the Constitution as having 'been counsel in the case' if a lawyer with

---

[139] *Id.*

[140] Motion, § IV.B.

[141] *Id.*

[142] 221 S.W.3d 550 (Tex. 2006) and 924 S.W.2d 123 (Tex. 1996), respectively.

whom the judge previously practiced law served as counsel to a party concerning the matter during their association.  This conclusion is consistent with our holding in *National Medical Enterprises, Inc. v. Godbey*,[143] that 'an attorney's knowledge is imputed by law to every other attorney in the firm.'[144]

123.    The *National Medical* court, however, imputed a certain **kind** of knowledge under circumstances relevant to the facts before the *Tesco* court.  Specifically, the *National Medical* court observed that, for purposes of Texas Disciplinary Rule 1.09, imputing an attorney's knowledge to her firm creates an "irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm" because "it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences" and it would help "clients feel more secure."[145]

124.    The *National Medical* court found only that "this same presumption applies when, as in the present case, an attorney is obliged to preserve another's confidences [under a joint-defense agreement], not because the other was a client, but because the attorney promised to do so just as if the other had been a client."[146]  The *Tesco* court majority applied the *National Medical* court's reasoning to the facts before it, arguing that "the same considerations apply here [*i.e.*, where a judge had been counsel for a party to an appeal]—proving misuse would be just as difficult, and damage to the profession just as extensive, if lawyers who become appellate judges might take confidential information with them for future use."[147]

---

[143] 924 S.W.2d at 13.

[144] 221 S.W.3d at 553 (quoting *In re O'Connor*, 92 S.W.3d 446, 449 (Tex. 2002)).

[145] *Nat'l Med. Enters.*, 924 S.W.2d at 131.

[146] *Id.* at 131-32.

[147] *Tesco*, 221 S.W.3d at 554.

125.   Thus, Texas law is more accurately described by the third (albeit equally inapposite) case cited by the U.S. Trustee.[148]   In *Unauthorized Practice of Law Committee*, the court again considered issues related to client conflicts under the Texas Disciplinary Rules, and put a finer point on Tesco's gloss on Texas law:  "Texas law imputes ***knowledge of confidential information*** to counsel's lawyer-associates so that in a private law firm, all of the lawyers are irrebuttably [*sic*] presumed to have ***knowledge of the confidential information***."[149]

126.   These cases do not provide controlling law or useful guidance for addressing the facts and issues raised in the Motion.  Texas law that imputes knowledge from one attorney to her entire firm (a) implicates only a certain ***kind*** of knowledge (*i.e.*, the attorney's knowledge of a client's protected, confidential information), and (b) does so for the limited purpose of enforcing ethics rules governing, *inter alia*, concurrent representations and former-client conflicts.  Here, of course, there is no allegation that Ms. Freeman was disqualified due to any conflict of interest in respect of JW's clients or that she had access to protected information or otherwise violated client confidences in any case.  For the purposes of vacatur under Rule 60(b)(6) and any other requested relief here, what matters are the applicable provisions of the Bankruptcy Code and Rules, and the only bankruptcy case the U.S. Trustee cites in this respect is *In re Bradley*.[150]

127.   In *Bradley*, the bankruptcy court imposed sanctions against both an attorney and his law firm.  The attorney in *Bradley* was found to have committed a litany of misdeeds; crucially,

---

[148] *Unauthorized Practice of Law Committee v. American Home Assurance Co., Inc.*, 261 S.W.3d 24, 40 (Tex. 2008). In *Unauthorized Practice of Law Committee*, various liability insurers brought suit against a county's unauthorized practice of law committee for a declaratory judgment that use of staff attorneys to represent insureds did not constitute the unauthorized practice of law. The trial court ruled in the committee's favor and the insurers appealed.  The court of appeals reversed and remanded, and the Texas Supreme Court affirmed (as modified) in part and reversed in part. The Texas Supreme Court held that, among other things, such staff attorneys need to fully disclose to an insured his or her affiliation with the liability insurer.

[149] 261 S.W.3d at 40 (citing *Tesco*, 221 S.W.3d at 553) (emphasis added).

[150] 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013).

*all* of his misconduct concerned the performance of legal services in the course of his employment in respect of cases pending before the bankruptcy court (*e.g.*, he failed to personally meet with the debtors or review their schedules and statements, he filed those documents without the debtors' signatures or authorization, he allowed his assistant to forge the debtors' signatures, and he failed to notify the debtors that he would not attend a hearing and did not adequately prepare his colleague to appear).  Not only did the attorney engage in gross misconduct before the court, his firm did, too.  The court found that the evidence indicated these "improper practices" were not rare occurrences **for the firm** or its attorneys, and that "such practices are directly related to the Firm's poor supervision of its attorneys and other personnel."[151]

128.     Accordingly, in *Bradley*, the evidence demonstrated that the firm itself had engaged in misconduct before the bankruptcy court.  Although the court stated, in *dicta*, that "[k]nowledge and actions are said to be imputed" to the firm, neither the *Bradley* court nor the cases it relied on construed the term "knowledge" under Bankruptcy Rule 2014 or any other relevant Bankruptcy Code provision.[152]   And critically, the *Bradley* court was not asked to impute the attorney's personal knowledge of, or actions taken in, his **private life** outside the scope his employment or courtroom conduct.  The *Bradley* court's ruling, therefore, stands for the unexceptional proposition that a court may impose sanctions against a law firm for the conduct of its attorneys in the course of their employment in matters pending before that court, particularly where the firm habitually failed to supervise its attorneys.

---

[151] 495 B.R. at 757.

[152] *Id.* at 790-91.

129.     Imputation is inapplicable, and the U.S. Trustee's strained application of case law to the instant facts cannot be harmonized with the unambiguous language in the Bankruptcy Code and Rules.

>    **(b)     JW Did Not Violate Any of the Texas Disciplinary Rules of Professional Conduct.**

130.     In its "kitchen sink" approach, the U.S. Trustee next points to the Texas Disciplinary Rules of Professional Conduct to fault JW.   The U.S. Trustee's attacks fall equally short for several reasons.

131.     <u>First</u>, the Disciplinary Rules do not give rise to private causes of action.[153]

132.     <u>Second</u>, the Disciplinary Rules the U.S. Trustee cites govern the conduct of individual attorneys, not law firms.[154] So, even if there were a private right of action, the U.S. Trustee could not cite any authority that alleged violations of these Rules by an individual attorney for her secret conduct allow for relief against her former law firm, rather than the culpable attorney herself.

133.     And <u>third</u>, the Disciplinary Rules require a showing of ***actual knowledge***.[155]   The Rules explain that the terms "*Knowingly*," "*Known*," or "*Knows*" refer to ***actual knowledge*** of the fact in question.[156]   Actual knowledge means "something other than constructive or imputed

---

[153] *Jones v. Blume*, 196 S.W.3d 440, 449 (Tex. App.—Dallas 2006, pet. denied) ("A private cause of action does not exist for violation of the disciplinary rules."); TEX. R. PROF. CONDUCT Preamble, No. 15 ("Violation of a rule does not give rise to a private cause of action nor does it create a presumption that a legal duty to a client has been breached.").

[154] *Compare* Motion, at § IV.C.1 (citing Rule 3.03 ("*A lawyer* shall not…"), 4.01 ("In the course of representing a client *a lawyer* shall not…), 5.01 ("*A lawyer* shall be subject to discipline because of another lawyer's violation of these rules of professional conduct *if…the lawyer* is a partner or supervisory lawyer…), 8.04(a)(6) ("*A lawyer* shall not…); *with* Rule 5.04(a) ("A *lawyer or law firm* shall not…") and TEX. R. PROF. CONDUCT Preamble (separately defining the term "firm" or "law firm").

[156] *See* TEX. R. PROF. CONDUCT, Preamble, "Terminology".

knowledge."[157]   It requires "substantial certainty."[158]   A hunch, a feeling, or a suspicion are insufficient to prove a disciplinary rule violation.[159]   The U.S. Trustee's imputation theory fails.

### (i)      JW Did Not Violate Disciplinary Rule 3.03 Requiring Candor.

134.      Disciplinary Rule 3.03(a)(1) prohibits "[a] lawyer" from "***knowingly*** mak[ing] a false statement of material fact or law to a tribunal."   This duty has been described as the "duty to disclose material facts; esp[ecially], a lawyer's duty not to allow a tribunal to be misled by false statements, either of law or of fact, that a lawyer ***knows*** to be false."[160]

135.      The U.S. Trustee does not claim that JW made a false statement to the Court, nor could he.   Instead, relying on the comments to Rule 3.03, the U.S. Trustee argues that certain JW attorneys violated the Rule because "there are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."   According to the U.S. Trustee, by failing to disclose Ms. Freeman's relationship with former Judge Jones, JW "effectively made an affirmative

---

[157] *Attorney U v. The Mississippi Bar*, 678 So. 2d 963, 970 (Miss. S. Ct. 1996) (holding that the attorney in question lacked sufficient knowledge—actual knowledge—of another attorney's ethical misconduct to require reporting the misconduct to the appropriate disciplinary authority).

[158] Vincent R. Johnson & Alan Gunn, *Studies in American Tort Law 41* (4th ed. 2009); *see generally* Restatement (Third) of Torts: Liability for Physical & Emotional Harm §1 (2010) (discussing knowledge).

[159] *See, e.g., Tex. Comm. on Prof'l Ethics*, Op. 520, 60 Tex. B.J. 490 (1997) (stating that a violation of Texas Disciplinary Rule 8.03 "requires that a lawyer *have knowledge* (rather than suspicion) that another lawyer has committed a violation of the applicable rules before informing the disciplinary authority. . . . A report of misconduct therefore must be based upon such objective facts that are likely to have evidentiary support." (emphasis in original)); *see also* S.C. Bar Ethics Advisory Comm., Op. 04 (2005), available at 2005 WL 483384 ("[E]ven if Attorney John made the statement about billing 15 hours in one day, Attorney Jane would still have no actual knowledge of a violation, and therefore, would not be required to reopen.   Attorney Jane has no ***"firm knowledge"*** of Attorney John schedule, or whether his statement reflects anticipated time to be spent during the evening or already spent on early morning work."); *Conn. Bar Ass'n Comm. on Prof'l Ethics*, Informal Op. 13 (2004) ("Sometimes one has a visceral reaction to conduct that produces a 'feeling' that the conduct ought to be reported.   That is a reasonable starting point for sorting things out.   But it is not enough."); *Phil. Bar Ass'n Prof. Guidance Comm.*, Op. 03 (1997), available at 1997 WL 428087 ("It is important that Rule 8.3(a) addresses ***actual knowledge*** of misconduct and not suspect[ed] misconduct.   AB such, since you do not have any *actual knowledge* that any attorney at the defendant law firm had any knowledge of its employees' conduct with respect to the signing and notarization of the Release and Trust Agreement, you are not required . . . to report these facts to the Disciplinary Board."); *see also Restatement (Third) of the Law Governing Lawyers* § 5 cmt. i (2000) ("Knowledge is assessed on an objective standard.   It includes more than a suspicion that misconduct has occurred, and mere suspicion does not impose a duty of inquiry.").

[160] Black's Law Dictionary (11th ed. 2019), duty of candor (emphasis added).

misrepresentation and violated the duty of candor."[161]   However, in each case the U.S. Trustee

cites, the attorney made an affirmative statement the attorney knew to be false or had actual (not

imputed or constructive) knowledge of a fact that he or she decided not to disclose.[162]   None of the

cases hold a law firm responsible for a firm member's ethical violation, let alone a violation based

on facts the firm did not know.

136.   Turning again to the comments (but not the plain text) of Rule 3.03, the U.S. Trustee

claims that JW failed to make a "reasonably diligent inquiry" of its connections, when it failed to

uncover Ms. Freeman's and former Judge Jones's intimate relationship—the same relationship

that the U.S. Trustee admits was secret.[163]   The U.S. Trustee again misses the mark: the Rule

requires attorneys to make a "reasonably diligent inquiry" before making factual assertions in open

court and in court filings.[164]   This does not, however, charge JW with constructive knowledge of

facts it might have uncovered through an investigation.[165]

---

[161] Motion, § IV.C.1.

[162] *See id.* (citing *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.,* 23 F.4th 529, 543 (5th Cir. 2022) (sanctions award against attorney for intentionally concealing his financial interest in one of the plaintiffs from corporate disclosures filed with the court remanded to consider when the relationship should have been disclosed and why it would have mattered); *United States v. Gellene,* 182 F.3d 578, 585-86 (7th Cir. 1998) (affirming bankruptcy attorney's criminal conviction for ***knowingly and fraudulently making a false material declaration*** in a bankruptcy case in violation of 18 U.S.C. § 152, and using a document under oath, *knowing* it contained a false material declaration in violation of 18 U.S.C. § 1623); *In re Ronco, Inc.* 838 F.2d 212, 218, 220 (7th Cir. 1988) (affirming sanctions against an attorney for seeking a continuance from the district court based on his recent retention on a bankruptcy case without disclosing his prior, extensive involvement in that bankruptcy case); *In re Brown,* 511 B.R. 843, 852 (Bankr. S.D. Tex. 2014) (holding that an attorney violated Disciplinary Rule 3.03 by agreeing to produce his client's phone even though he ***knew*** it was lost but hoped his client could find it)).

[163] *See supra* n.32.

[164] *See* TEX. R. PROF. CONDUCT 3.03, Comment 2; *see also, In re Hickman*, 673 S.W.3d 188, 195 (Tenn. 2023) (lawyer violated his duty of candor by filing pleadings falsely stating that the heir of his client's estate had authorized him to disburse funds from the estate for his fees under an arrangement the heir had not approved); *In the Matter of Foster*, 215 N.E.3d 394, 424-25 (Mass. 2023) (lawyer violated her duty of candor by making affirmative misrepresentations in court filings without conducting a reasonably diligent inquiry of whether the underlying information was true); *Office of Disciplinary Counsel v. Price*, 732 A.2d 599, 174-75 (Pa. 1999) (lawyer violated the duty of candor by filing court documents that contained false allegations based upon rumors, innuendo, and his own perceptions instead of conducting reasonably diligent inquiry).

[165] *Larsen v. Utah State Bar (In re Larsen)*, 379 P.3d 1209, 1213-14 (Utah 2016) (reversing lower court's determination that the lawyer had violated the duty of candor by treating a "misstatement that a reasonably diligent

137.    Undeterred by the plain language of the Rule, and citing no legal authority for what a reasonably diligent inquiry should entail, the U.S. Trustee further argues that JW violated its duty of candor because it "adopted a different schedule of material parties than [JW's co-counsel] in preparing its disclosures that failed to include connections with judges." The U.S. Trustee theorizes that if JW had properly analyzed the firm's potential connections to judges like its co-counsel, JW would have uncovered Ms. Freeman's connection to former Judge Jones. But how those disclosures—which identify attorneys of the firm that previously served as law clerks for judges in the district—would have revealed a secret romantic or cohabiting relationship is not and cannot be explained.

138.    The Disciplinary Rules place the onus on individual attorneys, not their law firms, to disclose pertinent information that may implicate their ethical duties.  When examining attorney conduct for other disciplinary purposes, courts have concluded that a reasonable inquiry has been made if the investigation he or she has undertaken and the conclusions drawn therefrom are reasonable under the circumstances.[166]  Ultimately, what is reasonable, is a matter for the court to decide based on the totality of the circumstances.[167]  And including judges in disclosure schedules simply would not have revealed the secret Freeman-Jones relationship for any of the Pre-March

---

inquiry would have avoided" as the legal equivalent of a knowing misstatement in violation of the rules of professional conduct).

[166] *See Chapman & Cole v. Itel Container Int'l B.V.,* 865 F.2d 676, 685-86 (5th Cir. 1989) (examining whether a reasonably diligent inquiry was conducted under Federal Rules 11 and 26 in connection with assessing discovery sanctions); *see also Price,* 732 A.2d at 175-76 (a reasonably diligent inquiry is measured by an objective standard and requires an examination of the factual basis for an assertion made to the court); Advisory Committee's 1983 Note on subd. (g) of Fed. R. Civ. P. 26 ("The duty to make a 'reasonable inquiry' is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11.").

[167] *Id.*

2022 Cases, and in the Post-March 2022 cases, neither Ms. Freeman nor former Judge Jones would agree to a truthful disclosure which ultimately led to Ms. Freeman's separation from the firm.[168]

139.    Next, the U.S. Trustee claims that JW did not exercise sufficient diligence (or haste) to uncover Ms. Freeman's secret intimate relationship with former Judge Jones because it only conferred with an ethics expert and required Ms. Freeman to confirm JW's understanding of the relationship.  Not only does the U.S. Trustee ignore that the country was in the midst of an unprecedented viral pandemic in 2020 and 2021, but he also glosses over the myriad steps JW took when the *allegations* were first made.[169]

140.    As described above, JW identified all connections "to the best of [its] knowledge" when it sought court approval of its employment under section 327 of the Bankruptcy Code. Because Rule 2014 does not require disclosure of connections to judges, JW did not violate any duty of candor by not disclosing a connection it was not required to disclose.

     **(ii)**     **JW Did Not Violate Disciplinary Rule 4.1's Prohibition on Knowingly Making False Statements.**

141.    Disciplinary Rule 4.01 prohibits a lawyer from knowingly "[i]n the course of representing a client" making a "false statement of material fact or law to a third person" or "fail[ing] to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client."

---

[168] JW maintains a client and conflicts database to screen potential conflicts of interest.  In conjunction with the client database, JW maintains a computer software system that enables a user to input the name of an entity, search the client database, and research any related entities that JW currently represents or has represented in the past.  JW followed these procedures for each of the challenged cases.

[169] *See*, *supra*, section II.H through II.J.

The comments to Rule 4.01(a) and caselaw affirm that false "statements will violate this Rule, however, only if the lawyer knows they are false and intends thereby to mislead."[170]

142.    The U.S. Trustee does not identify a false statement by JW that allegedly violates Rule 4.01.  Instead, he accuses JW of violating Rule 4.01 through its "silence in their duty to speak" about the relationship which "was tantamount to a misrepresentation that there was no connection . . . and that would call into question either his independence or Ms. Freeman's and JW's eligibility to serve as counsel under section 327 in cases before Judge Jones."[171]  This novel interpretation conflicts with the Rule's plain text:  the failure to make a required disclosure only qualifies as a violation of the rule when it "is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client."[172]  Neither former Judge Jones nor Ms. Freeman was JW's client; no criminal acts have been alleged.  The Rule does not apply.

### (iii)    JW Did Not Violate Disciplinary Rule 8.04(6)'s Prohibition on Knowingly Assisting a Judge's Ethical Violation.

143.    Disciplinary Rule 8.04(a)(6) provides that a lawyer shall not knowingly assist a judge or judicial officer in conduct that violates applicable rules of judicial conduct or other law.[173]

144.    Without referring to any specific timeframe, the U.S. Trustee alleges that JW violated Rule 8.04 because it knew of the relationship between Ms. Freeman and former

---

[170] *See* TEX. R. PROF. CONDUCT 4.01, cmt. 2; *see also Gonzales v. Dankel*, 2023 WL 1781800 (E.D. Tex. 2023); *In re Adams*, 2020 WL 4922330 (N.D. Tex. 2020).

[171] *See* Motion, § IV.C.2.

[172] TEX. R. PROF. CONDUCT 4.01(a).

[173] Like the other Disciplinary Rules, possessing actual knowledge is required to violate Disciplinary Rule 8.04.  *See In re LeBlanc*, 927 So. 2d 315, 318 (La. 2007) (suspending attorney from the practice of law for violating Rule 8.4 of the Louisiana Rules of professional conduct by knowingly making a cash contribution directly to a judge and knowing that the doing so violated his ethical duties); *In re Powell*, 533 N.E.2d 831, 837 (Ill. 1988) (attorney disbarred for knowingly arranging a loan for the judge to curry his favor even though he knew it was wrong); *In re Weishoff*, 382 A.2d 632, 635 (N.J. 1978) (municipal prosecutor was a knowing party to a traffic ticket fixing scheme where the deputy clerk impersonated a defendant in open court to create a false transcript).

Judge Jones but concealed it.  According to the U.S. Trustee, this alleged concealment assisted former Judge Jones in violating his ethical duties and obligation to recuse.  Because JW lacked actual knowledge of the relationship until March 30, 2022, it could not have knowingly assisted former Judge Jones in any duty he may have had to disclose the relationship or recuse before then. And after March 30, 2022, JW acted reasonably and responsibly and took the various remedial steps described above, which ultimately led to Ms. Freeman's separation from the firm.

> **(iv)    JW Did Not Violate Texas Disciplinary Rule 5.01 Because the Firm is Not a Partner or Supervisory Lawyer, and in Any Event Acted Reasonably Under the Circumstances.**

145.    Texas Disciplinary Rule 5.01 has no application.  The Rule subjects a partner and/or supervisory lawyer to discipline under two circumstances: (i) he or she ordered, encouraged, or knowingly allowed the conduct of a ***subordinate lawyer*** which violates the Rules, or (ii) he or she fails to take reasonable remedial action which avoids or mitigates the consequences of the violation, once the violation becomes known to the partner or supervising lawyer.

146.    As set forth above, JW, a law firm, is not an individual supervisory lawyer or partner whose conduct is governed by Rule 5.01.  The Rule does not apply and even if it did, the partner or supervisory lawyer must have actual knowledge of the supervised lawyer's violation to be subject to discipline.  Moreover, the comments to Rule 5.01 explain that whether appropriate remedial action has been taken depends on many factors, including the partner or supervisory lawyer's involvement, and the nature of the actions that could be reasonably be taken under the circumstances to avoid or mitigate injurious consequences.[174]

---

[174] TEX. R. PROF. CONDUCT 5.01, Comment 4 ("[t]he duty imposed upon the partner or other authoritative lawyer by Rule 5.01(b) is to take reasonable remedial action to avoid or mitigate the consequences of the other lawyer's known violation. Appropriate remedial action by a partner or other supervisory lawyer would depend on many factors, such as the immediacy of the partner's or supervisory lawyer's knowledge and involvement, the nature of the action that can reasonably be expected to avoid or mitigate injurious consequences, and the seriousness of the anticipated

147.    JW lacked actual knowledge of the secret Freeman-Jones relationship until March 30, 2022, and once JW learned of the relationship, JW moved to exit Ms. Freeman from the firm.

**B.    JW Cannot be Held Liable for Former Judge Jones's Misconduct.**

148.    The U.S. Trustee argues that JW's retention and compensation orders should be vacated because former Judge Jones was disqualified under section 455 of title 28 of the U.S. Code from presiding over cases (or serving as a mediator pursuant to Local Rule 16.4) where JW served as estate-retained counsel or, at a minimum, that he was disqualified from approving JW's retention and fee applications under the Bankruptcy Rules 5002 and 5004(b), respectively.[175]  The U.S. Trustee effectively asks this Court to hold JW liable for former Judge Jones's alleged violations.

149.    Under section 455(a), former Judge Jones was required to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[176]  Under section 455(a), "[t]he test is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal [or further disclosure] was sought would entertain a significant doubt about the [Judge Jones's] impartiality."[177]  The Motion does not set forth the specific facts needed to evaluate former Judge Jones's alleged failure to recuse under section 455(a) or any other purportedly applicable Bankruptcy Rule or Local Rule.[178]    Judicial

---

consequences. In some circumstances, it may be sufficient for a junior partner to refer the ethical problem directly to a designated senior partner or a management committee.").

[175] *See* Motion, § IV.A.

[176] 28 U.S.C. § 455(a).

[177] *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523 (11th Cir. 1988).

[178] For example, any recusal grounded in former Judge Jones's relationship with Ms. Freeman would need to explain the exact nature of that relationship at *each* relevant time in *each* challenged case.  Each "example case" the U.S. Trustee highlights in the Motion, however, concerns allegations related to events that happened *after* March 2022,

impropriety, however, does not mandate vacatur under section 455 or Rule 60(b)(6).[179]  Courts examine the specific facts and circumstances of the case to determine whether vacatur is warranted,[180] or whether the failure to recuse was "harmless error."  The same reasoning applies to alleged violations of Bankruptcy Rules 5002 and 5004(b).[181]  The Fifth Circuit applies the "harmless error" test through consideration of the following factors established by the Supreme Court in *Liljeberg v. Health Services Acquisition Corp.*:  (a) the risk of injustice to the parties in this particular case, (b) the risk that the denial of relief will produce injustice in other cases, and (c) the risk of undermining the public's confidence in the judicial process.[182]

150.    JW submits that, in light of the undisputed facts, equities, and the totality of the circumstances in each of the challenged cases, the entry of orders approving JW's retention and compensation, whether by former Judge Jones or by this Court after its independent review, is the paradigmatic example of "harmless error."

### i.    There is No Risk of Injustice to the Parties in the Challenged Cases.

151.    As to the first *Liljeberg* factor, there is no risk of injustice to the U.S. Trustee, any debtor or reorganized debtor, or any other parties in any of the challenged cases if the Motion is denied.

---

when Ms. Freeman finally admitted to JW that she was then in a romantic relationship with former Judge Jones (but continued to hide that they lived and owned property together).

[179] *See, e.g., Air Line Pilots Assoc., Int'l v. Cont'l Airlines, Inc. (In re Cont'l Airlines Corp.)*, 901 F.2d 1259, 1263 (5th Cir. 1990).  *See also Patterson v. Mobil Corp.*, 335 F.3d 476, 484 (5th Cir. 2003) ("Although we conclude that Judge Cobb should have stood recused under § 455(a), we do not automatically vacate the rulings issued after he should have recused himself").

[180] *See, e.g., Obduskey v. Wells Fargo*, No. 22-1156, 2023 WL 1831128, at *11 (10th Cir. Feb. 9, 2023) ("The circumstances of this case do not present a risk of injustice to Obduskey or to litigants in other cases, nor do they risk undermining public confidence in the judicial system.").

[181] The U.S. Trustee does not cite any authority for the proposition that a bankruptcy judge's violation of either Bankruptcy Rule 5002 or Bankruptcy Rule 5004(b) mandates vacatur of the applicable order or judgment.  Although, for reasons discussed in greater detail section III.B.v below, on the current record in these cases, neither Bankruptcy Rule 5002 nor 5004(b) applied to JW's retention or fee applications in the challenged cases.

[182] 486 U.S. 847 (1988).  *See Patterson*, 335 F.3d at 485; *Cont'l Airlines.*, 901 F.2d at 1263.

152.     The U.S. Trustee does not identify any substantive ruling in the cases that was prejudiced, biased, or in any way impacted by any alleged secret intimate relationship.  And for good reason—all such rulings were supported by the facts and circumstances of each case, applicable law, and the evidentiary record.  Additionally, the U.S. Trustee does not and cannot dispute that JW provided the services for which it was paid and that such services were reasonable, necessary, and benefitted the debtors, their estates, and their stakeholders.  Indeed, nothing in the Motion demonstrates (or even alleges) that JW or the orders approving its retention and compensation caused any specific, direct or indirect harm to any debtors, their estates, or any other party in interest in any way.  JW's retention and compensation orders, along with every other order former Judge Jones entered in the cases he presided over, were entered only after the U.S. Trustee, the debtors' creditors and other stakeholders (most of whom were sophisticated, well-represented financial companies), and all other parties entitled to notice were given an opportunity to be heard. Not one objection was filed to a JW retention or fee application in the challenged cases.[183]

153.     As set forth herein and in the exhibits hereto, the resolutions reached in each of the cases were, uniformly, held to be in the best interests of the applicable estates (often through a chapter 11 plan that was either consensual, broadly supported, or that did not impair trade creditors).  The U.S. Trustee's argument that former Judge Jones's secret relationship tainted *all proceedings*—while consistent with his "kitchen sink" approach—is unsupported by the record. Indeed, if the U.S. Trustee's arguments are correct, then nearly every order entered in all of the

---

[183] As discussed in section III.B.vi below, the risk to parties (and the other risks addressed through the *Liljeberg* factors) in the challenged cases is even lower in Mediation Cases.  In the Mediation Cases, *this Court*, not former Judge Jones, independently considered the facts, evidence, and numerous arm's-length, negotiated settlements reached among the stakeholders and entered all orders in the applicable Mediation Cases (including the applicable confirmation orders) based upon its independent judgment and consideration of the foregoing.  In the Mediation Cases, former Judge Jones had no oversight or approval of JW's retention and fee orders, all of which were entered by an impartial judge after his own independent review.

cases that former Judge Jones presided over, and all settlements reached in connection with any mediation former Judge Jones participated in, are equally tainted and should be vacated—not just the small fraction of orders that the Motion seeks to vacate.  No party—even the U.S. Trustee— would argue that disturbing the resolutions of any other issues in the challenged cases would benefit any of the estates.  The truth is that neither the U.S. Trustee nor any other party in interest has mustered any evidence that the "playing field" was at all "unlevel" or that it would be "manifestly unjust" if JW's retention and compensation orders are allowed to stand.

### ii.      There is No Risk of Injustice in Other Chapter 11 Cases.

154.    As to the second *Liljeberg* factor, there is no risk of injustice in other chapter 11 cases if the Motion is denied.

155.    The U.S. Trustee has filed separate, but nearly identical, Motions in 33 different cases.  The relief requested in the U.S. Trustee's Motion falls within the Court's broad discretion and requires the U.S. Trustee to demonstrate—***in each case***—that "extraordinary circumstances" mandate vacatur because orders approving JW's retention and fee applications were "manifestly unjust."[184]

156.    Here, denial of the U.S. Trustee's Motion is ***not*** an endorsement of Judge Jones's misconduct, or the alleged conduct of Ms. Freeman or any other person.  Former Judge Jones and his secret intimate relationship with Ms. Freeman have been fodder for national newspapers, launched disciplinary proceedings in the Fifth Circuit Court of Appeals, led to former Judge Jones's resignation, and spawned a number of proceedings in this Court, the U.S. District Court for the Western District of Texas, and the U.S. District Court for the Southern District of

---

[184] *See, e.g.*, *In re Roman Cath. Church of Archdiocese of New Orleans*, No. 22-30539, 2024 WL 2125507, at *5 (5th Cir. May 13, 2024) (finding that the second *Liljeberg* factor counseled against vacatur where purportedly related cases were "not mutually dependent such that the disposition of one would necessarily control the disposition of the other.").

Texas.  No reasonable person (let alone any mediator, arbitrator, judge, or attorney) would interpret this Court's denial of the Motion as a license to ignore disclosure obligations or a tacit endorsement of former Judge Jones's alleged misconduct and non-disclosure.[185]  Particularly where JW, the target of the Motion, had no knowledge of the judge's misconduct or his secret relationship with a JW partner during the majority of the challenged cases.

157.    That is particularly true here, where no party has even ***alleged*** that former Judge Jones or JW "acted inappropriately or ineffectively" in the performance of their respective duties; no party objected to the substance of JW's retention or fee applications; no party has sought to vacate any other underlying orders in the challenged cases, including any confirmation orders; no party has challenged any of the settlements in the cases that culminated in confirmed plans; no party has alleged that either the confirmed plans or related settlements were not in the best interests of the estates and consistent with the Bankruptcy Code; no party has identified a single order, ruling, or judgment that has been alleged to have been entered in error or otherwise unsupported by the facts and evidentiary record; and no party has alleged that any of the estates have suffered any actual harm due to the alleged non-disclosure of the Freeman-Jones relationship.

### iii.    Public Confidence Will Not be Undermined if Relief is Denied.

158.    As to the final *Liljeberg* factor, the public's confidence in bankruptcy judges or the bankruptcy process generally would not be undermined if the Motion is denied.

159.    In evaluating the *Liljeberg* factors, particularly the third factor, courts should consider context and all relevant circumstances bearing on the entry of a judgment and its vacatur.

---

[185] *See, e.g., CEATS, Inv. v. Continental Airlines, Inc.*, 755 F.3d 1356, 1366 (Fed. Cir. 2014) ("We find it unlikely that mediators will simply ignore their disclosure obligations if we deny relief here.  To the contrary, our decision serves to reinforce the broad disclosure rules for mediators by holding that Faulkner had a duty to disclose in this case.  The mere fact that the final judgment after a full jury trial will not be overturned every time a mediator fails to disclose a potential conflict is not likely to affect the disclosure decisions of other mediators.").

Here, the undisputed facts and circumstances make clear that **_granting_** the Motion in the challenged cases would undermine public confidence in this Court and its administration of chapter 11 cases.

160.     The U.S. Trustee does not—and cannot—dispute any of the following specific facts and circumstances of the challenged cases (set forth in greater detail in Exhibits 2 and 3 hereto):

- the debtors' restructurings, as embodied in the applicable plans and confirmation orders (or, in the _LaForta_ case, the dismissal order), were the product of months of hard-fought and arm's-length negotiations among the debtors' primary stakeholders and their respective professionals and advisors (including JW);

- the debtors' confirmed plans, among other things, strengthened their respective balance sheets and set them up for long-term financial success;

- 23 of the 33 challenged cases have been substantially administered or closed for months, if not years, before any credible allegations were made against former Judge Jones;

- the confirmation orders bind the debtors, the reorganized debtors, and all parties in interest (including the U.S. Trustee) and have the weight of a final judgment, _res judicata_ as to matters covered by their respective terms;[186]

- JW most often served in a limited role as local counsel, and in that capacity generally incurred fees and expenses that were far lower than those incurred by its clients' lead counsel and other estate-retained professionals;

- various challenged cases already included voluntary fee reductions or professional-fee settlements;

- JW's retention and fee applications in all of the challenged cases were approved without objection by the U.S. Trustee or any other party in interest;

- neither the U.S. Trustee nor any other party has disputed that JW's fees and expenses were reasonable, necessary, and beneficial to the estates in any of the challenged cases, or that JW's retention and compensation orders were erroneously entered;

---

[186] _See Manges v. Seattle-First Nat'l Bank (In re Manges)_, 29 F.3d 1034, 1039 (5th Cir. 1994); _Eubanks v. Federal Deposit Ins. Corp._, 977 F.2d 166, 171 (5th Cir. 1992).

- the U.S. Trustee has not (and cannot) identify a single order, ruling or judgment has been alleged to have been entered in error and/or otherwise unsupported by the facts and evidentiary record;

- the U.S. Trustee has not (and cannot) identify any actual harm suffered by any of the estates due to the Freeman-Jones relationship or its alleged non-disclosure;

- in respect of the Pre-March 2022 Cases, the U.S. Trustee has not (and cannot) plead any credible allegations that JW had actual knowledge of any alleged secret intimate relationship before the debtors emerged from chapter 11 or while JW performed legal services for the estates (to the extent any such relationship did exist during this period); and

- in respect of the Post-March 2022 Cases, JW acted reasonably in its efforts to comply with any disclosure requirements under applicable law in the applicable challenged cases.

161.    The U.S. Trustee ignores these "specific facts" in each of the challenged cases as well as those set forth in Exhibits 2 and 3 hereto.  The Motion does not include a single allegation that, if true, would **require** the Court to vacate any orders approving JW's retention and compensation under applicable law.  Vacatur would be tantamount to disqualification, which is not, and would never have been, the appropriate remedy.  The system was designed for former Judge Jones to do the right thing:  disclose or recuse, and have the case, mediation, or application transferred to another judge or mediator.[187]  The system failed, not because of JW's behavior, but because two people put their personal interests above their obligations to others—including JW.

162.    The integrity of the bankruptcy process is paramount indeed, but integrity would not be restored by punishing a law firm that helped to effectively and efficiently shepherd its clients through chapter 11, consummating in each case a restructuring or other resolution that was—as a matter of law—in the best interests of the applicable estate.[188]  JW did the work in each case, and

---

[187] *See, e.g., MacNeil Bros. Co. v. Cohen*, 264 F.2d 186 (1st Cir. 1959) (finding that, even when an appellate judge is disqualified for relation or connection with a party or attorney, the remedy is assignment of another judge to sit in his or her place).

[188] *See* **Exhibits 2 & 3**.

JW earned its fees in each case.  The Fifth Circuit has long recognized that "the public will ***lose***

***faith*** in our system of justice" where a judgment is "overturned without regard to the ***merits*** of"

the underlying claims.[189]  There was not a whisper of impropriety, favoritism, or misconduct in

the vast majority of cases.[190]  And when Ms. Freeman finally came clean, JW acted promptly to

address the issue and, ultimately, required that Ms. Freeman separate from the firm.  Under these

circumstances, vacating JW's retention and compensation orders (or denying JW's pending fee

applications) would be manifestly unjust and, ultimately, "contribute to the public's distrust in our

system of justice."[191]

### iv. Subsection 455(b) of the Judicial Code Does Not Apply.

163.    The U.S. Trustee also argues that former Judge Jones was disqualified under

section 455(b), which provides that a judge must recuse when his "spouse . . . is acting as a lawyer

in the proceeding . . . [or] [i]s known by the judge to have an interest that could be substantially

affected by the outcome of the proceeding."[192]

164.    As to section 455(b), the U.S. Trustee recognizes that former Judge Jones and

Ms. Freeman were not married at any time; nonetheless, he argues that Ms. Freeman should be

treated as a "spouse" under section 455(b)(5).  A spouse, however, is a married person.[193]  The

---

[189] *Parker*, 855 F.2d at 1527 (emphasis added); *see also Cont'l Airlines*, 901 F.2d at 1263 ("We are aware of the high profile the Continental bankruptcy has had before the public and that the circumstances surrounding Judge Roberts's retirement from the bench have not gone unnoticed by the press.  That we have ruled Judge Roberts's actions to be violative of Section 455(a) should serve to restore some of any public confidence lost as a result of the violation; whether vacating the orders granting summary judgment for the sake of appearances alone would help or hinder the restorative process, however, is not clear.").

[190] Notably, the first time any person alleged that a Freeman-Jones relationship existed came from Mr. Van Deelen, whose claims were found to be "scurrilous" and an "***unsupported character assassination [that] has no place in any court proceeding and cannot be grounds for recusal*.**"  *See* Appeal No. 4:21-cv-3369, Dkt. No. 102 at pp. 37-38 (emphasis added).

[191] *Id.* (emphasis added).

[192] 28 U.S.C. § 455(b)(5)(ii) and (iii).

[193] *See* "Spouse" definition, *Black's Law Dictionary* (11th ed. 2019) ("One's husband or wife by lawful marriage; a married person.").

analysis begins and ends there, and the U.S. Trustee cites no case for the proposition that the term "spouse" means anything other than a married person.  Codes of conduct and related materials cited in the Motion are not law.  If section 455(b)'s language should be revised to reflect contemporary norms and expectations, Congress alone has the power to do so.

165.    To this point, the U.S. Trustee principally relies on Commentary to the Code of Conduct for United States Judges and a related Advisory Opinion regarding Judicial Canon 3C from the Committee on Codes of Conduct.[194]  First, although Canon 3C closely tracks section 455, the Advisory Opinion makes clear that "the Committee is not authorized to render advisory opinions interpreting [section 455]."[195]  Second, Canon 3C's Commentary states that recusal considerations applicable to a judge's spouse should also be considered with respect to a person "other than a spouse with whom the judge maintains *both* a household *and* intimate relationship,"[196] which would create a two-part test to determine whether Canon 3C should apply. But nothing in the Motion demonstrates if or when both requirements were met in any case. Moreover, while the Advisory Opinion provides that recusal considerations under certain provisions of Canon 3C may be different where the judge's spouse is an "equity partner" versus a "non-equity" partner, the Motion glosses over the fact that Ms. Freeman did not become an equity partner until January 1, 2021 (yet, the Motion seeks the return of all compensation awarded to JW as early as July 2018).  Accordingly, even if the Court were to find these materials relevant to its determination under section 455, the U.S. Trustee has failed to show that the relevant provisions

---

[194] *See* Motion, § IV.A.1.

[195] Advisory Opinion 58, available at https://www.uscourts.gov/file/25673/download.

[196] Code of Conduct for United States Judges, Canon 3C Commentary (effective Mar. 12, 2019).  The Motion includes citations to various other ABA model codes and opinions, which are substantially similar to the provisions of the Code of Conduct for United States Judges.

in Canon 3C would apply.[197]   And critically, although the U.S. Trustee relies on the Fifth Circuit's decision in *Potashnick v. Port City Const. Co.* to argue that Advisory Opinion 58 applies, *Potashnick* was issued **before** the Supreme Court held in *Liljeberg* that the "harmless error" analysis applies to recusal violations.[198]

### v.   Bankruptcy Rules 5002 and 5004 Do Not Apply to Former Judge Jones's Approval of Any JW Retention or Fee Applications.

166.   In addition to incorporating section 455, the Bankruptcy Rules provide that a bankruptcy judge shall not approve the retention or compensation of certain individuals and their firms.   The U.S. Trustee argues that, under Bankruptcy Rules 5002 and 5004, Judge Jones was prohibited from approving JW's retention and fee applications because either Ms. Freeman "should have been treated as a 'relative'" under the rule or, alternatively, "Ms. Freeman was so connected to Judge Jones given their relationship—and, therefore, so was [JW]—'as to render it improper' for [him] to have approved" JW's employment while Ms. Freeman was a partner.[199]   In making his argument, the U.S. Trustee again ignores the plain meaning of the governing texts and the rules to invent bases for punishing JW for the actions of others.

167.   Bankruptcy Rule 5002(a) provides, in relevant part, that "[t]he employment of an **individual** as an attorney, . . . pursuant to §§ 327, 1103, or 1114 shall not be approved by the court if the individual is a **relative** of the bankruptcy judge approving the employment."[200]   Unlike Bankruptcy Rule 2014, a judge's relationship with a relative is expressly imputed to a relative's firm and all of its professionals under Bankruptcy Rule 5002(a), which states that when "an

---

[197] If, however, the Court ultimately determines that Judge Jones violated any provision of section 455(b), as set forth in sections III.B.i-iii above, the approval of JW's retention and fee applications was nevertheless "harmless error" in each of the challenged cases.   *See Roberts v. Wal-Mart Louisiana, L.L.C.*, 54 F.4th 852, 854 (5th Cir. 2022).

[198] *See* 609 F.2d 1101 (5th Cir. 1980); *Liljeberg*, 486 U.S. 847.

[199] Motion, § IV.A.3.

[200] *Id.* (emphasis added).

individual may not be approved for appointment or employment [under Bankruptcy Rule 5002(a)], the individual's firm, partnership, corporation, or any other form of business association or relationship, and all members, associates and professional employees thereof also may not be approved for appointment or employment."[201]

168.    The Bankruptcy Code defines "relative" as an "individual related by ***affinity*** or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree."[202]    "Affinity," as a legal term, means a "relationship resulting from a marriage."[203]   Therefore, under the Bankruptcy Code and Rules, an individual is a "relative" of a bankruptcy judge if they are related by blood or marriage.[204]   Case law construing the term under the Bankruptcy Code, as well as under Texas state law, is generally in accord.[205]

---

[201] FED. R. BANKR. P. 5002(a).

[202] 11 U.S.C. § 101(45) (emphasis added).

[203] "Affinity" definition, *Black's Law Dictionary* (11th ed. 2019) ("1. A close agreement. 2. The relation that one spouse has to the blood relatives of the other spouse; relationship by marriage. 3. Any familial relation resulting from a marriage."); *see also, e.g.*, "Quasi-affinity" definition, *id.* ("The affinity existing between two persons, one of whom has been engaged to a relative of the other."); "Relative" definition, *id.* ("A person connected with another by blood or affinity; a person who is kin with another"); "Relative by affinity" definition, *id.* ("Someone who is related solely as the result of a marriage and not by blood or adoption. • A person is a relative by affinity (1) to any blood or adopted relative of his or her spouse, and (2) to any spouse of his or her blood and adopted relatives. Based on the theory that marriage makes two people one, the relatives of each spouse become the other spouse's relatives by affinity.").

[204] The Motion cites only one case in support of the argument that "relative" under the Bankruptcy Code should include parties Congress excluded from its definition.  That case is factually inapposite but also generally in accord with cases holding that "affinity" refers to a relationship by marriage.  *See Loftis v. Minar (In re Montanino)*, 15 B.R. 307 (Bankr. D.N.J. 1981).  In *Montanino*, the bankruptcy court considered whether the parents of the debtor's live-in fiancée were "insiders" for purposes of Bankruptcy Code section 547.  The court found that "Congress did not intend to limit the classification of insiders to relatives by marriage or consanguinity" and further noted that a deed used to execute a fraudulent transfer of real property stated that "this is a conveyance between relatives."  In that context, the court found that the debtor's ***fiancée***—not her parents—fit within the Bankruptcy Code's definitions of "relative," but further found that, under the circumstances, the fiancée's parents were "insiders" under section 547.  And notably, the challenged deed included a recital stating that "[t]his is a conveyance between relatives."  Moreover, a later decision by the same bankruptcy court confirmed that a "relative" under section 101(34) must be related by blood or by marriage.  *In re Hill*, 342 B.R. 183, 199 ("A spouse of a debtor would be a relative because the definition includes relationships by affinity.  A former spouse, however, is not related by affinity, and therefore 'a former spouse will not be considered a relative.'") (Bankr. D.N.J. 2006).

[205] *See, e.g., In re Wibracht*, Case No. 21-50477-CAG, 2022 WL 981781, at *10 (Bankr. W.D. Tex. 2022) ("The Court will therefore conclude that a relative is a person connected to another by blood or marriage"), vacated and remanded

169.     The U.S. Trustee (despite arguing that Ms. Freeman has been, at different times, either a "spouse" or a former "spouse") has not alleged that Ms. Freeman and Judge Jones were ever married; thus, Ms. Freeman was not a "relative" under section 101(34).   Accordingly, Bankruptcy Rule 5002(a)'s imputation provision did not apply and former Judge Jones was not prohibited from approving JW's retention applications.

170.     Bankruptcy Rule 5002(b) and 5004(b) also prohibit bankruptcy judges from approving certain other employment applications and fee applications.  Under those rules, a judge cannot approve a law firm's employment application if *that law firm* is or was closely connected to the judge, and a judge cannot approve a law firm's fee application if *that law firm* is a "relative" of or closely connected with the judge.[206]   Consistent with the Court's holding in *Cygnus*, under the plain language of these rules, JW—not Ms. Freeman—is the "person" that sought employment under section 327 (or section 1103, as applicable) and the "person" that sought the allowance of compensation under the Bankruptcy Code.   And unlike Bankruptcy Rule 5002(a), neither Bankruptcy Rule 5002(b) nor 5004(b) impute the judge's relationship with any individual attorney to his or her firm.

### vi.     In the Mediation Cases, JW's Retention and Fee Applications were Subject to Independent Review and Approval.

171.     With respect to the Mediation Cases that are the subject of the U.S. Trustee's challenge, the U.S. Trustee argues that, under Local Rules and other guidelines, former

---

on other grounds, No. SA-21-50477-CAG, 2022 WL 16825193 (W.D. Tex. Nov. 8, 2022); *see also, e.g., Curtis v. The Chapman Family Trust (In re Chapman)*, 628 B.R. 512, (Bankr. S.D. Tex. 2021) (noting that, under Fifth Circuit law, "divorce terminates the marital relation") (citing *In re Holloway*, 955 F.2d 1008 (5th Cir. 1992)).

[206] Bankruptcy Rule 5002(b) provides, in relevant part, that "[a] bankruptcy judge may not . . . approve the *employment of a person* as an attorney,. . . pursuant to §§ 327, 1103, or 1114 of the Code *if that person* is or has been so connected with such judge . . . as to render the . . . employment improper." FED. R. BANKR. P. 5002(b) (emphasis added).   Bankruptcy Rule 5004(b) provides that "[a] bankruptcy judge shall be disqualified from allowing compensation *to a person who is a relative* of the bankruptcy judge *or* with whom the judge is *so connected* as to render it improper for the judge to authorize such compensation." FED. R. BANKR. P. 5004(b) (emphasis added).

Judge Jones should have disclosed his relationship with Ms. Freeman or declined his appointment. Even assuming, *arguendo*, that this argument is correct, the U.S. Trustee cannot meet his burden.

172.     In each of the Mediation Cases, the U.S. Trustee has not, and cannot, dispute the following facts:

- after the debtors consulted with the applicable stakeholders, all such parties consented to former Judge Jones's appointment to mediate disputes among them (typically, concerning the debtors' economic restructuring and plan-related matters);

- all mediation participants were sophisticated parties (including large financial or investment companies) represented by experienced restructuring professionals;

- the mediations were successful, and helped the applicable debtors and other mediation parties negotiate and formulate a chapter 11 plan that, after the Court's independent review and analysis, was confirmed and found to be in the best interests of the applicable estates;

- although former Judge Jones, as mediator, provided "assistance," "facilitation," and "oversight," he did not—and could not—force any result and had no power to bind parties;

- no mediation party alleged that Judge Jones was biased or otherwise behaved inappropriately in connection with the mediation, misused confidential information, or that the applicable estates or any stakeholder's interest were harmed;[207]

- as discussed in section III.A.iv above, JW could not disclose a fact that it did not know and, therefore, could not have raised an issue "concerning

---

[207] *CEATS*, 755 F.3d at 1367.  The U.S. Trustee's statement that "[w]hether or not the mediation was successful or anyone in fact challenged the result is irrelevant" is flatly wrong under applicable law.  Altera Motion ¶ 124 n.12.  The Fifth Circuit and other courts, in evaluating whether to vacate judgment for judicial impropriety, routinely focus on the substance of the subject judgment and the actual conduct and results in the subject proceeding. *See, e.g., id.*; *Wal-Mart*, 54 F.4th at 854 (finding that, under a harmless-error analysis, the district court judge's "ruling was based on firm legal principles, there is no evidence of bias or favor, and [the appellant] neither appealed Judge Doherty's decision at the time nor refiled her state law claims in state court within the time permitted her.").  The U.S. Trustee instead relies on the wholly inapplicable decision in *Clark v. Kapila*.  In that case, the court found that vacatur was appropriate because the "***error was not harmless***" where the bankruptcy judge, in an apparent change of position, "suddenly grant[ed]" a request for imposing an injunctions and sanctions after the requesting "firm had hired the judge's fiancée." 612 B.R. 808, 819 (Bankr. S.D. Fla. 2019).  Again, neither the U.S. Trustee nor any other party has alleged that Judge Jones's secret intimate relationship affected his performance in the administration of any bankruptcy case or mediation—including in respect of the approval of JW's retention and fee applications.

potential ADR provider conflicts" under Local Rule 16.4.I(2) in any Pre-
March 2022 Cases; and

- former Judge Jones had no oversight or approval rights in respect of JW's
retention or fee applications, all of which were entered by a different Court
after its own, independent review, and without objection as to
reasonableness by the U.S. Trustee or any other party in interest.[208]

173.    The evidence in the Mediation Cases shows that the debtors and the other mediation

parties got precisely what they bargained for:  a value-maximizing restructuring implemented

through a confirmed plan that the debtors and their stakeholders, in many cases, still benefit from

today.[209]    Indeed, neither the U.S. Trustee nor any other party has sought to vacate any

confirmation order or otherwise undo any other substantive ruling or mediated settlement reached

in any of the Mediation Cases.[210]

174.    Given that former Judge Jones did not participate in or influence this Court's

approval of JW's retention and fee applications or otherwise issue a single ruling, decision, order,

or judgment in the Mediation Cases, let alone a ruling, decision, or judgment alleged to have been

tainted or biased in any way, JW submits that vacating its retention and compensation orders in

the Mediation Cases would be particularly harmful and would only "contribute to the public's

distrust in our system of justice."[211]    Contrary to the U.S. Trustee's position, what *actually*

happened and whether there was *actual harm* is central to the Court's inquiry, particularly under

---

[208] *See, e.g., Wal-Mart*, 54 F. 4th at 854 ("On fresh review, we conclude likewise that after "a careful study . . . of the merits," there is no "risk of injustice to the parties in th[is] particular case.").

[209] *See In re Tailored Brands, Inc.*, Case No. 20-33900 (MI) [Dkt. No. 1268] Nov. 13, 2020 Hr'g Tr. at pp. 18:4-6 & 18:19-24 (Bankr. S.D. Tex.) (The Court: I just want—and I am serious about what will sound like a joke, which is that ***credit goes to the professionals in the case and not to Judge Jones.  I got it that he was helpful, but it's because of professionals in the case that in every instance—that's what enables mediation to work. It's not the personality of the judge or that he stays up late.***") (emphasis added).

[210] Indeed, *res judicata* and estoppel principles bar parties from contending that the various plans, or any agreements provided for in the plans, was anything other than "value maximizing" and in the "best interest of the estates."  *See Eubanks*, 977 F.2d at 171.

[211] *Id.* (emphasis added).

Rule 60(b).  The Federal Circuit's decision in *CEATS, Inv. v. Continental Airlines, Inc.* is instructive, and is the only court to analyze whether a mediator's failure to recuse pursuant to section 455 constitutes "extraordinary circumstances" under Rule 60(b)(6).

175.    In *CEATS*, former magistrate judge Robert Faulkner was appointed to mediate a patent-infringement suit filed by CEATS in the U.S. District Court for the Eastern District of Texas.  The parties failed to reach a settlement after two mediation sessions and proceeded to trial (during which additional mediations sessions occurred, but also failed) and, ultimately, a jury found that CEATS's patents were "infringed, but invalid."  CEATS later learned through a news article that both Faulkner and Fish & Richardson P.C., counsel for certain defendants in the infringement suit, were co-defendants in an unrelated action in Texas state court alleging that Faulkner and Fish breached an "arbitration agreement and fraudulently concealed the [Faulkner-Fish] relationship."[212]  CEATS then sought relief from the district court's judgment under Rule 60(b)(6) based on Faulkner's failure to disclose a relationship with Fish.[213]  The court held that, while Faulkner, as mediator, violated his duty to disclose, CEATS was not entitled to relief from judgment under the *Liljeberg* factors; thus, the Court of Appeals affirmed the district court's ***denial***

---

[212] The unrelated action arose out of Faulkner and Fish's role in a separate partnership-dispute litigation also pending in Texas state court.  In the underlying partnership-dispute action, Fish represented a party in a partnership dispute where Faulkner served as court-appointed arbitrator.  Faulkner disclosed that he previously had participated in arbitrations and mediations with the named Fish attorneys, but did not disclosed other contacts with Fish or its attorneys.  Faulkner later issued a $22 million award in favor of Fish's client, including $6 million in attorney's fees.  Opposing counsel in that case learned that Faulkner, Fish, and a certain Fish attorney failed to disclose the true nature and extent of their relationship.  Arguments concerning Faulkner's non-disclosure in the Texas state court action occurred ***during*** the CEATS infringement litigation.  Indeed, "[o]n June 28, 2011—between the first two mediation sessions in [the CEATS infringement litigation]," the Texas court of appeals vacated the arbitration award finding that "Faulkner's failure to disclose . . . violated his obligations as an arbitrator and tainted" the award.  *See* 755 F.3d at 1359.

[213] CEATS also sought relief from judgment under Rule 60(b)(3) related to Fish's failure to disclose the same facts.  CEATS, however, conceded "that there is nothing in the record that shows it was not given a full and fair opportunity to present its case" and the district court denied the request for Rule 60(b)(3) relief, finding that "60(b)(3) standard clearly requires the movant to have to be able to show and demonstrate some impact on their ability to have a full and fair trial."  The Court of Appeals affirmed.

of the Rule 60(b) motion. In its reasoning, the court determined, among other things, that there was no "meaningful risk of injustice" because (a) CEATS was "ultimately was able to fully and fairly present its case before an impartial judge and jury"; (b) it was "unlikely that mediators will simply ignore their disclosure obligations" if the Rule 60(b) motion were denied; and (c) there was limited "risk of undermining public confidence," given that CEATS "had the opportunity to present its case to a neutral judge and jury. . . ."[214]

176.    Similarly, here all parties in interest in the Mediation Cases had the opportunity to dispute any agreements or settlements reached (and, in some cases, actually did so), and such agreements were approved by an impartial judge based on the facts and evidentiary record, all of which complied with applicable law. Setting aside JW's retention and compensation orders, or any other order entered in the Mediation Cases, would not serve any legitimate purpose.

## C.    The Unprecedented Facts, Mitigating Circumstances, and Overall Equities Do not Warrant Sanctions Amounting to 100% of the Fees and Expenses Paid to JW in All of the Challenged Cases.

177.    The U.S. Trustee, relying on section 328(c) of the Bankruptcy Code and the Court's inherent authority, urges the Court to vacate *all* retention and fee orders and sanction JW for 100% of all fees and expenses paid by the 33 bankruptcy estates to JW for services JW indisputably performed. Neither section 328(c) nor the Court's inherent authority justify the request under the facts and circumstances alleged here.

178.    Section 328(c) authorizes the Court to deny compensation for estate retained professionals *only* if "at any time *during such professional person's employment under section 327 or 1103 of this title*, such professional person is not a disinterested person, or represents or holds an adverse interest to the estate with respect to the matter on which such professional person

---

[214] *CEATS*, 755 F.3d at 1367.

is employed." 11 U.S.C. § 328(c) (emphasis added). In emphasizing the phrase "at any time" in section 328(c),[215] the U.S. Trustee misconstrues the temporal limitation of the statute. Even if the U.S. Trustee's allegations were proven to be true, the statute does not allow for compensation to be denied for a relationship that arose after a professional's employment has concluded. The scope of section 328(c) is, by its plain text, limited to whether JW was disinterested or held an adverse interest *while JW was employed as a professional in the chapter 11 case*.[216] The various confirmed plans confirm this textual interpretation: professionals need not comply with sections 327 through 331 and 1103 of the Bankruptcy Code as of the confirmation date.[217] If the U.S. Trustee viewed this differently, he should have objected on this ground and/or appealed the entry of the confirmation orders. He did neither.

179. Here, of course, for the Pre-March 2022 Cases, JW was disinterested and did not hold an adverse interest.[218] JW did not have knowledge of any ongoing intimate relationship between Ms. Freeman and former Judge Jones at any time up until March 30, 2022, and Ms. Freeman's own personal knowledge of any relationship prior to that time cannot be imputed to JW for the reasons discussed above.[219] While JW was informed of a past relationship in March 2021, there was nothing for JW to disclose or supplement at that time.[220]

---

[215] *See* Motion, at § IV.G.1 (highlighting phrase "at any time").

[216] 11 U.S.C. § 328(c).

[217] *See, e.g., In re Exco Resources, Inc. et al.*, Case No. 18-30155 [Dkt. No. 2103, Art. II.A.2.d]; *In re Covia Holdings Corporation, et al.,* Case No. 20-33295 (CML) [Dkt. No. 1029, Art. II.B.4]; *In re Volusion LLC*, Case No. 20-80082 (MI) [Dkt. No. 128, Art. II.D]; *In re Bouchard Transportation*, Co., Inc., Case No. 20-34682 (CML) [Dkt. No. 1319, Art. II.C.4].

[218] *See supra* n.118.

[219] *See id.*

[220] As noted above, Ms. Freeman has confirmed on two different occasions that JW did not know about her relationship with former Judge Jones at this time. *See Defendant's Elizabeth Carol Freeman's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b), Michael D. Van Deelen v. David R. Jones, Elizabeth Carol Freeman, JW, LLP, Kirkland & Ellis, LLP, and Kirkland & Ellis International, LLP,* Civ. Action No. 4:23-cv-3729 [Dkt. No. 45 at ¶ 3] (S.D. Tex. 2023) ("Freeman and Judge Jones had a close personal relationship when she joined JW in March, 2018. When JW appeared as co-debtor-in-possession counsel in the McDermott chapter 11 case, Judge Jones elected not to disclose

180.    Neither the plain language of section 328 of the Bankruptcy Code nor the cases cited by the U.S. Trustee mandate supplementing disclosures with information not relevant to the period of retention after a professional's employment has concluded,[221] let alone require the professional to ask the Court to reopen a case to make such disclosures.  Not only would that requirement be impractical, particularly after either the estate dissolved, the client ceased operations, or the company reorganized as a new company, it is not what the law requires.

181.    Additionally, neither section 105 of the Bankruptcy Code nor the Court's inherent authority[222] "constitute a roving commission to do equity."[223]   Rather, a bankruptcy court's sanction authority is limited to enforcing provisions of the Bankruptcy Code, applicable rules, and

---

the relationship with Freeman in the McDermott case.  ***Neither Kirkland nor JW knew about the Freeman-Jones relationship at the time* . . . .**") (emphasis added); *see also Defendant Elizabeth Carol Freeman's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)*, Civ. Action No. 4:24:cv-00693 [Dkt. No. 18 at ¶ 4] (S.D. Tex. 2024) (stating the same in respect of the Bouchard chapter 11 cases).

[221] *See* 11 U.S.C. § 328(c); Motion, § IV.G (citing *In re Consol. Bancshares*, 785 F.2d at 1256 (remanding to consider whether an ongoing conflict of interest existed during the chapter 11 cases based on counsel's former representation of the debtor's officers and directors); *In re W. Delta Oil*, 432 F.3d at 354 (special counsel violated its disclosure obligations by failing to disclose investment in a company trying to buy the debtor during the cases); *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994) (debtor's counsel failed to disclose ongoing concurrent representation of the debtor's shareholders); *In re eToys*, 331 B.R. at 190 (debtor's counsel's failed to disclose concurrent representation of a creditor and a claimant during the cases)).

[222] JW recognizes that bankruptcy courts, like all federal courts, have the inherent power to impose sanctions against parties or attorneys in the cases before them.  *In re Case*, 937 F.2d 1014, 1023 (5th Cir. 1991).  But inherent power sanctions are reserved for punishing bad faith litigation conduct or willful disobedience of a court's orders and only when necessary to achieve the orderly and expeditious disposition of cases.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (affirming inherent power sanctions for abusing the judicial process, including filing numerous meritless motions and pleadings and delaying the case); *Carroll v. Abide (In re Carroll)*, 850 F.3d 811, 815-16 (5th Cir. 2017) (affirming inherent authority sanctions against appellants for engaging in conduct intended to harass and delay by repeated attempts to litigate issues conclusively resolved against them or that they lacked standing to assert).

[223] *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (citations omitted).

orders of the Court.[224]  Even then, such authority is limited to what is necessary for enforcement and must be the least restrictive sanction necessary to deter the inappropriate behavior.[225]

182.    Again, putting aside the U.S. Trustee's failure to demonstrate the extraordinary circumstances and manifest injustice required to vacate **all** of JW's retention and fee orders under Rule 60(b), the U.S. Trustee has not asserted credible allegations that would support a finding that JW violated any ethical rules, disclosure obligations, or fiduciary duties or acted in a manner that would otherwise warrant sanctions in any of the Pre-March 2022 Cases under section 105 of the Bankruptcy Code or the Court's inherent powers.[226]

183.    JW submits that the same result should hold true for the Post-March 2022 Cases given the unprecedented situation that was thrust upon JW.  As indicated above, JW learned that it had been repeatedly lied to by a highly respected and regarded partner about her secret intimate relationship with a sitting federal bankruptcy judge who insisted that any disclosure obligations were his, and his alone.  Nonetheless, once JW confirmed the existence of the relationship, JW

---

[224] *Law v. Siegel*, 571 U.S. 415, 420-21 (2014) (a bankruptcy court may not contravene specific statutory provisions when exercising authority under section 105(a) of the Bankruptcy Code and its inherent powers); *Jamo v. Katahdin Fed. Credit Union (In re Jamo)*, 283 F.3d 392, 404 (5th Cir. 2002) (vacating sanction imposed under section 105(a) in the absence of "any antecedent violation either of the automatic stay or of some other independent provision of the Bankruptcy Code"); *Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 478 (5th Cir. 1994) (section 105(a) of the Bankruptcy Code authorizes a bankruptcy court "to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code" but "the powers granted by that statute must be exercised in a manner that is consistent with the Bankruptcy Code." The statute "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." (quoting *Chiasson v. Bingler (In re Oxford Mgmt., Inc.)*, 4 F.3d 1329, 1333-1334 (5th Cir. 1993)); *Ameriquest Mortg. Co. v. Nosek (In re Nosek)*, 544 F.3d 34, 49-50 (1st Cir. 2008) (vacating damages awarded under section 105(a) because neither section 1322(b) nor the debtor's confirmed plan specifically proscribed the sanctioned conduct); *In re Cushman*, 589 B.R. 469,  500 (Bankr. D. Me. 2018) ("in the absence of an antecedent violation of the Code or a related court order, section 105(a) will not ordinarily provide a basis for sanctions").

[225] *See Baker v. Cage (In re Whitley)*, 737 F.3d 980, 987 (5th Cir. 2013) (reversing bankruptcy court's imposition of a sanction against debtor's counsel to return properties to the estate that had been transferred to his wholly owned entity); *Harris v. First City Bancorporation of Tex., Inc. (In re First City Bancorporation of Tex., Inc.)*, 282 F.3d 864, 867 (5th Cir. 2002) (when a bankruptcy court imposes a disciplinary sanction it "must use the least restrictive sanction necessary to deter the inappropriate behavior.").

[226] To the extent the Court determines that any disclosures were required for the Pre-March 2022 Cases, any lack of disclosure was not intentional, which the Court should consider in determining any appropriate sanction.  *See In re Am. Int'l Refinery*, 676 F.3d at 466.

took appropriate actions in response thereto which, among other things, included: (a) confronting Ms. Freeman upon learning of the new credible allegations; (b) instructing, as before, Ms. Freeman that she could not work on any matters before former Judge Jones; (c) continuing to deduct from Ms. Freeman's compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters pending before former Judge Jones; (d) re-engaging with its outside ethics expert, Mr. Jarvis; (e) engaging with Ms. Freeman's lawyer to discuss potential disclosure language and potential separation from the firm; and (f) ultimately exiting Ms. Freeman from the firm.

184.     Nonetheless, to the extent the Court is inclined to grant any relief or to otherwise sanction JW in respect of the Post-March 2022 Cases—whether under section 328 or the Court's inherent authority—the Court should reject the U.S. Trustee's proposal to disgorge all fees and expenses awarded to JW.  The Fifth Circuit does not follow this hardline approach.[227]   And as the U.S. Trustee implicitly acknowledges, the Court is not required to deny all of JW's compensation for services already rendered even if it finds that JW had an adverse interest or was not disinterested.[228]     Indeed, courts in this District view "the denial of compensation and

---

[227] The U.S. Trustee relies entirely on decisions from courts outside the Fifth Circuit to argue that non-disclosure requires complete disgorgement of all compensation. *See* Motion, § IV.G.2 (citing *In re Futuronics*, 655 F.2d at 470); *In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992)).  As reflected in the other decisions the U.S. Trustee cites elsewhere in his Motion, the Fifth Circuit takes a more measured approach.  *Waldron v. Adams & Reese, L.L.P. (In re American Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012) (rejecting trustee's argument that all compensation should have been disgorged for violating Bankruptcy Rule 2014); *Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 355 n.22 (5th Cir. 2005) (explaining that the denial of all compensation is not automatic because a bankruptcy court is a court of equity); *Arenes v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 n.1, 1005 (5th Cir. 1995) (although the court affirmed the disgorgement of the entirety of pre-petition retainer, that decision was based on non-disclosure and the finding that none of the services performed by the professional benefitted the debtors or their estates)).

[228] Motion, at § IV.G.2 (citing *Waldron v. Adams & Reese, L.L.P. (In re American Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012) ("A bankruptcy court is not required, however, to deny all compensation if an attorney has an adverse interest and is found to not be disinterested."); *In re Fish & Fisher, Inc.*, 574 B.R. 608, 619 (Bankr. S.D. Miss. 2017) ("The decision whether to deny fees to a professional who is not disinterested is within the discretion of the bankruptcy court.") (quoting 3 COLLIER ON BANKRUPTCY ¶ 328.05[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

reimbursement of expenses after services have been performed" as "draconian and inherently unfair," especially when no "actual injury or prejudice to the debtor's estate" has been shown.[229]

185.    Instead, the Court should exercise its discretion to fashion an appropriate remedy depending on the particular facts of the individual cases.  This means that "[w]hen a court metes out a sanction, it must exercise such power with restraint and discretion."[230]  In fact, "[t]he sanction levied must . . . be commensurate with the egregiousness of the conduct."[231]  "[T]o ensure that a sanction is "chosen to employ the least possible power to the end proposed," the bankruptcy court must compare the requested amount of sanctions to the offending party's conduct.[232]

186.    Here, in addition to the various steps that JW took immediately upon confirming the existence of a romantic relationship between Ms. Freeman and former Judge Jones on March 30, 2022 as discussed above, JW submits that any sanction for the Post-March 2022 Cases should be tempered by the fact that, among other things, (a) JW acted reasonably in moving to exit Ms. Freeman from the firm when JW confirmed the existence of current romantic relationship on March 30, 2022; (b) JW actually performed the work for which it was paid and that such work benefitted the bankruptcy estates and their respective stakeholders; (c) no ruling, decision, order, judgment, mediator recommendation, or settlement has been plead to have allegedly been biased in any way or otherwise improperly influenced by the relationship; (d) no allegations have been raised by the U.S. Trustee as to any actual injury to any party allegedly caused by that secret relationship; (e) JW has already incurred substantial legal fees in connection with these matters

---

[229] *In re GHR Energy Corp.*, 60 B.R. 52, 68 (Bankr. S.D. Tex. 1985) (declining to deny the entirety of the professional's fees upon a finding that the professional was not disinterested) (quoting 2 COLLIER ON BANKRUPTCY § 328.04 at 328-15 (15 ed. 1979)).

[230] *In re Whitley*, 737 F.3d at 988 (internal citations omitted).

[231] *Id.* at 987 (internal citations omitted).

[232] *Id.* at 988 (quoting *In re First City Bancorporation of Tex.*, 282 F.3d at 867).

and will likely incur additional substantial amounts; (f) JW has suffered significant reputational damage as a result of Ms. Freeman's and former Judge Jones's indiscretions; and (g) JW never acted with any improper motive, purpose, or intent.

187.    Sanctions are not appropriate.

## IV.    CONCLUSION

As discussed at length above, the U.S. Trustee's Motion is factually and legally flawed. JW, at all times, satisfied the requirements to be retained and compensated under the Bankruptcy Code and Bankruptcy Rules.  In the Pre-March 2022 Cases, JW could not have disclosed what it did not know, and in the Post-March 2022 Cases, JW acted reasonably and responsibly to address an unprecedented situation once Ms. Freeman admitted to the secret relationship.  The U.S. Trustee's "kitchen sink" request, which seeks to ensure that JW is not compensated for any of its efforts in 33 challenged cases, is unsupported by law and contrary to the facts and equities in each case.  JW respectfully requests that the Court decline to grant the U.S. Trustee's requested relief in each of the challenged cases.

Dated: May 22, 2024

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Jason L. Boland*
Jason L. Boland, Bar No. 24040542
William Greendyke, Bar No. 08390450
Maria Mokrzycka, Bar No. 24119994
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
jason.boland@nortonrosefulbright.com
william.greendyke@nortonrosefulbright.com
maria.mokrzycka@nortonrosefulbright.com

Jason I. Blanchard, Bar No. 24130197
2200 Ross Ave., Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8274
Email: jason.blanchard@nortonrosefulbright.com

James A. Copeland (*admitted pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5471
Email: james.copeland@nortonrosefulbright.com

*Counsel for Jackson Walker LLP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason L. Boland*
Jason L. Boland

-88-